IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

─────────────────────────────

MARC LEWIS,

                    Plaintiff,

                                                    Civil Action No.
          v.                                        9:12-CV-0031 (GLS/DEP)

HAVERNACK, Sergeant, Mt. McGregor
Correctional Facility, *et al.,*

                    Defendants.

─────────────────────────────

APPEARANCES:                    OF COUNSEL:

FOR PLAINTIFF:

MARC LEWIS, *Pro Se*
95-A-2837
Cayuga Correctional Facility
P.O. Box 1186
Moravia, NY 13118

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN       GREGORY J. RODRIGUEZ, ESQ.
Office of the Attorney General  Assistant Attorney General
State of New York
Department of Law
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

*Pro se* plaintiff Marc Lewis, a New York State prison inmate with considerable prior litigation experience, has commenced this action against five corrections officers employed at the prison facility in which he was confined at the relevant times, pursuant to 42 U.S.C. § 1983, alleging deprivation of his civil rights.[1]  In his complaint, plaintiff alleges that he was assaulted by one of the defendants and denied medical attention for his injuries arising from the alleged assault, and that the defendants later conspired to conceal the alleged assault. As relief, plaintiff's complaint seeks recovery of $3 million in damages.

Currently pending before the court is a motion brought by the defendants seeking dismissal of plaintiff's complaint based on his failure to exhaust administrative remedies, and for failure to state a claim as it relates to all of plaintiff's causes of action with the exception of his Eighth Amendment

---

[1]　In his complaint Lewis acknowledges having brought several other actions in this court, as well as the Western and Southern districts.  *See* Complaint (Dkt. No. 1) at 4-5. A search of the Public Access to Court Electronic Records reveals that plaintiff has filed seven other actions, with varying results, including (1) *Lewis v. Martin et al.*, No. 1:94-CV-6873-SHS (S.D.N.Y., filed Sept. 21, 1994) (settled); (2) *Lewis v. DeShore et al.,* No. 1:94-CV-7574-SHS (S.D.N.Y., filed Oct. 19, 1994) (settled); (3) *Lewis v. Rodriguez, et al.,* No. 1:95-CV-3572-TPG (S.D.N.Y. filed May 18, 1995) (dismissed pursuant to 28 U.S.C. § 1915(d)); (4) *Lewis v. Irvin, et al.,* No. 1:97-CV-0789-JTE (W.D.N.Y., filed Oct. 8 1997) (summary judgment granted to the defendants); (5) *Lewis v. Johnson, et al.,* No. 9:08-CV-0482-ATB (N.D.N.Y. filed May 12, 2008) (partial verdict in favor of plaintiff after trial); (6) *Lewis, et al. v. Patterson, et al.,* No. 1:08-CV-1130-LEK-DRH (N.D.N.Y. filed Oct. 20, 2008) (dismissed, and subsequent appeal dismissed); and (7) *Lewis v. Murphy, et al.,* No. 9:12-CV-0268-NAM-CFH (N.D.N.Y., filed Feb. 12, 2012) (pending).

excessive force claim. For the reasons set forth below, I recommend that defendants' motion to dismiss for failure to exhaust be denied as premature, without prejudice, but that their motion otherwise be granted.

I.    BACKGROUND[2]

Plaintiff is a New York State prison inmate currently being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally* Complaint (Dkt. No. 1). While he is now incarcerated elsewhere, at the times relevant to his claims in this action, plaintiff was confined in the Mt. McGregor Correctional Facility ("Mt. McGregor"), located in Wilton, New York. *Id.*

During the week of February 19, 2009, plaintiff filed a complaint with Mt. McGregor Superintendent William T. Hagget, accusing corrections officers of stealing and consuming state food products. Complaint (Dkt. No. 1) at 6. Plaintiff was interviewed by a corrections lieutenant on February 14, 2009, concerning the complaint, and was advised that the matter would be addressed. *Id.*

---

[2]    In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546 (1964).

On February 15, 2009, plaintiff was subjected to an unauthorized search of his prison cell by several corrections officers, all of whom threatened him. Complaint (Dkt. No. 1) at 7. Plaintiff attributes the search and threats to his complaint to Superintendent Hagget concerning the conduct of corrections officers. *Id.* In the morning of February 16, 2009, plaintiff mailed another written complaint regarding corrections officers stealing and consuming state food products to Mt. McGregor Superintendent Hagget and DOCCS Commissioner Brian Fischer. *Id.* at 9.

On February 20, 2009, plaintiff was asked to voluntarily meet with defendant Havernack, a corrections sergeant, to discuss his complaints. Complaint (Dkt. No. 1) at 9. Believing the meeting to be a "set up," plaintiff refused to attend and retreated to his cell. *Id.* After returning to his cell, defendant Havernack and two other unidentified officers arrived at plaintiff's cell, placed him in handcuffs, and escorted him to the basement of Mt. McGregor's administration building. *Id.* at 10. Upon arriving, and while still in handcuffs, plaintiff was placed in a chair in front of a desk, behind which defendant Sheridan, a corrections lieutenant, was sitting. *Id.* At some point during the meeting defendant Sheridan stood up, walked behind plaintiff, and struck plaintiff on the right side of the face with a closed fist, rendering Lewis

4

unconscious and knocking him out of his chair. *Id.* at 12. As a result of the incident, Lewis experienced injuries to his right upper facial cheek and lower eyelid, as well as his left upper facial cheek. *Id.* Upon returning to consciousness, plaintiff's several requests for medical attention were denied. *Id.* at 13-14.

Shortly following the incident, defendants Imfeld and Johnson, together with an unidentified corrections sergeant, escorted plaintiff to a waiting van, where he was transported out of Mt. McGregor. Complaint (Dkt. No. 1) at 15. As the van left the facility, plaintiff continued to complain of his injuries and request medical attention. *Id.* at ¶ 31. Those requests were denied. *Id.* Eventually, after plaintiff threatened to cause an accident if he was not provided medical attention, defendants Imfeld and Johnson returned the van to Mt. McGregor, where plaintiff was taken to the prison infirmary, and ultimately seen by medical personnel. *Id.* at 15-16.

## II.   PROCEDURAL HISTORY

Plaintiff's complaint in this action was filed on January 9, 2012. Complaint (Dkt. No. 1). That complaint names Corrections Sergeant Havernack, Corrections Lieutenant Sheridan, and Corrections Officers Chapman, Johnson and Imfeld, all of whom were stationed at Mt. McGregor at the relevant times,

as defendants, and sets forth five causes of action, including excessive force and deliberate indifference claims under the Eighth Amendment, a claim for conspiracy to violate his Eighth Amendment rights, and claims that are based upon alleged threats by defendants and the issuance of a false misbehavior report. *Id.*

In answer to plaintiff's complaint, defendants moved for its dismissal on July 3, 2012, arguing that plaintiff's claims are precluded based upon his failure to exhaust available administrative remedies, and additionally that all of his claims, except the excessive force claim, fail to state a claim upon which relief may be granted. Dkt. No. 30. Plaintiff has since responded in opposition to defendants' dismissal motion. Dkt. No. 42. In addition, plaintiff seeks leave, by motion filed on September 21, 2012, to file an amended complaint in the action. Dkt. No. 46. Plaintiff's motion for leave to amend has been opposed by defendants on the basis of futility. Dkt. No. 47.

The parties' cross-motions, which are now fully briefed and ripe for determination, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

   A.    Dismissal Standard

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure calls upon a court to gauge the facial sufficiency of that pleading using a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)).  Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. 677-78 (quoting Fed. R. Civ. P. 8(a)(2)).  While modest in its requirements, that rule commands that a complaint contain more than mere legal conclusions.  *See id.* at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citing *Twombly*, 550 U.S. at 555-56); *see also Cooper v. Pate*, 378 U.S. 546, 546

(1964); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint does not apply to legal conclusions. *Iqbal*, 556 U.S. at 678.

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *see also Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570) (alterations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant, whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson*, 551 U.S. at 94 ("'[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal

pleadings drafted by lawyers.'" (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)) (internal citation omitted)); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) ("[W]hen a plaintiff proceeds *pro se*, a court is obliged to construe his pleadings liberally." (internal quotation marks and alterations omitted)); *Kaminski v. Comm'r of Oneida Cnty. Dep't of Soc. Servs.*, 804 F. Supp. 2d 100, 104 (N.D.N.Y. 2011) (Hurd, J.) ("A pro se complaint must be read liberally.").

### B.  Exhaustion of Remedies

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is . . . mandatory.  Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04-CV-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits

brought under Section 1983.").[3]  "[T]he PLRA's exhaustion requirement applies

to all inmate suits about prison life, whether they involve general circumstances

or particular episodes, and whether they allege excessive force or some other

wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The failure of a prisoner to satisfy the PLRA's exhaustion requirement is

an affirmative defense that must be raised by a defendant in response to an

inmate suit.  *Jones v. Block*, 549 U.S. 199, 212 (2007).  In the event the

defendant establishes that the inmate plaintiff failed "to fully complete[] the

administrative review process" prior to commencing the action, the plaintiff's

complaint is subject to dismissal.  *Pettus v. McCoy*, No. 04-CV-0471, 2006 WL

2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548

U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires

proper exhaustion.").  "Proper exhaustion" requires a plaintiff to procedurally

exhaust his claims by "compl[ying] with the system's critical procedural rules."

*Woodford*, 548 U.S. at 95; *see also Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir.

2007) (citing *Woodford*).

Here, defendants argue that plaintiff's claims are barred based upon

plaintiff's alleged failure to comply with the exhaustion requirement pursuant to

---

[3]      Copies of all unreported decisions cited in this document have been appended
for the convenience of the *pro se* plaintiff.

the PLRA.  Defs.'s Memo. of Law (Dkt. No. 30, Attach. 1) at 5-7.  In support, defendants have filed a declaration from Jeffrey Hale, the Assistant Director of the Inmate Grievance Program with DOCCS, who avers that, based on an examination of DOCCS's records, plaintiff "did not pursue a grievance appeal to CORC regarding an incident date of February 15, 2009[,] or February 20, 2009, including the issues presented in this action[.]"  Hale Decl. (Dkt. No. 30, Attach. 3) at ¶ 4.  In response, plaintiff concedes that he did not file a grievance with regard to the alleged assault on February 20, 2009, because he argued these issues, instead, "at his multiple hearing proceedings," including "Superintendent hearing proceedings" – which I have presumed to be a reference to a disciplinary hearing – and his administrative appeal to the Commissioner.  Plf.'s Memo. of Law (Dkt. No. 42) at 9-10.

The exhaustion defense is one that is not particularly well-suited for resolution for a motion to dismiss, absent the clearest indication in a plaintiff's complaint that a failure to exhaust has occurred.  *See*, *e.g.*, *Laporte v. Fisher*, No. 11-CV-9458, 2012 WL 5278543, at *5 (S.D.N.Y. Oct. 24, 2012) ("Dismissal pursuant to Rule 12(b)(6) for failure to exhaust is thus appropriate only where nonexhaustion is apparent from the face of the complaint." (citing *McCoy v. Goord*, 255 F. Supp. 2d 233, 251, (S.D.N.Y. 2003)).  In this instance, plaintiff's

complaint alleges that he filed more than one grievance related to the facts in his complaint, and that his grievance was denied. Complaint (Dkt. No. 1) at 4. Plaintiff's complaint also alleges that he filed complaints to the DOCCS Commissioner, as well as the Superintendent at Mt. McGregor. *Id.* Considering these allegations, which are contained in the four corners of plaintiff's complaint, I conclude that there is sufficient doubt as to whether plaintiff exhausted his administrative remedies to deny defendants' motion to dismiss on this ground. *See Laporte*, 2012 WL 5278543, at *5 (holding that, absent a clear indication from the face of the complaint that a plaintiff has failed to exhaust, dismissal pursuant to Rule 12(b)(6) is not appropriate).

While defendants have submitted extrinsic evidence, including the Hale declaration, calling into question plaintiff's representation that exhaustion has been accomplished, such extrinsic materials are not properly considered on a motion to dismiss. It is true that one potential course would be to convert the motion into one for summary judgment, pursuant to Rule 12(d), so that the extrinsic materials would then properly be considered. *See McCoy*, 255 F. Supp. 2d at 251 ("If nonexhaustion is not clear from the face of the complaint, a defendant's motion to dismiss should be converted . . . to one for summary judgment limited to the narrow issue of exhaustion and the relatively

straightforward questions about the plaintiff's efforts to exhaust, whether remedies were available, or whether exhaustion might be, in very limited circumstances, excused."). I recommend against conversion, however, since the plaintiff has not been put on notice that such a conversion was a possibility, or of the possible consequences of such a conversion. *See Hernandez v. Coffey*, 582 F.3d 303, 308 (2d Cir. 2009) ("[A]bsent a clear indication that the *pro se* litigant understands the nature and consequences of Rule 56 [governing motions for summary judgment] . . . he or she must be so informed by the movant in the notice or, failing that, by the district court.").

Moreover, although plaintiff has apparently conceded that he did not "proper[ly] exhaust[]" his claims, *Woodford*, 548 U.S. at 95, relating to the February 20, 2009 incident, he argues that he satisfied his exhaustion obligation by making his arguments during "multiple hearing proceedings," including "Superintendent hearing proceedings" and on appeal after he was found guilty. Plf.'s Memo. of Law (Dkt. No. 42) at 9. I note that "under certain circumstances, an inmate may exhaust his administrative remedies by raising his claim during a related disciplinary proceeding." *Murray v. Palmer*, No. 03-CV-1010, 2010 WL 1235591, at *3 (Mar. 31, 2010) (Suddaby, J.) (emphasis omitted), *accord*, *Barksdale v. Frenya*, No. 10-CV-0831, 2012 WL 4107805, at *8 (N.D.N.Y. Sept.

19, 2012) (Peebles, M.J.), *adopted in its entirety by* 2012 WL 4107801 (D'Agostino, J.); *but see LaBounty v. Johnson*, 253 F. Supp. 2d 496, 501-02 (W.D.N.Y. 2003) ("An appeal from a disciplinary hearing does not satisfy the grievance exhaustion requirement for a [constitutional] claim, even if the hearing is based on the same set of facts underlying the grievance." (citing *McNair v. Sgt. Jones*, No. 01-CV-3253, 2002 WL 31082948, at *7 (S.D.N.Y. Sept. 18, 2002)). Because the reasons for plaintiff's choice to pursue his complaints through a disciplinary proceeding are far from clear at this early stage of the action, I am unable to make a determination as to whether plaintiff may be excused from properly exhausting his administrative remedies.

For all of these reasons, I recommend that defendants' motion to dismiss on the basis of plaintiff's alleged failure to exhaust be denied, without prejudice to defendants' right to raise the defense at a point when it can be analyzed based upon a more fully developed record.

C.   Eleventh Amendment

Plaintiff's complaint alleges that, at the relevant times, the named defendants were acting both in their individuals and official capacities in violating the plaintiff's constitutional rights. Complaint (Dkt. No. 1) at 1. In their motion to dismiss, defendants argue that, to the extent they are sued in their official

capacities, plaintiff's claims are precluded under the Eleventh Amendment. Defs.' Memo. of Law (Dkt. No. 30) at 7-8.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974); *Cory v. White*, 457 U.S. 85, 90-91 (1982); *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993). This absolute immunity, which states enjoy under the Eleventh Amendment, extends to both state agencies and state officials sued for damages in their official capacities when the essence of the plaintiff's claim seeks recovery from the state as the real party in interest.[4] *See, e.g., Daisernia v. State of New York*, 582 F. Supp. 792, 798-99 (N.D.N.Y. 1984) (McCurn, J.) ("[A] suit which seeks a money judgment 'which must be paid from the state treasury is barred by the Eleventh Amendment,' even though it is nominally asserted against an individual official." (quoting *Edelman*, 415 U.S. at 663)); *see also Richards v. State of New York App. Div., Second Dep't*, 597 F. Supp. 689, 691 (E.D.N.Y. 1984) (citing, *inter alia*, *Cory v. White*, 457 U.S. 85, 89-91,

---

[4]    In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. As the Supreme Court has reaffirmed, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham Cnty.*, 547 U.S. 189, 193 (2006).

(1982)).  "To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."[5] *Ying Jing Gan*, 996 F.2d at 529; *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State.").

Plaintiff's damage claims in this action against the named-defendants in their official capacities are, in reality, claims against the State of New York. *Daisernia*, 582 F. Supp. at 798-99.  They are therefore subject to dismissal. Accordingly, I recommend that, to the extent that any of the claims asserted in plaintiff's complaint are asserted against any of the named-defendants in their official capacities, those claims be dismissed with prejudice.

D.     Deliberate Medical Indifference

Plaintiff's complaint alleges that he requested and was denied immediate medical treatment by various correctional officers, including defendants Imfeld and Johnson, after he was allegedly punched and rendered unconscious by defendant Sheridan on February 20, 2009.  Complaint (Dkt. No. 1) at 13-14.

---

[5]     By contrast, the Eleventh Amendment does not preclude lawsuits seeking to impose individual or personal liability on state officials under section 1983.  *Hafer v. Melo*, 502 U.S. 21, 30-31 (1991).

Plaintiff's complaint also alleges that he was not provided medical assistance until, while being transferred out of Mt. McGregor and into another facility, he threatened to cause an accident on the highway if defendants Imfeld and Johnson did not return him to the Mt. McGregor infirmary. *Id.* at 15-16. Defendants argue that the nature of plaintiff's alleged injuries and the modest delay in providing plaintiff medical treatment do not give rise to a plausible claim for medical indifference. Defs.' Memo. of Law (Dkt. No. 30, Attach. 1) at 8-10.

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society[,]' or which 'involve the unnecessary and wanton infliction of pain[.]'" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) and *Gregg v. Georgia*, 428 U.S. 153, 169-73 (1976) (internal citations omitted)). While the Eighth Amendment "'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)).

"These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle,* 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst

cases, . . . may actually produce physical torture or lingering death, [and] . . . [i]n less serious cases, . . . may result in pain and suffering no one suggests would serve any penological purpose." *Id.*

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, 697 F. Supp. 2d 344, 356 (E.D.N.Y. 2010). To satisfy the objective requirement, the Second Circuit has said that

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care . . . . Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

*Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006) (internal citations omitted).

The second inquiry of the objective test requires a court to look at the seriousness of the inmate's medical condition if the plaintiff alleges a complete failure to provide treatment. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir.

2003).  "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain."  *Salahuddin*, 467 F.3d at 280 (internal quotation marks and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition.  *Salahuddin*, 467 F.3d at 280.  "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone."  *Id.* (quoting *Smith*, 316 F.3d at 185) (internal quotations marks omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'"  *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).  "In medical-treatment cases . . ., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the

plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280.  "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer,* 511 U.S. at 837); *see also Leach v. Dufrain,* 103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Farmer*); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (same).  "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40).

Applying this legal framework to this action, I conclude that plaintiff's complaint fails to allege facts that plausibly satisfy either the objective or subjective requirements.  First, although plaintiff's complaint alleges that defendants Imfeld and Johnson denied him medical care shortly after he regained consciousness, it does not provide a time frame indicating how long they denied plaintiff medical care.  *See generally* Complaint (Dkt. No. 1) at 13-16..  Plaintiff's complaint does show that, at some point after, and on the same day of, the alleged assault by defendant Sheridan, he was treated at the Mt. McGregor infirmary for his injuries.  *Id.* at 16.  Accordingly, I am unable to

determine whether the facts alleged plausibly suggest that defendants Imfeld and Johnson acted unreasonably under the circumstances as it relates to how quickly they provided plaintiff with medical treatment.  *See Salahuddin*, 467 F.3d at 279-80 ("Thus, prison officials who act reasonably in response to an inmate-health risk cannot be found liable under the Cruel and Unusual Punishment Clause[.]" (internal quotation marks and alterations omitted)); *see also Herbert v. NYC Dep't of Corrs.*, No. 10-CV-8799, 2012 WL 3834660, at *4 (S.D.N.Y. Aug. 21, 2012) (finding that the plaintiff's complaint failed to state a claim for deliberate indifference where the plaintiff "concede[d] . . . that he ultimately did receive medical treatment on the same days that he alerted Captains Williams and Brown to his condition"); *Sonds v. St. Barnabas Hosp. Corr. Health Svcs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. May 21, 2001) (finding that the plaintiff's complaint failed to state a claim for deliberate indifference where the plaintiff suffered an injury to his finger and waited for three and one-half hours for treatment).

    In addition, and more persuasively, plaintiff's complaint fails to allege facts plausibly suggesting that the alleged denial of medical care was "sufficiently serious."  *See Salahuddin*, 467 F.3d at 280 (requiring, when conducting the objective test, to determine, at the second inquiry, whether "the inadequacy of

medical care is sufficiently serious"). To make this determination when a

plaintiff, as in this case, alleges a "failure to provide any treatment," the court

"examine[s] whether the inmate's medical condition is sufficiently serious." *Id.*

(citing *Smith*, 316 F.3d at 185-86). Plaintiff's complaint alleges only that he

suffered injuries to his "upper facial cheek and lower eyelid, as well as [his] left

upper cheek" after being punched just once. Complaint (Dkt. No. 1) at 12.

These allegations regarding his injuries do not plausibly suggest that plaintiff's

daily activities were "significantly affect[ed]," or that his condition "cause[d]

chronic or substantial pain." *See Chance v. Armstrong*, 143 F.3d 698, 702 (2d

Cir. 1998) (listing that some of the factors relevant to determining the

seriousness of a medical condition include "the presence of a medical condition

that significantly affects an individual's activities[,] or the existence of a chronic

and substantial pain"). In addition, these allegations suggest plaintiff suffered

only minor injuries, which are not sufficiently serious to state a deliberate

indifference claim under the Eighth Amendment. *See, e.g., Harris v. Morton*,

No. 05-CV-1049, 2008 WL 596891, at *3, n.2 (N.D.N.Y. Feb. 29, 2008) (Kahn,

J. and Treece, M.J.) (noting that, although plaintiff stated he suffered from a

"snapped" neck, he had not indicated that he suffered from anything other than

a generic neck injury); *Bennett v. Hunter*, No. 02-CV-1365, 2006 WL 1174309,

*3 (N.D.N.Y. May 1, 2006) (Scullin, S.J. and Lowe, M.J.) (finding that a pinched nerve in one's wrist is not a serious medical need); *Jones v. Furman*, No. 02-CV-939F, 2007 WL 894218, at *10 (W.D.N.Y. Mar. 21, 2007) (finding that soreness, pain in, and a lump behind, his right ear, lump on the back of his head, small abrasions on his nose and knuckle, and bruising to his back, ribs, and legs, do not constitute the requisite serious medical need) (citing *Hemmings v. Gorczyk*, 134 F.3d 104, 109 (2d Cir.1998)); *Tapp v. Tougas*, No. 05-CV-0149, 2008 WL 4371766, at * 9 (N.D.N.Y. Aug. 11, 2008) (Peebles, M.J.), *Report and Recommendation Adopted in Part and Rejected in Part,* 2008 WL 4371762 (N.D.N.Y. Sept. 18, 2008) (Mordue, C.J.), (noting that a "dull pain" in plaintiff's back and kidney area and persistent rash on plaintiff's foot did not raise a constitutional issue) (citing *Peterson v. Miller*, No. 04-CV-0797, 2007 WL 2071743, at *7 (N.D.N.Y. July 13, 2007) (Hurd, J. and Peebles, M.J.); *Salaam v. Adams*, No. 03-CV-0517, 2006 WL 2827687, *10 (N.D.N.Y. Sept. 29, 2006) (Kahn, J. and Lowe, M.J.) (finding that plaintiff's injuries did not constitute a serious medical condition where plaintiff suffered from intermittent back pain requiring pain relievers and physical therapy, a gastrointestinal problem with stomach pains, and a psychological problem requiring Wellbutrin and/or Neurontin); *see also Ford v. Phillips*, No. 05-CV-6646, 2007 WL 946703, at *12

& n.70 (S.D.N.Y. Mar. 27, 2007) (finding that plaintiff's allegations of bruises, abrasions, slight bleeding, and scratches, did not constitute a sufficiently serious condition giving rise to a medical indifference claim); *Sonds*, 151 F. Supp. 2d at 311 (holding that a cut finger, even where the skin had "ripped off" was insufficiently serious); *Bonner v. New York City Police Dep't*, No. 99-CV-3207, 2000 WL 1171150, at *4 (S.D.N.Y. Aug. 17, 2000) (holding that the inability to "close" a finger due to swelling in one's hand is insufficiently serious to constitute Eighth Amendment violation); *Gomez v. Zwillinger*, 1998 U.S. Dist. LEXIS 17713, at *16 (S.D.N.Y. November 6, 1998) (holding that back pain and discomfort were not sufficiently serious); *Jones v. New York City Health & Hosp. Corp.*, No. 84-CV-5372, 1984 WL 1280 at *1 (S.D.N.Y. November 28, 1984) (dismissing claim for deliberate medical indifference where plaintiff challenged treatment for bruises on head and body). Even construing his complaint in the light most favorable to plaintiff, I am unable to conclude that the allegations meet the objective test for a deliberate indifference claim.[6]

---

[6] While not considered in making a recommendation concerning defendants' dismissal motion, the medical records submitted by plaintiff in opposition to the pending motion substantiate defendants' contention that, as a result of the alleged assault, Lewis did not suffer a "sufficiently serious" medical condition. *See* Plaintiff's Response (Dkt. No. 46) at 40-42; *see also Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (Hurd, J.) ("[I]n cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider matters outside of the complaint to the extent they 'are consistent with the allegations in the complaint.'"). Those records reveal that, as a result of defendant Sheridan's alleged actions, Lewis suffered from only moderate swelling to his cheek and

Finally, even if I were to find that the allegations in plaintiff's complaint satisfy the objective test, they would not meet the subjective test.  There are simply no allegations in plaintiff's complaint to plausibly suggest that, in denying plaintiff's requests for medical care, defendants Imfeld and Johnson acted with "deliberate indifference."  *Salahuddin*, 467 F.3d at 280.  The complaint, in contrast, alleges only that defendants Imfeld and Johnson denied plaintiff's request for medical care "after seeing [plaintiff's] injuries."  Complaint (Dkt. No. 1) at 14.  Bearing in mind that plaintiff's complaint provides little details as to the nature of his injuries, and only alleges that Lewis sustained an injury to his cheeks and an eyelid, I cannot conclude that, even assuming that defendants Imfeld and Johnson did deny plaintiff's medical care, that they were "actually aware of a substantial risk" to plaintiff's health in so doing.  *See Salahuddin*, 467 F.3d at 280 (holding that deliberate indifference "requires that the charged official act . . . while actually aware of a substantial risk that serious inmate harm will result").

For all of these reasons, I recommend that defendants' motion to dismiss for failure to state a claim be granted as to plaintiff's deliberate indifference claim

---

eyelid, with no other evidence of injury or trauma.  Plf.'s Response (Dkt. No. 46) at 41.  They also note that, during the examination, plaintiff was argumentative and refused ice offered to address his swelling.  *Id.* at 40.

against defendants Imfeld and Johnson.

      E.    <u>Plaintiff's Claims of Threats and Harassment</u>

Plaintiff's complaint alleges that, on February 15, 2009, as a prelude to the assault by defendant Sheridan, he was threatened and harassed by corrections officers, including defendant Havernack. Complaint (Dkt. No. 1) at 7. In their motion, defendants also seek dismissal of any claims that may be asserted by those allegations. Defs.' Memo. of Law (Dkt. No. 30, Attach. 1) at 10-11.

It is well recognized that "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley*, 261 F. Supp. 2d 113, 129 (N.D.N.Y. 2003); *Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 474 (S.D.N.Y. 1998). Thus, "[v]erbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation." *Carpio v. Walker*, No. 95-CV-1502, 1997 WL 642543, at *6 (N.D.N.Y. Oct. 15, 1997) (Pooler, J. and DiBianco, M.J.) (citing *Purcell*, 790 F.2d at 165 (holding that name-calling is insufficient to allege a constitutional violation)); *see also Moncrieffe v. Witbeck*, No. 97-CV-253, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (Mordue, J.) (finding allegations that the defendants laughed at the plaintiff while he showered did not give rise to liability under section 1983); *Alnutt v. Cleary*, 913

F. Supp. 160, 165 (W.D.N.Y. Jan. 8, 1996) ("It is well established that[] mere threatening language and gestures of a custodial officer do not, even if true, amount to constitutional violations.").

In this instance, because plaintiff's allegations of threats are insufficient to support a claim under section 1983, I recommend that defendants' motion to dismiss as it relates to plaintiff's claims of verbal threats against defendant Havernack be granted.

F.    Conspiracy

Plaintiff's complaint alleges the existence of a conspiracy among the defendants and other prison officials to cover-up the events giving rise to this action and falsify official documents in order to suggest that plaintiff's injuries were self-inflicted.  Complaint (Dkt. No. 1) at 13, 16.  Specifically, plaintiff alleges that defendants Chapman and Imfeld conspired to violate his constitutional rights when they allegedly drafted a false misbehavior report accusing Lewis of self-inflicting the injuries, which plaintiff alleges, resulted from defendant Sheridan's assault.  *Id.* at 16.  Plaintiff also alleges that defendant Sheridan and Havernack conspired to conceal defendant Sheridan's alleged assault on plaintiff by moving plaintiff into a different room after the alleged assault, and refusing to provide plaintiff with immediate medical care.  *Id.* at 13.

Defendants seek dismissal of these claims, arguing that plaintiff's complaint fails to allege facts plausibly suggesting a conspiracy, and, in any event, the claims are barred by the intra-agency conspiracy doctrine.  Defs.' Memo. of Law (Dkt. No. 30, Attach. 1) at 11-12.

"To prove a [section] 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *Malsh v. Austin*, 901 F. Supp. 757, 763 (S.D.N.Y. 1995).  "A complaint containing only conclusory, vague, or general allegations of a conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss."  *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983).

As it relates to plaintiff's claim of conspiracy against defendants Chapman and Imfeld, "a prison inmate has no general right to be free from being falsely accused in a misbehavior report."  *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997); *see also Applewhite v. Sheahan*, No. 08-CV-6045, 2013 WL 144957, at *10 (W.D.N.Y. Jan. 11, 2013) (dismissing the plaintiff's claim arising from allegations that the defendant filed a false misbehavior report against the

plaintiff to disguise the fact that the defendant stole the plaintiff's legal books). "There must be more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie*, 105 F.3d at 862. Where an alleged false misbehavior report is filed against a prisoner, his "due process rights are protected if he is granted a hearing on the charges and given an opportunity to rebut them[.]" *Jones v. Coughlin*, 45 F.3d 677, 679 (2d Cir. 1995).

Here, the allegation that defendants Chapman and Imfeld conspired to file a false misbehavior report against plaintiff is not cognizable under section 1983 because plaintiff has no general constitutional right to be free from being falsely accused in a misbehavior report. *See Boddie*, 105 F.3d at 862 (dismissing the plaintiff's conspiracy claim arising from allegations that the defendants conspired to retaliate against him by filing a false misbehavior report). For this reason, I recommend defendants' motion to dismiss be granted as it relates to plaintiff's conspiracy claim asserted against defendants Chapman and Imfeld.

As it relates to the conspiracy claim against defendants Sheridan and Havernack, I likewise find that plaintiff has failed to state a claim because there is no constitutional right to be free from the cover-up of a past constitutional violation. Generally, the case law that addresses allegations that a defendant conspired to conceal a violation of a plaintiff's constitutional rights assess

whether the allegations are sufficient to state a claim of conspiracy for denying the plaintiff's constitutional right to access the courts. *See*, *e.g.*, *McGarty v. Town of Carmel*, 997 F. Supp. 435, 437 (S.D.N.Y. 1998) (finding that, "for purposes of a motion to amend, plaintiff has made an adequate showing of deprivation of access to courts, and plaintiff's assertions are sufficient to state a [section] 1983 conspiracy claim" where the pleadings alleged that the defendants conspired to conceal evidence that they used excessive force). Here, however, plaintiff has failed to allege any facts that plausibly suggest that his right to access the courts has been denied. Indeed, plaintiff's complaint fails to allege any facts that plausibly suggest that any of plaintiff's constitutional rights have been violated as a result of the alleged conspiracy between defendants Sheridan and Havernack to conceal defendant Sheridan's alleged assault. For this reason, I recommend that defendants' motion to dismiss plaintiff's conspiracy claim as against defendants Sheridan and Havernack be granted.

For the sake of completeness, I will also briefly address whether plaintiff's conspiracy claims are barred, as argued by defendants, by the intracorporate conspiracy doctrine. That doctrine provides that "there is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single

corporation, acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." *See, e.g., Hermann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978); *see also Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008). While the Second Circuit has applied this doctrine in the context of claims arising under 42 U.S.C. § 1985, *see*, *e.g.*, *Hermann*, 576 F.2d at 459; *Girard v. 94th and Fifth Ave. Corp.*, 530 F.2d 66, 72 (2d Cir. 1976), it has not considered the doctrine's applicability to conspiracy claims arising under section 1983. *See Alvarez v. City of New York*, No. 11-CV-5464, 2012 WL 6212612, at *3 and n.21 (S.D.N.Y. Dec. 12, 2012) (finding that the Second Circuit has "applied the intracorporate conspiracy doctrine to Section 1985 claims[, b]ut it has not considered its applicability to conspiracy claims brought under Section 1983"); *see also Appel v. Spiridon*, No. 06-CV-1177, 2011 WL 3651353, at *19 (D. Conn. Aug. 18, 2011) (same). Because several district courts within this circuit have applied the doctrine to section 1983 claims,[7] and I have not found any controlling authority to the contrary, I find that the intracorporate conspiracy doctrine applies to the conspiracy claims against

---

[7]     *See Anemone v. Metro. Transp. Auth.*, 419 F. Supp. 2d 602, 603-04 (S.D.N.Y. 2006) ("In the absence of controlling contrary authority, this court will continue to apply the intracorporate conspiracy doctrine to Section 1983 claims because the doctrine's logic is sound."); *Jackson v. New York State*, 381 F. Supp. 2d 80, 90 (N.D.N.Y. 2005) (Munson, J.); *Kamara v. City of New York*, No. 03-CV-0337, 2005 WL 3113423, at *7 (E.D.N.Y Nov. 21, 2005); *Nat'l Congress for Puerto Rican Rights v. City of New York*, 75 F. Supp. 2d 154, 168-69 (S.D.N.Y. 1999).

defendants Chapman and Imfeld arising under section 1983.

As it relates to the conspiracy claims against defendants Sheridan and Havernack, however, I find that the "personal stake" exception to the intracorporate conspiracy doctrine precludes its applicability. Under this exception, the doctrine does not apply "to individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity." *Bond v. Bd. of Educ. of the City of New York*, No. 97-CV-1337, 1999 WL 151702, at *2 (E.D.N.Y. Mar. 17, 1999). For the exception to apply, "[t]he plaintiff must . . . allege that [the defendants] acted other than in the normal course of their corporate duties." *Girard*, 530 F.2d at 72 (internal quotation marks omitted). Here, plaintiff's complaint clearly alleges that defendants Sheridan and Havernack allegedly moved plaintiff from the location where he was allegedly assaulted while he was still unconscious and refused him immediate medical care in an attempt to conceal defendant Sheridan's alleged assault on plaintiff. Complaint (Dkt. No. 1) at 13. These allegations plausibly suggest that defendants Sheridan and Havernack acted in their own personal interest, not in the interest of DOCCS, in covering up defendant Sheridan's alleged excessive force. *See Hill v. City of New York*, 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005) (finding that the plaintiff's allegations that the

defendants conspired to cover-up one of the defendant's alleged use of excessive force was sufficient to apply the "personal stake" exception to the intracorporate conspiracy doctrine); *Alvarez*, 2012 WL 6212612, at *3 (same). I therefore recommend a finding that the intracorporate conspiracy doctrine does not apply to plaintiff's conspiracy claims against defendants Sheridan and Havernack.

### G.    Plaintiff's Motion for Leave to Amend

In response to defendants' motion, plaintiff has requested leave to amend to his complaint. Dkt. No. 46. In his proposed amended complaint, plaintiff eliminates the claims of threats and conspiracy. *See generally* Dkt. No. 46, Attach. 2. However, the proposed amended complaint retains a medical indifference claim against defendants Sheridan, Chapman, Imfeld, and Johnson. *Id.* at 13. Defendants oppose plaintiff's motion for leave to amend, arguing that the claims set forth in his proposed amended complaint are futile in light of his failure to exhaust administrative remedies, and that the allegations set forth in that pleading do not cure the deficiencies as it relates to the medical indifference cause of action. Dkt. No. 47 at 4-11.

Motions for leave to amend are governed by Rule 15(a) of the Federal Rules of Civil Procedure which provides, in pertinent part, that unless

amendment as a matter of right is permitted – circumstance that is not applicable here – a party may amend its pleading "only with the opposing party's written consent or the court's leave. Fed. Riv. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id.* Under Rule 15(a), leave to amend ordinarily should be liberally granted absent undue delay, bad faith, dilatory tactics, undue prejudice in being served with the proposed pleading, or futility. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Elma RT v. Landesmann Int'l Mktg. Corp.,* No. 98-CV-3662, 2000 WL 297197, at *3 (S.D.N.Y. Mar. 22, 2000) (citing *Foman*).

Notwithstanding the familiar and well accepted principle that leave to amend should be granted freely, if a claim contained in a proposed amended complaint would be vulnerable in the face of a Rule 12(b)(6) motion, then permitting amendment would be an act of futility that should not be sanctioned. *See, e.g., Saxholm AS v. Dynal, Inc.,* 938 F. Supp. 120, 124 (E.D.N.Y. 1996); *In re Boesky Sec. Litig.,* 882 F. Supp. 1371, 1379 (S.D.N.Y. 1995). If, on the other hand, a "proposed claim sets forth facts and circumstances which may entitle the plaintiff to relief, then futility is not a proper basis on which to deny amendment." *Saxholm*, 938 F. Supp. at 124 (citing *Allstate Ins. v. Administratia Asigurarilor De Stat,* 875 F. Supp. 1022, 1029 (S.D.N.Y. 1995)).

As is the case with respect to his original complaint, plaintiff's proposed amended complaint sets forth a plausible cause of action for the use of excessive force as against defendant Sheridan.[8]   Dkt. No. 46, Attach. 2 at 6. Moreover, plaintiff's proposed amended complaint, like his original complaint, alleges that plaintiff fulfilled his obligation to exhaust administrative remedies before filing suit.  Dkt. No. 46, Attach. 2 at 3-4.  The proposed amended complaint similarly asserts a medical indifference claim, as does its predecessor, but does not cure the deficiencies identified in this report and recommendation.  For example, plaintiff's proposed amended complaint fails to allege facts plausibly suggesting that his injuries were "sufficiently serious."  *See*

_____

[8]         The amended complaint also alleges the failure on the part of other corrections officers to intervene and protect him from the assault.  A corrections officer who did not participate in an assault upon an inmate, but was present while it occurred, may nonetheless bear responsibility for any resulting constitutional deprivation.  *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).  A law enforcement official is under an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers.  *See Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be used."); *Anderson*, 17 F.3d at 557; *Mowry v. Noone,* No. 02-CV-6257, 2004 WL 2202645, at *4 (W.D.N.Y. Sept. 30, 2004).  In order to establish liability on the part of a defendant under this theory, the plaintiff must adduce evidence establishing that (1) the officer had a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene.  *Henry v. Dinelle*, No. 9:10-CV-0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.) (citing *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008).   Mere inattention or inadvertence, it should be noted, does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene.  *Cf., Schultz v. Amick*, 955 F. Supp. 1087, 1096 (N.D. Iowa 1997) (finding that "liability in a [section] 1983 'excessive force' action cannot be founded on mere negligence") (citing, *inter alia*, *Daniels v. Williams*, 474 U.S. 327, 335-36, 106 S. Ct. 662, 667 (1986)).

*Salahuddin*, 467 F.3d at 280 (finding that, to determine whether "the inadequacy of medical care is sufficiently serious" when a plaintiff alleges "failure to provide any treatment," the court "examine[s] whether the inmate's medical condition is sufficiently serious.").  Instead, plaintiff's proposed amended complaint alleges only that his face "swelled up . . . with his right eye shut closed" and that he experienced pain as a result of his injuries.  Dkt. No. 46, Attach. 2 at 8.  As a result, I find that it would be futile to permit plaintiff to file his proposed amended complaint, and therefore recommend that his motion for leave to amend be denied.

H.    <u>Whether to Permit Further Amendment</u>

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend *at least* once "when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir.1991); *see also* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (permitting leave to replead granted where court could "not determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy").  Given the procedural history of this action, I must next determine whether to

recommend that plaintiff be afforded the benefit of this general rule.

As plaintiff seemingly recognizes, and as is reflected in his proposed amended complaint, the claims arising from allegations of the issuance of false misbehavior reports, harassment, threatening conduct, and conspiracy are not plausibly stated, nor are they likely to be in any future amended complaint. *See generally* Dkt. No. 46, Attach. 2. In contrast, while I also have significant reservations as to plaintiff's ability to state facts demonstrating the existence of a cognizable medical indifference claim for the reasons set forth above, I nonetheless recommend that he be granted leave to amend in order to attempt to plead facts that would support such a claim.

In formulating a new, amended complaint, plaintiff is advised that the law in this circuit clearly provides that "'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.'" *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (McAvoy, J.) (quoting *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987)); *Pourzandvakil v. Humphry*, No. 94-CV-1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J.). In his amended complaint, plaintiff therefore must clearly set forth the facts that give rise to the claim, including the dates, times,

and places of the alleged underlying acts, and each individual who committed each alleged wrongful act.  In addition, the revised pleading should specifically allege facts demonstrating the specific involvement of each of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations.  *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)

## IV.    SUMMARY AND RECOMMENDATION

Plaintiff's complaint in this action states a plausible claim for use of excessive force against defendant Sheridan.  However, his complaint fails to state a cognizable claim for medical indifference, filing a false misbehavior report, threats and harassment, and conspiracy against any of defendants.[9]  I therefore recommend dismissal of those claims, with leave to file a proposed amended complaint, in accordance with the local rules of practice for this court,

---

[9]        In their motion, defendants also address a potential due process claim arising from plaintiff's allegation that he was issued a false misbehavior report by corrections officials during the relevant time.  Defs.' Memo. of Law (Dkt. No. 30, Attach. 1) at 12-13.  As discussed above in connection with plaintiff's conspiracy claim against defendants Chapman and Imfeld, the mere allegation that a false misbehavior report has been filed against an inmate does not implicate constitutional conduct.  *Boddie*, 105 F.3d at 862; *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir. 1986).  "There must be more, such as retaliation against the prisoner for exercising a constitutional right."  *Boddie*, 105 F.3d at 862; *see also Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988).  In this instance, none of the allegations contained in plaintiff's complaint plausibly suggest that the alleged misbehavior report was issued to further a violation of plaintiff's constitutional rights.  As a result, I recommend that this claim, to the extent it is asserted in plaintiff's complaint, be dismissed.

with respect to the plaintiff's medical indifference claim only.

Turning to defendants' argument that plaintiff's complaint should be dismissed on the basis of plaintiff's alleged failure to exhaust his administrative remedies, I conclude that the issue cannot be determined at this early stage of the litigation. As a result, I recommend that this portion of defendants' motion be denied, without prejudice to renewal upon a more robust record, either on motion for summary judgment or at trial.

Based upon the foregoing it is therefore hereby respectfully

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 30) be GRANTED, and that all of plaintiff's claims, except those based upon defendant Sheridan's alleged assault of plaintiff, asserted against defendants in their individual and official capacities be DISMISSED; and it is further

RECOMMENDED that plaintiff be given leave to replead only with respect to his deliberate medical indifference cause of action; and it is further

RECOMMENDED that plaintiff's motion for leave to amend (Dkt. No. 46) be DENIED, without prejudice to his right to submit an amended complaint to the court that cures the deficiencies identified in this report and recommendation.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk

of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:    January 23, 2013
          Syracuse, New York

David E. Peebles
U.S. Magistrate Judge



Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

C  Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that
Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff [FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and filed
the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski, 430 F.3d 560, 562 (2d
Cir.2005)*(deeming *pro* se prisoner's § 1983
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
the operative date is between August 27, 2004
and September 20, 2004. As discussed, *infra,*
both of these dates occur before Hargrove
properly exhausted the administrative remedies
available to him at NCCF.

FN2. The Nassau County University Medical
Staff are employed by the Nassau Health Care
Corporation ("NHCC"). Pursuant to the
Correctional Center Health Services Agreement
between the County of Nassau and NHCC, dated
September 24, 1999, NHCC provides medical
services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis** Testing at NCCF

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.[FN4] Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a (1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis** Testing at NCCF

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.[FN5] Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

(3)

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. [FN6] The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

[FN6.] Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8]*Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9]*Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

FN8. Hargrove has not argued that he was unaware of this five-day deadline.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

(4)

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

> FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

*4 A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated

documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

*5 Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,*

--- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).*See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth,* 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford,* 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock,* 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero,* 467 F.3d at 176 (quoting *Woodford,* 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2382).

**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams,* 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca,* No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

**\*7** Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero,* 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford,* 126 S.Ct. at 2382).

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

> FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams, 418 F.Supp.2d at 101, 102* (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams, 418 F.Supp.2d at 101* (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by *42 U.S.C. § 1997e(a)* unless Hargrove can establish excuse for his failure to exhaust.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(4)**

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

*\*8* Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at *8-11;Sloane,* 2006 WL 3096031, at *4;Williams, 418 F.Supp.2d at 101.* Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero, 467 F.3d at 175;Collins v. Goord, 438 F.Supp.2d 399, 411 (S.D.N.Y.2006)* ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by *Section 1997e(a)* of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

> FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero, 467 F.3d at 175-76* (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law"). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6,

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14]*Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs.' Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

### c. Special circumstances

*10 Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " Hemphill, 380 F.3d at 688 (quoting Giano, 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." Giano, 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. See Sloane, 2006 WL 3096031, at *8; Freeman v. Goord, No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

**(5)**

**Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice**

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." Woodford, 126 S.Ct. at 2385. See also Ruggiero, 467 F.3d at 178 (citing Porter, 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. Berry v. Kerik, 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." Berry, 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests were given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. Berry, 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

*11 Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. Shangold v. The Walt Disney Co., No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." Gleason v. Jandrucko, 860 F.2d 556, 559 (2d Cir.1988); McMunn v. Mem'l Sloan-Kettering Cancer Center, 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the presentation of the opposing party's claim or defense." *McMunn*, 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold,* 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn*, 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn,* 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold,* 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic,* 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn,* 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

### Conclusion

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))



C

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
No. 9:04-CV-0471.

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney General, The Capitol Albany, NY, for Defendants.

### DECISION and ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff commenced the instant action asserting various violations of his constitutional rights arising out of his placement at the Southport Correctional Facility. In his Complaint, Plaintiff alleges that he was improperly sent to the Special Housing Unit ("SHU") at a maximum security facility and that being in SHU has put his life in jeopardy. Currently before the Court is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 seeking dismissal of the Complaint in its entirety for failure to exhaust administrative remedies.

### I. FACTS[FN1]

FN1. The following facts are taken from Defendants' statement of material facts submitted pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts are deemed admitted because they are supported by the record evidence and Plaintiff failed to submit an opposing statement of material facts as required by Rule 7.1(a)(3). Plaintiff was specifically advised by Defendants of his obligation to file an opposing statement of material facts and to otherwise properly respond to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State Department of Correctional Services. Plaintiff signed the instant Complaint on April 7, 2004. On his Complaint form, Plaintiff indicated that there is a grievance procedure available to him and that he availed himself of the grievance procedure by filing a complaint with the IGRC [FN2], followed by an appeal to the superintendent of the facility, and then to the Central Office Review Committee in Albany. The Complaint indicates that Plaintiff is "waiting for response from Albany." The Complaint was filed on April 27, 2004.

FN2. Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant Complaint, Plaintiff filed a grievance relating to the issues presented in this case. On April 19, 2004, the IGRC recommended that Plaintiff's grievance be denied. Plaintiff then appealed that decision to the facility Superintendent. In the meantime, on April 27, Plaintiff commenced the instant litigation. On May 3, 2004, after Plaintiff filed the Complaint in this case, the Superintendent denied Plaintiff's grievance. On May 5, 2004, Plaintiff appealed the decision to the Central Office Review Committee in Albany. On June 23, 2004, the Central Office Review Committee denied Plaintiff's appeal. Plaintiff did not file any other grievances in connection with the matters raised in this lawsuit.

Defendants now move to dismiss on the ground that Plaintiff commenced the instant action before fully exhausting his available administrative remedies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

## II. DISCUSSION

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." *Id.* at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1, *et seq.* Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. *Neal,* 267 F.3d 116.

## III. CONCLUSION

**\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 5278543 (S.D.N.Y.)

(Cite as: 2012 WL 5278543 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Hector LAPORTE, Plaintiff,
v.
Correction Sergeant FISHER and Correction Officer
Banks, Defendants.
No. 11 Civ. 9458(PKC)(HBP).

Oct. 24, 2012.
*MEMORANDUM AND ORDER*

P. KEVIN CASTEL, District Judge.

**\*1** Plaintiff Hector Laporte, proceeding *pro se,* brings this action pursuant to 18 U.S.C. § 1983 against Correction Sergeant Fisher and Correction Officer Banks in their individual and official capacities. Plaintiff asserts that defendants used excessive force against him in violation of the Eighth Amendment's prohibition against cruel and unusual punishment. Defendants Fisher and Banks move to dismiss the claims against them to the extent they are sued in their official capacities, as these claims are barred by the Eleventh Amendment. Defendant Banks further moves to dismiss all claims against him on the grounds of failure to state a claim upon which relief can be granted, qualified immunity, and failure to comply with the administrative exhaustion requirements of the Prison Litigation Reform Act, 42 U.S.C. § 1997e (the "PLRA"). For the reasons stated below, defendants' motion to dismiss all claims against them in their official capacities on the grounds of Eleventh Amendment immunity is granted. Defendant Banks' motion to dismiss on the grounds of failure to state a claim and qualified immunity is denied, and his motion to dismiss for failure to exhaust is converted into a motion for summary judgment, and denied.

BACKGROUND

Plaintiff is an inmate at Sing Sing Correctional Facility ("Sing Sing"). (Compl.¶ I–A.) Plaintiff alleges that while incarcerated at Sing Sing, he was assaulted on April 24, 2011 by defendant Banks, and on July 4, 2011 by defendant Fisher. (*Id.* ¶ II–D.)

According to the Complaint, on April 24, 2011 plaintiff was attempting to go to the chapel when he was stopped by defendant Banks. (*Id.* ¶ II–D, Ex. B "Banks Grievance.") Defendant Banks allegedly accused plaintiff of "playing games with [defendant Banks] and the facility" by "using the chapel as a way just to come out of [plaintiff's] cell." (*Id.* Ex. B.) Defendant Banks then asked plaintiff for his identification card. Upon production of the identification card, plaintiff alleges that defendant Banks "became aggressive, and started pushing, shoving, and eventually punched [plaintiff] in the stomach." (*Id.*) The impact of the punch allegedly caused plaintiff to lose his breath. (*Id.*) Plaintiff asserts that defendant Banks continued to threaten and harass him for a period of time following this incident, such that plaintiff has been afraid to come out of his cell "for fear that CO. Banks will assault [plaintiff], set [plaintiff] up, or have [plaintiff] beaten by other officers." (*Id.*)

Plaintiff further alleges that he was assaulted by defendant Fisher on July 4, 2011. (*Id.* ¶ II–D, Ex. A "Fisher Grievance .") According to the Complaint, plaintiff approached defendant Fisher in his office regarding a problem with a disbursement form for plaintiff's legal mail. Upon bringing the problem to defendant Fisher's attention, plaintiff asserts that defendant Fisher became "very aggressive" and shouted expletives at plaintiff. (*Id.* Ex. A) As plaintiff attempted to leave defendant Fisher's office, Fisher allegedly pulled plaintiff back into the office and "repeatedly punched [plaintiff's] face until [plaintiff] was unconscious." (*Id.*) Plaintiff allegedly regained consciousness later in his cell "with swollen [sic] and bruised [sic] on [plaintiff's] face and body." (*Id.*) Plaintiff asserts that when he awoke, "Sergeant Fisher was shaking me awake and he spit on my face." (*Id.*) Defendant Fisher then allegedly handcuffed plaintiff and told plaintiff he was going to take him to the hospital. (*Id.*) Because plaintiff "couldn't barely walk at this point," plaintiff asserts that he "was literally dragged out the gallery," "thrown down the stairs," then dragged

Slip Copy, 2012 WL 5278543 (S.D.N.Y.)

(Cite as: 2012 WL 5278543 (S.D.N.Y.))

"down 32 flights of stairs on [plaintiff's] back," at which point defendant Fisher took plaintiff to the hospital. (*Id.* ¶ II–D, Ex. A.) In addition to a swollen and bruised face, plaintiff claims he suffered "cervical and lumbar spinal injuries" and "was hospitalized for one month." (*Id.* ¶ III.)

**\*2** Plaintiff filed this Complaint on December 21, 2011, alleging that defendants' assaults violated the Eighth Amendment prohibition against cruel and unusual punishment. (Docket # 1.) Plaintiff seeks $2 million in compensatory and punitive damages. (Compl.¶ V.)

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), Fed.R.Civ.P., "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). " 'Labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,' " rather, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly,* 550 U.S. at 555).

In considering a Rule 12(b)(6) motion to dismiss, all non-conclusory factual allegations are accepted as true, and all reasonable inferences are drawn in favor of the plaintiff. *See In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (per curiam). Moreover, plaintiff's pro se pleadings, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Boykin v. KeyCorp,* 521 F .3d 202, 214 (2d Cir.2008) (internal quotations omitted). The plaintiff's pleadings are thus given a liberal and generous construction and are read "to raise the strongest arguments that they suggest." *Triestman v. Fed–Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (internal citation omitted).

In assessing the complaint, a court may consider documents incorporated by reference or attached to the complaint as exhibits, documents the plaintiff knew of or possessed and relied upon in framing the complaint, and items of which judicial notice maybe taken. *Samuels v. Air Transp. Local 504,* 992 F.2d 12, 15 (2d Cir.1993). Here,

plaintiff has attached relevant documents to the complaint, and these materials are properly considered on the motion.

## DISCUSSION

I. *Defendants' Motion to Dismiss All Claims Against Them in Their Official Capacities is Granted.*

Plaintiff sues the defendants in both their official and individual capacities. Absent a waiver or valid congressional override, the Eleventh Amendment has been construed to bar an action for damages by a private plaintiff against the state. *Seminole Tribe v. Florida,* 517 U.S. 44, 54 (1996). This immunity extends to state officials acting in their official capacity. *Kentucky v. Graham,* 473 U.S. 159, 169 (1985). Section 1983 does not abrogate Eleventh Amendment immunity. *See Edelman v. Jordan,* 415 U.S. 651, 675–77 (1974). Damages are thus not recoverable in a section 1983 action against state officials acting in their official capacities. *See, e.g., Davis v. New York,* 316 F.3d 93, 101–02 (2d Cir.2002).

**\*3** Since plaintiff exclusively seeks monetary damages, not prospective injunctive relief, *see Ex Parte Young,* 209 U.S. 123 (1908), defendants' motion to dismiss all claims against them in their official capacities is granted. Eleventh Amendment immunity has no bearing on claims asserted against defendants in their individual capacities.

II. *Defendant Banks' Motion to Dismiss For Failure to State a Claim is Denied.*

Defendant Banks asserts that plaintiff has failed to state a claim for relief. There is no dispute that Banks was acting under color of state law at all times alleged in the complaint. Nor is it contested that the right to be free from excessive force is protected under the Eighth Amendment. *See Graham v. Connor,* 490 U.S. 386, 395 n. 10 (1989) ("After conviction, the Eighth Amendment 'serves as the primary source of substantive protection ... in cases ... where the deliberate use of force is challenged as excessive and unjustified.' ") (quoting *Whitley v. Albers,* 475 U.S. 312, 327 (1986)). Defendant Banks argues that plaintiff has failed to allege any injuries as a result of Banks' alleged conduct, and that plaintiff's allegations are thus insufficient to state an Eighth Amendment claim. Defendant Banks relies on *Johnson v. Glick* 481 F.2d

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 5278543 (S.D.N.Y.)

(Cite as: 2012 WL 5278543 (S.D.N.Y.))

1028, 1033 (2d. Cir.1973), for the proposition that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers ...," violates the Constitution, and *Wilkins v. Gaddy,* 130 S.Ct. 1175, 1178 (2010), for the proposition that "not every malevolent touch by a prison guard gives rise to a federal cause of action."

Defendant Banks' reliance on these cases is misplaced. Plaintiff does not assert that defendant Banks "pushed" or "shoved" him. Rather, plaintiff alleges that defendant Banks "punched [plaintiff] in the stomach," causing plaintiff to "los[e][his] breath." (Compl.¶ II–D, Ex. B.) More significantly, the Supreme Court was clear in *Wilkins* that in assessing an Eighth Amendment claim, the " 'core judicial inquiry' ... was not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Wilkins,* 130 S.Ct. at 1178 (quoting *Hudson v. McMillian,* 503 U.S. 1, 7 (1992)). As plaintiff alleges that the punch was not the result of "a good-faith effort to maintain or restore discipline," but rather a "willfully malicious" action, (Compl.¶ V), which resulted from defendant Banks "harrassing (sic)" him, (*Id.* ¶ II–D), the Court concludes that plaintiff has pled sufficient facts to state a claim of use of excessive force, for which Section 1983 provides a remedy. Defendant Banks' motion to dismiss on these grounds is therefore denied.

### III. *Defendant Banks' Motion to Dismiss on the Ground of Qualified Immunity is Denied.*

Defendant Banks asserts that he is protected by qualified immunity against any Section 1983 claims, because the alleged punch did not violate any clearly established federal law. Defendant Banks does not cite any relevant Eighth Amendment case law in support of this argument. Rather, he merely states that the alleged punch "caused no injuries and [was] de minimus," and thus "did not violate any clearly established federal law." (Def.Mem.7.)

**\*4** "The right of an individual not to be subjected to excessive force has long been clearly established." *Calamia v. City of New York,* 879 F.2d 1025, 1036 (2d Cir.1989). As discussed in the preceding section, plaintiff does not allege de minimus use of force, and there is no

indication from the pleadings that force was necessary to maintain or restore discipline. An objectively reasonable corrections officer would have understood that punching an inmate in the stomach, for no purpose other than to harass him, would constitute excessive force in violation of the Eighth Amendment. *See Wilkins,* 130 S.Ct. at 1178. Plaintiff has thus sufficiently pled a violation of a clearly established federal right, and defendant Banks is not entitled to qualified immunity.

### IV. *Defendant Banks' Motion to Dismiss For Failure to Exhaust Under the PLRA is Converted to a Motion for Summary Judgment, and Denied.*

Defendant Banks asserts that plaintiff has failed to administratively exhaust his claim, as is required by the PLRA. Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any ... correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Hill v. Curcione,* 657 F.3d 116, 124 (2d Cir.2011) (quoting *Porter v. Nussle,* 534 U.S. 516, 532 (2002)). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock,* 549 U.S. 199, 211 (2007).

In order to properly exhaust administrative remedies under the PLRA, inmates must complete the administrative review process in accordance with the rules of the particular institution in which they are confined. *Jones,* 549 U.S. at 218. In New York state prisons, the Department of Corrections and Community Supervision ("DOCCS") has established a three-step inmate grievance procedure. This procedure is set forth in N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(2010).

First, an inmate must submit a grievance complaint to the clerk within twenty-one calendar days of an alleged occurrence. Id at (a). The Inmate Grievance Resolution Committee ("IGRC") then has up to sixteen calendar days to resolve the issue informally. *Id.* at (b)(1). If there is no informal resolution, the IGRC shall conduct a hearing

Slip Copy, 2012 WL 5278543 (S.D.N.Y.)

(Cite as: 2012 WL 5278543 (S.D.N.Y.))

within sixteen calendar days of receipt of the grievance, and issue a written decision within two working days of the close of the hearing. *Id.* at (b)(2). Next, an inmate must appeal an adverse decision to the facility superintendent within seven calendar days after receipt of the IGRC's written decision. *Id.* at (c)(1). The superintendent then has twenty days to render a decision. *Id.* at (c)(3). Finally, the inmate must appeal to the Central Office Review Committee ("CORC") within seven calendar days after receipt of the superintendent's written response, *id.* at (d)(1), and the CORC must render its final decision on the grievance within thirty calendar days from the time the appeal was received, *id.* at (d)(2). Only after an inmate has exhausted all three steps of this grievance process may he commence suit in federal court. *See Porter,* 534 U.S. at 524.

a. *Defendant Banks' Motion to Dismiss on Rule 12(b)(1) Grounds is Denied.*

**\*5** Defendant Banks seeks dismissal pursuant to Rule 12(b)(1) and (6), but fails to specify the precise Rule 12(b) grounds under which he seeks dismissal for failure to exhaust. As the PLRA's exhaustion requirement is not jurisdictional in nature, *Richardson v. Goord,* 347 F.3d 431, 434 (2d Cir.2003), the Court cannot dismiss plaintiff's action for lack of subject matter jurisdiction. Thus, to the extent that the motion at bar is brought pursuant to Rule 12(b)(1), it is denied.

b. *Defendant Banks' Motion to Dismiss on Rule 12(b)(6) Grounds is Converted To a Motion for Summary Judgment.*

Defendant Banks also seeks dismissal for failure to exhaust pursuant to Rule 12(b)(6). Failure to exhaust is an affirmative defense under the PLRA and "inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones,* 549 U.S. at 216. Dismissal pursuant to Rule 12(b)(6) for failure to exhaust is thus appropriate only where nonexhaustion is apparent from the face of the complaint. *See McCoy v. Goord,* 255 F.Supp.2d 233, 251 (S.D.N.Y.2003) (Chin, J.). Here, plaintiff states in the Complaint that he filed a grievance with Sing Sing's grievance office, and that his claims were denied. (Compl.¶ IV.) Plaintiff further states he

appealed to the superintendent Philip D. Heath and [his] appeal was denied. [He] then appealed to Albany N.Y. CORC and received a letter from them dated November 2nd 2011 claiming they would look into the matter. However as of today [he] ha[sn't] heard back from CORC.

(Compl.¶ IV–E(3).) Nonexhaustion is thus not apparent from the face of the complaint, and dismissal pursuant to Rule 12(b)(6) is inappropriate.

However, as then-District Court Judge Chin has noted,

If nonexhaustion is not clear from the face of the complaint, a defendant's motion to dismiss should be converted, pursuant to Rule 12(b) [now codified in relevant part as Rule 12(d) ], to one for summary judgment limited to the narrow issue of exhaustion and the relatively straightforward questions about the plaintiff's efforts to exhaust, whether remedies were available, or whether exhaustion might be, in very limited circumstances, excused.

*McCoy,* 255 F.Supp.2d at 251. Under Rule 12(d), Fed.R.Civ.P., if "matters outside the pleadings are presented to and not excluded by the court" on a motion under Rule 12(b)(6), "the motion must be treated as one for summary judgment under Rule 56." Moreover, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* Accordingly, "a district court acts properly in converting a motion for judgment on the pleadings into a motion for summary judgment when the motion presents matters outside the pleadings," so long as "the court give [s] 'sufficient notice to an opposing party and an opportunity for that party to respond.' " *Hernandez v. Coffey,* 582 F.3d 303, 307 (2d Cir.2009) (quoting *Groden v. Random House, Inc.,* 61 F.3d 1045, 1052 (2d Cir.1995)).

**\*6** In *Hernandez v. Coffey,* the Second Circuit expounded on the notice requirement with regards to *pro se* parties. *Hernandez,* 582 F.3d at 307–09. The court began by noting that formal notice is not ordinarily required "where a party 'should reasonably have

Slip Copy, 2012 WL 5278543 (S.D.N.Y.)

(Cite as: 2012 WL 5278543 (S.D.N.Y.))

recognized the possibility that the motion might be converted into one for summary judgment [and] was [neither] taken by surprise [nor] deprived of a reasonable opportunity to meet facts outside the pleadings.' " *Id.* at 307 (alteration in original) (quoting *Villante v. Dep't of Corrections of City of New York,* 786 F.2d 516, 521 (2d Cir.1986)). However, in the case of a pro se party, " '[n]otice is particularly important' because the *pro se* litigant 'may be unaware of the consequences of his failure to offer evidence bearing on triable issues.' " *Id.* (alteration in original) (quoting *Beacon Enters., Inc. v. Menzies,* 715 F.2d 757, 767 (2d Cir.1983)). Accordingly, the court ruled that "absent a clear indication that the *pro se* litigant understands the nature and consequences of Rule 56 ... he or she must be so informed by the movant in the notice of motion or, failing that, by the district court." Id at 308 (citing *McPherson v. Coombe,* 174 F.3d 276 (2d Cir.1999)).

Here, defendant Banks provided to plaintiff precisely the kind of notice required by *Hernandez.* In accordance with S.D.N.Y. Civil Rules 12.1 and 56.2, defendant Banks served plaintiff with notice that the motion to dismiss might be converted to a summary judgment motion, explaining to plaintiff what he had to do to oppose summary judgment. ("Notice to Pro Se Litigants Opposing Motion to Dismiss or Motion for Summary Judgment," dated March 26, 2012, Docket # 19.) *See* Hernandez, 582 F.3d at 309 n. 2 (in reversing the district court, noting that two cases relied upon by the district court were "inapposite because the defendants in each case provided notice pursuant to S.D.N.Y. Civil Rule 12.1 explaining that their motions to dismiss might be converted into motions for summary judgment for purposes of determining exhaustion, and, further, explaining what the plaintiff had to do to oppose summary judgment"). Accordingly, the Court concludes that converting the motion to dismiss to a motion for summary judgment is appropriate.

c. *Defenant Banks' Motion for Summary Judgment is Denied.*

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed.R.Civ.P. 56(a). "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ramos v. Baldor Specialty Foods, Inc.,* 687 F.3d 554, 558 (2d Cir.2012).

"[T]he burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Svcs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d. Cir.1994). In response, the nonmovant bears only a "limited burden of production," *Powell v Nat'l Bd. of Medical Examiners,* 364 F.3d 79, 84 (2d Cir.2004), and "all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought," *Gallo,* 22 F.3d at 1223. Moreover, the Second Circuit has "long recognized that summary judgment is a drastic device," *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n. Inc.,* 182 F.3d 157, 160 (2d Cir.1999), and "should not be granted when there are major factual contentions in dispute," *National Life Ins. Co. v. Solomon,* 529 F.2d 59, 61 (2d Cir.1975). "This is particularly so when, as here, one party has yet to exercise its opportunities for pretrial discovery." *Id.*

**\*7** Nonetheless, the nonmovant "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 248 (1986) (internal quotations omitted). If the evidence produced by the nonmovant "is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (internal citations omitted).

Here, there is a disputed issue of material fact as to whether plaintiff administratively exhausted his remedies. Defendant Banks has submitted evidence concerning the CORC computer database, which allegedly "contains a great deal of historical data with respect to appeals to CORC." (Bellamy Decl. ¶ 4, annexed to Harben Decl.) Defendant Banks submits that this database reveals that CORC never received any grievance appeals from plaintiff with respect to the incident at issue. However, plaintiff has declared under penalty of perjury: that he filed a grievance against defendant Banks, and that Sing Sing's Inmate Grievance Committee failed to respond; that he then

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 5278543 (S.D.N.Y.)

(Cite as: 2012 WL 5278543 (S.D.N.Y.))

appealed his grievance to the superintendant, and that the superintendant similarly failed to respond; and that he appealed to CORC, and was told that there was no record of his grievance. ("Opposition in Response to Defendants Motion to Dismiss" ¶ 1, Docket # 24; "Affidavit of Hector Laporte," Docket # 27.) This evidence, viewed in the light most favorable to the nonmoving party, raises a genuine dispute of material fact. Therefore, and particularly in light of the fact that plaintiff has "yet to exercise [his] opportunit[y] for pretrial discovery," *Solomon,* 529 F.2d at 61, summary judgment is denied. Defendant Banks is free to renew his motion for summary judgment at the close of discovery. If after a full and fair opportunity to conduct discovery, all that plaintiff is able to present is a conclusory assertion, unsupported by documentary evidence (where one would expect documentary support to exist), the defense of lack of exhaustion may look quite different.

## CONCLUSION

For the foregoing reasons and to the extent stated above, the defendants' motion to dismiss is GRANTED in part and DENIED in part. All claims against defendants Banks and Fisher in their official capacities are dismissed. All other claims, including all claims against the defendants in their individual capacities, remain pending.

The defendants shall provide to the plaintiff copies of all unreported cases cited herein. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45 (1962).

SO ORDERED.

S.D.N.Y.,2012.

Laporte v. Fisher
Slip Copy, 2012 WL 5278543 (S.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
James MURRAY, Plaintiff,
v.
R. PALMER, Corrections Officer, Great Meadow
Correctional Facility; S. Griffin, Corrections Officer,
Great Meadow Correctional Facility; M. Terry,
Corrections Officer, Great Meadow Correctional
Facility; F. Englese, Corrections Officer, Great Meadow
Correctional Facility; Sergeant Edwards, Great Meadow
Correctional Facility; K. Bump, Sergeant, Great
Meadow Correctional Facility; K.H. Smith, Sergeant,
Great Meadow Correctional Facility; A. Paolano,
Facility Health Director: and Ted Nesmith, Physicians
Assistant, Defendants.
No. 9:03-CV-1010 (DNH/GLS).

June 20, 2008.
James Murray, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, James Seaman, Esq., Asst. Attorney General,
of Counsel, Albany, NY, for Defendants.

### ORDER

DAVID N. HURD, District Judge.

**\*1** Plaintiff, James Murray, brought this civil rights
action pursuant to 42 U.S.C. § 1983. In a 51 page Report
Recommendation dated February 11, 2008, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' motion for summary
judgment be granted in part (i.e., to the extent that it
requests the dismissal with prejudice of plaintiff's claims
against defendant Paolano and Nesmith); and denied in
part (i.e., to the extent that it requests dismissal of
plaintiff's claims against the remaining defendants on the
grounds of plaintiff's failure to exhaust available
administrative remedies) for the reasons stated in the

Report Recommendation. Lengthy objections to the
Report Recommendation have been filed by the plaintiff.

Based upon a de novo review of the portions of the
Report-Recommendation to which the plaintiff has
objected, the Report-Recommendation is accepted and
adopted. See 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment is
GRANTED in part and DENIED in part;

2. Plaintiff's complaint against defendants Paolano
and Nesmith is DISMISSED with prejudice;

3. Defendants' motion for summary judgment is
DENIED, to the extent that their request for dismissal of
plaintiff's assault claims under the Eighth Amendment
against the remaining defendants on the grounds of
plaintiff's failure to exhaust available administrative
remedies as stated in the Report-Recommendation.

IT IS SO ORDERED.

JAMES MURRAY, Plaintiff,

-v.-

R. PALMER, Corrections Officer, Great Meadow
C.F.; S. GRIFFIN, Corrections Officer, Great Meadow
C.F.; M. TERRY, Corrections Officer, Great Meadow
C.F.; F. ENGLESE, Corrections Officer, Great Meadow
C.F.; P. EDWARDS, Sergeant, Great Meadow C.F.; K.
BUMP, Sergeant, Great Meadow C.F.; K.H. SMITH,
Sergeant, Great Meadow C.F.; A. PAOLANO, Health
Director, Great Meadows C.F.; TED NESMITH,
Physicians Assistant, Great Meadows C.F., Defendants.

R. PALMER, Corrections Officer, Great Meadow
C.F.; S. GRIFFIN, Corrections Officer, Great Meadow
C.F.; M. TERRY, Corrections Officer, Great Meadow

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

C.F.; Counter Claimants,

-v.-

JAMES MURRAY, Counter Defendant.

**ORDER and REPORT-RECOMMENDATION**

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 78.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

**I. BACKGROUND**

**A. Plaintiff's Second Amended Complaint**

In his Second Amended Complaint, James Murray ("Plaintiff") alleges that nine correctional officials and health care providers employed by the New York State Department of Correctional Services ("DOCS") at Great Meadow Correctional Facility ("Great Meadow C.F .") violated his rights under the Eighth Amendment on August 17, 2000, when (1) Defendants Palmers, Griffin, Terry, and Englese assaulted him without provocation while he was incapacitated by mechanical restraints, (2) Defendants Edwards, Bump, and Smith witnessed, but did not stop, the assault, and (3) Defendants Paolano and Nesmith failed to examine and treat him following the assault despite his complaints of having a broken wrist. (Dkt. No. 10, ¶¶ 6-7 [Plf.'s Second Am. Compl.].)

**B. Defendants' Counterclaim**

*2 In their Answer to Plaintiff's Second Amended Complaint, three of the nine Defendants (Palmer, Griffin and Terry) assert a counterclaim against Defendant for personal injuries they sustained as a result of Plaintiff's assault and battery upon them during the physical struggle that ensued between them and Plaintiff due to his threatening and violent behavior on August 17, 2000, at Great Meadow C.F. (Dkt. No. 35, Part 1, ¶¶ 23-30 [Defs.'

Answer & Counterclaim].)

I note that the docket in this action inaccurately indicates that this Counterclaim is asserted also on behalf of Defendants Englese, Edwards, Bump, Smith, Paolano, and "Nejwith" (later identified as "Nesmith"). (*See* Caption of Docket Sheet.) As a result, at the end of this Report-Recommendation, *I direct the Clerk's Office to correct the docket sheet to remove the names of those individuals as "counter claimants" on the docket.*

I note also that, while such counterclaims are unusual in prisoner civil rights cases (due to the fact that prisoners are often "judgment proof" since they are without funds), Plaintiff paid the $150 filing fee in this action (Dkt. No. 1), and, in his Second Amended Complaint, he alleges that he received a settlement payment in another prisoner civil rights actions in 2002. (Dkt. No. 10, ¶ 10 [Plf.'s Second Am. Compl.].) Further investigation reveals that the settlement resulted in a payment of $20,000 to Plaintiff. *See Murray v. Westchester County Jail,* 98-CV-0959 (S .D.N.Y.) (settled for $20,000 in 2002).

**II. DEFENDANTS' MOTION AND PLAINTIFF'S RESPONSE**

**A. Defendants' Motion**

In their motion for summary judgment, Defendants argue that Plaintiff's Second Amended Complaint should be dismissed for four reasons: (1) Plaintiff has failed to adduce any evidence establishing that Defendant Paolano, a supervisor, was personally involved in any of the constitutional violations alleged; (2) Plaintiff has failed to adduce any evidence establishing that Defendant Nesmith was deliberately indifferent to any of Plaintiff's serious medical needs; (3) at the very least, Defendant Nesmith is protected from liability by the doctrine of qualified immunity, as a matter of law; and (4) Plaintiff has failed to adduce any evidence establishing that he exhausted his available administrative remedies with respect to his assault claim, before filing that claim in federal court. (Dkt. No. 78, Part 13, at 2, 4-13 [Defs.' Mem. of Law].)

In addition, Defendants argue that, during his deposition in this action, Plaintiff asserted, for the first time, a claim that the medical staff at Great Meadow C.F. violated his rights under the Eighth Amendment by failing

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

to honor non-life-sustaining medical prescriptions written at a former facility. (*Id.* at 3.) As a threshold matter, Defendants argue, this claim should be dismissed since Plaintiff never included the claim in his Second Amended Complaint, nor did Plaintiff ever file a motion for leave to file a Third Amended Complaint. (*Id.*) In any event, Defendants argue, even if the Court were to reach the merits of this claim, the Court should dismiss the claim because Plaintiff has failed to allege facts plausibly suggesting, or adduce evidence establishing, that Defendants were personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided such allegations or evidence indicating the policy is even unconstitutional. (*Id.*)

**\*3** Defendants' motion is accompanied by a Statement of Material Facts, submitted in accordance with Local Rule 7.1(a)(3) ("Rule 7.1 Statement"). (Dkt. No. 78, Part 12.) Each of the 40 paragraphs contained in Defendants' Rule 7.1 Statement is supported by an accurate citation to the record evidence. (*Id.*) It is worth mentioning that the record evidence consists of (1) the affirmations of Defendants Nesmith and Paolano, and exhibits thereto, (2) the affirmation of the Inmate Grievance Program Director for DOCS, and exhibits thereto, (3) affirmation of the Legal Liaison between Great Meadow C.F. and the New York State Attorney General's Office during the time in question, and exhibits thereto, and (4) a 155-page excerpt from Plaintiff's deposition transcript. (Dkt. No. 78.)

**B. Plaintiff's Response**

After being specifically notified of the consequences of failing to properly respond to Defendants' motion (*see* Dkt. No. 78, Part 1), and after being granted *three* extensions of the deadline by which to do so (*see* Dkt. Nos. 79, 80, 83), Plaintiff submitted a barrage of documents: (1) 49 pages of exhibits, which are attached to neither an affidavit nor a memorandum of law (Dkt. No. 84); (2) 113 pages of exhibits, attached to a 25-page affidavit (Dkt. No. 85); (3) 21 pages of exhibits, attached to a 12-page supplemental affidavit (Dkt. No. 86); and (4) a 29-page memorandum of law (Dkt. No. 86); and a 13-page supplemental memorandum of law (Dkt. No. 88).

Generally in his Memorandum of Law and Supplemental Memorandum of Law, Plaintiff responds to

the legal arguments advanced by Defendants. (*See* Dkt. No. 86, Plf.'s Memo. of Law [responding to Defs.' exhaustion argument]; Dkt. No. 88, at 7-13 [Plf.'s Supp. Memo. of Law, responding to Defs.' arguments regarding the personal involvement of Defendant Paolano, the lack of evidence supporting a deliberate indifference claim against Defendant Nesmith, the applicability of the qualified immunity defense with regard to Plaintiff's claim against Defendant Nesmith, and the sufficiency and timing of Plaintiff's prescription-review claim against Defendant Paolano].) Those responses are described below in Part IV of this Report-Recommendation.

However, unfortunately, not among the numerous documents that Plaintiff has provided is a *proper* response to Defendants' Rule 7.1 Statement. (*See* Dkt. No. 85, Part 2, at 45-52 [Ex. N to Plf.'s Affid.].) Specifically, Plaintiff's Rule 7.1 Response (which is buried in a pile of exhibits) fails, with very few exceptions, to "set forth ... specific citation[s] to the record," as required by Local Rule 7.1(a)(3). (*Id.*) I note that the notary's "sworn to" stamp at the end of the Rule 7.1. Statement does not transform Plaintiff's Rule 7.1 Response into record evidence so as to render that Response compliant with Local Rule 7.1. First, Local Rule 7.1 expressly states, "The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits." N.D.N.Y. L.R. 7.1(a)(3). In this way, the District's Local Rule, like similar local rules of other districts, contemplates citations to a record that is independent of a Rule 7.1 Response. *See, e.g., Vaden v. GAP, Inc.,* 06-CV-0142, 2007 U.S. Dist. LEXIS 22736, at *3-5, 2007 WL 954256 (M.D.Tenn. March 26, 2007) (finding non-movant's verified response to movant's statement of material facts to be deficient because it did cite to affidavit or declaration, nor did it establish that non-movant had actual knowledge of matters to which he attested;) *Waterhouse v. District of Columbia,* 124 F.Supp.2d 1, 4-5 (D.D.C.2000) (criticizing party's "Verified Statement of Material Facts," as being deficient in citations to independent record evidence, lacking "firsthand knowledge," and being purely "self-serving" in nature). Moreover, many of Plaintiff's statements in his Rule 7.1 Response are either argumentative in nature or lacking in specificity and personal knowledge, so as to disqualify those statements from having the effect of

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

sworn testimony for purposes of a summary judgment motion. *See, infra,* notes 10-12 of this Report-Recommendation.

**III. GOVERNING LEGAL STANDARD**

*\*4* Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists,[FN1] the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[FN2]

> FN1. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN2. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."[FN3] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."[FN4] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[FN5]

> FN3. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary

judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

> FN4. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN5. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

What this burden-shifting standard means when a plaintiff has failed to *properly* respond to a defendant's Rule 7.1 Statement of Material Facts is that the facts as set forth in that Rule 7.1 Statement will be accepted as true[FN6] to the extent that (1) those facts are supported by the evidence in the record,[FN7] and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment.[FN8]

> FN6. *See* N.D.N.Y. L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*) [emphasis in original].

> FN7. *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[I]n determining whether the moving party has met [its] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted].

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

FN8. *See Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

Implied in the above-stated standard is the fact that a district court has no duty to perform an *independent* review of the record to find proof of a factual dispute, even if the non-movant is proceeding *pro se.*[FN9] In the event the district court chooses to conduct such an independent review of the record, any affidavit submitted by the non-movant, in order to be sufficient to create a factual issue for purposes of a summary judgment motion, must, among other things, not be conclusory.[FN10] (An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.)[FN11] Finally, even where an affidavit is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[FN12]

FN9. *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N.Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4, 2006 WL 395269 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN10. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN11. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN12. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb.15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

## IV. ANALYSIS

## A. Whether Plaintiff Has Adduced Evidence Establishing that Defendant Paolano Was Personally Involved in the Constitutional Violations Alleged

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ).[FN13] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[FN14] If the defendant is a supervisory official, such as a correctional facility superintendent or a facility health services director, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN15] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN16] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN17]

FN13. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN14. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN15. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN16. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN17. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

781 F.2d 319, 323-324 (2d Cir.1986) (setting forth four prongs).

**\*5** Defendants argue that Plaintiff has not adduced evidence establishing that Defendant Paolano, the Great Meadow C.F. Health Services Director during the time in question, was personally involved in the constitutional violations alleged. (Dkt. No. 78, Part 13, at 2 [Defs.' Memo. of Law].) In support of this argument, Defendants point to the record evidence establishing that, during the time in which Plaintiff was incarcerated at Great Meadow C.F. (i . e., from early August of 2000 to late November of 2000), Defendant Paolano never treated Plaintiff for any medical condition, much less a broken wrist on August 17, 2000. (*Id.; see also* Dkt. No. 78, Part 4, ¶¶ 7-8 [Paolano Affid.]; Dkt. No. 78, Part 5 [Ex. A to Paolano Affid.]; Dkt. No. 78, Part 11, at 32-33 [Plf.'s Depo.].)

Plaintiff responds that (1) Defendant Paolano was personally involved since he "treated" Plaintiff on August 17, 2000, by virtue of his supervisory position as the Great Meadow C.F.'s Health Services Director, and (2) Defendant Paolano has the "final say" regarding what medications inmates shall be permitted to retain when they transfer into Great Meadow C.F. (Dkt. No. 88, at 7-8 [Plf.'s Supp. Memo. of Law].) In support of this argument, Plaintiff cites a paragraph of his Supplemental Affidavit, and an administrative decision, for the proposition that Defendant Paolano, as the Great Meadow C.F. Health Services Director, had the "sole responsibility for providing treatment to the inmates under [the Facility's] care." (*Id.; see also* Dkt. No. 86, Suppl. Affid., ¶ 5 & Ex. 14.)

**1. Whether Defendant Paolano Was Personally Involved in Plaintiff's Treatment on August 17, 2000**

With respect to Plaintiff's first point (regarding Defendant Paolano's asserted "treatment" of Plaintiff on August 17, 2000), the problem with Plaintiff's argument is that the uncontroverted record evidence establishes that, as Defendants' assert, Defendant Paolano did not, in fact, treat Plaintiff on August 17, 2000 (or at any time when Plaintiff was incarcerated at Great Meadow C.F.). This was the fact asserted by Defendants in Paragraphs 38 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶ 38 [Defs.' Rule 7.1 Statement].) Defendants supported this

factual assertion with record evidence. (*Id.* [providing accurate record citations]; *see also* Dkt. No. 78, Part 12, ¶¶ 37-38 [Defs.' Rule 7.1 Statement, indicating that it was Defendant Nesmith, not Defendant Paolano, who treated Plaintiff on 8/17/00].) Plaintiff has failed to specifically controvert this factual assertion, despite having been given an adequate opportunity to conduct discovery, and having been specifically notified of the consequences of failing to properly respond to Defendants' motion (*see* Dkt. No. 78, Part 1), and having been granted *three* extensions of the deadline by which to do so (*see* Dkt. Nos. 79, 80, 83). Specifically, Plaintiff fails to cite any record evidence in support of his denial of Defendants' referenced factual assertion. (*See* Dkt. No. 85, Part 2, at 50 [Ex. N to Plf.'s Affid.].) As a result, under the Local Rules of Practice for this Court, Plaintiff has effectively "admitted" Defendants' referenced factual assertions. N.D.N.Y. L.R. 7.1(a)(3).

**\*6** The Court has no duty to perform an independent review of the record to find proof disputing this established fact. *See, supra,* Part III and note 9 of this Report-Recommendation. Moreover, I decline to exercise my discretion, and I recommend that the Court decline to exercise its discretion, to perform an independent review of the record to find such proof for several reasons, any one of which is sufficient reason to make such a decision: (1) as an exercise of discretion, in order to preserve judicial resources in light of the Court's heavy caseload; (2) the fact that Plaintiff has already been afforded considerable leniency in this action, including numerous deadline extensions and liberal constructions; and (3) the fact that Plaintiff is fully knowledgeable about the requirements of a non-movant on a summary judgment motion, due to Defendants' notification of those requirements, and due to Plaintiff's extraordinary litigation experience.

With regard to this last reason, I note that federal courts normally treat the papers filed by *pro se* civil rights litigants with special solicitude. This is because, generally, *pro se* litigants are unfamiliar with legal terminology and the litigation process, and because the civil rights claims they assert are of a very serious nature. However, "[t]here are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special solicitude" that is normally afforded *pro se* litigants.[FN18] Generally, the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

rationale for diminishing special solicitude (at least in the Second Circuit) is that the *pro se* litigant's extreme litigiousness demonstrates his *experience,* the lack of which is the reason for extending special solicitude to a *pro se* litigant in the first place.[FN19] The Second Circuit has diminished this special solicitude, and/or indicated the acceptability of such a diminishment, on several occasions.[FN20] Similarly, I decide to do so, here, and I recommend the Court do the same.

> FN18. *Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *3 & n. 17 (N.D.N.Y. Sept.26, 2007) (Kahn, J., adopting Report-Recommendation) [citations omitted].

> FN19. *Koehl,* 2007 WL 2846905, at *3 & n. 18 [citations omitted].

> FN20. *See, e.g., Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, at *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *see also Raitport v. Chem. Bank,* 74 F.R.D. 128, 133 (S.D.N.Y.1977) [citing *Ackert v. Bryan,* No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring).

Plaintiff is no stranger to the court system. A review of the Federal Judiciary's Public Access to Court Electronic Records ("PACER") System reveals that Plaintiff has filed at least 15 other federal district court actions, [FN21] and at least three federal court appeals.[FN22] Furthermore, a review of the New York State Unified Court System's website reveals that he has filed at least 20 state court actions,[FN23] and at least two state court appeals.[FN24] Among these many actions he has had at least one victory, resulting in the payment of $20,000 to him in settlement proceeds.[FN25]

> FN21. *See Murray v. New York,* 96-CV-3413 (S.D.N.Y.); *Murray v. Westchester County Jail,* 98-CV-0959 (S.D.N.Y.); *Murray v. McGinnis,* 99-CV-1908 (W.D.N.Y.); *Murray v. McGinnis,* 99-CV-2945 (S.D.N.Y.); *Murray v. McGinnis,* 00-CV-3510 (S.D.N.Y.); *Murray v. Jacobs,* 04-CV-6231 (W.D.N.Y.); *Murray v. Bushey,* 04-CV-0805 (N.D.N.Y.); *Murray v. Goord,* 05-CV-1113 (N.D.N.Y.); *Murray v. Wissman,* 05-CV-1186 (N.D.N.Y.); *Murray v. Goord,* 05-CV-1579 (N.D.N.Y.); *Murray v. Doe,* 06-CV-0205 (S.D.N.Y.); *Murray v. O'Herron,* 06-CV-0793 (W.D.N.Y.); *Murray v. Goord,* 06-CV-1445 (N.D.N.Y.); *Murray v. Fisher,* 07-CV-0306 (W.D.N.Y.); *Murray v. Escrow,* 07-CV-0353 (W.D.N.Y.).

> FN22. *See Murray v. McGinnis,* No. 01-2533 (2d Cir.); *Murray v. McGinnis,* No. 01-2536 (2d Cir.); *Murray v. McGinnis,* No. 01-2632 (2d Cir.).

> FN23. *See Murray v. Goord,* Index No. 011568/1996 (N.Y. Sup.Ct., Westchester County); *Murray v. Goord,* Index No. 002383/1997 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002131/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002307/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002879/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002683/2004 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002044/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. McGinnis,* Index No. 002099/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Sullivan,* Index No. 002217/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002421/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002495/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002496/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002888/2006 (N.Y. Sup.Ct., Chemung

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

County); *Murray v. LeClaire,* Index No. 002008/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002009/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002010/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002011/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. Fisher,* Index No. 002762/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. New York,* Claim No. 108304, Motion No. 67679 (N.Y.Ct.Cl.); *Murray v. New York,* Motion No. M-67997 (N.Y.Ct.Cl.).

FN24. *See Murray v. Goord,* No. 84875, 709 N.Y. S.2d 662 (N.Y.S.App.Div., 3d Dept.2000); *Murray v. Goord,* No. 83252, 694 N.Y.S .2d 797 (N.Y.S.App.Div., 3d Dept.1999).

FN25. *See Murray v. Westchester County Jail,* 98-CV-0959 (S.D.N .Y .) (settled for $20,000 in 2002).

I will add only that, even if I were inclined to conduct such an independent review of the record, the record evidence that Plaintiff cites regarding this issue in his Supplemental Memorandum of Law does not create such a question of fact. (*See* Dkt. No. 88, at 7-8 [Plf.'s Supp. Memo. of Law, citing Dkt. No. 86, Suppl. Affid., ¶ 5 & Ex. 14].) It appears entirely likely that Defendant Paolano had the ultimate responsibility for providing medical treatment to the inmates at Great Meadow C.F.[FN26] However, this duty arose solely because of his supervisory position, i.e., as the Facility Health Services Director. It is precisely this sort of supervisory duty that does *not* result in liability under 42 U.S.C. § 1983, as explained above.

FN26. To the extent that Plaintiff relies on this evidence to support the proposition that Defendant Paolano had the "sole" responsibility for such health care, that reliance is misplaced. Setting aside the loose nature of the administrative decision's use of the word "sole," and the different context in which that word was used (regarding the review of Plaintiff's grievance about having had his prescription

discontinued), the administrative decision's rationale for its decision holds no preclusive effect in this Court. I note that this argument by Plaintiff, which is creative and which implicitly relies on principles of estoppel, demonstrates his facility with the law due to his extraordinary litigation experience.

**\*7** As for the other ways through which a supervisory official may be deemed "personally involved" in a constitutional violation under 42 U.S.C. § 1983, Plaintiff does not even argue (or allege facts plausibly suggesting)[FN27] that Defendant Paolano *failed to remedy* the alleged deliberate indifference to Plaintiff's serious medical needs on August 17, 2000, after learning of that deliberate indifference through a report or appeal. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano created, or allowed to continue, *a policy or custom* under which the alleged deliberate indifference on August 17, 2000, occurred. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano had been *grossly negligent* in managing subordinates (such as Defendant Nesmith) who caused the alleged deliberate indifference. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano exhibited *deliberate indifference* to the rights of Plaintiff by failing to act on information indicating that Defendant Nesmith was violating Plaintiff's constitutional rights.

FN27. *See Bell Atl. Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) (holding that, for a plaintiff's complaint to state a claim upon which relief might be granted under Fed.R.Civ.P. 8 and 12, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," or, in other words, there must be "plausible grounds to infer [actionable conduct]"), *accord, Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) ("[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible." *) [emphasis in

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

original].

In the alternative, I reach the same conclusion (that Plaintiff's claim against Defendant Paolano arising from the events of August 17, 2000, lacks merit) on the ground that there was no constitutional violation committed by Defendant Nesmith on August 17, 2000, in which Defendant Paolano could have been personally involved, for the reasons discussed below in Part IV.B. of this Report-Recommendation.

**2. Whether Defendant Paolano Was Personally Involved in the Review of Plaintiff's Prescriptions in Early August of 2000**

With respect to Plaintiff's second point (regarding Defendant Paolano's asserted "final say" regarding what medications inmates shall be permitted to retain when they transfer into Great Meadow C.F.), there are three problems with this argument.

First, the argument regards a claim that is not properly before this Court for the reasons explained below in Part IV.E. of this Report-Recommendation.

Second, as Defendants argue, even if the Court were to reach the merits of this claim, it should rule that Plaintiff has failed to adduce evidence establishing that Defendant Paolano was personally involved in the creation or implementation of DOCS' prescription-review policy. It is an uncontroverted fact, for purposes of Defendants' motion, that (1) the decision to temporarily deprive Plaintiff of his previously prescribed pain medication (i.e., pending the review of that medication by a physician at Great Meadow C.F.) upon his arrival at Great Meadow C.F. was made by an "intake nurse," not by Defendant Paolano, (2) the nurse's decision was made pursuant to a policy instituted by DOCS, not by Defendant Paolano, and (3) Defendant Paolano did not have the authority to alter that policy. These were the facts asserted by Defendants in Paragraphs 6 through 9 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶¶ 6-9 [Defs.' Rule 7.1 Statement].) Defendants supported these factual assertions with record evidence. (*Id.* [providing accurate record citations].) Plaintiff expressly admits two of these factual assertions, and fails to support his denial of the remaining factual assertions with citations to record evidence that actually controverts the facts asserted. (Dkt. No. 85, Part 2, at

46-47 [Ex. N to Plf.'s Affid.].)

**\*8** For example, in support of his denial of Defendants' factual assertion that "[t]his policy is not unique to Great Meadow, but applies to DOCS facilities generally," Plaintiff says that, at an unidentified point in time, "Downstate CF honored doctors proscribed [sic] treatment and filled by prescriptions from Southport Correctional Facility.... Also I've been transferred to other prisons such as Auburn [C.F.] in which they honored doctors prescribe[d] orders." (*Id.*) I will set aside the fact that Defendants' factual assertion is not that the policy applies to every single DOCS facility but that it applies to them as a general matter. I will also set aside the fact that Plaintiff's assertion is not supported by a citation to independent record evidence. The main problem with this assertion is that it is not specific as to what year or years he had these experiences, nor does it even say that his prescriptions were immediately honored without a review by a physician at the new facility.

The other piece of "evidence" Plaintiff cites in support of this denial is "Superintendent George B. Duncan's 9/22/00 decision of Appeal to him regarding [Plaintiff's Grievance No.] GM-30651-00." (*Id.*) The problem is that the referenced determination states merely that Defendant Paolano, as the Great Meadow C.F. Health Services Director, had the "sole responsibility for providing treatment to the inmates under [the Facility's] care, and has the final say regarding all medical prescriptions." (Dkt. No. 86, at 14 [Ex. 14 to Plf.'s Suppl. Affid.].) For the sake of much-needed brevity, I will set aside the issue of whether an IGP Program Director's broadly stated *rationale* for an appellate determination with respect to a prisoner's grievance can ever constitute evidence sufficient to create proof of a genuine issue of fact for purposes of a summary judgment motion. The main problem with this "evidence" is that there is absolutely nothing inconsistent between (1) a DOCS policy to temporarily deprive prisoners of non-life-sustaining prescription medications upon their arrival at a correctional facility, pending the review of those medical prescriptions by a physician at the facility, and (2) a DOCS policy to give Facility Health Service Directors the "final say" regarding the review of those medical prescriptions.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

Because Plaintiff has failed to support his denial of these factual assertions with citations to record evidence that actually controverts the facts asserted, I will consider the facts asserted by Defendants as true. N.D.N.Y. L.R. 7.1(a)(3). Under the circumstances, I decline, and I recommend the Court decline, to perform an independent review of the record to find proof disputing this established fact for the several reasons described above in Part IV.A.1. of this Report-Recommendation.

Third, Plaintiff has failed to adduce evidence establishing that the policy in question is even unconstitutional. I note that, in his Supplemental Memorandum of Law, Plaintiff argues that "deliberate indifference to serious medical needs is ... shown by the fact that prisoners are denied access to a doctor and physical examination upon arrival at [Great Meadow] C.F. to determine the need for pain medications which aren't life sustaining ...." (Dkt. No. 88, at 10 [Plf.'s Supp. Memo. of Law].) As a threshold matter, Plaintiff's argument is misplaced to the extent he is arguing about the medical care other prisoners may not have received upon their arrival at Great Meadow C.F. since this is not a class-action. More importantly, to the extent he is arguing about any medical care that he (allegedly) did not receive upon his arrival at Great Meadow C.F., he cites no record evidence in support of such an assertion. (*Id.*) Indeed, he does not even cite any record evidence establishing that, upon his arrival at Great Meadow C.F. in early 2000, either (1) he asked a Defendant in this action for such medical care, or (2) he was suffering from a serious medical need for purposes of the Eighth Amendment. (*Id.*)

**\*9** If Plaintiff is complaining that Defendant Paolano is liable for recklessly causing a physician at Great Meadow C.F. to excessively delay a review Plaintiff's pain medication upon his arrival at Great Meadow C.F., then Plaintiff should have asserted that allegation (and some basic facts supporting it) in a pleading in this action so that Defendants could have taken adequate discovery on it, and so that the Court could squarely review the merits of it. (Dkt. No. 78, Part 11, at 53 [Plf.'s Depo.].)

For all of these reasons, I recommend that Plaintiff's claims against Defendant Paolano be dismissed with

prejudice.

**B. Whether Plaintiff Has Adduced Evidence Establishing that Defendant Nesmith Was Deliberately Indifferent to Plaintiff's Serious Medical Needs**

Generally, to state a claim for inadequate medical care, a plaintiff must allege facts plausibly suggesting two things: (1) that he had a sufficiently serious medical need; and (2) that the defendants were deliberately indifferent to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Defendants argue that, even assuming that Plaintiff's broken wrist constituted a sufficiently serious medical condition for purposes of the Eighth Amendment, Plaintiff has not adduced evidence establishing that, on August 17, 2000, Defendant Nesmith acted with deliberate indifference to that medical condition. (Dkt. No. 78, Part 13, at 4-9 [Defs.' Memo. of Law].) In support of this argument, Defendants point to the record evidence establishing that Defendant Nesmith sutured lacerations in Plaintiff's forehead, ordered an x-ray examination of Plaintiff's wrist, and placed that wrist in a splint (with an intention to replace that splint with a cast once the swelling in Plaintiff's wrist subsided) within 24 hours of the onset of Plaintiff's injuries. (*Id.* at 7-9 [providing accurate record citations].) Moreover, argue Defendants, Plaintiff's medical records indicate that he did not first complain of an injury to his wrist until hours after he experienced that injury. (*Id.* at 8 [providing accurate record citation].)

Plaintiff responds that "[he] informed P.A. Nesmith that his wrist felt broken and P.A. Nesmith ignored plaintiff, which isn't reasonable. P.A. Nesmith didn't even care to do a physical examination to begin with[,] which would've revealed [the broken wrist] and is fundamental medical care after physical trauma." (Dkt. No. 88, at 11 [Plf.'s Supp. Memo. of Law].) In support of this argument, Plaintiff cites *no* record evidence. (*Id.* at 11-12.)

The main problem with Plaintiff's argument is that the uncontroverted record evidence establishes that, as Defendants have argued, Defendant Nesmith (1) sutured lacerations in Plaintiff's forehead within hours if not minutes of Plaintiff's injury and (2) ordered an x-ray

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

examination of Plaintiff's wrist, and placed that wrist in a splint (with an intention to replace that splint with a cast once the swelling in Plaintiff's wrist subsided) within 24 hours of the onset of Plaintiff's injuries. These facts were asserted by Defendants in Paragraphs 27 through 32 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶¶ 27-32 [Defs.' Rule 7.1 Statement].) Defendants supported these factual assertions with record evidence. (*Id.* [providing accurate record citations].) Plaintiff expressly admits most of these factual assertions, and fails to support his denial of the remaining factual assertions with citations to record evidence that actually controverts the facts asserted. (Dkt. No. 85, Part 2, at 48-50 [Ex. N to Plf.'s Affid.].)

**\*10** The only denial he supports with a record citation is with regard to when, within the referenced 24-hour period, Defendant Nesmith ordered his wrist x-ray. This issue is not material, since I have assumed, for purposes of Defendants' motion, merely that Defendant Nesmith ordered Plaintiff's wrist x-ray within 24 hours of the onset of Plaintiff's injury.[FN28] (Indeed, whether the wrist x-ray was ordered in the late evening of August 17, 2000, or the early morning of August 18, 2000, would appear to be immaterial for the additional reason that it would appear unlikely that any x-rays could be conducted in the middle of the night in Great Meadow C.F.)

FN28. Furthermore, I note that the record evidence he references (in support of his argument that the x-ray was on the morning of August 18, 2000, not the evening of August 17, 2000) is "Defendants exhibit 20," which he says "contains [an] 11/20/00 Great Meadow Correctional Facility Investigation Sheet by P. Bundrick, RN, NA, and Interdepartmental Communication from defendant Ted Nesmith P.A. that state [that the] X ray was ordered on 8/18/00 in the morning." (*Id.*) I cannot find, in the record, any "exhibit 20" having been submitted by Defendants, who designated their exhibits by letter, not number. (*See generally* Dkt. No. 78.) However, at Exhibit G of Defendant Nesmith's affidavit, there is the "Investigation Sheet" to which Plaintiff refers. (Dkt. No. 78, Part 3, at 28 [Ex. G to Nesmith Affid.].) The problem is that document does not say what Plaintiff says. Rather, it says, "Later that evening [on August 17, 2000] ... [a]n x-ray was ordered for the following morning ...." (*Id.*) In short, the document says that the x-ray was not ordered *on* the morning of August 18, 2007, but *for* that morning. Granted, the second document to which Plaintiff refers, the "Interdepartmental Communication" from Defendant Nesmith, does say that "I saw him the next morning and ordered an xray ...." (*Id.* at 29.) I believe that this is a misstatement, given the overwhelming record evidence to the contrary.

Moreover, in confirming the accuracy of Defendants' record citations contained in their Rule 7.1 Statement, I discovered several facts further supporting a finding that Defendant Nesmith's medical care to Plaintiff was both prompt and responsive. In particular, the record evidence cited by Defendants reveals the following specific facts:

(1) at approximately 10:17 a.m. on August 17, 2000, Plaintiff was first seen by someone in the medical unit at Great Meadow C.F. (Nurse Hillary Cooper);

(2) at approximately 10:40 a.m. on August 17, 2000, Defendant Nesmith examined Plaintiff; during that examination, the main focus of Defendant Nesmith's attention was Plaintiff's complaint of the lack of feeling in his lower extremities; Defendant Nesmith responded to this complaint by confirming that Plaintiff could still move his lower extremities, causing Plaintiff to receive an x-ray examination of his spine (which films did not indicate any pathology), and admitting Plaintiff to the prison infirmary for observation;

(3) at approximately 11:00 a.m. on August 17, 2000, Defendant Nesmith placed four sutures in each of two 1/4" lacerations on Plaintiff's left and right forehead;

(4) by 11:20 a.m. Plaintiff was given, or at least prescribed, Tylenol by a medical care provider;

(5) Plaintiff's medical records reflect no complaint by Plaintiff of any injury to his wrist at any point in time other than between 4:00 p.m. and midnight on August 17,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

2000;

(6) at some point after 9:00 p.m. on August 17, 2000, and 9:00 a.m. on the morning of August 18, 2000, Defendant Nesmith ordered that Plaintiff's wrist be examined by x-ray, in response to Plaintiff's complaint of an injured wrist; that x-ray examination occurred at Great Meadow C.F. at some point between 9:00 a.m. on August 17, 2000, and 11:00 a.m. on August 18, 2000, when Defendant Nesmith personally performed a "wet read" of the x-rays before sending them to Albany Medical Center for a formal reading by a radiologist;

(7) at approximately 11:00 a.m. on August 18, 2000, Defendant Nesmith placed a splint on Plaintiff's wrist and forearm with the intent of replacing it with a cast in a couple of days; the reason that Defendant Nesmith did not use a cast at that time was that Plaintiff's wrist and forearm were swollen, and Defendant Nesmith believed, based on 30 years experience treating hundreds of fractures, that it was generally not good medical practice to put a cast on a fresh fracture, because the cast will not fit tightly once the swelling subsides;

*11 (8) on August 22, 2000, Defendant Nesmith replaced the splint with a cast;

(9) on August 23, 2000, Plaintiff was discharged from the infirmary at Great Meadow C.F.; and

(10) on August 30, 2000, Defendant Nesmith removed the sutures from Plaintiff's forehead. (*See generally* Dkt. No. 78, Part 2, ¶¶ 3-15 [Aff. of Nesmith]; Dkt. No. 78, Part 3, Exs. A-E [Exs. to Aff. of Nesmith].)

"[D]eliberate indifference describes a state of mind more blameworthy than negligence," [FN29] one that is "equivalent to criminal recklessness." [FN30] There is no evidence of such criminal recklessness on the part of Defendant Nesmith, based on the uncontroverted facts before the Court, which show a rather prompt and responsive level of medical care given by Defendant Nesmith to Plaintiff, during the hours and days following the onset of his injuries.

FN29. *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Murphy v. Grabo,* 94-CV-1684, 1998 WL 166840, at *4 (N.D.N.Y. Apr.9, 1998) (Pooler, J.) ("Deliberate indifference, whether evidenced by [prison] medical staff or by [prison] officials who allegedly disregard the instructions of [prison] medical staff, requires more than negligence.... Disagreement with prescribed treatment does not rise to the level of a constitutional claim.... Additionally, negligence by physicians, even amounting to malpractice, does not become a constitutional violation merely because the plaintiff is an inmate.... Thus, claims of malpractice or disagreement with treatment are not actionable under section 1983.") [citations omitted].").

FN30. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness ....") [citation omitted]; *cf. Farmer,* 511 U.S. at 827 ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

interpreted in our cases, and we adopt it as the test for 'deliberate indifference' under the Eighth Amendment.").

In his argument that his treatment in question constituted deliberate indifference to a serious medical need, Plaintiff focuses on the approximate 24-hour period that appears to have elapsed between the onset of his injury and his receipt of an x-ray examination of his wrist. He argues that this 24-hour period of time constituted a delay that was unreasonable and reckless. In support of his argument, he cites two cases. *See Brown v. Hughes,* 894 F.2d 1533, 1538-39 (11th Cir.), *cert. denied,* 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Loe v. Armistead,* 582 F.2d 1291, 1296 (4th Cir.1978), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980). However, the facts of both cases are clearly distinguishable from the facts of the case at hand.

In *Brown v. Hughes,* the Eleventh Circuit found a genuine issue of material fact was created as to whether a correctional officer knew of a prisoner's foot injury during the four hours in which no medical care was provided to the prisoner, so as to preclude summary judgment for that officer. *Brown,* 894 F.2d at 1538-39. However, the Eleventh Circuit expressly stated that the question of fact was created because the prisoner had "submitted affidavits stating that [the officer] was called to his cell because there had been a fight, that while [the officer] was present [the prisoner] began to limp and then hop on one leg, that his foot began to swell severely, that he told [the officer] his foot felt as though it were broken, and that [the officer] promised to send someone to look at it but never did." *Id.* Those are *not* the facts of this case.

In *Loe v. Armistead,* the Fourth Circuit found merely that, in light of the extraordinary leniency with which *pro se* complaints are construed, the court was unable to conclude that a prisoner had failed to state a claim upon which relief might be granted for purposes of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b) (6) because the prisoner had alleged that the defendants-*despite being (at some point) "notified" of the prisoner's injured arm*-had inexplicably delayed for 22 hours in giving him medical treatment for the injury. *Loe,* 582 F.2d at 1296. More specifically, the court expressly construed the prisoner's

complaint as alleging that, following the onset of the plaintiff's injury at 10:00 a.m. on the day in question, the plaintiff was immediately taken to the prison's infirmary where a nurse, while examining the prisoner's arm, heard him complain to her about pain. *Id.* at 1292. Furthermore, the court construed the prisoner's complaint as alleging that, "[t]hroughout the day, until approximately 6:00 p.m., [the prisoner] repeatedly requested that he be taken to the hospital. He was repeatedly told that only the marshals could take him to a hospital and that they had been notified of his injury." *Id.* at 1292-93. Again, those are *not* the facts of this case.

**\*12** Specifically, there is no evidence in the record of which I am aware that at any time before 4:00 p.m. on August 17, 2000, Defendant Nesmith either (1) heard Plaintiff utter a complaint about a wrist injury sufficient to warrant an x-ray examination or (2) observed physical symptoms in Plaintiff's wrist (such as an obvious deformity) that would place him on notice of such an injury. As previously stated, I decline, and I urge the Court to decline, to tediously sift through the 262 pages of documents that Plaintiff has submitted in the hope of finding a shred of evidence sufficient to create a triable issue of fact as to whether Plaintiff made, and Defendant Nesmith heard, such a complaint before 4:00 p.m. on August 17, 2000.

I note that, in reviewing Plaintiff's legal arguments, I have read his testimony on this issue. That testimony is contained at Paragraphs 8 through 12, and Paragraph 18, of his Supplemental Affidavit. (*See* Dkt. No. 86, at ¶¶ 8-10, 18 [Plf.'s Supp. Affid., containing two sets of Paragraphs numbed "5" through "11"].) In those Paragraphs, Plaintiff swears, in pertinent part, that "[w]hile I was on the x-ray table I told defendant Ted Nesmith, P.A. and/or Bill Redmond RN ... that my wrist felt broken, and was ignored." (*Id.* at ¶ 9.) Plaintiff also swears that "I was [then] put into a room in the facility clinic[,] and I asked defendant Ted Nesmith, PA[,] shortly thereafter for [an] x-ray of [my] wrist[,] pain medication and [an] ice pack but wasn't given it [sic]." (*Id.* at ¶ 10.) Finally, Plaintiff swears as follows: "At one point on 8/17/00 defendant Nesmith told me that he didn't give a damn when I kept complaining that my wrist felt broken and how I'm going to sue him cause I'm not stupid

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

[enough] to not know he's supposed to do [a] physical examination [of me], [and not] to ignore my complaints about [my] wrist feeling broke and feeling extreem [sic] pain. He told me [to] stop complaining [and that] he's done with me for the day." (*Id.* at ¶ 18.)

This last factual assertion is important since a response of "message received" from the defendant appears to have been critical in the two cases cited by Plaintiff. It should be emphasized that, according to the undisputed facts, when Plaintiff made his asserted wrist complaint to Defendant Nesmith during the morning of August 17, 2000, Defendant Nesmith was either suturing up Plaintiff's forehead or focusing on Plaintiff's complaint of a lack of feeling in his lower extremities. (This complaint of lack of feeling, by the way, was found to be inconsistent with Defendant Nesmith's physical examination of Plaintiff.)

In any event, Defendant Nesmith can hardly be said to have, in fact, "ignored" Plaintiff since he placed him under *observation* in the prison's infirmary (and apparently was responsible for the prescription of Tylenol for Plaintiff). FN31 Indeed, it was in the infirmary that Plaintiff was observed by a medical staff member to be complaining about his wrist, which resulted in an x-ray examination of Plaintiff's wrist.

> FN31. In support of my conclusion that this fact alone is a sufficient reason to dismiss Plaintiff's claims against Defendant Nesmith, I rely on a case cited by Plaintiff himself. *See Brown,* 894 F.2d at 1539 ("Although no nurses were present [in the hospital] at the jail that day, the procedure of sending [the plaintiff] to the hospital, once employed, was sufficient to ensure that [the plaintiff's broken] foot was treated promptly. Thus, [the plaintiff] has failed to raise an issue of deliberate indifference on the part of these defendants, and the order of summary judgment in their favor must be affirmed.").

**\*13** Even if it were true that Plaintiff made a wrist complaint directly to Defendant Nesmith (during Defendant Nesmith's examination and treatment of Plaintiff between 10:40 a.m. and 11:00 a.m. on August 17,

2000), and Defendant Nesmith heard that complaint, and that complaint were specific and credible enough to warrant an immediate x-ray examination, there would be, at most, only some *negligence* by Defendant Nesmith in not ordering an x-ray examination until 9:00 p.m. that night.

As the Supreme Court has observed, "[T]he question of whether an X-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice....." *Estelle,* 429 U.S. at 107.FN32 For this reason, this Court has actually held that a *17-day* delay between the onset of the prisoner's apparent wrist fracture and the provision of an x-ray examination and cast did not constitute deliberate indifference, as a matter of law. *Miles v. County of Broome,* 04-CV-1147, 2006 U.S. Dist. LEXIS 15482, at *27-28, 2006 WL 561247 (N.D.N.Y. Mar. 6, 2006)* (McAvoy, J.) (granting defendants' motion for summary judgment with regard to prisoner's deliberate indifference claim).

> FN32. *See also Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) (prisoner's "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention [with regard to the treatment of his broken finger], are not adequate grounds for a section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.") [citation omitted]; *cf. O'Bryan v. Federal Bureau of Prisons,* 07-CV-0076, 2007 U.S. Dist. LEXIS 65287, at *24-28 (E.D.Ky. Sept. 4, 2007) (holding no deliberate indifference where prisoner wore wrist brace/bandage on his broken wrist for two months even though he had asked for a cast; finding that "the type of wrap would only go the difference of opinion between a patient and doctor about what should be done, and the Supreme Court has stated that a difference of opinion regarding the plaintiff's

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

diagnosis and treatment does not state a constitutional claim.").

As I read Plaintiff's complaints about the medical care provided to him by Defendant Nesmith in this action, I am reminded of what the Second Circuit once observed:

It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of prisoners would not in freedom or on parole enjoy the excellence in [medical] care which plaintiff[ ] understandably seeks .... We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution.... The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves ....

*Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) [internal quotations and citations omitted].

For all of these reasons, I recommend that Plaintiff's claims against Defendant Nesmith be dismissed with prejudice.

**C. Whether Defendant Nesmith Is Protected from Liability by the Doctrine of Qualified Immunity, As a Matter of Law**

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " [FN33] In determining whether a particular right was *clearly established,* courts in this Circuit consider three factors:

FN33. *Williams,* 781 F.2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ).

*14 (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful. [FN34]

FN34. *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted).

Regarding the issue of whether *a reasonable person would have known* he was violating a clearly established right, this "objective reasonableness" [FN35] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." [FN36] As the Supreme Court explained,

FN35. *See Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

FN36. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law .... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

should be recognized.[FN37]

> FN37. *Malley,* 475 U.S. at 341.

Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law."[FN38]

> FN38. *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases].)

Here, I agree with Defendants that, based on the current record, it was not clearly established that, between August 17, 2000, and August 22, 2000, Plaintiff possessed an Eighth Amendment right to receive an x-ray examination and casting of his wrist any sooner than he did. (Dkt. No. 78, Part 13, at 9-11 [Defs.' Memo. of Law].) I note that neither of the two decisions cited by Plaintiff (discussed earlier in this Report-Recommendation) were controlling in the Second Circuit. *See Brown v. Hughes,* 894 F.2d 1533, 1538-39 (11th Cir.), *cert. denied,* 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Loe v. Armistead,* 582 F.2d 1291, 1296 (4th Cir.1978), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980). I also note that what was controlling was the Supreme Court's decision in *Estelle v. Gamble,* holding that "the question of whether an X-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice....." *Estelle,* 429 U.S. at 107.

Furthermore, I agree with Defendants that, at the very least, officers of reasonable competence could have believed that Defendant Nesmith's actions in conducting the x-ray examination and casting when he did were legal.[FN39] In his memorandum of law, Plaintiff argues that Defendant Nesmith *intentionally* delayed giving Plaintiff an x-ray for 12 hours, and that the four-day delay of placing a hard cast on Plaintiff's wrist caused Plaintiff *permanent injury* to his wrist. (Dkt. No. 88, at 12-13 [Plf.'s Supp. Memo. of Law].) He cites no portion of the

record for either assertion. (*Id.*) Nor would the fact of permanent injury even be enough to propel Plaintiff's Eighth Amendment claim to a jury.[FN40] I emphasize that it is an undisputed fact, for purposes of Defendants' motion, that the reason that Defendant Nesmith placed a splint and not a cast on Plaintiff's wrist and arm on the morning of August 18, 2000, was that Plaintiff's wrist and forearm were swollen, and Defendant Nesmith's medical judgment (based on his experience) was that it was not good medical practice to put a cast on a fresh fracture, because the cast will not fit tightly once the swelling subsides.[FN41] Officers of reasonable competence could have believed that decision was legal.

> FN39. (*Id.*)

> FN40. This particular point of law was recognized in one of the cases Plaintiff himself cites. *Loe,* 582 F.2d at 1296, n. 3 ("[Plaintiff's] assertion that he suffered pain two and one-half weeks after the injury and that the fracture had not healed do not establish deliberate indifference or lack of due process. Similarly, his allegation that he has not achieved a satisfactory recovery suggests nothing more than possible medical malpractice. It does not assert a constitutional tort.").

> FN41. (Dkt. No. 78, Part 12, ¶¶ 31-33 [Defs.' Rule 7.1 Statement]; *see also* Dkt. No. 78, Part 2, ¶¶ 11-13 [Affid. of Nesmith]; Dkt. No. 78, Part 3, Ex. C [Exs. to Affid. of Nesmith] )

**\*15** As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's claims against Defendant Nesmith based on the doctrine of qualified immunity.

**D. Whether Plaintiff Has Adduced Evidence Establishing that He Exhausted His Available Administrative Remedies with Respect to His Assault Claim**

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

or other correctional facility until such administrative remedies as are available are exhausted." [FN42] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN43] The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program.[FN44]

FN42. 42 U.S.C. § 1997e.

FN43. *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

FN44. 7 N.Y.C.R.R. § 701.7.

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following procedure.[FN45] *First,* an inmate must file a complaint with the facility's IGP clerk within fourteen (14) calendar days of the alleged occurrence. A representative of the facility's inmate grievance resolution committee ("IGRC") has seven working days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within seven (7) working days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within four (4) working days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within ten (10) working days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within four (4) working days of receipt of the superintendent's written decision. CORC is to render a written decision within twenty (20) working days of receipt of the appeal. It is important to emphasize that *any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process.* [FN46]

FN45. 7 N.Y.C.R.R. § 701.7; *see also White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

FN46. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g ., Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.).

Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. [FN47] However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA.[FN48] *First,* "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." [FN49] *Second,* if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." [FN50] *Third,* if the remedies were available and some of the defendants did not forfeit, and

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." [FN51]

> FN47. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

> FN48. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).

> FN49. *Hemphill,* 380 F.3d at 686 (citation omitted).

> FN50. *Id.* [citations omitted].

> FN51. *Id.* [citations and internal quotations omitted].

**\*16** Defendants argue that Plaintiff never exhausted his available administrative remedies with regard to his claim arising out of the assault that allegedly occurred on August 17, 2000. (Dkt. No. 78, Part 13, at 9-11 [Defs.' Memo. of Law].)

Plaintiff responds with four different legal arguments. First, he appears to argue that he handed a written grievance to an unidentified corrections officer but never got a response from the IGRC, and that filing an appeal under such a circumstance is merely optional, under the PLRA (Dkt. No. 86, at 23-25, 44 [Plf.'s Memo. of Law].) Second, he argues that Defendants "can't realistically show" that Plaintiff never sent any grievances or appeals to the Great Meadow C.F. Inmate Grievance Clerk since that facility did not (during the time in question) have a grievance "receipt system." (*Id.* at 25-29.) In support of this argument, he cites unspecified record evidence that, although he sent a letter to one "Sally Reams" at some point and received a letter back from her on May 5, 2003, she later claimed that she had never received a letter from Plaintiff. (*Id.* at 29.) Third, he argues that the determination he received from CORC (at some point) satisfied the PLRA's exhaustion requirement. (*Id.* at 30-38.) Fourth, he argues that Defendants rendered any

administrative remedies "unavailable" to Plaintiff, for purposes of the Second Circuit's above-described three-part exhaustion inquiry, by (1) failing to cause DOCS to provide proper "instructional provisions" in its directives, (2) failing to cause Great Meadow C.F. to have a grievance "receipt system," and (3) "trash [ing]" Plaintiff's grievances and appeals. (*Id.* at 39-45.) [FN52]

> FN52. I note that the breadth of Plaintiff's creative, thoughtful and well-developed legal arguments further demonstrates his extraordinary experience as a litigant.

For the reasons set forth below, I reject each of these arguments. However, I am unable to conclude, for another reason, that Plaintiff has failed to exhaust his administrative remedies as a matter of law, based on the current record.

**1. Plaintiff's Apparent Argument that an Appeal from His Lost or Ignored Grievance Was "Optional" Under the PLRA**

Plaintiff apparently argues that filing an appeal to CORC when one has not received a response to one's grievance is merely optional under the PLRA. (Dkt. No. 86, at 23-25, 44 [Plf.'s Memo. of Law].) If this is Plaintiff's argument, it misses the point.

It may be true that the decision of whether or not to file an appeal in an action is always "optional"-from a metaphysical standpoint. However, it is also true that, in order to satisfy the PLRA's exhaustion requirement, one *must* file an appeal when one has not received a response to one's grievance (unless one of the exceptions contained in the Second Circuit's three-party inquiry exists). *See, supra,* note 46 of this Report-Recommendation.

**2. Plaintiff's Argument that Defendants "Can't Realistically Show" that Plaintiff Never Sent any Grievances or Appeals to the Great Meadow C.F. Inmate Grievance Clerk**

Plaintiff also argues that Defendants "can't realistically show" that Plaintiff never sent any grievances or appeals to the Great Meadow C.F. Inmate Grievance Clerk since that facility did not (during the time in question) have a grievance "receipt system." (Dkt. No. 86,

at 25-29 [Plf.'s Memo. of Law].) This argument also fails.

***17** Plaintiff appears to misunderstand the parties' respective burdens on Defendants' motion for summary judgment. Even though a failure to exhaust is an affirmative defense that a defendant must plead and prove, once a defendant has met his initial burden of establishing the absence of any genuine issue of material fact regarding exhaustion (which initial burden has been appropriately characterized as "modest"),[FN53] the burden then shifts to the nonmoving party to come forward with specific facts showing that there is a genuine issue for trial regarding exhaustion. *See, supra,* Part III of this Report-Recommendation.

> FN53. *See* *Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord,* *Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.).

Here, it is an uncontroverted fact, for purposes of Defendants' motion, that (1) grievance records at Great Meadow C.F. indicate that Plaintiff never filed a timely grievance alleging that he had been assaulted by corrections officers at Great Meadow C.F. in 2000, and (2) records maintained by CORC indicate that Plaintiff never filed an appeal (to CORC) regarding any grievance alleging that he had been so assaulted. (*See* Dkt. No. 78, Part 12, ¶¶ 39-40 [Defs.' Rule 7.1 Statement, providing accurate record citations].) Plaintiff has failed to properly controvert these factual assertions with specific citations to record evidence that actually creates a genuine issue of fact. (*See* Dkt. No. 85, Part 2, at 50-51 [Ex. N to Plf.'s Affid.].) As a result, under the Local Rules of Practice for this Court, Plaintiff has effectively "admitted" Defendants' referenced factual assertions. N.D.N.Y. L.R. 7.1(a)(3).

With respect to Plaintiff's argument that the referenced factual assertions are basically meaningless because Great Meadow C.F. did not (during the time in question) have a grievance "receipt system," that argument also fails. In support of this argument, Plaintiff cites unspecified record evidence that, although he sent a letter to Sally Reams (the IGP Supervisor at Great Meadow C.F. in May 2003) at some point and received a letter back from her on May 5, 2003, she later claimed that she had never received a letter from Plaintiff. (*Id.* at 29.) (*See* Dkt. No. 86, at 29 [Plf.'s Memo. of Law].) After examining Plaintiff's original Affidavit and exhibits, I located and carefully read the documents in question. (Dkt. No. 85, Part 1, ¶ 23 [Plf.'s Affid.]; Dkt. No. 85, Part 2 [Exs. F and G to Plf.'s Affid.].)

These documents do not constitute sufficient evidence to create a triable question of fact on the issue of whether, in August and/or September of 2000, Great Meadow C.F. did not have a grievance "receipt system." At most, they indicate that (1) at some point, nearly three years after the events at issue, Plaintiff (while incarcerated at Attica C.F.) wrote to Ms. Reams complaining about the alleged assault on August 17, 2000, (2) she responded to Plaintiff, on May 5, 2003, that he must grieve the issue at Attica C .F., where he must request permission to file an untimely grievance, and (3) at some point between April 7, 2003, and June 23, 2003, Ms. Reams informed Mr. Eagen that she did not "remember" receiving "correspondence" from Plaintiff. (*Id.*) The fact that Ms. Reams, after the passing of several weeks and perhaps months, did not retain an independent memory (not record) of receiving a piece of "correspondence" (not grievance) from Plaintiff (who was not an inmate currently incarcerated at her facility) bears little if any relevance on the issue of whether Great Meadow C.F. had, in April and/or May of 2003, a mechanism by which it recorded its receipt of *grievances.* Moreover, whether or not Great Meadow C.F. had a grievance "receipt system" in April and/or May of 2003 bears little if any relevance to whether it had a grievance "receipt system" in August and/or September of 2000.

***18** It should be emphasized that Defendants have adduced record evidence specifically establishing that, in August and September 2000, Great Meadow C.F. had a *functioning* grievance-recording process through which,

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

when a prisoner (and specifically Plaintiff) filed a grievance, it was "assign[ed] a number, title and code" and "log[ged] ... into facility records." (Dkt. No. 78, Part 6, ¶¶ 7-9 [Bellamy Decl.]; Dkt. No. 78, Part 7, at 2 [Ex. A to Bellamy Decl.] Dkt. No. 78, Part 8, ¶ 4 [Brooks Decl.]; Dkt. No. 78, Part 9, at 6 [Ex. B to Brooks Decl.].)

Finally, even if Great Meadow C.F. did not (during the time in question) have a functioning grievance-recording process (thus, resulting in Plaintiff's alleged grievance never being responded to), Plaintiff still had the duty to appeal that non-response to the next level. *See, supra,* note 46 of this Report-Recommendation.

### 3. Plaintiff's Argument that the Determination He Received from CORC Satisfied the PLRA's Exhaustion Requirement

Plaintiff argues that the determination he received from CORC (at some point) satisfied the PLRA's exhaustion requirement. (Dkt. No. 86, at 30-38 [Plf.'s Memo. of Law].) This argument also fails.

Plaintiff does not clearly articulate the specific portion of the record where this determination is located. (*See id.* at 30 [Plf.'s Affid., referencing merely "plaintiff's affidavit and exhibits"].) Again, the Court has no duty to *sua sponte* scour the 209 pages that comprise Plaintiff's "affidavit and exhibits" for proof of a dispute of material fact, and I decline to do so (and recommend the Court decline to do so) for the reasons stated above in Part IV.A.1. of this Report-Recommendation. I have, however, in analyzing the various issues presented by Defendants' motion, reviewed what I believe to be the material portions of the documents to which Plaintiff refers. I report that Plaintiff appears to be referring to a determination by the Upstate C.F. Inmate Grievance Program, dated June 20, 2003, stating, "After reviewing [your June 11, 2003, Upstate C.F.] grievance with CORC, it has been determined that the grievance is unacceptable. It does not present appropriate mitigating circumstances for an untimely filing." (Dkt. No. 85, Part 2, at 37 [Ex. J to Plf.'s Affid.]; *see also* Dkt. No. 85, Part 1, ¶¶ 22-34 [Plf.'s Affid.].)

There are two problems for Plaintiff with this document. First, this document does *not* constitute a written determination by *CORC* on a written appeal by

Plaintiff to *CORC* from an Upstate C.F. written determination. (*See* Dkt. No. 85, Part 2, at 37 [Ex. J to Plf.'s Affid.].) This fact is confirmed by one of Plaintiff's own exhibits, wherein DOCS IGP Director Thomas Eagen advises Plaintiff, "Contrary to the IGP Supervisor's assertion in his memorandum dated June 20, 2003, the IGP Supervisor's denial of an extension of the time frames to file your grievance from Great Meadow in August 2000 has not been reviewed by the Central Office Review Committee (CORC). The IGP Supervisor did review the matter with Central Office staff who is [sic] not a member of CORC." (*See* Dkt. No. 85, Part 2, at 39 [Ex. K to Plf.'s Affid.].) At best, the document in question is an indication by Upstate C.F. that the success of an appeal by Plaintiff to CORC would be unlikely.

**\*19** Second, even if the document does somehow constitute a written determination by CORC on appeal by Plaintiff, the grievance to which the determination refers is a grievance filed by Plaintiff on June 11, 2003, at Upstate C.F., not a grievance filed by Plaintiff on August 30, 2000, at Great Meadow C.F. (Dkt. No. 85, Part 2, at 32-35 [Ex. I to Plf.'s Affid.].) Specifically, Plaintiff's June 11, 2003, grievance, filed at Upstate C.F., requested permission to file an admittedly *untimely* grievance regarding the injuries he sustained during the assault on August 17, 2000. (*Id.*)

A prisoner has not exhausted his administrative remedies with CORC when, years after failing to file a timely appeal with CORC, the prisoner requests *and is denied* permission to file an untimely (especially, a two-year-old) appeal with CORC due to an unpersuasive showing of "mitigating circumstances." *See Burns v. Zwillinger,* 02-CV-5802, 2005 U.S. Dist. LEXIS 1912, at *11 (S.D.N .Y. Feb. 8, 2005) ("Since [plaintiff] failed to present mitigating circumstances for his untimely appeal to the IGP Superintendent, the CORC, or this Court, [defendant's] motion to dismiss on the grounds that [plaintiff] failed to timely exhaust his administrative remedies is granted."); *Soto v. Belcher,* 339 F.Supp.2d 592, 595 (S.D.N.Y.2004) ("Without mitigating circumstances, courts consistently have found that CORC's dismissal of a grievance appeal as untimely constitutes failure to exhaust available administrative remedies.") [collecting cases]. If the rule were to the contrary, then, as

a practical matter, no prisoner could ever be said to have failed to exhaust his administrative remedies because, immediately before filing suit in federal court, he could perfunctorily write to CORC asking for permission to file an untimely appeal, and whatever the answer, he could claim to have completed the exhaustion requirement. The very reason for requiring that a prisoner obtain permission before filing an untimely appeal presumes that the permitted appeal would be required to complete the exhaustion requirement. Viewed from another standpoint, a decision by CORC to refuse the filing of an untimely appeal does not involve a review of the merits of the appeal.

**4. Plaintiff's Argument that Defendants Rendered any Administrative Remedies "Unavailable" to Plaintiff**

Plaintiff also argues that Defendants rendered any administrative remedies "unavailable" to Plaintiff, for purposes of the Second Circuit's above-described three-part exhaustion inquiry, by (1) failing to cause DOCS to provide proper "instructional provisions" in its directives, (2) failing to cause Great Meadow C.F. to have a grievance "receipt system," and (3) "trash [ing]" Plaintiff's grievances and appeals. (Dkt. No. 86, at 39-45 [Plf.'s Memo. of Law].) This argument also fails.

In support of this argument, Plaintiff "incorporates by reference all the previously asserted points, Plaintiff's Affidavit in Opposition with supporting exhibits, as well as[ ] the entire transcripts of Defendants['] deposition on [sic] Plaintiff ...." (*Id.* at 40, 45.) Again, the Court has no duty to *sua sponte* scour the 265 pages that comprise Plaintiff's Affidavit, Supplemental Affidavit, exhibits, and deposition transcript for proof of a dispute of material fact, and I decline to do so (and recommend the Court decline to do so) for the reasons stated above in Part IV.A.1. of this Report-Recommendation. I have, however, in analyzing the various issues presented by Defendants' motion, reviewed the documents to which Plaintiff refers, and I report that I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.

**\*20** For example, Plaintiff has adduced no evidence

that he possesses any *personal knowledge* (only speculation) of any Defendant in this action having "trashed" his alleged grievance(s) and appeal(s),[FN54] nor has he even adduced evidence that it was *one of the named Defendants in this action* to whom he handed his alleged grievance(s) and appeal(s) for delivery to the Great Meadow C.F. Inmate Grievance Program Clerk on August 30, 2000, September 13, 2000, and September 27, 2000.[FN55] Similarly, the legal case cited by Plaintiff appears to have nothing to do with any Defendant to this action, nor does it even have to do with Great Meadow C.F.[FN56]

FN54. (*See* Dkt. No. 85, Part 1, ¶¶ 13-14, 16-17 [Plf.'s Affid., asserting, "Prison officials trashed my grievances and appeals since they claim not to have them despite [the] fact I sent them in a timely manner. It's [the] only reason they wouldn't have them.... Prison officials have a history of trashing grievances and appeals.... I've been subjected to having my grievances and appeals trashed prior to and since this matter and have spoken to alot [sic] of other prisoners whom [sic] said that they were also subjected to having their grievances and appeals trashed before and after this incident, in alot [sic] of facilities.... Suspecting foul play with respect to my grievances and appeals, I wrote, and spoke to[,] prison officials and staff that did nothing to rectify the matter, which isn't surprising considering [the] fact that it's an old problem ...."].)

FN55. (*See* Dkt. No. 85, Part 1, ¶ 6 [Plf.'s Affid., asserting only that "[o]n August 30th, 2000 plaintiff handed the correction officer collecting the mail in F Block SHU in the Great Meadow Correctional Facility an envelope addressed to the inmate grievance clerk ... which contained the grievances relative to this action at hand ...."]; Dkt. No. 85, Part 1, ¶ 9 [Plf.'s Affid., asserting only that "[o]n September 13, 2000, I appealed said grievances to [the] Superintendent by putting them in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail, in F-Block

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

SHU [at] Great Meadow CF ...."]; Dkt. No. 85, Part 1, ¶ 11 [Plf.'s Affid., asserting only that "[o]n September 27th, 2000, I appealed said grievance ... to C.O.R.C. by putting them [sic] in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail in F-Block SHU [at] Great Meadow CF ...."].)

FN56. (*See* Dkt. No. 85, Part 1, ¶ 15 [Plf.'s Affid., referencing case]; Dkt. No. 85, Part 2, at 16-17 [Ex. B to Plf.'s Affid., attaching a hand-written copy of case, which mentioned a prisoner's grievances that had been discarded in *1996* by an *unidentified* corrections officer at *Sing Sing Correctional Facility* ].)

**5. Record Evidence Creating Genuine Issue of Fact**

Although I decline to *sua sponte* scour the lengthy record for proof of a triable issue of fact regarding exhaustion, I have, while deciding the many issues presented by Defendants' motion, had occasion to review in detail many portions of the record. In so doing, I have discovered evidence that I believe is sufficient to create a triable issue of fact on exhaustion.

Specifically, the record contains Plaintiff's testimony that (1) on August 30, 2000, he gave a corrections officer a grievance regarding the alleged assault on August 17, 2000, but he never received a response to that grievance, (2) on September 13, 2000, he gave a corrections officer an appeal (to the Superintendent) from that non-response, but again did not receive a response, and (3) on September 27, 2000, he gave a corrections officer an appeal (to CORC) from that non-response, but again did not receive a response.FN57

FN57. (*See* Dkt. No. 85, Part 1, ¶ 6 [Plf.'s Affid., asserting only that "[o]n August 30th, 2000 plaintiff handed the correction officer collecting the mail in F Block SHU in the Great Meadow Correctional Facility an envelope addressed to the inmate grievance clerk in which contained [sic] the grievances relative to this action at hand ...."]; Dkt. No. 85, Part 1, ¶ 9 [Plf.'s Affid., asserting only that "[o]n September 13, 2000, I appealed said grievances to [the] Superintendent

by putting them in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail; in F-Block SHU [at] Great Meadow CF...."]; Dkt. No. 85, Part 1, ¶ 11 [Plf.'s Affid ., asserting only that "[o]n September 27h, 2000, I appealed said grievance ... to C.O.R.C. by putting them [sic] in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail in F-Block SHU [at] Great Meadow CF ...."].)

The remaining issue then, as it appears to me, is whether or not this affidavit testimony is so self-serving and unsubstantiated by other direct evidence that "no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." FN58 Granted, this testimony appears self-serving. However, based on the present record, I am unable to find that the testimony is so wholly unsubstantiated by other direct evidence as to be incredible. Rather, this testimony appears corroborated by two pieces of evidence. First, the record contains what Plaintiff asserts is the grievance that he handed to a corrections officer on August 30, 2000, regarding the alleged assault on August 17, 2000. (Dkt. No. 85, Part 2, at 65-75 [Ex. Q to Plf.'s Affid.].) Second, the record contains two pieces of correspondence between Plaintiff and legal professionals *during or immediately following the time period in question* containing language suggesting that Plaintiff had received no response to his grievance. (Dkt. No. 85, Part 2, at 19-21 [Exs. C-D to Plf.'s Affid .].)

FN58. *See, supra,* note 12 of this Report-Recommendation (collecting cases).

Stated simply, I find that sufficient record evidence exists to create a genuine issue of fact as to (1) whether Plaintiff's administrative remedies were, with respect to his assault grievance during the time in question, "available" to him, for purposes of the first part of the Second Circuit's three-part exhaustion inquiry, and/or (2) whether Plaintiff has shown "special circumstances" justifying his failure to comply with the administrative procedural requirements, for purposes of the third part of the Second Circuit's three-part exhaustion inquiry.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

**\*21** As a result, I recommend that the Court deny this portion of Defendants' motion for summary judgment.

**E. Whether Plaintiff Has Sufficiently Alleged, or Established, that Defendants Were Liable for the Policy to Review the Non-Life-Sustaining Medical Prescriptions of Prisoners Upon Arrival at Great Meadow C.F.**

As explained above in Part II.A. of this Report-Recommendation, Defendants argue that, during his deposition in this action, Plaintiff asserted, for the first time, a claim that the medical staff at Great Meadow C.F. violated his rights under the Eighth Amendment by failing to honor non-life-sustaining medical prescriptions written at a former facility. (Dkt. No. 78, Part 13, at 3 [Defs.' Mem. of Law].) As a threshold matter, Defendants argue, this claim should be dismissed since Plaintiff never included the claim in his Second Amended Complaint, nor did Plaintiff ever file a motion for leave to file a Third Amended Complaint. (*Id.*) In any event, Defendants argue, even if the Court were to reach the merits of this claim, the Court should dismiss the claim because Plaintiff has failed to allege facts plausibly suggesting, or adduce evidence establishing, that Defendants were personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided such allegations or evidence indicating the policy is even unconstitutional. (*Id.*)

Plaintiff responds that "[he] didn't have to get in particular [sic] about the policy [of] discontinuing all incoming prisoners['] non[-]life[-]sustaining medications without examination and indiscriminently [sic] upon arrival at [Great Meadow] C.F. in [his Second] Amended Complaint. Pleading[s] are just supposed to inform [a] party about [a] claim[,] and plaintiff informed defendant [of] the nature of [his] claims including [the claim of] inadequate medical care. And discovery revealed [the] detail[s] [of that claim] as [Plaintiff had] intended." (Dkt. No. 88, at 10 [Plf.'s Supp. Memo. of Law].) In addition, Plaintiff responds that Defendant Paolano must have been personally involved in the creation and/or implementation of the policy in question since he was the Great Meadow Health Services Director. (*Id.* at 10.)

I agree with Defendants that this claim is not properly

before this Court. Plaintiff's characterization of the notice-pleading standard, and of the contents of his Amended Complaint, are patently without support (both legally and factually). It has long been recognized that a "claim," under Fed.R.Civ.P. 8, denotes "the aggregate of operative facts which give rise to a right enforceable in the courts." [FN59] Clearly, Plaintiff's Second Amended Complaint alleges no facts whatsoever giving rise to an asserted right to be free from the application of the prescription-review policy at Great Meadow C.F. Indeed, his Second Amended Complaint-which asserts Eighth Amendment claims arising *solely* out of events that (allegedly) transpired on August 17, 2000-says nothing at all of the events that transpired immediately upon his arrival at Great Meadow C.F. in early August of 2000, nor does the Second Amended Complaint even casually mention the words "prescription," "medication" or "policy." (*See generally* Dkt. No. 10 [Second Am. Compl.].)

FN59. *Original Ballet Russe, Ltd. v. Ballet Theatre, Inc.,* 133 F.2d 187, 189 (2d Cir.1943); *United States v. Iroquois Apartments, Inc.,* 21 F.R.D. 151, 153 (E.D.N.Y.1957); *Birnbaum v. Birrell,* 9 F.R.D. 72, 74 (S.D.N.Y.1948).

**\*22** Furthermore, under the notice-pleading standard set forth by Fed.R.Civ.P. 8(a)(2), to which Plaintiff refers in his Supplemental Memorandum of Law, Defendants are entitled to *fair notice* of Plaintiff's claims. [FN60] The obvious purpose of this rule is to protect defendants from undefined charges and to facilitate a proper decision on the merits. [FN61] A complaint that fails to provide such fair notice "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN62] This fair notice does not occur where, as here, news of the claim first springs up in a deposition more than two years after the action was commenced, approximately seven months after the amended-pleading deadline expired, and approximately two weeks before discovery in the action was scheduled to close. (*Compare* Dkt. No. 1 [Plf.'s Compl., filed 8/14/03] *with* Dkt. No. 42, at 1-2 [Pretrial Scheduling Order setting amended-pleading deadline as 2/28/05] *and* Dkt. No. 78, Part 11, at 52-53 [Plf.'s Depo.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

Transcript, dated 9/30/05] *and* Dkt. No. 49 [Order setting discovery deadline as 10/14/05].)

FN60. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (the statement required by Fed.R.Civ.P. 8 [a][2] must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests").

FN61. *Ruffolo v. Oppenheimer & Co., Inc.,* 90-CV-4593, 1991 WL 17857, at *2 (S.D.N.Y. Feb.5, 1991); *Howard v. Koch,* 575 F.Supp. 1299, 1304 (E.D.N.Y.1982); *Walter Reade's Theatres, Inc. v. Loew's Inc.,* 20 F.R.D. 579, 582 (S.D.N.Y.1957).

FN62. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Tech., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

Under the circumstances, the mechanism by which to assert such a late-blossoming claim was a motion to reopen the amended-pleading filing deadline (the success of which depended on a showing of cause), coupled with a motion for leave file a Third Amended Complaint (the success of which depended, in part, on a showing of lack of prejudice to Defendants, as well as a lack of futility). Plaintiff never made such motions, nor showed such cause.

I acknowledge that, generally, the liberal notice-pleading standard set forth by Fed.R.Civ.P. 8 is applied with even greater force where the plaintiff is proceeding *pro se.* In other words, while all pleadings are to be construed liberally, *pro se* civil rights pleadings are

generally construed with an *extra* degree of liberality. As an initial matter, I have already concluded, based on my review of Plaintiff's extensive litigation experience, that he need not be afforded such an extra degree of leniency since the rationale for such an extension is a *pro se* litigant's inexperience with the court system and legal terminology, and here Plaintiff has an abundance of such experience. *See, supra,* notes 21-25 of this Report-Recommendation. Moreover, even if he were afforded such an extra degree of leniency, his phantom prescription-review claim could not be read into his Second Amended Pleading, for the reasons discussed above. (I note that, even when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended.") FN63

FN63. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

Nor could Plaintiff's late-blossoming prescription-review claim properly be read into his papers in opposition to Defendants' motion for summary

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

judgment. Granted, a *pro se* plaintiff's papers in opposition to a *motion to dismiss* may sometimes be read as effectively amending a pleading (e.g., if the allegations in those papers are consistent with those in the pleading). However, a *pro se* plaintiff's papers in opposition to a *motion for summary judgment* may not be so read, in large part due to prejudice that would inure to the defendants through having the pleading changed after discovery has occurred and they have gone through the expense of filing a motion for summary judgment.[FN64]

> FN64. *See Auguste v. Dept. of Corr., 424 F.Supp.2d 363, 368 (D.Conn.2006)* ("Auguste [a *pro se* civil rights plaintiff] cannot amend his complaint in his memorandum in response to defendants' motion for summary judgment.") [citations omitted].

**\*23** Finally, in the event the Court decides to construe Plaintiff's Second Amended Complaint as somehow asserting this claim, I agree with Defendants that the Court should dismiss that claim, also for the reasons discussed above in Part IV.A.2. of this Report-Recommendation. Specifically, Plaintiff has failed to adduce evidence establishing that Defendant Paolano (or any named Defendant in this action) was personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided evidence establishing that the policy is even unconstitutional. *See, supra,* Part IV.A.2. of this Report-Recommendation.

**ACCORDINGLY,** it is

**ORDERED** that the Clerk's Office shall, in accordance with note 1 of this Order and Report-Recommendation, correct the docket sheet to remove the names of Defendants Englese, Edwards, Bump, Smith, Paolano, and Nesmith as "counter claimants" in this action; and it is further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 78) be ***GRANTED* in part** (i.e., to the extent that it requests the dismissal with prejudice of Plaintiff's claims against Defendants Paolano and Nesmith) and ***DENIED* in part** (i.e., to the extent that it requests dismissal of Plaintiff's claims against the remaining Defendants on the grounds of Plaintiff's failure to exhaust available administrative remedies) for the reasons stated above.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2008.

Murray v. Palmer
Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 4107805 (N.D.N.Y.)

(Cite as: 2012 WL 4107805 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Elijah BARKSDALE, Plaintiff,
v.
R.T. FRENYA, et al., Defendants.
Civ. Action No. 9:10–CV–00831 (MAD/DEP).

Sept. 19, 2012.
Elijah Barksdale, New York, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, David Cochran, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Elijah Barksdale, a former New York prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action against the Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS") as well as the superintendent and two corrections officers stationed at the prison in which he was confined at the relevant times, pursuant to 42 U.S.C. § 1983, alleging deprivation of his civil rights. In his complaint, Barksdale contends that defendants violated his Eighth and Fourteenth Amendment rights by failing to protect him from an attack by another inmate, denying him the right to call a witness at a disciplinary hearing arising out of the incident, affirming the findings from the hearing, and subjecting him to cruel and unusual punishment by confining him in a special housing unit ("SHU") for a period of 120 days. As relief, plaintiff seeks damages in the amount of $100 per day spent in the SHU and punitive damages of $10,000, awardable against each defendant.

Currently pending before the court is a motion for summary judgment brought by the defendants, seeking dismissal of plaintiff's claims. In support of their motion,

defendants assert that 1) Commissioner Fischer is entitled to dismissal of plaintiff's claims against him based upon a lack of personal involvement; 2) Barksdale's claims are subject to dismissal based upon his failure to exhaust his administrative remedies; and 3) plaintiff cannot sustain a due process violation related to his disciplinary hearing because he cannot establish a protected liberty interest in remaining free from the challenged SHU confinement. For the reasons set forth below, I recommend that defendants' motion, which the plaintiff has not opposed, be granted in part, but otherwise denied.

I. *BACKGROUND*[FN1]

> **FN1.** In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

Plaintiff, though no longer incarcerated, was formerly a prison inmate confined under the supervision of the DOCCS; at the times relevant to his claims in this action, plaintiff was designated to the Clinton Correctional Facility ("Clinton"), located in Dannamora, New York. *See generally* Complaint (Dkt. No. 1).

On September 8, 2009, plaintiff was involved in a physical altercation with another inmate. Complaint (Dkt. No. 1) § 6. While plaintiff was delivering meals to SHU inmates, Corrections Officer ("CO") Frenya was conducting showers for SHU inmates. *Id.* As a fellow inmate named Aiken "exited the shower and was returning to his cell", he turned around and attacked plaintiff. *Id.* A direct order was given for the two inmates to cease fighting, but was ignored. *Id.* When the altercation ended, a weapon was discovered in the area. *Id.*

As a result of the incident, plaintiff was issued a misbehavior report accusing him of multiple prison rule infractions, including possession of a weapon, refusing a direct order, and fighting. Complaint (Dkt. No. 1) § 6. An

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 4107805 (N.D.N.Y.)

(Cite as: 2012 WL 4107805 (N.D.N.Y.))

assistant, J. Kelsh, was assigned to help plaintiff prepare a defense for the charges against him. *Id.* Kelsh interviewed two potential witnesses on plaintiff's behalf—inmate Aiken and CO Frenya. During those interviews both agreed to testify at a disciplinary hearing scheduled to address the charges, and Aiken indicated that he would confirm that Barksdale did not possess, display or use a weapon during the incident. *Id.*

**\*2** A Tier III disciplinary hearing was held on September 14, 2009 before Corrections Hearing Officer ("CHO") Curtis Drown in connection with the charges against the plaintiff.[FN2] *Id.* Although CO Frenya was made available as a witness on plaintiff's behalf, inmate Aiken was not produced. *Id.* Plaintiff did not receive "any written notice or oral statements" stating the reason that inmate Aiken was not presented to testify. Complaint (Dkt. No. 1) § 6. At the close of the hearing, defendant Drown found plaintiff guilty of assaulting an inmate, fighting, weapon possession, and refusing to obey a direct order. Complaint (Dkt. No. 1) Exh. A. As a result, a penalty which included 120–days of disciplinary SHU confinement was imposed by the hearing officer. *Id.*

> FN2. The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3. Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. Tier III hearings concern the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

Plaintiff appealed defendant Drown's decision to Clinton Superintendent Dale Artus, resulting in a decision by Deputy Superintendent LaValley affirming the Tier III hearing determination on the Superintendent's behalf. Complaint (Dkt. No. 1) § 6 and Exh. E. On September 28, 2009, plaintiff appealed LaValley's affirmation to Commissioner Brian Fischer. Complaint (Dkt. No. 1) § 6 and Exh. E. In response, plaintiff received a letter from

Norman Bezio, the DOCCS Director of Special Housing and Inmate Disciplinary Program, affirming the hearing on behalf of the Commissioner Fischer.[FN3] *Id.* at Exh. G.

> FN3. A subsequent request for relief from that determination resulted in the issuance of a letter from Director Bezio rejecting plaintiff's call for reconsideration. *See* Complaint (Dkt. No. 1) Exh. H.

On November 10, 2009, plaintiff commenced a proceeding under Article 78 of the New York Civil Practice Law and Rules in the New York State Supreme Court, challenging the Tier III disciplinary hearing determination. Complaint (Dkt. No. 1) Exh. I. In that proceeding the state court found in plaintiff's favor and reversed the disposition of the detention hearing, finding that Barksdale's constitutional rights were violated by the failure of the hearing officer to make any attempt to obtain inmate Aiken's testimony at the hearing. *Id.* at Exh. J.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on July 8, 2010, and was thereafter granted leave to proceed *in forma pauperis.* Dkt. Nos. 1, 4. Plaintiff's complaint names CO Frenya, CHO Drown, Superintendent Artus, and Commissioner Fischer as defendants and, broadly construed, asserts three causes of action. *See generally* Complaint (Dkt. No. 1) §§ 3, 7. First, plaintiff claims that defendant Frenya failed to protect him by not following proper protocol for conducting showers for SHU inmates. *See id.* Second, plaintiff asserts that his Fourteenth Amendment Due Process rights were violated by defendant Drown, by virtue of his failure to call a requested witness during plaintiff's disciplinary hearing, and that defendants Artus and Fischer are liable for the resulting procedural due process violation by virtue of their having affirmed the disciplinary determination despite claims of due process violations. *Id.* Third, plaintiff claims that, in violation of the Eighth Amendment, he was subjected to cruel and unusual punishment when he was sentenced to 120 days of SHU confinement. Complaint (Dkt. No. 1) § 6.

**\*3** On December 2, 2011, defendants moved for summary judgment dismissing plaintiff's complaint for lack of personal involvement on the part of defendant

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 4107805 (N.D.N.Y.)

(Cite as: 2012 WL 4107805 (N.D.N.Y.))

Fischer, failure to exhaust administrative remedies, and lack of a protected liberty interest in remaining free from the challenged confinement.[FN4] Dkt. No. 44. Plaintiff has not responded to the motion, despite having requested and secured an extension of time for doing so.

> FN4. In their motion defendants do not address plaintiff's cruel and unusual punishment claim.

Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d

at 83. In the event this initial burden is met the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

*4 When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Plaintiff's Failure to Oppose Defendants' Motion*

Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' summary judgment motion. That failure is not without potential consequences.

The court's rules require that a motion seeking the entry of summary judgment must be accompanied by a statement of material facts with respect to which, the moving party contends, there exists no genuine issue. *See* N.D.N.Y.L.R. 7.1(a)(3). The purpose underlying this rule, which is typical of many local court rules governing summary judgment motion practice, is to assist the court in framing the issues and determining whether there exist any triable issues of fact that would preclude the entry of summary judgment. *Anderson v. Dolgencorp of N. Y.,*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 4107805 (N.D.N.Y.)

(Cite as: 2012 WL 4107805 (N.D.N.Y.))

Nos. 1:09–cv–360, 1:09–cv–363, 2011 WL 1770301, at *1 n. 2 (N.D.N.Y. May 9, 2011) (Sharpe, J.).[FN5] In order to fulfill this salutary purpose, it is essential for the court to have the benefit of both the moving party's statement and an opposition statement addressing the facts set forth in the initial statement.

> FN5. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

In this instance, the defendants have complied with Local Rule 7.1(a)(3), providing a statement setting forth fourteen facts as to which, they contend, there is no genuine triable issue. Plaintiff has failed to respond to that statement. By its express terms, the governing rule provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y.L.R. 7.1(a)(3). Based upon his failure to respond, I recommend that the court invoke this rule and deem the facts set forth in defendants' Local Rule 7.1(a)(3) to have been admitted by Barksdale.[FN6] *See Elgamil v. Syracuse Univ.,* No. 99–cv–611, 2011 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, J.) (listing cases); *see also Monehan v. New York City Dep't of Cor. RR.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing a district court's discretion to adopt local rules similar to 7.1(a)(3)).

> FN6. Defendants' notice of motion in this case was accompanied by a document entitled "notification of the Consequences of Failing to Respond to a Summary Judgment Motion," as required by this court's local rules in cases involving *pro se* litigants. *See* N.D.N.Y.L.R. 56.2.

C *Personal Involvement*

In their motion, defendants assert that plaintiff's due process claim against defendant Fischer should be dismissed based on his lack of personal involvement in the conduct giving rise to plaintiff's constitutional claims. Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

*5 Defendants assert that Commissioner Fischer is only named as a defendant because of his supervisory position, and therefore cannot be held liable for the violations alleged. It is true that defendant Fischer, as Commissioner of the DOCCS, cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Responsibility on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007), *rev'd on other grounds sub nom., Ashcroft v. Iqbal,* 556 U.S. 662,129 S.Ct. 1937 (2009); *see also Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501.[FN7]

> FN7. The Second Circuit has yet to address the impact of the Supreme Court's decision in *Iqbal* upon the categories of supervisory liability under *Colon.* Lower courts have struggled with this issue, and specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See Sash v. United States,* 674 F.Supp.2d at 531, 542–44 (S.D.N.Y.2009); *see also Stewart v. Howard,* No. 9:09–CV–0069 (GLS/GHL), 2010 WL 3907227, at *12 n. (N.D.N.Y. Apr. 26, 2010) ("The Supreme Court's decision in [*Iqbal* ]

Slip Copy, 2012 WL 4107805 (N.D.N.Y.)

(Cite as: 2012 WL 4107805 (N.D.N.Y.))

arguably casts in doubt the continued viability of some of the categories set forth in *Colon.*" ) (citations omitted), *report and recommendation adopted,* 2010 WL 3907137 (Sept. 30, 2010). While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801(SAS), 2009 WL1835939, at *6 (S.D.N .Y. June 26, 2009), *aff'd,* 387 Fed. App'x 55 (2d Cir.2010), others disagree and conclude that whether any of the five categories apply in any particular case depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 346–47 (S.D.N.Y.2010), *aff'd,* 2012 WL 498854 (2d Cir. Feb. 16, 2012); *Qasem v. Toro,* 737 F.Supp.2d 147, 151–52 (S.D.N.Y.2010).

In his deposition plaintiff testified that the "sole reason" he sued Commissioner Fischer was because Fischer affirmed the disciplinary hearing determination at issue. Rule 7.1(a)(3) Statement (Dkt. No. 44–7) ¶ 8. Within this circuit there is a severe division among the district courts as to whether mere review by a DOCCS official of an appeal from a disciplinary hearing, which an inmate claims to have been infected by due process violations, can lead to personal liability on the part of that individual. *See Thomas v. Calero,* 824 F.Supp.2d 488, 508–09 (S.D.N.Y.2011) ("a number of courts in this Circuit have concluded that merely affirming the hearing officer's determination is not a sufficient basis to impose liability under the second *Colon* factor.... On the other hand, other courts have found that affirming a hearing officer's determination on appeal is sufficient to establish personal involvement under the second *Colon* factor."). However, "the Second Circuit has, on at least one occasion, allowed a due-process claim to proceed against an upper-level prison official based on the allegation that the official 'affirmed [plaintiff's disciplinary] conviction on administrative appeal.' " *Thomas,* 824 F.Supp.2d at 507 (alteration in original) (quoting *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986)).

In *Rodriguez v. Selsky,* I followed those cases holding

that a supervisory official's affirmance "of a constitutionally defective disciplinary determination at a time when the inmate is still serving his or her disciplinary sentence, and the violation can therefore be abated, falls within the *Colon* factors articulated in the Second Circuit for informing the supervisory liability analysis." No. 9:07–CV–0432, 2011 WL 1086001, at *6 (N.D.N.Y. Jan. 25, 2011) (Peebles, M.J.), *report and recommendation adopted,* 2011 WL 830639 (N.D.N.Y. Mar. 3, 2011) (Kahn, J.) (citing *Colon,* 58 F.3d at 873); *see also Thomas,* 824 F.Supp.2d at 509 ("Director Bezio's actions fall squarely within the second *Colon* factor-after he learned, via an appeal, of an alleged violation of plaintiff's rights, he not only failed to remedy the wrong, but allowed it to continue."); *but see Tafari v. McCarthy,* 714 F.Supp.2d 317, 383 (N.D.N.Y.2010) ("the affirming of a disciplinary conviction does not constitute personal involvement in a constitutional violation"). In my view, those cases concluding that a plaintiff's allegations that a supervisory defendant reviewed and upheld an alleged constitutionally suspect disciplinary determination are enough to show his or her personal involvement in the alleged violation appear to be both better reasoned and more consonant with the Second Circuit's position regarding personal involvement. *See Black v. Coughlin,* 76 F.3d 72, 75 (2d Cir.1996) (criticizing a district court's denial of leave to amend to add Donald Selsky as a defendant in a due process setting and appearing to assume that Selsky's role in reviewing and affirming a disciplinary determination is sufficient to establish his personal involvement).

**\*6** In this case the question of which line of supervisory personal liability cases should be followed is not outcome-determinative. The record reflects that plaintiff's appeal of his disciplinary sentence to the Commissioner's office was reviewed by Norman Bezio. There is no evidence of defendant Fischer's involvement in the review of that disciplinary determination. In the absence of such evidence, defendant Fischer is entitled to dismissal of plaintiff's claims against him.

D. *Exhaustion of Remedies*

Defendants next assert that plaintiff's claim against defendant Frenya is procedurally barred based upon his

Slip Copy, 2012 WL 4107805 (N.D.N.Y.)

(Cite as: 2012 WL 4107805 (N.D.N.Y.))

failure to exhaust administrative remedies. The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389003, at *5–6 (E.D.N.Y. Jan. 31, 2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992 (2002) (citation omitted).

If the court finds that an inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94–95, 126 S.Ct. at 2387–88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ).[FN8]

> **FN8.** While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir.2004) (emphasis omitted).

In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate

plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement.[FN9] *Macias,* 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Under the prescribed catechism, a court must first determine whether adminsitrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. If such a remedy existed and was available, the court must next examine whether the defendants have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it or whether through their own actions in preventing the exhaustion of plaintiff's remedies, they should be estopped from asserting failure to exhaust as a defense.[FN10] *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event the proffered defense survives these first two levels of scrutiny, the court lastly must examine whether special circumstances nonetheless exist and "have been plausibly alleged" to justify the plaintiff's failure to comply with the applicable administrative procedural requirements.[FN11] *Macias,* 495 F.3d at 41; *Hemphill,* 380 F .3d at 686.

> **FN9.** Whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford,* has been a matter of some speculation. *See, e.g., Newman v. Duncan,* NO. 04–CV–395, 2007 WL 2847304, at *2 n. 4 (N.D.N.Y. Sept. 26, 2007) (McAvoy, S.J. and Homer, M.J.).

> **FN10.** Defendants have preserved the defense of non-exhaustion by raising it in their answer. *See* Answer (Dkt.18) ¶ 13 ("Plaintiff failed to exhaust administrative remedies.").

> **FN11.** In practicality these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap. *See Hargrove,* 2007 WL 389003, at *8 n. 14); *see also Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

**\*7** Plaintiff does not contest the availability of a mechanism for seeking internal administrative relief with respect to complaints regarding prison conditions at Clinton. New York prison inmates are subject to an Inmate

Slip Copy, 2012 WL 4107805 (N.D.N.Y.)

(Cite as: 2012 WL 4107805 (N.D.N.Y.))

Grievance program ("IGP") established by the DOCCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112–13 (2d Cir.1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident.[FN12] 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* at §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision. *Id.* at § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

> FN12. The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances." 7 N.Y.C.R.R. § 701 .6(g)(1)(i)(a)-(b).

1. *Failure to Protect Claim*

The record now before the court firmly establishes that plaintiff failed to file any grievances regarding his failure to protect claim against defendant Frenya. Bellamy Aff. (Dkt. No. 44–4); *see also* Complaint (Dkt. No. 1) § 4. In his inmate civil rights complaint, which is given under penalty of perjury, Barksdale states that he did not present facts relating to his complaint through the grievance program, nor did he complain to prison authorities about the facts alleged, noting as a reason the fact that the incident in issue allegedly occurred at Clinton, and that he was incarcerated in the Upstate Correctional Facility at the time the complaint was filed. *See* Complaint (Dkt. No. 1)

§ 4. While it is true that in his subsequent deposition in this action plaintiff claims to have filed several grievances that were "intercepted" and "ripped", and vaguely describes grievances related to the assault, misconduct, and disciplinary hearing, the plaintiff's complaint and accompanying submissions show the filing of three grievances alleging misconduct on the part of hearing officer Drown, with no response received to any of the three, but no grievances relating to his claim that defendant Frenya failed to protect him. *See* Complaint (Dkt. No. 1) Exh. D. Based upon the foregoing, and in particular the admission in plaintiff's complaint concerning the lack of any grievances, I recommend a finding that no genuine issue of material fact exists concerning exhaustion with regard to plaintiff's failure to protect the cause of action against defendant Frenya, and that it be dismissed on this procedural ground. *Baker v. Krieger,* 287 F.Supp.2d 207, 209 (W.D.N.Y.2003); *Hernandez v. Nash,* No. 9:00CV1564FJSGLS, 2003 WL 22143709, at * 4 (N.D.N.Y. Sep. 10, 2003).

2. *Due Process Claim*

**\*8** Plaintiff's due process claims stand on different footing. As an exception to the requirement of exhaustion through resort to the IGP, "under certain circumstances, an inmate may exhaust his administrative remedies by raising his claim during a related disciplinary proceeding."[FN13] *Murray v. Palmer,* No. 9:03–CV–1010, 2010 WL 1235591, at *3 (Mar. 31, 2010) (Suddaby, D.J.) (emphasis omitted) (citing *Giano,* 380 F.3d at 678–79; *Johnson,* 380 F.3d at 697). An appeal from a disciplinary hearing that presents the precise procedural infirmities raised in the section 1983 action, for example, may be sufficient to exhaust administrative remedies. *LaBounty v. Johnson,* 253 F.Supp.2d 496, 502 n. 5 (W.D.N.Y.2003) (citing and quoting *Flanagan v. Maly,* 99 Civ. 12336, 2002 WL 122921, *2 (S.D.N.Y. Jan. 29, 2002)). In *Flanagan,* for example, the court declined to dismiss the plaintiff's due process claim for failure to exhaust, reasoning that

> FN13. Notably, " 'an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable.' " *Murray,* 2010 WL 1235591, at * 3 (quoting 7 N.Y.C.R.R. § 701.(3)(e)(2)).

[t]o require Flanagan to file an administrative grievance

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 4107805 (N.D.N.Y.)

(Cite as: 2012 WL 4107805 (N.D.N.Y.))

in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of § 1997a(e), by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

*Flanagan,* 2002 WL 122921, at * 2.

The Second Circuit has explicitly upheld the reasoning of the court in *Flanagan* on at least two separate occasions. In *Ortiz v. McBride,* the Second Circuit "expressly agreed with the parties that Ortiz exhausted his administrative remedies with respect to his due process claim by successfully appealing the hearing which resulted in his confinement." *Davis v. Barrett,* 576 F.3d 129,132–33 (2d Cir.2009) (citing *Ortiz v. McBride,* 380 F.3d 649, 653 (2d Cir.2004)). In *Davis v. Barrett,* the Court held that the inmate-plaintiff's "successful appeal of his administrative hearing constitutes exhaustion under the PLRA for purposes of rendering his due process claim ripe for adjudication in federal court." *Davis,* 576 F.3d at 132. Citing to its previous decision in *Ortiz,* the court indicated "that a prisoner may exhaust his administrative remedies for segregated confinement by appealing the adverse hearing determination." *Id.* (citing *Ortiz,* 380 F.3d at 653–54).

In my view, the plaintiff should enjoy the benefit of this exception based upon his pursuit of a challenge to the disciplinary determination, ultimately resulting in the determination being overturned by the state court after plaintiff served his 120 days of disciplinary confinement. Complaint (Dkt. No. 1) § 6. Accordingly, I recommend that the motion to dismiss plaintiff's due process claim for failure to exhaust administrative remedies be denied.

E. *Merits of Plaintiff's Due Process Claim*

**\*9** Plaintiff claims his Due Process rights were violated because a requested witness was not called to testify at his disciplinary hearing, and as a result he was sentenced to 120 days of disciplinary SHU confinement. To successfully state a claim under 42 U.S.C. § 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he or she both 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient process. *See Tellier v.. Fields,* 260 F.3d 69, 79–80 (2d Cir.2000) (citations omitted); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996). In their motion, defendants assert that plaintiff's disciplinary confinement was of insufficient duration to qualify as a liberty interest deprivation of constitutional significance.

In *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293 (1995), the United States Supreme Court determined that to establish the deprivation of a liberty interest, a prison inmate must sufficiently demonstrate that (1) the State actually created a protected liberty interest in being free from segregation order imposed and that (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 483–84, 115 S.Ct. at 2300; *Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658. Atypicality in a *Sandin* inquiry is normally a question of law.[FN14] *Colon v. Howard,* 215 F.3d 227, 230–31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999). When determining whether a plaintiff possesses a liberty interest, the court must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335–36 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 48–49 (2d Cir.1997). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a detailed explanation of this analysis is not necessary.[FN15] *Hynes,* 143 F.3d at 658; *Arce,* 139 F.3d at 336.

> **FN14.** In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit the question to a jury for

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 4107805 (N.D.N.Y.)

(Cite as: 2012 WL 4107805 (N.D.N.Y.))

resolution. *Colon,* 215 F.3d at 230–31; *Sealey,* 197 F.3d at 585.

FN15. While not the only factor to be considered, the duration of a disciplinary confinement remains significant under *Sandin. Colon,* 215 F.3d at 231.

Although the Second Circuit has "not established a bright-line rule as to how lengthy a SHU confinement will be considered atypical and significant", *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000), that court has held that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required." FN16 *Palmer v. Richards,* 364 F.3d 60, 64–65 (2d Cir.2004) (quoting *Colon,* 215 F.3d at 232). "In the absence of a detailed factual record, we have affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short—less than the 30 days that the *Sandin* plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions." *Palmer,* 364 F.3d at 65–66.

FN16. In *Colon v. Howard,* a Second Circuit panel split markedly on whether or not adoption of a 180–day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. *See* 215 F.3d at 232–34 (Newman, C.J.), 235–37 (Walker, C.J. and Sack, C.J., concurring in part).

*10 In *Palmer,* the Second Circuit agreed with the district court that despite the plaintiff's relatively short confinement—77 days—in the absence of evidence concerning the conditions of the confinement, summary judgment was inappropriate. *Palmer,* 364 F.3d at 66 (agreeing that " 'Palmer should have the opportunity to demonstrate that the conditions of his confinement vis-a-vis both the conditions in administrative confinement and in the general prison population were sufficiently harsh' to violate a liberty interest despite the 'comparative shortness' of his confinement." (quoting *Palmer v. Goss,* No. 02 Civ. 5804, 2003 WL 22327110 at *6 (S.D.N.Y. Oct. 10, 2003)). In *Ortiz v. McBride,* the Second Circuit

also found that a 90–day SHU sentence was sufficiently "atypical and significant" to withstand dismissal where the plaintiff alleged that conditions differed from "normal SHU confinement". 380 F.3d at 655 (plaintiff alleged he was "kept in SHU for twenty-four hours a day, was not permitted an hour of daily exercise, and was prevented from showering 'for weeks at a time' ").

Very recently, in a decision from the Southern District of New York in a case involving confinement in SHU for 291 days, a motion to dismiss was denied, the court concluding that

plaintiff has not alleged that the conditions of his confinement differed from normal SHU circumstances. Plaintiff simply alleges that he was sentenced to twenty-two months in SHU, and actually confined in SHU for 291 days. Looking to *Palmer* and considering plaintiff's status as a *pro se* litigant, we conclude that plaintiff's confinement in SHU for 291 days is sufficient for pleading purposes, to implicate a liberty interest.... The length of time of plaintiff's SHU confinement and the lack of information concerning the conditions of plaintiff's confinement leave open sufficient possibility that plaintiff had a valid liberty interest.

*Thomas,* 824 F.Supp. at 500–01.

As can be seen, there is considerable uncertainty within this circuit as to whether a period of disciplinary SHU confinement for a period of 120 days is sufficiently atypical and significant to demonstrate the loss of a constitutionally protected liberty interest. In this instance, however, the matter comes before the court on a motion for summary judgment. To support their summary judgment motion it was incumbent upon the defendants to prove the lack of any issues of material fact. In light of the Second Circuit's cautionary notes, including in *Palmer,* calling for the development of a detailed factual record concerning the conditions of an inmate's confinement during the relevant period in cases such as this and defendants' failure to show that it was not a sufficiently atypical and significant departure from the ordinary incidents of general prison life, I recommend a finding that defendants have not sustained their burden of demonstrating entitlement to summary judgment on this

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 4107805 (N.D.N.Y.)

(Cite as: 2012 WL 4107805 (N.D.N.Y.))

claim. _Palmer,_ 364 F.3d at 67–68.

IV. *SUMMARY AND RECOMMENDATION*

**\*11** In seeking dismissal of plaintiff's claims defendants' motion raises several issues, both procedural and substantive in nature. Turning first to the question of personal involvement, I recommend a finding that defendant Fischer cannot potentially be found liable for any alleged due process violation, based upon his lack of involvement in the relevant conduct, and that defendants' motion to dismiss plaintiff's claims against him on this basis therefore be granted. Turning to the question of exhaustion of remedies, I conclude that the uncontradicted record in the case reflects that plaintiff failed to exhaust available administrative remedies with respect to his failure to protect claim against defendant Frenya before commencing this action, and therefore recommend dismissal of that claim on this procedural basis. Finally, addressing plaintiff's procedural due process claim, I recommend a finding that because defendants have failed to successfully shoulder their initial burden of demonstrating the lack of any genuine issues of fact surrounding whether plaintiff was deprived of a cognizable liberty interest by virtue of his 120–day SHU confinement, their motion for summary judgment dismissing this cause of action should be denied.

Based upon the foregoing, it is hereby respectfully

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 44) be GRANTED, in part, and that all claims in this action against defendants Frenya and Fischer be DISMISSED, but that defendants' motion otherwise be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; _Roldan v. Racette,_ 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2012.

Barksdale v. Frenya
Slip Copy, 2012 WL 4107805 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 4107801 (N.D.N.Y.)

(Cite as: 2012 WL 4107801 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Elijah BARKSDALE, Plaintiff,
v.
R.T. FRENYA, Correction Officer, Clinton Correctional
Facility; Curtis Drown, Correction Hearing Officer,
Clinton Correctional Facility, Dale Artus,
Superintendent, Clinton Correctional Facility, and Brian
Fisher, Commissioner of NYS Department of
Correctional Services, Defendants.
No. 9:10–CV–0831 (MAD/DEP).

Sept. 19, 2012.
Elijah Barksdale, New York, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, David L. Cochran, Esq., of Counsel,
Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.
**INTRODUCTION**

*1 In this *pro se* action under 42 U.S.C. § 1983,
plaintiff, an inmate in the custody of the New York State
Department of Correctional and Community Supervision
("DOCCS"), claims that defendants violated his Eighth
and Fourteenth Amendment rights. Defendants' moved for
summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No.
44). Plaintiff did not oppose the motion. The motion was
referred to United States Magistrate Judge David E.
Peebles for a Report–Recommendation pursuant to 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c). Magistrate
Judge Peebles issued a Report and Recommendation (Dkt.
No. 47) recommending that the motion be granted in part
and denied in part. FN1

> FN1. The Clerk is directed to append Judge
> Homer's Report–Recommendation to this
> decision, and familiarity is presumed.

Defendants filed specific objections to the
Report–Recommendation. (Dkt. No. 49). In view of the
objections and pursuant to 28 U.S.C. § 636(b)(1), this
Court conducts a *de novo* review of these issues. The
Court reviews the remaining portions of the Report and
Recommendation for clear error or manifest injustice. *See*
*Brown v.. Peters,* 1997 WL 599355, at *2–3 (N.D.N.Y.)
*aff'd without op.,* 175 F.3d 1007 (2d Cir.1999). After the
appropriate review, "the court may accept, reject, or
modify, in whole or in part, the findings or
recommendations made by the magistrate judge." 28
U.S.C. § 636(b)(1).

**BACKGROUND**

**I. Factual Background**

As the parties do not object to Magistrate Judge
Pebbles' thorough recitation of the facts, the Court adopts
the "Background" and "Procedural History" as set forth
therein.

**II. Report and Recommendation**

On December 2, 2011, defendants moved for
summary judgment arguing: (1) that defendant Fisher
lacked personal involvement; (2) plaintiff failed to exhaust
his administrative remedies; and (3) plaintiff did not
possess a protected liberty interest in remaining free from
the challenged confinement.

On August 17, 2012, Magistrate Judge Peebles
recommended that the Court grant in part and deny in part
defendants' motion for summary judgment. Magistrate
Judge Peebles recommended that defendants' motion be
granted as to all claims against defendant Fisher based
upon his lack of involvement in the relevant conduct.
Magistrate Judge Peebles also concluded that plaintiff
failed to exhaust available administrative remedies with
respect to his failure to protect claim against Frenya.
Magistrate Judge Peebles recommended denying
defendants' motion for summary judgment and dismissal
of plaintiff's procedural due process claims against
defendants Drown and Artus. Magistrate Judge Peebles
reasoned that defendants failed to sustain their burden of

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 4107801 (N.D.N.Y.)

(Cite as: 2012 WL 4107801 (N.D.N.Y.))

demonstrating the lack of genuine issues of fact surrounding whether plaintiff was deprived of a cognizable liberty interest by virtue of his 120–day SHU confinement.

### III. Objections

Defendants Drown and Artus object to the portion of the Report–Recommendation that denied their motion for summary judgment and dismissal of plaintiff's procedural due process claims against them. Defendants argue that plaintiff failed to allege or demonstrate any genuine issue of material fact as to whether he suffered from an atypical and significant hardship.

### DISCUSSION

### I. Standard on Motion for Summary Judgment

**\*2** A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court " 'cannot try issues of fact; it can only determine whether there are issues to be tried.' " *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N. Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

In reviewing a *pro se* case, the court "must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U .S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan,* 289 F.Supp.2d at 295 (quoting *Traguth v. Zuck,* 710 F .2d 90, 95 (2d Cir.1983)).

### II. Due Process

The Fourteenth Amendment to the Constitution provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship." *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citations omitted).

As a threshold matter, an inmate asserting a violation of his right to due process must first establish that he had a protected liberty interest in remaining free from the confinement that he challenges and, if so, that the defendant deprived the plaintiff of that liberty interest without due process. *See Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995). In *Sandin v. Conner,* the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* Thus, to show that a liberty interest is sufficient to invoke the protections of the Due Process Clause, a prisoner must establish both that his resulting confinement or restraint

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 4107801 (N.D.N.Y.)

(Cite as: 2012 WL 4107801 (N.D.N.Y.))

creates an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" and that the state has enacted a regulation or statute which grants inmates a protected liberty interest in remaining free from that confinement or restraint. *Id.* at 484; *see also Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey v. Giltner,* 197 F.3d 578, 586 (2d Cir.1999); *Arce v. Walker,* 139 F.3d 329, 335–36 (2d Cir.1998).

**\*3** "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " *Davis v. Barrett,* 576 F.3d 129, 133 (2d Cir.2009) (citations omitted). In making such a determination, courts are required to examine the actual circumstances of confinement. *Id.*

In *Palmer v. Richards,* 364 F.3d 60 (2d Cir.2004), the Second Circuit held:

[O]ur cases establish the following guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. Where the plaintiff was confined for an intermediate duration-between 101 and 305 days-"development of a detailed record" of the conditions of the confinement relative to ordinary prison conditions is required. In those situations, a district court must "make a fact-intensive inquiry," examining "the actual circumstances of SHU confinement" in the case before it without relying on its familiarity with SHU conditions in previous cases. Disputes about conditions may not be resolved on summary judgment, but where the conditions are undisputed, the *Sandin* issue should be resolved by the court as a matter of law.

*Palmer,* 364 F.3d at 65 (internal citations omitted).

In cases involving confinement between 101 and 305 days, courts are required to develop a detailed factual

record regarding the confinements in the SHU which may include "evidence of the psychological effects of prolonged confinement in isolation and the precise frequency of SHU confinements of varying durations." *Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000). In the absence of a detailed record, courts have affirmed dismissal of due process claims only in cases where the period of time spend in the SHU was exceedingly short and there was no indication that the plaintiff endured unusual SHU conditions. *Palmer,* 364 F.3d at 66.

In this matter, plaintiff testified during his deposition as follows:

Q. As a result of this TIER hearing, how long were you confined in SHU?

A. For four and a half months. For four months on that incident.

Q. Okay. Now, your complain says you were there for 120 days. Does that sound about right?

A. Yes [ ... ].

Q. Do you know how long you served in SHU just as a result of this incident?

A. I think I did five months and change maybe.

See Pl. Dep. at p. 19.

Indisputably, plaintiff was confined to the SHU for 120 days in the SHU, thus placing him within the guideline governing intermediate durations of confinement. However, during his deposition, counsel did not pose any questions or elicit any answers from plaintiff involving the conditions of his confinement in SHU. Moreover, while defendants presented affidavits in support of their motion for summary judgment, the affidavits are devoid of any reference to plaintiff's actual conditions of confinement in the SHU. There is no detailed record or evidence regarding the conditions of confinement in the SHU and how those conditions compared to "the ordinary incidents of prison life".

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 4107801 (N.D.N.Y.)

(Cite as: 2012 WL 4107801 (N.D.N.Y.))

**\*4** On a motion for summary judgment, defendants bear the burden of proof. "Only when the conditions are uncontested may a district court resolve the issue of atypicality of confinement as a matter of law." *Palmer,* 364 F.3d at 65. Consequently, viewing the evidence in a light most favorable to the non-movant, as the Court must due, defendants' motion for summary judgment and dismissal of plaintiff's due process claim is denied. *See Green v. Herbert,* 677 F.Supp.2d 633, 636–637 (W.D.N.Y.2010). The Court has reviewed the cases cited by defense counsel which allegedly support defendants' arguments. However, the Court finds these cases unpersuasive as they pre-date the Second Circuit's ruling in *Palmer.*

Upon *de novo* review of the remainder of Magistrate Judge Peebles' findings, the Court accepts and adopts the Report–Recommendation.

It is therefore

**ORDERED** that:

1. The Report–Recommendation (Dkt. No. 47) is hereby adopted in its entirety.

2. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

N.D.N.Y.,2012.

Barksdale v. Frenya
Slip Copy, 2012 WL 4107801 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Larry McNAIR, Plaintiff,
v.
SGT. JONES, C.O. Shepherd, C.O. Zoufaly, Registered
Nurse Matthews, C.O. K. Koenig, Sick Call Nurse for
Shu, Dr. Supple, Capt. Lowry, Superintendent Strack,
Jose Pico, Nurse Daly and Lieutenant A. Caves,
Defendants.
No. 01 Civ. 3253(RCC)(GWG).

Sept. 18, 2002.

State prisoner brought § 1983 action against prison
officials alleging claims such as excessive force,
unsanitary conditions, conspiracy, and denial of medical
needs. Prison officials moved to dismiss. The District
Court, Gorenstein, J., recommended that: (1) prisoner
failed to exhaust his administrative remedies pursuant to
Prison Litigation Reform Act (PLRA) regarding certain
claims or justify such failure, and (2) allegations that
conduct of prison disciplinary hearings were procedurally
flawed and that inappropriate penalties were imposed did
not state a claim under § 1983.

Report and recommendation issued.

West Headnotes

[1] Civil Rights 78 ⟨key⟩ 1319

78 Civil Rights
    78III Federal Remedies in General
        78k1314 Adequacy, Availability, and Exhaustion
of State or Local Remedies
            78k1319 k. Criminal Law Enforcement; Prisons.

Most Cited Cases
    (Formerly 78k209)
State prisoner did not file grievance through state
administrative prison grievance process regarding his §
1983 claims of excessive force, unsanitary conditions,
conspiracy, and denial of medical needs, and, thus, failed
to exhaust his administrative remedies pursuant to Prison
Litigation Reform Act (PLRA) regarding these claims. 42
U.S.C.A. §§ 1983, 1997e(a); 7 N.Y.C.R.R. §701.

[2] Civil Rights 78 ⟨key⟩ 1319

78 Civil Rights
    78III Federal Remedies in General
        78k1314 Adequacy, Availability, and Exhaustion
of State or Local Remedies
            78k1319 k. Criminal Law Enforcement; Prisons.
Most Cited Cases
    (Formerly 78k209)
State prisoner's verbal complaints of confinement
conditions, letters to legal aid organization for indigent
litigants, and letters to offices for prison superintendent
and inspector general were not sufficient to satisfy
requirement of Prison Litigation Reform Act (PLRA) that
he exhaust his administrative remedies before bringing §
1983 action; prisoner was required to go through prison
administrative process requiring written grievances and
setting forth procedure for such grievances which did not
allow submission of letters directly to prison management.
42 U.S.C.A. §§ 1983, 1997e(a); 7 N.Y.C.R.R. §701.

[3] Civil Rights 78 ⟨key⟩ 1319

78 Civil Rights
    78III Federal Remedies in General
        78k1314 Adequacy, Availability, and Exhaustion
of State or Local Remedies
            78k1319 k. Criminal Law Enforcement; Prisons.
Most Cited Cases
    (Formerly 78k209)
State prisoner's general allegations of conspiracy by prison
officials, and his claims that he did not file prison
grievance due to pending disciplinary charges against him
because he did not trust prison officers to file charges and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

because such grievance would be futile, did not excuse prisoner's failure to file prison grievance regarding disciplinary charges before bringing § 1983 action, for purposes of showing exhaustion of administrative remedies under Prison Litigation Reform Act (PLRA). 42 U.S.C.A. §§ 1983, 1997e(a); 7 N.Y.C.R.R. §701.

[4] Civil Rights 78 🔑 1308

78 Civil Rights
   78III Federal Remedies in General
      78k1306 Availability, Adequacy, Exclusivity, and Exhaustion of Other Remedies
         78k1308 k. Administrative Remedies in General. Most Cited Cases
         (Formerly 78k194)
Exhaustion of administrative remedies after § 1983 complaint is filed will not save case from dismissal for failure to exhaust administrative remedies. 42 U.S.C.A. §§ 1983, 1997e(a).

[5] Civil Rights 78 🔑 1092

78 Civil Rights
   78I Rights Protected and Discrimination Prohibited in General
      78k1089 Prisons
         78k1092 k. Discipline and Classification; Grievances. Most Cited Cases
         (Formerly 78k135)
Prison disciplinary proceeding and penalties imposed on state prisoner, such as loss of good time credit, were not invalidated on appeal, and thus prisoner's claims that conduct of hearings was procedurally flawed and that inappropriate penalties were imposed did not state a claim under § 1983. 42 U.S.C.A. §1983.

*REPORT AND RECOMMENDATION*

GABRIEL W. GORENSTEIN, Magistrate Judge.

**\*1** Larry McNair, the *pro se* plaintiff, brings this action pursuant to 42 U.S.C. § 1983, alleging that correction officers used excessive force against him during a pat frisk that occurred on June 7, 1999 while McNair was imprisoned in the Fishkill Correctional Facility; that medical personnel were deliberately indifferent to his serious medical needs; that he was forced to live in unsanitary conditions while confined as part of a "drug watch"; that all of the defendants were involved in a conspiracy to cover up the officers' malicious conduct; and that certain procedural defects occurred during his disciplinary hearing. The defendants have moved to dismiss pursuant to Fed.R.Civ.P. 12(b) or in the alternative for summary judgment pursuant to Fed.R.Civ.P. 56. For the following reasons, the defendants' motions should be granted.

I. *STATEMENT OF FACTS*

The details of the incident underlying the complaint are not directly relevant to the grounds for dismissal that are the subject of this Report and Recommendation. Nonetheless, they are recounted here to provide some background for the dispute.

A. *Allegations of Excessive Force*

At approximately 5:50 p.m. on June 7, 1999, while McNair was proceeding to his evening program at the Fishkill prison, Sergeant Jones directed McNair into the prison yard for a random pat frisk. Complaint, dated March 1, 2001 ("Complaint"), at § IV; Memorandum from E. Shepherd, dated June 7, 1999 ("Shepherd Report") (reproduced as Ex. D to Exhibits "A to D" in Support of Plaintiff's Statement Pursuant to Local Civil Rule 56.1, dated April 15, 2002), at 1.[FN1] Officer Shepherd instructed McNair to remove everything from his pockets and to stand against the wall so that the search could be performed. Shepherd Report at 1. McNair cooperated, first handing the officers his books, cigarettes and wallet, and then turning to place his hands on the wall. Complaint at § IV; Shepherd Report at 1.

FN1. A number of documents discussed herein, including the Rule 56.1 Statement cited above, were not filed with the Clerk at the time of their service or submission to Chambers. The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

documents consist of: (1) the defendants' notice of motion and memorandum of law dated August 6, 2001; (2) the exhibits, identified as "A to U," that were submitted as part of McNair's opposition papers to this motion, dated September 5, 2001; and (3) McNair's papers submitted in opposition to the defendants' February 2002 motion to dismiss or for summary judgment, consisting of an affirmation, memorandum of law, statement under Rule 56.1, a declaration and two sets of exhibits, all of which are dated April 15, 2002. These documents are now being docketed along with this Report and Recommendation.

According to a misbehavior report filed by Officer Shepherd, during the frisk Shepherd discovered a rolled up piece of toilet paper containing a small white packet of paper in McNair's wallet. At this point, according to the report, McNair began pushing Shepherd's hands, knocking the white packet to the ground. McNair immediately bent down, picked up the white packet and put it in his mouth. A struggle ensued, during which Shepherd lost his balance and fell to the ground. Shepherd ordered McNair to spit out the packet but McNair refused. Shepherd then placed his hands under McNair's chin in an attempt to force McNair to spit out the item. McNair, however, responded "I swallowed it." Officers Shepherd and Zoufaly then placed restraints on McNair, with Shepherd controlling McNair's left arm and Zoufaly controlling his right. Shepherd Report at 1-2.

According to McNair's version of events, however, Shepherd never discovered a white packet of paper in McNair's wallet. Rather, after McNair placed his hands against the wall, Shepherd asked about a bulge in his left shoe. McNair, who was injured in a basketball game the night before, reached down to his ankle, revealing an ace bandage protecting his Achilles tendon. Shepherd reacted to this gesture by attacking McNair-choking him and knocking him to the ground. Sergeant Jones then instructed Zoufaly to grab McNair's right arm and to break it if necessary. McNair claims that Shepherd held him on the ground in a choke hold as Zoufaly twisted his arm and wrist. When Sergeant Jones asked Shepherd what happened, Shepherd replied that he thought McNair had swallowed something. Complaint at § IV.

**\*2** Officer Jones and another unnamed officer then escorted McNair through the facility, toward the Special Housing Unit. McNair claims that the officers took a route that placed the men out of view of the general population. According to McNair, during this trip Sergeant Jones threatened to harm him if he reported any injuries to the medical staff. Complaint at § IV.

B. *Medical Examination and Drug Watch*

Upon arrival at the Special Housing Unit, Nurse Matthews examined McNair. Complaint at § IV. Matthews asserts that, although McNair told Matthews that he had a cut on his face, Matthews was not able to find any damage. Defendant Matthews' Declaration in Support of Defendants' Motion to Dismiss And/Or for Summary Judgment, dated February 21, 2002 ("Matthews Decl.") (annexed to Notice of Motion to Dismiss And/Or for Summary Judgment, filed February 22, 2002 ("Feb.Mot.") (Docket # 22)), at ¶ 7. Nurse Matthews did notice that McNair's knuckle was swollen but states that McNair retained a full range of motion in his hand. *Id.* McNair denies this, claiming that he was unable to clench his hand into a fist. Complaint at § IV. During the examination, Matthews states that McNair also drew attention to his ankle, which had been injured the previous night. Matthews Decl. at ¶ 7. Matthews' observations, however, revealed that McNair did not have difficulty walking. *Id.*

McNair asserts that he also discussed his history of high blood pressure with Nurse Matthews but was not placed on a low cholesterol diet. Complaint at § IV. McNair alleges that Dr. Supple, a physician who had examined McNair on three prior occasions for problems unrelated to the June 7 incident, should have either placed Nurse Matthews on notice of his condition or prescribed a remedy himself. *See* Affirmation in Opposition, dated September 5, 2001, ("McNair Aff.") (filed December 4, 2001, Docket # 20), at ¶¶ 2-3. Dr. Supple states that upon review of McNair's medical records, McNair did have high cholesterol, but his failure to prescribe special dietary provisions did not affect McNair negatively. Defendant Dr. Supple's Declaration in Support of Defendants' Motion to Dismiss And/Or for Summary Judgment, dated February 21, 2002, at ¶ 7. After the exam, McNair was not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

given any medication nor was he deemed to require any further medical attention. Matthews Decl. at ¶ 10.

At the conclusion of his examination, Officer Koenig took pictures of McNair as required by Directive No. 4944. *See* Photographs Taken by Officer K. Koenig After Use of Force and Directive 4944 (reproduced as Ex. O to Exhibits "A to U" in Support of Affirmation in Opposition, dated September 5, 2001 ("9/5/2001 Exs.")). McNair, however, claims that Officer Koenig refused to take pictures of his ankle and right hand. Complaint at § IV. McNair was then placed on a drug watch in the Special Housing Unit. *Id.* The purpose of such a watch is to monitor the progress of contraband suspected to have been ingested by the inmate. Declaration of Robert Ercole in Support of Defendants' Motion to Dismiss And/Or Summary Judgment, dated February 21, 2002 ("Ercole Decl.") (annexed to Feb. Mot.), at ¶ 6. Consequently, McNair was placed in a "dry cell" in which the water supply was turned off to enable the officers to monitor his bowel movements. Ercole Decl. at ¶ 7. McNair's cell was also lacking soap, a towel, toothpaste and a toothbrush. Complaint at § IV. However, as required by DOCS Directive No. 4910, such items were to have been provided to McNair when he was allowed out of his cell to wash himself. Ercole Decl. at ¶¶ 6-8. Though inmates are permitted to have bed linens in their cells, Ercole Decl. at ¶ 7, McNair alleges that his mattress remained undressed. Complaint at § IV.

**\*3** On the morning of June 8, 1999, Nurse Daly walked through the Special Housing Unit. Though she refused to stop at his cell, as she walked by, McNair told her that his ankle was causing him pain. According to McNair, Daly agreed to send him something to relieve his discomfort. However, no medication was ever sent. Complaint at § IV; Amended Complaint, dated July 2001 ("Amended Complaint"), at ¶ 2.

McNair remained on the drug watch for a total of 48 hours. Complaint at § IV. During this time, no contraband was found. A urinalysis test designed to recognize the existence of drugs also came back negative. *Id.*

McNair received no further medical treatment during his stay at the Fishkill Facility. Plaintiff's Statement Pursuant to Local Civil Rule 56.1, dated April 15, 2002 ("McNair 56.1"), at ¶ 24. McNair alleges that as a result of the incident, the tendon in his right hand was torn and his left ankle was injured. Complaint at § IV-A. He also alleges that he needed physical therapy on his right hand and surgery, resulting in diminished usage of his hand. *Id.*

On July 6, 1999, McNair was transferred to Southport Correctional Facility. McNair 56.1 at ¶ 24. At Southport, McNair was given a health screening, Ambulatory Health Record, dated July 6, 1999 (reproduced as Ex. Q to 9/5/2001 Exs.), at 1, after which he was placed on a low cholesterol, low fat diet. Therapeutic Diet Order Form, dated July 6, 1999 (reproduced as Ex. Q to 9/5/2001 Exs.), at 2. In July 2000, a medical report showed that the tendon in the long finger of McNair's right hand had been torn. Surgical Pathology Report, dated July 11, 2000 (reproduced as Ex. T to 9/5/2001 Exs.).

C. *The Disciplinary Charge and Appeal*

On June 7, 1999, the day of the pat frisk, Shepherd filed an Inmate Misbehavior Report in which he described his version of events. Inmate Misbehavior Report, dated June 7, 1999 (reproduced as Ex. E to Strack Declaration in Support of Defendants' Motion to Dismiss or Summary Judgment, dated February 21, 2002 ("Strack Decl.") (annexed to Feb. Mot.)). As a result, a disciplinary hearing was held before officer Jose Pico on June 18, 1999 in which McNair was charged with refusing a direct order, assaulting staff, and refusing to be searched or frisked. Inmate Disciplinary History (reproduced as Ex. P to 9/5/2001 Exs.). In support of his version of events, McNair presented a witness. Excerpt of Transcript from Disciplinary Hearing ("Disc.Hg.Transcript") (reproduced as Ex. P to 9/5/2001 Exs.), at 2. Nevertheless, Officer Pico found McNair guilty of all charges and sentenced him to loss of twelve months "good time" credits and 365 days in the Special Housing Unit, with a loss of package, commissary and phone call privileges. Disc. Hg. Transcript at 1.

McNair immediately sought to appeal this finding. On July 2, 1999, McNair sent Superintendent Strack the first of two letters requesting discretionary review of his disciplinary hearing. Letter to Wayne Strack, dated July 2,

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

1999 (reproduced as Ex. I to Exhibits "A to M" in Support of Plaintiff's Affirmation in Opposition to Defendant's Motion to Dismiss And/Or Summary Judgment, dated April 15, 2002 ("4/15/2002 A to M Exs.")). In his first letter, McNair stated that Officer Pico denied him his right to call a witness during the hearing. *Id.* That same day, William Mazzuca, on Strack's behalf, wrote to McNair, refusing to alter the results of the disciplinary hearing. Letter to McNair, dated July 2, 1999 (reproduced as Ex. K to 4/15/2002 A to M Exs.). On July 3, 1999, McNair sent a second letter to Superintendent Strack, this time informing him that he may be held personally liable if he failed to remedy the alleged violation of McNair's right to call witnesses. Letter to Wayne Strack, dated July 3, 1999 (reproduced as Ex. J to 4/15/2002 A to M Exs.).

**\*4** McNair also claims that he sent a letter to Superintendent Strack on June 16, 1999 in which he complained about the lack of medical attention he was receiving. McNair 56.1 at ¶ 20. Superintendent William Mazzuca apparently received this letter, although he asserted in January 2001 that he no longer had a copy. *See* Mazzuca Sworn Affidavit, dated January 26, 2001 (reproduced as Ex. G to 9/5/2001 Exs.), at ¶¶ 215, 220. Confusingly, defendants have submitted a copy of a letter dated June 16, 1999, from McNair to Superintendent Strack, which does not mention McNair's medical status or his disciplinary hearing but relates only to a missing package of cigarettes. Letter dated June 16, 1999 (reproduced as Ex. B to Hartofilis Declaration in Support of Defendant's Motion for Summary Judgment, dated February 22, 2002).

On September 1, 1999, McNair formally appealed the ruling in the disciplinary hearing. Inmate Disciplinary History (reproduced as Ex. P to 9/5/2001 Exs.). His appeal was heard by Donald Selsky, the Director of the Special Housing and Inmate Disciplinary Programs, who affirmed Hearing Officer Pico's order. *Id.* McNair sent out another letter appealing the ruling on October 19, 1999. *See* Response from Donald Selsky, dated October 28, 1999 ("Selsky Response") (reproduced as Ex. C to Affirmation in Opposition Exhibits "A to P", Docket # 41, dated June 11, 2002 ("6/11/2002 Exs.")). Selsky and Lucien J. Leclaire, Jr., Deputy Commissioner of the Department of Correctional Services, each received copies of the letter. Both declined to reconsider Pico's ruling and refused to reduce McNair's confinement time. *See* Selsky

Response; Letter from Lucien J. Leclaire, Jr., dated November 8, 1999 (reproduced as Ex. D to 6/11/2002 Exs.).

McNair then filed a petition with the Supreme Court of the State of New York, Dutchess County, challenging his disciplinary hearing. *See* Order to Show Cause, dated November 29, 1999 (reproduced as Ex. A to 6/11/2002 Exs.). On August 11, 2000, that court entered a judgment against McNair. *Cf.* Notice of Appeal for Article 78, dated August 23, 2000 (reproduced as Ex. E to 6/11/2002 Exs.). McNair then filed a notice of appeal on August 23, 2000. *Id.* On May 30, 2001, the Appellate Division, Second Department, dismissed the appeal because it had not been perfected within the time limit specified in 22 N.Y.C.R.R. § 670.8(e). Decision & Order on Motion, dated May 30, 2001 (reproduced as Ex. O to 6/11/2002 Exs.), at 2-3.

### D. *Complaint to Inspector General*

In December 1999, McNair made a complaint to the Inspector General's Office. *See* Inspector General's Office Investigative Report, dated May 25, 2000 ("Investigative Report") (annexed to Memorandum of Law in Opposition of Defendant's Motion to Dismiss And/Or Summary Judgment and Supplemental Brief, dated April 15, 2002 ("McNair 4/15/2002 Mem.")). On December 15, 1999, Officer Todd of the Inspector General's Office interviewed McNair about his complaints. Supplemental Brief and Memorandum of Law in Decision of Interest, dated June 11, 2002 (Docket # 40) ("McNair Supp. Mem."), at 2. In May 2000, a second officer, Investigator Holland took over the investigation. *Id.* This officer, Investigator Holland, found McNair's claims to be unsubstantiated and recommended that the case be closed. *See* Investigative Report.

### E. *The Present Action*

**\*5** On April 19, 2001, McNair filed the complaint in this matter pursuant to 42 U.S.C. § 1983 against defendants Jones, Shepherd, Zoufaly, Matthews, Koenig, an unidentified "sick call nurse," Dr. Supple, Captain Lowry and Superintendent Strack. The complaint, brought under 42 U.S.C. § 1983, describes the alleged attack, the

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

resulting injuries, the denial of medical care and unsanitary conditions. McNair seeks monetary damages in the amount of $5 million. Complaint at § V. On July 25, 2001, McNair filed an Amended Complaint which did not repeat any of the allegations in the original complaint but instead stated that it was being filed to add three new defendants: Jose Pico, Nurse T. Daly and a "Watch Commander." Amended Complaint at ¶¶ 1-3. McNair alleges that Pico, as Hearing Officer of McNair's disciplinary hearing, imposed improper penalties, denied "witnesses" and "adequate assistance," and was arbitrary and capricious. *Id.* at ¶ 1. McNair alleges that Daly failed to provide adequate medical care. *Id.* at ¶ 2. The "Watch Commander" is alleged to have "approved the photographs[ ] that were being filed to June 7, 1999, with knowledge that these photographs were not in accordance with the 'Use of Force' Directive." *Id.* at ¶ 3.

On August 6, 2001, the defendants submitted a motion to dismiss the complaint arguing that the complaint should be dismissed because of McNair's failure to exhaust his administrative remedies and because the complaint did not state a claim for the various constitutional violations alleged. McNair thereafter submitted an "Affirmation in Opposition" dated September 5, 2001, along with other papers, that provided additional detail about his allegations-particularly the allegations regarding his improper medical treatment. *See* McNair Aff.; Memorandum of Law dated September 5, 2001, filed December 4, 2001 (Docket # 21). Upon McNair's request, made by letter dated November 3, 2001, the Court construed this affirmation as supplementing his complaint. *See generally* Order, dated October 25, 2001 (Docket # 18).

On February 22, 2002, defendants Shepherd, Matthews, Supple and Strack moved to dismiss McNair's complaint, as amended, pursuant to Fed.R.Civ.P. 12(b)(1), 12(b)(6) and/or 56(c). *See* Feb. Mot. They argued that the complaint should be dismissed for a number of reasons: McNair had not exhausted his administrative remedies; he had failed to state a "deliberate indifference" claim with respect to his medical needs; there was no personal involvement by certain of the defendants; the defendants were entitled to qualified immunity; McNair had failed to state a claim regarding the allegation that a false misbehavior report had been filed; and he had failed to state a claim for conspiracy. On March 28, 2002, these

same defendants filed a supplemental memorandum (Docket # 30) to argue the effect of the Supreme Court's decision the previous month in *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). By memorandum endorsement dated, April 2, 2002 (Docket # 31), the defendants' motion was deemed to include defendants Pico, Daly, Jones, and the Watch Commander (who had since been identified as A. Caves). The plaintiff submitted opposition papers to this motion, which are all dated April 15, 2002, and included an affirmation, a statement under Local Civil Rule 56.1, a memorandum of law, and exhibits identified as "A to M." On May 9, 2002, the defendants filed a reply memorandum of law (Docket # 34).

**\*6** On the same date that the defendants filed the reply brief on the pending motion, defendants Pico and Strack again moved to dismiss McNair's complaint-this time citing Fed.R.Civ.P. 12(b)(1) and (6). *See* Notice of Motion, dated May 9, 2002 (Docket # 32). While Pico and Strack had previously made (or, in Pico's case, been deemed to have made) the motion filed February 22, 2002 to dismiss or in the alternative for summary judgment, Pico and Strack filed the 12(b)(1) and (6) motion in order to make specific arguments regarding McNair's claims that the disciplinary hearing had not been properly conducted. *See* Memorandum of Law In Support of Jose Pico and Superintendent Strack's Motion to Dismiss the Amended Complaint, filed May 9, 2002 (Docket # 33), at 1 n. 1. McNair opposed this new motion with an affirmation, exhibits and a brief, all of which are dated June 11, 2002 (Docket # 's 39, 40 and 41). The defendants filed a reply brief on July 26, 2002 (Docket # 42).

II. *Discussion*

A. *Summary Judgment Standard*

A district court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *New York Stock Exchange, Inc. v. New York,*

*New York Hotel LLC,* 293 F.3d 550, 554 (2d Cir.2002). A genuine issue is one that "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999). A material issue is a "dispute[ ] over facts that might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. Thus, " '[a] reasonably disputed, legally essential issue is both genuine and material' " and precludes a finding of summary judgment. *McPherson,* 174 F.3d at 280 (quoting *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996)).

When determining whether a genuine issue of material fact exists, courts must resolve all ambiguities and draw all factual inferences in favor of the non-moving party. *McPherson,* 174 F.3d at 280. Moreover, the pleadings of a pro se plaintiff must be read liberally and interpreted "to raise the strongest arguments that they suggest." *Id.* (citation omitted). Nonetheless, "mere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen Assocs. v. Incorporated Village of Mineola,* 273 F.3d 494, 499 (2d Cir.2001).

B. *Exhaustion of Administrative Remedies*

Under the Prison Litigation Reform Act, 110 Stat. 1321-73, as amended, 42 U.S.C. § 1997e(a), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This means the prisoner "must pursue his challenge to the conditions in question through the highest level of administrative review prior to filing suit." *Flanagan v. Maly,* 2002 WL 122921, at *2 (S.D.N.Y. Jan.29, 2002); *see also Porter v. Nussle,* 534 U.S. 516, ----, 122 S.Ct. 983, 988, 152 L.Ed.2d 12 (2002) ("All 'available' remedies must now be exhausted; those remedies need not meet federal standards, nor must they be 'plain, speedy and effective.' ") (citations omitted). The Supreme Court has clarified that "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 122 S.Ct. at 992.[FN2]

FN2. Even though McNair filed this action before *Porter v. Nussle* was decided, "the broad exhaustion requirement announced in *Nussle* applies with full force" to litigants in such a situation. *Espinal v. Goord,* 2002 WL 1585549, at *2 n. 3 (S.D.N.Y. July 17, 2002). *See generally Harper v. Virginia Dep't of Taxation,* 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993) ("When [the Supreme] Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the] announcement of the rule.").

*7 7 N.Y.C.R.R. § 701 outlines the Inmate Grievance Program under which New York prison inmates may file grievances regarding prison life. First, the inmate must file a complaint with the Inmate Grievance Resolution Committee ("IGRC"). 7 N.Y.C.R.R. § 701.7(a). Next, after receiving a response from the IGRC, the inmate may appeal to the Superintendent of the facility. *Id.* at § 701.7(b). Finally, after receiving a response from the Superintendent, the prisoner can seek review of the Superintendent's decision with the Central Office Review Committee ("CORC"). *Id.* at § 701.7(c). *See, e.g., Anderson v. Pinto,* 2002 WL 1585907, at *1 (S.D.N.Y. July 17, 2002). In New York, a "prisoner has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure." *Hemphill v. New York,* 198 F.Supp.2d 546, 548 (S.D.N.Y.2002). As was noted in *Flanagan,* "New York permits inmates to file internal grievances as to virtually any issue affecting their confinement." 2002 WL 122921, at *1. Exhaustion is not accomplished by an inmate's appeal of a disciplinary hearing decision brought against the inmate. *See, e.g., Benjamin v. Goord,* 2002 WL 1586880, at *2 (S.D.N.Y. July 17, 2002) (citing *Cherry v. Selsky,* 2000 WL 943436, at *7 (S.D.N.Y. July 7, 2000)).

[1] McNair's claims regarding the assault and subsequent denial of medical care were grievable under the prison regulations. *See* 7 N.Y.C.R.R. § 701.2(a) (permitting grievances for any "complaint about the substance or application of any written or unwritten policy, regulation, procedure or rule of the Department of Correctional Services or any of its program units, or the lack of a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

policy, regulation, procedure or rule"); 7 N.Y.C.R.R. § 701.11 (describing special expedited grievance process for "[e]mployee misconduct meant to ... harm an inmate"); *see also* Espinal v. Goord, 2002 WL 1585549, at *2 (S.D.N.Y. July 17, 2002) ("It is undisputed that '[a] claim of excessive force is a proper subject of a grievance inmates may file through [DOCS's] Inmate Grievance Program.' ") (citation omitted); Cruz v. Jordan, 80 F.Supp.2d 109, 111-12 (S.D.N.Y.1999) ("New York State provides administrative remedies that are available to prevent, stop and mitigate deliberate indifference to the medical needs of prisoners."); Thomas G. Eagen's Affidavit in Support of Defendant's Motion to Dismiss, dated August 2, 2001 ("Eagen Aff.) (annexed to Feb. Mot.), at ¶ 4.

[2] In the face of defendants' assertions that McNair's complaint must be dismissed for his failure to exhaust administrative remedies, McNair argues that he accomplished exhaustion through verbal complaints and by writing to the Legal Aid Society, the Superintendent's office, and the Inspector General's Office. McNair 4/15/2002 Mem. at 2.

Making a verbal complaint, however, does not satisfy the exhaustion requirement because the administrative grievance process permits only written grievances. *See* Flanagan, 2002 WL 122921, at *2. A complaint made to the Legal Aid Society is likewise not permitted by the administrative grievance process. McNair's letters to the Superintendent could not satisfy the exhaustion requirement for two reasons. First, the only letters in the record complain of procedural defects in the disciplinary hearing and do not assert any of his other claims. *See* Exhibits "A to M", dated April 15, 2002, Exs. I, J. Second, forgoing the step of filing a claim with the IGRC by submitting letters directly to the superintendent does not satisfy the exhaustion requirement. *See, e.g.,* Byas v. New York, 2002 WL 1586963, at *2 (S.D.N.Y. July 17, 2002) ("Permitting a plaintiff to bypass the codified grievance procedure by sending letters directly to the facility's superintendent would undermine the efficiency and the effectiveness that the prison grievance program is intended to achieve."); Nunez v. Goord, 2002 WL 1162905, at *1 (S.D.N.Y. June 3, 2002).[FN3]

FN3. Although the Inmate Grievance Program

does allow for an expedited procedure for allegations of inmate harassment by prison employees, which in some cases allows for review by the IGRC to be bypassed, the inmate must still file a grievance with the employee's supervisor before the superintendent can review the allegations to determine if the grievance presents a bona fide harassment issue. *See* 7 N.Y.C.R.R. § 701.11(b); Hemphill v. New York, 198 F.Supp.2d 546, 549 (S.D.N.Y.2002) (describing expedited grievance procedure). The regulations provide that if the superintendent fails to respond, the prisoner may appeal the grievance to the CORC. 7 N.Y.C.R.R. § 701.11(b)(6).

*8 Finally, although McNair eventually made a complaint to the Inspector General, that action does not satisfy the exhaustion requirement. Grey v. Sparhawk, 2000 WL 815916, at *2 (S.D.N.Y. June 23, 2000) ("Any complaint [plaintiff] may have made directly to the Inspector General's office does not serve to excuse plaintiff from adhering to the available administrative procedures. To allow plaintiff to bypass those procedures would obviate the purpose for which the procedures were enacted."); Houze v. Segarra, 2002 WL 1301555, at *2 (S.D.N.Y. July 16, 2002).

In any event, McNair at no time suggests that he went through the appeal process permitted by 7 N.Y.C.R.R. §§ 701.7(b), (c); 701.11(b)(6). This failure alone means that McNair has not exhausted his administrative remedies. Hemphill, 198 F.Supp.2d at 548.

[3] McNair offers several arguments why the lack of exhaustion should be excused. First, he seems to argue that he should be excused from the exhaustion requirement because he seeks "monetary damages." McNair 4/15/2002 Mem. at 2. In Booth v. Churner, 532 U.S. 731, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001), however, the Supreme Court held that the exhaustion requirement applies to a plaintiff seeking relief unavailable in the prison administrative proceeding such as monetary damages. Id. at 740-41. Second, McNair adverts generally to a conspiracy among the defendants to cover up their misconduct. *See, e.g.,* Complaint at § IV. He does not, however, claim that any of the defendants prevented him

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

from filing a grievance complaint.

Third, McNair contends that had he filed a complaint earlier it would have been disregarded because of the pending disciplinary charges against him. McNair 4/15/2002 Mem. at 1. Assuming for purposes of argument that use of the administrative process would have been futile, the Supreme Court has made clear that where a statute mandates exhaustion, even a futile administrative process must be observed. *Booth,* 532 U.S. at 741 n. 6. Fourth, McNair implies that the "Grievance supervisor" failed to conduct his rounds in the segregated housing unit he was in at the time. McNair 4/15/2002 Mem. at 1-2.[FN4] But the grievance process allowed McNair to have filed a grievance without interacting with the "Grievance supervisor"-either by requesting a grievance form from any accessible officer, 7 N.Y.C.R.R. 701.13(a)(1), or simply writing the complaint on a plain sheet of paper. 7 N.Y.C.R.R. 701.7(a)(1).

> FN4. McNair never directly states that the "Grievance supervisor" failed to conduct these rounds. Instead, his memorandum states that the defendants' motion papers did not verify that this occurred. McNair 4/15/2002 Mem. at 2.

In fact, McNair admits that the reason the grievance was not filed was not due to any inability to file such a grievance but rather that he "could not trust an officer to mail his grievance due to the assault on staff he was being charged with." McNair 4/15/2002 Mem. at 3. McNair's own distrust of the system, however, in the absence of any indication that he made an affirmative effort to file a grievance, does not permit avoidance of the exhaustion requirement. *See Reyes v. Punzal,* 206 F.Supp.2d 431, 434 (W.D.N.Y.2002) ("There is no suggestion in the record that plaintiff was somehow prevented from appealing his grievance, and even if plaintiff believed that further attempts to seek relief through administrative channels would prove fruitless, 'the alleged ineffectiveness of the administrative remedies that are available does not absolve a prisoner of his obligation to exhaust such remedies when Congress has specifically mandated that he do so.' ") (citing *Giano v. Goord,* 250 F.3d 146, 150-51 (2d Cir.2001)). The fact that McNair does not suggest that prison employees prevented him from filing a complaint distinguishes this case from those where the failure to

exhaust was excused because the prisoner made reasonable efforts to exhaust but was prevented from doing so by prison employees. *See, e.g., Rodriguez v. Hahn,* 2000 WL 1738410 (S.D.N.Y. Nov.22, 2000); *see also Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001) ("a remedy that prison officials prevent a prisoner from 'utiliz[ing]' is not an 'available' remedy under § 1997e(a)").

*9 With respect to his medical needs claim, McNair states that he was threatened by Sergeant Jones and warned not to complain to the medical staff about his injuries. Complaint at § IV. Mere verbal threats from correctional officers, however, do not excuse the exhaustion requirement. *See Flanagan v. Maly,* 2002 WL 122921, at *2 n. 3 (rejecting argument that prisoner could be excused from exhausting administrative remedies where correctional officers threatened him with violence if he filed a grievance because the prisoner "made no effort to file a written grievance, and verbal discouragement by individual officers does not prevent an inmate from filing a grievance").

Finally, McNair argues that he has not submitted "sufficient information" to establish whether he exhausted administrative remedies and that he should be allowed to take discovery concerning the Inspector General's investigations and to depose various prison officials. McNair Supp. Mem. at 4. In support of this argument he cites *Perez v. Blot,* 195 F.Supp.2d 539 (S.D.N.Y.2002). In *Perez,* the plaintiff was permitted to take discovery on his informal grievance efforts because the Court concluded that it was not clear if the plaintiff had complied with the "informal" provisions of § 701.11. *Id.* at 546. Here, McNair has explicitly stated what he in fact did with respect to submitting his complaints and nothing he states suggests that he complied with the § 701.11 procedures. Thus, discovery is not necessary. *See, e.g., Byas,* 2002 WL 1586963, at *3 (plaintiff's attempt to invoke *Perez* to suggest that he satisfied exhaustion requirement unavailing because, among other reasons, he did not submit evidence that he notified the defendants' supervisor of the alleged assaults as required by § 701.11).

In sum, having determined that McNair has not exhausted his administrative remedies nor offered a justification for failing to do so, the claims of excessive force, unsanitary

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

conditions, conspiracy, and denial of medical needs must be dismissed without prejudice. *See Morales v. Mackalm, 278 F.3d 126, 126 (2d Cir.2002)* (dismissal for failure to exhaust should be without prejudice to refiling following exhaustion).

[4] In a recent filing with the Court, McNair states that on April 7, 2002, nearly a year after the complaint in this case was filed, he filed a grievance with the Inmate Grievance Resolution Committee. *See* Grievance, dated April 7, 2002 (annexed to Affirmation in Opposition to Defendant's Motion to Dismiss, filed July 29, 2002 (Docket # 39)). He does not contend, however, that he has completed this process.[FN5] In any event, exhausting administrative remedies after a complaint is filed will not save a case from dismissal. *Neal v. Goord, 267 F.3d 116, 121-23 (2d Cir.2001), overruled on other grounds by Porter v. Nussle, 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).*

> FN5. In fact, McNair complains that the Department of Corrections has failed to respond to his grievance complaint. *See* Letter, dated June 11, 2002 (annexed as last page to Affirmation in Opposition to Defendant's Motion to Dismiss, filed July 29, 2002 (Docket # 39)). The Court notes that McNair filed this grievance nearly three years after the alleged incidents, and that inmate grievances must be filed within 14 days of the incident or be time-barred, unless the inmate demonstrates mitigating circumstances justifying the delay. 7 N.Y.C.R.R. § 701.7(a)(1). In any event, the Inmate Grievance Program regulations provide that "matters not decided within the time limits" for the initial step of review (14 days) "may be appealed to the next step." 7 N.Y.C.R.R. § 701.8.

C. *Claims of Procedural Defects*

[5] At the conclusion of his disciplinary hearing on June 18, 1999, McNair was found guilty of various rule violations. Disc. Hg. Transcript at 1. McNair challenges the conduct of this hearing on the grounds that it was procedurally flawed. He alleges that Pico "imposed inappropriate penalties of 365 days Special Housing Unit,

365 days loss of Telephones, Packages, and 365 days of recommended loss of good time" based on a prior weapons charge and a misbehavior report that is not in McNair's disciplinary record. Amended Complaint at ¶ 1; McNair Aff. at ¶ 3. McNair also claims that Pico denied McNair his right to call witnesses in his defense, denied him "adequate assistance," and that his ruling was "arbitrary and capricious." Amended Complaint at ¶ 1. In addition, McNair claims that because he gave Superintendent Strack notice of the alleged constitutional violations by way of his July 3, 1999 letter, Strack is also liable for damages. *See* Affirmation in Opposition Of Motion To Dismiss And/Or for Summary Judgment, dated April 15, 2002 ("McNair April Aff."). Defendants now move to dismiss these claims not on exhaustion grounds but rather pursuant to Fed.R.Civ.P. 12(b)(1) and (b)(6) on the ground that McNair's claims are not cognizable under 42 U.S.C. § 1983. *See* Notice of Motion, dated May 9, 2002 (Docket # 32); Memorandum of Law In Support of Jose Pico and Superintendent Strack's Motion to Dismiss the Amended Complaint, filed May 9, 2002 (Docket # 33).

1. *Standard for Motion to Dismiss*

**10** A court should dismiss a complaint pursuant to Rule 12(b)(6) if it appears beyond doubt that the plaintiff can prove no set of facts in support of the complaint that would entitle the plaintiff to relief. *See, e.g., Strougo v. Bassini, 282 F.3d 162, 167 (2d Cir.2002); King v. Simpson, 189 F.3d 284, 286-87 (2d Cir.1999).* The Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g., Koppel v. 4987 Corp., 167 F.3d 125, 130 (2d Cir.1999); Jaghory v. New York State Dep't of Educ., 131 F.3d 326, 329 (2d Cir.1997).* The issue is not whether a plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support his or her claims. *See, e.g., Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir.1995), cert. denied, 519 U.S. 808, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996).* The Court must "confine its consideration 'to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.' " *Leonard F. v. Israel Disc. Bank of New York, 199 F.3d 99, 107 (2d Cir.1999)* (quoting *Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir.1991)); Hayden v. County of Nassau, 180 F.3d 42, 54 (2d Cir.1999).*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

of his claim in a § 1983 action.

When considering motions to dismiss the claims of a plaintiff proceeding *pro se,* pleadings must be construed liberally. *See, e.g., Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (a *pro se* complaint may not be dismissed under Rule 12(b)(6) unless " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' ") (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *Lerman v. Board of Elections,* 232 F.3d 135, 139-40 (2d Cir.2000), *cert. denied,* 533 U.S. 915, 121 S.Ct. 2520, 150 L.Ed.2d 692 (2001); *Flaherty v. Lang,* 199 F.3d 607, 612 (2d Cir.1999).

2. *Merits of McNair's Claims*

In *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), the Supreme Court held that a state prisoner's claim for damages is not cognizable under 42 U.S.C. § 1983 if "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence," unless the prisoner can demonstrate that the conviction or sentence had previously been invalidated. *Id.* at 486-87. Later in *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997), the Court made clear that a claim may not be brought under 42 U.S.C. § 1983 alleging a violation of procedural due process in a prison disciplinary proceeding where the nature of the challenge necessarily implies the invalidity of the judgment or punishment imposed, unless of course the disciplinary proceeding is first invalidated. *Id.* at 648.

Here, McNair seeks damages based on his allegations that the disciplinary proceedings were improperly conducted, *inter alia,* because McNair was not permitted to call witnesses, he did not have adequate assistance, and the hearing officer relied on improper evidence (the prior weapons charge). Amended Complaint at ¶ 1. McNair's own filings with this Court concede that his disciplinary sanction-the loss of good time credits and other privileges-has never been invalidated. *See, e.g.,* Notice of Appeal for Article 78, dated August 23, 2000 (reproduced as Ex. E to 6/11/2002 Exs.); Decision & Order on Motion, dated May 30, 2001 (reproduced as Ex. O to 6/11/2002 Exs.), at 2-3. Thus, *Heck* and *Edwards* bar consideration

**\*11** McNair asserts in reply that his appeal to the Appellate Division, Second Department, was dismissed for failure to perfect his appeal within 10 days and that he was unable to perfect the appeal because of the disruption of his legal mail. *See* Affirmation in Opposition to Defendant's Motion to Dismiss, filed July 29, 2002 (Docket # 39), at ¶ 19. But even assuming this to be true, any attempt to seek relief for the untimely filing would have been properly addressed only to the state court. Because McNair has not "fully exhausted available state remedies," he has "no cause of action under § 1983 unless and until the conviction or sentence is reversed, expunged, invalidated, or impugned by the grant of a writ of habeas corpus." *Heck,* 512 U.S. at 489. In fact, nothing prevents McNair from returning to federal court on some later date if in fact he is able to obtain review from the state court and that review results in a reversal or expungement of the disciplinary action. *See id.* (statute of limitations for bringing § 1983 claim does not commence until state court proceedings have terminated in plaintiff's favor).

In addition, the Court notes that the case of *Jenkins v. Haubert,* 179 F.3d 19 (2d Cir.1999), is of no help to McNair because *Jenkins* held only that a § 1983 action would be available to a prisoner challenging the constitutionality of a disciplinary proceeding where the suit "does not affect the overall length of the prisoner's confinement." *Id.* at 27. Here, however, the sanction against McNair included the loss of "good time" credits, which is precisely the sort of sanction that affects the length of confinement. *See Edwards,* 520 U.S. at 646-48; *Hyman v. Holder,* 2001 WL 262665, at *3 (S.D.N.Y. Mar.15, 2001).

While McNair does not make the argument, it is also of no moment that McNair's disciplinary hearing resulted in additional sanctions that did not affect the length of McNair's sentence (for example, the placement in segregated housing and the loss of telephone privileges). This is because a judgment in favor of McNair in a § 1983 suit for damages would nonetheless imply the invalidity of his sentence through its reinstatement of good-time credits. McNair has not suggested that he seeks damages for the non-good-time sanctions by themselves and he would be unable in any event to so "split" his claim. *See*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

*Gomez v. Kaplan,* 2000 WL 1458804, at *7-11 (S.D.N.Y. Sept.29, 2000) (citing cases) (dictum).

Accordingly, McNair's claim challenging the process and validity of the disciplinary decision is not cognizable under § 1983 and must be dismissed with prejudice for failure to state a claim upon which relief can be granted under Fed.R.Civ.P. 12(b)(6).[FN6]

> **FN6.** The claim is not so patently without merit, however, that dismissal is appropriate for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1). *See, e.g., Town of West Hartford v. Operation Rescue,* 915 F.2d 92, 100 (2d Cir.1990). Accordingly, the defendants' motion must be denied on this ground.

> Additionally, the request to dismiss unserved defendants, made in a reply brief, *see* Defendants Reply Memorandum of Law in Further Support of Their Motion to Dismiss the Amended Complaint And/Or For Summary Judgment, dated July 26, 2002, at 1 n. 1, is now moot as the complaint does not state a claim against any defendant.

III. *CONCLUSION*

Judgment should be entered in favor of the defendants on all claims. With respect to McNair's claims against Pico and Strack alleging due process violations, these claims should be dismissed with prejudice. All other claims should be dismissed without prejudice for failure to exhaust administrative remedies.

**Notice of Procedure for Filing of Objections to this Report and Recommendation**

**\*12** Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report to file any written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Richard C. Casey, 40 Centre Street, New York, New York 10007, and to the chambers of the undersigned at the same address. Any request for an extension of time to file objections must be directed to Judge Casey. The failure to file timely objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

S.D.N.Y.,2002.
McNair v. Sgt. Jones
Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. *See*Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER FN1

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments. FN2 In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. Id. at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. Id. at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. Id. at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. Id. at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. Id. at ¶¶ 22, 27-28.

II. Motion to Dismiss

*2 When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from these facts in favor of the plaintiff. Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Staron v. McDonald's Corp., 51 F.3d 353, 355 (2d Cir.1995) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.), cert. denied, 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

III. Discussion

A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); Rhodes v. Chapman, 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. Farmer, 511 U.S. at 837.

1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare* *Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and* *Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with* *Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See* *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,*524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

*4 Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware that there is a significant risk of serious injury to that prisoner.*" *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at *3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at *3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

**IV. Failure to Complete Service**

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

**V. Conclusion**

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3834660 (S.D.N.Y.)

(Cite as: 2012 WL 3834660 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Vincent Herman HERBERT, Jr., Plaintiff,
v.
NYC DEPT. OF CORRECTIONS, et al., Defendant.
No. 10 CV 8799(BSJ)(RLE).

Aug. 21, 2012.
*Memorandum and Order*

BARBARA S. JONES, District Judge.

**\*1** *Pro se* Plaintiff Vincent Herman Herbert ("Plaintiff") has filed the instant action against the City of New York ("the City"), Correction Officer Captain Brown ("Capt.Brown"), Correction Officer Captain Williams ("Capt.Williams"), Dr. Donald Butlein ("Dr.Butlein"),[FN1] and Dr. Jean Claude Pernier ("Dr.Pernier") (collectively "Defendants") for their alleged indifference to his medical needs during the time he was incarcerated at Rikers Island.[FN2] Defendants have moved to dismiss Plaintiff's Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a cause of action, or in the alternative, for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons discussed, the Court **GRANTS** Defendants' motion to dismiss the complaint in its entirety.

> FN1. The Court has been informed by counsel for the Defendants that Dr. Donald Butlein passed away on October 3, 2011. As of the filing date of the instant motion, counsel for the Defendants had not been advised as to the identity of any representative of Dr. Butlein's estate.

> FN2. Plaintiff attempted to file an Amended Complaint on March 15, 2011, which Magistrate Judge Ronald Ellis ordered be removed from the docket on April 4, 2011. Plaintiff then filed a motion to amend the complaint on April 26,

2011, to which he appended a Second Amended Complaint. In an order dated May 11, 2011, the Court granted Plaintiff's motion to amend the complaint and accepted for filing Plaintiff's Second Amended Complaint.

**STANDARD OP REVIEW**

"In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor." *Johnson v. Westchester County Dept. of Correction Medical Dept.,* No. 10 Civ. 6309(JGK), 2011 WL 2946168, \*1–4, \*1 (S.D.N.Y. July 19, 2011) (citing *McCarthy v. Dun & Bradstreet Corp.,* 482 F .3d 184, 191 (2d Cir.2007)). To survive the motion to dismiss, the plaintiff must state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). The court is not, however, "bound to accept as true legal conclusions couched as factual allegations." *Id.*

The Court will read a *pro se* plaintiff's pleadings as raising the strongest arguments they suggest, *see Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir.2007). "Th[is] rule favoring liberal construction of pro se submissions is especially applicable to civil rights claims." *Henry v. Fischer,* No. 10 Civ. 3822, 2011 WL 5223600 at \* 3 (S.D.N.Y. Nov. 1, 2011) (citing *Hemphill v. New York,* 380 F.3d 680 (2d Cir.2004)). *Pro se* status does not, however, excuse a plaintiff from compliance with the pleading standards of the Federal Rules of Civil Procedure. Nor does the latitude accorded a pro se litigant excuse him from meeting the requirements necessary to respond to dispositive motions. *See Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003).

**ALLEGATIONS OF THE COMPLAINT**

Plaintiff was an inmate incarcerated at Rikers Island

Slip Copy, 2012 WL 3834660 (S.D.N.Y.)

(Cite as: 2012 WL 3834660 (S.D.N.Y.))

("Rikers") at the time of the events alleged in the Second Amended Complaint. (Second Am. Compl. at 3.) According to the Second Amended Complaint, from April 6, 2009, until the third week of January 2011 (*Id.* at 2), Plaintiff "continuously informed medical staff and the dentist that [he] had an abscess on the upper gum area of [his] mouth that was causing [him] pain and leaking a brownish fluid." (*Id.* at 3.) With respect to the response of Rikers' staff to Plaintiffs abscess, the Second Amended Complaint alleges that: (1) Dr. Butlein provided inadequate medical care; (2) Plaintiff was denied prompt medical attention; (3) Plaintiff was forced to endure unbearable pain; and (4) Plaintiff was refused medical attention by Captains Brown and Williams. (*Id.*) As a result of the aforementioned actions and inactions, the Second Amended Complaint alleges that Defendants were deliberately indifferent to Plaintiff's medical needs. (*Id.*)

**DISCUSSION**

**\*2** Plaintiff's present cause of action pursuant to 42 U.S.C. § 1983 relates to a denial of medical care that occurred in the course of Plaintiff's pretrial arrest and detainment. "In the case of a person being held prior to trial ... the cruel and unusual punishment proscription of the Eighth Amendment to the Constitution does not apply, because as a pre-trial detainee the plaintiff is not being punished." *Caiozso v. Koreman,* 581 F.3d 63, 69 (2d Cir.2009) (internal citations and quotations omitted). A pre-trial detainee instead receives protection against mistreatment at the hands of state prison officials under the Due Process Clause of the Fourteenth Amendment. *Id.* State pre-trial detainees' § 1983 claims for deliberate indifference to serious medical conditions are analysed, however, under the same standard used to address similar Eighth Amendment claims brought under the statute. *Id.* at 72. This Court therefore engages in an Eighth Amendment analysis to assess Plaintiff's claims of deliberate indifference to his medical needs.[FN3]

> FN3. "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care ..."

*Estelle v. Gamble,* 429 U.S. 97, 104–05 (1976).

**Claims Against the City**

As an initial matter, Defendants have moved to dismiss all of Plaintiffs claims against the City. Defendants argue that these claims must fail because the Second Amended Complaint does not allege that Plaintiff's injuries were the result of a municipal policy or custom.

"A municipality may not he held liable in an action under 42 U.S .C. § 1983 for actions alleged to be unconstitutional by its employees below the policymaking level solely on the basis of *respondeat superior." Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995) (citing *Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 691 (1978)). Since Plaintiff has not alleged that any of the individual defendants named in his Second Amended Complaint had policymaking authority, for the City to be found liable under § 1983, the Plaintiff must demonstrate: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Id.*

The Second Amended Complaint alleges that: "[o]n June 29th 2010 [Plaintiffs] mouth swell [sic] up to an unbelievable size and the pain became unbearable. I informed the officers, who informed the area captain and I was told that it was a weekend and that my situation wasn't a medical emergency. I was forced to endure the pain until routine sick call." (Second Am. Compl. at 3.) Plaintiff has further alleged in his opposition to the instant motion that the "state adds to the risk [of medical malpractice] by providing physicians who don't meet minimum standards of competence or diligence—or who can't give adequate care because of excessive case load, or inadequate facilities, or unsupported policies." (Rule 56.1 Statement 2.)

Even construing Plaintiff's claims broadly, the Court finds that Plaintiff has not pled sufficient facts for the court to draw the reasonable inference that there was a policy or custom of either inadequate staffing or excessive case load. Moreover, Plaintiff has not pled any facts to suggest that his injuries were in fact caused by such a policy or custom. In light of this, the Court dismisses the Second Amended Complaint's claims against the City.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3834660 (S.D.N.Y.)

(Cite as: 2012 WL 3834660 (S.D.N.Y.))

*Claims Against Individual Defendants*

**\*3** In order to assess whether the individual Defendants' actions constituted deliberate indifference to the Plaintiff's medical needs, the Court engages in a two-pronged analysis, both objective and subjective. "Objectively, the deprivation must be sufficiently serious, creating a risk of death, degeneration, or extreme pain. Subjectively, the official must have acted with the requisite state of mind, the equivalent of criminal recklessness." *Cole v. Fischer, et al., 416 Fed. Appx. 111, 113 (2d Cir.2011)* (internal quotations omitted). Although the subjective prong of the analysis speaks to the defendant's state of mind, the Plaintiff need not show "that the defendant acted for the very purpose of causing harm or with knowledge that harm will result." *Hernandez v. Keane, et al ., 341 F.3d 137, 144 (2d Cir.2003)* (internal quotations omitted).

*Drs. Butlein and Pernler*

Turning first to the physician defendants, Plaintiff alleges that these individuals failed to provide him with appropriate medical care, and that this failure resulted in a denial of his constitutional rights. With respect to Dr. Butlein, about whom the bulk of Plaintiff's factual allegations are regarding, the Second Amended Complaint alleges that Dr. Butlein: (1) incorrectly diagnosed Plaintiff's infection as gone after reviewing an x-ray; (2) accused Plaintiff of lying about fluid leaking from the area; and (3) failed to conduct proper follow-up after oral surgery. (Second Am. Compl. 3.) Plaintiff elaborates on these allegations in his "Rule 56.1 Statement," where he reiterates the allegations of the complaint, and additionally alleges that Dr. Butlein should have considered changing his course of treatment. (Rule 56.1 Statement 5.) With respect to Dr. Pernier, the Second Amended Complaint refers to this defendant only briefly, alleging that "Dr. Pernier didn't even prescribe me antibiotics to fight the infection. He told me that too much antibiotics wasn't good. But for an infection its [sic] needed." (Second Am. Compl. 5.) Plaintiff has, however, provided additional allegations in his Rule 56.1 Statement. In the Rule 56.1 Statement, Plaintiff alleges that "Dr. Pernier denied me anti-biotics saying to [sic] much was unhealthy-knowing that to not administer none wouldn't prevent spread of infection." (Rule 56.1 Statement 6.)

Having reviewed both the Second Amended Complaint and Plaintiff's submissions in response to the instant motion, even if the Court were to assume that Plaintiff's injuries were sufficiently serious so as to be considered a constitutional violation, the Court finds that Plaintiff has failed to plead the subjective prong of a deliberate indifference claim against Drs. Butlein or Pernier.

On their face, Plaintiff's allegations amount to a disagreement over the proper course of treatment for his dental condition. Plaintiff alleges that Dr. Butlein should have done more than prescribe antibiotics and that Dr. Pernier should have prescribed antibiotics. Plaintiff has not alleged, however, that either physician relied on anything other than his own professional judgment in making decisions regarding Plaintiff's treatment. Since "mere disagreement over the proper treatment does not create a constitutional claim," *Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir.1998),* this Court finds that Plaintiff has failed to plead a claim of deliberate indifference as to either Dr. Butlein or Dr. Pernier.

**\*4** The Court's decision would be unchanged, even if it were to assume that Plaintiff has pled a case of medical malpractice. In the context of a claim for denial of medical treatment, the Second Circuit has consistently held that allegations of medical malpractice alone do not satisfy the subjective prong of the deliberate indifference standard. *Cole, 416 Fed. Appx. at 113* ("[M]ere allegations of negligent malpractice do not state a claim of deliberate indifference.") (internal quotations omitted). "A showing of medical malpractice is [ ] insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of harm." *Hernandez, 341 F.3d at 144* (internal quotations omitted). To find otherwise would go against the Supreme Court's precedent that "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble, 429 U.S. 97, 106 (1976).* Since Plaintiff has not alleged any facts for the Court to draw an inference that either Dr. Butlein or Dr. Pernier acted recklessly or with a conscious disregard of harm, even if it were to assume

Slip Copy, 2012 WL 3834660 (S.D.N.Y.)

(Cite as: 2012 WL 3834660 (S.D.N.Y.))

malpractice on the part of both physicians, the Court would still find that Plaintiff's § 1983 claims cannot survive a motion to dismiss.

**Captains Brown and Williams**

The Second Amended Complaint's allegations with respect to Captains Brown and Williams are that "[Plaintiff] endured more increased facial swelling and pain and was again refused medical attention by Captains Brown and Williams," (Second Am. Compl. 3), and that Captains Brown and Williams "den[ied] [Plaintiff] access to emergency sick call due to personalopinions ..." (Second Am. Compl., Statement of Facts 1). Plaintiff further alleges in his opposition to the Defendants' motion that Captain Williams, on June 29, 2010; (1) was told between 2:30 a.m. and 3:00 a.m. that Plaintiff had requested emergency sick call due to pain and severe swelling in his face; (2) responded to the Plaintiff at 6:00 a.m.; (3) acknowledged the swelling in Plaintiff's face; and (4) advised the Plaintiff that he could not be seen because it was early and no one was there. (Rule 56.1 Statement 3.) Also in his opposition to the Defendants' motion, Plaintiff alleges that Captain Brown, on January 9, 2011: (1) was called between 10:00 a.m. and 1:00 p.m.; (2) came to the housing unit to ask Plaintiff what was wrong; (3) was told by Plaintiff about his pain; (4) asked Plaintiff if he was on antibiotics; and (5) informed Plaintiff that, due to it being the weekend, no one was available to see Plaintiff. (Rule 56.1 Statement 4.)

The Court finds that, even construing Plaintiff's allegations in the light most favorable to him, Plaintiff has failed to plead that either Capt. Williams or Capt. Brown acted with the requisite state of mind to support a claim for deliberate indifference to medical need. Although Plaintiff takes issue with the delay in his having received treatment, he does not allege facts to support an inference that either officer acted with a conscious disregard of substantial harm to him. Furthermore, Plaintiff himself concedes in his opposition that he ultimately did receive medical treatment on the same days that he alerted Captains Williams and Brown to his condition (Rule 56.1 Statement 3–4).[FN4] In light of these defects in Plaintiff's pleadings, the Court finds that Plaintiff's claims of deliberate indifference as to Captains Williams and Brown are insufficient to survive a motion to dismiss.

FN4. Plaintiff states in his opposition papers to Defendants' motion that he was seen by medical staff eight hours after he originally sought assistance on June 29, 2010, and at 9:30 p.m. on January 9, 2011. (Rule 56.1 Statement 3–4.)

**State Law Claims**

**\*5** Although the Second Amended Complaint is not clear as to what specific causes of action are alleged by Plaintiff, to the extent that Plaintiff brings state claims against the Defendants, this Court declines to exercise supplemental jurisdiction over these claims. *See Tops Mkt., Inc. v. Quality Mkts., Inc.,* 142 F.3d 90, 103 (2d Cir.1998).

**CONCLUSION**

For the reasons discussed, the Court **GRANTS** Defendants' motion to dismiss and dismisses the Second Amended Complaint in its entirety. The Clerk of the Court is directed to terminate motion # 67 on the ECF docket and to close the case.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45 (1962).

**SO ORDERED.**

S.D.N.Y.,2012.

Herbert v. NYC Dept. of Corrections
Slip Copy, 2012 WL 3834660 (S.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 596891 (N.D.N.Y.)

(Cite as: 2008 WL 596891 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
George HARRIS, Plaintiff,
v.
G. MORTON, et al, Defendants.
No. 9:05-CV-1049 (LEK/RFT).

Feb. 29, 2008.
George Harris, Marcy, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Risa L. Viglucci, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

### DECISION AND ORDER

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a Report-Recommendation filed on January 24, 2008 by the Honorable Randolph F. Treece, United States Magistrate Judge, pursuant to 28 U .S.C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report-Rec. (Dkt. No. 36). After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including the objections by Plaintiff George Harris, which were filed on February 26, 2008. Objections (Dkt. No. 38).

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* This Court has considered the objections and has undertaken a de novo review of the record and has determined that the Report-Recommendation should be approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 36) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion for summary judgment (Dkt. No 28) is **GRANTED;** and it is further

**ORDERED,** that the Complaint (Dkt. No. 1) is **DISMISSED;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

### *REPORT-RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff George Harris brings this civil rights action pursuant to 42 U.S.C. § 1983 claiming that his constitutional rights under the Eighth Amendment were violated when he was not properly treated for an injury he suffered as a passenger in a car accident. Dkt. No. 1, Compl. Defendants have filed a Motion for Summary Judgment (Dkt. No. 28) under Rule 56 of the Federal Rules of Civil Procedure, to which Plaintiff has responded in opposition (Dkt. No. 29). For the reasons that follow, it is recommended that Defendants' Motion for Summary Judgment be **granted,** and Plaintiff's Complaint be **dismissed.**

### I. FACTS

The following facts were derived mainly from the Defendants' Statement of Material Facts, submitted in accordance with N.D.N.Y.L.R. 7. 1, which were not specifically countered nor opposed by Plaintiff. *See* N.D.N.Y.L.R. 7.1(a)(3) ( *"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* (emphasis in original)). In any event, most, if not all, of the material facts are not in dispute, but rather, the issue is whether those facts give rise to constitutional violations.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 596891 (N.D.N.Y.)

(Cite as: 2008 WL 596891 (N.D.N.Y.))

On October 24, 2003, Plaintiff was a passenger in a van driven by Defendant Corrections Officer (C.O.) Morton headed from Mid-State Correctional Facility to the SUNY Health Care Center in Syracuse, New York. Dkt. No. 28-4, Defs.' 7.1 Statement at ¶ 1. While attempting to back out of a parking space, Morton hit the rear driver side panel of another vehicle. *Id.* at ¶ 3. Both Morton and Defendant C.O. Irving, who was also present in the car, inspected the vehicles and noted minimal damages. *Id.* at ¶ 4. Plaintiff was wearing a seatbelt when the accident occurred. *Id.* at ¶ 5. Plaintiff arrived at Mid-State at approximately 11:20 a.m. and was seen in the infirmary at approximately 12:40 p.m., at which point he completed an inmate injury report. *Id.* at ¶ 6; Compl. at p. 5. Plaintiff complained of a "bumped" left knee and a "snapped" neck, but Defendant Nurse Hanley found that Plaintiff was not suffering from any injuries requiring medical treatment, and noted that Plaintiff had full range of motion and was alert and oriented. Defs' 7.1 Statement at ¶¶ 8-9. Plaintiff did not seek any further medical attention until October 31, 2003, when he complained of pain and discomfort in his neck and knee to Nurse Myers [FN1] at the flu shot clinic, which is provided for the purpose of administering flu shots only. *Id.* at ¶ 9; Compl. at p. 6. Nurse Myers instructed Plaintiff to sign up for sick call if he needed medical attention, to which Plaintiff responded that he intended to file a grievance. Defs' 7.1 Statement at ¶ 9; Compl. at p. 7.

> FN1. Nurse Myers is not a named Defendant in this action.

*2 Plaintiff filed a grievance on November 6, 2003, which Superintendent James A. Nichols denied on November 11, 2003, after an investigation. Dkt. No. 28, Defs.' Mot. for Summ. J., Risa Viglucci, Esq., Affirm., dated Apr. 2, 2007, Ex. B at p. 3. Plaintiff's appeal to the Central Office Review Committee (CORC) was unanimously denied. *Id.* at p. 2; Defs' 7.1 Statement at ¶ 10. Plaintiff now brings this action claiming violation of his constitutional rights.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 596891 (N.D.N.Y.)

(Cite as: 2008 WL 596891 (N.D.N.Y.))

*Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

**B. Eighth Amendment Claim**

**\*3** Plaintiff claims that the Defendants failed to adequately care for injuries he sustained to his neck and knee during a minor car accident. "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to [his] serious medical needs." *Smith v. Carpenter,* 316 F.3d 178, 183 (2d Cir.2003) (internal quotation marks and citations omitted) (alteration in original). This standard contains both objective and subjective elements. *Id.* "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberative indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Id.* at 183-84 (citing *Chance v. Armstrong,* 143 F.3d at 702 & *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). The subjective element "entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Hathaway v. Coughlin,* 99 F.3d at 553 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835 (1994)).

The record in this case shows that on the day of the accident, October 24, 2003, Plaintiff was attended to by Defendant Nurse Hanley, who found Plaintiff free of injury. Viglucci Affirm., Ex. A ., Rep. of Inmate Injury, dated Oct. 24, 2003. Plaintiff did not seek any further medical attention until October 31, 2003, when he complained of pain and discomfort in his neck and knee to Nurse Myers, who instructed him to utilize the sick call procedure in order to receive medical attention. Compl. at p. 6. Plaintiff's Ambulatory Health Record (AHR) shows that Plaintiff continued to complain of neck pain in the months that followed. *See* Viglucci Affirm., Ex. A, AHR.

The medical staff questioned whether Plaintiff had possibly suffered from whiplash, and it was recommended that Plaintiff take Tylenol and apply heat to the afflicted area. *Id.* at entries dated Jan. 15 & Feb. 17, 2004.[FN2] An x-ray exam of Plaintiff's cervical spine revealed an "old apparent injury to [the] C6 spinous process." Dkt. No. 29, Pl.'s Resp. to Defs.' Mot. to Dismiss, Ex. 9, Cervical Spine Exam Rep., dated Jan. 16, 2004. Plaintiff's regular physician received the x-ray report and recommended no changes to his prescriptions. AHR, entry, dated Jan. 22, 2004. This injury was later diagnosed as a pinched nerve in his neck. *Id.* at entry dated Mar. 5, 2004. Such a minor injury does not normally rise to the level of seriousness required to make a viable claim of medical indifference under the Eighth Amendment. *See Bennett v. Hunter,* 2006 WL 1174309, at *3 (N.D.N.Y.2006) (stating that a pinched nerve is not a serious medical need).

> FN2. We note that although Plaintiff states he suffered from a "snapped" neck, he does not indicate he suffered from anything other than a generic neck injury. *See* Compl. at p. 9.

The record also reflects that Plaintiff has suffered from Degenerative Disc Disease [FN3] since 2002. Pl.'s Opp. to Defs.' Mot. to Dismiss, Ex. 9, Bone Scan Rep. dated Mar. 29, 2002 & Radiologic Consultation, dated Jan. 16, 2004. The January 16, 2004 report notes a "straightening and mild degenerative disc disease at C5-6 and C6-7." Degenerative Disk Disease itself might be considered a constitutionally significant injury, *see Moolenaar v. Champagne,* 2006 WL 2795339, at *6 n. 6 (N.D.N.Y. Sept. 26, 2006) (citation omitted), however, Plaintiff does not claim that he received inadequate treatment for this ongoing condition, but rather for the neck injury he allegedly suffered as a result of the car accident. *See generally* Compl.; *see also Smith v. Carpenter,* 316 F.3d at 186 (citations omitted) (stating Eighth Amendment claims concern "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract"). In addition, the Plaintiff has not asserted, nor does the record reflect, that his disease was somehow worsened as a result of the alleged injury he sustained in the car. Therefore, the Plaintiff's claim must fail under the objective prong of the

Not Reported in F.Supp.2d, 2008 WL 596891 (N.D.N.Y.)

(Cite as: 2008 WL 596891 (N.D.N.Y.))

Eighth Amendment deliberate indifference standard.

> FN3. Degenerative Disc Disease (DDD) is "not really a disease but a term used to describe the normal changes in your spinal discs as you age ... [it] can take place throughout the spine, but it most often occurs in the discs in the lower back (lumbar region) and the neck (cervical region)." Information *available at* www.webmd.com. DDD involves the break down or degeneration of the spinal disks caused by the loss of fluid in the discs or tiny cracks or tears in the outer layer of a disc. *Id.* DDD can result in back or neck pain, depending on the location of the affected disc. *Id.*

**\*4** Even assuming, *arguendo,* that Plaintiff sustained a serious medical injury, his claim would fail under the subjective prong as well. Defendants Irving, Morton, and Hanley are the only named Defendants who were directly involved in the care Plaintiff received after the accident. *See generally* Compl. C.O.'s Irving and Morton were present in the van during the accident, and upon their return to Mid-State, Defendant Morton sent Plaintiff to the infirmary to be checked out for any injury. *Id.* at p. 5. Thus, far from exhibiting a deliberate indifference to Plaintiff's medical needs or otherwise preventing Plaintiff from receiving medical attention, these officers ensured that Plaintiff received medical attention in a timely fashion. *Id.*

Nurse Hanley examined Plaintiff on the day of the accident and found no injuries, noting that Plaintiff was alert and had a full range of motion. Rep. of Inmate Injury, dated Oct. 24, 2003. Plaintiff states in his Complaint that he requested to see a doctor, but that Hanley denied his request stating he would have to go to sick call to see a doctor. Compl. at p. 6. Plaintiff also states later that night he again complained of neck pain to C.O. Jordan [FN4] who informed Hanley of his complaints, but that Hanley refused to see Plaintiff. *Id.* Even accepting these statements as true, there is no evidence on the record to suggest that Hanley acted with deliberate indifference towards Plaintiff's alleged injuries. Prison officials act with deliberate indifference "when [they] 'know[ ] of and disregard[ ] an excessive risk to inmate health or safety;

the official[s] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference.' " *Chance v. Armstrong,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1970). Hanley did a "head to toe assessment" and found nothing wrong with Plaintiff, and then advised Plaintiff to utilize the sick call procedure if he wanted to see a doctor. Rep. of Inmate Injury, dated Oct. 24, 2003. Plaintiff admits that despite the severe pain he allegedly felt, he did not inform any medical staffer until October 31, 2003, seven days after the car accident. Compl. at p. 6. At worse then, Hanley failed to identify an injury that Plaintiff himself had not felt the effects of at the time of Hanley's assessment. *Id.* (stating that only after Hanley's examination did Plaintiff "really feel the effects of the accident upon his neck."). There is no accusation nor evidence on the record that Defendant Hanley consciously disregarded Plaintiff's medical needs. *See Farmer v. Brennan,* 511 U.S. at 836 (stating a plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm).

> FN4. C.O. Jordan is not a named Defendant in this action.

For the foregoing reasons, it is recommended that Summary Judgment be **granted** as to Defendants Hanley, Irving, and Morton.

### C. Personal Involvement

**\*5** The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement. Therefore, a prison official may not be found liable for a constitutional violation merely because of the acts of those under his control." *Kinch v. Artuz,* 1997 WL 576038, at \*2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted).

If a plaintiff seeks to bring a § 1983 action for supervisory liability, liability on the part of the supervisor

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 596891 (N.D.N.Y.)

(Cite as: 2008 WL 596891 (N.D.N.Y.))

may exist in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir.2003) (citing Colon v. Coughlin, 58 F.3d at 873) (further citations omitted).

In the case at bar, Plaintiff has failed to identify how the remaining Defendants, Baxter, Stine, Nichols, Berry, and Mohrman, were personally involved in his alleged Eighth Amendment claim. Plaintiff's statements about these Defendants concern the investigation of the Grievance he filed and the subsequent decisions rendered against him. Plaintiff takes issue with several alleged failures to follow correct procedure in reporting the car accident, and accuses these Defendants of failing to follow what Plaintiff asserts is correct protocol in the aftermath of a car accident.[FN5] See Compl. at pp. 5-9. However, aside from his Eighth Amendment claim, Plaintiff fails to explain, and the Court cannot itself fathom, how any of these accusations amount to a violation of his constitutional rights.

> FN5. For example, Plaintiff states that Defendants Morton and Irvin failed to "speak with their superiors and get instructions as to what procedure was to be followed" in the wake of the car accident. Compl. at p. 5. Similarly, Plaintiff accuses Defendant Stine of failing to contact Plaintiff in order to make a written report of the accident. Id. at p. 7.

For these reasons it is recommended that the Motion for Summary Judgment be **granted** as to the remaining Defendants.

**D. Qualified Immunity**

Defendants raise the affirmative defense of qualified immunity. However, because we find that Plaintiff has suffered no constitutional violation, we need not address the merits of that defense. See Saucier v. Katz, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for fruther inquiries regarding qualified immunity.").

### III. CONCLUSION

For the reasons stated herein, it is hereby **RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 28) be **granted;** and it if further

**\*6 RECOMMENDED,** that Plaintiff's Complaint (Dkt. No. 1) be **dismissed;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir.1989)); see also 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2008.

Harris v. Morton
Not Reported in F.Supp.2d, 2008 WL 596891 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1174309 (N.D.N.Y.)

(Cite as: 2006 WL 1174309 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Donald Mack BENNETT, Plaintiff,
v.
T. HUNTER, Administrative Director of Medical,
Riverview Correctional Facility, Defendant.
No. 9:02-CV-1365 (FJS/GHL).

March 31, 2006.
May 1, 2006.
Donald Mack Bennett, White Plains, NY, for Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General for the State of New York, Nelson Sheingold, Assistant Attorney General, of counsel, Albany, NY, for Respondent Department of Law.

*ORDER*

FREDERICK J. SCULLIN, JR., S.D.J.

*1 The above-captioned matter having been presented to me by the Report-Recommendation of Magistrate Judge George H. Lowe filed March 31, 2006, and the Court having reviewed the Report-Recommendation and the entire file in this matter; and Judge Lowe's Report-Recommendation which was mailed to plaintiff's last known address, but was returned to the Clerk's office marked "Return to Sender". Under Local Rule 41.2(b), failure to notify the Court of a change of address as required by Local Rule 10.1(b) may result in dismissal of the action. Therefore, in light of Plaintiff's failure to notify the Court of his change of address, it is hereby

**ORDERED,** that the Report-Recommendation filed by Magistrate Judge George H. Lowe filed on March 31, 2006, is, for the reasons stated therein, **ACCEPTED** in its entirety; and it is further

**ORDERED,** that Defendant's motion for summary judgment is **GRANTED,** and it is further

**ORDERED,** that the Clerk of the Court is to enter judgment in favor of Defendant and **CLOSE** this case.

**IT IS SO ORDERED.**

GEORGE H. LOWE, United States Magistrate Judge.

*REPORT-RECOMMENDATION*

This matter has been referred to me for Report and Recommendation by the Honorable Frederick J. Scullin, Senior U.S. District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). Generally, in this *pro se* civil rights complaint brought under 42 U.S.C. § 1983, Donald Mack Bennett ("Plaintiff"), formerly an inmate at the Riverview Correctional Facility ("Riverview C.F."), alleges that the Administrative Director of the Medical Department at Riverview C.F., Thomas B. Hunter ("Defendant"), violated Plaintiff's rights under the First, Eighth and Fourteenth Amendments to the United States Constitution when, between July and December of 2000, he was deliberately indifferent to Plaintiff's serious medical needs (which included a heart condition known as "atrial fibrillation," a seizure disorder, a disc problem in his back known as "spondylolisthesis," and a pinched nerve in his right wrist). (Dkt. No. 29 [Plf.'s Second Am. Compl.].)

Currently before the Court is Defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 59.) Generally, Defendant's motion raises three issues: (1) whether Plaintiff has failed to establish the elements for a claim of deliberate indifference to a serious medical need; (2) whether Plaintiff has failed to establish any personal involvement by Defendant in the alleged constitutional deprivations, and (3) whether Defendant is protected by qualified immunity. (Dkt. No. 59 [Def.'s Mem. of Law].) For the reasons discussed below, I answer each of these questions in the affirmative. As a result, I recommend that Defendant's motion be granted.

**I. SUMMARY JUDGMENT STANDARD**

Under Fed.R.Civ.P. 56(c), summary judgment is

Not Reported in F.Supp.2d, 2006 WL 1174309 (N.D.N.Y.)

(Cite as: 2006 WL 1174309 (N.D.N.Y.))

warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [FN1] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990)* (citation omitted). However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986).

> FN1. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

*2 To "specifically controvert[ ]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" *and* that "set[s] forth a specific citation to the record where the factual issue arises." [FN2]

> FN2. N.D.N.Y. L.R. 7.1(a)(3); *see, e.g., Jones v. Smithkline Beecham Corp.,* 309 F.Supp.2d 343, 346 (N.D.N.Y.2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true."); *Lee v. Alfonso,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact. Nor has he overcome his failure to respond to Defendants' Rule 7.1(a)(3) Statement. Therefore, Defendants' version of the facts remains uncontroverted."); *Margan v.*

*Niles,* 250 F.Supp.2d 63, 67 (N.D.N.Y.2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record. Because plaintiff's response Rule 7.1(a)(3) statement does not comply with the local rules, it has not been considered."); *Mehlenbacher v. Slafrad,* 99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at *4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since [the plaintiff] has failed to respond to the defendant's statements of material fact, the facts as set forth in the defendants' Rule 7.1 Statement ... are accepted as true."); *Adams v. N.Y. State Thruway Auth.,* 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at *2, n. 1 (N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Local Rule 7. 1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff."); *see also Holtz v. Rockefeller,* 258 F.3d 62, 74 (2d Cir.2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").

"If the adverse party does not so respond, summary judgment, *if appropriate,* shall be entered against the adverse party." Fed.R.Civ.P. 56(e) (emphasis added). "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v.. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). "Such a motion may properly be granted only if the facts as to which there is no genuine dispute 'show that ... the moving party is entitled to a judgment as a matter of law.' " *Champion,* 76 F.3d at 486 (quoting Fed.R.Civ.P. 56[c]).[FN3] Therefore, the Court must review the merits of the motion. *Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 232 (N.D.N.Y.2001).

> FN3. Local Rule 7.1(b)(3) recognizes this requirement (that the motion have merit) when it provides that "the non-moving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown," only

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1174309 (N.D.N.Y.)

(Cite as: 2006 WL 1174309 (N.D.N.Y.))

where the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein." N.D.N.Y. L.R. 7.1(b)(3).

Where a plaintiff has failed to respond to a defendant's Rule 7.1 Statement of Material Fact, the facts as set forth in that Rule 7.1 Statement are accepted as true to the extent those facts are supported by the evidence.[FN4] A district court has no duty to perform an independent review of the record to find proof of a factual dispute.[FN5] In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit.[FN6] I note that, here, while Plaintiff's Second Amended Complaint ("Complaint") is *not* verified, he has submitted what purports to be an "affidavit" in opposition to Defendant's motion. (Dkt.Nos.29, 72.)

FN4. *See* N.D.N.Y. L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*) [emphasis in original]; *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243-245 (2d Cir.2004) ("If the evidence submitted in support of the motion for summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden ..., the district court may not rely solely on the statement of undisputed material facts contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [citation omitted]; *see, e.g ., Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added].

FN5. *See Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (citations omitted); *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN6. *See Patterson v. County of Oneida,* 375 F.2d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; Fed.R.Civ.P. 56(c) ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact....").

However, to be sufficient to create a factual issue, an affidavit (or verified complaint) must, among other things, be based "on personal knowledge."[FN7] An affidavit (or verified complaint) is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay.[FN8] In addition, such an affidavit (or verified complaint) must not be conclusory.[FN9] An affidavit (or verified complaint) is conclusory if, for example, its

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2006 WL 1174309 (N.D.N.Y.)

(Cite as: 2006 WL 1174309 (N.D.N.Y.))

assertions lack any supporting evidence or are too general.[FN10] Moreover, "[a]n affidavit must not present legal arguments."[FN11]

FN7. Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc., 44 F.3d 1082, 1084 (2d Cir.1995)* [citations omitted], *cert. denied sub nom, Ferrante v. U.S., 516 U.S. 806 (1995)*.

FN8. *See Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 643 (2d Cir.1988)* ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc., 425 F.2d 92, 97 (2d Cir.1970)* (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co., 803 F.Supp. 649, 664 (W.D.N.Y.1992)* (rejecting affidavit made on "secondhand information and hearsay"), *aff'd, 995 F.2d 1147 (2d Cir.1993)*.

FN9. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine

issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56(e) is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN10. *See, e.g., Bickerstaff v. Vassar Oil, 196 F.3d 435, 452 (2d Cir.1998)* (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur., 78 F.3d 61, 63 (2d Cir.1996)* (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon, 759 F.2d 989, 997 (2d Cir.1985)* (plaintiff's allegation that she "heard disparaging remarks about Jews, and, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN11. N.D.N.Y. L.R. 7.1(a)(2).

Finally, even where an affidavit (or verified complaint) is based on personal knowledge and is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[FN12]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1174309 (N.D.N.Y.)

(Cite as: 2006 WL 1174309 (N.D.N.Y.))

FN12. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

## II. ANALYSIS

*3 Before I analyze each of the three issues presented

by Defendant in his motion, I would like to make a general observation. In support of each of his arguments, Defendant relies on certain record citations and legal citations. I find that these citations indeed support Defendant's arguments. My resulting conclusion that Defendant's motion has merit is not rebutted by Plaintiff's opposition papers. His papers are woefully deficient, despite the fact that he was twice warned of the potential consequences of failing to properly respond to Defendant's motion, and was granted numerous extensions of time in which to do so.[FN13]

FN13. (Dkt.Nos.59, 63, 67, 70.)

Specifically, because Plaintiff fails to include in his opposition papers a Rule 7.1 Response which specifically controverts Defendant's factual assertions in matching numbered paragraphs with specific citations to the record, Defendant's factual assertions in his Rule 7.1 Statement are deemed admitted by Plaintiff.[FN14] In addition, because in his opposition papers Plaintiff fails to address the legal arguments advanced by Defendant, Plaintiff is deemed to have consented to the granting of Defendant's motion based on those legal arguments.[FN15]

FN14. N.D.N.Y. L.R. 7.1(a)(3).

FN15. N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."); N .D.N.Y. L.R. 7.1(a) (requiring opposition to motion for summary judgment to contain, *inter alia,* a memorandum of law); *Beers v.. GMC,* 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ); *cf.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1174309 (N.D.N.Y.)

(Cite as: 2006 WL 1174309 (N.D.N.Y.))

Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's *response ...* must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so *respond,* summary judgment, if appropriate, shall be entered against the adverse party.") [emphasis added].

**A. Whether Plaintiff Has Failed to Establish the Elements for a Claim of Deliberate Indifference to a Serious Medical Need**

Defendant recites the correct legal standard that governs Plaintiff's claim of inadequate medical care under the Eighth Amendment. (Dkt. No. 59, Mem. of Law at 9-12.) Generally, to prevail on such a claim, Plaintiff must show two things: (1) that Plaintiff had a sufficiently serious medical need; and (2) that Defendant was deliberately indifferent to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

**1. Serious Medical Need**

Defendant acknowledges, and the record establishes, that, during some or all of the time in question, Plaintiff had a heart condition (atrial fibrillation), [FN16] a seizure disorder, [FN17] a disc problem in his lower back (spondylolysis), [FN18] a pinched nerve in his right wrist, [FN19] and calluses on his feet. [FN20] However, Defendant argues that, while some of these health conditions may have constituted "serious medical needs" (e.g., Plaintiff's heart condition, his seizure disorder, etc.), other of these health conditions did not constitute "serious medical needs" (e.g., any calluses on his foot, etc.). [FN21]

FN16. (*See, e.g.,* Dkt. No. 59, Def.'s Rule 7.1 Statement, ¶ 4; Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement, Ex. D-2 at 589, 590-594, 639-642, 653, 678-679, 683.)

FN17. (*See, e.g.,* Dkt. No. 59, Def.'s Rule 7.1 Statement, ¶ 4; Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement, Ex. D-2 at 591, 594, 639.)

FN18. (*See, e.g.,* Dkt. No. 59, Def.'s Rule 7.1

Statement, ¶ 5; Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement, Ex. D-2 at 95, 536.)

FN19. (*See, e.g.,* Dkt. No. 59, Def.'s Rule 7.1 Statement, ¶ 6; Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement, Ex. D-2 at Dkt. 536.)

FN20. (*See, e.g.,* Dkt. No. 59, Def.'s Rule 7.1 Statement, ¶ 12; Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement, Ex. D-2 at 6 .)

FN21. (Dkt. No. 59, Mem. of Law at 9-10.)

Setting aside the fact that I can find no reference to any foot calluses in Plaintiff's Amended Complaint, [FN22] I am persuaded by Defendant's argument. Depending on the precise nature of the disease, generally a heart condition, a seizure disorder, and a disc problem in one's back are "serious medical needs," [FN23] while a pinched nerve in one's wrist, and calluses on one's feet are not "serious medical needs." [FN24]

FN22. Rather, Plaintiff's claim that he had foot calluses that constituted a "serious medical condition" appears to have been asserted in an administrative grievance filed by Plaintiff on January 2, 2001. (*Compare* Dkt. No. 29 *with* Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement, Ex. D-2.)

FN23. *See Mejia v. Goord,* 03-CV-0124, 2005 WL 2179422, at *7 (N.D.N.Y. Aug. 16, 2005) (Peebles, M.J.) ("The record in this case is strongly suggestive of a coronary condition which, though medically unspecified, could qualify as a serious medical need."); *Boomer v. Lanigan,* 00-CV-5540, 2001 WL 1646725, at *3 (S.D.N.Y. March 31, 1999) ("Epilepsy, or an epileptic seizure, is a serious medical injury."); *Williams v. M.C.C. Institution,* 97-CV-5352, 1999 WL 179604, at *10 (S.D.N.Y. March 31, 1999) ("There can be no question that epilepsy, and in particular an epileptic fit that runs unchecked, is a serious medical condition, even if for a half-hour.") [citation omitted]; *Veloz v. State of New York,* 339 F.Supp.2d 505, 522-524

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1174309 (N.D.N.Y.)

(Cite as: 2006 WL 1174309 (N.D.N.Y.))

(S.D.N.Y.2004) (spinal condition that included spondylosis was a serious medical need); *Faraday v. Lantz,* 03-CV-1520, 2005 WL 3465846, at *5 (D.Conn. Dec. 12, 2005) ("persistent [ ] ... back pain caused by herniated, migrating discs [and] sciatica" was a serious medical need).

FN24. *See Dixon v. Nusholtz,* No. 98-1637, 1999 U.S.App. LEXIS 13318, at *1, 5 (6th Cir.1999) (foot callouses that required orthopedic shoes were not a "grave medical need"); *Jackson v. O'Leary,* 89-CV-7139, 1990 U.S. Dist. LEXIS 17249, at *2, 4 (1990) (N.D.Ill.Dec. 17, 1990) ("[Plaintiff's] medical problem [of having callouses on his feet which allegedly required him to be able to wear gym shoes] is not one of especially grave concern."); *Green v. Senkowski,* 99-CV-1523, Decision & Order at 6-7 (N.D.N.Y. Aug. 5, 2003) (Hood, J.) (granting defendants' motion for summary judgment because, in part, plaintiff's wrist pain was not a "serious medical need"), *aff'd,* No. 03-250, 2004 U.S.App. LEXIS 11454 (2d Cir. June 10, 2004) (unpublished opinion); *Warren v. Purcell,* 03-CV-8736, 2004 U.S. Dist. LEXIS 17792, at *26 (S.D.N .Y. Sept. 3, 2004) ("[I]t appears highly unlikely that the injuries plaintiff alleges to have suffered ... namely pain in his wrists and pain, numbness and swelling in his foot and ankle, would be considered sufficiently serious to rise to the level of an Eighth Amendment violation.").

As a result, for purposes of summary judgment, I find that Plaintiff has established a serious medical need only with regard to his heart condition, seizure disorder, and back problem (but not with regard to his wrist pain and calloused feet). However, I note that, even if I were to consider all of Plaintiff's health problems *together* as constituting one "serious medical need" over the entire relevant time period, it would not change my ultimate recommendation in this report, for the reasons stated below.

**2. Deliberate Indifference**

**\*4** Defendant asserts, and the record establishes, that Riverview C.F. provided a considerable amount of medical care to Plaintiff during his incarceration there.FN25 Generally, Riverview C.F. (1) responded to Plaintiff's medical requests by examining and treating him (e.g., through the prescription of more than six medications, and the administration of "foot soaks," etc.), (2) investigated his complaints, and (3) kept comprehensive and detailed records regarding Plaintiff's various health problems and complaints.

FN25. (Dkt. No. 59, Def.'s Rule 7.1 Statement, ¶¶ 4, 5, 6, 12, 13, 14, 15, 16, 17, 20, 21, 23, 24, 25, 26, 27, 28, 29, 30; *see generally* Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement.)

Based on this evidence, Defendant argues that (1) Plaintiff was receiving more than adequate care for his various health problems at Riverview C.F., and (2) even if he was not receiving adequate care for some of those health problems, absolutely no evidence exists suggesting that Defendant was deliberately indifferent to those health problems (whether they constituted "serious medical needs" or not).FN26

FN26. (Dkt. No. 59, Mem. of Law, at 10-12.)

I agree with Defendant, for the reasons stated in his Memorandum of Law. Simply stated, there is no evidence that Defendant's state of mind was equivalent to the sort of *criminal recklessness* necessary for liability under the Eighth Amendment.FN27 At most, the evidence indicates there may have been a difference of opinion between the medical staff at Riverview C.F. and Plaintiff, or *conceivably* a hint of negligence on the part of someone on the medical staff at Riverview C.F. However, even if true, neither of those facts implicate Defendant or (if they did implicate Defendant) would be enough to make Defendant liable to Plaintiff under the Eighth Amendment.FN28

FN27. See *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ( "The required state of mind [under the Eighth Amendment is] equivalent to criminal recklessness....").

FN28. See *Estelle v. Gamble,* 429 U.S. 97, 106

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1174309 (N.D.N.Y.)

(Cite as: 2006 WL 1174309 (N.D.N.Y.))

(1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *see, e.g., Veloz v. New York,* 339 F.Supp.2d 505, 522-24 (S.D.N.Y.2004) (granting defendants' motion for summary judgment on plaintiff's claim for deliberate indifference because defendants denied plaintiff's request for a stronger pain medication to treat his back condition based on a mere disagreement as to treatment, and medical malpractice is not actionable under the Eighth Amendment); *Connors v. Heywright,* 02-CV-9988, 2003 WL 21087886, at *3 (S.D.N.Y. May 12, 2002) (granting defendants' motion to dismiss because plaintiff's allegations that defendants forgot to give him his medications, altered his medications, and did not give him his monthly examinations, despite his epileptic seizures, failed to state a claim for deliberate indifference but stated a claim only for negligence).

As a result, I find that Plaintiff has not established that Defendant acted with deliberate indifference to any of Plaintiff's various health conditions, including his heart condition, seizure disorder, and back problem.

**B. Whether Plaintiff Has Failed to Establish any Personal Involvement by Defendant in the Alleged Constitutional Deprivation**

A defendant's personal involvement in the alleged unlawful conduct is a prerequisite for a finding of liability in an action under 42 U.S.C. § 1983. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977),

*cert. denied,* 434 U.S. 1087 (1978). To prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior*) is insufficient to show his or her personal involvement in that unlawful conduct. *Richardson v. Goord,* 347 F .3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

Rather, for a supervisory official to be personally involved in unlawful conduct, he or she must have (1) directly participated in that violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

**\*5** Here, even after conducting an independent review of the record, I can find no evidence of any such personal involvement by Defendant in the alleged unlawful conduct (which primarily consisted of Nurse Holden's dispensing the wrong medication to Plaintiff). Plaintiff has not established (or even alleged) that Defendant directly participated in Nurse Holden's (alleged) misconduct.[FN29] Nor has Plaintiff established (or even alleged) the existence of a policy or custom under which Nurse Holden's (alleged) misconduct occurred.

> FN29. For example, in his opposition papers, Plaintiff acknowledges that "Defendant Hunter was not present for the pill incident." (Dkt. No. 72, ¶ 6.)

Rather, liberally construed, Plaintiff's sole theories of personal involvement appear to be that (1) Defendant knew of various of Plaintiff's complaints about Nurse Holden before and during the misconduct, but negligently

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1174309 (N.D.N.Y.)

(Cite as: 2006 WL 1174309 (N.D.N.Y.))

failed to act on those complaints, and (2) Defendant failed to remedy Nurse Holden's misconduct (and indeed sought to cover it up) after learning of it through Plaintiff's complaints. (Dkt. No. 29, ¶¶ VII, VIII, IX.) The problem with these theories of personal involvement is that they are completely devoid of any evidentiary support in the record.

At most, the record shows that Defendant supervised Nurse Holden (a part-time employee), and dutifully investigated Plaintiff's *sole* complaint about Nurse Holden, which was contained in Grievance No. RV-5422-01 (filed on January 2, 2001). In pertinent part, Plaintiff's grievance alleged that (1) on December 25, 2000, Nurse Holden gave Plaintiff the wrong liquid in which to soak his feet, making his calloused feet uncomfortable, and (2) on August 27, 2000, Nurse Holden failed to give Plaintiff a new pill after dropping that pill on the floor, and improperly took his pulse.

I can find no evidence in the record that Plaintiff made any complaints to Defendant about Nurse Holden before August 27, 2000, or even before December 25, 2000 (such that Defendant could possibly be said to have been "grossly negligent" or "deliberately indifferent" for failing to act on those complaints before the dates of the alleged misconduct in question). Indeed, he had arrived at Riverview C.F. only in July of 2000. Nor do I have any reason to believe that, if there existed any such complaints, they would have been sufficient to put Defendant on notice of the potential for misconduct by Nurse Holden, given Plaintiff's prolix and confusing use of language.[FN30]

> [FN30.] (*See, e.g.,* Dkt. No. 29; Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement, Ex. D-2 [attaching Plaintiff's Grievance No. RV-5422-01.)

The crux of Plaintiff's theory of personal involvement appears to be that Defendant failed to *remedy* Nurse Holden's misconduct during the "foot soak," dropped pill, and pulse reading. Setting aside the issue of whether any discipline of Nurse Holden would even be warranted for such "misconduct," the fact remains that Plaintiff wanted a remedy other than discipline of Nurse Holden.[FN31]

Rather, Plaintiff wanted Defendant to somehow undo the (alleged) results of Nurse Holden's misconduct, namely the worsening of Plaintiff's medical conditions, which (allegedly) included having his heart condition, seizure disorder and back problem "upgraded." I do not understand this extraordinary feat of medicine (bordering on a supernatural act) to be the sort of "remedy" referred to in the above-described personal involvement test for supervisors.

> [FN31.] (*See* Dkt. No. 29, ¶ IX [complaining that Defendant merely informed Plaintiff that Nurse Holden "will either be suspended or fired"].)

**6** All that was required of Defendant, under the circumstances, was what he did. He investigated Plaintiff's grievance (reviewing his medical records, and talking to both Plaintiff and Nurse Holden), and determined Plaintiff's complaints about Nurse Holden to be without merit. Even if Defendant's determination had been incorrect, there is no evidence that Nurse Holden's misconduct (if it indeed occurred) constituted a violation of Plaintiff's constitutional rights (i.e., that it occurred during the treatment of a serious medical need, and that it resulted from anything more than negligence by Nurse Holden). This absence of evidence is especially noteworthy, considering that Plaintiff was provided the opportunity to obtain such evidence during this action's discovery period, which closed long ago.[FN32] Under analogous circumstances, other district courts within the Second Circuit have refused to find personal involvement by a nurse supervisor.[FN33]

> [FN32.] (*See* Dkt. No. 39 at 1 [Scheduled Order of 6/22/04, setting discovery deadline as 10/30/04].)

> [FN33.] *See, e.g., Gates v. Goord,* 99-CV-1378, 2004 U.S. Dist. LEXIS 12299, at *32-35 (S.D.N.Y. July 1, 2004) (granting summary judgment to nurse supervisor, because-despite inmate's conclusory allegations that nurse supervisor was "repeatedly notified" of inmate's allegedly inadequate medical care but refused to take appropriate action-inmate had offered no facts showing personal involvement by nurse

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1174309 (N.D.N.Y.)

(Cite as: 2006 WL 1174309 (N.D.N.Y.))

supervisor in any constitutional violation, and discovery was closed); *Patterson v. Lilley,* 02-CV-6056, 2003 U.S. Dist. LEXIS 11097, at *19-22 (S.D.N.Y. June 30, 2003) (granting motion to dismiss filed by nurse administrator, because fact that inmate sent complaint letter to nurse administrator about subordinate nurse's allegedly inadequate medical care was not sufficient to personally involve nurse administrator in alleged misconduct, especially where no facts indicated any constitutional deprivation); *Gadson v. Goord,* 96-CV-7544, 2000 U.S. Dist. LEXIS 3944, at *20-21 (S.D.N.Y. March 28, 2000) (granting summary judgment to nurse supervisor, because no evidence existed showing he was personally involved in physical therapist's alleged denial of adequate wheel chair, even though he attended meetings at which issue of wheel chair was discussed, and because no evidence existed that alleged misconduct constituted a constitutional deprivation); *Rosales v. Coughlin,* 10 F.Supp.2d 261, 267 (W.D.N.Y.1998) (granting summary judgment to nurse supervisor because of lack of personal involvement, where record did not include any evidence that nurse supervisor failed to take appropriate action in response to inmate's complaints of inadequate medical care); *Muhammad v. Francis,* 94-CV-2244, 1996 U.S. Dist. LEXIS 16785, at *25 (S.D.N.Y. Nov. 13, 1996) (granting summary judgment to nurse supervisor because of lack of personal involvement, where evidence showed merely that nurse supervisor had been contacted during investigation of inmate's grievance complaint regarding his medical care); *Holmes v. Fell,* 856 F.Supp. 181, 183-184 (S.D.N.Y.1994) (granting summary judgment to nurse supervisor because of lack of personal involvement in subordinate nurse's allegedly inadequate medical care of inmate, and because of lack of any evidence that the allegedly inadequate medical care constituted a constitutional violation).

As a result, I find that, even if Plaintiff had established the elements of a claim for deliberate indifference to a serious medical need, Plaintiff has not established that Defendant was personally involved in any constitutional deprivation.

**C. Whether Defendant Is Protected by Qualified Immunity**

Finally, Defendant argues that he is entitled to dismissal because he is protected by qualified immunity. Regardless of the merits of this defense, I have already concluded that Plaintiff's Amended Complaint should be dismissed on two alternative grounds (failure to establish the elements of an Eighth Amendment claim, and failure to establish the personal involvement of Defendant in any constitutional deprivation). As I result, I need not address this issue. However, in the interest of thoroughness, I will do so briefly.

Defendant recites the correct legal standard with regard to the qualified immunity defense. (Dkt. No. 59, Mem. of Law at 14-16.) Generally, Defendant has established facts showing that (1) his investigation of Plaintiff's January 2, 2001, grievance was reasonably conducted, and (2) as a result of that investigation, he found no evidence that Nurse Holden had been deliberately indifferent to any of Plaintiff's medical needs (whether those needs were serious or not). Under the circumstances, I can find no violation of a "clearly established" right, much less a right of which a reasonable person would have known.

As a result, I find that Defendant is entitled to qualified immunity.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendant's motion for summary judgment (Dkt. No. 59) be **GRANTED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1174309 (N.D.N.Y.)

(Cite as: 2006 WL 1174309 (N.D.N.Y.))

Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2006.

Bennett v. Hunter
Not Reported in F.Supp.2d, 2006 WL 1174309
(N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 894218 (W.D.N.Y.)

(Cite as: 2007 WL 894218 (W.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

W.D. New York.
Eugene JONES, Plaintiff,
v.
Sergeant FURMAN, C.O. Carpender, C.O. Bly, C.O.
Losito, C.O. John Doe # 1, C.O. John Doe # 2, C.O.
John Doe # 3, C.O. John Doe # 4, Nurse John Doe,
Nurse J. Brink, R. Murphy, C.O., Lanasa, C.O., D.
Hersh, Nurse, and T. Lanasa, Correctional Officer,
Defendants.
No. 02-CV-939F.

March 21, 2007.
Eugene Jones, Fallsburg, NY, pro se.

Andrew M. Cuomo, Attorney General, State of New York,
Stephen F. Gawlik, Assistant Attorney General, of
Counsel, Buffalo, NY, for Defendants.

**DECISION and ORDER**

LESLIE G. FOSCHIO, United States Magistrate Judge.
*JURISDICTION*
**\*1** On May 7, 2003, the parties to this action
consented pursuant to 28 U.S.C. § 636(c) to proceed
before the undersigned. The matter is presently before the
court on Defendants' motion for summary judgment (Doc.
No. 58), filed February 18, 2005.
*BACKGROUND*

Plaintiff Eugene Jones ("Plaintiff"), proceeding *pro
se,* commenced this civil rights action on December 27,
2002, alleging that while incarcerated at Southport
Correctional Facility ("Southport"), Defendants Sergeant
Furman ("Sgt.Furman"), C.O. Carpender[FN1] ("Carpenter"),
C.O. Bly ("Bly"), C.O. Losito ("Losito"), C.O. John Does
1 through 4 and Nurse Jane Doe (together, "the Doe
Defendants"), and Nurse J. Brink ("Brink"), subjected
Plaintiff to excessive force, cruel and unusual punishment

and acted with deliberate indifference to Plaintiff's
medical needs, in violation of the Eighth Amendment. On
March 27, 2003, an answer was filed by Defendants Sgt.
Furman, Carpenter, Bly, Losito and Brink. On October 21,
2003, Plaintiff filed an Amended Complaint (Doc. No. 21)
("Amended Complaint"), asserting essentially the same
claims against the original named Defendants, and naming
new Defendants, including C.O. Lanasa ("Lanasa"), C.O.
R. Murphy ("Murphy"), and Nurse D. Hersh ("Hersh") in
place of the Doe Defendants. Answers to the Amended
Complaint were filed on November 13, 2003, by
Defendants Sgt. Furman, Bly, Brink, Carpenter, and
Losito (Doc. No. 22), and on October 14, 2004, by
Defendants Hersh, LaNasa and Murphy (Doc. No. 49).

> FN1. Plaintiff incorrectly spells Carpenter's name
> as "Carpender".

On February 18, 2005, Defendant filed the instant
motion seeking summary judgment ("Defendants'
motion"). Defendants also filed, on February 18, 2005,
papers in support of the motion a Memorandum of Law
(Doc. No. 59) ("Defendants' Memorandum"), a Statement
of Facts Not in Dispute (Doc. No. 60) (Defendants'
Statement of Facts"), and the Declarations of Defendants
Brink (Doc. No. 61) ("Brink Declaration"), Furman (Doc.
No. 62) ("Furman Declaration"), Lanasa (Doc. No. 63)
("Lanasa Declaration"), Murphy (Doc. No. 64) ("Murphy
Declaration"), Hersh, a/k/a Weed (Doc. No. 65) ("Weed
Declaration"), Carpenter (Doc. No. 66) ("Carpenter
Declaration"), Bly (Doc. No. 67) ("Bly Declaration"), and
Losito (Doc. No. 68) ("Losito Declaration").

In opposition to summary judgment, Plaintiff filed on
June 8, 2005, a Memorandum of Law (Doc. No. 72)
("Plaintiff's Memorandum"), a Statement of Disputed
Factual Issues and Questions (Doc. No. 73) ("Plaintiff's
Statement of Facts"), and the Declaration of Plaintiff
(Doc. No. 74) ("Plaintiff's Declaration"), attached to
which are exhibits A though X ("Plaintiff's Exh(s). ----").
In further support of summary judgment, Defendants filed
on June 16, 2005 the Reply Declaration of Assistant
Attorney General Stephen F. Gawlik ("Gawlik") (Doc.
No. 75) ("Gawlik Declaration"). Oral argument was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 894218 (W.D.N.Y.)

(Cite as: 2007 WL 894218 (W.D.N.Y.))

deemed unnecessary.

Based on the following, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

### FACTS [FN2]

FN2. Taken from the pleadings and motion papers filed in this action.

*2 Plaintiff's claims are based on separate incidents occurring on April 26, 2002 and June 4, 2002. Because Plaintiff's and Defendants' versions of the events concerning each incident vary greatly, and are critical to resolution of Defendants' motion, the court describes both.

**The April 26, 2002 Incident**

Plaintiff alleges that while incarcerated at the Southport Correctional Facility ("Southport"), on April 26, 2002, Defendants Sgt. Furman, and Corrections Officers Bly, Carpenter, and Lanasa, subjected Plaintiff to excessive force by engaging in an unprovoked physical attack on Plaintiff, and that following the attack, Defendants Thurman, Bly, Carpender, Lanasa and Nurse Brink ("Brink") acted with deliberate indifference to Plaintiff's medical needs by failing to treat Plaintiff for injuries allegedly sustained as a result of the attack. First Claim for Relief, Amended Complaint at 4. According to Plaintiff, on the morning of April 26, 2002, Plaintiff was released from his prison cell to attend recreation, and Sgt. Furman proceeded to pat-frisk Plaintiff, and remarked that Plaintiff "like[d] to write, huh? Well, we are going to give you something to write about." Id. Plaintiff maintains that after the pat-frisk concluded, Plaintiff "was directed back on to the company," and when Plaintiff reached the "shower area" he was struck on the right side of his head by Sgt. Furman, causing Plaintiff to fall to the floor, where Defendants Furman, Bly, Carpenter and Lanasa kicked, punched and jabbed at Plaintiff with batons. Id. According to Plaintiff, he was handcuffed and restrained with a wrist chain during the incident. Id.

According to Plaintiff, after the incident, Defendants Bly and Carpenter dragged Plaintiff to his cell and placed him inside. Amended Complaint at 4. Plaintiff requested that his injuries, including a sore and painful right ear, lumps behind his right ear and on the back of his head, small cuts on his nose and hand, and bruising on his ribs, back, and legs, be treated, but Sgt. Furman responded "Yeah, right!," and no treatment was provided at that time. Id.

Later, while Defendant Losito was on rounds, Plaintiff described his injuries to Losito and requested to see the nurse. Amended Complaint at 4. Losito responded that "the nurse will be around with medication and as long as you ['re] still breathing [it's] not a[n] emergency." Id. Plaintiff never saw the nurse on April 26, 2002. Id. Rather, on April 27 or 28, 2002, Plaintiff informed Defendant Nurse Brink of his injuries and blood in his urine while Brink was distributing medications to the inmates. Id. at 5. Plaintiff maintains Brink did not believe Plaintiff and, instead, responded by calling Plaintiff a "trouble maker and liar." Id.

Defendants deny any force was used against Plaintiff on April 26, 2002. Rather, Defendants maintain that Plaintiff, during his daily exercise run on April 26, 2002, refused to comply with exercise procedures by repeatedly turning his head while undergoing a pat-frisk. As a result, Sgt. Furman ordered Plaintiff to stop turning his head and warned that Plaintiff's continued refusal to comply with proper exercise procedures would constitute an exercise refusal necessitating Plaintiff's return to his cell. Because Plaintiff continued to turn his head, he was placed in restraints and escorted back to his cell where the restraints were removed without incident.

*3 According to Defendants, Plaintiff was seen by Nurse Brink on April 28, 2002 during Brink's regular rounds. Brink maintains that at that time, Plaintiff complained that since the previous evening, he had been passing blood in his urine, but made no other complaints and exhibited no other signs or symptoms, and there was no indication that Plaintiff suffered from any serious ailment requiring immediate attention. Brink Declaration ¶ 4. Brink advised Plaintiff to increase his fluids intake and report any change in signs or symptoms, and also requested a urinalysis be ordered. Id. The urinalysis order was approved by Southport Medical Director Dr. Alves. and, on April 30, 2002, Plaintiff's urine sample was collected for urinalysis which showed blood, bacteria and

Not Reported in F.Supp.2d, 2007 WL 894218 (W.D.N.Y.)

(Cite as: 2007 WL 894218 (W.D.N.Y.))

increased white blood cell count indicative of a mild urinary tract infection ("UTI"). *Id.* ¶¶ 4-5. Follow-up urinalysis on samples collected from Plaintiff on May 7 and 13, 2002 established that by May 13, 2002, Plaintiff's urine was normal. *Id.* ¶ 6.

On April 30, 2002, Plaintiff was seen by Nurse Peters [FN3] in connection with complaints of problems with his right ear. Upon examination, Nurse Peters observed no bruising or swelling and scheduled an ear examination.

FN3. Nurse Peters is not a party to this action.

When Nurse Brink next saw Plaintiff on May 1, 2002, Plaintiff complained that he was unable to hear out of his right ear. Brink found no outward sign of injury and discussed the matter with staff from Southport's mental health unit, advising of Plaintiff's recent allegations of paranoia. Brink noted in Plaintiff's medical chart that Plaintiff would sporadically refuse his morning psychiatric medications and that an ear examination was pending.

On May 2, 2002, Nurse Brink, at the request of Southport's security staff, examined Plaintiff in connection with Plaintiff's complaint that he had recently been the subject of an excessive use of force, which revealed a mark on Plaintiff's nose, a right swollen ear, a bump on the back of Plaintiff's head, a sore right rib, bilateral flank soreness, and a mark between Plaintiff's fourth and fifth left fingers. Upon a complete physical examination of Plaintiff in his underwear, Nurse Brink observed only a 3 cm superficial abrasion on Plaintiff's nose, and a 2 cm superficial abrasion on Plaintiff's knuckle. Otherwise, Plaintiff had no swelling or trauma about his ears, his ear canals were healthy, there were no bumps or bruising on Plaintiff's head, his lungs were clear, Plaintiff ambulated without difficulty and had full range of motion in all extremities, digits were normal, all skin was intact, and Plaintiff required no medication.

**The June 4, 2002 Incident**

As to the incident Plaintiff claims occurred on June 4, 2002, Plaintiff alleges Sgt. Furman advised that Plaintiff was being moved from C-Block, 2-Company, 6-Cell to C-Block, 1-Company, 15-Cell, and while escorting Plaintiff to the new cell, remarked that such cell "was

technically our of order, but that was where [Plaintiff] was being placed." Second Claim for Relief, Amended Complaint at 6. Plaintiff describes his new cell as "not in living condition," as the toilet did not flush, the sink's cold water did not work, although the hot water was on and would not stop running, the cell's floor was covered with water and grime, and the cell mattress was wet with water or urine. *Id.* Plaintiff maintains that upon informing Furman of the cell's conditions, Furman ignored Plaintiff and walked away. *Id.*

**\*4** According to Plaintiff, later that day, Defendant Murphy dropped two of Plaintiff's books into Plaintiff's cell. Amended Complaint at 6. When Plaintiff asked about his other personal property, including legal materials, bed sheets, letters, photographs, and other items, Murphy "just walked away." *Id.* Plaintiff also maintains that Murphy failed to provide Plaintiff with lunch, and when Plaintiff complained to Sgt. Furman about not receiving his luncheon meal, Furman acted as though he could not hear Plaintiff and walked away. *Id.*

Plaintiff asserts that the stress Defendants caused Plaintiff on June 4, 2002, "gave me a mental breakdown," such that after dinner, Plaintiff ate and smeared feces on his body, face and around his cell. Amended Complaint at 6-7. Plaintiff further maintains he slashed his wrist and forearm with a medication tube and that when he showed such wounds to Defendant Losito and requested help, Losito did nothing. *Id.* at 7. Defendants Losito and Nurse Hersh later stopped by Plaintiff's cell and, upon observing the blood and feces smeared on Plaintiff and around the cell, as well as the slash marks on Plaintiff's arms for which Plaintiff again requested help, Losito and Hersh laughed and Hersh stated "You want to kill yourself? Use your socks and hang yourself from the bars," and then walked away. *Id.*

On June 5, 2002, at 7:10 A.M., Nurse Peters stopped by Plaintiff's cell and advised that she was going to get Plaintiff some help. At 9:15 A.M. on June 5, 2002, two unidentified corrections officers and a sergeant removed Plaintiff, who was covered in feces and crying uncontrollably, from the cell and escorted him to the infirmary. Plaintiff was never returned to the cell where the alleged actions on June 4th and 5th took place.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 894218 (W.D.N.Y.)

(Cite as: 2007 WL 894218 (W.D.N.Y.))

Defendants maintain that when Sgt. Furman placed Plaintiff in the new cell on June 4, 2002, Plaintiff did not inform Furman of any problems with the cell's conditions. Rather, according to Southport's logbook,[FN4] Plaintiff was placed in the new cell on June 4, 2002, at 2:30 P.M., after Plaintiff made threats against Defendant Murphy. The officer making rounds at 5:15 P.M. that same day observed that Plaintiff had wiped feces on the cell's walls. Southport's logbook indicates that on June 5, 2002, at 9:10 A.M., Mr. Militello, a mental health worker from the New York State Office of Mental Health, visited Plaintiff and, by 10:10 A.M. on June 5, 2002, Plaintiff had been transferred to Southport's infirmary.

> FN4. Copies of the relevant portions of Southport's logbook are attached as Exh. A to the Furman Declaration.

According to Plaintiff's medical records, on June 4, 2002, Plaintiff was examined at 7:30 P.M., by Nurse Whedon [FN5] who noted that Plaintiff complained of a rash and dryness on his lower legs. June 4, 2002 Medical Records, Weed Declaration Exh. A. On June 5, 2002, Plaintiff was transferred from Southport to the Elmira Correctional Facility ("Elmira").

> FN5. Nurse W hedon is not a party to this action.

According to Outpatient Psychiatric Progress Notes prepared by Militello and submitted by Plaintiff ("Outpatient Psychiatric Progress Notes"), Plaintiff's Exh. W, when Plaintiff was transferred to Elmira on June 5, 2002, Plaintiff exhibited anger, self-harm, threats to self-harm, was withdrawn, had regressed and had behavioral problems including scratching his wrists, and smearing feces on himself. Plaintiff was noted to have an extensive pyschiatric history. Plaintiff was diagnosed with schizophrenia and antisocial personality disorder, and was further noted with self-harm gestures, and tendencies toward exposing himself to females and violence. On June 24, 2003, Mr. H.E. Smith ("Smith"), Executive Director of Central New York Psychiatric Center filed a petition ("the Petition") in New York Supreme Court, Oneida County, seeking an order pursuant to New York Correction Law § 402, committing Plaintiff to a state hospital for the mentally ill. Plaintiff's Exh. X. According

to Smith, the Petition was based on an examination of Plaintiff conducted by prison physicians [FN6] on June 23, 2002. *Id.*

> FN6. The record does not specify whether such "physicians" included a psychiatrist.

### DISCUSSION

**1. Summary Judgment**

**\*5** Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a) and (b); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250-51 (1986); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991). The court is required to construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 58, 59 (2d Cir.1999) (citing *Anderson, supra,* 477 U.S. at 255); *Rattner,* 930 F.2d at 209. The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment. *Celotex,* 477 U.S. at 322; *see Anderson,* 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' Such a motion, whether or not accompanied by affidavits, will be 'made and supported as provided in this rule [FRCP 56],' and Rule 56(e) therefore requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 323-24 (1986) (quoting Fed.R.Civ.P. 56). Thus, "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to

Not Reported in F.Supp.2d, 2007 WL 894218 (W.D.N.Y.)

(Cite as: 2007 WL 894218 (W.D.N.Y.))

support the non-moving party's case." *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 742 (2d Cir.1998). Once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995). Rule 56 further provides that

> [w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

> Fed.R.Civ.P. 56(e).

**\*6** Here, Plaintiff alleges Defendants violated his civil rights under 42 U.S.C. § 1983. Pursuant to § 1983, an individual may seek damages against any person who, under color of state law, subjects such individual to the deprivation of any rights, privileges, or immunities protected by the Constitution or laws of the United States. 42 U.S.C. § 1983. However, "Section 1983 'is not itself a source of a substantive rights,' but merely provides 'a method for vindication of federal rights elsewhere conferred.' " *Albright v.. Oliver,* 510 U.S. 266, 271 (1994) (citing *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)). Thus, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.* (citing *Graham v. Connor,* 490 U.S. 386, 394, (1989); and *Baker,* 443 U.S. at 140).

Based on the incident of April 26, 2002, Plaintiff claims violations of his Eight Amendment rights when Defendants Furman, Bly, Carpenter and Lanasa used excessive force on him, and when Defendants Furman, Bly, Carpenter, Lanasa and Brink acted with deliberate indifference to Plaintiff's medical needs. Amended Complaint at 5. Based on the incident of June 4, 2002, Plaintiff alleges violations of his Eighth Amendment rights against cruel and unusual punishment occurred when

Defendant Sgt. Furman placed Plaintiff in an unsanitary cell and refused to resolve Plaintiff's complaints of not being served a meal and providing clean bedding, and Murphy withheld from Plaintiff food, clean bedding and Plaintiff's personal property. Amended Complaint at 7. Plaintiff further claims Losito and Hersh violated his Eighth Amendment rights by acting with deliberate indifference to Plaintiff's psychiatric and medical needs. *Id.* at 7-8.[FN7]

> [FN7]. Although Defendants assert as an affirmative defense that Plaintiff failed to exhaust administrative remedies for any of the instant claims, Answer filed by Defendants Sgt. Furman, Bly, Brink, Carpenter, and Losito (Doc. No. 22), ¶ 17; Answer filed by Defendants Hersh, Lanasa and Murphy (Doc. NO. 49) ¶ 18, Defendants have not moved for summary judgment on that ground. Further, it is unclear from the record whether Plaintiff has, in fact, exhausted his administrative remedies. *See* Amended Complaint, Inmate Grievance Program Superintendent Statement (advising Plaintiff his grievance was untimely and granting Plaintiff permission to appeal to the Superintendent's Office, but failing to disclose whether Plaintiff ever pursued such appeal). The court takes no position as to whether Defendants can now move for leave to amend the scheduling order to permit further dispositive motions as to the exhaustion issue after the cut-off date provided in the Scheduling Order (Doc. No. 53) for dispositive motions. Accordingly, for the purposes of the instant motion, no exhaustion of remedies defense is before the court.

**2. Eighth Amendment**

Plaintiff's claims of excessive force, deliberate indifference to medical needs, and unsanitary conditions of confinement pertaining to the separate incidents on April 26, 2002 and June 4, 2002 all arise under the Eighth Amendment. In particular, the Eighth Amendment prohibits "cruel and unusual punishments" during imprisonment. U.S. Const. 8th amend.; *Wilson v. Seiter,* 501 U.S. 294, 296-97 (1991); *Romano v. Howarth,* 998 F.2d 101, 104 (2d cir.1993). Not every governmental

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 894218 (W.D.N.Y.)

(Cite as: 2007 WL 894218 (W.D.N.Y.))

action affecting the interests or well-being of a prisoner, however, is subject to Eighth Amendment protections. *Whitley v. Albers,* 475 U.S. 312, 319 (1986). Rather, only the unnecessary and wanton infliction of pain constitutes the cruel and unusual punishment forbidden by the Eighth Amendment. *Id.* Nevertheless, within the ambit of the Eighth Amendment are protections against the use of excessive force, deliberate indifference to an inmate's serious medical need, and inhumane conditions of confinement. *See Trammell v. Keane,* 338 F .3d 155, 162 (2d Cir.2003) (observing different tests for evaluating Eighth Amendment claims for excessive force, conditions of confinement, and denial of medical care).

**A. Excessive Force**

**\*7** Defendants argue in support of summary judgment that despite Plaintiff's claims asserted in the Amended Complaint and by Plaintiff in his affidavit opposing summary judgment, there is a complete lack of any objective evidence supporting Plaintiff's assertion that on April 26, 2002, he was subjected to excessive force, resulting in injuries for which Plaintiff was subsequently denied medical treatment. Defendants' Memorandum at 3-9. In opposition to summary judgment, Plaintiff submits the affidavit of David Albelo ("Albelo") ("Albelo Affidavit"), an inmate who was also confined in Southport's C-Block on April 26, 2002, and who witnessed the incident. Albelo Affidavit, Plaintiff's Exh. A, ¶ 1-4.

In assessing an inmate's claims that prison officials subjected him to cruel and unusual punishment by using excessive force, courts must determine whether the prison officials acted "in a good-faith effort to maintain or restore prison discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillan,* 503 U.S. 1, 7 (1992). An inmate plaintiff claiming that prison officials subjected him to cruel and unusual punishment by use of excessive force must establish both an objective and subjective component of the claim. *Romano,* 998 F.2d at 105.

Objectively, a § 1983 plaintiff must establish that the alleged deprivation is sufficiently serious or harmful to reach constitutional dimensions. *Romano,* 998 F.S2d at 104, *see also Wilson,* 501 U.S. at 296. This objective component is "contextual and responsive to 'contemporary standards of decency.' " *Hudson,* 503 U.S. at 8. Thus,

while a *de minimis* use of force will rarely suffice to state a constitutional claim, a plaintiff is not required to show that the application of force resulted in any serious injury. *Id.* at 9-10; *see also Johnson v. Glick,* 481 U.S. 1028, 1033 (2d Cir.1973) (noting that "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."). An inmate's constitutional protections against excessive force by corrections officers "is nowhere nearly so extensive as that afforded by the common law tort action for battery ." *Johnson,* 481 F.2d at 1033; *Anderson v. Sullivan,* 702 F.Supp. 424, 426 (S.D.N.Y.1988).

In the instant case, Plaintiff has filed in opposition to summary judgment the affidavit of David Albelo ("Albelo") ("Albelo Affidavit"), an inmate who was also confined in Southport's C-Block on April 26, 2002, and who claims to have witnessed the incident. Albelo Affidavit, Plaintiff's Exh. A, ¶ 1-4. Albelo avers he observed Sgt. Furman strike Plaintiff in the side of the head, causing Plaintiff to fall to the floor, and then observed Furman, Bly, Carpenter and two other corrections officers punch and kick Plaintiff as he lay on the floor in handcuffs and chains. *Id.* ¶ 5. According to Albelo, he and other inmates screamed for the officers to stop assaulting Plaintiff, *id.* ¶ 6, but that "Plaintiff was then half dragged and half walked to his cell while officer Bly slapped him." *Id.* ¶ 7. Albelo further stated that he was concerned about Plaintiff's well-being and asked the "unit officer" to check on Plaintiff, but the unit officer told Albelo to "mind your business, it does not concern [ ] you." *Id.* ¶ 9.

**\*8** The statements contained in the Albelo Affidavit contradicts the statements made by Defendants in support of summary judgment in which Defendants, while admitting that Plaintiff was placed in handcuffs and chained, deny that any force was used in returning Plaintiff to his cell on the morning of April 26, 2002, following Plaintiff's refusal to comply with Sgt. Furman's order to stop turning his head while being pat-frisked in preparation for the exercise run. Furman Declaration ¶¶ 5-10; Bly Declaration ¶¶ 5-7; Carpenter Declaration ¶¶ 5-8.

Nor is the fact that Plaintiff's medical records are

Not Reported in F.Supp.2d, 2007 WL 894218 (W.D.N.Y.)

(Cite as: 2007 WL 894218 (W.D.N.Y.))

devoid of any evidence that Plaintiff was injured in the April 26, 2002 dispositive of the claim. Rather, an Eighth Amendment excessive force claim does not require any serious injury. *Hudson,* 503 U.S. at 8; *Johnson,* 481 F.2d at 1028. Furthermore, the record on this motion establishes that Plaintiff was not thoroughly examined in connection with his complaints following the April 26, 2002 incident until May 2, 2002, almost a week later, during which time more minor injuries would likely become less apparent. Had Plaintiff undergone a thorough examination on April 26, 2002, the two abrasions observed on May 2, 2002, including the 3 cm superficial abrasion on Plaintiff's nose, and the 2 cm superficial abrasion on Plaintiff's knuckle, would likely have appeared more palpable and thus more serious. As such, there is a material issue of fact as to the first prong of Plaintiff's excessive force claim, and the court next considers the second, subjective prong of the claim.

The subjective component of an Eighth Amendment excessive force claim requires that the defendants act malicious and with the intent to harm the inmate plaintiff. *Hudson,* 503 U.S. at 7; *Romano,* 998 F.2d at 105. To determine whether the defendants acted maliciously, the trier of fact should consider (1) the extent of the plaintiff's injuries; (2) the need for the application of force; (3) the correlation between the need for force and the amount of force used; (4) the threat reasonably perceived by the defendants; and (5) any efforts made by the defendants to temper the severity of a forceful response. *Whitley,* 475 U.S. at 321. Here, the record also establishes a material issue of fact as to whether Plaintiff was subjected to the use of any force in being returned to his cell on April 26, 2002 and, if so, whether the use of such force was reasonable.

Specifically, as discussed above, *supra,* at 5, Defendants admit that Plaintiff was both handcuffed and restrained with a wrist chain before being escorted to his cell on April 26, 2002, but deny any force was used against Plaintiff, in contrast to Plaintiff's allegations, corroborated by Albelo, that Defendants struck Plaintiff in the side of the head, knocking Plaintiff to the ground, and then continued to punch and kick plaintiff while he lay in on the floor, still restrained by handcuffs and the chain. Defendants' assertion that no force was used implies that

any threat posed by Plaintiff was small, such that any use of force by Defendants could be disproportionate. It is significant that Defendants do not challenge the accuracy or authenticity of the Albelo Affidavit, which is both signed and notarized as required to be considered admissible evidence. This unresolved factual issue as to the subjective prong of Plaintiff's excessive force claim is not only material, but also sufficient to preclude summary judgment.

**\*9** Summary judgment on Plaintiff's excessive force claim arising from the April 26, 2002 incident is DENIED.

**B. Deliberate Indifference to Serious Medical Need**

Defendants also maintain that the record contains no objective evidence supporting Plaintiff's alleged injuries resulting from Defendants alleged use of excessive force on April 26, 2002, or that Plaintiff was denied necessary medical treatment for any serious injury. *Id.* at 9-12. According to Defendants, the record also fails to contain any evidence that on June 4, 2002, Plaintiff experienced a mental breakdown for which he was denied appropriate psychiatric care. *Id.* at 17-19.

"In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104 (1976) (bracketed text in original)). A serious medical condition exists where "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Chance,* 143 F.3d at 702. The standard for determining whether there has been an Eighth Amendment violation based on deliberate indifference to a prisoner's serious medical needs

incorporates both objective and subjective elements. The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison officials acted with a sufficiently culpable state of mind.

*Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d

Not Reported in F.Supp.2d, 2007 WL 894218 (W.D.N.Y.)

(Cite as: 2007 WL 894218 (W.D.N.Y.))

Cir.2003) (citing *Estelle,* 429 U.S. at 104, and *Hathaway v. Coughlin,* 99 F.3d 550. 553 (2d Cir.1996)).

Denying or delaying access to medical care or intentionally interfering with prescribed treatment may constitute deliberate indifference. *Estelle,* 429 U.S. at 104; *see Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (holding dentist's outright refusal for one year to treat a cavity, a degenerative condition tending to cause acute and pain if left untreated, combined with imposition of an unreasonable condition on such treatment, could constitute deliberate indifference on the part of the prison dentist, precluding summary judgment in defendant's favor). Such delay in treatment violates the Eighth Amendment "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards by intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle,* 429 U.S. at 104-05. Further, culpable intent requires the inmate establish both that a prison official "has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Hayes v. New York City Department of Corrections,* 84 F.3d 614, 620 (2d Cir.1996) (citing *Farmer v. Brennan,* 511 U.S. 825, 834-35 (1994). Nevertheless, neither "inadvertent failures to provide adequate medical care" nor "negligence in diagnosing or treating a medical condition" comprise Eighth Amendment violations. *Estelle,* 429 U.S. at 105-06 (holding medical malpractice does not become a constitutional violation merely because the victim is a prisoner); *Harrison,* 219 F.3d at 139 ("We agree that the mere malpractice of medicine does not amount to an Eighth Amendment violation."). Nor does a "mere disagreement" with a physician over the appropriate course of treatment arise to a constitutional violation, although in certain instances a physician may evince deliberate indifference by consciously choosing "an easier and less efficacious" treatment plan. *Chance,* 143 F.3d at 703.

*10 As to the objective prong, a sufficiently serious conditions is "a condition of urgency, one that may produce death, degeneration or extreme pain." *Hathaway,* 99 F.3d at 66. In the instant case, the record is devoid of any evidence establishing that Plaintiff, in connection with

either incident, had any medical urgency that might produce death, degeneration or extreme pain. Rather, the record demonstrates that any injury inflicted on Plaintiff in connection with the April 26, 2002 incident was relatively minor, given that by the time Plaintiff underwent the thorough physical examination on May 2, 2002, only two small abrasions were discovered. As such, assuming, *arguendo,* that on April 26, 2002, Plaintiff did in fact suffer the alleged injuries, including soreness, pain in and a lump behind his right ear, lump on the back of his head, small abrasions on his nose and knuckle, and bruising to his back, ribs and legs, Amended Complaint at 4, such injuries do not constitute the requisite "serious medical condition" necessary to establish an Eight Amendment deliberate indifference claim. *Compare Hemmings v. Gorczyk,* 134 F.3d 104, 109 (2d Cir.1998) (reversing district court's grant of summary judgment in favor of defendants on inmate plaintiff's Eighth Amendment deliberate indifference to serious medical needs claim where inmate suffered from ruptured Achilles tendon, which remained swollen and painful, requiring plaintiff use crutches to walk, which was originally diagnosed as a bad sprain, yet defendants failed for two months to provide proper treatment despite fact that plaintiff's disabling condition was "easily observable"). That by May 2, 2002, such injuries had healed without any medical treatment further establishes that the injuries were not likely to produce death, degeneration or extreme pain without urgent medical treatment. Additionally, that Plaintiff, on April 28, 2002, reported he was passing blood in his urine, yet failed at that time to make any other complaints, demonstrates that Plaintiff's claimed injuries had already sufficiently healed such that urgent treatment for them was never required. That Plaintiff received timely medical care in response to such complaint, including collecting a urine sample which, upon analysis, showed evidence of a mild UTI, rather than any trauma, further undermines Plaintiff's asserted denial of urgent medical care. The record thus fails to establish any factual issue which, if decided in Plaintiff's favor, could establish the objective prong of Plaintiff's deliberate indifference claim with regard to the April 26, 2002 incident.

The record is similarly deficient as to the June 4, 2002 incident. Specifically, although Plaintiff claims that he had a "mental breakdown" after he was placed in the allegedly

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 894218 (W.D.N.Y.)

(Cite as: 2007 WL 894218 (W.D.N.Y.))

unsanitary cell, which caused him to eat and smear feces on himself, and to attempt to slash his wrists with a medication tube, Amended Complaint, at 7, the record shows that Plaintiff was first observed to have wiped feces on himself and the walls of his cell at 5:15 P.M. on June 4, 2002, less than three hours after Plaintiff was moved to the cell. Prison Logbook, Furman Declaration Exh. A. At 7:10 P.M. that same day, Plaintiff was seen by Nurse Whedon in connection with Plaintiff's complaints of a rash and dryness on his lower legs. Weed Declaration ¶ 4 and Exh. A, Plaintiff's Ambulatory Health Record for June 4, 2002. In fact, two affidavits submitted by Plaintiff in opposition to summary judgment corroborate the fact that Plaintiff was seen by a nurse in the evening of June 4, 2002. *See* Plaintiff's Exhs. T (Affidavit of Inmate Bussey ("Bussey Affidavit")) and U (Affidavit of Inmate Douglas ("Douglas Affidavit")).[FN8] Significantly, Whedon did not note any injury to Plaintiff's wrists. Moreover, the very next morning, June 5, 2002, at 9:10 A.M., Plaintiff was seen by a mental health worker, Mr. Militello, who had Plaintiff transferred to the infirmary and then transferred to Elmira for reevaluation of Plaintiff's schizophrenia diagnosis because Plaintiff was exhibiting signs of mental illness. Furman Declaration ¶¶ 14-15; Outpatient Psychiatric Progress Notes, Plaintiff's Exh. W. Militello also reported that Plaintiff exhibited anger, was threatening to harm himself, had smeared feces on himself, and described Plaintiff as having "scratched wrists," Outpatient Psychiatric Progress Notes, but did not report any physical or mental condition arising to a serious medical need for which treatment had been denied. Rather, the record establishes that Defendants realized in the evening of June 4, 2002 that Plaintiff was experiencing some mental issues for which help was provided the next morning. The record thus fails to establish any factual issue which, if decided in Plaintiff's favor, could establish the objective prong of Plaintiff's deliberate indifference claim with regard to the June 24, 2002 incident.

FN8. Both Bussey and Douglas state that at 6:30 P.M. on June 24, 2002, Defendant Nurse Hersh, accompanied by C.O. Losito, stopped at Plaintiff's cell and while dispensing nighttime medications. Bussey Affidavit ¶ 10; Douglas Affidavit ¶ 10.

**\*11** Because Plaintiff has failed to establish the objective prong for his deliberate indifference claim as to either the April 26 or June 4, 2002 incident, the court need not address whether Plaintiff can establish the subjective prong as to either incident. Summary judgment as to Plaintiff's claim that Defendants acted with deliberate indifference to his serious medical needs is GRANTED as to Defendants.

**C. Conditions of Confinement**

Defendants argue in support of summary judgment that the alleged unsanitary conditions of the cell to which Plaintiff was transferred on June 4, 2002, even if true, are insufficient to support Plaintiff's claims that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment. Defendants' Memorandum at 13-15. Nor does Defendant Murphy's failure to serve Plaintiff lunch one day constitute any Eighth Amendment claim. *Id* . at 15-17. In opposition to summary judgment, Plaintiff submits the Bussey and Douglas Affidavits in which Southport inmates Bussey and Douglas corroborate Plaintiff's assertions that he, upon being placed in a different cell on June 4, 2002, complained of the living conditions in the cell, or the fact that he was not served lunch, and that although Defendant Murphy dropped two of Plaintiff's books into Plaintiff's cell, Plaintiff's request for the rest of his personal belongings were ignored. Bussey Affidavit ¶¶ 3-6; Douglas Affidavit ¶¶ 3-6.

To establish an Eighth Amendment violation based on prison conditions, a plaintiff must demonstrate "that it is contrary to current standards of decency for anyone to be exposed against his will" to the challenged prison conditions. *Helling v. McKinney,* 509 U.S. 25, 35 (1993).

An Eighth Amendment claim based on prison conditions must satisfy

both an objective element-that the prison official's transgression was "sufficiently serious"-and an objective element-that the officials acted, or omitted to act, with a "sufficiently culpable state of mind," *i.e.,* with "deliberate indifference to inmate health or safety."

*Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) (quoting *Farmer,* 511 U.S. at 834).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 894218 (W.D.N.Y.)

(Cite as: 2007 WL 894218 (W.D.N.Y.))

As to the objective element, while the Constitution "does not mandate comfortable prisons," *Rhodes v. Chapman,* 452 U.S. 337, 346 (1981), prison inmates may not be denied "the minimal civilized measure of life's necessities." *Id.* at 347. The Supreme Court has held that the Eighth Amendment requires that inmates not be deprived of their "basic human needs-*e.g.,* food, clothing, shelter, medical care, and reasonable safety." *Helling,* 509 U.S. at 32 (internal citation and quotation omitted). "Nor may prison officials expose prisoners to conditions that 'pose an unreasonable risk of serious damage to [their] future health.' " *Phelps,* 308 F.3d at 185 (quoting *Helling,* 509 U.S. at 35). The Eighth Amendment's objective prong requires an inmate "prove that the conditions of his confinement violate contemporary standards of decency." *Id.*

**\*12** As to the subjective element, the Supreme Court has held that

a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*Farmer,* 511 U.S. at 837.

The "deliberate indifference" element is equivalent to criminal law's reckless indifference standard. *Id.* at 839-40.

In the instant case, Plaintiff's Eighth Amendment claim fails to satisfy the objective element necessary to state a claim based on prison conditions. Although Plaintiff claims the cell to which he was moved on June 4, 2002 was dirty, the mattress was wet, no bedding was provided, the cell sink's cold water did not work, while the hot water continually ran, and Plaintiff missed receiving one meal, the amount of time for which Plaintiff endured such conditions, less than one full day, renders the claim without merit. *See Hutto v. Finney,* 437 U.S. 678, 687

(1978) ("the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. A filthy, overcrowded cell and a diet of 'grue' *[sic]* might be tolerable for a few days and intolerably cruel for weeks and months."). As such, Defendant's motion for summary judgment is GRANTED as to Plaintiff's claim challenging the conditions of his confinement based on the June 4, 2002 incident.

**3. Deprivation of Property**

Although not asserted as such, Plaintiff's claim that upon being transferred to a different cell on June 4, 2002, Defendants failed to give Plaintiff his personal property is properly construed under the Fourteenth Amendment as asserting a deprivation of property without due process. Nevertheless, no claim under 42 U.S.C. § 1983 lies based on the negligent conduct of a state actor even though such conduct may result in deprivation of a property interest. *Daniels v. Williams,* 474 U.S. 327, 330-31 (1986). Further, even intentional, unauthorized deprivations of property by prison officials are not redressable pursuant to 42 U.S.C. § 1983 if "adequate state post-deprivation remedies are available." *Hudson v. Palmer,* 468 U.S. 517, 533 (1984). In New York, several adequate post-deprivation remedies are available such that even if Defendants either negligently or intentionally failed to provide Plaintiff with his personal property, no claim for relief under § 1983 lies.

Specifically, an administrative procedure for inmate personal property claims is provided by N.Y. Comp.Codes R. & Regs. Tit. 7, Pt. 1700. Plaintiff may also commence an action to recover the value of his lost property in New York Court of Claims. *See Butler v. Castro,* 896 F.2d 698, 700 (2d Cir.1990)(holding that New York court of claims presents adequate post-deprivation remedy which precludes § 1983 action only where alleged deprivation was result of random, unauthorized conduct rather than the result of operation of established state procedure). Plaintiff alleges no state policy caused the alleged interference with his property. As such, Plaintiff may not sue under § 1983 to recover for deprivation of personal property. *Hudson,* 468 U.S. at 533.

**\*13** Summary judgment is thus GRANTED in favor of Defendants on Plaintiff's Fourteenth Amendment Due

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 894218 (W.D.N.Y.)

(Cite as: 2007 WL 894218 (W.D.N.Y.))

Process claim based on the June 4, 2002 incident.

**4. Qualified Immunity**

Alternatively, Defendants assert they are entitled to qualified immunity on all claims for damages. Defendants' Memorandum at 19-21. Plaintiff has not responded to this argument. Because the court is granting summary judgment on Plaintiff's claims alleging deliberate indifference to his serious medical needs and challenging the conditions of his confinement, as well as on Plaintiff's Fourteenth Amendment due process claim, the court addresses qualified immunity only as to Plaintiff's excessive force claim.

Qualified immunity shields law enforcement officials who perform discretionary functions from liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable prison official would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 806 (1982); *Washington Square Post No. 1212 v. Maduro,* 907 F.2d 1288, 1291 (2d Cir.1990). Even if the right at issue was clearly established, if it was objectively reasonable for the defendant to believe that his act did not violate the plaintiff's constitutional rights, the defendant may nevertheless be entitled to qualified immunity. *Saucier v. Katz,* 533 U.S.194, 201-02 (2001); *Anderson v. Creighton,* 483 U.S. 635, 641 (1987); *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 568-69 (2d Cir.1996); *Van Emrik v. Chemung County Dep't of Soc. Servs.,* 911 F.2d 863, 865-66 (2d Cir.1990); *Robison v. Via,* 821 F.2d 913, 920-21 (2d Cir.1987). "The availability of the defense depends on whether a reasonable officer could have believed his action to be lawful, in light of clearly established law and the information he possessed." *Weyant v. Okst,* 101 F.3d 845, 858 (2d Cir.1996) (internal quotation marks omitted).

A right is clearly established if (1) it was defined with reasonable specificity, (2) its existence has been affirmed by either the Supreme Court or the relevant court of appeals, and (3) a reasonable defendant official would have understood under the existing law that his acts were unlawful. *Brown v. City of Oneonta, N.Y. Police Dep't,* 106 F.3d 1125, 1131 (2d Cir.1997). If, however, it was objectively reasonable for the defendant to believe that his act did not violate the plaintiff's constitutional rights, the defendant may be entitled to qualified immunity. *Robison,*

821 F.2d at 920-21.

A defendant is entitled to summary judgment based on qualified immunity if the court finds that the asserted rights were not clearly established, or "if the defendant adduces[s] sufficient facts [such] that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to the plaintiff ... could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not violate a federally protected right." *Robison,* 821 F.2d at 921 (internal quotation omitted). Stated another way, a defendant is entitled to qualified immunity under the objectively reasonable standard if "officers of reasonable competence could disagree" on the legality of the defendant's actions. *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995).

**\*14** Where, however, the objective reasonableness of an officer's actions depends on disputed facts, summary judgment based on qualified immunity is properly denied. *Rivera v. United States,* 928 F.2d 592, 607 (2d Cir.1991); *Brawer v. Carter,* 937 F.Supp. 1071, 1082 (S.D.N.Y.1996). Provided that no factual issues are disputed, the application of qualified immunity to the facts is a question of law for the court to decide. *Finnegan v. Fountain,* 915 F.2d 817, 821 (2d Cir.1990). Accordingly, as to Plaintiff's excessive force claim, the court must evaluate whether Defendants' actions, in light of clearly established law in existence as of April 26, 2002, violated Plaintiff's civil rights.

Prison inmates have a clearly established right to be free from the application of excessive force by prison employees. *Hudson,* 503 U.S. at 7. However, a prisoner does not have a clearly established right to be free from the use of force by corrections officers attempting to subdue the prisoner with regard to a physical altercation and whether Defendants' conduct violated a clearly established right is not dependent on whether identical conduct has been previously held to violate a prisoner's constitutional rights. *See Hope v. Pelzer,* 536 U.S. 730, 740-41 (2002) (for purposes of qualified immunity, notice that a corrections officer's conduct violates established law does not require facts of previous cases be materially or fundamentally similar to situation in question, but that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 894218 (W.D.N.Y.)

(Cite as: 2007 WL 894218 (W.D.N.Y.))

state of law at relevant time provides fair warning that conduct is unconstitutional).

Here, the same disputed issues of fact that preclude summary judgment on Plaintiff's excessive force claim also prevent the court from finding Defendants are qualifiedly immune from liability on such claim. Accordingly, determination of Defendants' qualified immunity defense must await a fact trier's resolution of the questions of fact presented. Summary judgment based on qualified immunity is DENIED.

### *CONCLUSION*

Based on the foregoing, Defendants' motion for summary judgment (Doc. No. 58) is DENIED in part and GRANTED in part. The action will proceed only on Plaintiff's Eighth Amendment excessive force claim asserted against Defendants Sgt. Furman, Bly, Carpenter and Lanasa based on the April 26, 2002 incident. The parties are directed to appear before the court on **April 18, 2007** at 10:30 A .M. to schedule a trial date. Defendants are directed to make arrangements for Plaintiff to participate in the conference by telephone.

SO ORDERED.

W.D.N.Y.,2007.

Jones v. Furman
Not Reported in F.Supp.2d, 2007 WL 894218 (W.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Sean TAPP, Plaintiff,

v.

R. TOUGAS, et al., Defendants.

Civil Action No. 9:05-CV-01479 (NAM/DEP).

Aug. 11, 2008.

Sean Tapp, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Steven H. Schwartz, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

***1** Plaintiff Sean Tapp, a former New York prison inmate who is now apparently in the custody of Pennsylvania officials, has commenced this civil rights action pursuant to 42 U.S.C. § 1983 against Donald Selsky, who at the relevant times served as an Assistant Commissioner of the New York State Department of Correctional Services ("DOCS"), and various other employees of the department including four corrections officers, a sergeant, a nurse, a hearing officer, and a guidance counselor, complaining of several constitutional violations alleged to have occurred during the time of his confinement in New York. In his complaint, as amended, plaintiff asserts claims stemming from a series of events precipitated by an altercation between himself and several corrections officers. Plaintiff maintains that he was assaulted by corrections workers without provocation, denied adequate medical care for injuries sustained during the course of the conflict, and subjected to a lengthy period of disciplinary special housing unit ("SHU") confinement as a result of the incident, purportedly without first having been afforded the procedural safeguards guaranteed under the Fourteenth Amendment. As relief, *inter alia,* plaintiff seeks a mandatory injunction directing the restoration of good time credits forfeited as a result of the incident and directing his release from prison, termination of all defendants' employment with the DOCS, and recovery of $15 million in compensatory and punitive damages.

Now that pretrial discovery has concluded, the defendants have moved for summary judgment requesting dismissal of plaintiff's claims, arguing that they are substantively deficient, and further asserting their entitlement to qualified immunity. In addition to opposing defendants' motion, plaintiff has since cross-moved for summary judgment on the issue of liability, based substantially upon the allegations as set forth in his complaint.

Despite the existence of what at first blush appear to be conflicting accounts of the circumstances surrounding plaintiff's excessive force claim, having surveyed the record I am convinced no reasonable factfinder could credit plaintiff's version and find in his favor with respect to that claim. Additionally, discerning the existence of no genuine issues of material fact surrounding plaintiff's remaining claims, including for deliberate medical indifference, the issuance of a false misbehavior report, and violation of his procedural due process rights, and similarly concluding that no reasonable factfinder could rule in plaintiff's favor on any of those claims, I recommend that defendants' summary judgment motion be granted in its entirety, and plaintiff's cross-motion addressing those claims correspondingly be denied.

I. *BACKGROUND*[FN1]

FN1. In light of the procedural posture of the case, the following recitation is drawn from the record now before the court, with all inferences drawn, and ambiguities resolved, in favor of the plaintiff. *See* *Wells-Williams v. Kingsboro Psychiatric Ctr.,* No. 03-CV-134, 2007 WL 1011545, at *2 (E.D.N.Y. Mar. 30, 2007) (citations omitted). To the extent that the parties' versions of the relevant events differ, those

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)

(Cite as: 2008 WL 4371766 (N.D.N.Y.))

discrepancies will be noted.

At the times relevant to his claims, the plaintiff was entrusted to the custody of the DOCS and designated to the Great Meadow Correctional Facility ("Great Meadow"), a maximum security prison facility located in Comstock, New York. *See generally* Amended Complaint (Dkt. No. 19) ¶ 3; *see also* Brown Aff. (Dkt. No. 50-5) Exh. A at 60:21-22 (hereinafter cited as "Tapp Dep. (Dkt. No. 50-6) at ___."). On June 24, 2005, while waiting in a line in the Great Meadows B-block for a call out slip permitting him to go to the library, and later to a scheduled religious service, plaintiff was involved in a physical conflict with correctional officers at the Great Meadow facility. *See* Amended Complaint (Dkt. No. 19) ¶¶ 4-5, 7-9. It is that incident, together with events which followed, which form the underpinnings for plaintiff's claims in this action.

**\*2** Neither Tapp nor the defendants dispute the fact that a physical altercation, initially involving only the plaintiff and Corrections Officer R. Tougas, but with later intervention by other corrections officers, occurred on the date in question. The parties' respective versions of the controlling events, however, are sharply contradictory, particularly as relates to the issue of who initiated the confrontation. While both sides agree that the plaintiff attempted to go to the front of a relatively lengthy line of inmates awaiting call out passes, accustomed as he was to having his daily library pass already written and awaiting him, and that the plaintiff was ordered by Corrections Officer Tougas to return to the back of the line but ignored that directive, it is at this point that the parties' versions of the relevant events diverge.

Defendants assert that upon moving ahead of the other inmates also awaiting call out slips, Tapp was given a direct order by Corrections Officer Tougas to return to his place in line, and, when he refused to obey that directive and instead uttered expletives directed toward that officer, was ordered to return to his cell-an instruction which he also ignored. Tougas Decl. (Dkt. No. 50-24) ¶¶ 6-10. After Tapp refused a further order to place his hands on the cat walk bars, instead assuming an offensive fighting stance, raising his clenched fist and lunging at the officer, a struggle ensued between the two. *Id.* ¶¶ 10-17.

After signaling an alert in an attempt to gain control of the situation, with the assistance of Corrections Officer Sharrow, another defendant in the action, Tougas was ultimately able to force the plaintiff to lie face down on the floor, at which point mechanical restraints were applied by a third corrections officer, defendant Rando, and plaintiff was transported to the facility hospital for examination, strip frisked, and then taken to the facility SHU. *Id.* ¶¶ 16-17; Sharrow Decl. (Dkt. No. 50-22) ¶¶ 4-10 and Exh. A; *see also* Rando Decl. (Dkt. No. 50-18) ¶ 4. While at the prison infirmary plaintiff was examined by defendant Santini-Correa, who did not observe any injuries to the plaintiff, nor did he complain of any during her examination. Santini-Correa Decl. (Dkt. No. 50-8) ¶¶ 5-11 and Exh. A. During that examination, Nurse Santini-Correa wiped dried blood which did not appear to be his from the plaintiff's back. *Id.*

Plaintiff's sworn submissions recite a significantly different version of the relevant events. While acknowledging that he ignored a directive from Corrections Officer Tougas, and at one point instructed the officer to "shut the f__k up[,]" plaintiff maintains that after a verbal exchange between the two defendant Tougas "outright attacked" him, "banging [his] head against cell bars while he pulled on inmate & repeatedly punched [him] in the face, body & head for no apparent reason." Amended Complaint (Dkt. No. 19) ¶ 4; *see also* Tapp Dep. (Dkt. No. 50-6) at 66-72. While acknowledging that he punched defendant Tougas in the mouth during the course of the encounter, Tapp also asserts that it was only after he was punched and his shirt was pulled over his head, adding that he did so in an effort to defend himself. *Id.* Plaintiff also asserts that other corrections employees responded to an alert concerning the incident and continued to assault him and that defendant Michael, a corrections sergeant, stood idly by and refused to intercede on his behalf. Tapp Dep. (Dkt. No. 50-6) at 72-73.

**\*3** According to Tapp, once he was subdued and mechanical restraints were applied, he was escorted to the infirmary by defendant Rando who, along the way, intentionally stepped on his leg chains causing him to experience pain in his Achilles tendon. Tapp Decl. (Dkt. No. 50-6) at 75-76. Upon his arrival at the facility

---

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)

(Cite as: 2008 WL 4371766 (N.D.N.Y.))

hospital, plaintiff claims to have complained of pain in his wrist, back, right shoulder, and groin and having requested medical attention for his injuries. *Id.* at 88. Plaintiff further maintains that as a result of the incident he experienced blood in his urine, but that at the directive of defendant Michael, Nurse Santini-Correa "refused to note actual injuries of plaintiff such as swollen testicles, blood in urine & stool, lower back pain, bruises to [plaintiff's] wrist & face while she prevented co-workers from seeing [plaintiff] at sick call for" his injuries. Amended Complaint (Dkt. No. 19), at ¶¶ 5-6.

On the date of the incident, plaintiff was issued a misbehavior report charging him with multiple violations of prison disciplinary rules stemming from the altercation, including assault on staff (Rule 100.11), engaging in violent conduct (Rule 104.11), creating a disturbance (Rule 104.13), violating a direct order (Rule 106.10), and failure to comply with frisk and search procedures (Rule 115.10) .[FN2] *See* Amended Complaint (Dkt. No 19) ¶ 4; Tougas Decl. (Dkt. No. 50-24) ¶ 19 and Exh. A; Harvey Decl. (Dkt. No. 50-10) ¶ 5 and Exh. A, p. 9. A Tier III superintendent's hearing was convened at Great Meadow to address the charges set forth in the misbehavior report, beginning on July 1, 2005 and ending two weeks later on July 15, 2005; presiding at that hearing was Andrew Harvey, a Commissioner's Hearing Officer ("CHO") employed by the DOCS.[FN3] Harvey Aff. (Dkt. No. 50-10) ¶¶ 3-6 and Exh. A. In preparation for that hearing, following the filing of charges, plaintiff was offered a list of DOCS employees available to aid in preparation for the hearing and was assigned defendant Melanie Jones, a DOCS Guidance Specialist at the facility and his designated first choice, as his assistant. Amended Complaint (Dkt. No. 19) ¶ 12; Jones Decl. (Dkt. No. 50-14) ¶¶ 2-3 and Exh. A. In his amended complaint plaintiff asserts that defendant Jones conspired with others at the prison to deprive him of "everything that [he] was entitled too [sic] by due process of law." Amended Complaint (Dkt. No. 19) ¶ 12. Plaintiff's submissions, however, fail to identify any document or information obtained by defendant Jones that was withheld from him.

FN2. Plaintiff maintains that this misbehavior report was falsely written by defendant Tougas and deliberately fashioned to make it appear as if the plaintiff caused the incident by punching Tougas and resisting restraint. *See* Amended Complaint (Dkt. No. 19), at ¶ 4.

FN3. The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

In a declaration filed in support of defendants' summary judgment motion, defendant Jones advises that she met with the plaintiff on a total of three occasions to prepare for the impending disciplinary hearing. Jones Decl. (Dkt. No. 50-14) ¶ 4. According to Jones, during those meetings plaintiff requested numerous documents, and asked that she interview four witnesses identified by him. *Id.* ¶ 5. Upon interviewing those witnesses, defendant Jones ascertained that three of the four would agree to testify and secured a written statement from the fourth inmate declining plaintiff's request to testify on his behalf. *Id.* ¶ 5 and Exh. A. In addition, defendant Jones obtained most of the documents requested by the plaintiff, and advised him that other requested information could not be provided by prison officials. *Id.* ¶ 6. Among the documents withheld by prison officials from defendant Jones, as plaintiff's assistant, were Corrections Officer Tougas' medical records. *Id.* ¶ 7 and Exh. A.

**\*4** Defendant Jones explained her inability to obtain certain records to the plaintiff and informed him that in her role as his assistant she did not control what documents would be made available to the plaintiff, consistent with institutional security concerns and privacy interests. *Id.* ¶¶ 8-9. Defendant Jones also informed the plaintiff of his right to request additional information, either at the hearing or through other avenues. *Id.* ¶ 7.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)

(Cite as: 2008 WL 4371766 (N.D.N.Y.))

At the conclusion of the hearing defendant Harvey found plaintiff guilty of all charges set forth in the misbehavior report, imposing a penalty which included eighteen months of disciplinary SHU confinement, with a corresponding loss of package, commissary and telephone privileges, and additionally recommending a twelve month loss of good time credits.[FN4] Harvey Aff. (Dkt. No. 50-10) ¶ 18 and Exh. A at pp. 3-4.

> FN4. Despite plaintiff's apparent belief otherwise, a Tier III superintendent's hearing officer is not empowered to make a final determination regarding forfeiture of good time credits; such determinations are left to the appropriate facility time allowance committee ("TAC"). *See Dawes v. Kelly,* No. 01CV6276, 2005 WL 2245688, at *3, 8 (W.D.N.Y. Sep. 14, 2005). Inmate claims regarding improperly withheld good time credits are not appropriately brought under 42 U.S.C. § 1983, the court having no power in such a case to direct that an inmate be released from custody, but instead must be pursued by means of habeas petitions brought pursuant to 28 U.S.C. §§ 2241 and/or 2254. *See generally Peralta v. Vasquez,* 467 F.3d 98, 104-05 (2d Cir.2006); *see also Jenkins v. Duncan,* No. 9:02-CV-0673, 2003 WL 22139796, at *2-3 (N.D.N.Y. Sep. 16, 2003) (Sharpe, D.J.).

CHO Harvey's determination, including the penalty imposed, was upheld following plaintiff's appeal of that decision to defendant Donald Selsky, formerly an Assistant DOCS Commissioner and the Director of Special Housing and Inmate Disciplinary Programs for the agency. Selsky Decl. (Dkt. No. 50-20) ¶¶ 2, 7 and Exh. A. Plaintiff opted not to avail himself of the right to commence a proceeding in New York State Supreme Court under Article 78 of the N.Y. Civil Practice Law and Rules further challenging that disciplinary determination.

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on November 29, 2005, and later filed an amended complaint-the operative pleading now before the court-on April 11, 2006.[FN5] *See*

Dkt. Nos. 1, 19. In his complaint, as amended, plaintiff asserts multiple constitutional violations relating to the events occurring on and after June 24, 2005 at Great Meadow including, *inter alia,* the use of excessive force and the failure to protect him from injury, deliberate indifference to his injuries, the deprivation of procedural due process, and denial of equal protection.[FN6,FN7] Named as defendants in plaintiff's amended complaint, apparently both in their official capacities and as individuals, are various DOCS employees, including Assistant Commissioner Selsky; Sergeant Michael; CHO Harvey; Corrections Officers Tougas, Wilson, Rando, and Sharrow; and Nurse Santini-Correa. Amended Complaint (Dkt. No. 19) at ¶¶ 4-12.

> FN5. From a review of the court's records it appears that the amendment was prompted by a court order dated March 28, 2006 directing the filing of an amended complaint naming Corrections Officer Wilson as an additional defendant before that officer could be served as a defendant. Dkt. No. 10.

> FN6. The introductory portion of plaintiff's complaint makes reference to supplemental jurisdiction over state law tort claims pursuant to 28 U.S.C. § 1367. See Amended Complaint (Dkt. No. 19) ¶ 2. The body of plaintiff's complaint, however, does not assert any such claims, which in any event could well be precluded under N.Y. Corrections Law § 24. *See Ierardi v. Sisco,* 119 F.3d 183, 186-88 (2d Cir.1997).

> FN7. In his motion for summary judgment plaintiff addresses additional claims not included in his complaint, including discrimination, violation of his right to free speech, and lost property. *See generally* Plaintiff's Motion (Dkt. No. 56). Because those matters are raised for the first time on motion for summary judgment, and they are not included within his amended complaint, the court will not address these additional claims. *See, e.g., Caidor v. Potter,* No. 5:02-CV-1486, 2007 WL 2847229, at *8 (N.D.N.Y. Sep. 26, 2007) (Mordue, C.J.) (refusing to hear a claim raised for the first time in a summary judgment motion).

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)

(Cite as: 2008 WL 4371766 (N.D.N.Y.))

On February 20, 2008, following the close of discovery, the defendants filed a motion seeking summary judgment dismissing plaintiff's complaint in its entirety. *See generally* Defendants' Motion (Dkt. No. 50). In their motion defendants offer a variety of grounds for dismissal of plaintiff's claims, asserting deficiency of plaintiff's claims for violations of the Eighth Amendment, plaintiff's due process rights, and medical indifference. *Id.* Defendants also argue that plaintiff has not raised a cognizable constitutional question pertaining to the allegedly false misbehavior report issued by defendant Tougas, that this court lacks subject matter jurisdiction to decide plaintiff's due process claim based upon his failure to first invalidate the hearing results, and that they are entitled to qualified immunity. *Id.* In response, plaintiff has opposed defendants' motion and cross-moved for summary judgment, offering substantially the same arguments as those found in his complaint.[FN8] *See generally* Plaintiff's Motion (Dkt. No. 56).

> FN8. Although the plaintiff devotes a portion of his motion submission to discussion of his efforts to exhaust administrative remedies, because the defendants have not raised failure to exhaust as an affirmative defense there is no need to address the issue in this report and recommendation. *See* Plaintiff's Brief (Dkt. No. 56) at Argument, Point 2; *see also* Schwartz Decl. (Dkt. No. 61) at ¶¶ 3-4.

**\*5** The parties' motions are now ripe for determination, and have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* FED. R. CIV. P. 72(b).

### III. *DISCUSSION*

#### A. Summary Judgment Standard

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material," for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. FED. R. CIV. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)

(Cite as: 2008 WL 4371766 (N.D.N.Y.))

judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Excessive Force*

**\*6** The centerpiece of plaintiff's complaint is his claim of being beaten on June 24, 2005, initially by Corrections Officer Tougas, and later by others including Corrections Officers Wilson, Rando, and Sharrow, and that Sergeant Michael failed to intervene to protect him from injury. This component of plaintiff's civil rights claim implicates potential violations of the right of a sentenced prison inmate to be free from cruel and unusual punishment, as guaranteed under the Eighth Amendment.

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 998 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973) (Friendly, J.), *cert. denied sub nom., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462 (1973)). Analysis of claims of cruel and unusual punishment requires both objective and subjective examinations. *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999; *Wilson v. Seiter,* 501 U.S. 294, 298-99, 111 S.Ct. 2321, 2324 (1991); *Griffen,* 193 F.3d at 91.

The objective prong of the inquiry is contextual, and relies upon "contemporary standards of decency." *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999-1000 (quoting *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290 (1976)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a

prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). Under *Hudson,* even if the injuries suffered by a plaintiff " 'were not permanent or severe,' " a plaintiff may still recover if " 'the force used was unreasonable and excessive.' " *Corselli v. Coughlin,* 842 F.2d 23, 26 (2d Cir.1988) (quoting *Robinson v. Via,* 821 F.2d 913, 924 (2d Cir.1987)).

Turning to the subjective element, to prevail the plaintiff must establish that defendants acted with a sufficiently culpable state of mind. *Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994) (citing *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999). That determination is informed by four factors, including 1) the need for application of force; 2) the relationship between that need and the amount of force used; 3) the threat reasonably perceived by the responsible officials; and 4) any efforts made to temper the severity of a forceful response. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085. The principal focus of this inquiry "turns on 'whether force was applied in a good faith effort to maintain discipline or maliciously and sadistically for the very purpose of causing harm.' " *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson,* 481 F.2d at 1033).

**\*7** The portion of defendants' motion addressing whether plaintiff was subjected to a level of force which a reasonable factfinder could conclude was unlawful, considered against this backdrop, presents a close case. Because the versions of the relevant events offered by the various participants are sharply contradictory, it could be argued that defendants' motion invites the court to make a credibility determination, something which courts are generally loathe to do on motion for summary judgment. *See Snyder v. Goord,* 9:05-cv-01284, 2007 WL 957530, at \*9 (N.D.N.Y.2007) (McAvoy, S.J.).

In this instance, however, the evidence now before the court overwhelmingly establishes that the incident and resulting injuries to the participants was precipitated by the plaintiff and his admitted failure to comply with lawful

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

directives of C.O. Tougas and his admonition to that corrections officer that he should "shut the f__k up".[FN9] Tapp Dep. (Dkt. No. 50-6) at 66. Coupled with these factors is the stark contrast presented by evidence of the injuries suffered by the two primary participants. Corrections Officer Tougas, who the plaintiff admitted punching, received an injury during the conflict which required twelve stitches to repair. Tougas Decl. (Dkt. No. 50-24) ¶ 20; Tapp Dep. (Dkt. No. 50-6) at p. 69. By comparison the plaintiff, who contends that he was beaten, punched, dragged, and stomped on by Corrections Officer Tougas, with the assistance of Corrections Officers Wilson, Sharrow and Rando, suffered little if any injury despite the alleged participation of four corrections officers, as evidenced by both the sworn declaration of Nurse Santini-Correa, who examined him shortly after the incident, a videotape of plaintiff's escort following the incident, and photographs taken of him on that day. *See* Santini-Correa Decl. (Dkt. No. 50-8) ¶¶ 5-10; *see also* Dkt. No. 50-12. This evidence, augmented by a hearing officer's finding, following a disciplinary hearing at which plaintiff was provided due process, that it was the plaintiff who in fact assaulted staff members, including Corrections Officer Tougas, on the date in question, and the fact that at least on two prior occasions plaintiff was subjected to lengthy periods of disciplinary SHU confinement for having assaulted other DOCS staff members, convinces me that no reasonable factfinder could credit plaintiff's version and determine that the force applied by the corrections officers involved in the incident, including Corrections Officer Tougas, to control the situation and restore the safety and security of the institution, was unlawfully excessive.[FN10] *See Jeffreys v. City of New York,* 426 F.3d 549, 555 (2d Cir.2005) (in circumstances where the record is lacking in support of plaintiff's contradictory and incomplete statements, summary judgment may be appropriate upon the basis that no reasonable factfinder could credit plaintiff's version of the relevant events); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 470 (S.D.N.Y.1998) (same); *see also Panetta v. Crowley,* 460 F.3d 388, 394 (2d Cir.2006) (noting that "[j]udgment as a matter of law is appropriate if no reasonable factfinder could have viewed the evidence as supporting plaintiff's claim"). Accordingly, I recommend dismissal of plaintiff's Eighth Amendment claim against Corrections Officer Tougas, Wilson, Michael, Rando and Sharrow as a matter of law.

FN9. While the plaintiff apparently believed that Corrections Officer Tougas' directive that he return to the end of the line was somehow unreasonable, that belief did not legitimize Tapp's acknowledged failure to comply with that directive. *See Kalwasinski v. Artuz,* No. 02 CV 2582, 2003 WL 22973420, at *3 (S.D .N.Y.2003). As one court has noted,

> Under New York law, "inmates are not free to choose which orders to obey and which to ignore. *Farid v. Coombe,* 236 A.D.2d 660, 653 N.Y.S.2d 715, 716 (App.Div.1997). This is true even where the inmate feels that the order infringes upon his or her rights. "Inmates may not refuse to obey orders issued by correction officers, even if the orders appear to be without authority or to infringe upon the inmate's constitutional rights." *Keith v. Coombe,* 235 A.D.2d 879, 880, 653 N.Y.S.2d 401 (N.Y.App.Div.1997). The penological rationale for this is clear. "The threat to prison security would be manifest were we to allow inmates to decide for themselves which orders to obey and which to ignore as violative of their rights and to act accordingly." *Rivera v. Smith,* 63 N.Y.2d 501, 516, 483 N.Y.S.2d 187, 472 N.E.2d 1015 (1984).

> *Kalwasinski v. Artuz,* 2003 WL 22973420, at *3.

FN10. The incident at Great Meadow was not the first involving an altercation between the plaintiff and corrections officers. In 1996, while at the Attica Correctional Facility, plaintiff was found guilty of charges related to an alleged assault upon one or more corrections officers and was sentenced to serve three years of disciplinary confinement in the Attica SHU. *See* Tapp Dep. (Dkt. No. 50-6) at 53:3-55:22. Similarly, in 2000, while incarcerated at the Wende Correctional Facility, plaintiff became involved in a confrontation with a corrections officer,

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)

(Cite as: 2008 WL 4371766 (N.D.N.Y.))

again receiving a penalty which included disciplinary confinement of between eighteen months and two years following a hearing to address the matter. *Id.* at 55:24-58:13.

*C. Deliberate Indifference*

**\*8** Liberally construed, plaintiff's amended complaint also appears to assert deliberate indifference on the part of the defendants to his injuries following the June 24, 2005 incident. Amended Complaint (Dkt. No. 19) ¶¶ 6-7. While this aspect of plaintiff's complaint appears to focus principally on the actions of Nurse Santini-Correa, in his motion for summary judgment plaintiff seems to expand that claim, though without disclosing specifics, explaining that it is also being asserted against defendant Jones, his assigned hearing assistant, and Sergeant Michael. *See* Defendants' Motion for Summary Judgment (Dkt. No. 56) at p. 1. In their motion, defendants also seek dismissal of this cause of action.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and

Homer, M .J.); *see also generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at \*2 (same).

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious.' " *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance* ). Relevant factors informing this determination include whether the plaintiff suffers from an injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment,' " a condition that " 'significantly affects' " a prisoner's daily activities, or causes " 'chronic and substantial pain.' " *Chance,* 43 F.3d at 701 (citation omitted); *LaFave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at \*2-3 (N.D .N.Y. Apr. 3, 2002) (Sharpe, M.J.).

**\*9** Deliberate indifference, in a constitutional sense, exists if an official knows of and disregards an excessive risk to inmate health or safety; the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer*

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)

(Cite as: 2008 WL 4371766 (N.D.N.Y.))

); *Waldo,* 1998 WL 713809, at *2 (same).

It is well-established that mere disagreement with a prescribed course of treatment, or even a claim that negligence or medical malpractice has occurred, does not provide a basis to find a violation of the Eighth Amendment. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 201-02; *Chance,* 143 F.3d at 703; *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828 (1992). The question of what diagnostic techniques and treatments should be administered to an inmate is a "classic example of a matter for medical judgment"; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703; *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998).

Plaintiff alleges in his complaint that as a result of the incident, he suffered from "swollen testicles, blood in urine & stool, lower back pain, bruises to [his] wrist & face" which defendant Santini-Correa allegedly refused to note, as well as cuts to his wrists, a shoulder "pop," numbness in his right shoulder, left thumb, and both wrists, as well as a rash on his wrists. [FN11] Amended Complaint (Dkt. No. 19) ¶¶ 6-8. Noticeably absent from plaintiff's complaint is any indication that these conditions gave rise to extreme pain, degeneration, or death. [FN12] Even crediting plaintiff's claims concerning these injuries, it does not appear that plaintiff has set forth a "sufficiently serious" condition to support a claim for either deliberate or medical indifference. *See Peterson v. Miller,* No. 9:04-CV-797, 2007 WL 2071743, at *7 (N.D.N.Y. July 13, 2007) (noting that a "dull pain" in plaintiff's back and persistent rash on plaintiff's foot did not raise a constitutional issue) (Hurd, D.J. and Peebles, M.J.) (citing *Hathaway,* 37 F.3d at 66; *Salaam v. Adams,* No. 03-CV-0517, 2006 WL 2827687, at *10 (N.D.N.Y. Sept. 29, 2006)); *see also Ford v. Phillips,* No. 05 Civ. 6646, 2007 WL 946703, at *12 & n. 70 (S.D.N.Y. Mar. 27, 2007) (finding that plaintiff's allegations of bruises, abrasions, and blood in his urine for a few weeks did not constitute a sufficiently serious condition giving rise to a medical indifference claim).

FN11. In his summary judgment motion plaintiff also raises, for the first time, a claim that he was denied an asthma inhaler. *See* Plaintiff's Statement of Undisputed Facts (Dkt. No. 56) at § 5. Because the first mention of any issue pertaining to plaintiff's asthma medication has occurred at this late stage in the case, I recommend against expansion of his indifference cause of action to encompass this claim. *See, e.g., Caidor,* 2007 WL 2847229, at *8.

FN12. In his motion for summary judgment plaintiff now asserts that his back condition has been "diagnosed as chronic serious pain," and speculates as to his physical ability to have children in the future. *See* Plaintiff's Motion (Dkt. No. 56), at p. 6; Plaintiff's Statement of Undisputed Facts (Dkt. No. 56), at § 9. It is also noted that while plaintiff's ambulatory record entry for "6/24/05" reveals "[n]o injuries noted or voiced" by the plaintiff, an entry made a day later reveals that Nurse Santini-Correa observed "dry abrasion[s]" on plaintiff's wrist and upper extremities, along with numbness of his left thumb and two big toes, all of which appear to be injuries that plaintiff "want[ed] ... noted in [his] chart." *See* Plaintiff's Ambulatory Record (Dkt. No. 56-4), Exhs. 21-22. These matters are far too speculative and attenuated from the incident in question to constitute serious medical needs arising from the June 24, 2005 incident.

Moreover, even assuming the existence of a serious medical need, the record now before the court is also lacking in any evidence from which a reasonable factfinder could conclude that any of those three defendants implicated in this claim, and in particular Nurse Santini-Correa, was deliberately indifferent to his medical needs. At best, plaintiff appears to assert a claim of negligence or malpractice against Nurse Santini-Correa for failure to treat his injuries; such a claim, however, is not cognizable under the Eighth Amendment. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 201-02; *Chance,* 143 F.3d at 703; *Ross,* 784 F.Supp. at 44. As for the other defendants, the record is devoid of any evidence to suggest their awareness of, and deliberate indifference to, plaintiff's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)

(Cite as: 2008 WL 4371766 (N.D.N.Y.))

allegedly serious medical needs.

**\*10** In sum, because plaintiff has established neither the existence of a serious medical need nor defendants' subjective, deliberate indifference to any such need, his medical indifference claim is subject to dismissal as a matter of law.

D. *False Misbehavior Report*

One of the claims in this action is predicated upon plaintiff's contention that the misbehavior report issued by Corrections Officer Tougas, following the June 24, 2005 incident, was fabricated. In their motion, defendants seek dismissal of this claim as lacking in merit.

As defendants correctly note, the mere allegation that a false misbehavior report has been issued against an inmate, standing alone, does not implicate constitutional considerations. *Boddie v.. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997); *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U .S. 982, 108 S.Ct. 1273 (1988)). Proof that a false misbehavior report has been issued in response to an inmate having engaged in activity protected under the First Amendment, however, may suffice to support a claim of unlawful retaliation. *See Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988).

A thorough canvas of the record in this case, including plaintiff's amended complaint, fails to reveal any evidence tending to suggest that the misbehavior report issued in this case was in retaliation for Tapp having engaged in protected activity. Because plaintiff has not raised any further allegations concerning the allegedly false misbehavior report, any constitutional claims associated with it are subject to dismissal as a matter of law.

E. *Procedural Due Process*

A second major theme of plaintiff's amended complaint surrounds the procedures which followed the issuance of the June 24, 2005 misbehavior report. Plaintiff contends that during the course of the ensuing disciplinary proceedings he was denied procedural due process, and that assigned hearing officer was biased.[FN13] Those involved in this cause of action include defendants

Harvey, the hearing officer; Jones the corrections employee assigned to assist the plaintiff; and Selsky, the Assistant DOCS Commissioner who upheld the hearing determination on appeal. Defendants also seek dismissal of this claim as a matter of law.

FN13. Plaintiff also argues that the hearing did not comply with governing State requirements, in that it was not commenced within seven days of the filing of charges and did not end within the required fourteen days, and additionally because extensions were not properly sought and validly granted. Amended Complaint (Dkt. No. 19) ¶ 10. This portion of plaintiff's due process claim implicates only state procedural requirements which if violated nonetheless would not support a federal constitutional claim under section 1983. *See, e.g., Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.1987). To the extent that federal due process considerations are called into play, it appears that plaintiff's disciplinary hearing did occur within the "reasonable time" required by federal law. *See Green v. Bauvi,* 46 F.3d 189, 195 (2d Cir.1995); *see also* Harvey Declaration (Dkt No. 50-10) at §§ 7-9 (explaining that the hearing could not start until one day after the applicable state requirement of seven days due to a high volume of cases and that a six-day extension was granted due to the unavailability of defendant Tougas and certain of plaintiff's witnesses to testify).

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996). The allegation that as a result of the disciplinary hearing at issue plaintiff was subjected to eighteen months of disciplinary confinement in a facility SHU suffices to establish the deprivation of a liberty interest and trigger the due process protections of the Fourteenth Amendment. *See Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004) (citing *Welch v. Bartlett,* 196

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)

(Cite as: 2008 WL 4371766 (N.D.N.Y.))

F.3d 389, 394 n. 4 (2d Cir.1999)); see also *Alvarez v. Coughlin,* No. 94-CV-985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.)).

**\*11** The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well-established; the contours of the requisite protections were discussed in some detail in the Supreme Court's decision in *Wolff v. McDonnell,* 418 U.S. 539, 564-67, 94 S.Ct. 2963, 2978-80 (1974). Under *Wolff,* the constitutionally mandated due process requirements include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564-67, 94 S.Ct. at 2978-80; see also *Eng v. Coughlin,* 858 F.2d 889, 897-98 (2d Cir.1988). In addition, in order to pass muster under the Fourteenth Amendment a hearing officer's disciplinary determination must garner the support of at least "some evidence." *Superintendent v. Hill,* 472 U.S. 445, 105 S.Ct. 2768 (1985).

The record now before the court convincingly establishes that plaintiff received the requisite due process during the course of the disciplinary proceedings against him. The record discloses, and the plaintiff does not dispute, that he received written notice of the charges against him, as well as a written determination from the hearing officer, following the hearing, outlining his findings.

One of the issues raised in support of his due process argument is plaintiff's contention that he was precluded from presenting witnesses on his behalf. Undeniably, under *Wolff* and its progeny an inmate must be afforded the right to call witnesses and present evidence in his or her defense "when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." 418 U.S. at 566, 94 S.Ct. at 2979. Due process requires that the hearing officer explain why any witnesses requested were not allowed to testify. *Ponte,* 471 U.S. at 497, 105 S.Ct. at 2196; *Fox v. Coughlin,* 893 F.2d 475,

478 (2d Cir.1990) (citing *Ponte* ); *Parris v. Coughlin,* No. 90-CV-414, 1993 WL 328199, at *5 (N.D.N.Y. Aug. 23, 1993) (Hurd, M.J) (same). These reasons may be provided at the disciplinary hearing itself, or by presenting testimony in the course of a later constitutional challenge. *Ponte,* 471 U.S. at 497, 105 S.Ct. at 2196; *Parris,* 1993 WL 328199, at *6 (citing *Ponte* ). The burden is not upon the inmate to prove the official's conduct was arbitrary and capricious, but rather upon the official to prove the rationality of his or her position. *Fox,* 893 F.2d at 478 (citing *Ponte* ); *Parris,* 1993 WL 328199, at *6 (citing *Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30-31 (2d Cir.1991)).

In this case the record discloses that the plaintiff was permitted to call all of the witnesses necessary to present a meaningful defense to the charges. At the outset of the hearing plaintiff requested the presence of four inmate witnesses, one of whom refused to testify after which plaintiff advised the hearing officer that he did not wish to pursue securing testimony from him in any event. Jones Decl. (Dkt. No. 50-14) Exh. A; Harvey Decl. (Dkt. No. 50-10) Exh. A at pp. 1-2. The remaining three witnesses were permitted to testify on behalf of the plaintiff. Harvey Decl. (Dkt. No. 50-10) Exh. A at pp. 17-27. While the plaintiff later announced his intention to call twelve additional witnesses, and the hearing officer permitted him to select four-all of whom, when contacted, indicated their refusal to testify-plaintiff subsequently advised CHO Harvey that he did not find it necessary to call other witnesses all of whom would have repeated versions of events already given by himself and his other witnesses.[FN14] Harvey Decl. (Dkt. No. 50-10) Exh. C at pp. 41-47.

FN14. In addition to the inmate witnesses CHO Harvey also permitted plaintiff to call to elicit further testimony from Corrections Officers Walcak and Tougas. Harvey Decl. (Dkt. No. 50-10) Exh. C. at pp. 41-47.

**\*12** Under these circumstances it appears that CHO Harvey had a rational basis to conclude that calling the additional requested witnesses would have been cumulative and unnecessary. Similarly, it appears that the hearing officer had a reasonable basis to conclude that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)

(Cite as: 2008 WL 4371766 (N.D.N.Y.))

calling the witnesses who had refused to testify would be futile. *Dumpson v. Rourke,* No.CIVA96CV621,1997 WL 610652, at *5 (N.D.N.Y. Sept. 26, 1997) (Pooler, D.J.) (citing *Silva v. Casey,* 992 F.2d 20, 21-22 (2d Cir.1993)). "Clearly, if a witness will not testify if called, it cannot be a 'necessity' to call him." *Silva,* 992 F.2d at 22; *see also Wolff,* 418 U.S. at 568-69, 94 S.Ct. at 2981 (recognizing discretion of prison officials to decline to call as witnesses fellow inmates who do not wish to testify). Regarding the two witnesses who refused to testify with an explanation, a hearing officer has no power to force an inmate to testify, and when an inmate refuses, the hearing officer need not call that witness. *Silva,* 992 F.2d at 21-22; *Dumpson,* 1997 WL 610652, at *5 (citing *Greene v. Coughlin,* No. 93 Civ. 2805, 1995 WL 60020, at *14 (S.D.N.Y. Feb. 10, 1995) (hearing officer need not make independent evaluation of the basis for refusal to testify)). Finally, with regard to the plaintiff's eight additional witnesses who would have stated "basically ... the same thing," Harvey clearly had a rational basis to refuse to call these witnesses as their testimony would be unnecessarily repetitive. Thus, neither defendant Harvey or Jones took part in any improper denial of plaintiff's right to call witnesses to testify in his behalf.

It appears that the plaintiff finds fault with the aid rendered by the selected hearing assistant, Melanie Jones. The Fourteenth Amendment requires only that prison officials provide an inmate accused of a disciplinary infraction, in some though not necessarily all circumstances, meaningful assistance in preparing a defense. *Eng v. Coughlin* 858 F.2d 889, 897 (2d Cir.1988) (holding that in some circumstances, "[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges"). The assistant acts as a *"surrogate*-to do what the inmate would have done were he able." *Silva,* 992 F.2d at 22 (emphasis in original). An assistant also may not act in bad faith in aiding a prisoner in mounting a defense. *Id.* The law does not require that the assistant assigned be a trained lawyer or that the assistant be held to a standard of competent representation guaranteed to criminal defendants under the Sixth Amendment. *Contrast Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052 (1984) (outlining the contours of the right to effective assistance of counsel

guaranteed to criminal defendants). Despite plaintiff's protestations regarding the adequacy of her aid, the record discloses that defendant Jones provided him with capable assistance in preparing for the hearing, and that she met with the plaintiff on three occasions, interviewed the witnesses which he designated, and obtained a significant amount of the materials requested by him. *See generally* Jones Decl. (Dkt. No. 50-14) ¶¶ 3-9. Having carefully reviewed the record, I find no basis to conclude that plaintiff was not afforded the meaningful assistance guaranteed under *Wolff.*

**\*13** Although plaintiff does not place significant emphasis on this element, the due process provision of the Fourteenth Amendment requires that a hearing officer's disciplinary determination be supported by "some evidence." *See Hill,* 472 U.S. at 447, 105 S.Ct. at 2770; *Morales v. Woods,* No. 9:06-CV-15, 2008 WL 686801, at *6 (N.D.N.Y. Mar. 10, 2008) (McAvoy, S.J.) (citations omitted). Based upon a careful review of the record developed during the course of plaintiff's disciplinary proceeding, I conclude that no reasonable factfinder could determine that the hearing officer's decision in this case was not supported by the requisite modicum of evidence.

A focal point of plaintiff's due process argument relates to alleged bias on the part of the hearing officer. The fact that the hearing officer appointed to address the charges against Tapp was a DOCS employee, as is normally the case, does not disqualify him from serving as a hearing officer or in and of itself provide reason to question his objectivity. Prison disciplinary hearing officers are not held to the same standard of neutrality as are adjudicators in other types of controversies. *See Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). Such a hearing officer must only be sufficiently impartial as to avoid "a hazard of arbitrary decision making," *Wolff,* 418 U.S. at 571, 94 S.Ct. at 2982, and is deserving of a presumption of honesty and integrity. *Winfrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464 (1985); *Rivera v. Senkowski,* 62 F.3d 80, 86 (2d Cir.1995). Based upon thorough review of the record associated with the disciplinary proceeding, I am unable to discern any basis from which a reasonable factfinder could conclude that CHO Harvey was biased or partial. Simply stated, plaintiff's bald allegation of bias, representing little more

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)

(Cite as: 2008 WL 4371766 (N.D.N.Y.))

than sheer speculation on his part, is insufficient to overcome the presumption of impartiality. *See Lebron v. Artus,* No. 06-CV-0532, 2008 WL 111194, at *15 (W.D.N.Y. Jan. 09, 2008).

In sum, because the record firmly discloses that plaintiff was afforded all of the process to which he was entitled prior to the imposition of disciplinary SHU confinement, I recommend dismissal of plaintiff's due process claim against defendants Harvey, Jones and Selsky.[FN15]

> **FN15.** In light of this determination, I find it unnecessary to address defendants' alternative argument, to the effect that plaintiff's section 1983 surrounding the disciplinary proceeding are precluded under *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364 (1994) and *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584 (1997). As was previous noted, however, plaintiff may not necessarily be precluded from pursuing section 1983 claims surrounding his disciplinary proceeding under *Edwards* and *Heck,* despite not having first secured reversal of that determination, provided that he agrees to forego any potential habeas corpus claim challenging the loss of good time credits which resulted from the recommendation made following that hearing. *See Peralta,* 467 F.3d at 104-05.

F. *Equal Protection*

In his amended complaint, plaintiff incants that he was denied equal protection by the defendants. Neither plaintiff's amended complaint nor his motion papers, however, articulates the basis for that claim.

The Equal Protection Clause directs state actors to treat similarly situated people alike. *See City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985). To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing, *inter alia, McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct.

1756, 1767 (1987)). The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (quoting *Shaw v. Murphy,* 532 U.S. 223, 225, 121 S.Ct. 1475 (2001) (internal quotation marks omitted)).

**\*14** Because plaintiff has offered no proof that he was the subject of an improper classification, nor has he adduced any evidence of either invidious motivation for defendants' actions or discriminatory motivation, I recommend summary dismissal of plaintiff's equal protection claim.

G. *Conspiracy*

Also embedded within plaintiff's complaint, when liberally construed, is a claim that the defendants conspired to deprive him of his civil rights.

In a doctrine rooted in the conspiracy provision of section one of the Sherman Antitrust Act, 15 U.S.C. § 1, and which, although developed in the context of business entities, since inception has been expanded to apply to business corporations and public entities as well, the intra-corporate conspiracy doctrine provides that with exceptions not now presented, an entity cannot conspire with one or more of its employees, acting within the scope of employment, and thus a conspiracy claim conceptually will not lie in such circumstances. *See, e.g., Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 75-76 (E.D.N.Y.2002); *Griffin-Nolan v. Providence Washington Ins. Co.,* No. 5:05CV1453, 2005 WL 1460424, at *10-11 (N.D.N.Y. June 20, 2005) (Scullin, C.J.). In this instance plaintiff alleges that the various defendants named conspired to deprive him of his civil rights. Since those conspiracy claims are asserted against officers, agents or employees of the DOCS, each acting within the scope of his or her employment, they are precluded by virtue of the intracorporate conspiracy doctrine. *See Little v. City of New York,* 487 F.Supp.2d 426, 441-42 (S.D.N.Y.2007) (citations omitted); *Lewis v. Goord,* No. 9:06-CV-504, 2008 WL 902179, at *4 (N.D.N.Y. Mar. 31, 2008) (Scullin, S.J.).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)

(Cite as: 2008 WL 4371766 (N.D.N.Y.))

## IV. *SUMMARY AND RECOMMENDATION*

The plaintiff in this action has advanced an array of constitutional claims arising out of an incident occurring on June 24, 2005, alleging the use of excessive force by prison officials, the failure to adequately address the injuries resulting from the incident, and due process deprivations associated with the disciplinary proceedings which ensued. Having carefully reviewed plaintiff's amended complaint, I conclude that no reasonable factfinder could credit plaintiff's version of the incident, and determine that defendants did not violate his rights by exerting unnecessary force against him, in violation of the Eighth Amendment. Similarly, I find that plaintiff has not alleged or proven the existence of a serious medical need associated with injuries stemming from the incident, nor has he offered evidence tending to establish the defendants' subjective indifference to his medical needs, and therefore cannot support a medical indifference claim under the Eighth Amendment. Lastly, I find that while plaintiff was deprived of a liberty interest by virtue of the disciplinary proceedings against him, he received the requisite procedural due process guaranteed under the Fourteenth Amendment during the course of that deprivation. Accordingly, finding no other cognizable constitutional claim asserted in his amended complaint and supported by evidence in the record now before the court, I conclude that no reasonable factfinder could find liability on the part of one or more of the named defendants on any of plaintiff's claims, and therefore recommend dismissal of his complaint in its entirety as a matter of law.[FN16] Accordingly, it is hereby

> FN16. In light of this determination, I find it unnecessary to address the additional issue of qualified immunity, also raised by the defendants in support of their motion. *See Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151 (2001).

**\*15** RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 50) be GRANTED, and plaintiff's complaint in this action be DISMISSED its entirety; and is further

RECOMMENDED that in light of this determination, plaintiff's motion for summary judgment (Dkt. No. 56) be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2008.

Tapp v. Tougas
Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 4371762 (N.D.N.Y.)

(Cite as: 2008 WL 4371762 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Sean TAPP, Plaintiff,
v.
R. TOUGAS, C.O.; C.O. Wilson; M.E. B.
Santini-Correan; C.O. J. Rando; Sgt. Michael; C.O.
Sharrow; Mr. Harvey, Hearing Officer; Donald Selsky;
and Ms. Jones, Defendants.
No. 9:05-CV-1479.

Sept. 18, 2008.

Sean Tapp, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Steven H. Schwartz, Esq., Assistant Attorney
General, Albany, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Hon. NORMAN A. MORDUE, Chief Judge.

*1 Plaintiff, formerly an inmate in the custody of New
York State Department of Corrections, brings this civil
rights action pursuant to 42 U.S.C. § 1983, claiming in his
amended complaint (Dkt. No. 19) that he was assaulted by
corrections officers, denied adequate medical care for
injuries sustained during the course of the altercation, and
subjected to a lengthy period of disciplinary special
housing unit ("SHU") confinement as a result of the
incident without having been afforded procedural due
process.

Defendants move (Dkt. No. 50) for summary
judgment. Plaintiff cross-moves (Dkt. No. 56) for
summary judgment. The motions were referred to United
States Magistrate Judge David E. Peebles pursuant to 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c). Magistrate
Judge Peebles has issued a thorough Report and
Recommendation recommending that this Court grant
defendants' motion, deny plaintiff's motion, and dismiss
the action.

Plaintiff interposes specific objections to numerous
aspects of Magistrate Judge Peebles' Report and
Recommendation. Pursuant to 28 U.S.C. § 636(b)(1)(C),
this Court reviews de novo those parts of a report and
recommendation to which a party specifically objects.
Where only general objections are filed, the Court reviews
for clear error. See Brown v. Peters, 1997 WL
599355,*2-* 3 (N.D.N.Y.), af'd without op., 175 F.3d
1007 (2d Cir.1999). Failure to object to any portion of a
report and recommendation waives further judicial review
of the matters therein. See Roldan v. Racette, 984 F.2d 85,
89 (2d Cir.1993).

The Court adopts all factual and legal recitations in
the Report and Recommendation. The Court has
conducted de novo review of all issues to which plaintiff
interposes objections, and adopts Magistrate Judge
Peebles' analysis and recommendation with respect to all
issues except the recommendation that summary judgment
be granted dismissing the excessive force claim against
defendants Tougas, Wilson, Rando, Michael, and
Sharrow.

The Court adopts Magistrate Judge Peebles' recitation
of the law and facts with respect to the excessive force
claim. The Court agrees with his observation that the
question of whether to grant summary judgment to
defendants on this issue is a close one; however, in the
Court's view, plaintiff's testimony at his deposition and the
disciplinary hearing, and the supporting testimony of his
inmate witnesses at the disciplinary hearing, are sufficient
to raise questions of fact on this claim.[FN1]

FN1. Given his recommendation of dismissal,
Magistrate Judge Peebles did not address
whether plaintiff's excessive force claim might be
barred under the rule in Edwards v. Balisok that
a prisoner's section 1983 claim is not cognizable
where, if successful, it would necessarily
implicate the invalidity of a disciplinary
determination affecting the length of his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371762 (N.D.N.Y.)

(Cite as: 2008 WL 4371762 (N.D.N.Y.))

confinement. 520 U.S. 641, 645-48 (1997). It is not clear on this record that the *Edwards* rule would preclude plaintiff in the instant case from proceeding on his section 1983 excessive force claim, because it is not clear that a jury determination that defendants used excessive force in subduing plaintiff would necessarily implicate the invalidity of the disciplinary determination that he was guilty of violent conduct, creating a disturbance, an assault on staff, refusing a direct order, and refusing a search and frisk. *See, e.g., Sales v. Barizone,* 2004 WL 2781752, *13-14 (S.D.N.Y. Dec. 2, 2004).* Further, plaintiff's excessive force claim is based in part on events occurring after the events that were the subject of the disciplinary charge. Specifically, plaintiff and other inmates allege that the corrections officers continued to beat plaintiff after they had subdued him, even after they had placed him in handcuffs and leg irons. A finding in plaintiff's favor on these allegations would not affect the validity of the disciplinary determination. Moreover, the record does not clearly establish plaintiff's present custodial status on his New York sentence; if he has served his full sentence, *habeas corpus* is no longer an available remedy, and the *Edwards* rule would not bar the section 1983 claim. *See Huang v. Johnson,* 251 F.3d 65, 74-75 (2d Cir.2001). Accordingly, the *Edwards* rule does not warrant summary judgment in defendants' favor.

The Court also rules that the application of the doctrine of qualified immunity does not warrant dismissal of the excessive force claims against defendants Tougas, Wilson, Rando, Michael, and Sharrow. Accepting plaintiff's allegations as true for purposes of this motion, these defendants could not reasonably have believed their actions were consistent with plaintiff's Eighth Amendment rights. *See Anderson v. Creighton,* 483 U.S. 635, 639-40 (1987).

It is therefore

**\*2** ORDERED that defendants' motion (Dkt. No. 50)

for summary judgment is denied with respect to plaintiff's excessive force claim against defendants Tougas, Wilson, Rando, Michael, and Sharrow, and otherwise granted; and it is further

ORDERED that plaintiff's cross motion (Dkt. No. 56) for summary judgment is denied in its entirety; and it is further

ORDERED that the case will proceed to trial solely on the issue of excessive force; and it is further

ORDERED that the Report and Recommendation is rejected insofar as it recommends summary judgment dismissing plaintiff's claim of excessive force, and is otherwise accepted and adopted in all respects.

IT IS SO ORDERED.

N.D.N.Y.,2008.

Tapp v. Tougas
Not Reported in F.Supp.2d, 2008 WL 4371762 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)

(Cite as: 2007 WL 2071743 (N.D.N.Y.))

C

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Alvin PETERSON, Plaintiff,
v.
Sheryl MILLER, Nurse Practitioner; and Nurse Admin.
Tousignant, Nurse Administrator, Defendants.
No. 9:04-CV-797.

July 13, 2007.
Alvin Peterson, East Elmhurst, NY, pro se.

Stephen M. Kerwin, Esq, Michael G. McCartin, Esq., Assts. Attorney General, of Counsel, Hon. Eliot Spitzer, Hon. Andrew M. Cuomo, Attorney General of the State of New York, Department of Law, Albany, NY, for Defendants.

### DECISION and ORDER

DAVID N. HURD, United States District Judge.

*1 Plaintiff brought this civil rights action pursuant to 42 U.S.C. § 1983. By Report-Recommendation dated April 27, 2007, the Honorable David E. Peebles, United States Magistrate Judge, recommended that the defendants' motion for summary judgment be granted and that plaintiff's complaint be dismissed in all respects. No objections to the Report-Recommendation have been filed.

Based upon a careful review of the entire file and the recommendations of Magistrate Judge Treece, the Report-Recommendation is accepted and adopted in whole. See 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. The defendants' motion for summary judgment is GRANTED; and

2. Plaintiff's complaint is DISMISSED in all respects.

IT IS SO ORDERED.

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, U.S. Magistrate Judge.

Plaintiff Alvin Peterson, a former New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 complaining of the deprivation of his constitutional rights. Plaintiff asserts that while incarcerated, he was denied adequate medical treatment by the defendants, both of whom were nurses at the facility in which he was confined at the relevant times, for kidney pain and a foot rash, and denied the migraine medication of his choice, in violation of his Eighth Amendment right to be free of cruel and unusual punishment.

Currently pending before the court is a motion by the defendants for summary judgment dismissing plaintiff's complaint, both on the merits and based upon qualified immunity. Having carefully considered the record in light of defendants' motion and finding that it presents no genuine issue of material fact for trial, I recommend that defendants' motion, which plaintiff has not opposed, be granted.

### I. BACKGROUND[FN1]

FN1. In light of the procedural posture of this case, the following facts are presented in a light most favorable to the plaintiff, the non-moving party. See *Samuels v. Mockry,* 77 F.3d 34, 35 (2d Cir.1996). In this instance, the court's findings of fact are also informed by defendants' statement pursuant to Northern District of New York Local Rule 7.1(a)(3), the contents of which are assumed to be true as a result of plaintiff's failure to oppose defendants' motion. *See* pp. 9-11, *post.*

At the times relevant to his complaint, plaintiff was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"), and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)

(Cite as: 2007 WL 2071743 (N.D.N.Y.))

confined within the Clinton Correctional Facility ("Clinton"), located in Dannemora, New York. Plaintiff was released from DOCS custody on July 7, 2004.

While at Clinton, plaintiff was treated over time for a variety of medical ailments including, *inter alia,* complaints of pain in the area of his kidney, a foot rash condition which has on occasion been described as athlete's foot, and migraine headaches. Among the medical personnel at Clinton who have acted as plaintiff's care providers are defendants Sheryl Miller, a nurse practitioner, and Amy Tousignant, who at the relevant times served as a nurse administrator. [FN2]

> [FN2.] Defendant Tousignant, a registered nurse, is currently employed by the DOCS as Supervisor of Utilization Management and Quality Improvement. Tousignant Decl. (Dkt. No. 25) ¶ 1.

A. *Kidney Pain*

According to his medical records, plaintiff complained to prison medical personnel of pain, the origin of which is not disclosed, in his right flank or kidney area on eleven separate occasions between July 16, 2001 and October 28, 2003. Miller Decl. (Dkt. No. 25) ¶ 3. On November 30, 2001, plaintiff lodged his fourth such complaint, describing his symptoms as including a "dull pain." Miller Decl. (Dkt. No. 25) Exh. A at p. 128. Plaintiff was seen by a prison doctor several times for evaluation of his complaints of kidney pain, and was provided with Motrin to address his discomfort. *See, e.g., id.* at pp. 128, 133, 144, 171. X-rays taken in or about July of 2002 were reviewed by a consulting radiologist, Dr. M. Browman, M.D., D.A.B.R., who concluded that plaintiff had "no suspicious calcifications" and a normal bowel gas pattern. *Id.* at p. 92. Plaintiff's x-rays were characterized by Dr. Browman as "normal abdominal radiographs." *Id.*

B. *Foot Rash*

**\*2** The record, including plaintiff's complaint, reveals that Peterson suffered from a chronic foot rash condition over at least the last two and one-half years of his incarceration as a New York State inmate. *See, e.g.,* Complaint (Dkt. No. 1) ¶ 7. Early on, plaintiff's foot rash

condition was treated principally with Hydrocortisone cream, administered on a minimum of fifteen occasions between August 9, 2001 and January 30, 2004. Miller Decl. (Dkt. No. 25) ¶ 8 and Exh. A at pp. 138-40, 155, 158. Plaintiff was also provided with Vitamin E lotion for his condition at least eight times during 2003 and 2004. *See, e.g., id.,* Exh. A at pp. 160-62, 166.

In addition to these nonprescription remedies, plaintiff was prescribed at least four different types of medication to help combat his foot condition. Miller Decl. (Dkt. No. 25) ¶ 9. On July 5, 2002, defendant Miller initially prescribed Selenium Sulfide (2.5% strength), a prescription medication used to treat tinea versicolor, a type of fungal infection of the skin. *Id.* ¶ 9. Plaintiff reported on August 29, 2002 that the Selenium Sulfide had completely relieved his itch, although he continued to experience a rash on his feet. Miller Decl. (Dkt. No. 25) Exh. A at p. 144. Three other prescription medications were subsequently administered in an effort to control plaintiff's foot condition, including 1) Temovate, a medication designed to relieve skin itching and inflammation of moderate to severe degrees; 2) Itraconazole, a drug utilized to combat fungal infections including aspergillosis, blastomycosis, histoplasmosis, and fungal infection localized to the toenails and fingernails (onychomycosis); and 3) Lamisil, another anti-fungal prescription medication used to combat foot conditions. *Id.* ¶ 10 and Exh. A at pp. 186, 193.

C. *Migraine Headache Medication*

The third element of plaintiff's deliberate medical indifference claim relates to the discontinuance of Fioricet, described as a strong, non-narcotic pain reliever used for relief of tension headache symptoms caused by muscle contractions in the head, neck and shoulder area. Miller Decl. (Dkt. No. 25) ¶ 12. The drug Fioricet contains butalbital, a sedative barbiturate, and acetaminophen, a non-aspirin pain reliever, as well as caffeine. *Id.*

Prison officials, including defendant Miller, prescribed Fioricet to the plaintiff on several occasions prior to March 29, 2004. *See, e.g.,* Miller Decl. (Dkt. No. 25) Exh. A at pp. 146, 153, 186. After learning on March 29, 2004 that plaintiff had accumulated four tablets of Fioricet on his person, while asking medical personnel for yet another two tablets of the same medication, and, upon

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)

(Cite as: 2007 WL 2071743 (N.D.N.Y.))

further investigation, learning that another inmate locked in the same area as plaintiff had thirty Fioricet tablets stockpiled in his cell, security staff at Clinton requested that medical personnel discontinue providing the drug to the plaintiff. Miller Decl. (Dkt. No. 25) ¶ 13. Defendant Miller and other medical personnel complied, substituting instead a prescription for Motrin 600 mg, a pain reliever much more potent than the over-the-counter medication known by the same name, to address plaintiff's headaches. *Id.* ¶ 14 and Exh. A. at p. 191.

**\*3** A month later, on May 4, 2004, defendant Miller prescribed Naproxen, a non-steroidal anti-inflammatory drug utilized for the management of moderate pain, fever, and inflammation through reduction of levels of prostaglandins, for plaintiff's migraine headaches. Miller Decl. (Dkt. No. 25) ¶ 15. Following complaints by the plaintiff that the Naproxen was not working well to control his migraine headaches, defendant Miller replaced that drug with Inderal, a medication specifically designed for the treatment of migraine headaches, among other ailments. *Id.* ¶ 16 and Exh. A at p. 193. Plaintiff continued on the Inderal migraine medication until shortly before leaving DOCS custody. *Id.* at ¶ 16 and Exh. A at p. 197.

One of plaintiff's complaints concerns the failure of prison officials to resume his Fioricet as recommended by a cardiac consultant following its discontinuance. That portion of plaintiff's complaint relates to a consultation which occurred on June 2, 2004, at defendant Miller's recommendation, resulting in a report that the cardiologist "would [discontinue] Inderal & resume Norvasc 5 QD & Fioricet." <u>FN3</u> Miller Decl. (Dkt. No. 25) Exh. A at p. 87. That recommendation was not followed in light of the finding of security personnel at the facility regarding plaintiff's "saving" of Fioricet tablets for later use and suspected conveyance of Fioricet tablets to a fellow inmate. Miller Decl. (Dkt. No. 25) ¶ 18 and Exh. A at p. 187.

FN3. Norvasc is a medication used to treat high blood pressure and angina. Miller Decl. (Dkt. No. 25) ¶ 17.

II. *PROCEDURAL HISTORY*

After exhausting available administrative remedies, plaintiff commenced this action on July 8, 2004. Dkt. No. 1. Plaintiff's complaint asserts three separate causes of action, all of which relate to defendants' alleged failure to provide him with proper medical treatment for his various medical conditions. Named as defendants in the action are Nurse Practitioner Sheryl Miller, and Nurse Administrator Amy Tousignant. *Id.* ¶ 3. As relief, plaintiff seeks recovery of $750,000 in compensatory damages and $1,500,000 in punitive damages. *Id.*

On March 27, 2006, following the close of discovery, defendants moved seeking the entry of summary judgment dismissing plaintiff's complaint. Dkt. No. 25. In their motion, defendants argue that 1) plaintiff's deliberate indifference claim is legally deficient, based both on the lack of a showing that he suffered from a serious medical condition and his failure to establish that either of the defendants was deliberately indifferent to any such condition; 2) plaintiff has failed to demonstrate the personal involvement of defendant Tousignant in the matters complained of; and 3) in any event, both defendants are entitled to qualified immunity. *Id.* Defendants' motion, which plaintiff has not opposed, is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).<u>FN4</u>

FN4. A prior action brought by the plaintiff in this court pursuant to 42 U.S.C. § 1983 against various DOCS employees at Clinton, *Peterson v. Lacy, at al.,* 9:03-CV-1226 (DNH/RFT) (N.D.N.Y., filed 2003), was dismissed, on recommendation of United States Magistrate Judge Randolph F. Treece, on February 27, 2006, based upon plaintiff's failure to comply with the requirement that he notify the court of any change of address. 9:03-CV-1226, Dkt. Nos. 52, 54; *see also* Northern District of New York Local Rules 10.1(b)(2) and 41.2(b). In this case, plaintiff similarly has failed to notify the court of any change of address since his apparent release from DOCS custody. Based upon information received in connection with 9:03-CV-1226, the court has nonetheless adjusted its records to reflect a current address for the plaintiff in East

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)

(Cite as: 2007 WL 2071743 (N.D.N.Y.))

Elmhurst, New York. It appears from correspondence forwarded in the *Peterson v. Lacy* case to the plaintiff at that address but returned as undeliverable, *see* 9:03-CV-1226, Dkt. No. 63, however, that plaintiff may have again moved without notifying the court and defendants' counsel of his change of circumstances, thereby making it impossible for the court to communicate with him regarding his action and, if true, providing an independent basis for dismissal of his complaint. *See* Northern District of New York Local Rules 10.1(b)(2) and 41.2(b).

### III. *DISCUSSION*

#### A. *Failure to Respond*

**\*4** The first issue to be addressed is the legal significance, if any, of plaintiff's failure to oppose defendants' summary judgment motion, and specifically whether that failure automatically entitles defendants to dismissal based upon their motion.

This court's rules provide that

[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown. N.D.N.Y.L.R. 7.1(b)(3).

While recognizing that *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, *see Jemzura v. Public Serv. Comm'n, 961 F.Supp. 406, 415 (N.D.N .Y.1997)* (McAvoy, C.J.), courts in this district have found it appropriate to grant a dispositive motion pursuant to Local Rule 7.1(b)(3) based upon a pro se plaintiff's failure to respond. *Robinson v. Delgado,* No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998)* (Pooler, D.J. & Hurd, M.J.); *Cotto v. Senkowski,* No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997)* (Pooler, D.J. & Hurd,

M.J.); *Wilmer v. Torian, 980 F.Supp. 106, 106-07 (N.D.N.Y.1997)* (Pooler, D.J. & Hurd, M.J.). Before such an unopposed motion can be granted, however, the court must review the motion to determine whether it is facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc., 140 F.Supp.2d 229, 231-32 (N.D.N.Y.2001)* (Scullin, C.J.); *Leach v. Dufrain, 103 F.Supp.2d 542, 545-46 (N.D.N.Y.2000)* (Kahn, J.).

While a party's failure to properly oppose an adversary's dispositive motion thus does not assure that the motion, however lacking in merit, will be granted, that failure is not without consequences. By opting not to submit papers in opposition to the motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statement unchallenged. Courts in this district have uniformly enforced Local Rule 7.1(a)(3) and its predecessor, Local Rule 7.1(f), by deeming facts set forth in a statement of material facts not in dispute to have been admitted based upon an opposing party's failure to properly respond to that statement.[FN5] *See, e.g., Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (Aug. 22, 2000)* (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr., 214 F.3d 275, 292 (2d Cir.2000)* (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). I recommend that the court follow this well-established practice and, notwithstanding plaintiff's *pro se* status, accept defendants' assertion of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, in light of plaintiff's failure to respond to that statement, when reviewing defendants' motion for facial sufficiency.

> FN5. Local Rule 7.1(a)(3) provides that "any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." *See* N.D.N.Y.L.R. 7.1(a)(3) (emphasis omitted).

#### B. *Summary Judgment Standard*

**\*5** Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no

Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)

(Cite as: 2007 WL 2071743 (N.D.N.Y.))

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material," for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing Anderson). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (stating that summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

C. *Eighth Amendment Claims*

Plaintiff asserts three causes of action in his complaint. First, plaintiff avers that defendants violated his Eighth Amendment rights when "they failed to provide adequate medical attention and treatment for two and one half years for his complaints of pain in his left kidney area,

and rashes on his feet." Complaint (Dkt. No. 1) ¶ 7. Plaintiff next contends that defendants violated his Eighth Amendment rights by discontinuing the Fioricet migraine medication and failing to prescribe a beneficial medication. *Id.* Finally, the plaintiff claims that the defendants violated his Eighth Amendment rights by disregarding the order of the cardiologist to re-prescribe the Fioricet migraine medication. *Id.*

*\*6* Plaintiff's medical indifference claims are properly analyzed against the backdrop of a body of well-established Eighth Amendment jurisprudence. The Eighth Amendment prohibits the imposition of cruel and unusual punishments, including those that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102-03, 97 S.Ct. 285, 290-91 (1976) (quotations omitted). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison officials have violated the Eighth Amendment by their failure to provide adequate medical care must satisfy both an objective and a subjective requirement-the medical need must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, D.J. and Homer, M.J.). Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713909, at * 2 (same).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)

(Cite as: 2007 WL 2071743 (N.D.N.Y.))

1. *Serious Medical Need*

To establish a constitutionally cognizable claim of deliberate medical indifference under the Eighth Amendment, a plaintiff must initially allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious.' " *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance* ). Relevant factors in making this determination include injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment,' " a condition that " 'significantly affects' a prisoner's daily activities, or causes " 'chronic and substantial pain.' " *Chance,* 143 F.3d at 701 (citations omitted); *LaFave v. Clinton County,* No. 00CV744, 2002 WL 31309244, at *2-3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.), *adopted,* No. 00-CV-744, Dkt. No. 27 (N.D.N.Y. June 20, 2002) (Hurd, D.J.).

a. *Kidney Pain*

**\*7** According to his medical records, plaintiff complained to prison officials of pain in his kidney area over a period of two and one half years. Those records show that Peterson communicated those complaints to the medical staff, and as a result was seen on eleven occasions. Miller Decl. (Dkt. No. 25) ¶¶ 4, 6. Plaintiff described this pain as "dull pain." Miller Decl. (Dkt. No. 25) Exh. A at p. 128.

Having carefully reviewed plaintiff's medical records, I find that no reasonable factfinder could conclude that his complaints of back or kidney pain arose to a level of constitutional significance, demonstrating the requisite level of "death, degeneration, or extreme pain."

*Hathaway,* 37 F.3d at 66; *see also Salaam v. Adams,* No. 03-CV-0517, 2006 WL 2827687, at * 10 (N.D.N.Y. Sept. 29, 2006) (Kahn, D.J. and Lowe, M.J.) (back pain that requires treatment with pain relievers and physical therapy was not a sufficiently serious medical need for purposes of the Eighth Amendment). Since at no time did plaintiff describe his pain in terms which would equate to "urgent," "debilitating," or "extreme", no reasonable factfinder could conclude that the condition constituted a sufficiently serious medical need to trigger the protections of the Eighth Amendment.

b. *Foot Rash*

Plaintiff alleges, and his medical records bear out, that over a lengthy period of time he registered multiple complaints regarding a foot rash condition. Those records, however, fail to suggest that the rash increased in severity over time or that because of it, plaintiff suffered from a condition capable of producing "death, degeneration, or extreme pain." *Hathaway,* 37 F.3d at 66. Indeed, plaintiff's records reflect that while the rash persisted, the itch associated with it was relieved by medication provided to the plaintiff. Miller Decl. (Dkt. No. 25) ¶ 9 and Exh. A at p. 144. Under these circumstances, once again, no reasonable factfinder could conclude that during the relevant period, plaintiff's foot condition rose to a level of constitutional significance. *See Smith v. Nash,* No. 04-CV-0074, 2006 WL 2806464, at *4-5 (N.D.N.Y. Sept. 28, 2006) (Kahn, D.J. and Homer, M.J.) (arthritis pain for which plaintiff was being treated with medication, and of which plaintiff did not complain of any pain, was not a sufficiently serious medical need).

c. *Migraine Headaches*

Plaintiff's complaint also claims a failure on the part of the defendants to properly medicate and otherwise treat his migraine headaches, causing him to needlessly suffer. Neither plaintiff's complaint nor his medical records are particularly informative as to the specifics regarding his migraine headaches, including their severity, duration, and degree. At most, plaintiff's medical records reveal that in March of 2004, plaintiff noted he "generally" suffered from headaches twice a week, and in April of 2004, his headaches were "bad" and generally started late at night. Miller Decl. (Dkt. No. 25) Exh. A at pp. 186, 189. While

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)

(Cite as: 2007 WL 2071743 (N.D.N.Y.))

the court is therefore disadvantaged on this score, this particular issue is not appropriately resolved on summary judgment, since such a condition has, on occasion, been found by other courts to represent a sufficiently serious potential medical need as to survive a motion for summary judgment attacking the sufficiency of a plaintiff's showing in this regard. [FN6] *See, e.g., Moriarity v. Neubould,* No. 02CV1662, 2004 WL 288807, at *2 n. 2 (D.Conn. Feb. 10, 2004) (suggesting that plaintiff's migraine headaches constituted a sufficiently serious condition to warrant Eighth Amendment protection since they can be "extremely painful and debilitating"); *O'Bryan v. Sedgwick County,* No. 98-3308, 2000 WL 882516, at *5 (D. Kan. June 12, 2000) (assuming plaintiff's migraine headaches, for which he was prescribed medication, comprised a sufficiently serious medical need under the Eighth Amendment); *Medcalf v. State of Kansas,* 626 F.Supp. 1179, 1183 (D.Kan.1986) (finding that deceased prisoner, who consistently complained of severe headaches, nausea and vomiting, exhibited sufficiently severe medical symptoms for the court to conclude that administrator of prisoner's estate had stated a claim for relief under section 1983 and the Eighth Amendment).

> FN6. Defendants have not argued that plaintiff's migraine headaches do not constitute a sufficiently serious medical condition to warrant the Eighth Amendment protections, and I have therefore not assumed otherwise.

2. *Deliberate Indifference*

**\*8** Deliberate indifference, in a constitutional sense, exists if an official knows of and disregards an excessive risk to inmate health or safety; the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer*); *Waldo,* 1998 WL 713809, at *2 (same).

It is well-established that mere disagreement with a prescribed course of treatment, or even a claim that negligence or medical malpractice has occurred, does not provide a basis to find a violation of the Eighth Amendment. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 291-92; *Chance,* 143 F.3d at 703; *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.),

*cert. denied,* 506 U.S. 1040, 113 S.Ct. 828 (1992). The question of what diagnostic techniques and treatments should be administered to an inmate is a "classic example of a matter for medical judgment"; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703; *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998); *see also Perez v. Hawk,* 302 F.Supp.2d 9, 21 (E.D.N.Y.2004) (noting that "treatment of a prisoner's medication condition generally defeats a claim of deliberate indifference") (quotations omitted).

a. *Kidney Pain*

Plaintiff's medical records show that he complained of pain in the area of his kidney eleven times between July 16, 2001 and October 28, 2003. Miller Decl. (Dkt. No. 25) ¶ 3. Defendant was given Motrin to alleviate his discomfort, *see, e.g., id.,* Exh. A at pp. 128, 133, 144, 171, and was seen by a medical doctor on several of those occasions. Miller Decl. (Dkt. No. 25) ¶ 3 and Exh. A at pp. 133, 144, 171. As a general matter, the record fails to disclose any failure on the part of medical officials at Clinton to respond to his pain complaints.

Focusing on the involvement of defendant Miller, the record supports a finding that she was made aware of the plaintiff's kidney pain through plaintiff's complaints to her on July 5, 2002-a fact which she readily acknowledges. On that one and only occasion when defendant Miller saw the plaintiff regarding his pain complaints, she arranged for an outside radiologist to review x-rays of the plaintiff's back. Miller Decl. (Dkt. No. 25) ¶¶ 4, 5. Those x-rays were determined to be negative. *Id.* at ¶ 5. After the x-rays were taken, defendant Miller had no contact with the plaintiff regarding the condition. The record therefore fails to disclose any evidence from which a reasonable factfinder could conclude that defendant Miller was aware of but deliberately indifferent to plaintiff's kidney condition.

While the record discloses at least some minimal involvement on the part of defendant Miller in the treatment of plaintiff's kidney pain, there is no evidence from the record currently before the court of any involvement on the part of defendant Tousignant in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)

(Cite as: 2007 WL 2071743 (N.D.N.Y.))

connection with care or treatment for that complaint. Personal involvement of a defendant in an alleged constitutional deprivation is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**\*9** Although plaintiff's complaint is silent on this issue, it may be that plaintiff asserts claims against defendant Tousignant in her administrative capacity as a nurse administrator. A supervisor, however, cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986). Even under this test the record fails to disclose any basis for finding defendant Tousignant liable with regard to plaintiff's kidney condition. Accordingly, I recommend that the portion of plaintiff's deliberate indifference claim against defendant Tousignant, related to the treatment of his kidney pain, be dismissed on this basis.

b. *Foot Rash*

The record reflects that both defendants were subjectively aware of plaintiff's foot rash. Plaintiff was seen on February 11, 2004 by defendant Tousignant, complaining of a rash on his feet. Tousignant Decl. (Dkt. No. 25) ¶ 4; Miller Decl. (Dkt. No. 25) Exh. A at p. 180. Defendant Tousignant reports that on that date she discussed with another nurse at the facility the care and treatment of plaintiff's foot condition, and was of the opinion that the treatment was appropriate. Tousignant Dec. (Dkt. No. 25) ¶ 4. While defendant Tousignant was aware of the plaintiff's foot rash condition, there was no evidence in the record demonstrating her deliberate indifference to that condition. I therefore recommend dismissal of plaintiff's foot rash indifference claim as against defendant Tousignant.

The record also reflects that defendant Miller was aware of, and indeed had a more active role in caring for, plaintiff's foot condition. The medical records associated with defendant Miller's care and treatment for that condition reflect significant efforts on her part, through administering of various prescription and non-prescription medications, to control plaintiff's condition and to relieve the itch associated with it. While plaintiff's quarrel appears to stem from his frustration over the inability to cure his rash condition, this without more fails to establish a constitutional violation. *See, e.g., Armour v. Herman,* No. 1:05CV295, 2005 WL 2977761, at \*3 (N.D.Ind. Nov. 4, 2005) ("The Eighth Amendment does not require medical success ...."); *Ramos v. Artuz,* No. 00 Civ. 0149, 2003 WL 342347, at \*9 (S.D.N.Y. Feb. 14, 2003) (indicating that an unsuccessful course of treatment does not support a finding of deliberate indifference); *see also Moolenaar v. Champagne,* No. 03-CV-1464, 2006 WL 2795339, at \*7 (N.D.N.Y. Sept. 26, 2006) (Kahn, D.J. and Peebles, M.J.) (plaintiff's complaints of pain resulting from degenerative disc disease, a chronic ailment sustained by many individuals and treated with exercise, pain medication, and physical therapy, with which plaintiff was treated, did not give rise to a valid deliberate indifference claim). Based upon my review of the records associated with that defendant Miller's treatment, I am unable to discern any basis upon which a reasonable factfinder could conclude that defendant Miller was inattentive and deliberately indifferent to plaintiff's foot rash condition.

c. *Migraine Headaches*

The treatment administered by medical personnel with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)

(Cite as: 2007 WL 2071743 (N.D.N.Y.))

respect to plaintiff's migraines similarly belies any claim of deliberate indifference to his medical needs. It is true that both defendants were aware of plaintiff's prescription of Fioricet and his desire to continue with that medication. *See, e.g.,* Miller Decl. (Dkt. No. 25) ¶ 13; Tousignant Decl. (Dkt. No. 25) ¶ 5. Plaintiff's complaint in this regard stems from the failure to continue prescribing his pain medication of choice; that decision, however, was not made by the defendants, who instead were merely following directives from security personnel at the facility to discontinue the prescription drug in light of plaintiff's stockpiling and at least the suspected potential for having sold or given the drugs to fellow inmates. Such legitimate security concerns can provide a basis for discontinuing or denying a treatment, especially when, as in this case, adequate alternative measures are taken. *See, e.g., Kosilek v. Maloney,* 221 F.Supp.2d 156, 161 (D.Mass.2002) (stating that the duty of prison officials to protect the safety of both inmates and prison staff "is a factor that may properly be considered in prescribing medical care"); *Hawley v. Evans,* 716 F.Supp. 601, 604 (N.D.Ga.1989) (noting that as long as prison system abides by reasonable medical practices, whether to permit a prisoner to be treated with experimental drugs is within the discretion of the state officials, as "jail authorities have a legitimate security concern in limiting the exposure of inmates to drugs").

**\*10** In this instance, alternative efforts were taken by prison medical officials to address plaintiff's pain complaints. After termination of the Fioricet in or about late March, 2004, plaintiff was written a prescription for Motrin 600 mg, a strong pain reliever. Miller Decl. (Dkt. No. 25) ¶ 14 and Exh. A at p. 191. That was followed with a prescription on May 4, 2004 for Naproxen, another non-steroidal anti-inflammatory drug. Following a determination that the Naproxen was not working well enough to treat plaintiff's headaches, defendant Miller prescribed Inderal, a medication specifically designed for such purposes. Miller Decl. (Dkt. No. 25) ¶ 16 and Exh. A at p. 193.

In sum, plaintiff's medical records reflect that his migraine headaches were treated with three different prescription pain reliever medications. "[T]reatment of a prisoner's medical condition 'generally defeats a claim of deliberate indifference.' " *Perez,* 302 F.Supp.2d at 21

(quoting *Wells v. Franzen,* 777 F.2d 1258, 1264 (7th Cir.1985)). In this instance plaintiff's complaint represents nothing more than a disagreement with prison officials' choice of treatments, a matter which does not arise to a level of medical deliberate indifference. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 291-92; *see also Chance,* 143 F.3d at 703. Accordingly, I find that plaintiff has not established medical deliberate indifference on the part of either of the defendants to his migraine medical condition.[FN7]

> **FN7.** The evidence reflects that defendant Tousignant did have at least minimal awareness of an involvement in the decision to discontinue his Fioricet medication and of plaintiff's quarrel with that determination. *See e.g.,* Tousignant Decl. (Dkt. No. 25) ¶ 5. I therefore recommend against dismissal of plaintiff's migraine headache claim as against defendant Tousignant on the independent basis of lack of personal involvement.

## IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's complaint claims deliberate indifference on the part of defendants to three separate conditions, including pain in the region of his kidney, a foot rash, and migraine headaches. Because the first two of those three conditions are insufficiently serious, either separately or in combination, to trigger the Eighth Amendment's cruel and unusual punishment protections, I recommend dismissal of those claims on this basis. Additionally, having carefully reviewed the available records associated with plaintiff's medical treatment while an inmate at Clinton, I find no evidence from which a reasonable factfinder could conclude that either of the defendants was deliberately indifferent to plaintiff's medical conditions even assuming, *arguendo,* that they were sufficiently serious to implicate the Eighth Amendment. Finally, in light of my recommendations on the merits, I find it unnecessary to address defendants' additional argument that they are entitled to qualified immunity.[FN8]

> **FN8.** The first step in the qualified immunity analysis requires a threshold determination of whether plaintiff has facially established a constitutional violation. *Harhay v. Town of*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)

(Cite as: 2007 WL 2071743 (N.D.N.Y.))

*Ellington Bd. of Educ.,* 323 F.3d 206, 211 (2d Cir.2003). Only if the answer to that inquiry is in the affirmative must the court then turn its focus to whether the right in issue was clearly established at the time of the alleged violation, and if so whether it was objectively reasonable for the defendant to believe that his or her actions did not violate any such clearly established right. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151, 2156 (2001)); *see also Poe v. Leonard,* 282 F.3d 123, 132-33 (2d Cir.2002).

Based upon the foregoing, it is hereby,

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 25) be GRANTED, and that plaintiff's complaint be DISMISSED in all respects.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

**\*11** It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with the court's local rules.

N.D.N.Y.,2007.

Peterson v. Miller
Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)

(Cite as: 2006 WL 2827687 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Rasool SALAAM, Plaintiff,
v.
D. ADAMS, Facility Nurse; Susan A. Walsh, Facility
Nurse; R.A. Girdich, Superintendent, Defendants.
No. 9:03-CV-0517 (LEK/GHL).

Sept. 29, 2006.
Rasool Salaam, Auburn, NY, pro se.

Hon. Eliot L. Spitzer, Attorney General for the State of
New York, Risa L. Viglucci, Esq., Assistant Attorney
General, of counsel, Albany, NY, for Defendants.

## DECISION AND ORDER

LAWRENCE E. KAHN, District Judge.

*1 This matter comes before the Court following a
Report-Recommendation filed on August 18, 2006, by the
Honorable George H. Lowe, United States Magistrate
Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3 of the
Northern District of New York. Report-Rec. (Dkt. No.
44). After ten days from the service thereof, the Clerk has
sent the entire file to the undersigned, including the
objections by Plaintiff Rasool Salaam, which were filed on
September 11, 2006. Objections (Dkt. No. 45).

It is the duty of this Court to "make a de novo
determination of those portions of the report or specified
proposed findings or recommendations to which objection
is made." 28 U.S.C. § 636(b). "A [district] judge ... may
accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge." Id.
This Court has considered the objections and has
undertaken a de novo review of the record and has
determined that the Report-Recommendation should be
approved for the reasons stated therein.

Accordingly, it is hereby

ORDERED, that the Report-Recommendation (Dkt.
No. 44) is APPROVED and ADOPTED in its
ENTIRETY; and it is further

ORDERED, that Defendants' motion for summary
judgment (Dkt. No. 33) is GRANTED and the case is
DISMISSED IN ITS ENTIRETY; and it is further

ORDERED, that the Clerk serve a copy of this Order
on all parties.

IT IS SO ORDERED.

GEORGE H. LOWE, United States Magistrate Judge.

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and
Recommendation by the Honorable Lawrence E. Kahn,
United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rule N.D.N.Y. 72.3(c). This is a pro se
civil rights action under 42 U.S.C. § 1983 by Inmate
Rasool Salaam ("Plaintiff") against three employees of
Upstate Correctional Facility ("Upstate C.F.")-Facility
Nurse Debra J. Adams, Facility Nurse Susan A. Walsh,
and Superintendent R.A. Girdich ("Defendants").
Generally, Plaintiff alleges that Defendants violated his
First and Eighth Amendment rights between September of
2001 and May of 2003 by retaliating against him for filing
grievances and for practicing his religion, and by being
deliberately indifferent to his serious medical needs. (Dkt.
No. 6 [Am. Compl.].) Currently before the Court is
Defendants' motion for summary judgment. (Dkt. No. 33.)
For the reasons discussed below, I recommend that
Defendants' motion for summary judgment is granted.
I. BACKGROUND

A. Plaintiff's Amended Complaint

Plaintiff's Amended Complaint alleges the following
set of events. On September 25 and 26, 2001, Plaintiff was
assaulted at Upstate C .F. As a result, he sustained "off
and on back pains." Plaintiff complained about the back

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)

(Cite as: 2006 WL 2827687 (N.D.N.Y.))

pains. Defendants Adams and Walsh provided Plaintiff with pain killers and an "exercise sheet" for his back problem. Despite taking the pain killers and using the exercise sheet, Plaintiff continued to experience pains in his lower back. Plaintiff complained of his continuing back pain, and asked to see a doctor. However, Defendants Adams and Walsh refused to let Plaintiff see a doctor.

**\*2** Over the course of the next year, Plaintiff regularly signed up for sick call to complain about his pain. However, Defendants Adams and Walsh continued to refuse to let Plaintiff see a doctor. In addition, in approximately May of 2002, Plaintiff started experiencing, and complaining about, gastrointestinal problems and resulting stomach pains. Defendant Adams denied Plaintiff adequate medical treatment for these problems. Plaintiff filed grievances alleging a denial of adequate medical care. The grievances were denied. They were then appealed to the office of Defendant Girdich.

Finally, on October 2, 2002, Plaintiff was seen by a doctor for his back problem. The doctor referred Plaintiff to a physical therapist. However, after approximately three therapy sessions, certain "infirmary escorts" stopped taking Plaintiff to his physical therapist. Plaintiff grieved his denial of physical therapy. In retaliation for making these grievances, Plaintiff was, at some point, taken off the "physical therapy list." In addition, Plaintiff's grievances were "taken out of [a] mail box" so that Plaintiff could not appeal the denial of those grievances to the Department of Correctional Services' Central Office Review Committee. Plaintiff grieved this "mail box" issue as well, bringing that grievance to the attention of (among others) the First Deputy Superintendent. However, Plaintiff continued to be retaliated against.

For example, in February of 2003, Defendants Adams and Walsh threatened Plaintiff with a misbehavior report if he continued to sign up for sick call on a daily basis. In addition, earlier, on January 28, 2003, Plaintiff was issued a false misbehavior report for allegedly calling Defendant Walsh a degrading name the day before. Similarly, on February 5, 2003, Plaintiff was issued a second false misbehavior report for allegedly breaking an "inhaler" the day before. As a result of these two false misbehavior

reports, Plaintiff was placed on a restricted diet for 28 days.

Finally, Plaintiff was retaliated against based on his religion. Specifically, during the time in question, Plaintiff was practicing the religion of Islam. He was also a mental health patient, who had been taking Wellbutrin which had been prescribed to "control his rage and/or emotions." From early November of 2002 to early December of 2002-the holy month of Ramadan-Plaintiff sincerely believed that he was prohibited by his religion from taking his medications from sunrise to sunset. As a result, he consulted with his psychologist, who informed him that she would direct the medical staff to give Plaintiff his medication before sunrise, at 6:00 a.m. However, during the month of Ramadan, Defendant Adams refused to comply with the order of Plaintiff's psychologist. In addition, Defendant Adams ordered the other nurses (including Defendant Walsh) not to comply with the order of Plaintiff's psychologist. Indeed, at some point during Ramadan, Defendants stopped Plaintiff from receiving his medication altogether. Plaintiff resumed receiving his medication at the end of Ramadan. However, at various times, including on March 23, 2003, and March 24, 2003, Defendants Adams and Walsh wrongfully denied Plaintiff the medication Neurontin, which he had been prescribed. (*See generally* Dkt. No. 6 [Plf.'s Am. Compl.].)

**\*3** Liberally construing Plaintiff's *pro se* civil rights allegations, as I must, I construe Plaintiff's Amended Complaint as asserting the following claims:

**(1)** a First Amendment **free-exercise-of-religion** claim against Defendants **Adams** and **Walsh** based on their alleged failure to change Upstate C.F.'s regular medication-delivery schedule for Plaintiff during the holy month of Ramadan in 2002 so that he could receive his medication either before sunrise or after sunset;

four First Amendment **retaliation** claims:

**(a)** one claim against Defendants **Adams** and **Walsh** based on their allegedly taking Plaintiff off the so-called "physical therapy list" in response to his grieving his denial of physical therapy;

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)

(Cite as: 2006 WL 2827687 (N.D.N.Y.))

**(b)** one claim against Defendants **Adams** and **Walsh** based on their alleged cessation of Plaintiff's medication delivery altogether during the holy month of Ramadan in 2002 in response to (i) his practicing of his religion and/or (ii) his filing of grievances alleging inadequate medical care; FN1

> FN1. (*See* Dkt. No. 6, ¶ 45 [Plf.'s Am. Compl., alleging, "The medication then stoped [sic] being given to me, until I was interviewed by the psychologist."].)

**(c)** one claim against Defendants **Adams** and **Walsh** based on their allegedly filing false misbehavior reports in response to his signing up for sick call (and presumably complaining of various medical conditions) on a daily basis; and

**(c)** the final claim against Defendant **Girdich** based on his alleged failure to resolve Plaintiff's "mail box" complaint in response to his grieving his denial of physical therapy; and

**(3)** two Eighth Amendment claims for **deliberate indifference** to a serious medical need:

**(a)** the first claim against Defendants **Adams** and **Walsh** based on their allegedly refusing to let him see a doctor for his back pain between September of 2001 and October of 2002, denying him adequate treatment for his gastrointestinal problem and stomach pain starting in May of 2002, taking him off the "physical therapy list" for his back problem in the fall of 2002, depriving him of the medication Wellburtin during the holy month of Ramadan in 2002, and denying him the medication Neurontin in March of 2003; and

**(b)** the second claim against Defendant **Girdich** based on his alleged failure to resolve, in Plaintiff's favor, Plaintiff's grievances regarding his lack of access to a doctor for his back pain, his lack of adequate treatment for his stomach pain, and his "mail box" issue.

**B. Defendant's Motion**

Generally, Defendants base their motion for summary judgment on three grounds. First, they argue that Plaintiff

has failed to establish a free-exercise claim under the First Amendment because (1) Plaintiff has not established that his psychologist ever in fact directed Defendants Adams and Walsh to give Plaintiff his medication before sunrise, (2) Plaintiff has not established that he ever complained to Defendants Adams or Walsh that the facility's normal medication schedule violated Ramadan, and (3) Plaintiff has not established that Ramadan prohibits the taking of medication between sunrise and sunset.

**\*4** Second, Defendants argue that Plaintiff has failed to establish an Eighth Amendment claim for deliberate indifference to a serious medical need because (1) he has failed to establish that his alleged medical condition (consisting of an alleged back problem, gastrointestinal disorder and psychological condition) constitutes a "serious medical need" for purposes of the Eighth Amendment, and (2) in any event, Plaintiff has failed to establish that Defendants manifested the sort of intentional or reckless state of mind necessary to incur liability under the Eighth Amendment.

Third, Defendants argue that Plaintiff has failed to establish the personal involvement of Defendant Girdich in any of the alleged constitutional deprivations since supervisors such as Defendant Girdich can be personally involved in only certain circumstances, none of which are present under the facts established by the current record. (Dkt. No. 37 [Defs.' Mem. of Law].)

**II. SUMMARY JUDGMENT STANDARD**

Under Fed.R.Civ.P. 56(c), summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material FN2 fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. FN3

> FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

> FN3. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson*

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)

(Cite as: 2006 WL 2827687 (N.D.N.Y.))

*v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).[FN4] The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." [FN5] "A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN6]

> FN4. *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).

> FN5. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

> FN6. *Ross v. McGinnis*, 00 Civ. 0275, 2004 WL 1125177, *8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with which the Court generally views a *pro se* civil rights plaintiff's papers.[FN7] For example, where a civil rights plaintiff is proceeding *pro se*, and the defendant has filed a dispositive motion, generally the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest.[FN8] Having said that, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment ." [FN9]

> FN7. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (*per curiam* ) (*pro se* civil rights action); *Ortiz v. Cornetta*, 867 F.2d 146, 148 (2d Cir.1989) (*pro se* civil rights action); *Aziz Zarif Shabazz v. Pico*, 994 F.Supp. 460, 467 (S.D.N.Y.1998) (*pro se* civil rights action), *aff'd in part, vacated in part on other grounds*, 205

F.3d 1324 (2d Cir.2000) (unpublished decision).

> FN8. *See Weixel v. Bd. of Ed. of City of New York*, 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving*, 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

> FN9. *Bussa v. Aitalia Line Aeree Italiane S.p.A.*, 02-CV-10296, 2004 WL 1637014, at *4 (S.D.N.Y. July 21, 2004) [citations omitted], *accord, Durran v. Selsky*, 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) [citations omitted]. For example, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.*, No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994).

### III. STATEMENT OF MATERIAL FACTS

Generally, the facts set forth in a movant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [FN10] and are not specifically controverted by the non-movant.[FN11] Thus, where the non-movant fails to respond to the movant's Rule 7.1 Statement of Material Facts, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.[FN12]

> FN10. *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 243-245 (2d Cir.2004) ("If the evidence submitted in support of the motion for summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden ..., the district court may not rely solely on the statement of undisputed material facts contained in the moving party's Rule 56.1

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [citation omitted]; *see, e.g .,* Govan v. Campbell, 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added].

FN11. *See* Local Rule 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*).

FN12. *See* Amnesty Am. v. Town of West Hartford, 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (citations omitted); *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N.Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); Govan v. Campbell, 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); Prestopnik v. Whelan, 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

**\*5** Here, Plaintiff has not responded to Defendants' Rule 7.1 Statement. FN13 The closest he comes to responding to Defendants' Rule 7.1 Statement is through his submission of a document entitled "Affirmation of Opposition." FN14 However, there are four problems with this document.

FN13. (Dkt. No. 36.)

FN14. (Dkt. No. 39.)

First, the document fails to "mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs," as required by Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court. FN15 Second, the document fails to "set forth a specific citation to the record where [any] factual issue[s] arise[ ]," as also required by Local Rule 7.1(a)(3). FN16 Third, the document contains impermissible legal argument in violation of Local Rule 7.1(a)(3) (providing that the Rule 7.1 Response shall contain facts only). FN17 (*See also* N.D.N.Y. L.R. 7.1(a)(2) (providing that "[a]n affidavit must not contain legal arguments.") Fourth, portions of the so-called "affirmation" are not even based on personal knowledge, as required by Rule 56(e) of the Federal Rules of Civil Procedure. FN18

FN15. Specifically, the document does not "affirm" or "deny" any of Defendants' factual assertions; nor do the document's paragraphs match Defendants' paragraphs. (*Compare* Dkt. No. 36 [Defs.' Rule 7.1 Statement, containing thirteen paragraphs] *with* Dkt. No. 39 [Plf.'s "Affirmation in Opposition," containing six paragraphs].)

FN16. (*See* Dkt. No. 39, ¶¶ 1, 2, 5, 6, 7 [Plf.'s "Affirmation in Opposition," containing absolutely no record citations], ¶ 3 [vaguely referring to Plaintiff's "complaint file" and "grievance file], ¶ 4 [vaguely referring to Plaintiff's "medical files"; and referring to affidavit of Defendant Adams but not citing in support of any dispute of fact].)

FN17. (*See, e.g.,* Dkt. No. 39, ¶¶ 5, 6 [Plf.'s "Affirmation in Opposition," citing case law].)

FN18. (*See, e.g.,* Dkt. No. 39, ¶ 3.B. [Plf.'s "Affirmation in Opposition," asserting that Defendant Girdich "had first hand knowledge of the problems" in question but not citing any evidence in support of Plaintiff's inference that Defendant Girdich read any of Plaintiff's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)

(Cite as: 2006 WL 2827687 (N.D.N.Y.))

complaints].)

These deficiencies in Plaintiff's response papers are especially conspicuous considering that Defendants specifically notified Plaintiff of the consequences of his failure to properly contradict the facts asserted by Defendants' in their motion.[FN19]

FN19. (Dkt. No. 34 [Defs.' Rule 56.2 Notice].)

Under the circumstances, I decline to perform an independent review of the record to find proof of a factual dispute-although I take notice of any such proof of factual disputes that I discover during my necessary review of the record (e.g., my review of the record to confirm that Defendants' factual assertions in their Rule 7.1 Statement are supported by the record).

However, I note that, as indicated above, to be sufficient to create a factual issue, an affidavit must, among other things, be based "on personal knowledge."[FN20] An affidavit is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay.[FN21] In addition, such an affidavit must not be conclusory.[FN22] An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.[FN23] Moreover, "[a]n affidavit must not present legal arguments."[FN24] Finally, even where an affidavit is based on personal knowledge and is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[FN25]

FN20. Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc., 44 F.3d 1082, 1084 (2d Cir.1995)* [citations omitted], *cert. denied sub nom, Ferrante v. U.S., 516 U.S. 806 (1995).*

FN21. *See Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M .C. Floor Crafters, Inc., 842 F.2d 639, 643 (2d Cir.1988)* ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd, 995 F.2d 1147 (2d Cir.1993).*

FN22. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate, 425 F.2d at 97* (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN23. *See, e.g., Bickerstaff v. Vassar Oil, 196 F.3d 435, 452 (2d Cir.1998)* (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)

(Cite as: 2006 WL 2827687 (N.D.N.Y.))

insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN24. N.D.N.Y. L.R. 7.1(a)(2).

FN25. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint" [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements

by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

**IV. ANALYSIS**

**A. Whether Plaintiff Has Failed to Establish a First Amendment Claim**

**1. Free-Exercise Claim Against Defendants Adams and Walsh**

"Prisoners retain their right to religious freedom [under the First Amendment] even when incarcerated ... [and are] therefore entitled to a reasonable accommodation of [their] religious beliefs." [FN26] "To assess a free exercise claim, a court must determine (1) whether the practice asserted is religious in the [prisoner's] scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological objective." [FN27] The reason for the third consideration is the fact that the right of a prisoner to exercise his religion is balanced against "the interest of prison officials charged with the complex duties arising from administration of the penal system." [FN28]

FN26. *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)

(Cite as: 2006 WL 2827687 (N.D.N.Y.))

FN27. *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988); *see also, Ford v. McGinnis,* 352 F.3d 582, 588-596 (2d Cir.2003) (not deciding question of whether "substantial burden" requirement is contained among elements of First Amendment free-exercise claim); accord, *McEachin v. McGinnis,* 357 F.3d 197, 203 (2d Cir.2004); *Shakur v. Selsky,* 319 F.3d 106, 120 (2d Cir.2004).

FN28. *Ford,* 352 F.3d at 588; *Burgess v. Friedmann,* 05-CV-0379, 2005 U.S. Dist. LEXIS 38423, at *7-8 (N.D.N.Y. Dec. 22, 2005) (Mordue, J.); *see also Turner v. Safley,* 482 U.S. 78, 89 (1987); *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995); *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.1989); *Farid,* 850 F.2d at 925.

*6 Here, I will assume for the sake of argument that (1) Plaintiff was a sincere believer in Islam, and (2) not taking medication during the day was a practice that was religious in nature in Plaintiff's "scheme of beliefs." [FN29] The problem with Plaintiff's claim, as Defendants correctly point out, has to do with the extent to which the practice has infringed on Plaintiff's religious belief and the extent to which the practice furthers some legitimate penological objective.

FN29. I note that I assume these two facts despite my suspicions of their veracity. For example, I question Plaintiff's claimed belief that the Ramadan fasting requirement contains an exception only for those who are threatened with death, as opposed to those who are merely "ill." *See The Quran,* 2:184-185 (making exceptions for those who are "ill or traveling").

Specifically, I find that the practice in question-which consisted of not making an exception to Upstate C.F.'s regular medication-delivery schedule-did not *infringe* on Plaintiff's religious beliefs under the circumstances. The sole medication of which Plaintiff was deprived during Ramadan, according to the evidence and his own allegations, consisted of one drug (Wellbutrin) . [FN30]

Plaintiff does not adduce any evidence (or even assert an allegation) that his not taking Wellbutrin actually caused him to suffer any physical or psychological consequences, much less any consequences that were of such a magnitude as to *interfere* with his observance of Ramadan. [FN31] Moreover, the evidence shows, and Plaintiff appears to acknowledge, that he was *offered* Wellbutrin during the regular medication-delivery runs on the days in question (which generally occurred between approximately 6:20 a.m. and 7:25 a . m.) but that he *refused* to accept that medication. [FN32]

FN30. (*See* Dkt. No. 6, ¶¶ 37-38 [Plf.'s Am. Compl.]; Dkt. No. 35, Ex. A [Affirm. of Risa L. Viglucci, attaching Plf.'s medical records, specifically Plf.'s "Ambulatory Health Record" dated 11/2/02, 11/3/02, 11/6/02, 11/10/02, 11/30/02 and his "Refusal of Medical Examination and/or Treatment" forms dated 11/4/02, 11/11/02, 11/12/02, indicating that the only drug that Plf. was refusing was Wellbutrin.])

FN31. (*See generally* Dkt. No. 6, ¶¶ 34-47 [Plf.'s Am. Compl.], alleging that he "practic[ed] the religion of Islam during the month of Ramadan in 2002, and not alleging that he was prevented from practicing that religion]; Dkt. No. 35, Ex. A [Affirm. of Risa L. Viglucci, attaching Plf.'s medical records, specifically Plf.'s "Ambulatory Health Records" from 11/1/02 to 11/30/02, indicating that Plf. was experiencing only gas and skin rash during time in question].)

FN32. (*See* Dkt. No. 6, ¶¶ 39, 41, 42, 45 [Plf.'s Am. Compl.]; Dkt. No. 35, Exs. A-B [Affirm. of Risa L. Viglucci, attaching (1) Plf.'s "Ambulatory Health Records" dated 11/2/02 indicating refusal at 7:00 a.m., 11/3/02 indicating refusal at 7:25 a.m., 11/6/02 indicating refusal at 6:20 a.m., 11/10/02 indicating refusal at some point in the morning, 11/22/02 indicating refusal at 6:35 a.m., 11/27/02 indicating refusal at 6:25 a.m., 11/30/02 indicating refusal at 7:00 a.m., and 12/14/05 indicating that plaintiff "has been refusing meds for some time," (2) Plf.'s "Refusal

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)

(Cite as: 2006 WL 2827687 (N.D.N.Y.))

of Medical Examination and/or Treatment" forms dated 11/4/02, 11/11/02, 11/12/02 indicating that he refused Wellbutrin offered to him at 7:00 a.m. on those dates, and (3) CORC's appellate decision of Plf.'s Grievance No. UST-14199-02, stating that its investigation indicates that Plf.' refused his medication from 12/1/02 to 12/16/02].)

Even if the practice in question somehow infringed on Plaintiff's religious beliefs, I find that Upstate C.F. had a *legitimate penological interest* in maintaining its regular medication-delivery schedule under the circumstances. Upstate C.F. is a maximum-security prison housing approximately 1,500 inmates, with limited resources. I believe that it would be unreasonable and impractical to require a prison to deliver medications to its inmates on an "on-demand" basis, absent a showing of a *medical* need for such special treatment. I note, by the way, that the sole evidence in the record that I have found suggesting that someone from a psychiatric unit directed anyone to give Plaintiff Wellbutrin during the time in question consists of an ambiguous notation in a single medical record indicating a telephone conversation between someone at "psych" and someone in the Upstate C.F. medical department concerning the continuation of Plaintiff's twice-per-day Wellbutrin medication for the month of November in 2002.[FN33] However, this isolated medical record does not indicate whether a psychiatrist had directed that the Wellbutrin *must* be dispensed at 6:00 a.m. and 8:00 p.m. (for medical reasons) or whether those times were merely the *approximate* times on a standard morning and evening delivery schedule. Nor does the record mention the words "sunrise," "sunset," or "Ramadan." Thus, I believe that it would be unreasonable to interpret that notation as either indicating a medical need for a special medication-delivery schedule or constituting a medical order for such special delivery.[FN34]

FN33. (Dkt. No. 35, Ex. 1 [Affirm. of Risa L. Viglucci, attaching Plf.'s medical records, specifically Plf.'s "Ambulatory Health Record" dated 11/1/02]; *see also* Dkt. No. 6, ¶¶ 43, 44 [Plf .'s Am. Compl., implicitly assuming, conclusorily, that such an order had been issued and communicated to Defendants Adams and

Walsh].)

FN34. (Dkt. No. 35, Ex. B, Adams Affid., ¶¶ 6-7 [stating, "I was not aware, nor did a review of plaintiff's medical records disclose any doctor's order requiring that plaintiff's medication be provided before sunup during Ramadan.... Further, I have reviewed plaintiff's medical records, and find no such order is contained in his records."].)

*7 Federal court cases arising from such circumstances appear to be rare. Indeed, I have found only one reported decision that addressed analogous circumstances, involving a Muslim prison inmate not wanting to receive medical treatment during the daytime hours of Ramadan, and requesting instead to receive that treatment before sunrise or after sunset.[FN35] As the court found in that case, I believe that no rational fact-finder could conclude, based on the record, that such circumstances constitute a violation of the inmate's First Amendment right to freely exercise his religion.[FN36]

FN35. *See Ballard v. Woodard,* 641 F.Supp. 432, 436-437 (W.D.N.C .1986) (First Amendment free-exercise claim by Muslim inmate against prison officials based on their refusal, during Ramadan, to alter prison's tuberculosis-testing schedule, which involved injecting antigens into inmate's arm during the daytime, even though inmate had informed prison officials that he would be willing to receive the injection after sundown).

FN36. *See Ballard,* 641 F.Supp. at 436-437 (granting summary judgment to prison officials with respect to inmate's free-exercise claim).

Finally, even if the practice in question somehow infringed on Plaintiff's religious beliefs, and Upstate C.F. did not have a legitimate penological interest in maintaining its regular medication-delivery schedule under the circumstances, I would find that Plaintiff has not established that it was Defendants Adams and Walsh (and not someone else) who *caused* the constitutional deprivation in question. For example, in Plaintiff's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)

(Cite as: 2006 WL 2827687 (N.D.N.Y.))

grievance about the deprivation of medication, he alleged that it was a *male* nurse who had denied Plaintiff his medication.[FN37] Furthermore, he alleged that this male nurse worked the 2:00 p.m. to 10:00 p.m. shift at Upstate C.F.[FN38] In addition, the name of this male nurse apparently started with the letter "L."[FN39] However, both Defendants Adams and Walsh are *female* nurses whose name do not start with the letter "L." Moreover, Defendant Adams did not work the evening shift (but the morning shift) during the time in question.[FN40]

> **FN37.** (Dkt. No. 35, Ex. B [Affirm. of Risa L. Viglucci, attaching attaching Plf.'s Grievance No. UST-14199-02, dated 12/2/02, which alleged that "I asked the nurse for my med's [sic]. *He* said Salaam your [sic] not getting shit anymore."] [emphasis added].)

> **FN38.** (Dkt. No. 35, Ex. B [Affirm. of Risa L. Viglucci, attaching attaching Plf.'s Grievance No. UST-14199-02, dated 12/2/02, which alleged that "The 2-10 shift nurse has refused to give me my medication 3 time [sic] in a row."].)

> **FN39.** (Dkt. No. 35, Ex. B [Affirm. of Risa L. Viglucci, attaching CORC's appellate decision of Plf.'s Grievance No. UST-14199-02, referring to the nurse of whom Plaintiff complains as "Nurse L ..."].)

> **FN40.** (Dkt. No. 35, Ex. B, Adams Affid., ¶ 8 [stating, "In that my shift is from 6:00 a.m. to 2:00 p.m. I would only have been involved with providing his 6:00 a.m. medication."].)

I note that, to the extent Plaintiff is not basing his free-exercise claim on events that occurred during the nursing staff's evening shift in December of 2002, but on events that occurred during the nursing staff's morning shift in November of 2002, he has failed to exhaust his administrative remedies, since his grievance complained about only the former events.

As a result, I recommend that the Court dismiss Plaintiff's First Amendment free-exercise claim against Defendants Adams and Walsh.

**2. Retaliation Claims Against Defendants Adams and Walsh**

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment.[FN41] Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights.[FN42] Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care.[FN43] As the Second Circuit has noted,

> **FN41.** *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004).

> **FN42.** *See Gill,* 389 F.3d at 381-383.

> **FN43.** *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

[t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.[FN44]

> **FN44.** *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

**\*8** To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech or conduct and the adverse action-in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)

(Cite as: 2006 WL 2827687 (N.D.N.Y.))

other words, that the protected speech or conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff.[FN45] Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone.[FN46]

> FN45. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U . S. 274, 287 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ).

> FN46. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

Here, as described above in Part I.A. of this Report-Recommendation, Plaintiff has asserted three distinct First Amendment retaliation claims against Defendants Adams and Walsh: (1) a claim based on their allegedly taking him off the physical therapy list in response to his grieving his denial of physical therapy; (2) a claim based on their alleged cessation of Plaintiff's medication delivery altogether during the holy month of Ramadan in 2002 in response to (i) his practicing of his religion and/or (ii) his filing of grievances alleging inadequate medical care; [FN47] and (3) a claim based on their allegedly filing false misbehavior reports in response to his signing up for sick call (and complaining of various medical conditions) on a daily basis.

> FN47. (*See* Dkt. No. 6, ¶ 45 [Plf.'s Am. Compl., alleging, "The medication then stoped [sic] being given to me, until I was interviewed by the psychologist."].)

I will assume for the sake of argument that Plaintiff was engaging in *protected speech or conduct* during the time of the events giving rise to Plaintiff's first and second claims. I will make that assumption, like the others, out of recognition of Plaintiff's special status as a pro se civil rights litigant, and in the interest of brevity.

The problem with Plaintiff's first and second claims has to do with the fact that (1) there is no evidence in the record that (1) Defendants Adams and Walsh (as opposed to some other correctional employee) took *adverse action*

against Plaintiff or (2) even if there was evidence of such adverse action, there is no evidence in the record that there was a *causal connection* between Plaintiff's protected speech or conduct and the adverse action (i.e., there is no evidence that the adverse action was not taken for proper reasons).

For example, I find no evidence that Plaintiff was ever prematurely taken off a "physical therapy list" in the fall of 2002, or that any such premature removal of Plaintiff's name from such a list was effected by Defendants Adams or Walsh.[FN48] Rather, it appears that Plaintiff's physical therapy was discontinued on January 17, 2003, by his physical therapist.[FN49] Indeed, Plaintiff does not even specifically allege that Defendants Adams or Walsh *caused* his name to be removed from the "therapy list"; rather, he alleges that, "[a]fter about three weeks of therapy, the infirmary escorts started to deprive the plaintiff of his therapy." [FN50] Moreover, Plaintiff's allegation that the removal of his name from the "therapy list" was in retaliation for his having filed grievances is, in addition to being entirely conclusory, not even based on personal knowledge. Specifically, Plaintiff alleges, "Upon information and belief, [he] was taken of [sic] the physical therapy list, because of and/or out of retaliation of [sic] the grievances and complaints about being deprived of his physical therapy." [FN51]

> FN48. (*See generally* Dkt. No. 35, Ex. A [Affirm. of Risa L. Viglucci, attaching Plf.'s medical records dated 10/1/02 to 1/1/03, not containing or referring to such a physical therapy list]; *see also* Dkt. No. 6, ¶ 13 [Plf.'s Am. Compl., indicating that his allegation that he was placed on an actual "physical therapy waiting list" was based "upon information and belief"].)

> FN49. (Dkt. No. 35, Ex. B, Smith Aff., ¶ 9.)

> FN50. (Dkt. No. 6, ¶ 15 [Plf.'s Am. Compl.].)

> FN51. (Dkt. No. 6, ¶ 16 [Plf.'s Am. Compl.].)

**\*9** Similarly, I find no evidence in Plaintiff's medical records that the Upstate C.F. medical staff stopped trying to give Plaintiff Wellbutrin during the holy month of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)

(Cite as: 2006 WL 2827687 (N.D.N.Y.))

Ramadan in 2002; indeed, the record evidence is to the contrary.[FN52] Nor have I found any evidence that any such cessation was effected by Defendants Adams or Walsh. Even if there was evidence of such a denial of Wellbutrin by Defendants Adams or Walsh, I find no evidence that it was the practice of Plaintiff's religion-and not his refusal to accept medication during the prison's regular delivery runs-that *caused* him to be taken off the medication-delivery list. Similarly devoid of evidence is Plaintiff's allegation that the alleged denial of medication was caused by his having previously filed grievances.[FN53]

FN52. (*See* Dkt. No. 6, ¶ 45 [Plf.'s Am. Compl., asserting conclusorily that the medication stopped coming at some point during the month of Ramadan]; Dkt. No. 35, Ex. A [Affirm. of Risa L. Viglucci, attaching Plf.'s "Ambulatory Health Record" dated 11/30/02 indicating that he refused Wellbutrin on that date, which was near the end of the holy month of Ramadan]; Dkt. No. 35, Ex. A [Affirm. of Risa L. Viglucci, attaching Plf.'s medical records, specifically Plf.'s "Refusal of Medical Examination and/or Treatment" forms dated 11/4/02, 11/11/02, 11/12/02, indicating that prison treated such refusals by Plaintiff as limited to only a day-by-day basis].)

FN53. Setting aside the lack of evidentiary support for this allegation, I note that this allegation appears inconsistent with Plaintiff's grievance about the issue, in which he alleged not that this denial of medication was a form of retaliation based on Plaintiff's prior grievances but that this denial was a form of retaliation based merely on "a personal hate." (Dkt. No. 35, Ex. B [Affirm. of Risa L. Viglucci, attaching Plf.'s Grievance No. UST-14199-02, dated 12/2/02].)

Finally, with respect to Plaintiff's third claim, I find that Plaintiff has no First Amendment right to sign up for sick call, much less to sign up for sick call on a daily basis for needless reasons.[FN54] Even if he had such a First Amendment right, I find no evidence that any misbehavior reports filed against him in January and/or February of 2003 were false, or that there was any causal connection

between the filing of those misbehavior reports and Plaintiff's engaging in protected conduct or speech.

FN54. *See* Rahman v. Stephenson, 626 F.Supp. 886, 887-888 (W.D.Tenn.1986) (inmate did not have a First Amendment right to have his name placed on a prison sick call roster even where the prison's refusal to place the inmate's name on the roster was due to the prison's refusal to acknowledge the "name" that the inmate was attempting to use, which was the inmate's adopted religious name).

As a result, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claims against Defendants Adams and Walsh. I note that, although Defendants do not specifically address, in their memorandum of law, Plaintiff's retaliation claims (presumably due to the fact that those claims are difficult to discern as articulated by Plaintiff), the Court can, and should, *sua sponte* dismiss those claims as without merit. *See* 28 U.S.C. § 1915(e)(2)(B) (ii), (iii) ("[T]he court shall dismiss the case at any time if the court determines that ... the action ... is frivolous ... [or] fails to state a claim on which relief may be granted...."); Fed.R.Civ.P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction over the subject matter, the court shall dismiss the action.").

**3. Retaliation Claim Against Defendant Girdich**

Plaintiff's retaliation claim against Defendant Girdich stems from his failure to resolve, in Plaintiff's favor, his "mail box" complaint in response to Plaintiff's prior grievances regarding a denial of physical therapy. Based on the current record, I find that Plaintiff has adduced no evidence that (1) there was any adverse action taken against him by anyone much less Defendant Girdich (i.e., through a knowing and reckless refusal to resolve the "mail box" issue and the alleged interference with Plaintiff's right to file grievances), or (2) even if there was such adverse action, there was a causal connection between Plaintiff's filing of previous grievances regarding a denial of physical therapy and the alleged adverse action taken by Defendant Girdich. Indeed, Plaintiff's allegation that the removal of his grievances in his mail box was caused by his filing of grievances (rather than being

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)

(Cite as: 2006 WL 2827687 (N.D.N.Y.))

caused simply by a mistake or negligence) is, in addition to being entirely conclusory, not even based on personal knowledge.[FN55]

> FN55. (Dkt. No. 6, ¶ 18 [Plf.'s Am. Compl.].)

**\*10** As a result, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claims against Defendant Girdich.

**B. Whether Plaintiff Has Failed to Establish an Eighth Amendment Claim of Deliberate Indifference to a Serious Medical Need**

Defendants recite the correct legal standard that governs Plaintiff's claim of inadequate medical care under the Eighth Amendment. (Dkt. No. 37 at 3-5 [Defs.' Mem. of Law].) Generally, to prevail on such a claim, Plaintiff must show two things: (1) that Plaintiff had a sufficiently serious medical need; and (2) that Defendant was deliberately indifferent to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

**1. Serious Medical Need**

Here, I find that Plaintiff has adduced no evidence of a medical need that was sufficiently serious under the Eighth Amendment. Plaintiff has alleged that, during the relevant time period, he suffered from one or more of the following ailments: (1) an injury to his lower back, which caused intermittent back pain requiring pain relievers and physical therapy; (2) a gastrointestinal problem that caused stomach pains; and (3) a psychological problem requiring Wellbutrin and/or Neurontin.[FN56] However, there is no evidence that, even when considered together, these conditions were sufficiently serious for purposes of the Eighth Amendment.

> FN56. (*See generally* Dkt. No. 6 [Plf.'s Am. Compl.].)

For example, Plaintiff's medical records indicate that, during the days and weeks following the alleged assault on him on September 25, 2001, Plaintiff did not exhibit any signs of injury (such as bruising, marks, distress, diminution in range of motion, x-rays indicating a fracture, etc.); moreover, any complaints of pain communicated by Plaintiff to medical staff were sporadic and moderate or mild in nature (i.e., not characterized by Plaintiff as

"severe," "extreme," "agonizing," "excruciating," etc.).[FN57]

> FN57. (Dkt. No. 35, Ex. A [Affirm. of Risa L. Viglucci, attaching Plf.'s medical records, specifically Plf.'s Ambulatory Health Records dated 9/25/01, 9/26/01, 9/27/01, 9/28/01, 9/29/01, 10/4/01, 106/01, 10/8/01, 10/9/01, 10/14/01, 10/16/01, 10/24/01, 10/28/01, 10/29/01,11/2/01, 11/3/01, 11/7/01, etc.].)

Moreover, while Plaintiff's medical records do indicate that, in approximately May of 2002, Plaintiff complained about gastrointestinal problems apparently associated with a previous high-fiber diet that Plaintiff had been following (e.g., "gas," "spitting up," and "vomiting"), the records indicate that the complaints were, again, sporadic in nature and not of such severity as to be "urgent." [FN58] *See Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (standard contemplates "a condition of urgency, one that may produce death, degeneration or extreme pain") [citation omitted].

> FN58. (Dkt. No. 35, Ex. A [Affirm. of Risa L. Viglucci, attaching Plf.'s medical records, specifically Plf.'s Ambulatory Health Records dated 45/10/02, 5/14/02, 5/20/02, 5/22/02, 5/23/02, 5/24/02, 5/26/02, 5/27/02, 5/29/02, etc.].)

Under the current record, I find that no reasonable fact-finder could conclude that Plaintiff was, during the relevant time period, afflicted with a medical condition that was so serious as to implicate the Eighth Amendment.

**2. Deliberate Indifference**

Even if Plaintiff had adduced evidence of a sufficiently serious medical need, he has adduced no evidence that Defendants Adams, Walsh or Girdich acted with the sort of *criminal recklessness* necessary to impose on them liability under 42 U.S.C. § 1983.[FN59] Indeed, the available evidence is to the contrary. The evidence indicates that the medical staff at Upstate C.F. adequately treated Plaintiff for his injuries.[FN60] Even if the medical staff at Upstate C.F. did not adequately treat Plaintiff, there is no evidence that either Defendant Adams or Defendant Walsh had anything to do with such inadequate

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)

(Cite as: 2006 WL 2827687 (N.D.N.Y.))

treatment, since those two Defendants did not work the cell block in which Plaintiff was housed during the time in question.[FN61]

FN59. *See Farmer v. Brennan,* 511 U.S. 825, 827 (1994) ( "[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for "deliberate indifference" under the Eighth Amendment."); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a claim of deliberate indifference to a serious medical need under the Eighth Amendment is] equivalent to criminal recklessness...."); *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness....").

FN60. For example, the evidence indicates that, in approximately May of 2002, when Plaintiff complained about gastrointestinal problems (e.g., gas), Plaintiff received nearly constant medical attention for that condition. (Dkt. No. 35, Ex. A [Affirm. of Risa L. Viglucci, attaching Plf.'s medical records, specifically Plf.'s Ambulatory Health Records dated 45/10/02, 5/14/02, 5/20/02, 5/22/02, 5/23/02, 5/24/02, 5/26/02, 5/27/02, 5/29/02, etc.]; *see also* Dkt. No. 35, Ex. B, Smith Aff., ¶¶ 5-8 [generally describing medical staff's treatment of Plaintiff].)

FN61. (Dkt. No. 35, Ex. B, Affid. of Def. Adams, ¶ 5.)

**\*11** At most, Plaintiff is alleging there may have been a difference of opinion between the medical staff at Upstate C.F. and Plaintiff,[FN62] or *conceivably* a hint of negligence on the part of someone on the medical staff at Upstate C.F. However, neither a difference of opinion or negligence would be enough to make any staff member (much less Defendants Adams or Walsh) liable to Plaintiff under the Eighth Amendment.[FN63] As the Second Circuit has explained,

FN62. (*See, e.g.,* Dkt. No. 6, ¶¶ 7, 50-51 [Plf.'s Am. Compl., indicating a disagreement between Plf. and Defs. Adams and Walsh regarding their treatment of his back problem, and a disagreement with Def. Adams regarding whether mental health medication goes "out of stock"]; Dkt. No. 39, ¶ 4.A. [Plf.'s Affirm. of Opp., stating, "The exams conducted by medical staff are only personal opinions of medical staff.... The exams was [sic] not professional...."].)

FN63. *See Estelle v. Gamble,* 429 U.S. 97, 106 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.").

It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of prisoners would not in freedom or on parole enjoy the excellence in [medical] care which plaintiff[ ] understandably seeks.... We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution.... The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves.... The essential test is one of medical

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 15

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)

(Cite as: 2006 WL 2827687 (N.D.N.Y.))

necessity and not one simply of desirability.

*Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) [internal quotations and citations omitted].

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim for deliberate indifference to a serious medical need.

**C. Whether Plaintiff Has Established the Personal Involvement of Defendant Girdich in any of the Alleged Constitutional Deprivations**

A defendant's personal involvement in alleged unlawful conduct is a prerequisite for a finding of liability in a Section 1983 action. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987). Supervisory officials such as prison superintendents are personally involved in a constitutional violation only if: (1) they directly participated in that violation; (2) they failed to remedy that violation after learning of it through a report or appeal; (3) they created, or allowed to continue, a policy or custom under which the violation occurred; (4) they were grossly negligent in managing subordinates who caused the violation; or (5) they exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323-324 (2d Cir.1986) (setting forth four prongs).

Here, Plaintiff acknowledges that "Defendant Superintendent Girdich did not have any direct part in the infraction[s]" at issue. (Dkt. No. 39, ¶ 3.A. [Plf.'s "Affirmation of Opposition"].) Rather, argues Plaintiff, Defendant Girdich was involved in the infractions because he was the "over seer of the prison." (*Id.*) As a result, reasons Plaintiff, "[w]hen complaints get sent to his office it is his job to review the complaint, investigate the complaint and try to rectify the complaint." (*Id.*) Here, argues Plaintiff, although several complaints and grievances were sent by Plaintiff to Defendant Girdich's office, those complaints and grievances were never "rectified" by Defendant Girdich. (*Id.*)

*12 In this way, Plaintiff alleges and/or argues that Defendant Girdich is personally involved in the alleged constitutional deprivations through the *second* and *fifth*

forms of personal involvement described above, namely that Defendant Girdich "failed to remedy [the] violation after learning of it through a report or appeal," and/or that he "exhibited deliberate indifference to the rights of [Plaintiff] by failing to act on information indicating that the violation was occurring."

Several problems exist with Plaintiff's theory of liability against Defendant Girdich. First, Plaintiff has adduced no evidence that he ever sent any complaint letters directly to Defendant Girdich.[FN64] Second, even if Plaintiff had adduced evidence that he sent complaint letters directly to Defendant Girdich, Plaintiff has adduced no evidence indicating that Defendant Girdich ever read any of the complaint letters.[FN65] Third, the only grievance contained in the record (Grievance No. UST-14199-02) was decided by Upstate C.F.'s First Deputy Superintendent, not by Defendant Girdich .[FN66] Indeed, Plaintiff appears to acknowledge the lack of involvement by Defendant Girdich when he alleges that his grievance about his "mail box" issue was brought to the attention of the First Deputy Superintendent (rather than alleging that it was brought to the attention of Defendant Girdich).[FN67]

> **FN64.** I note that, although Plaintiff's Amended Complaint refers to an "inclosed [sic] affidavit of support to and froms [sic] to IGRC and the Superintendent telling them to appeal all grievances to C.O.R.C. and responce [sic] also grievances and appeals [sic]," I can find no such attachment to Plaintiff's Amended Complaint (or any such affidavit or "enclosure" in the docket). (Dkt. No. 6, ¶ 12 [Plf.'s Am. Compl.].) Moreover, although Plaintiff's "Affirmation of Opposition" asserts that Plaintiff sent complaints to Defendant Girdich, that vague assertion is devoid of such details as the dates on which the communications were sent, a description of the issues raised in the communications, or even a description of the precise nature of the communication (e.g., whether it was a letter, grievance appeal, etc.). (Dkt. No. 39, ¶ 3.B. [Plf.'s Affirm. of Opp.].) As a result, Plaintiff's assertion is entirely conclusory and insufficient to create a dispute of material fact sufficient to defeat a motion for summary judgment. (*See,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)

(Cite as: 2006 WL 2827687 (N.D.N.Y.))

*supra,* Part III of this Report-Recommendation.).

FN65. (*See, e.g.,* Dkt. No. 6, ¶ 15 [Plf.'s Am. Compl., assuming, without indicating any personal knowledge, that Def. Girdich read Plaintiff's complaints].)

FN66. (Dkt. No. 35, Ex. B [Affirm. of Risa L. Viglucci, attaching Superintendent's Decision of Plf.'s Grievance No. UST-14199-02, dated 12/24/02, signed by Deputy Superintendent].)

FN67. (Dkt. No. 6, ¶ 19 [Plf.'s Am. Compl.].)

As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's claims against Defendant Girdich due to his lack of personal involvement in the alleged constitutional deprivations.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 33) be *GRANTED.*

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2006.

Salaam v. Adams
Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Corey FORD, Plaintiff,
v.
William E. PHILLIPS, Superintendent of Green Haven
Correctional Facility; Guiney, Deputy Superintendent;
Matthew Miller, Corrections Officer; Franklin W.
Middleton, Corrections Officer; S. Phillip, Corrections
Officer; D. McClenning, Corrections Officer, J. Erns,
Corrections Officer; D. Huttel, Corrections Officer; C.
Austin, Corrections Officer; L. Czyzewski, Corrections
Officer; R. Myers, Sergeant; D. Carey, Sergeant; John
Doe # 1, Corrections Officer; John Doe # 2, Corrections
Officer; Joseph T. Smith, Superintendent of
Shawangunk Correctional Facility; John Maly, Deputy
Superintendent; Bipin Bhavsar, Medical Doctor;
Kimbler, Sergeant; Jewett, Sergeant; Alfred Vacca,
Inspector General, individually and in their official
capacities, Defendants.[FN1]

FN1. This caption reflects the caption in
plaintiff's Complaint. Defendants did not provide
the Court with a full, corrected caption.

No. 05 Civ. 6646(NRB).

March 27, 2007.

Corey Ford, Walkill, NY, Plaintiff, pro se.

Efthimios Parasidis, Assistant Attorney General, Office of
the Attorney General, State of New York, New York, NY,
for Defendants.

MEMORANDUM AND ORDER

BUCHWALD, J.

**\*1** *Pro se* plaintiff Corey Ford ("Ford"), who is currently
incarcerated, brings this action against employees of the
Department of Correctional Services ("DOCS"), pursuant
to 42 U.S.C. § 1983, alleging: (1) excessive force; (2)
denial of recreation, showers, special meals and property;
(3) deliberate indifference to a serious medical need; and
(4) mail interference, all in violation of his constitutional
rights. Ford moved for summary judgment on July 24,
2006 and defendants cross-moved for summary judgment
on December 22, 2006.[FN2] For the reasons stated below,
we deny Ford's motion for summary judgment and grant
defendants' motion for summary judgment in part.

FN2. Although the title of Ford's motion is
"Motion for Partial Summary Judgment", his
papers clearly argue for judgment on all of the
claims raised in his Complaint. Defendants'
motion for summary judgment expressly applies
to Ford's entire Complaint.

*BACKGROUND* [FN3]

FN3. Unless otherwise noted, the following facts
are not in controversy.

A. Ford's Attack on Officer Miller

Plaintiff's Complaint arises from events at the Green
Haven and Shawangunk correctional facilities in April and
May of 2004.[FN4] In the early afternoon of April 14, 2004,
at approximately 12:30 p.m., Ford exited his cell without
permission when a corrections officer unlocked the door
for Ford's cellmate.[FN5] After leaving his cell, Ford headed
directly for Officer Miller, who was writing passes for
inmates.[FN6] As Ford later admitted,[FN7] Ford then threw hot
oil on Officer Miller, burning his face, head, eye, neck,
shoulders and chest, and repeatedly stabbed Officer Miller
with a homemade shank measuring approximately nine
inches in length. As he was attacked by Ford, Officer
Miller repeatedly screamed, "Get him off me!" [FN8]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

FN4. Plaintiff is currently incarcerated and serving a sentence of twelve and one-half to twenty-five years, having plead guilty to attempted murder, kidnapping and a weapons violation. *See* Declaration of Efthimios Parasidis ("Parasidis Decl."), dated December 22, 2006.

FN5. *See* Parasidis Decl., Ex. B, FORD 42. Earlier that day, Officer McClenning observed Ford yelling from his cell gate and generally being disrespectful. *Id.* at FORD 39.

FN6. *See id.* at FORD 1, 15, 17-18, 27, 34, 40, 42, 44, 66.

FN7. *Id.,* Ex. E., FORD IG 26-29, 290-295.

FN8. *Id.,* Ex B., April 14, 2004 Statement of Officer J. Erns ("I heard officer Miller begin to scream.... I saw Officer Miller being attacked by an inmate and Officer Miller screaming 'Get him off me Get him off me' ').

Officers Phillips, Middleton and Todriff responded to Officer Miller's call, attempting to restrain Ford.[FN9] After slipping in the oil and falling with Ford to the ground, the officers pried the shank out of Ford's hand, placed him in mechanical restraints, stood him up, and faced him against a wall.[FN10] Once the officers had Ford under control, an ambulance rushed Officer Miller to St. Francis Hospital in Poughkeepsie, New York, where he remained over night.[FN11] Officers Todriff and Middleton were also treated at the St. Francis emergency room for injuries sustained while restraining Ford.[FN12] Ford was later convicted by a jury for his assault on Officer Miller and is currently awaiting sentencing.[FN13]

FN9. *Id.*

FN10. *Id.* at FORD 1, 10-12, 16, 27, 29, 42, 77, 80.

FN11. *Id.* at FORD 45-46.

FN12. *Id.* at FORD 1-2, 21-22, 43.

FN13. *See id.,* Ex. F, FORD 130-131. *See also* Supreme & County Courts of the State of New York, Dutchess County, Certificate of Disposition Indictment (certifying that Ford was convicted of one count of first degree attempted assault, two counts of second degree assault, two counts of third degree criminal possession of a weapon, and one count of promoting prison contraband in the first degree).

In his Complaint, Ford provides a somewhat different version of the events of April 14, 2004. Specifically, Ford asserts that Officer Miller denied him recreation, an alternative meal, and showers on April 5, 12, 13 and 14 of 2004[FN14] and that, on the morning of April 14, 2004, prior to his attack on Officer Miller, Officers Miller, Erns, and McClenning kicked and punched Ford in the face, head, chest and back without provocation.[FN15] Ford further asserts that later, at 12:30 p.m., approximately the time of Ford's assault on Officer Miller, Officers Miller, Erns, Middleton and Phillips used excessive force against him.[FN16]

FN14. Ford Complaint, received June 20, 2005 at the S.D.N.Y. Pro Se Office, at 6. Ford contends that he is entitled to non-meat meals.

FN15. *Id.* (alleging cruel and unusual punishment, harassment, excessive force, deprivation of outside exercise, threats of bodily harm, and other grievances). As discussed *infra,* these claims are contradicted by statements made and signed by Ford shortly after the putative attack.

FN16. *Id.* at 7.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

Thus, Ford does not directly challenge the facts provided above, but adds that Officer Miller deprived him of certain entitlements over four days, that Officers Miller, Erns and McClenning used excessive force against him on the morning of April 14, 2004, and that Officers Miller, Erns, Middleton and Phillips used excessive force against him again when he attacked Officer Miller.

B. Ford's Escort to Special Housing

**\*2** After Ford attacked Officer Miller, Officers Huttel, Czyzewski, Myers and Austin escorted Ford to Special Housing (also known as "SHU"). During the escort, defendants contend that plaintiff was combative and uncooperative, kicking Officer Huttel and attempting to kick the other officers.[FN17] As is evident from a videotape showing parts of Ford's transfer to Special Housing, Ford fell twice during his escort[FN18] and was picked up by the officers each time. Ford claims that he was again the victim of excessive force during this transfer, calling the officers' conduct "unwarrantly malicious sadistic and unprovoked" and alleging that his head was repeatedly rammed into a wall and steel bars, and that he was punched and kicked in the face and back.[FN19]

FN17. Parasidis Decl., Ex. B, FORD 2, 42, 48, 52, 60-63; Ex. H (videotape of officers escorting Ford to Special Housing).

FN18. *Id.*

FN19. Compl. at 6-10. Apparently quoting the report from his medical examination, Ford asserts that he sustained "extreme and numerous abriasions (sic), with bleeding Lt temple (sic), redenes abriasion (sic) on both right and left sides of plaintiff face. 2 redden abriasions areas (sic) RT upper chest, superficial scratches on RT upper back" from the April 14 attacks.

C. Ford's Post-Incident Medical Treatment

Upon his arrival at Special Housing, Ford was examined

by medical staff, which found him to have a minor bruise on his forehead; reddened abrasions with a slight amount of bleeding on his left temple; reddened abrasions on his right upper chest, abdomen, and right underarm; and superficial scratches on his right upper back.[FN20] The staff found no other injuries and the medical records indicate that Ford did not suggest that he had any other injuries at that time.[FN21]

FN20. Parasidis Decl., Ex. B, FORD 2, 8-9 (April 14, 2004 Physical Examination of Corey Ford), 51-53.

FN21. *See id.,* Ex. C, FORD GRIEVANCE 43-46 (SHU Entrance Exam, stating "Use of force exam done.").

During the next few weeks, Ford received additional medical attention. On the morning of April 16, for instance, Ford was examined by a triage nurse and complained the he was urinating and spitting up blood.[FN22] The nurse scheduled an appointment for Ford to meet with a doctor and he was examined by Dr. Bipin Bhavsar that afternoon.[FN23] After examining Ford, Dr. Bhavsar ordered a urine analysis[FN24] and prescribed Tylenol.[FN25] Dr. Bhavsar also treated Ford on April 21, 2004, as Ford again complained of blood in his urine, and ordered a second urine analysis.[FN26] Both urine analyses found evidence of blood.[FN27]

FN22. *Id.,* Ex. B, 47; Ex. D, FORD MEDICAL 26.

FN23. *Id.*

FN24. *Id.;* Ex. G (Bhavsar Decl.) at 1.

FN25. *Id.*

FN26. *Id.* at FORD MEDICAL 25; Ex. G at 2.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

FN27. *Id.*

On April 29, 2004, medical staff examined Ford because Ford complained of pain in his wrists.[FN28] The staff determined that Ford had "no obvious loss of dexterity."[FN29] The next day, on April 30, 2004, Dr. Bhavsar reexamined Ford, observing that Ford's ribs and abdomen had no tenderness, that his glands were not enlarged, that his abrasions were healed, and that his wrist was not swollen or restricted in movement.[FN30] As Ford still complained of blood in his urine, Dr. Bhavsar ordered a third urine analysis and ordered that x-rays be taken of Ford's hands as a precaution.[FN31] The x-rays were taken on May 3, 2004 and revealed no "fracture, dislocation or arthritic change."[FN32]

FN28. *Id.*

FN29. *Id.*

FN30. *Id.* at FORD MEDICAL 24; Ex. G at 9.

FN31. *Id.* at FORD MEDICAL 37.

FN32. *Id.* at FORD MEDICAL 41.

Finally, since Ford continued to complain of pain and other problems, and since the urine tests persisted in revealing blood at level "3+", Dr. Bhavsar ordered that Ford undergo a CAT-scan of his abdomen and kidneys on May 7, 2004.[FN33] The CAT-scan results were negative.[FN34] In addition to this and the other treatments he received, Ford had daily opportunities for medical assistance from the Special Housing nurse who, in accordance with DOCS policy, made regular rounds of the entire Special Housing unit.[FN35]

FN33. *Id.* at FORD MEDICAL 22-3, 69; Ex. G at 2.

FN34. *Id.* (Ford's "renal parenchyma and

collecting system [were] normal on all series" and there was "no evidence of renal stone, filling defect, or mass lesion". Ford's liver, adrenals, pancreas, spleen and bowels were also found to be "unremarkable". No free fluid or air was detected and, more generally, there was no evidence of any medical abnormality).

FN35. *Id.*, Ex. C, FORD GRIEVANCE 34.

**\*3** Notwithstanding the medical attention he received, Ford contends that he was denied necessary medical treatment during April and May of 2004.[FN36] Specifically, he asserts that he "was denied medical treatment on arrival to [Special Housing]" and, despite numerous complaints made to Sgt. Jewett, Sgt. Kimbler and others that he was in excruciating pain, "never received medical attention".[FN37] Ford claims that, to this day, he suffers from a weak bladder and leaks blood from his penis on occasion.[FN38]

FN36. *See e.g.* Ford' Motion for Partial Summary Judgment, dated July 24, 2006, at 18.

FN37. *Id.*

FN38. *Id.*

D. Post-Incident Restrictions on Ford

Ford was placed under certain restrictions upon his admission to Special Housing. According to defendants, Ford was under a restraint order as a result of his assault on the staff at Green Haven and, accordingly, was not permitted out-of-cell activities.[FN39] As well, Ford was initially denied certain property because of the danger he posed to himself and to others.[FN40] The order restraining Ford remained in effect until May 3, 2004, and the order regarding Special Housing property remained in effect until April 25, 2004.[FN41] Ford was permitted to leave his cell on April 20, 2004 to retrieve his personal property and, according to defendants' affidavits, was permitted out of his cell to shower on a regular basis starting on April

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

23, 2004. [FN42]

> FN39. Parasidis Decl., Ex. C, FORD GRIEVANCE 34-35, 50-57.

> FN40. *Id.*

> FN41. *Id.*

> FN42. *Id.*

Ford offers a slightly different, if only more specific, version of these restrictions. Ford repeatedly claims that, in violation of his rights, his cell was covered with plexi-glass and he was denied bed sheets, a pillow case, a towel, a wash cloth, soap, toothpaste, a toothbrush, pens and writing paper. [FN43] He also claims that he was not permitted to shower or to have outside recreation for fourteen days. [FN44] Ford states that he complained of these deprivations to Sgts. Kimbler and Jewett on April 15, 2004, the day after his attack on Officer Miller and before some of the deprivations allegedly occurred, but that the Sergeants ignored his complaints. [FN45]

> FN43. *See e.g.* Complaint at 10.

> FN44. *Id.*

> FN45. *Id.* at 10-11.

E. Ford's Mail Watch

Following his attack on Officer Miller, Shawangunk officials also implemented a mail watch for Ford pursuant to DOCS policy. [FN46] During the mail watch, DOCS employees discovered a letter from Ford in which he boasts about his attack on Officer Miller: "I had to let one of those crazy ass pink boys have a balance kit of steel & an hot oil treatment." [FN47] The mail watch also revealed a letter in which Ford apparently tried to convince his girlfriend and others to improperly influence a witness in his trial for that attack: "I'm trying to establish a way to try & beat this case, some way so (sic) how we have to make Mr. Hill do what we want him to do not what he wants to do." [FN48]

> FN46. Parasidis Decl., Ex. B, 126, 128-129, 131-137; Ex. J, FORD MAIL 1-12.

> FN47. *Id.,* Ex. E, FORD IG 316-324.

> FN48. *Id.,* at FORD IG 316, 325-333.

In his Complaint, Ford contends that Superintendent Joseph T. Smith authorized a mail watch on his personal and legal mail, which prevented Ford's girlfriend from receiving Ford's mail and prevented Ford from receiving mail from his girlfriend. [FN49] Ford further claims that DOCS employees and others conspired to deprive him of his privacy and to hamper his access to the courts by confiscating his incoming and outgoing legal mail, stating that incoming legal documents were taken and never returned to him. [FN50]

> FN49. Compl. at 13-14.

> FN50. *Id.* at 15.

*DISCUSSION*

A. Legal Standard

**\*4** Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 55(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); *Gallo v. Prudential Residential Srvcs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). The moving party bears the initial burden of "informing the district court of the basis for its motion"

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

and of identifying the matter that "it believes demonstrates the absence of a genuine issue of material fact." *Celotex, 477 U.S. at 323.* In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).* If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P. 56(e).*

When, as here, both parties seek summary judgment, the Court must consider each party's motion on its own merits, "taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer v. Board of Educ., 667 F.2d 305, 314 (2d Cir.1981); accord Abrams v. United States, 797 F.2d 100, 103 (2d Cir.1986).* However, the submissions of a *pro se* plaintiff are held to a less stringent standard than those drafted by an attorney and must be liberally construed for the benefit of the plaintiff. *Estelle v. Gamble, 429 U.S. 97 (1976); Patrick v. LeFevre, 745 F.2d 153, 160 (2d Cir.1984).*

B. Analysis

1. Eleventh Amendment

As a preliminary matter, defendants note that they are sued for damages in their official as well as individual capacities and argue that Ford may only sue defendants for damages in their individual capacities. Defendants are correct. *See Al- Jundi v. Estate of Rockefeller, 885 F.2d 1060, 1065 (2d Cir.1989)* ("[S]ection 1983 claim for damages against a state official can only be asserted against that official in his or her individual capacity"); *accord Davis v. New York, 316 F.3d 93 (2d Cir.2002); see also Kentucky v. Graham, 473 U.S. 159 (1985)* (a claim for damages against state officials in their official capacity is considered to be a claim against the state and is therefore barred by the Eleventh Amendment); *Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89 (1984)* (agencies and departments of the state are entitled to assert the state's Eleventh Amendment immunity); *Santiago v. New York State Dep't of Corr. Servs., 945 F.2d 25, 28 n. 1 (2d Cir.1991)* (department that is an agency of the state is entitled to assert Eleventh Amendment immunity); *cf. Hafer v. Melo, 502 U.S. 21, 27-31 (1991)* (Eleventh Amendment does not bar actions for damages against state officials sued in their personal or individual capacities). Accordingly, Ford's claims for damages against defendants in their official capacities are dismissed.

2. Excessive Force

**\*5** Regarding his claims for excessive force, Ford describes three instances of abuse in his Complaint, which he alleges occurred: (1) on the morning of April 14, 2004; (2) after his assault on Officer Miller; and (3) during his transfer to Special Housing. Defendants argue that Ford was not the victim of excessive force and that any force used against him was appropriate given his attack on Officer Miller and his combative behavior following that attack.

To prevail on a claim for excessive force constituting cruel and unusual punishment under the Eighth Amendment, a plaintiff must show the unnecessary and wonton infliction of pain. *Hudson v. McMillian et al., 503 U.S. 1 (1992)* (citing *Whitley v. Albers, 475 U.S. 312 (1986)).* Whether an infliction of pain is unnecessary and wanton depends on the context in which force is used. *Whitley, 475 U.S. at 320.* Where prison officials use force to quell a prison disturbance, the question is whether force was applied in a good faith effort to maintain or restore discipline or, instead, if it was applied maliciously and sadistically for the purpose of causing harm. *Id. at 320-21; Hudson, 503 U.S. at 7* (prison officials must act quickly when responding to a prison disturbance, balancing the need to "maintain and restore discipline" against "the risk of injury to inmates."). When an individual attacks with a deadly weapon, for instance, corrections officers may respond with commensurate force. *Diggs v. New York Police Dep't et al., 2005 U.S. Dist. LEXIS 38244, \*1 (E.D.N.Y.2005)* (citing *Tennessee v. Garner, 471 U.S. 1, 11-12 (1985)* and *Estate of Kenneth Jackson v. Rochester, 705 F.Supp. 779, 783 (W.D.N.Y.1989)).*

a. The Morning of April 14, 2004

Ford alleges that Officers Miller, Erns and McClenning,

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

without provocation, kicked and punched him in the face, head, chest and back, while using racial epithets, on the morning of April 14, 2004. Defendants respond that Ford was abusive and disruptive on the morning of April 14, 2004 and that corrections officers "verbally counseled" Ford without using any force.[FN51]

> [FN51.](#) *See e.g.* Parasidis Decl., Ex. E., FORD IG 303.

Having reviewed the parties' submissions and the evidence presented to the Court, we hold that no reasonable jury could find in favor of Ford on this claim. First, Ford's evidence is very weak and primarily suggests only a *de minimus* use of force. Ford offers no direct medical evidence supporting his claim [FN52] and his documentary evidence is limited to affidavits from other inmates, which contradict one another and are otherwise problematic. [FN53] The only affidavit submitted by Ford that offers any specific allegations of potentially excessive force is signed by inmate Eric Tolliver. That affidavit states, somewhat ambiguously, that Tolliver saw Officers Miller and McClenning attack Ford with "solid fist and kicks" after 9:40 a.m. on April 14, 2004.[FN54] However, in addition to being ambiguous in its description of the morning's events, Tolliver's affidavit suffers from the following problems: (1) it contradicts statements in the other affidavits submitted by Ford, including inmate Shaun Harris's sworn recollection of what Ford told Harris about that morning; (2) it makes no mention of Officer Erns, in contrast to the version of the events offered in Ford's Complaint; and (3) it was signed and dated by Tolliver on September 12, 2006, more than two years after the incident allegedly took place.

> [FN52.](#) Ford could have sustained any and all of the medical injuries evidenced in the record during his attack on Officer Miller or during his transfer to Special Housing.

> [FN53.](#) Specifically: the May 19, 2004 affidavit of Shaun Harris offers no personal knowledge of the alleged attack, stating only that Ford told Harris that Officer Miller had pushed Ford into his cell after yelling at Ford; the July 22, 2004 affidavit of Jermaine Page offers personal

knowledge of Ford being "up on the wall" on April 14, 2004, but says nothing about a push or any other violence; the September 14, 2004 affidavit of Jesse Guess states that Mr. Guess saw Officer Miller push Ford into his cell, consistent with what Harris claims Ford told Harris, but inconsistent with Jermaine Page's statement; the April 28, 2004 affidavit of Ralph Nieves only alleges general harassment of Ford by Officer Miller; and the August 24, 2004 affidavit of Allen Griffin generally alleges that he saw Officer Miller "verbally, mentally, emotionally, and physically" assault Ford on April 14, 2004, but does not specify whether the assault occurred in the morning or in the afternoon on April 14 and does not specify what kind of physical assault took place. The Court found these affidavits amidst a stack of disorganized papers in the case file kept by the clerk's office.

> [FN54.](#) Paragraph 8 of the Tolliver affidavit states exactly as follows: "On April 14, 2004 I was out of my cell as usual to clean up after keeplock recreation went out approx. 9:30 AM, I was talking to the dubble (sic) bunk cell above 143, 4 company, for about 10 minutes, The cell on 4-company 143 opened up around 9:40 AM I locked in and called the guy whom I heard his name was "C" which I found out was actually Corey Ford, I told him to watch himself I seen C.O. Miller use the exact tactics that I warned [him] about yesterday, the Guy Corey Ford was called over to the [B] post first and the gate to 4-company was then locked, I seen solid fist and kicks being thrown by officer M. Miller and c.o. McClenning connecting against the inmate Corey ford FACE and body, The inmate was yelling for help, I witness the whole excessive force incident."

**6** Second, defendants offer evidence that Ford faced no excessive force on the morning of April 14, 2004, having submitted a number of sworn affidavits to this effect,[FN55] and Ford's own statements, made shortly after the alleged abuse, confirm this position. In a statement signed on April 14, 2004, and in another statement signed on April 15, 2004 ("Ford's Post-Incident Statements"), Ford does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

not accuse Officers Miller, McClenning and Erns of punching and kicking him during the morning of April 14, 2004. On the contrary, Ford makes no mention of any force used by Officers McClenning and Erns and only alleges that Officer Miller used a *de minimus* amount of force against him: "At this point, Miller slapped me on each side of my face ..."[FN56] *Candelaria v. Coughlin,* 787 F .Supp. 368, 374 (S.D.N.Y.1992) (use of force *de minimus* when officer "pushed his fist against [plaintiff's] neck so that [he] couldn't move and was losing [his] breath"), *aff'd* 979 F.2d 845 (2d Cir.1992).

FN55. *See supra* note 51.

FN56. Parasidis Decl., Ex. E, FORD IG 26-28 (quoting Ford's April 14, 2004 statement); *see also id.* at FORD IG 290-93 ("This is where he yells at me and slap me (sic) across my face"), dated April 15, 2004 at 9:00 a.m.

Third, given the different versions of the April 14 events offered by Ford and the inconsistencies between the affidavits submitted by Ford to support his Complaint, no reasonable jury could credit Ford's latest allegations. *See e.g. Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 572 (2d Cir.1991) (plaintiff may not "create a material issue of fact by submitting ... affidavit[s] disputing his own prior sworn testimony" in order to defeat defendants' summary judgment motion) (quoting *Mack v. United States,* 814 F.2d 120, 124 (1987)); *Jeffreys v. City of New York,* 426 F.3d 549, 553 (affirming district court's grant of summary judgment for defendants in section 1983 case brought by *pro se* prisoner-where plaintiff relied almost exclusively on his own testimony, district court could make assessments about whether a reasonable jury could credit plaintiff's testimony); *Shabazz v. Pico,* 994 F.Supp. 460, 470 (S .D.N.Y.1998) (Sotomayor, J.) (granting summary judgment for defendants where "plaintiffs allegations of the events at issue [were] replete with inconsistent and contradictory statements" and "plaintiff's version of the events ... [had] undergone at least one significant revision"). Ford has offered no fewer than four versions of what happened on the morning of April 14, 2004 through his submissions to the Court, at least three of which allege only a *de minimus* use of force and many of which, as discussed, are inconsistent with one another.[FN57] Moreover, Ford's signed

and personal version of the events, without any explanation from Ford, has undergone at least one significant and self-serving revision, changing from a story about a *de minimus* use of force to one about a brutal, unprovoked beating.

FN57. *See supra* note 53. Versions of the events offered in Ford's submissions include: (1) Ford was pushed into his cell; (2) Ford was held up on a wall; (3) Ford was slapped in the face by Officer Miller; (4) Ford was punched and kicked by Officers Miller, McClenning and Erns; and (5) Ford was punched and kicked by Officers Miller and McClenning.

In sum, given the sheer lack of evidence to support Ford's new version of the April 14 morning events, the substantial evidence against that version, and the fact that Ford's initial, signed statements contradict the allegations in his Complaint and confirm defendants' position, no reasonable jury could find in favor of Ford on this claim. Accordingly, we deny Ford's motion for summary judgment and grant summary judgment in favor of defendants.

b. Attack on Officer Miller

**\*7** Regarding the afternoon of April 14, 2004, Ford alleges that Officers Miller, Erns, Middleton and Phillips kicked and punched him, and that Sgt. Carey watched this happen without taking action. Having reviewed the parties' submissions, we hold that, even accepting Ford's allegations as true, no reasonable jury could find that defendants responded with excessive force when attempting to save Officer Miller.

The genesis of Ford's claim is his own brutal attack on Officer Miller. As Ford admits, he rushed Officer Miller, threw hot oil on his face and then stabbed him repeatedly with a nine inch shank. Given this use of potentially lethal force, and given that defendants had to react quickly to save Officer Miller, defendants were legally authorized to respond to Ford with significant force of their own, perhaps including deadly force. *See e.g. Tennessee,* 471 U.S. at 11-12; *see also Diggs v. New York Police Dep't et*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

*al.,* 2005 U.S. Dist. LEXIS 38244, *1 (E.D.N.Y.2005). Most significantly, Ford does not allege that defendants used force even commensurate with the force that he used against Officer Miller. Instead, he only alleges that the officers punched and kicked him as they got him under control.[FN58] No reasonable jury could deem this force to have been wanton, unnecessary or otherwise excessive under the circumstances. Accordingly, we deny summary judgment for Ford and grant it for defendants.[FN59]

> [FN58.] *See e.g.* Parasidis Decl., Ex. B, FORD 1-2, 22, 43.

> [FN59.] Additionally, the officers are protected by the doctrine of qualified immunity for this allegation of excessive force as it would be objectively reasonable to respond to Ford's apparent attempt to seriously injure or kill Officer Miller with force much greater than that alleged by Ford. *See e.g. Cerrone v. Brown,* 246 F.3d 194, 199 (2d Cir.2001) (officers entitled to qualified immunity as it was objectively reasonable for them to believe that their actions were lawful at the time of the challenged act).

c. Transfer to Special Housing

Regarding his transfer to Special Housing, immediately following his attack on Officer Miller, Ford alleges that he was kicked and punched by the officers escorting him, that Sgt. Myers punched him in the right side of his face, that the officers tried to break his wrist while he was on the elevator to Special Housing, that the officers repeatedly rammed his head into the steel bars at the entrance to Special Housing, and that the officers rammed his head into the wall of the strip/frisk room.[FN60] Defendants respond that they did not use excessive force against Ford and that Ford was uncooperative and violent throughout the transfer to Special Housing.

> [FN60.] Compl. at 9.

We deny Ford's motion for summary judgment on this claim. Ford offers no meaningful evidence, other than his own version of the events, to support the putative attacks during his transfer to Special Housing, and the medical evidence submitted by defendants tends to contradict Ford's claims. For instance, Ford asserts that his face and head were repeatedly rammed into steel bars, that the officers tried to break his wrist, and that Ford was otherwise beaten severely throughout the transfer-beatings that ostensibly followed Ford's alleged beating that morning at the hands of Officers Miller, Erns and McClenning as well as Ford's alleged beating during his attack on Officer Miller. Yet, the medical record of Ford's injuries upon his entrance to Special Housing reveals only the minor abrasions and scratches discussed *supra,* and the subsequent CAT-scan and x-rays revealed no injuries to Ford's abdomen or wrist. Moreover, Ford's transfer to Special Housing came immediately after, and because of, his assault on Officer Miller, making it objectively reasonable for the officers to use some amount of force to keep him under control.

**\*8** Despite the apparent weakness of Ford's evidence regarding this claim, we also deny defendants' motion for summary judgment. Defendants offer the medical evidence, which tends to contradict Ford's story, their sworn affidavits that Ford was not beaten during the transfer, their claims that Ford was combative throughout the transfer, and a video tape of the transfer that shows no violence being committed against Ford (but also does not show Ford being noticeably combative). Nevertheless, this evidence is not sufficient to preclude a reasonable jury from finding in Ford's favor. First, Ford offers his own sworn statement of the events in his Complaint, which describes a malicious, unprovoked beating accomplished while using racial epithets and, unlike his version of the morning attack, this version is consistent with Ford's Post-Incident Statements.[FN61]

> [FN61.] Ford makes no mention of abuse during his transfer to Special Housing in his April 14, 2004 statement. However, in his April 15, 2004 statement, Ford notes, "I also want to tell you about how I was assaulted in the elevator on my way to SHU. I was slammed in to the wall and taken to the floor a number of times. I did not resist. They had my hands cuffed behind my back and my pants were falling down. I had a hard time standing up-so I fell to the floor. When this happened they punched me in the balls. I think I

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

got the bump on my head when they threw me into the wall....".

Second, although the Court might find the low level of injuries in Ford's medical reports to strongly contradict Ford's claims, we cannot rely on that evidence alone to enter summary judgment against him. *See e.g. Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999) (genuine issues of material fact existed concerning what transpired after appellant was handcuffed and whether the guards maliciously used force against him; district court mistakenly concluded that because appellant's injuries were not severe, appellant's claim failed as a matter of law); *Estelle,* 429 U.S. at 102-105 ("inmates have the right to be free from the 'unnecessary and wanton infliction of pain' at the hands of prison officials").[FN62]

> **FN62.** As well, the evidence that Ford had blood in his urine tends to support his allegation that he was punched and kicked in the back. If defendants needlessly punched Ford in the back causing him to have internal bleeding, they violated his Eighth Amendment rights.

Finally, although the video tape shows Ford being escorted to and from the elevator to Special Housing and shows him entering the strip/frisk room and being stripped and frisked without apparent incident, the video has periodic breaks and interruptions. Whereas a complete video might dispel all issues of fact regarding Ford's transfer, an incomplete video cannot.[FN63] Accordingly, summary judgment is denied for defendants as well as for Ford on this claim.[FN64]

> **FN63.** Ford insists that defendants intentionally beat him when the cameras were off and during transitions between cameras. *See* Ford's Motion for Partial Summary Judgment at 8.

> **FN64.** Defendants claim that they are entitled to qualified immunity on all claims raised by Ford. However, the doctrine of qualified immunity, which protects officers in the reasonable exercise of their duties, clearly would not cover a malicious beating as alleged by Ford during his

transfer to Special Housing. *See supra* note 59.

**d. Due Process**

Liberally construed, Ford's Complaint also alleges that the aforementioned uses of excessive force violated his due process rights under the Fourteenth Amendment. For prisoners, however, the Eighth Amendment "serves as the primary source of substantive protection ... in cases ... where the deliberate use of force is challenged as excessive and unjustified." *Whitley v. Albers,* 475 U.S. 312, 327 (1986). "Any protection that 'substantive due process' affords convicted prisoners against excessive force is, [the Supreme Court] has held, at best redundant of that provided by the Eighth Amendment." *Graham v. Connor,* 490 U.S. 386, 395 (1989). Accordingly, Ford is only entitled to pursue his claims for excessive force under the Eighth Amendment. *Cf. Rodriguez v. Phillips,* 66 F.3d 470, 477 (2d Cir.1995) (in the non-prisoner, non-seizure context, the due process right to be free from excessive force is alive and well). Thus, we grant summary judgment for defendants on this claim.

**3. Deprivations**

**\*9** Ford also alleges that he suffered a number of deprivations upon being transferred to Special Housing and that these deprivations amounted to cruel and unusual punishment under the Eighth Amendment and to a violation of his due process rights under the Fourteenth Amendment. Defendants argue that Ford has failed to offer sufficient support for these claims.

**a. Cruel and Unusual Punishment**

"The constitutional prohibition against cruel and unusual punishments is intended to protect inmates from serious deprivations of basic human needs such as adequate food, clothing, shelter and medical care." *Malsh v. Garcia,* 971 F.Supp. 131, 138 (S.D.N.Y.1997). An Eighth Amendment claim challenging prison deprivations requires proof of subjective and objective components. Subjectively, the prison officials must have acted with deliberate indifference toward an inmate's health or safety and,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

objectively, the inmate's deprivation must have been sufficiently serious to have denied that inmate "the minimal civilized measure of life's necessities." *Branham v. Meachum,* 77 F.3d 626 (2d Cir.1996) (citing *Wilson v. Seiter,* 501 U.S. 294, 297-98 (1997) and *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied* 513 U.S. 1154 (1995)). The "minimal civilized measures of life's necessities" is not a low standard. Indeed, "conditions that are restrictive and even harsh are part of the penalty that criminal offenders pay for their offenses against society." *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985) (internal quotations omitted).

To support his Eighth Amendment claim, Ford alleges a number of deprivations. He complains that, on April 5, 12, 13, and 14, he was denied special meals, outside exercise and showers by Officer Miller and that, upon his arrival at Special Housing and until April 28, he was forced to have a plexi-glass shield on his cell, was denied recreation, was denied showers, did not trust the food given to him on one or two occasions, and was denied various personal items.

Defendants respond that Special Housing prisoners are limited in the number of belongings they may possess, that they are further limited in their recreation and shower privileges, and that these limitations may be extended if members of DOCS staff determine that the inmate poses a threat to himself or to others. [FN65] Defendants further state that Ford's vicious attack on Officer Miller precipitated his placement in Special Housing, that DOCS staff placed the restrictions on Ford expressly in response to that attack, and in response to the danger that Ford posed to himself and to others, and that the restrictions, which were temporary in nature and made in accordance with DOCS policy, did not amount to a constitutional violation.

FN65. See Defendants' Mem. of Law at 10-13.

We agree with defendants that Ford's deprivation claims do not begin to demonstrate deliberate indifference toward Ford's need for the minimal necessities of life. Ford does not allege or explain why the temporary placement of a plexi-glass shield threatens his minimum needs and, as a matter of law, minor and temporary deprivations of property, showers and recreation do not violate the Eighth

Amendment. *See e.g. Chapple v. Coughlin,* 1996 U.S. Dist. LEXIS 12960, *1 (S.D.N.Y 1996) (temporary deprivations of shower, recreation and legal papers "in no way involved the severity of treatment which must be shown to make out a case of cruel and unusual punishment") (citing *Majid v. Scully,* No. 83 Civ. 7409, 1985 WL 1408 *6 (S.D.N.Y. May 21, 1985) (unpublished)); *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (prisoners must receive nutritiously adequate food that does not endanger their health and safety); *Cruz v. Jackson,* 1997 U.S. Dist. LEXIS 1093 (S.D.N.Y. Feb. 5, 1997) (two weeks without showers, cold food for four weeks and unspecified incidents of receiving rusty drinking water did not violate Eighth Amendment rights) (citing *Williams v. Greifinger,* 918 F.Supp. 91, 95 n. 3 (S.D.N.Y.1996)).

**\*10** Moreover, defendants have provided evidence that the deprivations were not a result of malice or of deliberate indifference to Ford's health or safety but, instead, served legitimate security and safety needs following Ford's attack on Officer Miller and were imposed during a period of time when Ford received food and medical care. [FN66] Accordingly, Ford's motion for summary judgment on his Eighth Amendment claim is denied and summary judgment is granted for defendants.

FN66. *See e.g.* Parasidis Decl., Ex. C, FORD GRIEVANCE 34-35, 50-57; Ex. I, FORD ORDERS 1-8.

b. Due Process

Ford also suggests that his confinement to Special Housing, given the deprivations discussed above, violated his right to due process under the Fourteenth Amendment. We construe Ford's Complaint as asserting his liberty interest to be free from confinement involving atypical and significant hardships without due process of law.

A prisoner's confinement to Special Housing in a New York prison may implicate that prisoner's legally recognized interest in being free from restraints imposing atypical and significant hardships relative to the ordinary incidents of prison life. *Sandin v. Connor,* 515 U.S. 472

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

(1995) (thirty days in Special Housing does not, by itself, violate prisoner's due process rights); *Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996)* (prisoner failed to demonstrate a significant deprivation of a liberty interest where he spent approximately twelve days in Special Housing and was denied "certain privileges that prisoners in the general population enjoy"); *Lee v. Coughlin, 26 F.Supp.2d 615 (S.D.N.Y.1996)* (Sotomayor, J.) (376 days in Special Housing implicated liberty interest recognized by the State of New York). However, to prevail under section 1983, a plaintiff must allege not only that his confinement to Special Housing implicated a recognized liberty interest, but also that the liberty interest was infringed without due process of law. *See e.g. Cespedes v. Coughlin, 956 F .Supp. 454, 469 (S.D.N.Y.1997)*.

Regarding Ford's claim that he was denied recreation, showers, and a special meal on four occasions before and on April 14, 2004, we deny summary judgment for Ford and grant it in favor of defendants. These minor and temporary denials clearly do not constitute significant hardships implicating a constitutionally protected liberty interest. *See e.g. Frazier,* 81 F.3d at 317. We also deny summary judgment for Ford and grant it for defendants on Ford's claim arising from his confinement in Special Housing.

There are three significant problems with Ford's due process claim based on his confinement in Special Housing. First, it is far from clear that the alleged confinement, even if accurately depicted by Ford, implicates a protected liberty interest given the temporary nature of the deprivations. *See e.g. Frazier,* 81 F.3d at 317. Second, Ford has failed to allege that he was denied due process of law in connection with this ostensible liberty interest. Ford does not allege that he was denied a hearing or that his hearing officer was not objective, and he does not allege that defendants did not explain to him why he faced the deprivations he did. *Cf. Sandin,* 515 U.S. at 487-88 (summary judgment granted for defendants where plaintiff claimed violation of due process because defendants "refus[ed] to allow him to present witnesses at his hearing, and [sentenced] him to disciplinary segregation for thirty days.").

**\*11** Third, although Ford does allege that defendants deprived him of privileges and Special Housing property

in violation of DOCS directive 4933, this allegation fails to state a violation of due process. For one, the text of Directive 4933 shows that Ford was not necessarily entitled to the claimed property and privileges under the circumstances of his confinement: "An order depriving an inmate of a specific item, privilege or service may be issued when it is determined that a threat to the safety or security of staff, inmates, or State property exists". Moreover, defendants offer a mass of evidence demonstrating that they followed Directive 4933 with respect to Ford and that Ford received full consideration and a hearing in connection with Directive 4933. A "Deprivation Order", dated April 14, 2004 and authorized by Sgt. Maly, for example, states:

In accordance with 7 NYCRR Section 305.2, you are being deprived of the following specific item(s), privilege(s), or service(s): All out of cell activities (including showers) because it is determined that a threat to the safety or security of staff, inmates or State property exists and for the following specific reason(s): You seriously assaulted a corrections officer. [FN67]

> FN67. Parasidis Decl., Ex E., FORD GRIEVANCE 50. *See also id.* at FORD GRIEVANCE 50-58, 109, 118-20, 126, 128, 129, 131, 132, 133, 134, 135-37, 143; Ex. I, FORD ORDERS 1-8.

A lengthy statement reviewing Ford's April 19, 2004 grievance regarding his Special Housing confinement further provides: "Upon full hearing of the facts and circumstances in the instant case, the action requested herein is hereby denied with clarification to the extent that the matter was investigated and the issue of the complaint has been found to be without merit." [FN68]

> FN68. *Id.* at FORD GRIEVANCE 30.

Since Ford has failed to allege any cognizable violation of due process of law relating to his Special Housing confinement, and since defendants have provided the Court with ample, uncontroverted evidence that Ford received such process, summary judgment is denied for Ford and granted for defendants on this claim. [FN69]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

FN69. We note further that the reasons and bases for Ford's confinement and deprivations in Special Housing should have been obvious to Ford immediately upon his transfer to Special Housing given that they arose immediately after his vicious attack on Officer Miller. Not only would such an attack make guards fearful for themselves and other prisoners should Ford be taken out of his Special Housing cell, but guards would also be fearful that Ford would use any property he obtained to hurt himself or others. In fact, this is the explanation provided in the deprivation orders and related documents submitted by defendants. *See supra* note 67.

4. Deliberate Indifference to a Serious Medical Need

Ford argues that defendants Joseph Smith, John Maly, Sgt. Kimbler and Dr. Bhavsar violated his constitutional rights by failing to provide adequate medical care for the injuries to his face, head, back, kidneys, groin area and penis during April of 2004. Defendants respond that Ford's pleadings are not sufficient to support a claim for constitutionally deficient medical care.

To maintain a claim for deliberate medical indifference, Ford must prove "deliberate indifference to [his] serious medical needs." *Hathaway,* 37 F.3d at 63 (quoting *Estelle,* 429 U.S. at 102 (medical indifference claim brought by prisoner pursuant to section 1983 alleging violation of Eighth Amendment as applied to the states via Fourteenth Amendment)). This standard requires proof of objective and subjective prongs. *Id.*

The objective prong of the deliberate indifference standard requires proof of a medical deprivation "sufficiently serious" to create a condition of urgency that might produce death, degeneration or extreme pain. *Williams v. Vincent,* 508 F.2d 541 (2d Cir.1974) (easier and less efficacious treatment of throwing away prisoner's ear and stitching the stump may be deliberate indifference); *cf. Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (cut finger with "skin ripped off" is insufficiently serious);

*Bonner v. N.Y. City Police Dep't,* No. 99 Civ. 3207, 2000 WL 1171150, at *4 (S.D.N.Y. Aug. 17, 2000) (inability to close hand due to swelling insufficiently serious to constitute Eighth Amendment violation); *Gomez v. Zwillinger,* 1998 U.S. Dist. LEXIS 17713 at *16 (S.D.N.Y. November 6, 1998) (back pain and discomfort not sufficiently serious); *Jones v. New York City Health & Hosp. Corp.,* 1984 U.S. Dist. LEXIS 21694 at *3-4 (S.D.N.Y. November 28, 1984) (deliberate indifference claim dismissed where plaintiff challenged treatment for bruises on head and body).

*12 The subjective prong of the deliberate indifference standard requires proof that the accused defendant knew of and disregarded "an excessive risk to inmate health or safety". *Hathaway,* 37 F .3d at 66 ("The official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and must also draw the inference."). Specifically, the plaintiff must prove that the accused defendant acted, or declined to act, with a state of mind equivalent to criminal recklessness. *See Boomer v. Lanigan,* 2002 WL 31413804, *1 (S.D.N.Y.2002) (Cote, J.) (unreported) (citing *Hathaway,* 99 F.3d at 553); *Cunningham v. City of New York,* 2006 U.S. Dist. LEXIS 35607 at *6 (S.D.N.Y. June 1, 2006) (mere disagreement between treating physician and patient about course of treatment does not give rise to a constitutional claim).

Having reviewed the pleadings and evidence submitted with the motions for summary judgment, we agree with defendants that Ford cannot prevail on his claim for deliberate medical indifference stemming from his treatment during April and May of 2004. First, most of the injuries asserted by Ford were not sufficiently serious to satisfy the objective prong of the deliberate indifference standard. Ford claims, and the prison's medical reports confirm, that Ford suffered from a minor bruise on his forehead; reddened abrasions with a slight amount of bleeding on his left temple; reddened abrasions on his right upper chest, abdomen, and right underarm; and superficial scratches on his right upper back when he was admitted to Special Housing. Abrasions, a minor bruise, slight bleeding and scratches are not injuries that may produce death, degeneration or extreme pain, and no reasonable jury could find to the contrary. *See e.g. Jones,* 1984 U.S. Dist. LEXIS 21694 at *3-4 (allegations of bruises about head and body do not shock the conscience

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

and are inadequate to state claim for deliberate medical indifference in section 1983 suit). [FN70]

FN70. The remaining injuries claimed by Ford, which might have appeared to be serious upon his initial complaints, also proved not to be serious. Ford complained that he found blood in his urine, that he vomited blood, that he suffered from persistent abdominal and groin pain, that his wrists hurt and that he had headaches and dizzy spells. Within a few weeks, however, Ford ceased to have blood in his urine; his bruises and abrasions were healed or healing normally; x-rays showed no damage to his wrist; and a CAT-scan revealed no injuries to the organs inside his abdomen or to his abdomen generally, confirming Dr. Bhavsar's finding that Ford had no tenderness in his ribs or abdomen. As well, Ford has not alleged that his vomiting, dizzy spells or headaches, for which there is no objective evidence to begin with, persisted or led to more serious problems, and though Ford claims that he now has a weak bladder, he has not alleged that it is degenerative or causes him extreme pain. *See generally* Parasidis Decl., Ex. G, Bhavsar Decl.

Second, in light of the evidence submitted by defendants, Ford also cannot satisfy the subjective prong of the deliberate indifference standard. Various medical forms submitted by defendants reveal that Ford was evaluated on no fewer than eight occasions between April 14, 2004 and early May of 2004, including examinations by a triage nurse and visits with Dr. Bhavsar, and not including the regular opportunities Ford had to speak with a Special Housing nurse. As Ford admits, Dr. Bhavsar, in addition to examining Ford personally, ordered three different urine analyses, a set of x-rays, and a CAT-scan, calling for the latter two procedures even though Ford's wrist and abdomen showed no apparent signs of problems. Dr. Bhavsar's records further reveal that he explained to Ford the proper course of treatment for his various injuries, that he prescribed Tylenol for his minor injuries, and that he continued to monitor Ford's possible internal injuries, such as the blood in his urine, until those symptoms subsided. [FN71]

FN71. *Id.*

*13 As such, no reasonable jury could find that the medical staff demonstrated deliberate indifference to Ford's medical condition and certainly Ford has not offered any evidence to suggest that the medical care he received amounted to criminal recklessness. On the contrary, a reasonable jury would readily find that Ford, in receiving x-rays for a non-swollen wrist with full movement, a CAT-scan for an abdomen showing no tenderness, and three urine tests for a problem that shortly resolved itself, obtained more thorough medical attention while incarcerated than he would have outside of prison. For these reasons, we deny Ford's motion for summary judgment and grant defendants' motion for summary judgment on Ford's medical indifference claim. [FN72]

FN72. Even if one or more officers ignored Ford's complaints on one or more specific occasions, which Ford alleges without offering additional support, the fact that Ford actually received extensive and repeated medical attention demonstrates that those instances of indifference did not deny Ford adequate medical attention. Moreover, to prevail on the subjective element against those officers, Ford would have to demonstrate that the officers knew that Ford actually had a serious injury-as opposed to simply hearing Ford complain of such an injury-and nevertheless ignored it. Ford has not offered any evidence to this effect, beyond that he complained more than once that he suffered from severe pain. He does not, for instance, allege that the officers saw him bleeding or otherwise suffering some clearly serious injury.

5. Mail Interference

Ford further complains that the DOCS staff instituted a mail-watch on his personal mail and confiscated some of his mail in violation of his constitutional rights, denying him access to the courts and preventing him from communicating with his girlfriend. Defendants admit that they instituted a mail watch on Ford following his attack on Officer Miller and argue that Ford has not sufficiently alleged any constitutional violation based on mail

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

interference.

a. Denial of Access to the Courts

In order to state a constitutional claim for denial of access to the courts, a plaintiff must show deliberate and malicious action resulting in an actual injury, such as the dismissal of an otherwise meritorious claim. *Cancel v. Goord,* 2001 U.S. Dist. LEXIS 3440, *16 (S.D.N.Y. Mar. 29, 2001) (plaintiff must show frustration of non-frivolous claim as a result of official action) (citing *Washington v. Jones,* 782 F.2d 1134, 1138 (2d Cir.1986)); *see also Lewis v. Casey,* 518 U.S. 343, 351 (1996); *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997). Actions causing mere delay in a prisoner's ability to work on a legal action or to communicate with the courts do not rise to the level of a constitutional violation. *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) (citing *Jones v. Smith,* 784 F.2d 149, 151-52 (2d Cir.1986)).

We agree with defendants that Ford cannot prevail on his denial of access claim. Ford's only allegations that defendants' interference with his mail caused him an actual legal injury are his vague statements that the interference made him lose papers that were "very important" to his motion to set aside the verdict in his criminal trial and that the interference hurt his preparation for sentencing.[73] Ford has not alleged that he missed any deadlines or faced any other, specific legal injuries as a result of the alleged interference, and the mere suggestion, without any supporting argument or evidence, that Ford would have succeeded on his motion to set aside the verdict or that he would have received a lighter sentence but-for defendants' mail-watch clearly does not state that Ford lost an otherwise meritorious claim.[74] This is especially true in light of Ford's conviction for the offense charged, the substantial evidence supporting that conviction discussed *supra,* the fact that Ford has not yet been sentenced for his attack on Officer Miller, and the fact that Ford, far from proceeding *pro se,* has been represented by counsel throughout his criminal trial and post-trial proceedings.[75] Thus, we deny Ford's motion for summary judgment on this claim and grant summary judgment in favor of defendants.

FN73. *See* Ford Brief at 22-23; *see also*

Complaint at 25.

FN74. Ford also generally alleges that he was denied the right to appear before a grand jury. However, Ford does not explain how interference with his mail caused this denial and he has also submitted documents to the Court suggesting that he did not intend to appear before the grand jury in his criminal case. *See infra* note 75 at 3-4.

FN75. *See* March 16, 2006 Order of Judge Hayes at 2-3 (Ford was initially represented by Assistant Public Defender James Hill and was later represented by Assistant Public Defenders George Hazel and David Martin. Kenneth J. Roden, Esq. represented Ford in connection with his CPL §§ 330.30 and 440.10 motions).

b. First Amendment

**\*14** Ford's Complaint does not expressly assert a First Amendment claim based on interference with his non-legal mail, but a liberal reading of that document suggests that Ford intended to do so since he complains that DOCS staff took mail going to and coming from his girlfriend.[76] In order to state a First Amendment claim based on mail interference, a prisoner must show that the interference either did not further one or more substantial government interests, such as security, order and rehabilitation, or that the interference was greater than necessary to the protection of that interest. *Davis,* 2003 U.S.App. LEXIS 13030 at *8-10 (citing *Washington v. James,* 782 F.2d 1134 (2d Cir.1986)); *U.S. v. Felipe et al.,* 148 F.3d 101 (2d Cir.1998) (interception of prison correspondence does not violate First Amendment if prison officials had "good or reasonable cause" for inspection) (citing *U.S. v. Workman,* 80 F.3d 688, 699 (2d Cir.1996) ("We think it clear that-at least where prison officials have reasonable cause for suspicion-surveillance of inmate mail is unobjectionable; investigation and prevention of illegal activity among inmates is "a legitimate penological interest, which has a logical connection to the decision to impose a mail watch on a prisoner")).

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

FN76. At times in Ford's submissions, he also complains of losing mail to his spouse. It is not entirely clear whether the spouse and girlfriend to whom Ford refers are the same person, but the pleadings, taken together, strongly suggest that this is the case.

We agree with defendants that no reasonable jury could find for Ford on his First Amendment claim. To the extent that Ford complains about a mail watch, it is evident from defense submissions and from the facts discussed *supra* that defendants had legitimate reasons for monitoring Ford's mail, namely: (1) to investigate Ford's assault on Officer Miller; (2) to prevent Ford from instigating further violence following that assault; and (3) to monitor efforts by Ford to improperly influence his trial for that assault.[FN77] In fact, the mail watch revealed one letter in which Ford admits to stabbing and throwing hot oil on Officer Miller, which proved to be useful to the prison's investigation of that attack, and at least one letter wherein Ford discusses and recommends efforts to improperly influence a witness in his trial.[FN78]

FN77. *See* Parasidis Decl., Ex. C, FORD GRIEVANCE 126, 128-29, 131-37; Ex. J, FORD MAIL 1-12; Ex. E, FORD IG 316-24.

FN78. *Id.*

Moreover, although destroying Ford's incoming and outgoing mail would likely go beyond the measures necessary to protect the prison's interests in security and in investigating Ford's assault, Ford has failed to plead any instance of mail interference wherein defendants improperly confiscated his mail. Ford generally alleges that defendants took mail going to and from his girlfriend, but he does not allege any specific occurrence of confiscation and does not specify whether DOCS staff confiscated just the two letters discussed above or whether they took other letters as well. Clearly, if defendants only confiscated the letters admitting to the assault on Officer Miller and attempting to improperly influence Ford's trial for that assault, the confiscation did not go beyond what was necessary to protect the prison's legitimate penological interests. Without any specific allegation regarding some other confiscation by DOCS staff, without

any evidence offered to support such an allegation, and given defendants' affidavits and documents stating that defendants merely implemented an appropriate mail watch in accordance with DOCS policies and procedures,[FN79] no reasonable jury could find that defendants violated Ford's constitutional rights by improperly interfering with his non-legal mail.

FN79. *See e.g.* Parasidis Decl., Ex C., FORD GRIEVANCE 128-29, 131-37; Ex. J, FORD MAIL 1-12.

**\*15** Accordingly, Ford has not sufficiently alleged any violation of his rights regarding the mail to state a constitutional claim. Ford's summary judgment motion for his mail claims is denied and summary judgment is granted in favor of defendants.

6. Responsibility of Individual Defendants

Defendants' Memorandum of Law concludes by arguing that Ford fails to allege that certain defendants were personally involved in or responsible for the constitutional violations he alleges, entitling those defendants to judgment as a matter of law. Specifically, defendants argue that Ford fails to allege: (1) that Sgt. Carey, Superintendent Phillips and Sgt. Guiney used any force against him; (2) that Inspector Vacca violated his constitutional rights by ordering a mail watch; and (3) that Sgt. Kimbler and Sgt. Jewett are responsible to him for any deliberate indifference to his medical needs. Defendants are correct that Ford must allege and support personal involvement in the constitutional violations to prevail against these defendants. *See e.g. Woods v. Goord,* 2002 U.S. Dist. LEXIS 7157, *23 (S.D.N.Y.2002) (Section 1983 plaintiff must allege personal involvement of each defendant); *see also Montero v. Travis,* 171 F.3d 757, 761-62 (2d Cir.1999) (requiring allegation of direct personal involvement against supervisory official to state section 1983 claim) (citing *Sealey v.. Giltner,* 116 F.3d 47, 51 (2d Cir.1997)).

Having reviewed Ford's submissions, we agree that Sgt. Carey, Superintendent Phillips and Superintendent Guiney are entitled to summary judgment. Ford does not accuse

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

these defendants of using excessive force against him. We also agree that Inspector Vacca is entitled to summary judgment given that we grant defendants' motion for summary judgment on Ford's mail interference claims, and that Sgts. Kimbler and Jewett are entitled to summary judgment on Ford's claims for medical indifference and for lack of due process.

*CONCLUSION*

For the reasons stated above, we deny all aspects of Ford's motion for summary judgment and grant summary judgment for defendants on all of Ford's claims except for his excessive force claim arising from his transfer to Special Housing on April 14, 2004 .[FN80] Thus, Ford may pursue his claim for excessive force against defendants C.O. Huttel, C.O. Austin, C.O. Czyzewski and Sgt. Myers,[FN81] but his Complaint is dismissed as to the following defendants: Superintendent Phillips, Deputy Superintendent Guiney, C .O. Miller, C.O. Middleton, C.O. McClenning, C.O. Erns, Sgt. Carey, Superintendent Smith, Deputy Superintendent Maly, Dr. Bhavsar, Sgt. Kimbler, Sgt. Jewett and Inspector General Vacca.

FN80. Ford raises what purports to be an equal protection argument, for the first time, in his Motion for Partial Summary Judgment, dated July 24, 2006, at 26-27. The argument offers only minimal facts and conclusions of law, without providing any reason or argument as to why those facts support a violation of Ford's right to equal protection. To the extent that Ford seeks summary judgment on an equal protection claim, summary judgment is denied.

FN81. Although we do not grant summary judgment for defendants on Ford's one remaining claim, we note that our reluctance to do so should *not* be taken to reflect any view that Ford will prevail on that claim. On the contrary, Ford has only limited evidence to support the claim and defendants have considerable evidence against it. Moreover, for the plaintiff's edification, even if a jury were to find in his favor on that claim, it would be entitled to award Ford only nominal damages-as low as $1-if it

found that Ford deserved nothing more.

IT IS SO ORDERED.

S.D.N.Y.,2007.
Ford v. Phillips
Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 1171150 (S.D.N.Y.)
(Cite as: 2000 WL 1171150 (S.D.N.Y.))

⚐

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Dennis BONNER, Plaintiff,
v.
NEW YORK CITY POLICE DEPT.; Michael
Orlowski, 5577; New York City Department of
Corrections; Jame Sanchex, 5769, Defendants.
**No. 99 Civ. 3207(AGS).**

Aug. 17, 2000.

Michael D. Hess, Corporation Counsel of the City of New
York, by Lisa J. Black, for Defendants.

*OPINION AND ORDER*

SCHWARTZ, J.

**\*1** Plaintiff Dennis Bonner, appearing *pro se,* brings this
action pursuant to 42 U.S.C. § 1983 against defendants
New York City Police Department ("NYPD"), New York
City Department of Corrections ("DOC"), Michael
Orlowski ("Orlowski"), and Jame Sanchex ("Sanchex")
(collectively: "defendants"). Before the Court is
defendants' motion to dismiss the complaint pursuant to
Federal Rule of Civil Procedure ("Fed. R. Civ.P.")
12(b)(6). For the reasons stated below, defendants' motion
is GRANTED.

FACTUAL BACKGROUND [FN1]

FN1. On a motion to dismiss pursuant to
Fed.R.Civ.P. 12(b)(6), the Court is required to
accept as true the allegations stated by the
non-moving party. *SeeGant v. Wallingford
Board of Educ.,* 69 F.3d 669, 673 (2d Cir.1995).

Further, in deciding the motion under 12(b)(6),
the court may consider "facts stated on the face
of the complaint and in documents appended to
the complaint or incorporated in the complaint
by reference, as well as [ ] matters of which
judicial notice may be taken." *Automated
Salvage Transport, Inc. v. Wheelabrator
Environmental Systems, Inc.,* 155 F.3d 59, 67
(2d Cir.1998) (citation omitted). Accordingly,
the facts discussed herein are accepted as true for
the purposes of this motion and are drawn from
the allegations of the complaint or are otherwise
reflected in the record.

Plaintiff alleges that, on March 12, 1997, while in police
custody at the 46th Precinct in the Bronx, he requested
medical treatment "for [a] hand that was extremely
swolle[n]". (Complaint at 3, section IV.) Allegedly,
plaintiff was denied medical treatment for a period of
time. (Complaint at 3, section IV.) Plaintiff further alleges
that, on April 4, 1997, a bus conveying plaintiff was
involved in an accident and plaintiff's head and back were
injured. (Complaint at 4, section IV.) The bus was
allegedly operated by the DOC. (Complaint at 4, section
IV.) Plaintiff asserts that he was "given pain killer" but
still suffers discomfort. (Complaint at 4, section IV-A.) He
further asserts that he is still in need of medical
attention because a finger on his right hand "does not close".
(Complaint at 4, section IV-A.)

On May 4, 1999, plaintiff filed this action seeking
approximately five million dollars in damages. Plaintiff
brings this action pursuant to 42 U.S.C. § 1983 ("section
1983"), alleging that, by denying him adequate medical
treatment and by deliberately disregarding his safety,
defendants violated his Eighth Amendment right to be free
from cruel and unusual punishment. (Plaintiff's
Memorandum in Opposition to Defendants' Motion to
Dismiss ("Pl's.Mem.Law") at 1, 6.) In addition, the
complaint is construed to assert a pendent claim for
negligence under New York common law. Defendants
filed the instant motion to dismiss, which was fully
submitted on May 17, 2000.[FN2]

FN2. Defendants filed the instant motion to

Not Reported in F.Supp.2d, 2000 WL 1171150 (S.D.N.Y.)
(Cite as: 2000 WL 1171150 (S.D.N.Y.))

dismiss on January 5, 2000. By letter dated January 6, 2000, defendants apprised the Court that although they had filed their own papers, plaintiff's opposition papers had been rejected by the Clerk of the Court for failure to set forth the correct docket number. Plaintiff, who is incarcerated, was ultimately successful in filing his opposition papers to the instant motion on May 17, 2000.

DISCUSSION

I. LEGAL STANDARD GOVERNING DISMISSAL PURSUANT TO FED. R. CIV. P. 12(b)(6)

Defendants move to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6). On such a motion, the court is required to accept the material facts alleged in the complaint as true and to construe all reasonable inferences in plaintiff's favor. *See Grandon v. Merril Lynch & Co., 147 F.3d 184, 188 (2d Cir.1998); Caspar v. Lew Lieberbaum & Co., Inc.,* No. 97 Civ. 3016(JGK), 1998 WL 150993,*1 (S.D.N.Y. Mar. 31, 1998). Further, the court's function on a motion to dismiss "is not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Caspar,* 1998 WL 150993,*1 (citation omitted). Therefore, a defendant's motion should be granted only if the court determines that "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.,* 155 F.3d 59, 67 (2d Cir.1998) (quoting *Conley v. Gibson,* 35 U.S. 41, 45-46 (1957)). Where, as here, the plaintiff is proceeding *pro se,* courts must apply a "more flexible standard in determining the sufficiency of [the] complaint than they would in reviewing a pleading submitted by counsel." *Platsky v. CIA,* 953 F.3d 26, 28 (2d Cir.1991) (*per curiam* ); *see Haines v. Kernier,* 404 U.S. 519, 520-21 (1972).

*2 However, "while *Conley* permits a pleader to enjoy all favorable inferences from facts that have been pleaded, it does not permit conclusory statements to substitute for minimally sufficient factual allegations". *Electronics*

*Communications Corp. v. Toshiba America Consumer Prods., Inc.,* 129 F.3d 240, 243 (2d Cir.1997) (citation omitted). The Court is not required to uphold the validity of a claim supported only by conclusory allegations. *See Gant,* 69 F.3d at 673 ("It is well settled in this Circuit that a complaint consisting of nothing more than naked assertions, and setting forth no facts upon which a court could find a violation ... fails to state a claim under Rule 12(b)(6).").

II. CLAIM PURSUANT TO SECTION 1983

Plaintiff asserts a claim under section 1983, alleging that his Eighth Amendment right to be protected from cruel and unusual punishment was violated by inadequate medical care and defendants' deliberate disregard for his safety. Defendants contend that the section 1983 claim must be dismissed because: (i) defendants NYPD and DOC are not suable entities; (ii) plaintiff has failed to allege facts upon which a court could find that defendants Orlowski and Sanchex were personally involved in the alleged misconduct; and (iii) plaintiff has failed to allege facts upon which a court could find that a constitutional violation had occurred.

A. *Section 1983 claim as against the NYPD and the DOC is barred*

Defendants argue that the section 1983 claim as asserted against defendants NYPD and DOC must be dismissed because these defendants are not suable entities. Chapter 17 § 396 of the New York City Charter provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not that of any agency, except where otherwise provided by law." The NYPD and the DOC are agencies of the City of New York and, consequently, may not be sued independently. *See Baird v. Perez,* No. 98 Civ. 3762(SAS), 1999 WL 386746,*4 (S.D.N.Y. Jun. 10, 1999) (recognizing that the NYPD is an agency and pursuant to § 396 may not be sued independently); *Adams v. Galletta,* 996 F.Supp. 210, 212 (S.D.N.Y.1997) (recognizing that the DOC is an agency and pursuant to § 396 may not be sued independently) (collecting cases). Accordingly, plaintiff's section 1983 claim as asserted against the NYPD and the DOC must be

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1171150 (S.D.N.Y.)
(Cite as: 2000 WL 1171150 (S.D.N.Y.))

dismissed. *See* Perez, 1999 WL 386746,*4 (dismissing section 1983 claim as against the NYPD pursuant to § 396); *Adams,* 966 F.Supp. at 212 (dismissing section 1983 claim as against the DOC pursuant to § 396).

B. *Section 1983 claim as against defendants Orlowski and Sanchex is barred*

Defendants argue that the section 1983 claims as asserted against defendants Orlowski and Sanchex must be dismissed because plaintiff has failed to allege that these defendants were personally involved in the allegedly unconstitutional activity. It is well established in the Second Circuit that to state a claim under section 1983 a plaintiff must allege facts showing that the defendant was directly and personally involved in the alleged constitutional deprivations. *See* McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977) (cited by Ella v. Jackson, No. 95 Civ. 2314(AGS), 1996 WL 673819,*2 (S.D.N.Y. Nov. 20, 1996) (Schwartz, J.); *cf.* Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir.1986) (holding that doctrine of *respondeat superior* cannot be applied to impute liability to a supervisor under section 1983). The only circumstances under which allegations of direct participation may not be necessary arise when a supervisory official has had "actual or constructive notice of unconstitutional practices and demonstrates 'gross negligence' or 'deliberate indifference' by failing to act." Ella, 1996 WL 673819,*2 (quoting Al- Jundi v. Estate of Rockefeller, 885 F.2d 1060, 1065 (2d Cir.1989) (citation omitted)).

**\*3** Here, under the most liberal construction of the complaint, plaintiff merely alleges that Orlowski and Sanchex were supervisors. This allegation is inadequate to establish personal involvement. *See* Pritchett v. Artuz, No. 99 Civ. 3957(SAS), 2000 WL 4157,*6-7 (S.D.N.Y. Jan. 3, 2000) (finding that plaintiff had failed to establish personal involvement where "plaintiff has simply alleged that [defendant] should be held liable because he is in charge"). Plaintiff's complaint is entirely devoid of allegations that defendants Orlowski and Sanchex (i) were directly involved in the alleged violation of plaintiff's civil rights; or (ii) were supervisors who had actual or constructive notice of unconstitutional practices and had demonstrated gross negligence or deliberate indifference in failing to act. Accordingly, plaintiff's claims against

Orlowski and Sanchex must be dismissed. *See* Ella, 1996 WL 673819,*2 (dismissing section 1983 claim for failure to state a claim where complaint was "entirely devoid of allegations of any personal involvement" by individual defendants and "there [wa]s no evidence of actual or constructive notice of unconstitutional practices demonstrating gross negligence or deliberate indifference in the failure to act"); *see also* Simmons v. Artuz, No. 98 Civ. 777(SAS), 1999 WL 287366,*5 (S.D.N.Y. May 6, 1999) (dismissing section 1983 claim for failure to allege each defendant's personal involvement in the alleged constitutional deprivation).

C. *Plaintiff has failed to allege facts upon which a court could find that plaintiff's Eighth Amendment rights have been violated*

Even were the complaint amended to name the City of New York as a defendant and to allege personal involvement by Orlowski and Sanchex, plaintiff's section 1983 claim would be dismissed for failure to allege facts showing a constitutional violation. Neither Monell v. Department of Soc. Serv., 436 U.S. 658, 690-91 (1978), nor its progeny "authorize the award of damages against a municipal corporation based on the actions of one of its officers when in fact ... the officer inflicted no constitutional harm." City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986); *see* Pitchell v. Callan, 13 F.3d 545, 549 (2d Cir.1994). In order to assert a claim pursuant to section 1983, a plaintiff must allege that a constitutional violation has occurred. *See* Paul v. Davis, 424 U.S. 693 (1976); Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir.1983). Here the constitutional violation alleged is that defendants violated the Eighth Amendment both by providing inadequate medical care and by deliberately disregarding plaintiff's safety.

1. *Inadequate Medical Care*

In order to state an Eighth Amendment claim arising out of inadequate medical treatment, a prisoner must set forth facts showing "deliberate indifference to [his] serious medical needs." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir.1998) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)) (brackets in original). This standard includes an objective and a subjective component. The objective

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1171150 (S.D.N.Y.)
(Cite as: 2000 WL 1171150 (S.D.N.Y.))

component, a "serious medical need", involves "a condition of urgency, one that may produce death, degeneration, or extreme pain". *See* *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The subjective component, the defendant's "deliberate indifference", requires that the defendant "knows [of] and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994) (cited by *Henderson v. Doe,* No. 98 Civ. 5011(WHP), 1999 WL 378333,*4 (Jun. 10, 1999)). "Negligence, even if it constitutes medical malpractice, does not without more, engender a constitutional claim" *Chance,* 143 F.3d at 703; *see also* *Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.").

**\*4** Here, however liberally this Court construes plaintiff's allegations, the complaint falls short of meeting these pleading requirements. First, plaintiff has not alleged facts that show that there was a sufficiently serious medical need. Plaintiff's asserts that, as a result of allegedly inadequate treatment of his swollen hand, one of his fingers "does not close" and he "still suffers discomfort." These assertions do not set forth facts upon which the Court could conclude plaintiff suffered or suffers from a condition that may produce death, degeneration, or extreme pain. *Cf.* *Henderson,* 1999 WL 378333,*4 (finding that broken right pinky finger was not a medical condition that might "produce death, degeneration, or extreme suffering"); *Rivera v. Johnson,* 1996 WL 549336,*2 (W.D.N.Y. Sept. 20, 1996) ("A broken finger without more, simply does not present a condition of urgency of the type that may produce death, degeneration or extreme pain which correspondingly merits constitutional protection.").[FN3]

> **FN3.** Plaintiff further alleges that he "suffered a back and head injury" as a consequence of a motor vehicle accident. Given the liberal reading of the pleadings required on a motion to dismiss, the Court liberally construes this to be an additional allegation intending to establish the inadequacy of the medical care plaintiff has received. However, the terse allegation that

plaintiff was injured, bereft of any facts that would indicate incipient death, degeneration, or extreme pain, likewise fails to support the existence of a "serious medical need".

Second, even were the Court to conclude that plaintiff had alleged a serious medical need existed, plaintiff has failed to plead facts that establish "deliberate indifference." Plaintiff entirely fails to set forth facts showing that defendants had been "aware of the facts from which the inference could be drawn [that serious harm existed]", had, in fact, "drawn the inference," and had, nevertheless, disregarded such harm. *Chance,* 143 F.3d at 703 Consequently, plaintiff has failed to allege facts upon which the Court could find that a constitutional violation arising out of inadequate medical care has occurred.

### 2. *Deliberate disregard for safety of plaintiff*

In order to state a claim for violation of the Eighth Amendment arising out of disregard for prisoner safety, a plaintiff must allege facts showing that the defendants acted toward him with "deliberate indifference." *Rangolan v. County of Nassau,* No. 99 Civ. 9343, 2000 WL 827312,*2 (2d Cir. Jun. 26, 2000) (quoting *Wilson v. Seiter,* 501 U.S. 294, 297 (1991)). Under that standard, plaintiff must show, *inter alia,* that defendants must have known of and disregarded an excessive risk to plaintiff's health and safety. *See* *Branham v. Meachum,* 77 F.3d 626, 631 (2d Cir.1996); *Pritchett v. Artuz,* No. 99 Civ. 3957(SAS), 2000 WL 4157,*2 (S.D.N.Y. Jan. 3, 2000) ("Similarly, with respect to a prisoner's safety, a prison official may be held liable if the official: (1) knows that the inmate faces a substantial risk of serious harm; and (2) disregards that risk by failing to take reasonable measures to abate it.").

Here, plaintiff fails to allege any facts demonstrating that defendants knew of and disregarded an excessive risk to plaintiff's safety. The sole reference to disregard for plaintiff's safety in the complaint is the terse allegation that the DOC motor vehicle conveying plaintiff was involved in an accident. This brief assertion that a motor vehicle accident occurred does not set forth facts showing deliberate indifference. *Cf.* *Stewart v. McMickens,* 677 F.Supp. 226 (S.D.N.Y.1988) (finding that plaintiff had

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1171150 (S.D.N.Y.)
(Cite as: 2000 WL 1171150 (S.D.N.Y.))

*failed* to state a claim pursuant to section 1983 alleging deliberate disregard for safety in violation of the Eighth Amendment where plaintiff had not only alleged that the DOC bus conveying him had been involved in a motor vehicle accident, but also had alleged that his back had been injured as a result of "excessive speeding, no screws in the seat cushions, and a general lack of concern by the correction officers operating the vehicle").

**5** In fact, in the only reference to the claim of deliberate disregard for plaintiff's safety that appears in plaintiff's motion papers, plaintiff himself asserts that the operation of the vehicle was merely negligent. (Pl's. Mem. Law at 6.) Negligence is not actionable under section 1983. *See Rucco v. Howard,* No. 91 Civ. 6762(RPP), 1993 WL 299296, *3 (S.D.N.Y. Aug. 4, 1993) (citing *Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir.1974)) ("Mere negligence on the part of the prison guard will not give rise to a claim under section 1983."). Consequently, plaintiff has failed to allege facts upon which a court could find that a constitutional violation arising out of deliberate disregard for plaintiff's safety has occurred.

Having failed to allege facts showing that a constitutional violation has occurred, plaintiff has failed to state a claim pursuant to section 1983. Accordingly, even had plaintiff named the City of New York as a defendant and alleged facts showing Orlowski's and Sanchex's personal involvement, plaintiff's section 1983 claim would be dismissed.

III. CLAIM FOR NEGLIGENCE UNDER NEW YORK COMMON LAW

Given the liberal reading of the pleadings required on a motion to dismiss, particularly where a plaintiff is proceeding *pro se,* the Court construes the complaint to assert a claim for negligence, arising out of the alleged inadequacy of medical treatment defendant received or the alleged motor vehicle accident. However, insofar as the complaint may be construed to assert a pendent claim under New York law for negligence, such claim must be dismissed. Pursuant to 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over a state claim where "the district court has dismissed all claims over which it has original jurisdiction." 28

U.S.C. C. § 1367(c)(3). The Court, having dismissed plaintiff's federal claim, declines to exercise supplemental jurisdiction over plaintiff's state claim. *See Polar International Brokerage Corp. v. Reeve,* No. 98 Civ. 6915(SAS), 2000 WL 827667, *18 (S.D.N.Y. Jun. 27, 2000) (declining to exercise supplemental jurisdiction over state claims where no federal claims remained) (citing *Martinez v. Simonetti,* 202 F.3d 625, 636 (2d Cir.2000)).

CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) is GRANTED. The Clerk of the Court is directed to close the file in this action.

SO ORDERED.

S.D.N.Y.,2000.
Bonner v. New York City Police Dept.
Not Reported in F.Supp.2d, 2000 WL 1171150 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1984 WL 1280 (S.D.N.Y.)

(Cite as: 1984 WL 1280 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court; S.D. New York.

ROBERT L. JONES, Plaintiff,
v.
NEW YORK CITY HEALTH AND HOSPITAL
CORP., et al. Defendants.
No. 84 Civ. 5372 (MJL).

November 28, 1984.
MEMORANDUM OPINION AND ORDER

MARY JOHNSON LOWE, District Judge.

*1 Plaintiff, presently a prisoner at Riker's Island, commenced this action, pro se, pursuant to 42 U.S.C. § 1983, alleging that he was beaten by corrections officers while being transported from Riker's Island to Manhattan Supreme Court. Plaintiff alleges that the incident occurred at the Brooklyn House of Detention for Men ('Brooklyn HDM'). Plaintiff further alleges that while he remained at the Brooklyn HDM, he was denied proper medical treatment for alleged injuries suffered as a result of the incident. Plaintiff moves for summary judgment pursuant to Fed.R.Civ.P. 56. Defendants cross-move for an order to dismiss the complaint on the ground that it fails to state a cause of action upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), or in the alternative, for summary judgment.[FN1]

In order to state a claim against defendant New York City Department of Corrections ('Department') under § 1983, plaintiff must allege that a policy or custom of the Department caused the deprivation of his constitutional rights. See Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 690 (1978); Bates v. Westervelt, 502 F.Supp. 94, 96 (S.D.N.Y. 1980). Moreover, more than an allegation of a 'single incident of illegality such as a first arrest without probable cause or with excessive use of force', is required to suggest that such a policy is in force. Turpin v. Maillet, 619 F.2d 196, 202 (2d Cir. 1980) cert denied, 449 U.S. 1016; Bates, 502 F. Supp. at 96. In the case at bar, plaintiff has failed to

allege any facts which indicate the existence of an official policy or custom by the Department, that encourages or permits correction officers to use excessive force in dealing with prisoners. Plaintiff's claim against the Department is therefore dismissed.

Plaintiff's claim that he was denied proper medical treatment at the Brooklyn HDM, appears to be solely addressed to defendant New York City Health and Hospitals Corporation ('HHC'). However, the HHC does not provide medical services for prisoners within prison facilities, and as such is not a proper party to the present action.[FN2] Plaintiff's claim against the HHC is also dismissed.

A complaint under § 1983 based on inadequate medical treatment is actionable only if the conduct alleged shocks the conscience. This plaintiff has not pleaded such deliberate indifference to serious medical needs. Williams v. Vincent, 508 F.2d 541, 543–44 (2d Cir. 1974).

Plaintiff alleges he received bruises about the head and body and was treated at the Brooklyn HDM apparently by a Dr. Klimas (Compl. para. IVA).

Although this Court would grant plaintiff the right to amend his complaint to name the proper party defendant rather than dismiss his claim, in this case, assuming the facts most favorable to plaintiff, plaintiff does not plead a valid claim of denial of medical treatment under § 1983, Estelle v. Gamble, 429 U.S. 97, 104 (1976).

The Court grants defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6); and plaintiff's motion for summary judgment is denied.

*2 It Is So Ordered.

FN1 Since the Court has not looked beyond the pleadings in this action, we will address defendants' motion as one to dismiss the complaint. Accordingly, for purposes of this

Not Reported in F.Supp., 1984 WL 1280 (S.D.N.Y.)

(Cite as: 1984 WL 1280 (S.D.N.Y.))

motion, the complaint is construed in the light most favorable to plaintiff, and its allegations taken as true.

Plaintiff filed a pleading which he called a Rule 12(b)(6) motion, a close reading of plaintiff's pleading however, leads this Court to believe that plaintiff intended to reply to defendants' 12(b)(6), and treats it accordingly.

Plaintiff also filed a pleading that is labeled as a 'Notice of Application for Joinder'. A careful inspection of these papers indicates that plaintiff's application simply repeats his arguments against defendants' motion to dismiss.

FN2 The New York City Department of Health is responsible for providing medical services for the inmates of prisons maintained and operated by the City of New York. N.Y. City Charter, Chapter 22, § 556(k).

Jones v. New York City Health and Hospital Corp.

Not Reported in F.Supp., 1984 WL 1280 (S.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Robert del CARPIO, Plaintiff,

v.

Hans WALKER, Superintendent; Edward Dann, Deputy
Superintendent; Lt. Battle, Officer of the Adjustment
Committee; Officer York; Officer Kimak, Auburn Corr.
Facility, Defendants.
**No. Civ.A.95CV1502RSPGJD.**

Oct. 15, 1997.

Robert del Carpio, Federal Medical Center, Lexington,
Kentucky, pro se.

Dennis C. Vacco, New York State Attorney General, The
Capitol, Albany, New York, for defendants, Lisa Renee
Harris, Assistant Attorney General, of Counsel.

**ORDER**

POOLER, J.

**\*1** The above matter comes to me following a
Report-Recommendation by Magistrate Judge Gustave J.
Di Bianco, duly filed on the 18th day of September, 1997.
Following ten days from the service thereof, the Clerk has
sent me the entire file, including any and all objections
filed by the parties herein.

After careful review of all of the papers herein, including
the Magistrate Judge's Report-Recommendation, and no
party having submitted objections <u>FN1</u> thereto, it is

> <u>FN1.</u> I note that the magistrate judge's report

recommendation was returned to the court
undelivered because the plaintiff is no longer at
the address listed in the court's file, which is the
last address plaintiff instructed the court to use.
By Order filed November 22, 1995, Magistrate
Judge Gustave Di Bianco ordered that plaintiff
"promptly notify the Clerk's Office of any change
in his address." Dkt. No. 3 at 4. The same order
provided that "failure to keep such office
apprised of [plaintiff's] current address will result
in the dismissal of the instant action." *Id.* I do not
rely on plaintiff's failure to notify the court of his
current address as a basis for dismissing the
action; I merely note that plaintiff cannot in the
future claim, in reliance on his failure to receive
a copy of the report-recommendation, that he
was deprived of the opportunity to file objections
due to any fault of the court.

ORDERED, that:

1. The Report-Recommendation is hereby approved.

2. The defendant's motion is granted and the action
dismissed for the reasons set forth in the Magistrate
Judge's Report.

3. The Clerk serve a copy of this Order on the parties by
regular mail.

IT IS SO ORDERED.
<u>GUSTAVE J. DI BIANCO</u>, Magistrate J.

**REPORT-RECOMMENDATION**

This matter has been referred to the undersigned for
Report and Recommendation by the Honorable Rosemary
S. Pooler, United States District Judge pursuant to <u>28
U.S.C. § 636(b)</u> and LOCAL RULES N.D.N.Y. 72.3(c).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

In the instant civil rights complaint, the plaintiff alleges that while he was incarcerated, defendants York and Battle harassed plaintiff and filed false misbehavior reports against him in retaliation for the exercise of his right to redress grievances and the right to practice his religion in violation of the First and Fourteenth Amendments of the Constitution. Plaintiff also alleges Eighth Amendment violations as a result of defendants' actions.

The complaint seeks both injunctive and monetary relief.

Presently before the court is the defendants' motion for summary judgment pursuant to FED.R.CIV.P. 56. For the following reasons, the undersigned will recommend granting the defendants' motion and dismissing the complaint.

## DISCUSSION

### 1. Summary Judgment

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED.R.CIV.P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.*

### 2. Facts

In his complaint, plaintiff alleges a chronology of events, commencing in May of 1995. Plaintiff states that he wrote letters to Superintendent Walker about defendants York and Kimak. Plaintiff alleges that these two defendants constantly harassed plaintiff. Plaintiff then alleges that after he complained of their actions to prison officials, defendants York and Kimak participated in filing false misbehavior reports against plaintiff in retaliation for his complaints. Plaintiff also alleges that defendant York forced plaintiff to continue working when York knew that plaintiff's heart condition would not permit him to do as York asked. Plaintiff also claims that defendant York refused to feed the plaintiff. Plaintiff refers to three misbehavior reports that he alleges were fabricated.

**\*2** Plaintiff states that he has written to Superintendent Walker many times, but Walker has failed to remedy the situation. Plaintiff states that due to Walker's failure to remedy the problem, York and Kimak believe that they can continue to harass the plaintiff without adverse consequences. Plaintiff claims that Deputy Superintendent Dann failed to properly investigate plaintiff's allegations against York and Kimak. Plaintiff states that Lieutenant Battle was a hearing officer involved in the allegedly retaliatory misbehavior charges.[FN1] Plaintiff claims that defendant Battle did not properly evaluate or credit the plaintiff's testimony or the testimony of plaintiff's witnesses.

> FN1. The court notes that Lieutenant Battle was the hearing officer in only *one* of the plaintiff's disciplinary hearings. Lieutenant Perkins presided over the other two disciplinary hearings. Plaintiff did not sue Lieutenant Perkins.

### 3. Respondeat Superior

It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a section 1983 action, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978), and that the doctrine of respondeat superior is inapplicable to section 1983 claims. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

In *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation. A supervisory official is said to have been personally involved if that official directly participated in the infraction. *Id.* A supervisory official is said to have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement of a supervisory official is said to exist if he or she created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.*

Defendants Walker and Dann argue that the plaintiff has not alleged sufficient personal responsibility to survive a motion for summary judgment. Clearly, neither Walker nor Dann directly participated in the alleged violations. Plaintiff seeks to establish personal responsibility by claiming that these defendants failed to remedy the violations after learning of them through a report or appeal.

Plaintiff alleges that he began writing to defendant Walker in May of 1995 about harassment by defendant York. It is true that personal responsibility of a supervisory official may be established if the official learns of the violation through a report or appeal and fails to remedy the situation. *Williams, supra.* However, the letter or complaint must alert the supervisory official to the constitutional violation of which the plaintiff complains. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Watson v. McGinnis,* 964 F.Supp. 127, 129-30 (S.D.N.Y.1997).

**\*3** In the instant case, the plaintiff's complaints to defendant Walker about York and Kimak relate to the alleged harassment that the plaintiff was suffering. There is no evidence that the Superintendent or Deputy Superintendent Dann knew anything about the plaintiff's allegation of retaliatory misbehavior reports. Thus, they could not be held liable for any claims of retaliation. The grievances that the plaintiff submitted were all investigated as shown by the defendants' exhibits. One of the grievances dealt with an allegation of "false keeplock."

[FN2] Defendants' Exhibit C. A review of the documents relating to the grievance and all the appeals associated therewith, shows no evidence that defendants Walker or Dann were ever informed of the situation. In fact, the grievance is signed by an individual named Duncan in the space reserved for the Superintendent's signature. Defendants' Exhibit C at p. 6. Attached to the grievance papers are all the memoranda regarding the investigation of the issue.

FN2. This was the June 6, 1995 grievance mentioned in plaintiff's complaint.

Defendants' Exhibit J contains plaintiff's June 11, 1995 letters [FN3] to defendant Walker. The letters stated that defendants York and Kimak were trying to cause the plaintiff to have a heart attack by their harassment. The harassment included not releasing the plaintiff for "chow" and preventing plaintiff from timely visits to the law library. Plaintiff mentioned a false misbehavior charge, but stated that this allegation was being handled in the Cayuga County Court.

FN3. There are two letters in Exhibit J. Both are dated June 11, 1995. One is typed and one is handwritten.

One of plaintiff's June 11 letters was given to Deputy Superintendent Dann, who asked Lieutenant Jackson to investigate the issues raised. Defendants' Exhibit K includes documents relative to Lieutenant Jackson's investigation of the matter, including memoranda of interviews of the officers involved. Although the investigation did not achieve the result desired by the plaintiff, this does not constitute the requisite personal involvement by Walker or Dann in any alleged constitutional violations.

In fact, defendant Dann wrote plaintiff a memorandum stating the results of Lieutenant Jackson's investigation. Defendants' Exhibit K. The memorandum stated that although no merit had been found in plaintiff's claims, Sergeant Lupo was told to speak with the plaintiff to make sure his concerns were addressed. *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

**4. Due Process**

The complaint in this action focuses upon defendant York and Kimak's retaliatory misbehavior reports, however, in passing, the plaintiff also states that Lieutenant Battle "closed his eyes to the evidence," did not properly evaluate the plaintiff's testimony, and "covered" for the officers. These claims could be interpreted as raising a procedural due process claim in addition to the substantive retaliation claim.

The court would first point out that there were three allegedly retaliatory misbehavior reports. Lieutenant Battle was the hearing officer only at *one* of the hearings. Lieutenant Perkins was the hearing officer for the other two hearings. Plaintiff does not mention Perkins in the complaint at all. Thus, the undersigned will consider a procedural due process claim on the one hearing over which defendant Battle presided which took place on July 17, 1995. Defendants' Exhibit S. The formal charge was served on plaintiff on July 13, 1995, and charged plaintiff with refusing a direct order and being out of place. *Id.* at p. 3 (transcript of disciplinary hearing). Officer Kimak was the individual signing the misbehavior report. Defendants' Exhibit R.

**\*4** In order for a plaintiff to be awarded damages under section 1983 for an alleged violation of procedural due process, the court must find that as a result of conduct performed under color of state law, plaintiff was deprived of life, liberty, or property without due process. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In the instant case, there is no dispute that the defendants acted under color of state law. In *Bedoya,* the Second Circuit indicated that "[w]hat remains is a two-pronged inquiry: (1) whether the plaintiff had a protected liberty interest in not being confined in keeplock ...; and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law." *Id.* at 351-52 (citing *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460-61, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)).

In order to determine whether a liberty interest existed, courts, until recently, were relying on the Supreme Court decision in *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). In *Hewitt,* the Supreme Court noted that a state could create a liberty interest through a statute or regulation by utilizing language of unmistakably mandatory character, limiting the discretion of the decision maker. *Id.* After the decision in *Hewitt,* lower courts, as well as the Supreme Court, focused more upon the language of the statute or regulation, rather than upon the character of the deprivation. *See e.g., Kentucky Dep't of Corrections, supra; Hernandez v. Coughlin,* 18 F.3d 133 (2d Cir.1994) (finding no liberty interest after examining regulations associated with the Family Reunion Program), *cert denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994); *Matiyn v. Henderson,* 841 F.2d 31 (2d Cir.1988) (finding liberty interest in remaining free from administrative segregation based on New York regulations); *Gittens v. LeFevre,* 891 F.2d 38, 41 (2d Cir.1989) (finding a liberty interest in remaining free from keeplock based on language of the regulations).

The Supreme Court has held that the *Hewitt* analysis is not applicable and has led to undesired results in prison cases. *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Courts may no longer rely *solely* upon the language of the regulations when determining whether a liberty interest exists. *Id.* at 2300. The Court stated in Sandin that "the search for a negative implication from mandatory language in prison regulations has strayed far from the real concerns under-girding the liberty protected by the Due Process Clause." *Id.* The court also stated that it was *returning* to the principles established in *Wolff* and *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). *Id.* Ultimately, the court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.*

**\*5** *Sandin* rejected the notion that any action taken by prison personnel for punitive reasons encroaches on a liberty interest. *Id.* at 2301. The court referred to as "dicta" statements in other cases implying that solitary confinement automatically triggers due process protections. *Sandin,* 115 S.Ct. at 2301 (citing *Wolff,* 418 U.S. at 571 n. 19; *Baxter v. Palmigiano,* 425 U.S. 308, 323, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)). Applying this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

standard to the facts in *Sandin,* the court determined that Conner's discipline in segregated confinement for 30 days did ***not*** present the type of atypical, significant deprivation in which the state might create a liberty interest. *Id.*

In determining what constituted "atypical and significant" deprivations, the *Sandin* court compared disciplinary segregation with other forms of segregation; compared the plaintiff's confinement with conditions in general population to see whether the inmate had suffered a major disruption in his environment; and examined whether the ***length*** of the inmate's sentence was affected. *Id.*

The Second Circuit has not yet squarely addressed the issue of whether after *Sandin* an inmate facing a disciplinary hearing has a liberty interest, protected by due process. The Second Circuit has *implied* that whether a deprivation is atypical and significant involves fact finding. *See Frasier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) ("[t]he extensive fact-finding of the district court permits us to measure Frasier's SHY claim by the standard of *Sandin* ); *Samuels v. Mockry,* 77 F.3d 34, 38 (2d Cir.1996) (assessment as to whether inmate had a protected liberty interest may require fact finding).

Some courts in New York have also read *Sandin* narrowly and have distinguished the holding when applying the *Sandin* factors and distinguishing the situation experienced by inmate Conner to that experienced by New York inmates who face Tier III disciplinary hearings. *See Campo v. Keane,* 913 F.Supp. 814, 820-21 (S.D.N.Y.1996); *see Moolenaar v. Finn,* No. 94 Civ. 6778 n. 4 (S.D.N.Y. March 14, 1996) (commenting that the case involved a Tier II hearing with no ***possibility*** of loss of good time and contrasting Tier III hearings where such loss is possible). As noted by the courts in *Campo* and *Moolenaar,* a recognized Second Circuit principle is that due process rights must be determined with respect to the "potential penalty". *Campo,* 913 F.Supp. at 821 (citing *McKinnon v. Patterson,* 568 F.2d 930, 939 (2d Cir.1977), *cert denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). Some courts, however, have squarely rejected the potential penalty theory, opting instead to examine the facts and length of each confinement to determine whether the confinement was atypical and significant. *See Marino v.. Klages,* No. 95-CV-1475 (N.D.N.Y. March 27, 1997) (declining to adopt the

potential penalty approach); *Delany v. Selsky,* 899 F.Supp. 923, 927-28 (N.D.N.Y.1995) (considering length of confinement together with plaintiff's unusual physical problems).

**\*6** In the instant case, the plaintiff was subjected only to a ***Tier II*** hearing, in which the maximum possible penalty he could receive was 30 days of segregated housing or keeplock. *See* N.Y.Comp.Codes R. & Reg. Tit. 7 § 254.7(a)(iii) and (vi). There is no possibility in a Tier II hearing of a loss or even a recommended loss of good time. Regardless of the disposition, the length of an inmate's sentence cannot be affected as a result of a Tier II hearing. Even under the potential penalty approach, this plaintiff, who was only sentenced to five days of keeplock for the hearing that he is challenging would not have a liberty interest in being free from that confinement. Thus, any procedural due process claim against Lieutenant Battle, based on the July 17, 1995 disciplinary hearing may be dismissed.

## 5. Verbal Harassment

Plaintiff states that defendants York and Kimak harassed him "to death." Verbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation. *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Brown v. Croce,* 967 F.Supp. 101, 104 (S.D.N.Y.1997). Thus, any claims of general verbal harassment by either defendant may be dismissed.

## 6. Retaliation

Even after the Sandin decision, a claim that a false misbehavior report was filed in retaliation for the exercise of a constitutional right, is still actionable as a violation of ***substantive due process.*** The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to false misbehavior charges or be harassed in retaliation for the exercise of a constitutional right such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589-90 (2d

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

Cir.1988). In cases where the defendants' actions are taken for both retaliatory and legitimate reasons, ultimately the defendants must show that they would have taken the same action absent the retaliatory motive. *Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir .1994)*. Courts recognize, however, that claims of retaliation may be prone to abuse. *Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983)*. The court in Flaherty described three situations where retaliation is claimed, each situation requiring a different approach by the court. *Id.* The court stated that a retaliation claim supported by specific and detailed allegations must be pursued with full discovery. *Id.* Whereas, a claim that contains "completely conclusory" allegations may be dismissed on the pleadings alone. *Id.* The third situation involves a complaint alleging facts that give rise to a "colorable suspicion of retaliation." *Id.* This third type of case will support at least documentary discovery. *Id.*

In the instant case, the plaintiff alleges that officers York and Kimak filed the false misbehavior reports in retaliation for plaintiff's complaints and grievances against them. Plaintiff also alleges that defendant York retaliated against plaintiff for the exercise of a First Amendment right to practice his religion. This latter claim is not explained by the plaintiff. He does not allege specifically what First Amendment right he was exercising or how the defendants' actions were in retaliation for the exercise of that right.

**\*7** Defendants have submitted all the records relating to the disciplinary hearings. With respect to the charges, a review of the transcripts of the disciplinary hearings shows that the plaintiff was given the opportunity to explain his behavior at the disciplinary hearing. *See e.g.* Defendants' Exhibit M at p. 4. Exhibit M is the transcript of the disciplinary hearing that took place on June 11, 1995 for a misbehavior that occurred on June 7, 1995. The misbehavior involved the plaintiff failing to obey an order to continue working. The plaintiff admitted that he did not continue working when defendant York told him to continue. *Id.* Plaintiff stated that his medical condition was preventing him from continuing. *Id.* Essentially, the plaintiff admitted his behavior, but alleged a defense that his medical condition prevented him from following the officer's order.

Thus, the misbehavior report was not *false.* Rather, the plaintiff had an explanation for his misbehavior that the hearing officer did not believe. In fact, hearing officer Perkins adjourned the hearing to "check into [[[plaintiff's] medical profile." *Id.* at p. 5. The hearing was reconvened on July 12, 1995, and Lieutenant Perkins had reviewed the plaintiff's medical record. *Id .* at p. 6. Perkins determined that although the plaintiff did have a health problem, there was no indication that he could not work. *Id.* Whether the hearing officer made the correct decision is not the issue. It is clear that at worst, there could have been a dual motivation for defendant York's misbehavior report, and plaintiff did admit failing to obey the officer's order, albeit with reason.

The misbehavior report of July 8, 1995 resulted in a hearing on July 12, 1995. First, the officer fling the misbehavior report was Officer Hoey. The misbehavior report involved unauthorized legal assistance and unauthorized legal exchange. Defendants' Exhibit P (transcript of July 12 hearing). A frisk of the plaintiff's cell resulted in finding 81 pages of legal work that belonged to other inmates. Plaintiff did not dispute that the legal papers were in his cell, but argued that he was using the other individuals' papers to work on his own legal matters. *Id.* at p. 3. The hearing officer simply did not believe the plaintiff's explanation. *Id.* at p. 5.

Neither defendant York nor defendant Kimak was directly involved in the search or the misbehavior report of July 7, 1995. Thus, there is no evidence that this misbehavior report was false and in retaliation for any constitutional right exercised by the plaintiff.

The final misbehavior report was authored by defendant Kimak and involved refusal to obey an order and being out of place. The disciplinary hearing was held on July 17, 1995. Defendants' Exhibit S (transcript of disciplinary hearing). The misbehavior report stated that when plaintiff was returning from his shower, he refused to obey Officer Kimak's order get back into plaintiff's cell. Defendant Kimak stated in the report that plaintiff had stopped at one of the cells and placed his hands inside. *Id.* at p. 3. Plaintiff alleged at the hearing that he was returning from the shower, but he did not stop at anyone's cell and did not disobey any orders. *Id.* at p. 4. Plaintiff also told the hearing officer that defendant Kimak's actions were in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

retaliation for plaintiff's complaints against Kimak. *Id.* at pp. 4-5. Plaintiff called two inmate witnesses to testify at the hearing. *Id.* at p. 7. His first witness was very unclear, but essentially testified that he did not hear the officer give plaintiff an order. *Id.* The second inmate was more articulate and stated that after plaintiff exited the I shower, he always went straight back to his cell. *Id.* at p. 12. Moore testified that he did not hear any order given. *Id.* However, Lieutenant Battle found the witnesses incredible and found plaintiff guilty of the misbehavior. It would appear that the only evidence of retaliation is the plaintiff's allegation of complaints against Kimak and York. A review of the documents I relating to the misbehavior reports shows that even if the plaintiff's statements are credited, the misbehavior reports could have been written for valid reasons as well as invalid reasons. Thus, the plaintiff cannot maintain an action for retaliation in the instant case.

### 7. Eighth Amendment

**\*8** Plaintiff makes some vague allegations that the defendants forced him to work when he was not capable. Plaintiff admitted at his disciplinary hearing that he wanted to work but needed to take a break. Lieutenant Perkins looked through the plaintiff's medical records and found no limitations with respect to the work he could do. The medical record did note a heart condition.

The Eighth Amendment prohibits the infliction of cruel and unusual punishments, including punishments that involve the unnecessary and wanton infliction of pain. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). In order to state a claim based on inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). A plaintiff must allege that his access to physicians for necessary medical care was unreasonably delayed or denied or that prescribed medical treatment was not administered. *Tomarkin v. Ward,* 534 F.Supp. 1224, 1230 (S.D.N.Y.1982) (citing *Todaro v. Ward,* 431 F.Supp. 1129, 1133 (S.D.N.Y.), aff'd, 565 F.2d 48 (2d Cir.1977)). Plaintiff's claims, although not specifically involving medical care, do involve allegations that the defendants violated the doctor's orders, and are governed by the same

deliberate indifference standard. Deliberate indifference, whether evidenced by medical staff or by officials who allegedly disregard the instructions of the medical staff requires more than negligence, but less than conduct taken for the very purpose of causing harm. *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994). In order for a prison official to act with deliberate indifference, the official must know of and disregard an excessive risk to inmate health and safety. *Id.* at 1979. The official must both be "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* In the instant case, defendant York allegedly told the plaintiff to keep working when plaintiff stated that he needed a break. The defendant could not have been deliberately indifferent since there was no medical limitation on plaintiff's work in his medical file. Thus, York could not have known about and disregarded a serious risk to plaintiff. Additionally, according to the misbehavior report, the plaintiff had already taken a break when defendant York told plaintiff to keep working. Thus, based on the undisputed facts, there is no evidence that defendant York violated the plaintiff's Eighth Amendment rights relating to his medical condition. Plaintiff also indicated in his complaint that defendant York refused to let plaintiff out of his cell to be fed. Plaintiff wrote a grievance on June 29, 1995 regarding being released "for chow." Defendants' Exhibit D. However, it does not appear that Officer York was involved in the incident. In fact, the grievance was resolved informally. Thus, the plaintiff does not state any Eighth Amendment claim for a retaliatory denial of food or for any denial of food.

**\*9 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the defendants' motion for summary judgment (docket # 15) be **GRANTED,** and the complaint be **DISMISSED.**

Pursuant to 28 1 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))


Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R .Civ.P. 6(a),
6(e), 72.


N.D.N.Y.,1997.
Carpio v. Walker
Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Shawn MONCRIEFFE, Plaintiff,
v.
Linda WITBECK, Corrections Officer at Coxsackie
Correctional Facility; B. Schwebler; Dominic Mantello,
Superintendent; C.O. Weeks; C.O. Jensen; and C.O.
McFarlene, Defendants.
**No. 97-CV-253.**

June 29, 2000.

Shawn Moncrieffe, Auburn Correctional Facility, Auburn,
New York, Plaintiff, pro se.

Hon. Dennis C. Vacco, Attorney General for the State of
New York, Steven H. Schwartz, Assistant Attorney
General, Department of Law, the Capitol, Albany, New
York, for Defendants.

MEMORANDUM-DECISION AND ORDER

MORDUE, J.

*INTRODUCTION*

**\*1** Plaintiff moves and defendants cross-move for
summary judgment under Section 56(b) of the Federal
Rules of Civil Procedure in this *pro se* action pursuant to
42 U.S.C. § 1983 alleging violations of his rights under
the Fourth, Eighth and Fourteenth Amendments to the
United States Constitution.

Presently before the Court is the Report-Recommendation
of the Hon. Magistrate Judge David R. Homer dated

December 23, 1998, recommending that plaintiff's motion
be denied and defendants' cross-motion be granted in part
and denied in part.

Plaintiff filed timely objections to the
Report-Recommendation.

*FACTS*

In his complaint, plaintiff alleges that between August and
November, 1996, while he was housed in the Special
Housing Unit of Coxsackie Correctional Facility,
defendant Correctional Officer Linda Witbeck deprived
him of a food tray six times; that Witbeck deprived him of
things such as recreation and supplies six times; that
Witbeck laughed at him four times while he was in the
shower; that Witbeck sexually harassed plaintiff once
"when she felt [plaintiff's] genitals and rear end during a
regular recreation pat frisk;" that Witbeck ransacked his
cell; and that in some unspecified manner Witbeck gave
him a death threat. Plaintiff further alleges that during the
same period defendant Correctional Officer Weeks
sexually harassed him during a routine pat frisk when
Weeks "felt [plaintiff's] genitals a few times." Plaintiff
claims that on two occasions defendant Correctional
Officer McFarlene entered his cell and ransacked it while
plaintiff was in the shower and once confiscated "a few of
[plaintiff's] things." Plaintiff also claims that defendant
Correctional Officer Jensen threatened him once and
assaulted him once by kicking him in the back. Plaintiff
states that the grievance supervisor, defendant Schwebler,
did not log and number plaintiff's grievances as required
and that Superintendent Dominic J. Mantello disregarded
plaintiff's numerous complaints.

Magistrate Judge Homer recommended denial of plaintiff's
motion for summary judgment and dismissal of all of
plaintiff's claims except his Eighth Amendment claim
against Witbeck for denial of food.

*DISCUSSION*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

Pursuant to 28 USC § 636(b)(1)(C), this Court must make a de novo determination of those portions of the Magistrate Judge's Report-Recommendation to which plaintiff has specifically objected. Here, plaintiff objects to Magistrate Judge Homer's recommendations except with respect to the issues of verbal harassment, threats and denial of recreation. He erroneously states that the Report-Recommendation does not address the claim that Witbeck laughed at him while he was in the shower; however, this allegation amounts to a claim of verbal harassment, which is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Accordingly, the Court will address all other issues de novo.

Summary Judgment is appropriate when the pleadings, affidavits, and any other supporting papers demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). Facts, inferences therefrom and ambiguities must be examined in a context which is most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

**\*2** The movant bears the initial burden of showing that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). When the moving party has met this burden the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita* at 586. The moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P.56(e); *Liberty Lobby* at 250.

Where summary judgment is sought against a *pro se* litigant the Court must afford him special solicitude. *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

A. *Defendant Mantello*

Plaintiff alleges that defendant Mantello is liable because, as Superintendent of the Coxsackie Correctional Facility, he "disregarded" numerous complaints made to him by plaintiff. More specifically, plaintiff alleges that (1)

Mantello failed to remedy a wrong after having learned of it and (2) that Mantello was negligent in his supervision of subordinate employees.

Magistrate Judge Homer concluded in his Report-Recommendation that plaintiff failed to demonstrate a claim against Mantello. With respect to plaintiff's first allegation that Mantello failed to remedy a wrong, the Magistrate Judge determined that either Mantello or his subordinates investigated plaintiff's grievances. Because plaintiff's complaints were investigated and it was concluded that the grievances were without merit, Mantello satisfied his obligations with respect to plaintiff's grievances.

The Magistrate Judge similarly rejected plaintiff's second claim that Mantello negligently supervised subordinate employees who were allegedly violating his constitutional rights. Magistrate Judge Homer concluded that no claim was stated because, whereas the law requires gross negligence to impose supervisor liability, plaintiff merely alleged negligence. In addition to determining that plaintiff's claim was without merit for failure to plead and prove gross negligence, Magistrate Judge Homer also concluded that plaintiff had failed to establish even ordinary negligence on the part of Mantello.

Plaintiff objects to Magistrate Judge Homer's conclusion that he failed to establish supervisor liability. Plaintiff argues that the record establishes gross negligence in that Mantello was aware that plaintiff's rights were being violated but chose to ignore them by failing to investigate or remedy same.

In order to establish a successful § 1983 claim, a plaintiff must establish that a defendant was personally involved in the alleged rights violation. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). An official is not liable in a section 1983 action under the doctrine of respondeat superior. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981). However, an individual who occupies a supervisory position may be found personally involved by: (1) direct participation; (2) failing to remedy a wrong after learning of the violation through a report or appeal; (3) creating a policy or custom under which unconstitutional practices occurred or

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

allowing the policy or custom to continue; or (4) gross negligence in managing subordinates whose conduct caused the unlawful condition or event. *See* *Wright,* 21 F .3d at 501.

**\*3** With respect to plaintiff's objection arguing that Mantello was grossly negligent, plaintiff simply reiterates his original arguments and relies on evidence already in the record and considered by the Magistrate Judge. Plaintiff merely reiterates in his objections to the Report-Recommendation that he has established a case

which includes gross negligence as evidence [sic] in plaintiff's motion. (See plt. motion for summary judgment, memo. Of law pg. 23 with annexed exibits [sic] and plt. Reply decl. Pg. 11 with attached exibits [sic] ). Moreover, the record is legally sufficient to establish and impose supervisory liability. (See exibits [sic] attached to plt. motion for summary judgment and Reply motion).

As Magistrate Judge Homer correctly stated, the record clearly reveals that Mantello or his subordinate employees investigated plaintiff's grievances and rejected them as being without merit. As such, there is nothing in the record indicating that Mantello either turned a blind eye to plaintiff's complaints. Simply stated, plaintiff's assertion that Mantello ignored his complaints is refuted by the investigations conducted regarding the complaints. Similarly, plaintiff's allegation that Mantello failed to remedy a wrong is without merit because the record reflects that the investigation of the complaints came to the conclusion that no wrongs were being committed.

Aside from reiterating his initial arguments, plaintiff has failed to provide the Court with anything further in his objection which would warrant disturbing the sound conclusion of the Magistrate Judge. Accordingly, this Court accepts Magistrate Judge Homer's determination to dismiss plaintiff's claim with respect to defendant Mantello.

B. *Verbal Threats and Harassment*

Plaintiff alleges that he was subjected to verbal threats and

harassment in that corrections officers laughed and insulted him while he showered. Plaintiff also maintains that he was subjected to threats of violence. Magistrate Judge Homer recomended that defendants were entitled to summary judgment because plaintiff failed to establish an actual injury resulting from the alleged threats or harassment.

A claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998); *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995). As correctly noted by the Magistrate Judge, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Picco* 994 F.Supp. at 474. Similarly, "threats do not amount to violations of constitutional rights." *Malsh,* 901 F.Supp. at 763.

Even assuming that the alleged verbal harassment and threats occurred, plaintiff has failed to plead or prove that there were any accompanying actual injuries. Furthermore, plaintiff does not object to the findings of the Magistrate Judge with respect to verbal threats and harassment. After a thorough review of the Report-Recommendation the Court adopts the recommendation of the Magistrate Judge.

C. *Excessive Force*

**\*4** Plaintiff alleges that defendant Jensen kicked him once in the back on November 9, 1996. He states that he suffered pain but does not claim that he sought medical assistance. Plaintiff does not allege that Jensen acted maliciously or sadistically.

Magistrate Judge Homer found that plaintiff had failed to annunciate an actionable claim for excessive force. More particularly, he concluded that the alleged kick, even if true, was of limited duration and that there was no malicious intent on the part of the corrections officer.

It is well settled that "the unnecessary and wanton

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Hudson v. McMillian,* 503 U.S. 1, 5 (1992) (quoting *Whitley v. Albers,* 475 U.S. 312 (1986))(internal quotation marks omitted). In reviewing a prisoner's claim a Court must consider whether the prison official acted with a sufficiently culpable state of mind and whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation. *Hudson* at 8. In considering whether the prison official possessed a culpable state of mind while engaging in the use of force, the inquiry is whether the prison official applied force maliciously and sadistically to cause harm. *Id.* at 7. The extent of an inmate's injuries is relevant to this inquiry, as is the nature and duration of the act. *James v. Coughlin,* 13 F.Supp.2d 403, 409 (W.D.N.Y.1998); *Reyes v. Koehler,* 815 F.Supp. 109, 113-14 (S.D.N.Y.1993). Important in considering the alleged wrongdoing is determining whether the force was applied in a good faith effort to maintain or restore prison discipline or maliciously and sadistically to cause harm. *Hudson* at 7.

With respect to the nature of the wrongdoing, a prisoner must demonstrate that the deprivation alleged is sufficiently serious or harmful enough to reach constitutional dimensions. *Romano v. Howarth,* 998 F.2d 101, 104-05 (2d Cir.1993). A prisoner is not required to demonstrate that he sustained a serious injury; *de minimis* use of force does not, however, give rise to an Eighth Amendment claim. *Hudson* at 9-10.

Plaintiff's allegations, even if true, do not support a determination that Jensen acted maliciously or sadistically. Interestingly, in his objections to the Report-Recommendation, plaintiff admits that the kick was of limited duration. In the balance of his objection plaintiff merely reiterates his opinion that the evidence submitted supports an inference of malice. The Court concludes that the conduct alleged is not sufficiently serious or harmful to reach constitutional dimensions. Accordingly, defendants are entitled to summary judgment dismissing plaintiff's excessive force claim.

D. *Access to the Courts*

Plaintiff alleges that he was denied access to the courts as a result of cell searches, confiscation of documents and denial of supplies between August and November 1996. Plaintiff alleges that these actions were motivated to frustrate his efforts to litigate.

**\*5** Magistrate Judge Homer recommended that the defendant's motion to dismiss this claim should be granted. The Magistrate Judge found that plaintiff's claim of denial of access to the courts was unsubstantiated with any evidence which demonstrated that plaintiff had suffered any actual injuries from any alleged wrongful conduct. To the contrary, Magistrate Judge Homer concluded that plaintiff's claims were supported by a thirty-five page memorandum of law containing both case and statutory authority as well as an exhibit related to state court proceedings-all of which demonstrated plaintiff's full and adequate ability to litigate his claims.

It is well established that prisoners have a constitutional right to access the courts. "To state a claim that his constitutional right to access the court was violated, plaintiff must allege facts demonstrating that defendants deliberately and maliciously interfered with his access to the courts, and that such conduct materially prejudiced a legal action he sought to pursue." *Smith v. O'Connor,* 901 F.Supp. 644, 649 (S.D.N.Y.1995); *see Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987). In other words, in order to establish a violation of his right of access to the courts, an inmate must demonstrate that he has suffered or imminently will suffer actual harm in presenting a claim to the court. *Lewis v. Casey,* 518 U.S. 343 (1996).

In his objections to the Report-Recommendation, plaintiff restates arguments already considered by Magistrate Judge Homer. He states that "[p]laintiff further reiterates that he has incurred irreparable harm and injury as a result of the lack of legal services he received while confined in Coxsackie SHU." Plaintiff goes on to note that his complaints would not have been able to have been brought had he not been transferred to the Elmira Correctional Facility. Implicit in this statement is that plaintiff was in fact allowed to bring his claims. Assuming *arguendo* that plaintiff was not allowed to bring his claims until after transfer, the fact still remains that plaintiff did in fact have the ability to air his grievances. Therefore, at best, plaintiff's hardship was delay in bringing his claims. As plaintiff has not established how such an alleged delay has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

prejudiced his rights or amounted to an injury, he fails to make the requisite showing of actual injury for a successful claim. As such, the Court accepts Magistrate Judge Homer's recommendation and grants defendant's motion as to this claim.

E. *Sexual Harassment*

With respect to plaintiff's sexual harassment claim, Magistrate Judge Homer concluded that plaintiff failed to establish an actionable case. Magistrate Judge Homer found that the conduct involved was *de minimus* and, therefore, did not violate a constitutionally protected right.

Sexual abuse of an inmate by a corrections officer may reach constitutional dimensions and give rise to an Eighth Amendment claim. *Boddie v. Schnieder,* 105 F.3d 857, 859 (2d Cir.1997). When reviewing an Eighth Amendment claim stemming from an allegation of sexual abuse, a Court must consider whether the conduct alleged is sufficiently serious to violate contemporary standards of decency and cause severe physical and psychological harm. *Id.* at 861. The Court must further consider whether the prison official involved possessed a sufficiently culpable state of mind. Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may be sufficient evidence of a culpable state of mind. *Id.* at 861.

**\*6** As set forth above, plaintiff claims that defendants Weeks and Witbeck, each on one occasion, conducted pat frisks in an improper manner. Assuming the truth of these allegations for the purposes of these motions, they are not sufficiently serious to violate contemporary standards of decency and cause severe physical and psychological harm. Plaintiff has failed to demonstrate any severe physical or psychological harm that he has suffered as a result of the alleged harassment. Thus, plaintiff's allegations of sexual abuse fail to state a claim cognizable under the Eighth Amendment. Defendants are therefore entitled to summary judgment dismissing this claim.

F. *Cell Searches*

Plaintiff alleges that he was subjected to cell searches which were designed to harass. Plaintiff's initial pleadings merely allege same with no evidence to support the claim. As a result, Magistrate Judge Homer concluded that plaintiff's claim was without merit and recommended that defendant's motion be granted.

"[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell," *Hudson v. Palmer,* 468 U.S. 517, 526 (1984), even where the search is retaliatory in nature. *Higgins v. Coombe,* 1997 WL 328623, at *7 (S.D.N.Y.1997). Prisoners do, however, enjoy Eighth Amendment protection from searches that lack any legitimate penological interest and are intended solely to harass. *Nilsson v. Coughlin,* 1987 WL 129823, at *4 (S.D.N.Y.1987), see also *Hudson* at 530.

Plaintiff fails to raise anything in his objections to the Magistrate Judge's Report-Recommendation which would warrant disturbing the sound conclusion and recommendation found therein. As Magistrate Judge Homer correctly stated the law with respect to plaintiff's claim, and since plaintiff fails to provide any evidence to support his argument that the alleged searches were improper, the Court concludes that this claim is without merit and grants defendant's motion.

G. *Deprivation of Food and Recreation*

Prison officials have a duty under the Eighth Amendment to provide humane conditions of confinement: adequate food, clothing, shelter and medical care. Denial of a minimal civilized measure of life's necessities violates the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825 (1994). Depriving an inmate of food or serving him contaminated food may constitute a violation of the Eighth Amendment. *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983); *Odom v. Sielaff,* 1995 WL 625786, at *5 (E.D.N.Y.1995); *see also Rhodes v. Chapman,* 452 U.S. 337, 348 (1981).

Plaintiff alleges that corrections officer Witbeck denied him food on six occasions and on at least two occasions contaminated his food with spit or perfume. In support of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

their motion to dismiss, defendants rely on an affidavit from Witbeck denying the allegations. Defendants also rely on copies of logbook entries for the SHU in which plaintiff was housed. Because these logbooks do not contain clear entries for some of the dates in issue and would not likely reflect the wrongful denial of meals to an inmate by a corrections officer, they do not establish as a matter of law that defendants never denied plaintiff food. Credibility assessments and choices between conflicting versions of events are matters for a fact-finder at trial, not for the Court on a summary judgment motion. *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997). Thus, plaintiff's motion and defendants' cross-motion for summary judgment are denied with respect to the issue of whether plaintiff's Eighth Amendment rights were violated by deprivation of food.

**\*7** Plaintiff further alleges that he was deprived of his Eighth Amendment rights where he was allegedly denied recreation on a single occasion. Magistrate Judge Homer concluded that denial of recreation on a single occasion was not sufficiently serious to support a constitutional claim. Plaintiff does not object to these recommendations.

Although prisoner's have a constitutional right to exercise, a claim alleging deprivation of this right requires a showing of a serious deprivation and deliberate indifference on the part of prison officials. *Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996); *Barnham v. Meachum,* 77 F.3d 626, 630 (2d Cir.1996). As illustrated by the Report-Recommendation, denial of recreation for eighteen out of nineteen days has been upheld in the Second Circuit and denials of up to seventy-five days have been upheld elsewhere. *Arce v. Walker,* 907 F.Supp. 658 (W.D.N.Y.1995), *aff'd in part, vacated in part* 139 F.3d 329 (2d Cir.1998); *Green v. Ferrell,* 801 F.2d 765 (5th Cir.1986).

Based on the foregoing, the Court concludes that the alleged denial of recreation on a single occasion does not support a claim for deprivation of constitutional rights. Accordingly, defendant's motion is granted with respect to this element of plaintiff's claim.

*CONCLUSION*

After a careful review of the file, party submissions and applicable law, it is hereby

ORDERED that Magistrate Judge Homer's Report-Recommendation dated December 23, 1998 is ACCEPTED IN FULL; and it is further

ORDERED that plaintiff's motion for summary judgment is DENIED in all respects; and it is further

ORDERED that defendant's cross-motion for summary judgment be DENIED with respect to plaintiff's claim against defendant Witbeck regarding the alleged deprivation of food and GRANTED in all other respects.

IT IS SO ORDERED

N.D.N.Y.,2000.
Moncrieffe v. Witbeck
Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 144957 (W.D.N.Y.)

(Cite as: 2013 WL 144957 (W.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

W.D. New York.
Chris APPLEWHITE, Plaintiff,
v.
Captain Micheal SHEAHAN, et al., Defendants.
No. 08–CV–6045–CJS.

Jan. 11, 2013.
Chris Applewhite, Brooklyn, NY, pro se.

Gary M. Levine, A.A.G., New York State Attorney General's Office, Rochester, NY, for Defendants.

DECISION and ORDER

CHARLES J. SIRAGUSA, District Judge.

**\*1 Siragusa, J.** Plaintiff Chris Applewhite filed this *pro se* action seeking relief under 42 U.S.C. § 1983 for alleged civil rights violations occurring at Southport Correctional Facility. There are now five motions before the Court: (1) Defendants' motion to dismiss some or all allegations against thirteen defendants, filed August 20, 2009, ECF No. 12; (2) Defendants' motion for summary judgment as to three defendants, filed September 21, 2009, ECF No. 20; (3) Defendants' motion to set aside a clerk's entry of default, filed September 25, 2009, ECF No. 26; (4) Plaintiff's motion for default judgment, filed March 2, 2010, ECF No. 39; and (5) Plaintiff's motion to strike Defendants' motions to dismiss and for summary judgment, ECF No. 42. For the reasons stated, Plaintiff's motion for default judgment is denied; Defendants' motion to set aside a clerk's entry of default is granted; Plaintiff's motion to deny or strike Defendants' motions is granted in part, and denied in part; Defendants' motion to dismiss is granted in part, and denied in part; and Defendants' motion for summary judgment is denied without prejudice.

**BACKGROUND**

*Procedural History*

Plaintiff commenced this action by filing a sixty-nine page complaint on January 27, 2008.[FN1] He sets out three claims for relief based on alleged wrongdoing, from 2003 forward, by a total of nineteen Defendants: Anthony Annucci, DOCCS [FN2] deputy commissioner; Donald Selsky, former DOCCS SHU director; Michael McGinnis ("McGinnis"), Southport's superintendent; Paul Chappius ("Chappius"), deputy superintendent for security services; Michael Sheahan ("Sheahan"), senior captain, Joseph Cieslak ("Cieslak"), inmate grievance program advisor, Betty Kennedy ("Kennedy"), institution steward; Jimmie Irizarry ("Irizarry"), food service administrator, Kent E. Cassler ("Sergeant Cassler"), supervising sergeant; Stanley Sepiol ("Sepiol"), senior supervising sergeant; Herbert Williams ("Williams"), senior supervising sergeant; John Alves ("Alves"), medical doctor; Bradley S. Sullivan ("C.O.Sullivan"), corrections officer; Larry G. Gleason ("Gleason"), corrections officer; Richard A. Donohue ("Donohue"), lieutenant and tier II disciplinary hearing officer; Michael Furman ("Furman"), lieutenant and day-shift supervisor for C-block; Daniel Sullivan ("Captain Sullivan"), captain and tier II disciplinary appeals review officer; Scott D. Waters ("Waters"), corrections officer; and Dale L. Hillard ("Hillard"), corrections officer.

> FN1. This is the date on which Plaintiff signed the complaint and is assumed to have placed it in the Correctional Facility mail. ECF No. 5 at 4.

> FN2. The New York State Department of Correctional and Community Services.

The Court issued a Decision and Order, dated May 30, 2008, in which it noted that several of Plaintiff's allegations appeared to pre-date the three-year statute of limitations applicable to civil rights actions, and provided him an opportunity to raise arguments relative to tolling. ECF No. 5. Plaintiff filed a response in which he argued that his first claim for relief alleges a continuing course of retaliatory conduct stemming from grievances and litigation he pursued in an attempt to obtain property to which he was entitled—specifically, a pair of Bermuda shorts. ECF No. 6. He argued that the initial "casual"

Slip Copy, 2013 WL 144957 (W.D.N.Y.)

(Cite as: 2013 WL 144957 (W.D.N.Y.))

deprivation "snowballed into the ultimate destruction ... of the [B]ermuda shorts[ ] without due process," and that other incidents occurring during that same time period are relevant to show a pattern of harassment. *Id*. at 4–5. In an Order dated March 10, 2009, the Court determined that alleged retaliatory acts pre-dating January 27, 2005, which Plaintiff claims relate to his attempts to retrieve his Bermuda shorts, could go forward under a continuing violation theory, but dismissed as time-barred all other allegations pre-dating January 27, 2005.[FN3]

> [FN3.] Any determination as to the evidentiary relevance of the discrete, unrelated acts was and is premature. However, it has been determined that a continuing violation theory does not apply to salvage untimely claims based on such discrete acts.

**\*2** The Court did not previously specify which claims and/or Defendants were then dismissed. In the interests of clarity and efficiency, it will do so now. All claims against Sergeant Cassler, who is alleged to have "harassed" Plaintiff in February 2004, Compl. ¶ 46, and manipulated a corrections officer to file a false misbehavior report against Plaintiff on January 24, 2005, *id*. ¶¶ 110–117, are dismissed as time-barred.[FN4] All claims against C.O. Gleason and Sergeant Sepiol, who are alleged to have acted in concert with Sergeant Cassler, *id*. ¶¶ 108, 176, 146, are dismissed as time-barred. All claims against C.O. Bradley Sullivan, the officer allegedly manipulated by Cassler, Gleason, and Sepiol, *id*. ¶¶ 113, 115–17, 146, are time-barred. Discrete allegations against other Defendants are dismissed as time-barred as well, including: (1) alleged conduct by C.O. Waters on January 24, 2005, *id*. ¶¶ 110–111, 150; (2) Lt. Donahoe's service as a hearing officer in connection with a February 21, 2004, misbehavior report unrelated to the Bermuda shorts, *id*. ¶ 44; (3) Lt. Donahoe's and Daniel Sullivan's alleged "bias" and "arbitrary and capricious" disposition of disciplinary charges brought against Plaintiff on June 3, 2004, and June 7, 2004; (4) allegations relative to the participation of Sullivan, Selsky, and Kennedy in the disposition of a misbehavior report issued to Plaintiff on October 13, 2004, *id*. ¶ 54; and (5) the issuance of cell shield and deprivation orders by Sheahan and McGinnis, on January 25, 2005, in connection with the misbehavior report

written by C.O. Bradley Sullivan the previous day, *id*. ¶¶ 100, 115–116. Accordingly, Defendants Cassler, Gleason, Sepiol, and Captain Sullivan are dismissed from this action. Only timely allegations against the remaining Defendants are addressed hereafter.

> [FN4.] Plaintiff does not state how he was harassed, why he was harassed, or any circumstances surrounding the alleged harassment. Thus, while this particular allegation is presented in Plaintiff's first claim regarding his Bermuda shorts, there are no fact allegations linking Defendant Cassler to the alleged continuing course of retaliation. As for the January 24, 2005, incident, Plaintiff alleges Cassler and others falsely accused him of misconduct because of his "voicing of prior grievance complaints against and/or involving defendants Gleason, Cassler, and Sepiol, et al." Compl. ¶ 109. Again, this has nothing to do with the Bermuda shorts.

### Factual Background

The following facts are taken from the complaint and, at this juncture, are construed broadly in a light most favorable to Plaintiff. At all relevant times, Plaintiff was an inmate in the custody of DOCCS, and housed at Southport Correctional Facility.

In his first claim, Plaintiff alleges that Defendants McGinnis, Sheahan, Chappius, Cieslak, and Kennedy conspired to retaliate against him for pursuing a grievance and state court proceeding relative to his right to possess a pair of Bermuda shorts. On November 17, 2003, Plaintiff ordered a pair of khaki Bermuda shorts with green pin stripes from an outside vendor. According to Plaintiff, he was entitled to receive the shorts as a PIMS Level III prisoner. [FN5] The shorts arrived at Southport on January 27, 2004, but were not delivered to Plaintiff. On that same day and the following day, Plaintiff sent letters to the package room officer demanding the immediate delivery of his shorts. On January 30, 2004, he filed a formal grievance. The Inmate Grievance Resolution Committee denied the grievance on February 9, 2004. While it confirmed that Plaintiff could receive a pair of Bermuda shorts, it found he was not entitled to the particular pair he had ordered because they were

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 144957 (W.D.N.Y.)

(Cite as: 2013 WL 144957 (W.D.N.Y.))

multicolored, not solid-colored. Upon receiving the denial, on February 12, 2004, Plaintiff appealed the decision to Defendant McGinnis, who concurred with the Committee's ruling in a decision dated February 24, 2004. Plaintiff appealed the Superintendent's decision to the Central Office Review Committee on February 26, 2012. After this appeal was denied, Plaintiff commenced an Article 78 proceeding in state court, on June 1, 2004, seeking delivery of his shorts.

> FN5. The Court takes judicial notice that PIMS, which stands for Progressive Inmate Movement System, is a program employed at Southport by which Special Housing Unit ("SHU") inmates may achieve designated privileges based on improvements in and maintenance of acceptable behavior. *See, e.g., Callender v. State of New York,* UI D No., 2012–049–108 (N.Y.Ct.Cl., Weinstein, D., Aug. 3, 2012) (describing system employed at Southport and identifying Level III as providing the greatest range of privileges, including broader rights to clothing and property).

**\*3** Plaintiff alleges that, two days after filing his Article 78 petition, on June 3, 2004, he was "suddenly discriminatively [sic] targeted for retaliatory harassment" and issued a false misbehavior report for which Defendant McGinnis designated a biased hearing officer, Defendant Donahoe. Compl. ¶ 51. When Plaintiff appealed Donahoe's determination of guilt, the disposition was affirmed by another McGinnis designee, Defendant Daniel Sullivan. On June 9, 2004, Plaintiff was targeted for further retaliation and issued another false misbehavior report, on which he was again found guilty by Donahoe, and the determination later affirmed by Daniel Sullivan. Plaintiff was demoted to a PIMS Level I classification.

On November 30, 2004, Plaintiff received a favorable decision in his Article 78 proceeding, with the state court concluding that Directive 4911 did not prohibit the possession of multi-colored shorts. When Plaintiff sought to obtain his shorts, however, he was told he was not then eligible to receive them because he was not at a PIMS Level III.

Plaintiff was promoted from PIMS Level I to Level II on December 14, 2004. Though he had not been returned to Level III, he renewed his efforts to obtain the shorts. According to Plaintiff, Defendants McGinnis and Sheahan refused his requests, improperly ignoring the court order. When he prepared a further grievance, it is alleged that McGinnis and Sheahan conspired with Defendant Cieslak to obstruct the grievance process, Sheahan attempted to coerce Plaintiff into voluntarily giving up the shorts, Sheahan and Defendant Chappius improperly removed the shorts from the package room, Sheahan refused to let Plaintiff examine the shorts, and Sheahan gave Plaintiff a deadline—January 28, 2005—by which to submit a "# 2068 Authorization for disposal of personal property form" to avoid destruction of the shorts.

Plaintiff alleges that he filled out the form on January 27, requesting that the shorts be mailed to his home, and that the request was received in the package room on January 28. However, Defendant Chappius also filled out a form on January 27, directing that the shorts be destroyed, and that is what occurred. Plaintiff grieved the destruction of his shorts. It is alleged that Cieslak again obstructed the grievance process, McGinnis denied the grievance, Defendant Kennedy denied his further claim to be reimbursed the value of the shorts, and McGinnis denied the appeal of that determination.

Plaintiff's second claim is against Defendants Alves, Irizarry, Selsky, and Williams. It involves conduct that relates to a disturbance on Plaintiff's gallery on January 24, 2005, for which Plaintiff received a misbehavior report and was placed on cell shield and deprivation orders. He alleges that Defendant Alves did not act on his request to be taken off a restricted diet; Defendant Williams, who was to act as Plaintiff's hearing assistance officer, displayed a conflict of interest and conspired to frustrate and undermine Plaintiff's defense; Defendant Irizarry, the assigned hearing officer, had no authority to conduct the hearing, was biased, violated Plaintiff's due process rights, ejected him from the hearing, denied him discovery, declined to call all his witnesses, made a determination of guilt without sufficient evidence, and improperly imposed six months' SHU confinement; and Defendant Selsky, who rendered a decision on Plaintiff's appeal, merely reduced SHU confinement to three months, instead of reversing

Slip Copy, 2013 WL 144957 (W.D.N.Y.)

(Cite as: 2013 WL 144957 (W.D.N.Y.))

and expunging the disciplinary determination.

**\*4** The third claim, against Defendants Annucci, Donahue, Furman, Hillard, and Waters, relates to the alleged wrongful confiscation of Plaintiff's legal books by Waters, an action that Annucci was informed of, but failed to remedy. Plaintiff further alleges that Waters filed a false misbehavior report against Plaintiff regarding the legal books taken from his cell, and that Furman, Hillard, and Donahue denied him due process when they prevented Plaintiff from attending the subsequent hearing on the matter.

## STANDARDS OF LAW

### Standard under *Federal Rule of Civil Procedure 12(b)(6) to Dismiss*

When considering a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all factual allegations in the complaint as true and make all reasonable inferences in a plaintiff's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007). In order to survive such a motion, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); *ATSI Commc'ns, Inc.,* 493 F.3d at 98. This assumption of truth applies only to factual allegations and is inapplicable to legal conclusions. *Ashcroft v. Iqbal,* 556 U.S. at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Inasmuch as Plaintiff is proceeding *pro se,* this Court must, of course, follow the directive of the Second Circuit, that:

When considering motions to dismiss a *pro se* complaint such as this, "courts must construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggests." *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (internal quotation marks omitted). This is especially true when dealing with *pro se* complaints alleging civil rights violations. *See Weinstein v. Albright,* 261 F.3d 127, 132 (2d

Cir.2001). Accordingly, the plaintiff's allegations in this case must be read so as to "raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (internal quotation marks omitted).

*Weixel v. Bd. of Educ. of N.Y.,* 287 F.3d 138, 145–46 (2d Cir.2002).

### Standard under *Federal Rule of Civil Procedure 56(b) for Summary Judgment*

As a general rule, summary judgment will not be granted before discovery. Summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact zexists. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598 (1970). Additionally, "the movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.40(1)(a) (Matthew Bender 3d ed.).

**\*5** "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew,* 75 F.3d 98, 107 (2d Cir.1996) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548 (1986)), *cert. denied,* 517 U.S. 1190 (1996). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *United States v., Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the nonmoving party." *Leon v. Murphy,* 988 F.2d 303, 308 (2d Cir.1993).

### Standard Under *42 U.S.C. § 1983*

Plaintiff brings this action pursuant to 42 U.S.C. § 1983. "To state a valid claim under 42 U.S.C. § 1983, the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 144957 (W.D.N.Y.)

(Cite as: 2013 WL 144957 (W.D.N.Y.))

plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton,* 126 F.3d 400, 405 (2d. Cir.1997) (citing *Eagleston v. Guido,* 41 F.3d 865, 875–76 (2d Cir.1994)).

**ANALYSIS**

**Defendant Sepiol's Alleged Failure to Respond**

As noted above, Defendant Sepiol is dismissed from this action pursuant to the Court's Order dated March 10, 2009, ECF No. 7. However, because that Order did not specifically identify the dismissed defendants, the Clerk of Court subsequently entered a default as to Sepiol, at Plaintiff's request, ECF No. 19. This entry, while understandable, is obviously of no effect. Accordingly, Defendants' motion to set aside the Clerk's entry of default, ECF No. 26, is granted, and Plaintiff's motion for default judgment against Sepiol is denied.

**Plaintiff's Motion to Strike or Deny Defendants' Motion to Dismiss**

Defendants have moved for full or partial dismissal of the claims made against several of them. In response, Plaintiff requests that the Court strike or deny Defendants' motion because: (1) it was filed prior to discovery, ECF No. 42 at 1, and (2) the moving Defendants are in default, *id.* at 6–8. To the extent it is directed to Defendants' motion to dismiss, Plaintiff's motion to strike is denied.

Plaintiff first maintains that he is entitled to discovery before the Court rules on the motion to dismiss. The Federal Rules of Civil Procedure require that a motion to dismiss for "failure to state a claim upon which relief can be granted ... *must be made before pleading* if a responsive pleading is allowed." FED. R. CIV. P. 12(b) (emphasis added). The Rules expressly provide that such motions be made before answer and discovery because the motion is directed solely at the sufficiency of the complaint; matters outside the pleading are not considered. In short, Plaintiff's contention that a pre-discovery ruling on a Rule 12(b) (6) motion violates due process is without merit.

*6 Plaintiff next contends that Defendants' motion was filed more than 20 days after certain of Defendants were served, and that the Clerk of Court improperly

declined to enter defaults on the basis of the late filing. Even assuming some or all Defendants were at one time in default, the default was cured once he or she appeared and responded to the complaint. Therefore, the Clerk of Court did not err in declining Plaintiff's request for entry of default after Defendants had filed their motion to dismiss, nor will the Court strike the motion to dismiss on that basis.[FN6]

FN6. Defendants are cautioned not to read this as a license to withhold proof of service or to file untimely documents without first obtaining an extension of time. This ruling is directed solely to Plaintiff's contention that it was error to deny an entry of default after defendants had responded.

**Defendants' Motion to Dismiss**

*Claims against Defendants in their Official Capacity*

Plaintiff has sued five Defendants—McGinnis, Sheahan, Chappius, Cieslak, and Kennedy-in their individual and official capacities. These Defendants first move to dismiss all official capacity claims against them on Eleventh Amendment grounds. Suits against government officials in their official capacity "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "[T]he Eleventh Amendment bars a damages action against a State in federal court [and] [t]his bar remains in effect when State officials are sued for damages in their official capacity ." *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (internal citations omitted).

Injunctive relief is another matter. In *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Supreme Court held that a state official acting in his or her official capacity may be sued for prospective injunctive relief from ongoing violations of federal law. *McKeown v. N.Y. State Comm'n on Judicial Conduct,* No. 08–4586–cv, 377 Fed. Appx. 121, 2010 U.S.App. LEXIS 10056 (2d Cir. May 18, 2010). Though Defendants do not address this issue, the Court notes that the last alleged acts by these five Defendants relate to the disposition of Plaintiff's

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 144957 (W.D.N.Y.)

(Cite as: 2013 WL 144957 (W.D.N.Y.))

grievance, in early 2005, over the destruction of his Bermuda shorts. As there are no allegations of any ongoing violation for which Plaintiff could obtain prospective injunctive relief,[FN7] the official capacity claims are dismissed in their entirety.

> FN7. The Court further notes that Plaintiff is no longer in DOCCS' custody, thus any request for prospective injunctive relief is now moot.

*The First Claim for Relief*

Construing the Complaint broadly, Plaintiff alleges that Defendants McGinnis, Sheahan, Chappius, Cieslak, and Kennedy retaliated against him for filing an Article 78 proceeding by denying him his Bermuda shorts, denying him reimbursement, and interfering with the prison disciplinary and grievance processes. Compl. ¶ 99. Only Sheahan and Chappius have moved to dismiss the retaliation claim. All, except McGinnis, have moved to dismiss Plaintiff's claims that the alleged conduct, in and of itself, gives rise to a constitutional violation. This latter aspect of Defendants' motion is considered first.

*Alleged Constitutional Violations*

**\*7** As already noted in detail above, Defendant Sheahan is alleged to have denied Plaintiff's requests to examine and possess a pair of Bermuda shorts. When Plaintiff attempted to file a grievance regarding his requests, Defendant Cieslak returned the grievance to him due to its length—12 pages—thereby delaying processing of Plaintiff's complaint. Thereafter, Defendants Sheahan and Chappius destroyed the shorts, and Defendant Kennedy denied Plaintiff's request for compensation. Sheahan, Chappius, and Kennedy are alleged to have deprived Plaintiff of his property without due process, Compl. ¶ 99, and Cieslak to have "unlawfully" obstructed the grievance process and "deprive[d] Plaintiff of his rights," (*id.* ¶ 75).

Setting aside, for a moment, Plaintiff's claim that such conduct was retaliatory, the conduct, in and of itself, does not constitute a violation of constitutional rights. "Inmates do not have a constitutional right to have grievances processed or to ensure that grievances are processed properly." *Conseillant v. Lafontant,* 2009 U.S. Dist. LEXIS 61795, at \*6 (N.D.N.Y. July 20, 2009) (citation

omitted); *see also Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003) (prison grievance procedures do not confer any constitutionally protected right on an inmate). Thus, Plaintiff's allegation that Cieslak delayed or obstructed the grievance process fails to state a constitutional claim.

As for the alleged deprivation of property without due process, New York State provides an adequate post-deprivation remedy in the Court of Claims. *Reynolds v. Barrett,* 741 F.Supp.2d 416, 443 (W.D.N.Y.2010) (citing *Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir.2001)). Therefore, Plaintiff does not state a due process claim under § 1983 against Sheahan, Chappius, and Kennedy.

*Retaliation*

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the important principle that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See id.* at 381–383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. See *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted:

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

**\*8** *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds by Swierkiewicz v. Sorema N.A .,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 144957 (W.D.N.Y.)

(Cite as: 2013 WL 144957 (W.D.N.Y.))

To state a retaliation claim under 42 U.S.C. § 1983, a plaintiff must allege facts plausibly suggesting that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-that is, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); Gill, 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d at 492).

Captain Sheahan and Deputy Superintendent of Security Chappius, the only Defendants to move on the retaliation claim, contend that Plaintiff does not allege a causal connection between his Article 78 proceeding and their allegedly retaliatory conduct.[FN8] The Court disagrees. It may be that Plaintiff ultimately will be unable to show a causal connection, but for purposes of the instant motion, he has set forth sufficient facts to render such a connection at least plausible. Plaintiff alleges that, after receiving a favorable state court decision, Sheahan repeatedly refused his requests for compliance with the court order, Sheahan and Cieslak delayed the processing of his further grievance seeking compliance, and after Plaintiff ultimately ceded to the directives issued by Sheahan, Sheahan and Chappius destroyed the property that was the subject of the court order. Plaintiff's fact allegations as to the nature of Defendants' conduct and its temporal proximity to his success in litigation, are sufficient to allege a causal connection. Temporal proximity between protected activity and the alleged discriminatory conduct may serve as circumstantial evidence of retaliation. *Jackson v. Goord,* No. 06–CV–6172CJS, 2011 U.S. Dist. LEXIS 117539, at *55 (W.D.N.Y.Oct.12, 2011) (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

> FN8. They raise no arguments as to the first two elements, and apparently concede that they are sufficiently pled.

*The Second Claim for Relief*

Plaintiff's second claim is against Defendants Alves, Irizarry, Selsky, and Williams. Only Alves has moved to dismiss for failure to state a claim.

After being charged with misbehavior on January 24, 2005, Plaintiff was placed on a restricted diet. According to Plaintiff, he wrote a letter to Alves the next day, advising that he "could not eat the loaf diet" and had not been seen by a nurse prior to placement on the diet. He also reminded Alves that he had high blood pressure, high cholesterol, and had lost 20 pounds in a two-week period in 2001 or 2002 while on the loaf diet. Compl. ¶ 122. Alves responded two days later, on January 28, 2005, and directed Plaintiff to address his problems through the established sick call procedures. *Id.* ¶ 123. Plaintiff claims that Alves's failure to immediately recommend that he be removed from a restricted diet constitutes deliberate indifference.

**\*9** The legal standard applicable to Eighth Amendment medical claims is well settled in this Circuit:

> To substantiate an Eighth Amendment claim for medical indifference, a plaintiff must prove that the defendant was deliberately indifferent to a serious medical need. *See Farmer v. Brennan,* 511 U.S. 825, 834–35, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). A deliberate indifference claim requires a showing of both objective and subjective elements. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). "Objectively, the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration or extreme pain exists." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (citation and internal quotation marks omitted). Where the allegation is that the defendant failed to provide any treatment for the medical condition, "courts examine whether the inmate's medical condition is sufficiently serious." *Salahuddin v. Goord,* 467 F .3d 263, 280 (2d Cir.2006). Where the challenge is to the adequacy of the treatment provided, such as in cases where treatment is alleged to have been delayed or interrupted, the seriousness inquiry focuses on "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract." *Smith,*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 144957 (W.D.N.Y.)

(Cite as: 2013 WL 144957 (W.D.N.Y.))

316 F.3d at 186. Moreover, "a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment." Hill v. Curcione, 657 F.3d 116, 123 (2d Cir.2011); see also Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir.1998).

"Subjectively, the official charged ... must act with a sufficiently culpable state of mind." Curcione, 657 F.3d at 122 (citation and internal quotation marks omitted); see also Chance, 143 F.3d at 703. A person acts with deliberate indifference to an inmate's health or safety only if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837, 114 S.Ct. 1970.

Hanrahan v. Mennon, 470 Fed. App'x 32, 33, 2012 WL 1764196 at *1 (2d Cir.2012). In the instant case, Plaintiff's challenge is to the "adequacy of the treatment provided," since he alleges that Alves did not act promptly and did not himself make the recommendation requested.

Defendants contend that Plaintiff fails to state a claim because, accepting the Complaint as true, Alves did promptly and appropriately respond to Plaintiff. The Court agrees that, even upon the most liberal construction of the complaint, Plaintiff does not state a deliberate indifference claim. The complaint does not identify a particular risk of harm or any actual harm. Moreover, Plaintiff does not allege that he attempted to follow Alves's recommendation without success. He states only that Alves responded to him within two days, and he "starved for an entire week" because Alves did not immediately grant his request in the manner he preferred. Compl. ¶ 123. These allegations are not sufficient to state a claim for relief, and Defendant Alves is entitled to dismissal of the claim against him.

*The Third Claim for Relief*

**\*10** Each Defendant named in the third claim, involving the alleged confiscation of Plaintiff's legal books, and a disciplinary hearing on charges lodged against Plaintiff in connection with the legal books, has moved to dismiss.

*The Confiscation of Legal Books*

The complaint alleges that, on January 24, 2005, Defendant Waters removed law books belonging to Plaintiff from his cell. It already has been determined that any claim based on this alleged confiscation is untimely. However, Plaintiff goes on to allege that, when he later complained about the confiscation of his property, DOCCS Deputy Commissioner Annucci failed to "resolve the constitutional transgression" by either returning the books or compensating Plaintiff for them. Compl. ¶ 176.

As noted in connection with Plaintiff's first claim, New York State provides an adequate post-deprivation remedy in the Court of Claims. Reynolds v. Barrett, 741 F.Supp.2d at 443. As such, Plaintiff does not state a constitutional claim against Annucci.

*The Disciplinary Charges and Hearing*

On January 28, 2008, Defendant Waters filed a misbehavior report against Plaintiff, in which he charged that Plaintiff falsely represented the legal books belonged to him and tampered with State property. According to Plaintiff, these charges were false, and were issued in an attempt to disguise the theft of his legal books. Although Defendant Waters has not moved to dismiss Plaintiff's allegations in this regard, it is well established that, even if they are true, the issuance of a false misbehavior report does not state a cognizable constitutional claim. "[A] prison inmate has no general right to be free from being falsely accused in a misbehavior report." Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir.1997) (cited in Bennett v. D.S.D. Habeck, No. 11–CV–6585–CJS, 2012 U.S. Dist. LEXIS 115182, at *6 (W.D.N.Y. Aug. 15, 2012)). Accordingly, this allegation against Waters is dismissed, *sua sponte,* under 28 U.S.C. § 1915(e)(2)(B)(ii), for failure to state a claim. As there are no further fact allegations against Waters, the complaint is dismissed in its entirety as against him.

The remaining allegations relate to the subsequent disciplinary hearing held on February 2, 2005, which Plaintiff alleges he was not permitted to attend. In the context of a prison disciplinary hearing, inmates possess due process rights under the Fourteenth Amendment, but "the full panoply of rights" due a defendant in a criminal proceeding does not apply. Wolff v. McDonnell, 418 U.S.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 144957 (W.D.N.Y.)

(Cite as: 2013 WL 144957 (W.D.N.Y.))

539, 556 (1974); *Zavaro v. Coughlin,* 970 F.2d 1148, 1152 (2d Cir.1992). An inmate has the right to advance written notice at least twenty-four hours prior to a disciplinary hearing, he has a right to be advised of the facts relied upon by prison officials in bringing charges, he has the right to call witnesses and to present documentary evidence, *Wolff,* 418 U.S. at 563–66, and he has the right to an assistant to aid him in the preparation of his defense, *Eng v. Coughlin,* 858 F.2d 889, 898 (2d Cir.1988).

**\*11** Here, Plaintiff alleges that C.O. Hillard arrived at his cell to escort him to the hearing, but appeared hostile and aggressive. Compl. ¶ 162. According to Plaintiff, he had previously been assaulted by Hillard, was fearful of his demeanor, and asked Hillard to call a supervisor to oversee the escort. *Id.* ¶ 163. Hillard then left the gallery and returned minutes later with Furman, who asked Plaintiff what the problem was. *Id.* ¶ 165. Plaintiff explained his fear that Hillard would assault him if allowed to escort him unsupervised. *Id.* ¶ 166. Defendants Furman and Hillard left the gallery. *Id.* ¶ 168. Someone then advised the hearing officer, Defendant Donahue, that Plaintiff refused to attend the hearing, after which Donahue conducted the hearing without him. *Id.* ¶ 169. Plaintiff alleges Defendant Donahue should have come to his cell to assess whether Plaintiff had "knowingly and intelligently" refused to attend, particularly where he did not sign a refusal to attend hearing form. *Id.* ¶¶ 165, 170. Defendants, urge, without citation or explanation, that these facts do not state a constitutional claim.

In general, a prisoner who refuses to attend a disciplinary hearing forfeits the opportunity to challenge the underlying misbehavior report. *Murray v. Foster,* No. 08–CV–0872, 2010 U.S. Dist. LEXIS 66977, at 7–8 (N.D.N.Y. June 11, 2010). Here, however, Plaintiff alleges he did not refuse, but was prevented from attending by Hillard and Furman. Under the lenient standards applicable at this stage in the proceedings, the allegation that Defendants kept Plaintiff from appearing at his disciplinary hearing is sufficient to state a plausible claim for relief. *Hiney v. Wilson,* 520 F.2d 589, 591 (2d Cir.1975) (reversing dismissal of claim against corrections officers who allegedly prevented plaintiff from attending hearing).

As for Donahue, Plaintiff does not allege that he violated any of the due process rights recognized in *Wolff,* 418 U.S. at 563–66. Prisoners to not have a constitutional right to be personally interviewed by a hearing officer as to the validity of a purported waiver.[FN9] Accordingly, Plaintiff fails to state a claim for relief against Donahue. Because all allegations against Donahue are now dismissed, he is terminated from this action.

FN9. Nor does such a right exist under state law. See *Pauljajoute v. Goord,* 306 A.D.2d 576, 577 (3d Dep't 2003).

### Plaintiff's Motion to Strike or Deny Defendants' Summary Judgment Motion

Defendants Selsky, Williams, and Irizarry have moved for summary judgment as to all claims against them, which are brought in connection with another disciplinary hearing. In response, Plaintiff requests that the Court strike or deny the motion because: (1) there has not yet been discovery, (2) Defendants' answers were untimely and the Clerk of Court erroneously failed to enter default against them, and (3) the motion itself is untimely. ECF No. 42 at 1–6.

The Court declines to deny or strike Defendants' motion on the ground that their answers were untimely for the same reasons discussed in connection with the motion to dismiss. And because no deadline was ever set for filing summary judgment motions, the motion itself is not untimely. That leaves the issue of discovery.[FN10]

FN10. Plaintiff is advised that, under Rule 56 of the Federal Rules of Civil Procedure, it is not enough to simply protest that there has been no discovery. The nonmovant must show "by affidavit or declaration that, for specified reasons, [he] cannot present" essential facts. Fed.R.Civ.P. 56(d). In other words, the nonmovant must identify the essential facts he expects to obtain through discovery that will justify his opposition to the motion. Plaintiff has not done so here.

**\*12** Defendants did not oppose Plaintiff's motion to strike, but they do assert, in support of their own motion, that because Plaintiff's claims are based on what occurred

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 144957 (W.D.N.Y.)

(Cite as: 2013 WL 144957 (W.D.N.Y.))

at a disciplinary hearing, all "relevant facts should be contained in the transcript and submitted documents" provided with their motion. ECF No. 23 ¶ 6.

As noted above, the general rule is that summary judgment will not be granted prior to discovery. Even assuming the accuracy of Defendants' assertion, there are two compelling reasons to follow that general rule here. First is Plaintiff's *pro se* status. Second, this case will proceed to discovery with respect to seven other Defendants, whose motion to dismiss is now denied. In light of the posture of this case, Defendants' motion for summary judgment will be dismissed without prejudice and may be renewed upon the completion of discovery.

## CONCLUSION

For the reasons stated, Plaintiff's motion for default judgment against Defendant Sepiol, ECF No. 39 is denied, and Defendants' motion to vacate the Clerk's entry of default as to Sepiol, ECF No. 26, is granted. Plaintiff's motion to deny or strike Defendants' motions, ECF No. 42, is granted in part, and denied in part. Defendants' motion to dismiss, ECF No. 12, is granted in part, and denied in part, consistent with the foregoing discussion. Specifically, the motion is denied with respect to: (1) all claims against McGinnis, acting in his individual capacity, (2) the retaliation claim against Sheahan, Chappius, Cieslak, and Kennedy, acting in their individual capacities, and (3) the due process claim against Furman and Hillard. Defendants motion for summary judgment, ECF No. 20, is denied without prejudice so as to allow for the conduct of discovery.

The Complaint is dismissed in its entirety, with prejudice, as to Defendants Alves, Annucci, Cassler, Donahue, Gleason, Sepiol, C.O. Sullivan, Captain Sullivan, and Waters. The Clerk is directed to enter judgment for these defendants.

IT IS SO ORDERED.

W.D.N.Y.,2013.

Applewhite v. Sheahan
Slip Copy, 2013 WL 144957 (W.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2012 WL 6212612 (S.D.N.Y.)

(Cite as: 2012 WL 6212612 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.
Angel ALVAREZ, Plaintiff,
v.
The CITY OF NEW YORK, et al., Defendants.
No. 11 Civ. 5464(LAK).

Dec. 12, 2012.

Matthew J. Galluzzo, Zachary H. Johnson, Galluzzo & Johnson LLP, for Plaintiff Angel Alvarez.

Katherine A. McFarlane, Ben N. Kuruvilla, Assistant Corporation Counsel, Michael A. Cardozo, Corporation Counsel, for Defendants The City of New York, Police Commissioner Raymond Kelly, P.O. DouglasA. Brightman, P.O. ThomasM. Cozart, Sgt. Paul M. Kerrigan, P.O. MichaelT. Tedeschi, P.O. Tiffany Jeffries, P.O. Joseph Green, Sgt. Philip Terpos, Detective Daniel Hull, and Detective Robert Gibbons.

**MEMORANDUM OPINION**

LEWIS A. KAPLAN, District Judge.

*1 Before the Court is defendants' partial motion to dismiss the first amended complaint ("FAC") in this civil rights suit. The motion is granted in part and denied in part, as provided below.

*Facts*

The facts alleged in the FAC need be summarized only briefly here: On August 8, 2010, plaintiff Angel Alvarez was engaged in a fistfight with one Luis Soto, who produced a firearm and shot plaintiff with it.FN1 Shortly thereafter, four police officers of the New York City Police Department (the "Shooting Officers") opened fire on the two, killing Soto and wounding plaintiff 27 times .FN2 After one of the Shooting Officers told another police officer that plaintiff had fired a weapon at them, plaintiff was transported to Harlem Hospital.FN3 Plaintiff

awoke in the hospital on the morning of August 14, 2010, where he was arrested by officers of the NYPD and charged with the attempted murder of a police officer.FN4 Plaintiff appeared before the Criminal Court of the City of New York on August 16, 2010 and ultimately remained incarcerated until March 2, 2011, when a special grand jury declined to indict plaintiff in connection with the incident.FN5

FN1. FAC ¶¶ 2931.

FN2. Id. ¶¶ 32–35.

FN3. Id. ¶¶ 38, 40.

FN4. Id. ¶¶ 5152.

FN5. Id. ¶¶ 57, 66.

Plaintiff brings claims *inter alia* for excessive use of force, false arrest, failure to intervene, and conspiracy under 42 U .S.C. §§ 1983, 1985 and on state law grounds, against the Shooting Officers, six other named police officers allegedly involved with the subsequent investigation, and a number of "John Doe" and "Richard Roe" officers.FN6

FN6. Plaintiff concedes that such claims brought against the City should be dismissed. DI 39 at 2. Plaintiff brings additional claims against defendants that are not the subject of defendants' motion and are discussed no further here.

*Discussion*

*I. Excessive Force and Failure to Intervene*

The FAC brings Section 1983 claims of excessive use of force against each Shooting Officer and defendant Terpos.FN7 Defendants have not moved to dismiss these claims.

FN7. The FAC alleges that Terpos used excessive force in the course of handcuffing plaintiff immediately after the shooting. *See* FAC ¶¶ 39, 72.

Slip Copy, 2012 WL 6212612 (S.D.N.Y.)

(Cite as: 2012 WL 6212612 (S.D.N.Y.))

But it seeks recovery also from each of the Shooting Officers and from all of the other officer defendants on the theory that each is liable for failing to intervene to prevent the allegedly excessive use of force by others. The law permits a plaintiff to recover from an officer for failing to intervene in the excessive force used by another if the officer "observed or has reason to know ... that excessive force is being used" and there was "a realistic opportunity to intervene to prevent the harm from occurring." [FN8] Insofar as defendants seek dismissal of the failure to intervene claims against the Shooting Officers for other Shooting Officers' use of force, the motion is denied. The FAC alleges that "plaintiff collapsed to the ground" when the shooting began and, "[a]s plaintiff lay defenseless, [that] the [Shooting Officers] continued to fire bullets into him," prompting plaintiff to "squeez [e] himself into the fetal position" for protection. Moreover, "[w]hen the police shooting finally stopped," the officers allegedly had discharged 46 rounds and hit plaintiff 27 times.

FN8. *Anderson v. Branen,* 17 F.3d 552, 558 (2d Cir.1994).

These allegations render it plausible that each Shooting Officer observed or had reason to know the force being used by each of the other Shooting Officers. [FN9] Moreover, one may infer from these allegations that the shooting took sufficient time that each Shooting Officer had a realistic opportunity to prevent or mitigate the harm caused by the others as it was occurring. [FN10]

FN9. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

FN10. To the extent defendants contend that it is inherently implausible that one of the Shooting Officers had an opportunity to intervene because he himself was shot during the incident, that question cannot be resolved as a matter of law at this stage.

*2 The situation with respect to the other officer defendants is different. The FAC does not allege facts from which one might conclude that any of them knew or was able to prevent the alleged use of unreasonable force

against plaintiff. Accordingly, the failure to intervene claims against them are dismissed. [FN11]

FN11. Additionally, defendants' motion is granted with respect to claims against the Shooting Officers for failure to intervene in Terpos's alleged use of excessive force. Nothing in the FAC permits a plausible inference that these officers had reason to know of or a realistic opportunity to prevent Terpos's action.

*II. False Arrest and Failure to Intervene*

The FAC brings federal and state false arrest claims against all defendants and, separately, brings federal claims against all defendants for failure to intervene in the alleged false arrest. [FN12]

FN12. There is some suggestion in our Circuit's caselaw that a failure to intervene is more properly construed as a means to be liable for false arrest, rather than a separate cause of action. *See Escalera v. Lunn,* 361 F.3d 737, 748 n. 4 (2d Cir.2004). In any event, the FAC does not appear to allege a violation of state law regarding the failure to intervene in the false arrest.

Defendants move to dismiss all of these claims on the ground that probable cause existed as a matter of law, noting the FAC's admission that plaintiff was involved in a fistfight just before the shooting. [FN13] The point merits little discussion. As counsel for defendants conceded at oral argument, an officer may observe an individual engaging in a fistfight without necessarily having probable cause to arrest the individual for a crime. [FN14]

FN13. *See Jaegly v. Couch,* 439 F.3d 149, 153 (2d Cir.2006) (Sotomayor, J.) (holding that "claim for false arrest turns only on whether probable cause existed to arrest a defendant, and ... it is not relevant whether probable cause existed with respect to ... any charge actually invoked by the arresting officer at the time of arrest"); *see also Ackerson v. City of White Plains,* ––– F.3d ––––, 2012 WL 5951836 (2d Cir. Nov. 29, 2012) (stating elements of false

Slip Copy, 2012 WL 6212612 (S.D.N.Y.)

(Cite as: 2012 WL 6212612 (S.D.N.Y.))

arrest claim under New York law and observing that elements are substantially similar to those under Section 1983).

FN14. Moreover, the FAC does not even allege that the officers in fact did observe the fistfight. *See* FAC ¶¶ 31–32.

Defendants assert also that the false arrest count does not state a legally sufficient claim. The FAC alleges that unnamed officers arrested plaintiff on August 14 "with the cooperation and aid" of a number of the named defendants. FN15 It does not allege, however, that any named defendant was present at the arrest. Our Circuit has held that a police officer can be liable for a false arrest that "occurs outside of his presence" only under a failure-to-intervene theory.FN16 Accordingly, the false arrest claim is not sufficient as to the named defendants.

FN15. In his briefing and at oral argument, plaintiff has clarified that his false arrest claim is predicated solely upon his arrest on August 14, not the events of August 8.

FN16. *See Escalera,* 361 F.3d at 748 n. 4.

Turning then to the failure to intervene claims, the Court considers whether the FAC adequately alleges that any of the named defendants had "reason to know" that plaintiff would be arrested unjustifiably and a "realistic opportunity" to prevent the arrest.FN17

FN17. *Anderson,* 17 F.3d at 558.

Insofar as it asserts this claim against the Shooting Officers, the FAC is sufficient in this respect. They are alleged to have been present during the shooting. The FAC permits an inference that they were aware that plaintiff had not fired a weapon. Thus, they had reason to know that the charges against plaintiff were unfounded. It therefore may be inferred that they had a realistic opportunity to prevent the arrest from occurring almost a week later.

The FAC is insufficient in this respect with regard to all other named defendants. As plaintiff's counsel

conceded at oral argument, the FAC fails to allege facts indicating that these other defendants had reason to know, prior to August 14, that plaintiff had not in fact shot at the police.

*III. Conspiracy*

The FAC appears to allege two conspiracy theories. First, in the Section 1983 count regarding excessive force, the FAC alleges that the defendants conspired to "cover up" the events of the shooting and that this conspiracy operated to deprive plaintiff of his rights to be free of unreasonable force.FN18 Second, the FAC alleges as an independent claim that defendants conspired to deprive plaintiff of his constitutional rights in violation of 42 U.S.C. § 1985(3). Defendants move to dismiss all of the conspiracy claims as barred by the intracorporate conspiracy doctrine, which generally provides that "officers, agents and employees of a single corporate entity are legally incapable of conspiring together." FN19

FN18. FAC ¶ 74.

FN19. *Hartline v. Gallo,* 546 F.3d 95, 99 n. 1 (2d Cir.2008) (internal quotation marks omitted).

**\*3** The Second Circuit has applied the intracorporate conspiracy doctrine to Section 1985 claims.FN20 But it has not considered its applicability to conspiracy claims brought under Section 1983.FN21 In any case, courts have recognized an exception to this doctrine when the defendants "were motivated by [an] independent personal stake in achieving the corporation's objective." FN22 Plaintiff contends that this personal stake is alleged adequately because the complaint states that the defendants conspired falsely to accuse plaintiff of attempted murder "to shield themselves from liability, embarrassment, and charges of misconduct." FN23

FN20. *See id.* (barring Section 1985 claim based on police department's strip-search of plaintiff); *Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978) (barring Section 1985 claim based on law school's discharge of professor); *Girard v. 94th and Fifth Avenue Corp.,* 530 F.2d 66 (2d Cir.1976) (barring Section 1985 claim based on cooperative board's policy preventing plaintiff

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6212612 (S.D.N.Y.)

(Cite as: 2012 WL 6212612 (S.D.N.Y.))

from assuming lease).

FN21. *See Appel v. Spiridon,* No. 06 Civ. 1177, 2011 WL 3651353, *19 (D.Conn. Aug. 18, 2011) (recognizing that Second Circuit has not addressed issue in Section 1983 context); *cf. Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999) (setting out elements of conspiracy claim under Section 1983).

FN22. *Girard,* 530 F.2d at 71–72; *see Hartline v. Gallo,* 2006 WL 2850609, *9 (E.D.N.Y.2006) reasoning adopted by 546 F.3d at 99 n. 1.

FN23. FAC ¶ 55.

The Court agrees that the intracorporate conspiracy does not apply here. As another district court in this Circuit has concluded in a very similar case, "plaintiff clearly alleges that [the Shooting Officers] acted in [their] own personal interest, not in the interest of the police department or the city, by conspiring with others to cover-up [their] alleged use of excessive force." [FN24] This conclusion accords with other decisions finding the doctrine inapplicable where law enforcement allegedly exercises official duties in unconstitutional ways in order to secure personal benefit. [FN25]

FN24. *Hill v. City of New York,* No. 03 Civ. 1283, 2005 WL 3591719, *6 (E.D.N.Y.2005).

FN25. *See Yeadon v. New York City Transit Auth.,* 719 F.Supp. 204, 207, 212 (S.D.N.Y.1989) (holding that officers who allegedly engaged in race-based false arrests to "improve their arrest records in order to secure promotions and other benefits" had "independent, conspiratorial purpose"); *Medina v. Hunt,* No. 05 Civ. 1460, 2008 WL 4426748, *79 (N.D.N.Y. Sept. 25, 2008) (identifying factual dispute in whether officers acted pursuant to personal interests in allegedly assaulting prisoner in retaliation for participating in federal lawsuit).

No different conclusion is warranted based on the FAC's allegations that defendants "acted within the scope of their employment and under color of state law." Although some district courts have relied on similar allegations to conclude that the personal stake exception is not applicable, [FN26] it is important to distinguish the personal stake inquiry from whether a defendant has acted "under color of law" for purposes of Section 1983. The color-of-law question principally concerns "pretense of law"—whether the defendant was "clothed with the authority of state law." [FN27] The intracorporate conspiracy doctrine, however, concerns whether the allegedly unlawful conduct *actually* was just implementation of a single corporate policy by officers serving the corporate entity—whether "the conspiratorial conduct challenged is essentially a single act by a single corporation." [FN28] Where, as here, a group of defendants allegedly maintained the pretense of serving the state while in fact pursuing their own ends to avoid liability, it is entirely consistent to conclude that they acted both under color of state law and with an independent personal stake barring application of the intracorporate conspiracy doctrine. This alleged conduct presents precisely the " 'group danger at which conspiracy liability is aimed.' " [FN29] For these reasons, the Court denies defendants' motion to dismiss plaintiff's conspiracy claims based on the intracorporate conspiracy doctrine. [FN30] Nevertheless, there are glaring defects in the FAC's pleadings that necessitate dismissal of these claims. [FN31]

FN26. *See Anemone v. Met. Transp. Auth.,* 419 F.Supp.2d 602, 604 (S.D.N.Y.2006) (concluding that personal stake exception did not apply because complaint alleged that government employees acted within scope of employment); *see also Mendoza v. Cnty. of Nassau,* No. 11 Civ. 2487, 2012 WL 4490539, *8 (E.D.N.Y. Sept. 27, 2012).

FN27. *U.S. v. Giordano,* 442 F.3d 30, 42 (2d Cir.2006) (Sotomayor, J.) (internal quotation marks and alterations omitted).

FN28. *Herrman,* 576 F.2d at 459.

FN29. *Brever v. Rockwell Int'l Corp.,* 40 F.3d 1119, 1127 (10th Cir.1994) (quoting *Dussouy v.*

Slip Copy, 2012 WL 6212612 (S.D.N.Y.)

(Cite as: 2012 WL 6212612 (S.D.N.Y.))

*Gulf Coast Inv. Corp.,* 660 F.2d 594, 603 (5th Cir.1981)). *Cf. Ricciuti v. New York City Trans. Auth.,* 124 F.3d 123, 12931 (2d Cir.1997) (holding that conspiracy between officers to prosecute plaintiff through false affidavits presented triable issues of fact).

FN30. The Court reaches this conclusion even though it finds the personal stake adequately alleged only as to the Shooting Officers. Some district courts have assumed that the personal stake must be held by "each and every" alleged co-conspirator. *Tardd v. Brookhaven Nat. Laboratory,* 407 F.Supp.2d 404, 414 (E.D.N.Y.2006); *see Watrous v. Town of Preston,* No. 10 Civ. 597, 2012 WL 4512534, *23 (D.Conn. Sept. 29, 2012). The Court respectfully disagrees. The reason the intracorporate conspiracy bars claims is that a conspiracy requires multiple actors; a single corporation cannot conspire with itself. *See generally Girard,* 530 F.2d at 70. Where, as here, four of the alleged co-conspirators are acting in their own interests, the requisite multiplicity is established and the doctrine does not apply to the alleged conspiracy at all. *Cf. Tavolini v. Mt. Sinai Medical Ctr.,* 984 F.Supp. 196, 206 (S.D.N.Y.1997) (stating that doctrine applies only if "none of the members" of alleged conspiracy has independent personal stake).

FN31. *See* 5B CHARLES A. WRIGHT, ARTHUR R. MILLER, ET AL., FEDERAL PRACTICE & PROCEDURE, § 1357 (3d ed. 2004) ("[T]he district judge on his or her own initiative may note the inadequacy of the complaint and dismiss it for failure to state a claim as long as the procedure employed is fair to the parties."); *Wachtler v. Cnty. of Herkimer,* 35 F.3d 77, 82 (2d Cir.1994).

First, the FAC fails to plead a Section 1985 conspiracy because it does not allege facts even remotely suggesting a " 'racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' actions,' " the existence of which is essential to

liability.[FN32] To the contrary, the FAC alleges that the defendants acted "to shield themselves from liability, embarrassment, and charges of misconduct." [FN33]

FN32. *Reynolds v. Barrett,* 685 F.3d 193, 201–02 (2d Cir.2012) (quoting *Griffin v. Breckenridge,* 403 U.S. 88, 102 (1971)).

FN33. FAC ¶ 55.

*4 Second, the Section 1983 conspiracy claim simply makes no sense. In the count regarding excessive use of force, the FAC alleges that defendants conspired to "cover up" the incident and that this conspiracy deprived plaintiff of his right to be free of unreasonable force.[FN34] The FAC, however, does not allege an agreement between or among any defendants to engage in the use of excessive force. To the extent the defendants may have conspired after the fact to conceal what had occurred, that conspiracy, if any, would have injured plaintiff only by causing his arrest or further incarceration. But plaintiff's Section 1983 false arrest count does not rely on any theory of conspiratorial liability.[FN35]

FN34. *Id.* ¶ 74.

FN35. *See id.* ¶¶ 8289. Nor will this Court read such a theory into the FAC's stray note in the allegations regarding the excessive use of force claim that the conspiracy deprived plaintiff of his right to be free from unreasonable search or seizure. *Id.* ¶ 74.

In light of these significant deficiencies, dismissal of all of plaintiff's conspiracy claims is appropriate. Because defendants failed to move to dismiss on these grounds, however, the Court will grant plaintiff leave to amend his conspiracy allegations if he thinks he has a basis for doing so, notwithstanding his election at oral argument to stand on his complaint as to these counts.[FN36]

FN36. Plaintiff of course is free also to seek reconsideration of this order if he thinks it warranted.

*IV. Conclusion*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 6212612 (S.D.N.Y.)

(Cite as: 2012 WL 6212612 (S.D.N.Y.))

Defendants' motion to dismiss [DI 34] is granted to the extent that (1) Count I is dismissed as to (a) the claim of use of excessive force against defendant City of New York and (b) the conspiracy claims, (2) Counts II and VIII are dismissed as to all named defendants, (3) Count IV is dismissed as to (a) defendants Brightman, Kerrigan, Cozart, and Tedeschi regarding any failure to intervene in Terpos's alleged use of excessive force and (b) defendants City of New York, Terpos, Green, Jeffries, Hull, Gibbons, and Kelly, (4) Count V is dismissed in its entirety, and (5) Count XI is dismissed on the ground that no separate cause of action lies for punitive damages [FN37] although, of course punitive damages may be recovered in an appropriate case where otherwise permitted by law. It is denied in all other respects. Plaintiff may file an amended complaint to the extent indicated herein and at oral argument provided it is filed no later than December 21, 2012. The previously entered stay of discovery is vacated.

> FN37. *E.g., Paisley v. Coin Device Corp.,* 5 A.D.3d 748, 750, 773 N.Y.S.2d 582, 583 (2d Dep't 2004).

SO ORDERED.

S.D.N.Y.,2012.

Alvarez v. City of New York
Slip Copy, 2012 WL 6212612 (S.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2011 WL 3651353 (D.Conn.)

(Cite as: 2011 WL 3651353 (D.Conn.))

H

Only the Westlaw citation is currently available.
United States District Court,

D. Connecticut.
Rosalie APPEL, Plaintiff,
v.
Charles SPIRIDON, et al., Defendants.
Civil Action Nos. 3:06cv1177 (SRU), 3:07cv1237.

Aug. 18, 2011.
As Corrected Sept. 1, 2011.
John R. Williams, Katrena K. Engstrom, John R. Williams and Associates, LLP, New Haven, CT, Kelly Anne Rommel, Law Offices of Norman A. Pattis, Bethany, CT, for Plaintiff.

Beth Z. Margulies, Margaret Q. Chapple, Attorney General's Office, Hartford, CT, for Defendants.

### RULING AND ORDER

STEFAN R. UNDERHILL, District Judge.

*1 Rosalie Appel is a former tenured professor of art at Western Connecticut State University ("WCSU" or the "University"), where she taught for over forty years. During the 2004–2005 academic year, Appel supported a colleague's claim of race discrimination in the art department. At the start of the following academic year, Appel found herself the subject of a department-wide petition complaining of Appel's conduct in the workplace. The University convened a special assessment committee ("SAC" or the "Committee") to evaluate Appel's conduct and develop an action plan to address any problems the Committee identified. On June 30, 2006, the SAC issued its Plan for Remediation (the "Plan"). The final Plan called, in pertinent part, for Appel to undergo a "neuropsychological and projectives assessments." On July 31, 2006, Appel filed an action against four university administrators, pursuant to 42 U.S.C. §§ 1983 and 1988, alleging that the administrators' conduct violated the First Amendment and the Equal Protection Clause.[FN1] In

September 2006, Appel was suspended without pay when she refused to undergo the neuropsychologi cal assessment. At that time Appel sought a preliminary injunction. *See* doc. # 10. I granted the motion on the basis that Appel had raised serious questions concerning the merits of her equal protection claim. *Appel v. Spiridon,* 463 F.Supp.2d 255, 261–62, 264–66 (D.Conn.2006). The injunction was later vacated after remand from the Second Circuit in light of the Supreme Court's holding in *Engquist v. Or. Dep't of Agric.,* 553 U.S. 591, 128 S.Ct. 2146, 2155–57, 170 L.Ed.2d 975 (2008), that public employees cannot bring Equal Protection claims based on a "class of one" theory. *Appel v. Spiridon,* 531 F.3d 138 (2d Cir.2008).

> FN1. Appel initially filed suit against: Charles Spiridon, Dean of Human Resources at the University; Linda Vaden–Goad, Dean of Arts & Sciences at the University; Linda Rinker, Provost and Vice President for Academic Affairs at the University; and James Schmotter, President of the University.

On November 25, 2008, I held a hearing on defendants' motion for summary judgment on the initial complaint. I granted the motion in favor of all four defendants with respect to Appel's class-of-one claim and in favor of James Schmotter and Linda Rinker with respect to Appel's First Amendment retaliation claim. Docs.86, 87 at 31. I denied the motion with respect to Appel's First Amendment retaliation claim against Charles Spiridon and Linda Vaden–Goad. Doc. # 87 at 31. I also ordered the case consolidated with a second action filed by Appel concerning additional disciplinary action taken against her since the filing of her claim in 2006.

On June 19, 2009, Appel filed a third-amended consolidated complaint (doc. # 100) against nine university administrators and staff members alleging additional claims of First Amendment retaliation concerning a second CHRO hearing, and the filing of her 2006 lawsuit.[FN2] Appel also alleges a substantive due process claim concerning the psychiatric examination. Defendants have moved for summary judgment on the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3651353 (D.Conn.)

(Cite as: 2011 WL 3651353 (D.Conn.))

additional allegations. Doc. # 127. For the following reasons, defendants' motion is denied in part and granted in part.

> FN2. In addition to Rinker, Spiridon, Vaden–Goad and Schmotter, Appel's third amended complaint named as defendants the following University employees: Carole Hawkes, Dean of the School of Visual and Performing Arts (who replaced Vaden–Goad); Terry Wells, Chair of the Art Department; Margaret Grimes, John Wallace, and Abe Echevarria.

## I. Standard of Review

**\*2** Summary judgment is appropriate when the evidence demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also* *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson,* 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *see also* *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."

*Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991); *see also* *Suburban Propane v. Proctor Gas, Inc.,* 953 F.2d 780, 788 (2d Cir.1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson,* 477 U.S. at 249–50.

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247–48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex,* 477 U.S. at 322. In such a situation, "there can be no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23; *accord* *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex,* 477 U.S. at 323.

## II. Factual Background

**\*3** The following facts are undisputed, unless otherwise noted. All inferences are drawn in favor of Appel, the non-moving party, and any disputes are resolved in her favor.
A. *2004–2006*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3651353 (D.Conn.)

(Cite as: 2011 WL 3651353 (D.Conn.))

In 2004, Appel supported a colleague's claim of race discrimination. After WCSU failed to consider Hwa Young–Caruso for an open position in the Art Department, Young–Caruso filed a claim with the Connecticut Commission on Human Rights and Opportunities (CHRO). Young–Caruso's claim involved events that occurred during an Art Department meeting in September 2003. In March 2004, Spiridon and Barbara Barnwell, the University's affirmative action officer, met with Appel to discuss the September 2003 meeting and Young–Caruso's claims of discrimination.

On May 12, 2005, Appel testified at a CHRO hearing on behalf Young–Caruso about what took place during the September 2003 meeting of the Art Department. Spiridon, Vaden–Goad, and defense counsel Beth Marguiles, attended the CHRO hearing. Doc. # 127, ex. 20, Spridon Aff. at ¶ 13 and att. A. Four days later, Appel received a letter from Spiridon concerning her alleged improper handling of acid in the print making lab. Doc. # 132, ex. H at 38. Shortly thereafter, the spring semester ended.

At the start of the fall semester the full -time faculty members of the art department, other than Appel, signed a petition dated September 1, 2005 objecting to certain aspects of Appel's behavior. Doc. # 132, ex. B. The petition—in the form of a memorandum addressed to Vaden–Goad—described Appel's "unprofessional" conduct as "disruptive and accusatory." *Id.* Appel's colleagues requested outside assistance for the purposes of improving the functioning of their department. *Id.* On October 31, 2005, Vaden–Goad met with Appel to discuss the petition.

On November 11, 2005, pursuant to Article 4.13 of the CSU–AAUP/BOT collective bargaining agreement,[FN3] Vaden–Goad convened a special assessment committee to evaluate Appel's conduct and to develop an action plan to address any problems. Doc. # 132, ex. C. The Committee was comprised of three faculty members from WCSU, including Professor Katy Wiss, who headed the Committee, as well as the chair of the Art Department at Central Connecticut State University.

> FN3. The collective bargaining agreement is between the Connecticut State University American Association of University Professors

and the Board of Trustees for the Connecticut State University System.

As part of its assessment, the SAC reviewed three sets of student evaluations, including two that the Committee distributed; interviewed six graduating senior art majors; twice observed Appel's classroom teaching; interviewed various WCSU faculty, staff members, and administrators; reviewed complaints concerning Appel filed by students in recent years; and reviewed documents submitted by Appeal relating to her teaching and professional responsibilities. The Committee attempted to meet with Appel and requested written feedback, but she refused to attend a meeting or provide the Committee with written responses.

The SAC issued a report dated April 28, 2006. Doc. # 127, ex. 3. In that report, the Committee summarized its findings, concluding that, although Appel is capable of teaching well, the Committee has strong reservations about "her ability to develop the rapport appropriate to effective teaching." *Id.* The Committee expressed concern that Appel's behavior may negatively affect individual students. The SAC also noted its concern regarding Appel's lack of recent creative activity. Appel's use of e-mail, which the Committee described as "bordering on bullying," was a specific behavior that troubled the SAC. Finally, the Committee concluded that "Appel's service is significantly limited by her apparent inability to work with her colleagues."

**\*4** In its report, the SAC set forth several preliminary recommendations. Those recommendations included suggestions for the Art Department as a whole, for colleagues who work with Appel, and for Appel herself. With respect to recommendations directed at Appel and her teaching and work with students, the Committee suggested that she rework her syllabi, establish clear professional boundaries with students, and find accessible space for student exhibitions. With respect to her work with colleagues, the SAC recommended that Appel be given clear instructions on acceptable behavior, and, because the Committee concluded that it was unclear whether she could consistently control her behavior, it recommended that she "be given an in-depth psychological assessment (neuropsychological and

Not Reported in F.Supp.2d, 2011 WL 3651353 (D.Conn.)

(Cite as: 2011 WL 3651353 (D.Conn.))

projectives battery)." The purpose of the exam would be to "determine whether she has the capacity to alter the behaviors that have been documented as being problematic in the work setting. If there are biological or psychological factors which prevent her from performing her duties effectively and consistently appropriate solutions should be discussed." *Id.* In addition, the SAC suggested that Appel be given the opportunity for medical treatment or psychotherapy to "talk through some of her feelings and concerns."

On June 30, 2006, the SAC issued its final Plan for Remediation. Doc. # 127, ex, 3–G. The Plan took into account the "rebuttal" and certain materials that Appel provided following the SAC report. The SAC identified several areas of remediation and recommended action responsive to those areas. The Committee's final recommendations focused on Appel altering her interpersonal behavior with faculty, students, and staff; improving her syllabi, modifying the administration of student surveys, and finding accessible space if she wishes to display her students' work publicly. In addition, the SAC recommended that Appel undergo "neuropsychological and projectives assessments to determine whether she has the capacity to alter the behaviors in this work setting that have been documented as problematic (yelling, accusing and needing instructions to be repeated many times)." In other words, the Committee recommended that Appel undergo a psychiatric examination, at an institution selected by the University's Human Resources Department, because of her "problematic behavior." The schedule recommended by the SAC required Appel to undergo the psychiatric evaluation before the fall 2006 semester. The SAC also recommended that, depending on the results of the psychological testing, the University implement appropriate solutions with medical personnel. Finally, the SAC recommended that Employee Assistance Program ("EAP") support be made immediately available to Appel, and that the University monitor her behavior.

Vaden–Goad sought to meet with Appel in July to discuss the Plan and Appel's compliance with the recommendations. Appel refused to meet with Vaden–Goad at that time.

**\*5** In addition to Appel's Plan for Remediation, the SAC composed general recommendations for the Art Department and for individuals who work with Appel. The Committee requested that Vaden–Goad also implement those recommendations, which addressed treating Appel with respect, designing general guidelines for responding to inappropriate behavior, providing a means for students to inform others of a faculty member's inappropriate behavior, generating standards for student surveys and their administration, and retaining syllabi in the Art Department.

In a letter dated July 25, 2006, Spiridon wrote Appel and informed her of the necessity to attend the "neuropsychological and projective assessments" at the Institute for Living in order to comply with the Plan for Remediation. Appel refused to attend and Appel filed the instant lawsuit on July 31, 2006.

On September 5, 2006, Appel met with Spiridon and Rinker but refused to discuss the Plan for Remediation. Following that meeting, Rinker decided to discipline Appel and informed her that WCSU would be suspending her without pay effective September 14, 2006 because of her failure to undergo the psychological assessment and to cooperate with the Plan for Remediation developed by the SAC. Rosalie Appel moved for a preliminary injunction to restrain her employer from requiring her to undergo a mental health evaluation.

On November 9, 2006, I conducted a hearing on that motion and subsequently enjoined the defendants from requiring Appel to submit to any psychiatric or psychological examination or assessment in order to maintain her salary, benefits, and teaching position as a professor of art at the University. [FN4] The injunction, however, did not affect the other aspects of the Plan. The defendants appealed the ruling and moved to stay the injunction pending appeal. I denied the motion to stay on December 21, 2006. Doc. # 51.

FN4. The Second Circuit vacated the order on July 7, 2008 [doc. # 64] because the order granted relief on an equal protection class of one claim brought by a public employee. *See Enquist v.Or. Dep't of Agr. ic.,* 553 U.S. 591, 128 S.Ct.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3651353 (D.Conn.)

(Cite as: 2011 WL 3651353 (D.Conn.))

2146, 170 L.Ed.2d 975 (2008). Neither the preliminary injunction order nor the Second Circuit's decision addressed Appel's substantive due process claim.

B. *2007 to Present*

On January 26, 2007, the Second Circuit denied the defendants' motion to stay. *See Appel v. Spiridon,* 06–5723–cv (2d Cir.). On February 2, 2007, Appel attended a meeting with Rinker, Spiridon, Carol Hawkes, Dean of Visual Arts, and Terry Wells, Chair of the Art Department, to discuss Appel's return to the classroom.[FN5] Spiridon memorialized the meeting, noting that Appel's return to teaching was conditioned upon her compliance with the Plan. Doc. # 127, ex. 4, att. C. At that point, the issues between Appel and the University rapidly escalated, as set forth below, and resulted in her eventual termination.[FN6]

> FN5. Hawkes replaced Vaden–Goad.

> FN6. Appel's termination is not at issue in this case.

On February 5, 2007, Appel returned to work conditioned on her compliance with the Plan. Upon her return to teaching, four faculty members (Defendants Margaret Grimes, Abe Echevarri a, John Wallace, and Terry Wells) making up the Art Department Evaluation Committee began reviewing Appel's performance as set forth in Articles 4.11.6–4.11.9 of the collective bargaining agreement. The first incident following Appel's return to work occurred on February 6, 2007, when Appel contacted the University's Public Safety Department in an effort to have two lab assistants' entry cards to the printmaking lab disabled. The lab assistants had been hired to teach her classes during her absence. Appel was formally reprimanded on March 15, 2007 for attempting to cancel the lab assistants' access to the lab.

**\*6** The second point of disagreement between Appel and the University concerned her syllabi. The Plan called for Appel to "add to her syllabi clear explanations of course expectations, grading and assignments" and that she "use language that supports student learning and avoid language that may appear to be blaming." Doc. # 127, ex.

3. On February 8, 2007, Wells and Hawkes informed Appel, by letter, of their suggested changes to her syllabi. Doc. # 127, ex 4. att. F. They recommended that Appel: organize the syllabus under headings, include a schedule of class assignments and due dates, a description of the grading policy, and a direction to remove threatening or embarrassing statements such as "rowdy behavior" and "provocations by students." The letter directed Appel to submit revised syllabi by February 20, 2007. Appel submitted revised syllabi, however, on February 22, 2007 Wells and Hawkes sent another letter concerning perceived inadequacies in those revisions. Ten days later, Appel attended a meeting to discuss her syllabi. On March 6, 2007, Hawkes sent Appel a letter purporting to memorialize the March 2, 2007 meeting. Doc. # 127, ex. 4, att. H. The letter indicates that Appel was upset at the presence of Spiridon at the meeting, and that Appel felt the issue of her syllabi was moot because she was using the adjunct's syllabi that had been issued to the class in her absence at the beginning of the semester.

On March 12, 2007, Appel argued with several students in class. The next day the students complained to Wells and Spiridon about Appel's classroom behavior and on March 15, 2007, Appel filed a complaint against each of the involved students. On March 28 and 30, 2007, University Judicial Officer, Charles Alexander, informed Wells that three of the four involved students wanted to transfer out of Appel's class. Rinker sent Appel notice that the school was investigating the students' complaints concerning the March 12, 2007 incident. On April 2, 2007, Appel was informed that the investigation into her claim of student misconduct was complete and there was no probable cause to believe the students violated the school code.

The next incident occurred a few weeks later, on March 28, 2007, when Appel is alleged to have had a verbal altercation with a member of the computer department. On July 9, 2007, the President's Grievance Committee found that Appel should be suspended for two days without pay for her alleged misconduct.

On April 9, 2007, Appel was notified of a pending charge and sanction concerning certain violations of the Plan. On April 12, 2007, the DEC signed its report (all

Not Reported in F.Supp.2d, 2011 WL 3651353 (D.Conn.)

(Cite as: 2011 WL 3651353 (D.Conn.))

four members of the DEC were department members who signed the initial petition against Appel). The DEC issued its report and gave Appel an unsatisfactory rating. On May, 1, 2007, Hawkes sent Rinker a memo summarizing the DEC's assessment of Appel. Rinker notified Appel of the report by letter dated May 14, 2007 and offered a time to discuss the evaluation and Appel's failure to comply with the Plan. Two weeks later, a "Step II" hearing concerning the pending charges for violating the Plan was held. On July 9, 2007, the President's Grievance Committee found that Appel should be suspended without pay for one day for violating the Plan.

**\*7** Rinker sent a follow-up letter dated July 20, 2007, concerning Appel's compliance with the Plan. Rinker's letter stated that Appel would be permitted to teach only one course in the Fall 2007 semester, would be required to enroll in an approved Communications course, and Appel must present her syllabus for the fall semester to Wells no later than August 20, 2007 and a detailed plan concerning her creative activity by September 9, 2007.

On August 15, 2007, Appel filed a second lawsuit alleging First Amendment retaliation arising out of her filing of the 2006 suit and being listed as a witness in Young–Caruso's reopened CHRO fact-finding. On September 5, 2007 Appel attended a meeting with Hawkes, Wells, and Spiridon to discuss Appel's failure to comply with the Plan as set forth in the July 20, 2007 letter. On September 7 and 8, 2007, the University notified Appel of pending charges and sanctions. Four days later, September 11, 2007, Appel relented and asked Rinker to grant a class override in order for Appel to register for a Communications course as required under the Plan. On September 13, 2007, Wells and Hawkes met with Appel to discuss her creative activity and her syllabi. Appel's relationship with the University deteriorated and on September 17, 2007 she filed a grievance alleging denial of due process. The grievance was denied and after further administrative proceedings, the University terminated Appel on March 14, 2008.

### C. Pending Allegations

Appel alleges that the Special Assessment Committee and review process, including the resulting progressive

discipline, imposed by the University constitutes retaliation: (1) for testifying on behalf of a colleague, against WCSU, in a 2005 CHRO hearing; (2) for bringing the instant lawsuit; and (3) because she was identified as a witness in the reopened CHRO fact finding. Appel also alleges that the defendants have engaged in conscience-shocking conduct in violation of the substantive due process clause of the 14th Amendment by ordering Appel to submit to a psychiatric exam and intending to access Appel's mental health record and the results of the exam.

### III. Discussion

I previously denied summary judgment on Appel's First Amendment retaliation claim concerning her testimony at the 2005 CHRO hearing. Defendants now move for summary judgment on Appel's substantive due process claim and her First Amendment retaliation claims regarding the filing of her 2006 lawsuit and her being listed as witness for the CHRO's reopened fact finding. Defendants argue that Appel's substantive due process claim fails as a matter of law. They also maintain that Appel's speech is unprotected and that defendants would have implemented the Plan and carried out progressive discipline of Appel's filing the 2006 lawsuit or participating in the reopened fact finding on behalf of Young–Caruso. Defendants further argue that Appel fails to demonstrate a temporal causal link between the alleged retaliation and any protected speech. Because defendants are state actors, defendants claim that qualified immunity provides a bar to claims against them in their individual capacities and that Appel failed to serve them in their official capacities. Each argument is addressed in turn, considering first the merits of Appel's First Amendment and substantive due process claims. *Clue v. Johnson,* 179 F.3d 57, 60 (2d Cir.1999) ("The Supreme Court has stated an unambiguous preference' that we consider the merits first in qualified immunity cases.") (relying on *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)).

### A. First Amendment Retaliation

**\*8** I previously determined that summary judgment could not enter in favor of Vaden–Goad and Spiridon on the question whether they implemented the Plan, through the SAC, in retaliation for Appel's 2005 CHRO testimony

Not Reported in F.Supp.2d, 2011 WL 3651353 (D.Conn.)

(Cite as: 2011 WL 3651353 (D.Conn.))

on behalf of Young–Caruso. *See* doc. # 86. Appel must now demonstrate that a reasonable jury could find that enforcement of the Plan throughout 2007 and the resulting progressive discipline is attributable to the filing of her 2006 lawsuit and/or the fact that Young–Caruso asked Appel to testify on Young–Caruso's behalf at the CHRO's re-opened fact finding.

In the Second Circuit, the standard for assessing whether the speech of a public employee is protected from retaliation by the First Amendment is a two-part inquiry. *Anemone v. Metropolitan Transp. Auth.,* 629 F.3d 97, 2011 WL 9376 (2d Cir.2011) (citing *Garcetti v. Ceballos,* 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006)). Appel, a public employee, must first show that she spoke as a citizen on a matter of public concern, that she suffered an adverse employment action, and that a causal connection existed between the speech and the adverse employment action. *Anemone,* 629 F.3d 97, 2011 WL 9376 at * 15; *see also Konits v. Valley Stream Central High School District,* 394 F.3d 121, 124 (2d Cir.2005). The burden then shifts to the defendants to show that they had an "adequate justification for treating the employee different from any other member of the general public." *Anemone,* 629 F.3d 97, 2011 WL 9376 at * 15 (citing *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (quoting *Garcetti,* 547 U.S. at 418)). Appel alleges two distinct First Amendment claims and I address each in turn.

*1. Appel's 2006 Civil Action*

a. Matter of Public Concern

Defendants claim that Appel filed her 2006 lawsuit not to address a matter of public concern, but to seek redress for her own personal situation. "Whether speech by a public employee is protected from retaliation under the First Amendment begins with this question: whether the employee spoke as a citizen on a matter of public concern.' " *Garcetti v. Cebalos,* 574 U.S. 410, 418 (2006). An employee who speaks not as a citizen but instead pursuant to her "official duties" cannot invoke the protection of the First Amendment where her employer adversely responds to the speech. *Id.; see also Weintraub v. Board of Education,* 593 F.3d 196, 203 (2d Cir.2010) (holding that the First Amendment did not protect public

employee's speech that was "part-and-parcel of his concerns about his ability to properly execute his duties as a public school teacher"). Here, the defendants do not contend, nor could they, that the filing of the 2006 lawsuit constitutes speech "part-and-parcel" of Appel's duties as a professor of art. Accordingly, I conclude for purposes of this motion that, in filing her 2006 lawsuit, Appel spoke as a private citizen and not as a public employee.

Next I must consider whether Appel's speech addressed a matter of public concern. *Garcetti,* 574 U.S. at 418. "Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." *Lewis v. Cowen,* 165 F.3d 154, 163 (2d Cir.1999); *see also Huth v. Hasulan,* 598 F.3d 70, 74–75 (2d Cir.2010). Generally "an employee who complains solely about [the employee's] dissatisfaction with the conditions of [her] own employment is speaking upon matters only of personal interest.' " *Sousa v. Roque,* 578 F.3d 164, 174 (2d Cir.2009) (quoting *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)).

**\*9** Here, the speech forming the basis of Appel's instant First Amendment claim is her 2006 lawsuit. Appel's 2006 lawsuit concerned, in pertinent part, alleged retaliation against her for testifying about race discrimination at the University on behalf of a co-worker at an administrative proceeding. Race discrimination in a government workplace is a matter of public concern. *Cotarelo v. Village of Sleepy Hollow Police Department,* 460 F.3d 247, 252 (2d Cir.2006); *see also Mandell v. County of Suffolk,* 316 F.3d 368, 383 (2d Cir.2003) (holding that racism in the government workplace is a matter of public concern). Testimony before an administrative body on behalf of a co-worker alleging discrimination also addresses a matter of public concern. *Konits,* 394 F.3d at 125 (addressing an issue of first impression and holding that any use of state authority to retaliate against employees who speak out against discrimination in the workplace, including employees identified as witnesses in proceedings addressing discrimination claims, can give rise to a First Amendment claim). Accordingly, as I previously held, Appel's 2005 testimony on behalf of Young–Caruso constituted

Not Reported in F.Supp.2d, 2011 WL 3651353 (D.Conn.)

(Cite as: 2011 WL 3651353 (D.Conn.))

protected speech because it addressed a matter of public concern, namely the existence of race discrimination at WCSU.

Logic and Second Circuit precedent dictate that a lawsuit predicated on speech about race discrimination within the workplace is itself protected speech on a matter of public concern. *Id.; see also Cotarelo,* 460 F.3d 247. The initial inquiry articulated by the Second Circuit in *Konits* is whether the subject of the initial lawsuit touched upon a public concern. 394 F.3d at 124. In *Konits,* a tenured high school music teacher brought a section 1983 claim against certain school officials alleging First Amendment retaliation for an earlier retaliation lawsuit she filed. 394 F.3d 121. Konits, like Appel, complained of retaliation for assisting a co-worker with a discrimination claim. *Id.* Also like Appel, Konits argued that she was the subject of ongoing retaliation that did not end with the filing of the initial lawsuit but continued until the filing of the second lawsuit. *Id.* The court stated that Konits's prior speech, i.e., her first lawsuit, touched upon a matter of public concern—discrimination in the workplace—and therefore the first lawsuit constituted speech on a matter of public concern.

A year after deciding *Konits,* the Second Circuit revisited the issue in *Cotarelo.* Cotarelo, a police officer, brought an action in May 2002 alleging that he was not promoted because, *inter alia,* he had filed a lawsuit in 1999 challenging the department's alleged hostility toward Hispanic police officers. The district court had determined that both the 1999 and 2002 actions concerned "personal grievances relating to plaintiff's own employment interests" and therefore did not constitute protected speech on a matter of public concern. *Id.* at 252. On appeal, the Second Circuit disagreed and stated that "the complaints in the lawsuits concern discrimination problems generally and were not limited to instances affecting only Cotarelo." *Id.* Accordingly, the court held that both of Cotarelo's lawsuits constituted protected speech on a matter of public concern.

**\*10** With respect to the defendants' argument that Appel's 2006 lawsuit concerns only Appel's personal work performance dispute, defendants properly state that courts in this circuit generally accept that a plaintiff's lawsuit to redress his or her own personal situation, such as dissatisfaction with the conditions of his or her employment, does not constitute a matter of public concern. *Lewis,* 165 F.3d at 164. The Second Circuit, however, recently clarified that "it does not follow that a person *motivated by* a personal grievance cannot be speaking on a matter of public concern." *Sousa,* 578 F.3d at 174. In *Sousa,* the district court granted summary judgment in favor of the defendants after finding the plaintiff's complaints of reverse discrimination, work place violations and hostile work environment constituted statements directed at redressing Sousa's own personal grievances. The Second Circuit reversed. The court, relying on the Supreme Court's holding in *Connick,* directed the district court on remand to consider, when determining whether or not the speech addressed a matter of public concern, the content, form and context of a given statement and be mindful that "while motive may be one factor in making this determination, it is not, standing alone, dispositive or conclusive." *Id.* at 175.

Here, it may be that, at bottom, Appel's motive in initiating an action against the defendants is to resolve her own workplace issues. Nevertheless, Appel's 2006 complaint properly pled a First Amendment retaliation claim predicated on allegations that the defendants targeted Appel for testifying on behalf of a co-worker on the issue of discrimination. Such testimony is protected activity and a matter of public concern. Any lawsuit brought by Appel alleging retaliation for engaging in the protected activity of testifying about discrimination in the workplace also constitutes speech on a matter of public concern. The protected speech at issue in this case is not Appel's complaints about her own work conditions, even though those work conditions may have motivated her to initiate suit, but speech that served a broader public purpose in that it addressed discrimination at the University. Accordingly, under the holdings of *Konits, Cotarelo* and *Sousa,* Appel spoke as a citizen on a matter of public concern when she filed the 2006 lawsuit against the defendants.

b. Adverse Employment Action

Appel must next show that she suffered an adverse employment action. "[I]n the context of a First

Not Reported in F.Supp.2d, 2011 WL 3651353 (D.Conn.)

(Cite as: 2011 WL 3651353 (D.Conn.))

Amendment retaliation claim ... only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Zelnick v. Fashion Institute of Technology,* 464 F.3d 217, 225 (2d Cir.2006) (quoting *Washington v. County of Rockland,* 373 F.3d 310, 320 (2d Cir.2004)) (internal quotations and alteration omitted). In *Zelnick,* the Second Circuit further instructed that adverse employment actions, in the context of a First Amendment retaliation claim, include: discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand. 464 F.3d at 226. The list is not exhaustive and certain "lesser actions" including negative evaluation letters, express accusations of lying, material changes in classroom duties or assignments can also constitute an adverse employment action. *Id.* Whether an employment action qualifies as " 'adverse' is a heavily fact-specific, contextual determination." *Id.*

**\*11** The factual record at summary judgment reveals that Appel suffered the following adverse employment actions. First, six weeks after filing her 2006 lawsuit, Appel was suspended. Second, after the Second Circuit denied the defendants' motion to stay the preliminary injunction, Appel returned to a work environment in which she was subject to heightened scrutiny and required to perfectly comply with the very Plan she claims was devised out of retaliatory animus for Appel's 2005 CHRO testimony. In the context of this case and because the Plan by its own terms called for material changes to Appel's autonomy as a teaching professional, the enforcement of the Plan and any resulting discipline for failing to comply could be found to constitute an adverse employment action. Third, for alleged violations of the Plan, Appel received at least one reprimand and three days' suspension without pay—each constitutes an adverse employment action. *Zelnick,* 464 F.3d at 226; *see also Lovejoy–Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 203, 223–24 (2d Cir.2001) (holding that suspension without pay constitutes an adverse employment action). Furthermore, at the outset of Appel's return to work, her lab access had been limited and her autonomy as the lab supervisor impaired by the presence of lab assistants. A jury could construe this change in print lab conditions as an act that would objectively deter a professor of art and an artist whose primary expression is print, from exercising her protected speech. Appel has shown that she suffered numerous

adverse employment actions.

c. Causal Connection

Appel must next present sufficient evidence that a jury could find that a causal connection existed between the filing of her 2006 lawsuit and the adverse employment actions she alleges to have suffered. A plaintiff may prove a causal connection in one of three ways: (1) directly through evidence of retaliatory animus, (2) indirectly by showing that the protected activity was followed closely by discriminatory treatment, or (3) through other evidence such as disparate treatment of fellow employees who engaged in similar conduct. *See Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991). "A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009) (citing *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)). The causal connection must be sufficient to support the inference that the protected speech was a substantial or motivating factor in the adverse employment action. *Blum v. Schelegal,* 18 F.3d 1005, 1010 (2d Cir.1994).

Defendants argue that Appel fails to draw a temporal connection between the filing of her 2006 lawsuit and any adverse employment action she suffered. In support of their arguments, defendants cite a number of cases in which courts of various jurisdictions require a "very close" temporal proximity. Defendants, however, overlook established Second Circuit case law that no bright line has been drawn "to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Espinal,* 558 F.3d at 130 (quoting *Gorman–Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 554 (2d Cir.2001)). The temporal connection between Appel's filing of her 2006 lawsuit and the adverse employment actions she alleges to have suffered is twofold. First, six weeks after Appel filed her initial action, she was suspended. Second, with regards to defendants' argument that no connection exists between Appel's filing of the lawsuit in 2006 and the progressive discipline imposed in 2007, defendants overlook the fact that it was only upon learning that the Second Circuit denied their request to

Not Reported in F.Supp.2d, 2011 WL 3651353 (D.Conn.)

(Cite as: 2011 WL 3651353 (D.Conn.))

stay the preliminary injunction, that the defendants undertook zealous enforcement of the Plan with exception of the neuropsychiatric evaluation requirement. There is sufficient evidence for a jury to find a causal connection between Appel's 2006 lawsuit and the adverse employment actions she alleges to have suffered.

d. Adequate Justification

**\*12** Although Appel makes out a prima facie case of First Amendment retaliation, the defendants may be entitled to summary judgment if they demonstrate entitlement to a relevant defense. *Anemone,* at \* 16. Here, defendants argue that they would have taken the same actions against Appel in the absence of the protected speech. *See Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). In *Anemone,* the Second Circuit stated that

> The constitutional principle at stake [, i.e., freedom from retaliation for protected speech,] is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the [protected] conduct. This principle prevents an employee who engages in unprotected conduct from escaping discipline for that conduct by the fact that it was related to protected conduct, and ensures that an employee who makes an unprotected statement is not immunized from discipline by the fact that this statement is surrounded by protected statements. We have noted that although the language in *Mt. Healthy* refers to the plaintiff's *conduct,* the [Supreme] Court's analysis, properly understood, attempts to weigh the impact of the defendant's *impermissible reason* on the defendant's decision to act, such that a defendant can avoid liability by showing that it would have taken the same action in the absence of the impermissible reason. The burden is on the government to make out the defense.

629 F.3d 97, 2011 WL 9376 at \* 16 (internal citations and quotations omitted)

The controlling question becomes whether defendants can show indisputably that they would have taken the same adverse actions, namely implementation and enforcement of the Plan and the resulting progressive discipline against Appel, even in the absence of her

protected speech. Not surprisingly, defendants articulate seemingly legitimate reasons for each action taken against Appel. *See* doc. # 127 at pp. 19–29. The flaw with defendants' position, however, is that it assumes that enforcement and implementation of the SAC's Plan for Remediation is itself appropriate under the circumstances. In my previous ruling, I determined that whether the Plan derived from an ill-will to target Appel for testifying at the 2005 CHRO hearing presents a genuine issue of material fact. Accordingly, it follows that a genuine issue of material fact necessarily exists concerning the enforcement of the Plan, including any progressive discipline arising out its enforcement.

Furthermore, even though defendants may have taken some action against Appel for isolated conduct, the record can be read as a whole to permit a jury finding that the actions were part of a continuing course of conduct and heightened scrutiny beginning with Appel's 2005 CHRO testimony that continued to snowball with each move Appel made and resulted in the progressive discipline including three days of suspension and the requirement to take a communications course. On this record it cannot be held as a matter of law that the defendants would have taken the 2007 actions against Appel had she not filed the 2006 lawsuit.

2. *CHRO's Re–Opened Fact Finding*

a. Matter of Public Concern

**\*13** Appel's identification by Young–Caruso as a potential witness at the CHRO reopened fact finding constitutes speech on a matter of public concern. *Konits,* 394 F.3d at 125 ("[A]ny use of state authority to retaliate against those who speak out against discrimination suffered by others, including witnesses or potential witnesses in proceedings addressing discrimination claims, can give rise to a cause of action under 42 U.S.C. § 1983 and the First Amendment.").

b. Adverse Employment Action

The actions taken against Appel in 2007, namely three days' suspension and a material change in her autonomy as a professor of art, constitute adverse employment actions.

Not Reported in F.Supp.2d, 2011 WL 3651353 (D.Conn.)

(Cite as: 2011 WL 3651353 (D.Conn.))

c. Causal Connection

In order for Appel to demonstrate a causal connection between her agreement to testify on behalf of Young–Caruso and the adverse employment actions against her, she must show that the defendants knew of her willingness to testify. Any actions taken before defendants learned about her possible testimony cannot have been caused by plaintiff's speech. Here, Appel attempts to rely on a temporal link between her speech and the adverse employment actions without any evidence about when defendants learned of her speech. At summary judgment the mere suggestion of a temporal link without evidence that any one of the defendants knew of Young–Caruso's request is too attenuated to establish a causal relationship between the protected activity and alleged retaliation. *See Gorman–Bakos, 252 F.3d at 554.* Appel, to survive summary judgment on the claim, needed to show at least some temporal proximity between Young–Caruso's request and any action taken against Appel by the University. Appel's testimony that at an unspecified time during the relevant period Young–Caruso reached out to her, without more, is plainly insufficient. Accordingly, defendants' motion for summary judgment on Appel's First Amendment retaliation claim premised on Appel being identified as a potential witness at the reopened CHRO fact finding is granted.

3. Personal Involvement and Qualified Immunity

I previously held on summary judgment that Appel's First Amendment claim concerning her CHRO testimony would proceed against only Vaden–Goad and Spiridon. The question now becomes whether Appel's instant First Amendment retaliation claim proceeds against Rinker, Spiridon, Hawkes, Wells, Grimes, Wallace, Echevarria and Schmotter. In the Second Circuit, personal involvement of the defendants in the alleged First Amendment retaliation is a prerequisite to an award of damages under *section 1983. Scott v. Fisher, 616 F.3d 100, 110 (2d Cir.2010)* (citing *McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977), cert denied, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)*). If personal involvement is shown, a government official may still avoid liability and is entitled to a defense of qualified immunity where the official performs discretionary functions that do not violate clearly established statutory

or constitutional rights of which a reasonable person would have known. *Pearson v. Callhan, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)*. The qualified immunity analysis at summary judgment is a two-step inquiry. *Id. at 230–31; see also Taravella v. Town of Wolcott, 599 F.3d 129, 133 (2d Cir.2010)*. The inquiry is not sequential and requires that I consider whether the facts shown demonstrate a violation of a constitutional right and whether the identified right was clearly established at the time of the alleged misconduct. *Pearson, 555 U.S. at 230–31; Taravella, 599 F.3d at 133*.

*14 First, with respect to Rinker, the facts concerning Appel's 2006 lawsuit reveal that Rinker was responsible for disciplining Appel throughout 2007 and that Rinker played the leading role in the enforcement of the Plan. *See* Ex. 18. Indeed, each of the other defendants acted on her orders. *See* doc. # 127 at 31. Rinker maintains that she merely enforced the SAC's Plan, but the validity of the Plan is already at issue. Furthermore, although Rinker argues that legitimate grounds existed for each action taken against Appel in 2007, the record equally supports a finding that enforcement of the Plan and the resulting discipline arose out of a retaliatory animus that can be traced back to Appel's initial CHRO testimony and the filing of her 2006 lawsuit. At the time the facts giving rise to this claim occurred, it was established law in this Circuit that a lawsuit alleging race discrimination was protected speech. *Konits, 394 F.3d 121*. Rinker fails to come forth with any evidence in the record that Appel's speech, namely the filing of her 2006 lawsuit was so disruptive to the effective and efficient operation of the WCSU Art Department that a reasonable and prudent person could not have anticipated that disciplining her would violate her First Amendment rights. *DiMarco v. Rome Hosp. and Murphy Memorial Hosp., 952 F.2d 661, 666 (2d Cir.1992)*. Rinker knew of Appel's 2006 lawsuit and there remains a genuine issue of material fact whether Rinker took Appel's protected speech into consideration in imposing discipline against her. Accordingly, genuine issues of material fact preclude summary judgment on qualified immunity grounds in favor of Rinker with respect to Appel's First Amendment retaliation claim. *See Mandell v. County of Suffolk, 316 F.3d 368, 385 (2d Cir.2003)*.

Defendants maintain that Spiridon's conduct did not

Not Reported in F.Supp.2d, 2011 WL 3651353 (D.Conn.)

(Cite as: 2011 WL 3651353 (D.Conn.))

result in an adverse action taken against Appel in 2007. The record, however, shows that Spiridon was part of the grievance committee that approved Appel's suspensions and that he was well aware of Appel's 2006 lawsuit and the facts giving rise to that suit. Accordingly, a jury could find, for substantially the same reasons as Rinker, that Spiridon took part in the adverse employment actions against Appel in 2007 and that Spiridon was motivated by a desire to punish Appel for the filing of her 2006 action.

The remaining defendants each argue their entitlement to qualified immunity on the basis of lack of personal involvement and/or each merely followed Rinker's orders. In the Second Circuit, personal involvement of the defendants in the alleged First Amendment retaliation is a prerequisite to an award of damages under section 1983. *Scott v. Fisher,* 616 F.3d 100, 110 (2d Cir.2010) (citing *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). Following a supervisor's orders does not alone entitle a defendant to qualified immunity, *Raysor v. Port Authority of New York & New Jersey,* 768 F.2d 34, 38 (2d Cir.1985), *cert. denied,* 475 U.S. 1027, 106 S.Ct. 1227, 89 L.Ed.2d 337 (1986); however, where a defendant lacks authority to issue or stop the adverse employment action he cannot be considered to have retaliated against the plaintiff and is therefore entitled to qualified immunity. *Deters v. Lafuente,* 368 F.3d 185, 189–90 (2d Cir.2004).

**\*15** In her role as the Dean of the School of Visual and Performing Arts, Hawkes engaged in the following actions against Appel during the 2007 period. Hawkes met with Appel along with Rinker, Wells and Spiridon to review the Plan and Appel's return to work. Hawkes played a critical role in the syllabi issue and in monitoring Appel's compliance with the Plan, and she reviewed the DEC. The evidence at summary judgment indicates that Hawkes acted on Rinker's orders to enforce the terms of the Plan and there is no evidence that Hawkes knew of Appel's 2006 lawsuit. *See* Ex. 9. Retaliatory intent is an element of a First Amendment retaliation claim. Appel, at summary judgment, needed to present evidence raising a genuine issue concerning whether Appel's 2006 lawsuit was a motivating factor for Hawkes's decision to enforce compliance with the Plan. Appel failed to do so. Accordingly, Hawkes is entitled to qualified immunity

with respect to Appel's First Amendment retaliation claim. *Deters,* 368 F.3d at 189.

In his capacity as Chair of the Art Department, Terry Wells played a role in enforcing the terms of the Plan after Appel's return to work in 2007. The incidents in which Wells, also a member of the DEC, directly participated included the lab assistant card access issue, and the syllabi issue. Like Hawkes, Wells was acting on orders from Rinker and carrying out his duties as Chair in enforcing the Plan and was unaware of Appel's 2006 lawsuit. Wells is entitled to qualified immunity with respect to Appel's First Amendment claim for substantially the same reasons as Hawkes.

With respect to defendants Grimes, Wallace, and Echevarria, each was assigned to the DEC and lacked any knowledge of Appel's 2006 lawsuit. Accordingly, for the same reasons, there is simply no evidence in the record that any of these defendants retaliated against Appel and each is entitled to qualified immunity.

President Schmotter, a defendant in the 2006 lawsuit, knew of Appel's protected speech. There is nothing in the record, however, connecting Schmotter to the acts taken against Appel in 2007. Schmotter's knowledge of Appel's protected speech, without evidence of an affirmative act against Appel on his part, cannot give rise to liability. *See generally Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Accordingly, Appel has failed to demonstrate that Schmotter was personally involved in the acts taken against her. *See generally Scott,* 616 F.3d 100.

In sum, Hawkes, Wells, Grimes, Wallace, Echevarri are entitled to qualified immunity on Appel's First Amendment retaliation claim. Schmotter is entitled to summary judgment on the claim because the record lacks evidence of his personal involvement in the actions taken against Appel. Rinker and Spiridon's motion for summary judgment on the issue of qualified immunity with respect to Appel's First Amendment retaliation claim is denied.

B. *Substantive Due Process Claim*

Appel also brings a substantive due process claim alleging that the defendants violated her right to privacy

Not Reported in F.Supp.2d, 2011 WL 3651353 (D.Conn.)

(Cite as: 2011 WL 3651353 (D.Conn.))

when they ordered her to submit to a neuropsychological exam and projectives battery and intended to access to the results of those exams. An individual's right to privacy is protected by the Due Process Clause of the Fourteenth Amendment. *O'Connor v. Pierson,* 426 F.3d 187 (2d Cir.2005) (citing *Whalen v. Roe,* 429 U.S. 589, 598–600 & 598 nn. 23, 97 (1977)). The privacy right encompasses the right to hold confidential certain information about oneself. *O'Connor,* 426 F.3d at 201. For Appel to prove that the defendants violated her right to substantive due process under the Fourteenth Amendment to the Constitution of the United States, she must show "conscience-shocking' exercises of power by government actors." *Johnson v. Newburgh Enlarged School District,* 239 F.3d 246, 252 (2d Cir.2001); *see also Burns v. Cook,* 458 F.Supp.2d 29, 42 (N.D.N.Y.2006) ( "Whether defendants' conduct constitutes arbitrary, egregious, and otherwise conscience-shocking conduct depends on defendants' states of mind when they engaged in such conduct.... For example, if the alleged conduct was motivated by spite and served no rational governmental purpose it would fall within that category of conduct against which the substantive due process doctrine protects.... On the other hand, if the conduct was well-intentioned or merely negligent, substantive due process would not apply. To state a substantive due process claim, a plaintiff must also allege that the governmental conduct deprived her of a protected right. One such protected right is the individual right to privacy, which includes the right to confidentiality.").

**\*16** The Second Circuit has determined that violating or intending to violate the privacy of an employee's medical records, especially her mental health records, violates the Fourteenth Amendment right to substantive due process where the defendants' intent was to injure or to spite the plaintiff. *O'Connor,* 426 F.3d 187. The facts of *O'Connor* are highly instructive and involve a strikingly similar situation to Appel's: a teacher (O'Connor), with a history of difficult behavior as evidenced by students' and colleagues' feedback, is disciplined and ordered to undergo a mental examination; at first the employer expresses a desire to access the results of that exam and later retracts its request. *Id.* at 201–04. First, the *O'Connor* court took issue, not with the employer's requirement that the employee submit to a fitness for duty examination, but that the employer desired to access the results of that

examination to make its own independent medical assessment. *Id.* at 201. The court then held that a substantive due process claim could survive summary judgment on the basis that the plaintiff's privacy interest was violated when school officials ordered his medical records disclosed if the school board's interest did not outweigh the burdened privacy right. *Id.* at 202–03. In order to determine whether the board's interest outweighed O'Connor's privacy interest, the court held that O'Connor needed to show that the action was "arbitrary in a constitutional sense" and was conduct that "shocks the conscience." *Id.* at 203 (citing *County of Sacramento v. Lewis,* 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *Collins v. City of Harker Heights,* 503 U.S. 115, 118, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). Next, the court concluded that, because reasonable inferences drawn in the plaintiff's favor cast doubt upon the motivation behind defendants' request to access plaintiff's mental health records (i.e, was the board simply mistaken about its right to access the records, or was it driven by a desire to injure or to spite O'Connor), summary judgment on the substantive due process claim was inappropriate. *Id.* at 203–04.

The facts concerning Appel's substantive due process claim demonstrate the following. On June 30, 2006, the SAC issued its final plan. The Plan called for Appel to undergo "neuropsychological and projectives assessments to determine whether she has the capacity to alter the behaviors in this work setting that have been documented as problematic (yelling, accusing and needing instructions to be repeated many times)." Doc. # 127, ex. 3–G. In other words, the Committee recommended that Appel undergo a psychiatric examination, at an institution selected by the University's Human Resources Department, because of her "problematic behavior." The schedule recommended by the SAC required Appel to undergo the psychiatric evaluation before the Fall 2006 semester. The SAC also recommended that, "if there are biological or psychological factors which prevent Professor Appel from performing her duties effectively and consistently that appropriate solutions be discussed and implemented with proper medical personnel so that Professor Appel may do her job effectively ." *Id.* The report also suggested that Appel be offered EAP support for any "emotional stress or anxiety." *Id.* Spiridon subsequently scheduled an

Not Reported in F.Supp.2d, 2011 WL 3651353 (D.Conn.)

(Cite as: 2011 WL 3651353 (D.Conn.))

appointment for Appel with the Institute for Living. Appel never attended that appointment, instead she initiated suit and moved for a preliminary injunction barring the defendants from forcing her to undergo testing. I granted the preliminary injunction.

**\*17** On November 9, 2006, I held a hearing on Appel's motion for a preliminary injunction. Certain defendants' testimony at that hearing suggested that, at least when Appel was ordered to undergo psychological testing, the defendants expected to obtain her medical records including her mental health history. *See* Transcript of Nov. 9, 2006 Hr'g (hereafter "Trans."). Appel also testified that she believed she would be required to disclose those results. Trans. p. 22, ln. 22–p. 23, ln. 1–2. Linda Rinker testified that, when she was involved in similar discipline once in the past, including "a psychiatrist to do an assessment for the University, ... both parties ... were given the information, both the individual and the university." She assumed that would happen in Appel's case as well, including "a complete review of any psychiatric history that Ms. Appel had in the past" *Id.* at p. 65, ln. 17–p. 66, ln. 12. Vaden–Goad testified that in one instance in the past an employee's mental health information may have been disclosed, and at the least indicated that Appel's might have been as well, although "I believe there's some difference between whether [the mental health examination is] mandated or whether it's voluntary and I believe Human Resources can answer that more fully." *Id.* at p. 84, ln. 24–p. 85, ln. 8. Vaden–Goad also indicated that she believed she could have struck the mental health exam from the university's disciplinary plan, although she did not. *Id.* at p. 91, ln. 2–4. Although other faculty members have been subject to special assessments, Appel is the only WCSU faculty member who has ever been ordered to undergo a psychiatric examination in order to continue teaching and receiving pay and benefits at the University. [FN7] Rinker testified at the preliminary injunction hearing that the University assumed and intended it would have access to Appel's psychiatric evaluation, including a "complete review of any psychiatric history that Ms. Appel had in the past." Ex. H at p. 66.

FN7. Vaden–Goad testified concerning one other faculty member who voluntarily underwent psychological counseling as part of a special assessment plan for remediation. In that case, there were concerns about violence and displays of "extreme anger," including yelling at students and hitting walls.

Notably, before lunch during the November 9, 2006 preliminary injunction hearing, defense counsel discussed the University's interest in receiving the results of Appel's psychological examination. *Id.* at p. 93, ln. 7–16. After lunch, during which time defense counsel read the *O'Connor* decision discussed above, defense counsel indicated that the defendants had no interest in receiving Appel's medical records. *Id.* at p. 93, ln. 3–17. That change of position during the preliminary injunction hearing, like the defendants' change in position in *O'Connor,* has no bearing on the issue of intent and raises itself a question of fact for the jury whether the defendants intended to access Appel's medical records. At bottom, the key question here concerns the defendants' belief and intent when requiring Appel to undergo a mental health exam, not their later decision and representation not to seek mental health records and exam results.

**\*18** Here, as in *O'Connor,* there is a genuine issue of material fact whether the defendants sought access to Appel's mental health records and exam results out of a mistaken belief that they were entitled to them as a means of assessing her ability to continue in her duties, or whether the defendants were seeking ways to discredit and injure Appel. Indeed, a jury could certainly find that requiring Appel to undergo a psychiatric exam and to release her mental health records and exams was a decision made out of spite or some other ill-will and is conscience-shocking. *O'Connor,* 426 F.3d at 203–04. Because the defendants' state of mind is likely the difference between a successful claim and one that fails, the merits of the substantive due process claims must be decided by a jury, not the court. *Id.* at 203 ("[W]e do not believe that whether the Board's actions were conscience-shocking can be decided at the summary judgment stage. The primary issue is the state of mind [of the defendants]."). The defendants' motion for summary judgment with respect to Appel's substantive due process claim is denied.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3651353 (D.Conn.)

(Cite as: 2011 WL 3651353 (D.Conn.))

1. *Qualified Immunity & Certain Defendants' Involvement*

The defendants argue that qualified immunity is appropriate with respect to Vaden–Goad and Spiridon for lack of personal involvement and with respect to all defendants because the right at issue was not clearly established.[FN8] As previously noted, personal involvement of the defendants in the alleged substantive due process violation is a prerequisite to an award of damages under section 1983.[FN9] *Scott,* 616 F.3d at 110. However, the mere following of Rinker's orders does not entitle the defendants to qualified immunity. *See Raysor,* 768 F.2d at 38. Spiridon and Vaden–Goad argue that evidence does not exist that would support a finding that each was sufficiently personally involved in the ordering of the mental health examination of Appel to be liable on the claim. Testimony from the November 2006 hearing, however, raises questions about the extent of their involvement. Spiridon scheduled Appel's psychological evaluation and ordered Appel to submit to the evaluation. Trans. at p. 18, ln. 20–25; p. 99, ln. 6–23. He also placed a copy of the SAC's special assessment report in Appel's file. *Id.* at p. 99, ln. 1–3. Vaden–Goad invoked the special assessment process and decided who should be on the SAC. *Id.* at p. 77, ln. 19–20. Vaden–Goad "was to get together with Professor Appel to discuss and create a way of complying with the recommendations of the committee." *Id.* at p. 80, ln. 22–24. In other words, it was not up to the SAC to implement their recommendations, but rather "it was up to Dean Vaden–Goad and others to decide ... what to do with the information [the SAC] we came up with." *Id.* at p. 142, ln. 17–p. 143, ln. 1 (testimony from chair of SAC). Because Vaden–Goad was in charge of implementing any discipline that Appel would receive, including the requirement of a mental health evaluation, there exist genuine issues of material fact concerning what she intended with regard to the results of that evaluation. Accordingly, qualified immunity on the basis of lack of personal involvement is denied with respect to VadenGoad and Spiridon.

FN8. Rinker does not move for qualified immunity on the basis of lack of personal involvement.

FN9. There exists no evidence in the record connecting Wells, Wallace, Grimes, Echevarria,

or Schmotter to the issue of the mental health evaluation. Accordingly, to the extent that Appel included those defendants in her substantive due process claim, it necessarily fails against them.

**\*19** Defendants are correct that a government official is entitled to a defense of qualified immunity where the official performs discretionary functions that do not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson,* 555 U.S. at 231–32. As discussed *infra* section A.3, the qualified immunity analysis at summary judgment is a two-step inquiry that is not sequential and requires that I consider whether the facts shown demonstrate a violation of a constitutional right and whether the identified right was clearly established at the time of the alleged misconduct. *Pearson,* 129 S.Ct. at 815–16. The facts in the record permit a finding of a violation of Appel's Fourteenth Amendment right to privacy. The remaining issue therefore is whether that right was clearly established at the time the defendants are alleged to have sought her mental health records. A right is clearly established if the law is defined with reasonable clarity, the Supreme Court or Second Circuit has recognized the right, and a reasonable person could have understood from that law that his conduct was unlawful. *See Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003). The Second Circuit's *O'Connor* decision was decided on October 11, 2005 and makes plain that it can be a violation of one's substantive due process right to privacy to compel the production of medical records on the basis of ill-will. *O'Connor,* 426 F.3d 187. Accordingly, approximately nine months before the SAC issued the final Plan (and exactly one month before Vaden–Goad provided Appel notice of the SAC, *see* doc. # 132, ex C), the defendants were on notice that intending to access Appel's mental health medical records and exams could give rise to liability. Rinker, Spiridon and Vaden–Goad are not entitled to qualified immunity with respect to Appel's substantive due process claim; their claim that the law was not clearly established is mistaken.

C. *Conspiracy*[FN10]

FN10. In Appel's initial complaint she alleged conspiracy to violate her Constitutional rights.

Not Reported in F.Supp.2d, 2011 WL 3651353 (D.Conn.)

(Cite as: 2011 WL 3651353 (D.Conn.))

Doc. # 1 at ¶ 6. Defendants did not move for summary judgment on that claim. Doc. # 70. Defendants now move for summary judgment on the conspiracy claim as alleged in the third amendment complaint. Accordingly, I consider that claim as it applies to both of Appel's First Amendment claims as well as her substantive due process claim.

Appel also alleges that each of the defendants acted jointly and in concert with each other to violate her First and Fourteenth Amendment rights. Defendants argue that Appel's conspiracy claim is barred by the intracorporate conspiracy doctrine. The intracorporate conspiracy doctrine precludes a claim of conspiracy where the individual defendants are also employees of an institutional defendant. *Nat'l Congress for Puerto Rican Rights v. City of New York,* 75 F.Supp.2d 154, 168–69 (S.D.N.Y.1999). Under the doctrine, officers, agents, and employees of a single institutional entity are legally incapable of conspiring together. *Nassau County Employee "L" v. County of Nassau,* 345 F.Supp.2d 293, 304–05 (E.D.N.Y.2004). The doctrine is applicable where the officers, agents, and employees are alleged to be acting within the scope of their employment. *Id.* at 304.

Appel counters that the Second Circuit has not explicitly held that the doctrine applies to section 1983 claims. Numerous district courts of this circuit, however, have consistently determined that the doctrine applies to section 1983 claims. *See Anemone v. Metropolitan Transp. Authority,* 419 F.Supp.2d 602, 603–04 (S.D.N.Y.2006); *Jessamy v. City of New Rochell,* 292 F.Supp.2d 498, 514 (S.D.N.Y.2003); *Jackson v. New York,* 381 F.Supp.2d 80, 90–91 (N.D.N.Y.2005); *Kamara v. City of New York,* No. 03 Civ. 0337(CPS), 2005 WL 3113423, at *7 (E.D.N.Y. Nov.21, 2005); *Nassau County Employee "L",* 345 F.Supp.2d at 304–05; *Nat'l Congress for Puerto Rican Rights,* 75 F.Supp.2d at 168–69. Accordingly, I hold that, in the absence of controlling contrary authority, the intracorporate conspiracy doctrine applies to section 1983 claims. 419 F.Supp.2d at 603–04.

**\*20** A conspiracy claim under section 1983 requires an agreement between two or more actors to act in concert to inflict an unconstitutional injury and that an over act in furtherance of the goal caused damages. *See Ciambriello v. County of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002). At the outset, the conspiracy claim against Wells, Wallace, Grimes, Echevarri a and Schmotter is dismissed because each is entitled to qualified immunity for lack of personal involvement in both of Appel's constitutional claims. With respect to Rinker, any allegation that she participated in a conspiracy to retaliate against Appel for Appel's 2005 CHRO testimony fails as I have already determined that Rinker is entitled to qualified immunity on that claim. However, turning to the conduct of Rinker, Spiridon, and Vaden–Goad, as the conduct relates to the First Amendment and substantive due process claim at issue in this motion, I hold that, because each of the defendants is an employee and acting as an agent of the University, Appel has not satisfied the "two or more actors" requirement. The motion for summary judgment on Appel's conspiracy claim is therefore granted.

D. *Service of Process in Official Capacities*

Defendants argue that, although Appel properly served defendants in their individual capacities, she failed to properly effect service of process on them in their official capacities. Rule 4(e) of the Federal Rules of Civil Procedure provides that service against an individual may be effected by either following state law for serving a summons or by personal service, abode service, or service upon an authorized agent. Service upon a state officer in his or her official capacity is sufficient if made pursuant to Rule 4(e). *See Cassie v. DuBois,* 346 F.3d 213, 216 (1st Cir.2003); *see also Echevarria–Gonzalez v. Gonzalez–Chapel,* 849 F.2d 24, 28–30 (1st Cir.1988); *Stoianoff v. Comm'r. of Motor Vehicles,* 208 F.3d 204, 2000 WL 287720 (Table) (2d Cir.2000); *Strong v. Board of Educ. of Uniondale Union Free School Dist.,* No. CV–90–2373, 1991 WL 37053 (E.D.N.Y. March 13, 1991); *Richards v. New York State Dept. of Correctional Services,* 572 F.Supp. 1168, 1172–73 n. 3 (S.D.N.Y.1983) (J. Goettel) (noting that personal service pursuant to Rule 4(e)'s predecessor controls rather than the rule governing service upon a state where the suit is against a state actor in his official capacity and recovery sought is under the Civil Rights Act). Because Appel properly effected individual service as set forth in Rule 4(e), she has also satisfied the requirements with respect to service in the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3651353 (D.Conn.)

(Cite as: 2011 WL 3651353 (D.Conn.))

defendants' official capacities.

## IV. Conclusion

For the foregoing reasons, the motion for summary judgment is granted in its entirety with respect to Wells, Wallace, Hawkes, Grimes, Echevarria and Schmotter. Appel's claims that she was retaliated against as a possible witness at Young–Caruso's reopened fact finding and her conspiracy claim fail as a matter of law and the defendants' motion for summary judgment is granted on those claims. The following claims survive the motion for summary judgment. Appel's substantive due process claim will proceed against Rinker, Spiridon and Vaden–Goad. Appel's claim of First Amendment retaliation concerning her 2006 lawsuit shall proceed against Rinker and Spiridon. Appel's claim of First Amendment retaliation arising out of her 2005 CHRO testimony will proceed against Spiridon and Vaden–Goad. Having determined that each of the defendants, Rinker, Spiridon and Vaden–Goad have been properly served, the case will proceed against them their official and individual capacities.

**\*21** It is so ordered.

D.Conn.,2011.

Appel v. Spiridon
Not Reported in F.Supp.2d, 2011 WL 3651353 (D.Conn.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 3113423 (E.D.N.Y.)

(Cite as: 2005 WL 3113423 (E.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

E.D. New York.
Kadi KAMARA, Plaintiff,
v.
CITY OF NEW YORK and New York City Police
Officer Louis Camello, Defendants.
No. CV 03-0337 CPS.

Nov. 21, 2005.

Duane C. Felton, Attorney at Law, Staten Island, NY, for
Plaintiff.

Hillary A. Frommer, Corporation Counsel for the City of
New York, Katie C. O'Connor, Office of the Corporation
Counsel, New York, NY, for Defendants.

MEMORANDUM OPINION AND ORDER

SIFTON, Senior J.

**\*1** Plaintiff Kadi Kamara ("Kamara") brings this
action pursuant to 42 U.S.C. § 1983 against the City of
New York (the "City") and New York City Police Officer
Louis Camello ("Detective Camello") alleging violation of
her constitutional and common law rights. Specifically,
plaintiff Kamara alleges that she was falsely arrested when
a search warrant was executed upon her residence at 225
Park Hill Avenue, Apartment 6G, Staten Island, New
York. She states claims for relief pursuant to 42 U.S.C. §
1983 for false arrest and conspiracy to deprive her of her
constitutional rights against Detective Camello, and she
asserts municipal liability under § 1983. She also alleges
common law claims for intentional infliction of emotional
distress and false arrest against Detective Camello and
negligent hiring and supervision against the City.

The defendants now move for summary judgment
with respect to all claims against them pursuant to Rule 56
of the Federal Rules of Civil Procedure on the grounds
that (1) plaintiff has failed to establish municipal liability
under 42 U.S.C. § 1983, (2) probable cause existed for

plaintiff's arrest, (3) defendant Detective Camello is
entitled to qualified immunity, (4) plaintiff's claim of
conspiracy against Detective Camello fails as a matter of
law, and (5) plaintiff's state law claims fail as a matter of
law. For the reasons stated herein, the motion for summary
judgment is granted in part and denied in part.

BACKGROUND

The following facts are drawn from the parties
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the submissions in
connection with the present motion. Factual disputes are
noted.

Detective Louis Camello, during all relevant times,
was employed as a detective with the New York City
Police Department, and assigned to the Staten Island Gang
Division. Plaintiff Kadi Kamara, a naturalized United
States citizen and native of Liberia, during all relevant
times resided at 225 Parkhill Avenue, Apartment 6G,
Staten Island, New York with her infant son. No other
adult lived with plaintiff in that apartment.

Prior to June 13, 2002, Detective Camello was
conducting a five month investigation of identity theft in
the Park Hill Apartment Complex ("Park Hill") under the
supervision of Assistant District Attorney David Frey. The
investigation revealed that individuals in Park Hill were
applying for credit cards without prior authorization or
knowledge of the person to be named on the card, and
thereafter either changing the names on cards issued or
adding themselves as additional card holders. Those
fraudulent cards were sent to addresses other than those of
the named card holders and were then used to purchase
merchandise. Detective Camello states that he obtained
evidence of the Park Hill identity theft scheme from a
variety of sources, including the execution of search
warrants, prior arrests, a confidential informant, and
merchandisers such as AOL.com and Amazon.com.

**\*2** Defendant Camello states that during his
investigation, and prior to June 13, 2002, he obtained
evidence through a confidential informant that plaintiff

Not Reported in F.Supp.2d, 2005 WL 3113423 (E.D.N.Y.)

(Cite as: 2005 WL 3113423 (E.D.N.Y.))

was receiving fraudulent credit cards at her apartment on behalf of an individual named Tiffany Roberts. Detective Camello also states that he obtained evidence from Amazon.com that a credit card under the name Diane Leslie was used to purchase merchandise for shipment to 225 Park Hill Avenue, Apartment 6G in the names of Tiffany Roberts and Jasmine Frilando, and that he learned that UPS was delivering packages to plaintiff's apartment. Plaintiff disputes that Detective Camello had this information before he arrested plaintiff.

Both sides agree that in December 2001, six months before she was arrested, plaintiff received credit cards by mail that she had not asked for or authorized. An individual whom plaintiff claims she did not know at the time approached plaintiff and threatened to physically assault her if she did not turn over the cards. Plaintiff called the police to report this incident; however, the police did not pursue an investigation. Shortly thereafter, plaintiff became aware of the fact that an unauthorized charge had been made to her credit card account. She immediately called her credit card company, and the company reversed the charge. Plaintiff also claims that she received a package that she did not order, and that she immediately took it to the Park Hill security office.

As part of Detective Camello's identity theft investigation, the Richmond County District Attorney's Office applied for, and on June 6, 2002 was granted, approximately twenty search warrants. A June 3, 2002 memo from the Commander of the Staten Island Gang Squad indicates that the purpose of obtaining these search warrants was "dual" in nature, "namely the arrest of criminal suspects and the obtainment of evidence to assist in the furtherance of this ongoing investigation." Included among these warrants was one for the search of plaintiff's apartment. The search warrant, issued by Magistrate Judge William F. Master, directed any officer of the New York City Police department to enter 225 Park Hill Avenue, Apartment 6G, Staten Island, New York, within ten days from the date of issuance, and to search for and seize the following property:

"evidence of schemes to defraud, petit larceny, grand larceny, conspiracy, criminal impersonation, evidence of a proprietary interest in the apartments, evidence of

obtaining and using fraudulent or stolen credit cards, credit card statements, stolen property, computers, merchandise purchased with stolen and fraudulent credit cards and credit card information, including electronic equipment, such as televisions, DVD players, gaming systems, DVDs, cell phones, business records, and United States currency."

On June 13, 2002, Detective Camello and other members of the New York City Police Department executed these search warrants in the apartment complex. Officers broke open the door of plaintiff's apartment and searched her apartment. Upon searching her apartment, the police discovered papers reflecting plaintiff's bank and credit card information, three Visa Gold Credit Cards in plaintiff's name, one Citibank Banking Card in the name of Haja F. Kamara,[FN1] and one CFS Bank Visa Card in plaintiff's name. These credit cards were all legitimate cards, and none were determined to have been used by plaintiff in fraudulent transactions. The police also discovered a Compaq Presario 5000 computer and floppy disks. These items were not identified as items which had been shipped to Kamara's apartment by AOL.com or Amazon.com and were not obtained through the use of stolen credit cards. Nevertheless, Detective Camello seized these items and arrested plaintiff Kamara. Plaintiff, along with 38 other individuals, was handcuffed and transported to the 120th police precinct for arrest processing. The police One Line Booking Sheet stated the same reason for all persons arrested: "above defendant was arrested and charged from execution of a valid Richmond County search warrant."

FN1. Haja Kamara is plaintiff Kadi Kamara's mother.

*3 Plaintiff claims that while at the police station, she saw the woman who had confronted her in December 2001, and learned from a police officer that the woman's name was Tiffany Roberts. It is not disputed that Tiffany Roberts was arrested on June 13, 2002, along with the 38 other individuals arrested on that day. Plaintiff told the police at this time that Tiffany Roberts was the woman who had confronted and threatened her in December 2001.

Plaintiff, along with all of the other individuals

Not Reported in F.Supp.2d, 2005 WL 3113423 (E.D.N.Y.)

(Cite as: 2005 WL 3113423 (E.D.N.Y.))

arrested on that day, was charged with conspiracy in the 3rd degree and criminal possession of stolen property in the 4th degree. Jasmine Frilando was convicted on January 30, 2003 of conspiracy in the 4th degree and grand larceny in the 3rd degree, both felonies. On April 3, 2003, Tiffany Roberts was convicted of criminal possession of stolen property in the 4th degree, conspiracy in the 4th degree, and grand larceny in the 4th degree, all felonies.

The District Attorney's Office thereafter either conducted an independent investigation into plaintiff's role in the identity theft scheme, or simply reviewed the evidence it already had. In any event, the District Attorney's Office thereafter concluded that plaintiff was a victim of the Park Hill identity theft scheme rather than a participant, and plaintiff was not prosecuted. Nor were 24 other individuals arrested on that day.[FN2]

> FN2. Several of the others allegedly falsely arrested as part of this same operation have also filed suit in this Court, and those cases have been settled.

Plaintiff filed the present complaint against defendants, claiming, pursuant to 42 U.S.C. § 1983, that she was falsely arrested because Detective Camello did not have probable cause to arrest her. She also states claims for relief for conspiracy to deprive her of her constitutional rights pursuant to 42 U.S.C. § 1983 and common law claims for false arrest, intentional infliction of emotional distress, and negligent hiring and supervision. Defendants move for summary judgment dismissal on all claims. For the following reasons, the motion for summary judgement is granted in part and denied in part.

DISCUSSION

*Jurisdiction*

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1343, which authorizes jurisdiction over actions arising under 42 U.S.C. § 1983 and 28 U.S.C. § 1367, which creates supplemental jurisdiction over claims arising under state law.

*Summary Judgment Standard*

Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rule 56 of the Federal Rules of Civil Procedure provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Electrical Inspectors, Inc. v. Village of East Hills,* 320 F.3d 110, 117 (2d Cir.2003). A fact is material when it "might affect the outcome of the suit under the governing law." *Id.*

*4 The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.1987). If the moving party's initial burden is met, the burden shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Brady v. Town of Colchester,* 863 F.2d 205, 210-11 (2d Cir.1988). The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, there is a genuine issue for trial. *Anderson,* 477 U.S. at 249 (1986); *Pinto v. Allstate Ins. Co.,* 221 F.3d 394, 398 (2d Cir.2000).

*Section 1983 Claims*

Section 1983 claims have two principal elements: (1) the defendant acted under the color of state law, and (2) as a result of defendant's actions, plaintiff was deprived of a right secured by the Constitution and laws of the United States. *See e.g. Mahoney v. National Organization of Women,* 681 F.Supp. 129, 132 (D.Conn.1987); *Lehman v. Kornblau,* 134 F.Supp.2d 281, 287 (E.D.N.Y.2001), *citing Annis v. County of Westchester,* 136 F.3d 239, 245 (2d Cir.1998); *Eagleston v. Guido,* 41 F.3d 865, 872 (2d

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3113423 (E.D.N.Y.)

(Cite as: 2005 WL 3113423 (E.D.N.Y.))

Cir.1994).

Here, the first element is undisputed, because the actions giving rise to plaintiff's claims were committed by Detective Camello in the course of his work as a law enforcement officer. *See Daniels v. Williams,* 474 U.S. 327 (1986). The following discussion focuses on the second element.

*False Arrest*

Plaintiff asserts a claim of false arrest under § 1983 as well as a state law claim of false arrest. A false arrest claim rests on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause. *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). A claim for false arrest under 42 U.S.C. § 1983 is substantially the same as a claim for false arrest under New York law. *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996).

A damages claim for false arrest cannot be sustained if there was probable cause for the arrest. *See e.g., Singer v. Fulton County Sheriff,* 63 F.3d 110, 118-19 (2d Cir.1995); *Bernard v. United States,* 23 F.3d 98, 102 (2d Cir.1994). The existence of probable cause is a complete defense to a false arrest claim, even where the plaintiff was ultimately acquitted of the criminal charges. *See Weyant,* 101 F.3d at 852 (citing *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994).

"Probable cause exists where 'the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Brinegar v. United States,* 338 U.S. 160, 175-176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (*quoting Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925)). "If the determination of whether an arresting officer had probable cause requires the resolution of disputed facts, the existence of probable cause is to be decided by a jury." *Campbell v. Giuliani,* 2001 WL 91615, 3 (E.D.N.Y.2001) (*citing Murphy v. Lynn,* 118 F.3d 938, 947 (2d Cir.1997), *cert. denied,* 522 U.S. 1115, 118 S.Ct. 1051, 140 L.Ed.2d 114 (1998)). Probable cause is presumed when the arrest is effected pursuant to an arrest warrant issued by a neutral magistrate. *Golino v.*

*City of New Haven,* 950 F.2d 864, 970 (2d Cir.1991); *Lehman v. Kornblau,* 134 F.Supp.2d 281 (E.D.N.Y.2001).

**\*5** In the present case, defendants argue that the claim for false arrest must be dismissed because Detective Camello had probable cause to arrest plaintiff Kamara. Relying on *Golino,* they argue that "the issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause." 950 F.2d at 870. This argument fails, however, because although a valid warrant existed in the present case, the warrant was a *search* warrant, not an *arrest* warrant as was the case in *Golino.* The search warrant issued as to plaintiff's apartment was therefore not based upon a finding that probable cause existed to arrest her. Accordingly, there is no presumption that it was objectively reasonable for Detective Camello to arrest plaintiff Kamara based on the search warrant.

Neither has defendant established that the evidence gathered during the search gave rise to probable cause. During the search, the police found only legitimately obtained and possessed credit cards, computer, and floppy disks. Indeed, Detective Camello conceded during his deposition that plaintiff Kamara's "arrest wasn't based upon evidence found in the apartment." Defendants, however, have failed to provide sufficient evidence that probable cause to arrest plaintiff existed prior to execution of the search warrant. Detective Camello claims that he was relying on information from a confidential informant and from information obtained from UPS, AOL.com, and Amazon.com; however, defendants have failed to provide evidence sufficient to establish as a matter of law the nature, timing and reliability of the information said to have been relied upon. Because defendants have not established that they are entitled to judgment as a matter of law, summary judgment on the false arrest claims is denied.

*Qualified Immunity*

Even if a court finds that an arrest was unlawful, the Court should grant summary judgment, if it finds that, when viewing the facts in the light most favorable to the plaintiff, the defendant officer is entitled to qualified

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3113423 (E.D.N.Y.)

(Cite as: 2005 WL 3113423 (E.D.N.Y.))

immunity for his conduct. *See Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *see also Hamilton v. City of New Haven,* 214 F.Supp.2d 125, 131 (D.Conn.2002). The qualified immunity doctrine shields "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *X-Men Security, Inc. V. Pataki,* 196 F.3d 56, 65-65 (2d Cir.1999).

The question of qualified immunity is independent from the merits of the underlying action and must be examined independently of the underlying claims. *See Saucier* 533 U.S. at 207 (2001); *Washington Square Post No. 1212 v. Maduro,* 907 F.2d 1288, 1292 (2d Cir.1990)(*citing Mitchell v. Forsyth,* 472 U.S. 511, 527-28, 105 S.Ct. 2806, 86 L.Ed.2d 411). Moreover, because "the entitlement is an *immunity from suit* rather than a mere defense to liability," *Mitchell,* 472 at 526, the Supreme Court has "repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Saucier,* 533 U.S. at 201 (noting that "to deny summary judgment any time a material issue of fact remains [on the underlying constitutional claim] could undermine the goal of qualified immunity ... to permit the resolution of many insubstantial claims on summary judgment"); *see also Hunter,* 502 U.S. at 227 (1991).

**\*6** In assessing whether an officer is entitled to qualified immunity, the court must first consider the question of whether "[t]aken in the light most favorable to the party asserting the injury ... the facts alleged show the officer's conduct violated a constitutional right." *Saucier,* 533 U.S. at 201. The "next sequential step is to ask whether the right was clearly established." *Id.* The right "must be defined at the appropriate level of specificity before a court can determine if it was reasonably established." *Id.* (citing *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Finally, "even where the law and the scope of permissible official conduct are clearly established, the defense of qualified immunity will protect a government official if it was 'objectively reasonable' for him to believe his acts were lawful." *Cartier v. Lussier,* 955 F.2d 841, 844 (2d Cir.1992). The objective reasonableness test is met, and

the officer is entitled to qualified immunity, if "reasonably competent officials could disagree" as to whether the conduct at issue would violate clearly established rights. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *Cartier,* 955 F.2d at 46 (2d Cir.1992); *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995).

It is not disputed that it was clearly established at the time of the incident that individuals have a Fourth Amendment right to be free from unreasonable seizures, including arrest without probable cause. *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). There is also no dispute that this right was at that time defined at the appropriate level of specificity. Thus, the relevant question is "whether a reasonable officer could have believed" the arrest "to be lawful, in light of the established law and the information the officers possessed." *Hunter,* 502 U.S. at 227; *Anderson,* 483 U.S. at 641.

In claiming that defendant Detective Camello is entitled to qualified immunity, defendants again argue that "police activity conducted pursuant to a warrant rarely will require any deep inquiry into reasonableness because a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith." *Simms v. Village of Albion,* 115 F.3d 1098, 1106 (2d Cir.1997) (*citing United States v. Leon,* 468 U.S. 897, 992 (1984)). Defendants erroneously apply the holdings in the cases they have cited to the present case. The "police activity" at issue in this case is the arrest of plaintiff Kamara, *not* the search of her apartment, which was conducted pursuant to the search warrant. Plaintiff Kamara's arrest, on the other hand, was not conducted pursuant to any arrest warrant.

The question thus becomes whether Detective Camello had sufficient evidence to arrest plaintiff Kamara such that "a reasonable officer could have believed" the arrest "to be lawful." Because, as stated above, the amount, nature, and reliability of the evidence Detective Camello had supporting his arrest of plaintiff Camello have not been established and present issues of fact to be decided by a jury, summary judgement based on the defense of qualified immunity must also be denied.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3113423 (E.D.N.Y.)

(Cite as: 2005 WL 3113423 (E.D.N.Y.))

### Conspiracy Claim

**\*7** To establish a conspiracy under § 1983, a plaintiff must show: (1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages. *Ciambriello v. County of Nassau,* 292 F.3d 307, 324-325 (2d Cir.2002); *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999). The plaintiff must demonstrate that the defendant "acted in a willful manner, culminating in an agreement, understanding or 'meeting of the minds,' ' that violated the plaintiff's constitutional rights. *Duff v. Coughlin,* 794 F.Supp. 521, 525 (S.D.N.Y.1992) (*quoting Katz v. Morgenthau,* 709 F.Supp. 1219, 1231 (S.D.N.Y.), aff'd in part, rev'd in part, 892 F.2d 20 (1989)); *see also Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995).

Plaintiff asserts that Detective Camello conspired with other members of the Staten Island Gang Division and his commander to arrest plaintiff. However, "[w]here the individual defendants are all employees of the institutional defendant, a claim of conspiracy will not stand." *Nat'l Congress for Puerto Rican Rights v. City of New York,* 75 F.Supp.2d 154, 168-69 (S.D.N.Y.1999) (dismissing conspiracy claim because all alleged co-conspirators were employees of the New York City Police Department) (*quoting Burrell v. City University of New York,* 995 F.Supp. 398, 414 (S.D.N.Y.1998)); *Everston v. State of New York Mortgage Agency,* 89 Civ. 7474, 1992 WL 6190, at 6 (S.D.N.Y.1992) (conspiracy claim failed as a matter of law where all of the individual defendants were employees of SONYMA at the time of the alleged conspiracy); *Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs.,* Inc., 996 F.2d 537, 542 (2d Cir.1993) (unilateral conduct on the part of a single enterprise falls outside the purview of § 1 of the Sherman Act, prohibiting conspiracies in restraint of trade); *Ritzie v. City University of New York,* 703 F.Supp. 271, 277 (S.D.N.Y.1989) (conspiracy requires participation by an external party).

Because Detective Camello and the others with whom plaintiff alleges defendant conspired are all employees of the New York City Police Department, this claim must be dismissed. Accordingly, defendant's motion for summary judgment as to plaintiff's conspiracy claim is granted.

### Plaintiff's Remaining Claims

Plaintiff Kamara concedes dismissal of her state law claim of negligent hiring and supervision against defendant City as well as her state law claim of intentional infliction of emotional distress against Detective Camello. Plaintiff Kamara also concedes that there is no evidence to support municipal liability under 42 U.S.C. § 1983. Accordingly, these claims must be dismissed. Because no claim for relief remains against defendant City, the complaint as to defendant City of New York must be dismissed in its entirety.

### CONCLUSION

For the aforementioned reasons, the motion for summary judgment is granted in part and denied in part, and the complaint as to defendant City of New York is dismissed in its entirety.

**\*8** The Clerk is directed to furnish a filed copy of the within to all parties and to the magistrate judge.

SO ORDERED.

E.D.N.Y.,2005.

Kamara v. City of New York
Not Reported in F.Supp.2d, 2005 WL 3113423 (E.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 1999 WL 151702 (E.D.N.Y.)
(Cite as: 1999 WL 151702 (E.D.N.Y.))

C

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.
Ethel BOND, Plaintiff,
v.
BOARD OF EDUCATION OF THE CITY OF NEW
YORK, Martha Rodriguez-Torres, as Principal of
Public School 156, and Oswaldo Malave, as Assistant
Principal of Public School 156, Defendants.
**No. 97 CV 1337.**

March 17, 1999.

ORDER

GERSHON, District J.

**\*1** Plaintiff Ethel Bond ("Bond") is a fifty-two year old,
African-American woman who has been a teacher for the
New York City Board of Education ("BOE") since 1981
and a delegate to the United Federation of Teachers
("UFT") since 1992. Defendants are the BOE, Martha
Rodriguez-Torres ("Rodriguez-Torres"), the principal of
Public School 156 and Oswaldo Malave ("Malave"), the
assistant principal of Public School 156. Plaintiff filed this
action in March 1997, seeking injunctive and monetary
relief. She alleges retaliation pursuant to the National
Labor Relations Act ("NLRA"), 29 U.S.C. § 158, and age
discrimination pursuant to the Age Discrimination in
Employment Act ("ADEA"), 29 U.S.C. §§ 623 and 626.
Specifically, plaintiff alleges that defendants retaliated
against her for her involvement in the UFT by threatening
to "get rid of" her and by giving her unsatisfactory
performance ratings in December 1994 and June 1995,
and that they discriminated against her because of her age
by requiring her to submit weekly lesson plans,
reassigning her paraprofessional to other teachers, and
denying her a promotion to the position of team leader.

Plaintiff moves to amend her complaint to include claims
under 42 U.S.C. §§ 1983, 1985(3), 1986 and for
defamation under state law. In addition to the allegations
contained in the original complaint, the proposed amended
complaint includes allegations that plaintiff was suspended
and that defendants placed derogatory materials in her
personnel file. The proposed pleading states that the
materials accused plaintiff of neglecting to follow
prescribed lesson plans, but it does not specify the exact
language contained in such materials.

Defendants oppose plaintiff's motion to amend on the
ground that leave to amend would be futile.

DISCUSSION

Rule 15(a) of the Federal Rules of Civil Procedure
provides, in pertinent part, that "a party may amend the
party's pleading only by leave of court or by written
consent of the adverse party; and leave shall be freely
given when justice so requires." Amendments are
generally favored as they tend " 'to facilitate a proper
decision on the merits." ' *Sokolski v. Trans Union Corp.,*
*178 F.R.D. 393, 396 (E.D.N.Y.1998)* (citation omitted).
"If the underlying facts or circumstances relied upon by a
plaintiff may be a proper subject of relief, he ought to be
afforded an opportunity to test his claim on the merits."
*Foman v. Davis,* 371 U.S. 178, 182 (1962).

The party opposing an amendment must establish that
leave to amend would be prejudicial or futile or that there
exists undue delay, bad faith or dilatory motive on the part
of the moving party. *See Foman,* 371 U.S. at 182; *Scharff*
*v. Clarigde Gardens, Inc.,* 1990 WL 186879 \*2
*(S.D.N.Y.).* A proposed amendment is futile only if it fails
to state a claim and could not survive a motion to dismiss.
*See Scharff,* 1990 WL 186879 at \*2.[FN1] "If the [movant]
has at least colorable grounds for relief, justice ...
require[s]" that leave to amend be granted. *Golden Trade,*
*S.r.L. v. Jordache,* 143 F.R.D. 504, 506 (S.D.N.Y.1992)
(quoting *S.S. Silberblatt, Inc. v. East Harlem Pilot*
*BlockBldg. 1 Housing Dev. Fund Co., Inc.,* 608 F.2d 28,
42 (2d Cir.1979)).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 151702 (E.D.N.Y.)
(Cite as: 1999 WL 151702 (E.D.N.Y.))

FN1. On a motion to dismiss, "a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). The court "must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir.1995) (quoting *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.), cert. denied, 513 U.S. 836 (1994)). A motion to dismiss "is addressed solely to the face of the pleadings, and '[t]he court's function...is not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." ' *Tinlee Enterprises, Inc. v. Aetna Casualty & Surety Co.*, 834 F.Supp. 605, 607 (E.D.N.Y.1993) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985)).

Plaintiff's Section 1985(3) Claim

**\*2** 42 U.S.C. § 1985(3) states, in relevant part:

If two or more persons in any state ... conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

Plaintiff alleges that, by giving her unsatisfactory performance ratings, requiring her to submit lesson plans, placing derogatory materials in her personnel file, suspending her and threatening to get rid of her, Rodriguez-Torres and Malave acted in concert and with unnamed conspirators to retaliate against her for her union activities and to discriminate against her based on her age. Defendants argue that leave to amend to include a claim of conspiracy under Section 1985(3) would be futile because such a claim is barred by the intracorporate conspiracy doctrine.

Under that doctrine, officers, agents and employees of a single corporate entity are legally incapable of conspiring together. *See Solla v. AETNA Health Plans of New York Inc.*, 14 F.Supp.2d 252, 257 (E.D.N.Y.1998). The Second Circuit has imported the doctrine into Section 1985 jurisprudence and has dismissed a claim of conspiracy against officers and employees of a non-profit institution. *See Herrmann v. Moore*, 576 F.2d 453 (2d Cir.), cert. denied, 439 U.S. 1003 (1978). An exception to the intracorporate conspiracy doctrine applies to individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity. *See Roniger v. McCall*, 22 F.Supp.2d 156, 168 (S.D.N.Y.1998); *Solla*, 14 F.Supp.2d at 257-59. Thus, whether the doctrine is applicable here depends on whether Malave and Rodriguez-Torres were acting in furtherance of the BOE's interests or whether their conduct was motivated by personal interest. Plaintiff's proposed amended complaint specifically states that Malave and Rodriguez-Torres were acting "in the ordinary course of employment," and there are no allegations that either defendant had a personal interest in discriminating against plaintiff apart from any interests held by the BOE. Although the complaint includes an allegation that Rodriguez-Torres wanted to "get rid of" plaintiff, personal bias does not constitute personal interest and is not sufficient to defeat the intracorporate conspiracy doctrine. *See Johnson v. Nyack Hospital*, 954 F.Supp. 717, 723 (S.D.N.Y.1997). Rather, as in *Natale v. Town of Darien, Conn.*, 1998 WL 91073 \* 5 (D.Conn.), plaintiff alleges only the classic circumstance for application of the intracorporate conspiracy doctrine, namely, that defendants acted within the scope of their employment. Therefore, plaintiff has failed to state a claim of conspiracy upon which relief can be granted, and she is not entitled to amend her complaint to include such a claim under Section 1985(3).

Plaintiff's Section 1986 Claim

**\*3** 42 U.S.C. § 1986 states, in relevant part, that:

Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 151702 (E.D.N.Y.)
(Cite as: 1999 WL 151702 (E.D.N.Y.))

the power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented....

Plaintiff alleges that the BOE "adopted, with little or no investigation, all wrongful acts" taken by Rodriguez-Torres and Malave, and that such "willful neglect" by the BOE deprived her of equal protection of the laws in violation of 42 U.S.C. § 1986. "Courts within this circuit have interpreted § 1986 as merely giving a remedy for misprision of a violation of 42 U.S.C. § 1985." *Dangler v. New York City Off Track Betting Corp.,* 1998 WL 599711 *6 (S.D.N.Y.)* (citation and quotations omitted). Since plaintiff has failed to state a cognizable conspiracy claim under Section 1985(3), it necessarily follows that her Section 1986 claim must also be dismissed.

Plaintiff's Section 1983 Claim

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that (1) she was deprived of a right secured by the Constitution or laws of the United States and (2) the deprivation was committed by a person acting under the color of state law. *See Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994). "[A] complaint must contain specific allegations of fact which indicate a deprivation of constitutional rights; allegations which are nothing more than broad, simple, and conclusory statements are insufficient to state a claim under § 1983." *See Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987). Defendants do not dispute that they were acting under the color of state law in their positions as administrators in a public high school. Rather, they argue that the complaint is conclusory and that plaintiff has not properly alleged that she was deprived of a right secured by the Constitution and laws of the United States.

In *Alfaro,* the Second Circuit held that plaintiffs' "general and conclusory allegation" that they were deprived of "a prompt administrative hearing" to review the denial of their application for taxi medallions did not meet the requisite standard for pleadings in a Section 1983 action.

*See id.* Here, however, plaintiff specifies how and when defendants discriminated against her (*i.e.,* by giving her unsatisfactory performance ratings and requiring her to submit weekly lesson plans, etc.), the reasons for such discrimination (*i.e.,* her age and membership in a labor union), and the injury suffered (*i.e.,* suspension and denial of a promotion). Thus, the factual allegations in plaintiff's proposed amended complaint are not so conclusory as to require dismissal.

*4 The more difficult issue is whether plaintiff has properly alleged that she was deprived of a right secured by the Constitution or laws of the United States. Although plaintiff does not articulate a specific legal basis for her Section 1983 claim in the body of the proposed amended complaint, in her reply brief she states: "Plaintiff has made sufficient allegations of a deliberate policy and practice by the Board of Education that allow principals of Schools under it to harass, defame, unfairly target, discipline and punish teachers under such principals. This conduct of the defendants promoted a hostile working environment and that is a deprivation of equal protection." Thus, it is assumed that plaintiff is alleging a violation of the Equal Protection Clause of the Fourteenth Amendment.[FN2] Defendants argue that leave to amend to include a Section 1983 equal protection claim would be futile because the ADEA provides the exclusive remedy for age discrimination claims and that plaintiff is barred from making a claim based on her status as a union activist because government employers at the state level are exempt from the NLRA.

> FN2. In the jurisdiction section of the complaint, plaintiff states that the action arises under Title VII of the Civil Rights Act and under the Fourth, Fifth, Sixth, Thirteenth and Fourteenth Amendments to the United States Constitution. As defendants point out, the complaint does not contain any allegations from which it could be inferred that defendants violated plaintiff's Fourth, Fifth, Sixth or Thirteenth Amendment rights. The Fourth Amendment prohibits unreasonable searches and seizures, which are not at issue here; the Fifth Amendment prohibits deprivations of due process by the federal government, which is not a party to this action; the Sixth Amendment applies to criminal prosecutions only; and the Thirteenth

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Amendment prohibits involuntary servitude, which is not alleged.

Defendants' contention that plaintiff is barred from making a claim of anti-union bias under Section 1983 because state and municipal employers are not subject to the NLRA is without merit. Plaintiff's equal protection claim is not based on any rights afforded her under the NLRA, but on her right to equal protection under the Equal Protection Clause itself. Cf. Greene v. Hawes, 913 F.Supp. 136, 142 (N.D.N.Y.1996) (denying fair representation claim for lack of jurisdiction under Section 1983). The Equal Protection Clause clearly protects individuals from discriminatory acts by state and municipal officials based on union membership. Although union members are not a suspect class, the Supreme Court has held that discrimination based on union membership must satisfy the rational basis test to survive scrutiny under the Equal Protection Clause. See City of Charlotte v. Local 660, International Association of Firefighters, 426 U.S. 283, 286 (1976) (city's refusal to withhold dues from union members' paychecks must meet standard of reasonableness to survive scrutiny under the Equal Protection Clause). See also Local 749, AFSCME, Council 4, AFL-CIO v. Ment, 945 F.Supp. 30, 36 (D.Conn.1996) (dismissing plaintiffs' claim under the Equal Protection Clause because plaintiffs failed to allege facts sufficient to show that they were discharged based on union membership). The existence of a federal statute, which applies to federal government employers only, does not change this. In other words, it is precisely because the NLRA provides no protection to plaintiffs discriminated against by municipal employers that plaintiff's equal protection claim is not preempted by the NLRA.

The Second Circuit has not ruled on whether the ADEA preempts claims of age discrimination under Section 1983. The circuits that have considered the issue have held that the ADEA provides the exclusive remedy for such discrimination. See Zombro v. Baltimore City Police Dep't, 868 F.2d 1364, 1369 (4th Cir.), cert. denied, 493 U.S. 850 (1989); Ray v. Nimmo, 704 F.2d 1480, 1485 (11th Cir.1983); Paterson v. Weinberger, 644 F.2d 521, 525 (5th Cir.1981). And the district courts in this circuit are split. Compare Jungels v. State University College of New York, 922 F.Supp. 779, 785 (W.D.N.Y.1996) (ADEA does not preempt age discrimination claims under Section 1983); Reed v. Town of Branford, 949 F.Supp. 87, 90

(D.Conn.1996) (same), with Gregor v. Derwinski, 911 F.Supp. 643, 651 (W.D.N.Y.1996) (ADEA provides the exclusive remedy for age discrimination); Reale v. Jenkins, 1993 WL 37091 *4 (S.D.N.Y.1993) (same). However, the Second Circuit has held that employment discrimination claims under Section 1983 are not preempted by concurrent Title VII claims, stating that "Title VII is not the exclusive remedy for discrimination claims against state or municipal employers, where those claims derive from violations of Constitutional rights." Annis v. County of Westchester, N.Y., 36 F.3d 251, 254 (2d Cir.1994). See also Saulpaugh v. Monroe Community Hospital, 4 F.3d 134, 143 (2d Cir.), cert. denied, 510 U.S. 1164 (1994) ("a § 1983 claim is not precluded by a concurrent Title VII claim, when the former is based on substantive rights distinct from Title VII.") (citation and quotations omitted). Given the current uncertain state of the law and the Second Circuit's holdings in the employment discrimination context, plaintiff will be permitted to amend her complaint to include an age discrimination claim under Section 1983. The issue of preemption can be revisited at a later date if necessary.

### Defamation

**\*5** Section 3813(1) of the New York Education Law requires a plaintiff to serve a notice of claim before filing a tort action against the BOE. Since plaintiff acknowledged at oral argument that she never filed a notice of claim, plaintiff has failed to state a claim of defamation against the BOE upon which relief can be granted.

In addition, plaintiffs alleging defamation in New York must set forth "the particular words complained of" in the complaint. N.Y.C .P.L.R. 3016(a). Failure to specify the allegedly defamatory language warrants dismissal. See Gill v. Pathmark Stores, Inc., 237 A.D.2d 563, 564 (2d Dep't 1997); Vardi v. Mutual Life Ins. Co. of N.Y., 136 A.D.2d 453, 456 (1st Dep't 1988). Failure to state the particular person or persons to whom the comments were made also requires dismissal. See Gill, 237 A.D.2d at 564. Since plaintiff's proposed amended complaint does not state the exact language contained in the materials defendants placed in her personnel file, nor does the complaint specify who read the file, plaintiff has failed to state a claim upon which relief may be granted, and leave

Not Reported in F.Supp.2d, 1999 WL 151702 (E.D.N.Y.)
(Cite as: 1999 WL 151702 (E.D.N.Y.))

to amend would be futile.

CONCLUSION

Plaintiff's motion for leave to amend the complaint to include a state law defamation claim and claims under 42 U.S.C. §§ 1985(3) and 1986 is denied. Plaintiff's motion to amend the complaint to include a claim under 42 U.S.C. § 1983 is granted. Plaintiff is directed to serve and file an amended complaint in conformity with this order within ten days.

SO ORDERED.

E.D.N.Y.,1999.
Bond v. Board of Educ. of City of New York
Not Reported in F.Supp.2d, 1999 WL 151702 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3591719 (E.D.N.Y.)

(Cite as: 2005 WL 3591719 (E.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

E.D. New York.
Sean HILL, Plaintiff,
v.
THE CITY OF NEW YORK, Detective Gregory
Barrett, individually and in his official capacity as a
New York City Policy Officer, and Police Officer John
Does, individually and their official capacities as New
York City Police Officers, the identity and number of
whom are presently unknown, Defendants.
No. 03 CV 1283(ARR).

Dec. 30, 2005.

Rene Myatt, The Law Office of Rene Myatt, Hollis, NY,
for Plaintiff's Counsel.

Hillary A. Frommer, Corporation Counsel for the City of
New York Law Department, New York, NY, James M.
Moschella, Karasyk & Moschella, LLP, New York, NY,
for Defendants' Counsel.

*NOT FOR PRINT OR ELECTRONIC PUBLICATION*

ROSS, J.

*OPINION AND ORDER*

*1 In this action, plaintiff Sean Hill ("plaintiff" or
"Hill") brings suit against defendants Detective Gregory
Barrett ("Barrett"), Police Officer John Doe ("Does"),
and the City of New York ("New York City")
(collectively, "defendants") pursuant to 42 U.S.C. § 1983
and various state tort laws. Specifically, plaintiff seeks
relief for violations of his Fourth and Fourteenth
Amendment rights and for state-law claims, such as
assault, battery, intentional infliction of emotional distress,
and negligence. At this time, the court considers
defendants' motions for summary judgment pursuant to
Rule 56 of the Federal Rules of Civil Procedure. For the
reasons set forth below, defendants' motions are granted in
part and denied in part.

BACKGROUND

Unless otherwise noted, the parties do not contest the
following facts. On the afternoon July 2, 2002, plaintiff
witnessed a shooting, which resulted in the death of the
victim, on Rutland Road and 94th Street in Kings County,
New York. Ptf. 56.1 Stmt. ¶¶ 1-2. Plaintiff was riding a
yellow and black motorcycle at the time of the shooting.
Id. ¶ 3. After observing the shooting, plaintiff took a closer
look at the victim to figure out if he knew him. Id. ¶ 4.
After realizing that he did not know the victim, plaintiff
drove his motorcycle to the corner of 94th Street and
parked it. Id. ¶¶ 5, 8. Plaintiff remained on the scene,
talking to his friend John about the incident. Id. ¶ 10.

Police arrived on the scene and began securing the
area by taping around its perimeter, where plaintiff was
located. Id. ¶¶ 11-14. Plaintiff attempted to leave the
scene, but an unidentified police officer told him he could
not leave the taped-off area. Id. ¶ 13. Plaintiff explained
that he had to leave to make his 3:00pm shift as a New
York City Transit Authority employee. Id. ¶ 15. Plaintiff
provided his name to the police officer and was permitted
to leave the scene. Id. ¶¶ 19-21. He then drove away from
the scene down Rutland Road. Id. ¶ 24. According to
defendants, at some point, a description of the perpetrator
was transmitted over the radio to police officers. Def.
Barrett 56.1 Stmt. ¶¶ 44-45. The perpetrator was described
as an African-American male who was driving a yellow
and black motorcycle. Id. ¶ 46.

Defendant Barrett and his partner, Detective Patrick
Rafferty, were driving in the vicinity of the crime scene at
this time and received the radio transmission describing
the perpetrator. Id. ¶ 44. They observed plaintiff, who
apparently matched the description of the perpetrator,
driving on his motorcycle from the crime scene and started
following him. Id. ¶¶ 49, 52. Plaintiff took a left on
Remsen Avenue, and the detectives continued to follow
him. Ptf. 56.1 Stmt. ¶ 26. He then stopped at a red traffic
light at the intersection of Remsen Avenue and Winthrop
Street. Id.

According to plaintiff, he was stopped at the light for

Not Reported in F.Supp.2d, 2005 WL 3591719 (E.D.N.Y.)

(Cite as: 2005 WL 3591719 (E.D.N.Y.))

about a minute when a car hit his motorcycle from behind and threw him from the vehicle to the ground. *Id.* ¶¶ 30-32. It is undisputed that the New York City Police Department has a written policy prohibiting officers from using the tactic of "ramming" other vehicles in an attempt to stop those vehicles. *See* Ptf. Ex. I; Def. New York City 56.1 Stmt. ¶ 113. Plaintiff claims that two white male officers and two black male officers surrounded him with guns in his face and then threw him on the car, handcuffed him, and searched his person. Ptf. 56.1 Stmt. ¶¶ 33-34. Plaintiff further claims that he broke his right hand as a result of defendants' conduct. *Id.* ¶¶ 71, 75, 80. An independent witness, Dave Campbell, corroborated plaintiff's story in interviews with the Civilian Complaint Review Board during its investigation of this incident. *See* Ptf. Ex. C at 6.

**\*2** Defendants, on the other hand, claim that Defendant Barrett stopped his car behind the motorcycle and observed Detective Rafferty exit the passenger side of their vehicle and approach the right side of plaintiff's motorcycle. Def. Barrett 56.1 Stmt. ¶¶ 62-63. Defendant Barrett further observed Detective Rafferty grab plaintiff's right hand and remove it from the motorcycle throttle. *Id.* ¶ 64. At this time, Defendant Barrett parked his vehicle and then approached plaintiff's motorcycle from the left side, where he helped Detective Rafferty remove plaintiff from the motorcycle. *Id.* ¶¶ 65-68. Meanwhile, two deputy sheriffs arrived on the scene and parked their car in front of the motorcycle. *Id.* ¶¶ 72-73. Defendants claim that, though the motorcycle fell to the ground, plaintiff never fell on the ground. *Id.* ¶ 85. Defendants also maintain that plaintiff never complained about any injuries and there was no damage to the rear of plaintiff's motorcycle. *Id.* ¶¶ 86, 105.

Thereafter, plaintiff was detained at the Remsen Avenue location until a witness identified plaintiff as being at the scene of the earlier murder. *Id.* ¶ 106. According to plaintiff, he and his friends who joined him at the Remsen Avenue location explained to the police that he was not involved in the murder. Ptf. 56.1 Stmt. ¶ 43. Detectives Barrett and Rafferty directed Officers Lynah and Mason to transport plaintiff to the 67th Precinct. Def. Barrett 56.1 Stmt. ¶ 107-08. There, he was placed in an interview room, where he was questioned by Detectives

Hardman and O'Brien. *Id.* ¶ 120. According to plaintiff, he was in the room for approximately seven hours. Ptf. 56.1 Stmt. ¶¶ 60-61. He subsequently was released, and he was given a letter for his employer explaining that he missed his shift because he was aiding the police in an investigation. Def. Barrett 56.1 Stmt. ¶ 130.

Plaintiff, who is represented by counsel, filed his initial complaint on March 17, 2003. On April 29, 2004, plaintiff filed an amended complaint. Discovery was completed on April 15, 2005. *See* Order dated February 28, 2005. Defendant New York City moved for summary judgment on August 10, 2005. Defendant Barrett moved for summary judgment on August 11, 2005.

DISCUSSION

A. *Standard for Summary Judgment*

Under Rule 56, summary judgment is proper if the pleadings, depositions, answers, interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Proc.56(c). An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to the outcome of the litigation if application of the relevant substantive law requires their determination. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). The moving party has the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate [s] the absence of a genuine issue of material fact." *Celotex Corp. v. Cartrett,* 477 U.S. 317, 323 (1986). The substantive law determines the facts that are material to the outcome of a particular litigation. *See Anderson,* 477 U.S. at 250; *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975). In determining whether summary judgment is appropriate, a court must resolve all ambiguities, and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986) (*citing United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)).

**\*3** If the moving party meets its burden, the burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3591719 (E.D.N.Y.)

(Cite as: 2005 WL 3591719 (E.D.N.Y.))

trial." Fed. R. Civ. Proc. 56(e). The non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." _Matsushita, 475 U .S. at 586._ "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." _Anderson, 477 U.S. at 247-48._ Only when it is apparent that no rational finder of fact "could find in favor of the non-moving party because the evidence to support its case is so slight" should summary judgment be granted. _Gallo v. Prudential Residential Servs. Ltd. Partnership,_ 22 F.2d 1219, 1223 (2d Cir.1994).

B. _Claims Against Defendant Barrett_

1. _Section 1983_ Claims

i) _Excessive Force_

Barrett argues that plaintiff's excessive force claims under § 1983 should be dismissed because plaintiff's initial stop and detention was based on reasonable suspicion and any force used in detaining plaintiff was _de minimus_ and, therefore, objectively reasonable. The Fourth Amendment protects against unreasonable seizures. _See Graham v. Connor,_ 490 U.S. 386, 395 (1989). "[T]he 'reasonableness' of a particular seizure depends not only on _when_ it is made, but also on _how_ it is carried out." _Id._ (emphasis in original) (quoting _Tennessee v. Garner,_ 471 U.S. 1, 7-8 (1985)). Thus, a plaintiff can "prevail on his excessive force claim if he is able to show that [the defendant officer] used more force than was necessary to subdue him." _Curry v. City of Syracuse,_ 316 F.3d 324, 332 (2d Cir.2003). The officer's actions, however, "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." _Graham,_ 490 U.S. at 396. Determining whether a particular seizure is reasonable is a fact-intensive process, which "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." _Id._ (internal quotation marks and citations omitted). More specifically, such an inquiry requires the factfinder to apply "careful attention

to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." _Id._ Given the need for such a fact-intensive inquiry, "granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." _Amnesty America,_ 361 F.3d at 123.

**\*4** The court concludes that summary judgment is not appropriate with regard to plaintiff's excessive force claim because there is clearly a genuine issue of material fact as to whether Barrett used his vehicle to strike plaintiff's motorcycle. It is undisputed that on the afternoon of July 2, 2002, Barrett and Detective Rafferty stopped plaintiff at a red traffic light on Remsen Avenue, handcuffed him, placed him in the back of a patrol car, and sent him to the 67th Precinct to be questioned about a murder that he witnessed. Plaintiff contends that Barrett "rammed" his vehicle into plaintiff's stopped motorcycle, throwing plaintiff off the motorcycle on to the ground. Ptf. 56.1 Stmt. ¶¶ 30-34. Plaintiff supports his allegation with his own deposition testimony, _see_ Hill Dep. at 48-49, and the CCRB report,[FN1] which substantiated plaintiff's claim of that Barrett improperly used his vehicle "to hit [plaintiff] off his motorcycle thereby injuring him." _See_ Ptf. Ex. C at 21. In addition to concluding that plaintiff was a credible witness, CCRB relied on photographs of plaintiff's motorcycle after the incident, documentation of plaintiff's injuries, and the testimony of various witnesses, including an independent eyewitness who corroborated plaintiff's story. _Id._ Barrett contests plaintiff's version of events, claiming that he did not use his vehicle to hit plaintiff's motorcycle. _See_ Barrett Dep. at 46. Barrett contends that he stopped his vehicle behind plaintiff's motorcycle and then aided Detective Rafferty in removing plaintiff from his motorcycle. _Id._ at 46-50. The testimony of other officers on the scene supports Barrett's claim that he did not hit his vehicle into plaintiff's motorcycle. _See_ Alves Dep. at 47; Williams Dep. at 36-37.[FN2]

FN1. In his reply memorandum of law, Barrett argues that the CCRB report is inadmissible

Not Reported in F.Supp.2d, 2005 WL 3591719 (E.D.N.Y.)

(Cite as: 2005 WL 3591719 (E.D.N.Y.))

hearsay. The court disagrees. The CCRB report fits within Rule 803(8)(C) of the Federal Rules of Evidence, which provides that "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth factual findings resulting from an investigation made pursuant to authority granted by law" are admissible in civil proceedings, "unless the sources of information or other circumstances indicate lack of trustworthiness." The CCRB report clearly represents the factual findings of the investigation of plaintiff's complaint. Barrett simply asserts that the CCRB report is hearsay, but he fails to provide any evidence indicating that the sources of the report lack trustworthiness. Thus, the court concludes that the CCRB report is admissible as a public record pursuant to Rule 803(8)(C) of the Federal Rules of Evidence.

FN2. In an effort to attack plaintiff's credibility, defendant Barrett also cites evidence that plaintiff did not complain about his injuries and did not seek medical attention immediately. Def. Barrett 56.1 Stmt. ¶¶ 105, 113, 140, 144. In addition, he notes that plaintiff was involved in another physical altercation around the same time of this incident and, thus, could have sustained injuries as a result of that incident. *Id.* 141-43. If anything, these facts only reinforce the court's conclusion that there is a genuine issue of material fact for a jury to decide.

Viewing the evidence in the light most favorable to plaintiff and drawing all reasonable inferences in his favor, the court is not able to conclude that no rational factfinder could find that Barrett used excessive force. The deposition testimony of plaintiff and the CCRB report give rise to a genuine issue of material fact as to Barrett's conduct, and the court must therefore deny Barrett's motion for summary judgment on the excessive force claim.

ii) *Qualified Immunity*

Barrett also argues that he should be entitled to

qualified immunity because he reasonably believed that he had the requisite legal justification to stop and detain plaintiff and that he could use reasonable force to detain plaintiff. Where a defendant claims qualified immunity and moves for summary judgment on this ground, the court engages in a two-step analysis. *Saucier v. Katz,* 533 U .S. 194, 201 (2001). The initial inquiry is whether, viewed in the light most favorable to the injured party, the facts alleged demonstrate that the officer's conduct violated a constitutional right. *Id.* If the alleged facts fail to establish a constitutional violation, the inquiry ends. If, however, "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* If a right has not been clearly established, then an official, acting unconstitutionally, is not on notice that his conduct is unlawful. *Id.* at 202. In the absence of such notice, summary judgment based on qualified immunity is appropriate. *Id.*

**\*5** Viewed in the light most favorable to the plaintiff, the facts alleged indicate that defendant Barrett used excessive force and thus violated the Fourth Amendment. The court, therefore, proceeds to the second step of the *Saucier* analysis and asks whether this violated right was clearly established. There can be no doubt that the right to be free from excessive use of force was clearly established at the time of the incident. *See, e.g., Graham,* 490 U.S. at 395. It "would have been clear to a reasonable officer" that it was unlawful to use his vehicle to hit a stopped motorcycle, thereby throwing its driver to the ground. *See Saucier,* 533 U.S. at 202. Consequently, defendant Barrett does not have qualified immunity with regard to his alleged use of excessive force against plaintiff.

iii) *Failure to Intercede*

Barrett also argues that plaintiff's failure to intercede claim should fail as a matter of law because it is relates to the alleged violation of plaintiff's rights by Barrett himself. The court agrees. The Second Circuit has held that "[a] law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988). The duty to intercede has been invoked in cases where, as here, law enforcement officers are accused of using excessive

Not Reported in F.Supp.2d, 2005 WL 3591719 (E.D.N.Y.)

(Cite as: 2005 WL 3591719 (E.D.N.Y.))

force. *See id.* (collecting cases). This duty, however, is premised on the theory that the defendant officer did nothing to prevent the unlawful use of excessive force by other officers. *See id.* at 12 (upholding jury verdict finding defendant liable for excessive force because he did nothing to prevent a fellow officer from dragging the perpetrator across the floor after watching him be beaten by another officer). Here, plaintiff's failure to intercede claim against Barrett is meritless because the only underlying constitutional violations alleged are claims against Barrett himself-namely, the excessive force, fabrication, and false statement claims. The court therefore dismisses plaintiff's § 1983 claim alleging that Barrett failed to intercede.

iv) *Conspiracy*

Barrett also contends that there is no evidence supporting plaintiff's conspiracy claim under § 1983. To establish a § 1983 conspiracy, a plaintiff must demonstrate that there is (1) an agreement between state actors or between a state actor and a private entity; (2) to act in concert to cause an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages. *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999). The Second Circuit has also recognized that " 'conspiracies are by their very nature secretive operations,' and may have to be proven by circumstantial, rather than direct, evidence." ' *Id.* at 72 (quoting *Rounseville v. Zahl,* 13 F.3d 625, 632 (2d Cir.1994)).

Here, plaintiff's complaint alleges that defendants Barrett and Does "conspired together and maliciously and willfully entered into a scheme to deprive plaintiff to his rights, well-being[,] and to commit the above-alleged unlawful acts." Amended Compl. ¶ 70. Plaintiff supports his allegation with his own deposition testimony and the CCRB report, which show that Barrett used his vehicle to hit plaintiff's stopped motorcycle, causing plaintiff to fall off the motorcycle and sustain injuries. *See* Hill Dep. at 48-49; Ptf. Ex. C at 21. This evidence directly contradicts the testimony of Barrett and the deputy sheriffs, Alves and Williams. While plaintiff has not established with direct evidence that Barrett and the deputy sheriffs had an agreement to conspire to falsify their testimony, the circumstantial evidence-in the light most favorable to plaintiff-does suggest that there was an agreement between state actors to falsify testimony and cover-up an

unconstitutional use of excessive force. Given that a jury may rationally infer that the defendant officers participated in a conspiracy to cover-up unconstitutional acts, summary judgment is not appropriate on plaintiff's conspiracy claim. *See Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 131 (2d Cir.1997) (denying summary judgment based on circumstantial evidence supporting claim that defendant officers engaged in conspiracy to maliciously prosecute plaintiffs).

**\*6** Barrett also argues that plaintiff's conspiracy claim is barred by the intracorporate conspiracy doctrine. Under this doctrine, "there is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation, acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." *Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978). "This is particularly so where the officers and employees are alleged to be acting within the scope of their employment." *Rini v. Zwirn,* 886 F.Supp. 270, 291 (E.D.N.Y.1995). Although the Second Circuit has recognized the intracorporate conspiracy doctrine in the context of 42 U.S.C. § 1985, *see Herrmann,* 576 F.2d at 459; *Girard v. 94th and Fifth Avenue Corp.,* 530 F.2d 66, 72 (2d Cir.1976), a review of relevant case law suggests that it has not extended its application of the doctrine to conspiracy claims under § 1983. At least one district court in this circuit has applied the doctrine to bar a § 1983 conspiracy claim. *See Nassau County Employee "L" v. County of Nassau,* F.Supp.2d 293, 304 (E.D.N.Y.2004). Courts in other circuits have also barred conspiracy claims under § 1983 in reliance on the intracorporate conspiracy doctrine. *See, e.g., Buschi v. Kirven,* 775 F.2d 1240, 1252-53 (4th Cir.1985); *Veney v. Ojeda,* 321 F.Supp.2d (E.D.Va.2004). The court, however, need not determine whether the doctrine applies to § 1983 conspiracy claims in the instant case because plaintiff's claim fits within an exception to the rule.

Under the "personal stake" exception, the intracorporate conspiracy doctrine does not apply "to individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity." *Bond v. Bd. of Educ. of the City of New York,* No. 97-1337, 1999 WL 151702, at \*2 (E.D.N.Y. Mar. 17, 1999). For the exception to apply, "[s]imply joining

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3591719 (E.D.N.Y.)

(Cite as: 2005 WL 3591719 (E.D.N.Y.))

corporate officers as defendants in their individual capacities is not enough to make them persons separate from the corporation in legal contemplation." *Girard,* 530 F.2d at 72 (internal quotation marks and citation omitted). Rather, "[t]he plaintiff must also allege that they acted other than in the normal course of their corporate duties." *Id.* (internal quotation marks and citation omitted). Here, plaintiff clearly alleges that defendant Barrett acted in his own personal interest, not in the interest of the police department or the city, by conspiring with others to cover-up his alleged use of excessive force. Given that plaintiff has alleged that Barrett conspired based on a personal stake, the intracorporate conspiracy doctrine is inapplicable to the instant case. Consequently, the court denies summary judgment on plaintiff's conspiracy claim.[FN3]

> FN3. In his motion for summary judgment, defendant Barrett does not seek to dismiss plaintiff's remaining § 1983 claims for fabrication and falsifying statements (claims two and three). Thus, the court concludes that those claims stand.

2. *State Law Claims*

Given that the court has not dismissed plaintiff's § 1983 claims against defendant Barrett, the court maintains original jurisdiction over this action and must exercise supplemental jurisdiction over the related state law claims. *See* 28 U.S.C. § 1367(a) (2005). Barrett, however, argues that two state law claims-intentional infliction of emotional distress and prima facie tort-fail as a matter of law and must be dismissed.

i) *Intentional Infliction of Emotional Distress (IIED)*

**\*7** Barrett argues that plaintiff has failed to satisfy the elements of an IIED claim. Under New York law, a plaintiff must satisfy four elements to establish a claim of IIED: (1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress. *See Howell v. New York Post Co.,* 81 N.Y.2d 115, 121 (1993). The New York Court of Appeals has emphasized, however, that "[l]iability has been found only where the conduct has been so outrageous in

character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 122 (internal quotation marks and citations omitted). The Court of Appeals has also strongly cautioned against claiming IIED where other tort remedies are available. *See Fischer v. Maloney,* 43 N.Y.2d 553, 558 (1978). Accordingly, "[n]o intentional infliction of emotional distress claim will lie where the conduct underlying the claim falls within the ambit of traditional tort liability." *Hansel v. Sheridan,* 991 F.Supp. 69, 75 (N.D.N.Y.1998).

Barrett argues that his conduct does not constitute the "extreme and outrageous conduct" New York requires for this tort. In response, plaintiff maintains that Barrett's alleged "ramming" of plaintiff's motorcycle with his own vehicle is sufficiently outrageous to establish an IIED claim. In the instant case, the alleged conduct is entirely encompassed in plaintiff's traditional tort claims for assault and battery. Thus, plaintiff's claim for intentional infliction of emotional distress must be dismissed. *See Moore v. City of New York,* 219 F.Supp.2d 335, 339 (E.D.N .Y.2002).

ii) *Prima Facie Tort*

Barrett also argues that plaintiff has failed to satisfy the requisite elements of a cause of action for prima facie tort. Under New York law, "[p]rima facie tort affords a remedy for the infliction of intentional harm, resulting in damage, without excuse or justification, by an act or series of acts which would otherwise be lawful." *Freihofer v. Hearst Corp.,* 65 N.Y.2d 135, 142 (1985) (internal quotation marks and citations omitted). To establish a claim for prima facie tort, a plaintiff must show (1) the intentional infliction of harm; (2) which results in special damages; (3) without any excuse or justification; (4) by an act or series of acts which would otherwise be lawful. *Id.* at 142-43. The New York Court of Appeals has noted that prima facie tort is not a "catch-all alternative for every cause of action which cannot stand on its own legs." *Id.* at 143 (internal quotation marks and citations omitted). While a party is not foreclosed from pleading prima facie tort as an alternative where a traditional tort remedy exists, "once a traditional tort has been established the allegation with respect to prima facie tort will be rendered

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3591719 (E.D.N.Y.)

(Cite as: 2005 WL 3591719 (E.D.N.Y.))

academic." *Bd. of Educ. v. Farmingdale Classroom Teachers Ass'n,* 38 N.Y.2d 397, 406 (1975); *see also Freihofer,* 65 N .Y.2d at 143. Moreover, the Court of Appeals has stressed that "[a] critical element of the cause of action is that plaintiff suffered a specific and measurable loss, which requires an allegation of special damages." *Id.*

*8 Barrett argues that the prima facie tort claim must be dismissed because plaintiff failed to allege special damages. The court need not reach the issue of special damages because plaintiff has failed to establish that the act or series of acts alleged would otherwise be lawful. *See Chen v. United States,* 854 F.2d 622, 629 (2d Cir.1988) (dismissing prima facie tort claim because acts of racial harassment and violations of federal procurement regulations fail to "constitute[ ] conduct that is otherwise lawful"). The court cannot conclude that Barrett's alleged use of excessive force and participation in a conspiracy to cover-up his unconstitutional conduct constitute lawful conduct. Moreover, assuming plaintiff is pleading prima facie tort in the alternative, it would also fail if a jury were to accept Barrett's version of events. Barrett claims that he did not use his vehicle to hit plaintiff's motorcycle nor did he in any way injure plaintiff or conspire to cover-up his acts. He also claims that he stopped and detained plaintiff based on reasonable suspicion, and plaintiff was subsequently questioned as a witness not as a suspect. Thus, were a jury to believe Barrett, plaintiff would not have a viable claim for prima facie tort because he failed to establish either intentional infliction of harm or lack of justification for Barrett's actions. The court therefore concludes that plaintiff's prima facie tort claim fails as a matter of law and must be dismissed.

**C.** *Claims Against Defendant New York City*

**1.** *Section 1983 Claims*

New York City argues that plaintiff's § 1983 claims should be dismissed because plaintiff has failed to demonstrate that a municipal policy caused the alleged constitutional violations. Section 1983 provides a cause of action against any person who, under color of state law, violates rights or privileges established under the Constitution or law of the United States. A local government is considered a "person" for § 1983 purposes

and, therefore, can be sued under the statute. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (197). In *Monell,* however, the Supreme Court established that municipal liability under § 1983 only applies when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690; *see also Coon v. Town of Springfield,* 404 F.3d 683, 686 (2d Cir.2005). Thus, the plaintiff must establish (1) the existence of some municipal policy or custom and (2) "a causal connection-an 'affirmative link'-between the policy and the deprivation of his constitutional rights." *Vippolis v. Village of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985) (citation omitted).

**i)** *Failure to Train*

In his amended complaint, plaintiff alleges that New York City should be held liable under § 1983 due to its failure to train police officers who have engaged in excessive and unjustified use of force. The Supreme Court has held that a municipality may be held liable for failure to train its employees where it acts with " 'deliberate indifference' to the rights of persons with whom the police come into contact." *City of Canton v. Harris,* 489 U.S. 378, 388 (1989). To establish deliberate indifference, "plaintiffs [must] identify a specific deficiency in the city's training program and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 129 (2d. Cir.2004) (quoting *Canton,* 489 U.S. at 390-91). Such proof is necessary to ensure that " 'the officer's shortcomings ... resulted from ... a faulty training program' rather than from the negligent administration of a sound program or other unrelated circumstances." *Id.* (quoting *Canton,* 489 U.S. at 390-91).

*9 Here, plaintiff provides no evidence of a specific deficiency in New York City's training program, nor has he offered any evidence establishing the close relationship between the deficient program and the injury at issue. The court therefore dismisses plaintiff's § 1983 claim concerning New York City's alleged failure to properly train its employees.

**ii)** *Failure to Supervise*

Not Reported in F.Supp.2d, 2005 WL 3591719 (E.D.N.Y.)

(Cite as: 2005 WL 3591719 (E.D.N.Y.))

In his amended complaint, plaintiff also argues that New York City failed to properly supervise its police officers. A failure to supervise claim need not rely on an explicitly stated municipal policy or regulation. *See Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir.1995). Rather, to survive summary judgment, a plaintiff must establish that "a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was 'obvious,' and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction." *Amnesty America,* 361 F.3d at 128 (quoting *Vann,* 72 F.3d at 1049). "[D]eliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Vann,* 72 F.3d at 1049. Alternatively, deliberate indifference may be proven by "expert testimony that a practice condoned by the defendant municipality was 'contrary to the practice of most police departments' and was 'particularly dangerous' because it presented an unusually high risk that constitutional rights would be violated." *Id.*

Here, plaintiff merely offers generalized statistics related to police misconduct complaints made to the CCRB several years prior to the incident at issue. *See* Amended Compl. ¶¶ 49-51. These statistics suggest that excessive force allegations comprise a substantial portion of total civilian complaints of police misconduct. *See id.* ¶ 49. Plaintiff also cites statistics indicating that CCRB conducts "full investigations" on less than half of the complaints received and that the police department disciplines a small percentage of officers. *See id.* ¶¶ 50-51. Plaintiff argues that these numbers demonstrate that New York City has been on notice that police officers, including defendants Barrett and Does, "were disproportionately involved in police misconduct and abuse, particularly involving excessive force and brutality," and that New York City has failed to remedy the situation. *See id.* ¶ 53.

Even assuming *arguendo* that these statistics are accurate, plaintiff has failed to demonstrate that New York City has acted with deliberate indifference. At most, plaintiff's evidence demonstrates that New York City was

on notice that there were a substantial number of complaints about police officers' use of excessive force against civilians. Plaintiff, however, does not offer any evidence establishing that New York City failed to follow up on the credible claims of excessive force or failed to discipline police officers who actually used excessive force against civilians. Plaintiff can not establish that New York City was deliberately indifferent to claims of excessive force by simply noting that the percentage of "fully investigated" CCRB complaints or disciplinary actions is small. Without an understanding of the types of complaints the CCRB "fully investigated," the disposition of the remaining complaints, or the categories of police misconduct that warranted discipline, plaintiff's statistics are meaningless to the issue of the whether New York City acted with deliberate indifference. Consequently, the court must dismiss plaintiff's § 1983 claim alleging that New York City failed to adequately supervise its employees.

iii) *Failure to Discipline*

**\*10** Plaintiff's claim that New York City failed to discipline officers for using excessive force should also be dismissed as a matter of law. As the CCRB report dated August 18, 2003 indicates, New York City did indeed pursue an investigation of defendant Barrett and the other officers involved in the incident at issue. *See* Ptf. Ex. I. Moreover, the CCRB investigator concluded that the allegation that Barrett employed excessive force was substantiated and that another allegation against an unknown officer should be further investigated. *Id.* at 22. At his deposition on April 5, 2005, Barrett testified that his case was still pending before the police disciplinary committee. Barrett Dep. at 94-95. Even assuming that the almost two-year delay between the issuance of the CCRB report and any disciplinary action demonstrates a failure to discipline, such a claim suggests, at most, negligent administration or one isolated incident of bureaucratic inaction. "[M]ere negligence or bureaucratic inaction" does not rise to the level of an actionable violation. *See Amnesty America,* 361 F .3d at 128. Plaintiffs must raise an inference that the municipality or its policymakers actually condoned such conduct and that the system is "so deficient as to reflect a policy of deliberate indifference to the civil rights of the citizenry." *See Sarus v. Rotundo,* 831 F.2d 397, 401-02 (2d Cir.1987). Plaintiff has failed to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3591719 (E.D.N.Y.)

(Cite as: 2005 WL 3591719 (E.D.N.Y.))

raise such an inference and, therefore, the court dismisses the § 1983 claim alleging that New York City failed to discipline defendants Barrett and Does.[FN4]

> FN4. Plaintiff also alleges that New York City has a policy or practice in place "wherein police officers regularly cover-up police use of excessive and unjustified force by telling false and incomplete stories." Amended Compl. ¶ 47. Plaintiff has failed to support his "code of silence" theory of § 1983 with any evidence, aside from the allegation that Barrett made false statements regarding the incident at issue. Even if the allegation is substantiated, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823-24 (1985). Therefore, the court also dismisses plaintiff's § 1983 claim under the "code of silence" theory.

2. *State Law Claims*

i) *Defective Notice of Claim*

New York City argues that plaintiff's state law claims against the city fail as a matter of law because plaintiff failed to comply with the state's notice of claim requirements. As a general rule, "in a federal court, state notice-of-claim statutes apply to state-law claims." *Hardy v. New York City Health & Hosp. Corp.,* 164 F.3d 789 (2d Cir.1999). Under New York law, a notice of claim is a "condition precedent" to bringing a tort claim against a municipality or any of its officers, agents, or employees. *See* N .Y. Gen. Mun. §§ 50-i(1)(a); 50-e(1)(a). The purpose of the notice of claim requirement is to afford the municipality "an adequate opportunity to investigate the circumstances surrounding the accident and to explore the merits of the claim while information is still readily available." *Teresta v. City of New York,* 304 N.Y. 440, 443 (1952). A plaintiff must serve the notice of claim within ninety days after the claim arises. *See id.* § 50-e(1)(a). In addition, the notice must specify (1) the name and address of each claimant and his or her attorney;

(2) the nature of the claim; (3) the time and the place of the incident; and (4) the injuries or damages claimed. *See id.* § 50-e(2). Notice of claim requirements are generally strictly construed, and failure to comply with the requirements typically results in dismissal due to failure to state a cause of action. *Hardy,* 164 F.3d at 793-94. To determine whether a notice of claim is sufficient, the proper inquiry is "whether it includes information sufficient to enable the city to investigate." *Brown v. City of New York,* 95 N.Y.2d 389, 393 (2000) (citations and internal quotation marks omitted). More specifically, the inquiry focuses on "whether based on the claimant's description municipal authorities can locate the place, fix the time[,] and understand the nature of the accident." *Id.*

**\*11** Here, plaintiff timely served a notice of claim upon New York City. *See* Def. New York City Ex. K. However, New York City argues that the notice of claim fails to fully specify the nature of plaintiff's claim or identify the place of the incident. In his notice of claim, plaintiff states he "was struck from the rear by a vehicle owned and operated by the City" and "was thrown from his motorcycle and received injuries." *Id.* at 1. Plaintiff fails to specify the location of the accident or the fact that he is bringing a negligent hiring and supervision claim. *Id.* New York City correctly notes that such deficiencies are typically fatal to claims against the city. *See Fincher v. County of Westchester,* 979 F.Supp. 989, 1003 (S.D.N.Y.1997) (collecting state cases). However, New York's notice of claim statute also permits the court to disregard such defects if they were made in good faith and did not prejudice the city. *See* N.Y. Gen. Mun. § 50-e(6). Here, New York City alleges that plaintiff's notice of claim was defective, but fails to put forth any facts establishing that it was prejudiced by the defect. Moreover, there is no showing that the defect was made in bad faith. Consequently, the court exercises its discretion pursuant to N.Y. Gen. Mun. § 50-e(6) to disregard the defect. *See Malcom v. City of New York,* 770 N.Y.S.2d 79, 80 (2d Dep't 2003) (disregarding defect in notice of claim, which failed to allege location of arrest, because no actual prejudice was demonstrated nor was there a showing of bad faith). Plaintiff's state law claims against New York City are, therefore, properly before the court.

ii) *Negligent Hiring and Supervision*

Not Reported in F.Supp.2d, 2005 WL 3591719 (E.D.N.Y.)

(Cite as: 2005 WL 3591719 (E.D.N.Y.))

New York City argues that summary judgment is appropriate with regard to plaintiff's negligent hiring and supervision claim because such a claim cannot be sustained when an employee is acting within the scope of his employment. "A claim for negligent hiring or supervision can only proceed against an employer for an employee acting outside the scope of her employment." *Colodney v. Continuum Health Partners, Inc.,* No. 03 Civ. 7276, 2004 WL 829158, at *8 (S.D.N.Y. Apr. 15, 2004). Where an employee acts within the scope of his or her employment, the employer generally is held liable for all the employees' torts under the doctrine of respondeat superior. *See Niles v. Palmer,* No. 97 Civ. 7573, 1999 WL 1419042, at *14 n. 6 (S.D.N.Y. Oct. 26, 1999). Accordingly, under the theory of respondeat superior, an employer is liable for any damages caused by an employee's negligence, and "no claim may proceed against the employer for negligent hiring or retention." *Karoon v. New York City Transit Auth.,* 659 N.Y.S.2d 27, 29 (1st Dep't 1997).

Here, New York City concedes that defendant Barrett was acting within the scope of his employment as an officer with the New York City Police Department. *See* Def. New York City Memorandum of Law at 19-20.[FN5] Accordingly, plaintiff's negligent hiring and supervision claim must be dismissed as a matter of law.

> FN5. New York City states that "plaintiff himself is asserting that Detective Barrett was acting as a police officer and in the scope of his duties as a police officer to investigate crimes. Thus, plaintiff cannot claim that Detective Barrett was not acting in the scope of his employment on July 2, 2002." Def. New York City Memorandum of Law at 20. Given that defendant New York City is arguing that there is no triable issue of fact regarding whether defendant Barrett was acting within the scope of his employment on the date at issue, the court infers that defendant New York City claims that defendant Barrett was acting within the scope of his employment.

iii) *Respondeat Superior*

**\*12** Finally, New York City argues that the court should decline to exercise supplemental jurisdiction over the respondeat superior claim because all the federal claims against the city have been dismissed. Under the Federal Rules of Civil Procedure, the court "may decline to exercise supplemental jurisdiction ... if the [ ] court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). Although the court has dismissed all federal claims against New York City, the respondeat superior claim against the city is directly related to the state law claims against defendant Barrett. In the interests of judicial economy, the court exercises its discretion to retain jurisdiction over plaintiff's remaining state law claim against New York City.

CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment are granted in part and denied in part. The court denies defendant Barrett's motion for summary judgment for plaintiff's excessive force and conspiracy claims under § 1983 and grants summary judgment on the failure to intercede, intentional infliction of emotional distress, and prima facie tort claims. The court denies defendant New York City's motion for summary judgment for plaintiff's respondeat superior claim, but grants summary judgment on plaintiff's § 1983 and negligent supervision and training claims against the city.

SO ORDERED.

E.D.N.Y.,2005.

Hill v. City of New York
Not Reported in F.Supp.2d, 2005 WL 3591719 (E.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2000 WL 297197 (S.D.N.Y.)
(Cite as: 2000 WL 297197 (S.D.N.Y.))

**H**
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
ELMA RT and NAGYKOROS CANNING FACTORY
RT, Plaintiffs,
v.
LANDESMANN INTERNATIONAL MARKETING
CORPORATION, Landesmann International Marketing
Services GmbH, Mark Landesmann, individually, and
Tamas Batizi, individually, Defendants.
**No. 98 CIV. 3662 LMM.**

March 22, 2000.

MEMORANDUM AND ORDER

MCKENNA, D.J.

*1 Plaintiffs Elma RT ("Elma") and Nagykoros Canning Factory RT ("Nagykoros"), both Hungarian companies, brought this suit against defendants Landesmann International Marketing Corporation ("LIMC"), Mark Landesmann ("Landesmann"), Landesmann International Marketing Services GmbH ("LIMS") and Tamas Batizi ("Batizi"), based on contracts for the sale of apple juice concentrate by plaintiffs to defendants. LIMC is a Delaware corporation with its principal place of business in New York, and Landesmann is LIMC's sole owner and CEO. LIMS is an Austrian corporation with a place of business in the United States, and Batizi is LIMS's managing director. The citizenship of Landesmann and Batizi is not specifically alleged, but the former is alleged to have been born in Austria but to reside in the United States, while the latter is alleged to be located in Austria.

Plaintiffs assert both federal question and diversity subject matter jurisdiction. Federal question subject matter jurisdiction is supplied by a claim under the Racketeer and Corrupt Organizations Act ("RICO"). On the face of the amended complaint, however, diversity subject matter jurisdiction is not available, since both the plaintiffs are alien corporations and at least one of the defendants, LIMS, is an alien as well. *Lloyds Bank PLC v. Norkin,* 817 F.Supp. 414, 417 (S.D.N.Y.1993) (collecting cases).

In their amended complaint, plaintiffs allege that LIMC committed breach of contract, fraud, and conversion. Plaintiff Nagykoros also seeks consequential damages against LIMC. In addition, plaintiffs jointly claim that defendants violated RICO, 18 U.S.C. § 1962(c).

Defendants move to dismiss plaintiffs' amended complaint on three grounds. First, they argue it is actually a supplemental complaint, which was served without leave of the court, in violation of Fed.R.Civ.P. 15(d) ("Rule 15(d)"). Second, they claim the RICO and conversion counts fail to state a claim under Fed.R.Civ.P. 12(b)(6) ("Rule 12(b)(6)"). Finally, they argue that the RICO count fails to plead fraud with particularity under Fed.R.Civ.P. 9(b) ("Rule 9(b)"). For the reasons set forth below, the Court denies defendants' motion to dismiss the complaint under Rule 15(d), but grants the motion to dismiss the conversion and RICO claims under Rule 12(b)(6). Because the RICO count is dismissed, the Court need not address whether that claim is pleaded with sufficient particularity under Rule 9(b).

*I. Background*

A. Plaintiff Elma

The following background is based upon plaintiffs' amended complaint, which is based partially on information and belief.

On November 14, 1997, Landesmann entered into a contract with Elma whereby Elma agreed to provide LIMC with thirty containers (approximately six hundred tons) of apple juice concentrate. Landesmann agreed to pay fifty percent of the contract price upon dispatch, and the remaining fifty percent within thirty-five days of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 297197 (S.D.N.Y.)
(Cite as: 2000 WL 297197 (S.D.N.Y.))

Bill of Lading.

**\*2** Pursuant to the contract, Elma delivered thirty containers of concentrate to LIMC, which accepted them without objection. LIMC made the initial payment for one-half the total amount owed. However, LIMC made no further payments to Elma. Instead, on February 9, 1998 (approximately the day on which the remaining payments were due) Landesmann informed Elma that LIMC was rejecting all thirty containers on quality grounds. Landesmann further demanded replacement of the concentrate and immediate reimbursement for all payments already made by LIMC, including shipping costs.

In response, Elma directed LIMC not to dispose of the concentrate. In addition, Elma requested: 1) an independent laboratory be named for testing of the concentrate, with costs to be split equally between ELMA and LIMC; 2) proof that the concentrate was handled properly in transit and subsequent storage; and 3) that LIMC disclose the location of the concentrate.

Landesmann, however, agreed to permit inspection only under the following conditions: 1) LIMC retain the sole right to name any testing facility; 2) Elma bear sole responsibility for payment of the testing costs; 3) the testing facility be allowed to disclose the results only to LIMC; and 4) the identity and location of the inventory not be disclosed to Elma. Elma objected to these demands, but agreed to replace the concentrate. Landesmann notified Elma by letter that he would accept replacement only if it was tendered in the New York/New Jersey area, instead of in Hungary, the location specified in the contract. In addition, Landesmann demanded full reimbursement for all expenses and costs, including financing. Finally, he demanded that Elma arrange, test, and send a substantial portion of the replacement cargo within three business days of receiving Landesmann's letter. When Elma refused these demands, Landesmann resold the concentrate.

B. Plaintiff Nagykoros

The facts alleged by Nagykoros are similar to those alleged by Elma. In November of 1997, LIMC entered into three separate contracts with Nagykoros whereby Nagykoros agreed to provide LIMC with fifty containers of apple juice concentrate. Fifty percent of the contract price was to be paid after dispatch and transfer of possession, and the remaining fifty percent was to be paid within forty-five days after arrival. Pursuant to the agreement, Nagykoros delivered the fifty containers to LIMC, which received them without objection. LIMC then paid for one-half of the amount due on the first ten containers delivered. On February 4, 1998, however, Landesmann notified Nagykoros that LIMC was rejecting all fifty containers of concentrate on quality grounds.

Nagykoros directed Landesmann not to dispose of the concentrate, and informed him that, under Hungarian law, Nagykoros would suffer severe consequential damages if the contract was not fulfilled. Nagykoros also requested information to enable the stock of concentrate to be properly examined, suggested a neutral quality control agency for testing, and offered to pay for the testing if Landesmann's claim proved justified. Landesmann refused to permit inspection and testing of the apple juice concentrate unless: 1) the quality control agency be ordered that it was working on defendants' behalf; 2) Nagykoros prepay the control agency; and 3) the control agency keep the location of the inventory confidential.

**\*3** After weeks of inconclusive attempts between the parties to negotiate, Nagykoros informed Landesmann that if the parties did not reach a settlement of some kind, the Hungarian Ministry of Agriculture would fine Nagykoros approximately $150,000, and Nagykoros would possibly default on bank loans. Landesmann, however, proceeded to resell the concentrate.

*II. Discussion*

A. Rule 15(d)

Defendants argue that plaintiffs' amended complaint alleges events which occurred after the original complaint was filed, and therefore is actually a supplemental complaint which, to be filed, requires leave of the Court under Rule 15(d). While plaintiffs dispute that theirs is a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 297197 (S.D.N.Y.)
(Cite as: 2000 WL 297197 (S.D.N.Y.))

supplemental complaint, the Court need not decide which party is correct. Even assuming the complaint is properly labeled "supplemental," there is no compelling reason why this mislabeling should be fatal. Absent undue delay, bad faith, dilatory tactics, undue prejudice in being served with the proposed pleading, or futility, motions to serve a supplemental pleading will be freely granted. *See Forman v. Davis,* 371 U.S. 178, 182 (1962). The fact that a complaint is improperly labeled as "amended" instead of "supplemental" should not prevent the Court from considering the merits of the pleading. *See Sorel v. G & U, Inc.,* 103 F.R.D. 69, 73 (S.D.N.Y.1984). Thus, plaintiffs' motion to dismiss on this ground is denied.

B. Rule 12(b)(6) Standards

On a motion to dismiss under Rule 12(b)(6), a court must accept the truth of and draw all reasonable inferences from the well-pleaded factual allegations. *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993). The Court's task is to "assess the legal feasibility of the complaint [and] not ... assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980); *see also Riccuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 124 (2d Cir.1991). A complaint should only be dismissed "if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994)(quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

C. Conversion

Plaintiffs allege that defendants committed conversion by refusing to pay the balance due for the concentrate, not accepting replacement, not allowing return of the rejected concentrate, and proceeding to re-sell the concentrate without plaintiffs' consent. Defendants in turn move under Rule 12(b)(6) to dismiss plaintiffs' conversion claim, arguing that it merely reasserts their breach of contract claim. This motion is granted.

Conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to

the exclusion of the owner's rights. *Vigilant Ins. Co. of America v. Housing Auth. of El Paso, Texas,* 87 N.Y.2d 36, 44 (1995). Under New York law, it is well established that an action for conversion cannot be validly maintained where a plaintiff seeks damages merely for breach of contract. *See Fraser v. Doubleday & Co.,* 587 F.Supp. 1284, 1288 (S.D.N.Y.1984). To sustain a conversion claim, a plaintiff must allege acts that constitute unlawful or wrongful behavior separate from a violation of contractual rights. *See id.; see also In re Chateaugay Corp.,* 10 F.3d 944, 958 (2d Cir.1993) (holding that a tort claim will not arise where plaintiff is essentially seeking enforcement of the bargain); *New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 316 (1995) (holding that a defendant may be liable in tort where it breaches a duty of reasonable care distinct from its contractual obligations, and where it engages in tortious conduct separate and apart from its failure to fulfill its contractual obligations).

*4 To determine whether an action for conversion (or any other tort) exists in addition to an action for breach of contract, a court must first ask whether "the alleged obligation to do or not to do something that was breached could not have existed but for a manifested intent." W. Page Keeton, et al., *Prosser & Keeton on the Law of Torts* § 92 (5th ed.1984). In other words, the Court must determine whether defendants had a duty separate from any duties imposed by defendants' contractual obligations. If no such duty exists, then contract is the only theory upon which liability can rest. *Id.*

In the present case, defendants' duty to return the concentrate, accept replacement, and refrain from resale exists solely because of the contract between the parties. Outside the contract, there was no pre-existing obligation imposed by law which required defendants to honor plaintiffs' requests. This is apparent by the fact that if plaintiffs are successful on their breach of contract claim, they will be fully compensated for the balance due on the concentrate delivered to defendants, and therefore, no additional damages would be available to them under a theory of conversion.[FN1] *See Fraser,* 587 F.Supp. at 1288. Plaintiffs' argument that defendants' conduct amounted to conversion because it violated the Uniform Commercial Code ("U.C.C.") does not sway the Court otherwise. Indeed, this argument actually lends credence to the conclusion that any remedies they may be owed exist

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 297197 (S.D.N.Y.)
(Cite as: 2000 WL 297197 (S.D.N.Y.))

under a breach of contract claim alone, since the U.C.C. governs contract, not tort, disputes.

> FN1. Punitive damages may be awarded for conversion, but the defendants must allege that defendants acted with malice or reckless disregard of plaintiffs' rights. *See* *Ashare v. Mirkin, Barre, Saltzstein & Gordon,* 435 N.Y.S.2d 438, 441 (Sup.Ct.1980), *modified on appeal to delete punitive damages,* 441 N.Y.S.2d 408 (2d Dep't.1981), *aff'd,* 54 N.Y.2d 891 (1981). Plaintiffs have failed to allege malice or reckless disregard of their rights.

For the reasons stated above, plaintiffs' conversion claim is dismissed.

D. RICO

Plaintiffs also allege that defendants' conduct violated RICO. To state a claim for damages under 18 U.S.C. § 1962(c), a complaint must specifically allege:

(1) the existence of an enterprise which affects interstate or foreign commerce;

(2) that the defendants were "employed by" or "associated with" the enterprise;

(3) that the defendants participated in the conduct of the enterprise's affairs; and

(4) that the participation was through a pattern of racketeering activity.

> *Clifford v. Hughson,* 992 F.Supp. 661, 665 (S.D.N.Y.1998) (quoting *Town of West Hartford v. Operation Rescue,* 915 F.2d 92, 100 (2d Cir.1990)).

Defendants argue that plaintiffs have failed to properly allege the existence of an "enterprise." Additionally, defendants argue that the amended complaint fails to allege the predicate acts [FN2] and "continuity" needed to show a "pattern of racketeering activity." They therefore move to dismiss plaintiffs' RICO claim under Rule 12(b)(6). Since the Court finds that plaintiffs have failed to allege "continuity," the RICO claim is dismissed.

> FN2. The predicate acts alleged in this case are mail and wire fraud.

Plaintiffs must allege "continuity" as a prerequisite for the existence of a "pattern of racketeering activity." *See* *H.J Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 230 (1989). In other words, the predicate acts must be related, and must constitute or threaten long-term criminal activity. *Id.* Such continuity can be either "closed" or "open-ended." *Id.* Plaintiffs apparently concede that closed-ended continuity is not present in this case. [FN3] Therefore, the issue before the Court is whether the requirements of open-ended continuity have been satisfied.

> FN3. Closed-ended continuity is established by proving a series of related predicate acts extending over a substantial period of time. *H.J. Inc.,* 492 U.S. at 230 (holding that predicate acts extending over a few weeks or months and threatening no future criminal conduct did not satisfy the requirement of continuity). The time period involved here, four months, clearly cannot be called "substantial."

**\*5** Open-ended continuity requires the threat of long-term racketeering activity. *Id.* This threat is indicated when the predicate acts themselves involve a distinct threat of such future racketeering activity, are part of the regular way of doing business for an ongoing entity (be it a criminal association or legitimate business), or are a regular means of conducting or participating in an ongoing RICO enterprise. *Id.* Ordinarily, however, courts will not find a threat of future racketeering in "cases concerning alleged racketeering activity in furtherance of endeavors that are not inherently unlawful, such as frauds in the sale of property ...." *United States v. Aulicino,* 44 F.3d 1102, 1111 (2d Cir.1995).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 297197 (S.D.N.Y.)
(Cite as: 2000 WL 297197 (S.D.N.Y.))

In the present case, plaintiffs have inadequately pleaded open-ended continuity. In conclusory fashion, they allege only that "the fraudulent activities of the Enterprise continue to this day." (Compl.¶ 250). However, they offer no specificity as to what the fraudulent activities involve. Moreover, they have not claimed that the alleged "enterprise" depends on the commission of fraudulent acts "in the conduct of its day to day affairs," a factor courts have often looked to in determining whether fraudulent activity constitutes an entity's "regular way of doing business." *See, e.g., Mead v. Schaub,* 757 F.Supp. 319, 323 (S.D.N.Y.1991). Furthermore, plaintiffs fail to allege that defendants pursued an "inherently unlawful" goal. Under the facts alleged in the complaint, the only endeavor that could be attributed to defendants' actions is the desire to resell goods for a profit, which is the lawful goal of nearly every business. As noted above, unless an "inherently unlawful" pursuit is involved, continuity is not ordinarily inferred.

For all the above reasons, the Court dismisses plaintiffs' RICO claim. [FN4]

> FN4. Because the Court grants defendants' motion to dismiss the RICO claim for lack of "continuity," it is unnecessary to decide whether plaintiffs have alleged the existence of an "enterprise" distinct from defendants or the predicate acts needed to establish a "pattern of racketeering activity." It is also unnecessary to decide whether the alleged predicate acts were pleaded with sufficient particularity under Rule 9(b). While the Court declines to opine as to the validity of these arguments, it appears likely that, in addition to the complaint's shortcomings in alleging continuity, it is also deficient in the other areas challenged by defendants.

*III. Conclusion*

For the foregoing reasons, defendants' motion to dismiss the amended complaint pursuant to Rule 15(d) is denied. However, defendants motion to dismiss plaintiffs' conversion and RICO claims under Rule 12(b)(6) is granted.

With the dismissal of the RICO claim, the Court does not have federal subject matter jurisdiction, and, for the reason set forth above, it does not have diversity subject matter jurisdiction. The Court declines, pursuant to 28 U.S.C. § 1367(c)(3), to exercise supplemental jurisdiction over plaintiffs' remaining claims. Accordingly, the amended complaint is dismissed.

The Court grants plaintiffs leave to file a second amended complaint within 30 days of the date hereof.

SO ORDERED

S.D.N.Y.,2000.
Elma RT v. Landesmann Intern. Marketing Corp.
Not Reported in F.Supp.2d, 2000 WL 297197 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Frank G. MOWRY, Plaintiff(s),
v.
Robert F. NOONE, In his Individual and Official
Capacity and Douglas Dickenson, Individually and in
his Official Capacity as an employee/agent of the
County of Seneca, Defendant(s).
**No. 02-CV-6257FE.**

Sept. 30, 2004.

Frank G. Mowry, Gowanda, NY, pro se.

Thomas J. Lynch, Esq., Law Offices of Thomas J. Lynch,
Syracuse, NY, Thomas Desimon, Esq., Harris Beach LLP,
Pittsford, NY, for Defendants.

DECISION AND ORDER

*Preliminary Statement*

FELDMAN, Magistrate J.

**\*1** Plaintiff Frank G. Mowry ("Mowry" or "plaintiff"),
proceeding *pro se,* brings this action pursuant to 42 U.S.C.
§ 1983. Plaintiff alleges that (1) defendant Robert F.
Noone, Jr. ("Noone") used excessive force to effectuate
his arrest, in violation of his rights under the Fourth
Amendment of the Constitution, (2) defendant Douglas
Dickenson ("Dickenson") failed to intervene to prevent
Noone from using excessive force, and (3) both
Noone and Dickenson deliberately denied him medical care in
violation of his rights under the Fourteenth Amendment of
the Constitution. Defendants now move for summary

judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure (Docket # 70). In accordance with the
provisions of 28 U.S.C. § 636(c), the parties have
consented to the jurisdiction of this Court for all
dispositive matters, including trial. (Docket # 11). For the
reasons set forth herein, defendants' motion for summary
judgment is granted.

*Factual Background*

Mowry alleges that on July 22, 1999 he was stopped at a
traffic light in the left turn only lane at the Ovid Street
bridge in Seneca Falls, New York. Mowry continued
straight ahead onto Cayuga Street when the light turned
green. Defendant Officer Robert F. Noone, Jr. of the
Seneca Falls Police Department, observed Mowry disobey
the traffic sign, activated the emergency lights on his
vehicle and began following Mowry. (Mowry Dep. Trans.
p. 17, 17-18 FN1). Mowry knew that he was driving
illegally but did not pull over. (Mowry Dep. Trans. p. 18,
12). Noone continued to follow Mowry for several miles.
(Mowry Dep. Trans. p. 20, 8). When Mowry turned onto
Route 318, Deputy Douglas Dickenson of the Seneca
County Sheriff's Department, joined the pursuit and
activated his emergency lights. (Mowry Dep. Trans. p. 22,
5-6, p. 24, 3). Mowry continued driving even though he
knew he was the subject of pursuit. (Mowry Dep. Trans.
p. 25, 7). Mowry lead defendants on a highspeed chase
that reached speeds of over 75 mph and narrowly avoided
several head-on collisions as he attempted to pass vehicles
on the two-lane road. (Mowry Dep. Trans. p. 21, 12-13,
22). Mowry turned onto Birdsey Road and continued
driving until a construction road closure forced him to stop
his car. (Mowry Dep. Trans. p. 28, 9-22).

FN1. Deposition references are to the page and
line number of transcript of the May 27, 2003
deposition of plaintiff Frank. G. Mowry.

Mowry exited his car and when he saw Dickenson,
followed by Noone, turn onto Birdsey Road he began to
flee. (Dep. Trans. p. 38, 9-13; p. 39, 3). Dickenson ran
after Mowry yelling at him to stop. (Mowry Dep. Trans. p.
39, 8). Once Mowry saw that he was about to be overtaken

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

by Dickenson, he stopped and Dickenson brought him to the ground. (Mowry Dep. Trans. p. 34, 20). Mowry landed with his hands and knees on the gravel. (Mowry Dep. Trans. p. 37, 2; p. 40, 20-21). Dickenson asked Mowry if he was alright, and Mowry responded yes. (Mowry Dep. Trans. p. 42, 15-20).

Dickenson gave Mowry 30 seconds to catch his breath on his hands and knees, then pulled Mowry's right arm behind his back to handcuff him. (Mowry Dep. Trans. p. 42, 12-13, p. 39, 21-22). At the same time, Mowry heard a car door slam and saw Noone running towards them. (Mowry Dep. Trans. p. 72, 19-21). Mowry testified that when he saw Noone running towards them he only had time to turn his head away. (Mowry Dep. Trans. p. 46, 6-8). Mowry testified that Noone was running too fast and overran Mowry and Dickenson. (Mowry Dep. Trans. p. 46, 18-19). As Noone jumped over the top of Mowry's head, the toe of Noone's boot hit the side of Mowry's head. (Mowry Dep. Trans. p. 49, 4-5). Noone landed on one foot before regaining his balance. (Mowry Dep. Trans. p. 48, 21-23). Noone and Dickenson pulled Mowry off the ground and placed him in Noone's car. (Mowry Dep. Trans. p. 49, 13-14). Mowry claims to have lost consciousness until he was placed in the back of the patrol car. (Mowry Dep. Trans. 50, 9-14). Mowry denies telling anyone that he was injured until after he got to the police station and was formally "booked in" at the county jail. (Mowry Dep. Trans. 55, 7-13). Mowry concedes that he did not ask for any medical attention at that time. (Mowry Dep. Trans. 55, 17-22, 68, 10-15).

**\*2** Mowry was taken to the Seneca Falls Police Station where he was charged with Driving While Intoxicated, Aggravated Unlicensed Operation of a Motor Vehicle in the First Degree, and Reckless Endangerment.[FN2] Within 24 hours of his arrest, Mowry was examined by medical personnel at the county jail and was treated for neck pain. (Mowry Dep. Trans. p. 68, 19; p. 58, 3-4).

> FN2. Mowry later admitted guilt to all three charges. (Mowry Dep. Trans. p. 63, 8-20).

Mowry alleges that he was later diagnosed with a fractured left cheekbone. (Mowry Dep. Trans. p. 65, 5-9). He also asserts that as a result of this injury he experiences blurred vision and migraine headaches. (Mowry Dep. Trans. p. 65, 6-9). According to Mowry, the results of an MRI taken while he was in prison were "normal." (Mowry Dep. Trans. p. 82, 18-19).

*Discussion*

*Summary Judgment Standard:* Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" only if it has some affect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Catanazaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998).

The burden of showing the absence of any genuine issue of material fact rests on the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When a court is confronted with facts that permit different conclusions, all ambiguities and inferences that may reasonably be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996). Rule 56(e), however, also provides that in order to defeat a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial. Such an issue is not created by a mere allegation in the pleadings [citations omitted], nor by surmise or conjecture on the part of the litigants." *United States v. Potamkin Cadillac Corp.,* 689 F.2d 379, 381 (2d Cir.1982) (per curium). "Affidavits submitted in opposition to a motion for summary judgment must set forth such facts as would be admissible in evidence." *Franklin v. Krueger Int'l,* 1997 WL 691424 at *3 (S.D.N.Y. November 5, 1997) (citing *Raskin v. The Wyatt Co.,* 125 F.3d 55 (2d Cir.1997) ("only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment").

In addition, *pro se* submissions, particularly those alleging civil rights violations, are construed liberally and are

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

treated as raising the strongest arguments that they might suggest. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). *See also Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (because plaintiff's "complaint alleges civil rights violations and he proceeded *pro se* in the District Court, we must construe his complaint with particular generosity") (citations omitted).

**\*3** *I. Excessive Force Claim:* The Supreme Court has held that claims against police officers for excessive force must be examined under the Fourth Amendment's reasonableness standard. *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Determining whether the force used was reasonable requires a balancing of the intrusion on the individual's Fourth Amendment rights against the interests of the government. *Id.* at 396. The reasonableness of a particular use of force must be judged objectively from the perspective of a reasonable officer at the scene of the arrest. *Graham,* 490 U.S. at 397. In evaluating the officer's actions, courts should consider the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he was actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396. It is well established that the right to make an arrest necessarily carries with it the right to use some degree of physical coercion. *Id. See Mickle v. Morin,* 297 F.3d 114, 120 (2nd Cir.2002)(in the context of excessive force used during an arrest, "not every push or shove" is excessive.)(internal citations omitted).

In this case, the record is clear that the officers were faced with an extremely dangerous situation as Mowry drove erratically down narrow roads to avoid capture. Indeed, Mowry's actions repeatedly put the lives of other motorists in imminent danger. Applying the *Graham* balancing test to these circumstances, there is no question that the officers acted appropriately in stopping and arresting Mowry. *See Washington v. City of Riverside Illinois,* 2003 WL 1193347, \*5 (N.D.Ill. March 13, 2003) (summary judgment granted when driver's decision to flee justified officer's subsequent use of force to arrest.). Simply put, Mowry has produced no evidence upon which a reasonable jury could find that the defendants used excessive force during his take down and arrest.

As for Mowry's allegation that Noone applied excessive force by "kicking him in the head," this Court will not credit Mowry's attempt to change his deposition testimony with the affidavit he submits in opposition to defendants' motions. Rather, this Court relies on Mowry's deposition testimony which clearly establishes the accidental nature of any injury caused by Noone. *See Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987)("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment."); *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir.1996) ("[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial.").

The undisputed facts here are that after Mowry was taken down by Dickenson, Noone exited his vehicle, ran toward Mowry with such speed that he overran Mowry and Dickenson, and tripped over Mowry. In light of the prolonged chase, the officers had a reasonable basis for believing that Mowry posed a serious threat, especially since he continued to run and evade arrest after he exited his vehicle. Under these circumstances, this Court finds that it was objectively reasonable for Noone to approach Mowry at a high rate of speed in his effort to assist Dickenson in subduing Mowry, and that his actions can not constitute excessive force.

**\*4** *II. Failure to Intervene Claim:* Mowry also makes a claim for failure to intervene. It is well established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers. *Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994); *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988). Failure to intercede results in liability where an officer observes the use of excessive force or has reason to know that it will be used. *Anderson,* 17 F.3d at 557. In order to be held liable, the law enforcement official must have had a realistic opportunity to intervene in order to prevent the harm from occurring. *Id.* at 557.

Here, based on the facts as presented by Mowry, Dickenson did not have the opportunity to intercede before Noone tripped over Mowry, and therefore cannot be held liable. *See O'Neill v. Krzeminski,* 839 F.2d 9, 11

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

(2d Cir.1988) (defendant entitled to judgment where record clear that blows were struck in such a rapid succession that officer "had no realistic opportunity to attempt to prevent them."). At the time the alleged excessive force was used, Dickenson had one hand on Mowry's left arm and was attempting to pull Mowry's right arm behind Mowry's back. Even Mowry stated that when he heard Noone running toward them he only had time to turn his head away before Noone overran them. Moreover, Noone's alleged use of excessive force was a single kick to the head, an event which Mowry concedes happened quickly and without warning. This was not a situation where the alleged excessive force continued for such a period of time that Dickenson, upon realizing what was happening, could have stopped it. *Id.* at 11-12.

Because a reasonable jury could not conclude otherwise, summary judgment should be granted in favor of Dickenson on the failure to intervene claim.

*III. Denial of Medical Treatment:* Mowry's third claim is for denial of medical treatment. The denial of medical treatment for a pre-trial detainee is evaluated under the Due Process Clause of the Fourteenth Amendment. *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996). Although not specifically defined by the Supreme Court, the due process rights of a pre-trial detainee are at least as great as the Eighth Amendment rights of a convicted prisoner. *City of Revere,* 463 U.S. at 244; *Weyant v. Okst,* 101 F.3d. at 856.

In *Weyant,* the Second Circuit established a two-part test to determine liability for denial of medical treatment. First, the denial of medical treatment must concern an objectively serious injury. *Weyant,* 101 F.3d at 856. A serious injury has been defined as "one that may produce death, degeneration or extreme pain." *Mills v. Fenger,* 2003 WL 251953, *4 (W.D.N.Y.2003)* (citations omitted). Second, the plaintiff is required to show that based on what the defendant knew or should have known, the defendant acted with deliberate indifference to plaintiff's serious medical needs. *Weyant,* 101 F.3d at 856. Deliberate indifference is established if the defendant acted with reckless disregard for the substantial risk posed by the plaintiff's serious medical condition. *Weyant,* 101 F.3d at 856.

*5 Here, the undisputed facts establish that the defendants did not deny plaintiff medical treatment. Even assuming arguendo that Mowry's injury rose to the level of an objectively serious medical injury, there is no credible evidence in the record to base a finding that either Noone or Dickenson should have been aware of his need for medical treatment, but were indifferent to him. Indeed, the record demonstrates that Mowry never told the defendants that he needed medical attention and the injuries he now alleges were not apparent to them. Contrary to plaintiff's claims, Dickenson demonstrated his concern for plaintiff's well-being when he asked Mowry if he was alright and gave him time to catch his breath. Mowry did not ask for medical assistance or complain about his alleged injuries immediately following the arrest. At the county jail, Mowry stated that he did not need medical attention. It was not until the following day that Mowry first requested medical attention. Mowry admits that in response to this request, he was then treated by the medical personnel at the county jail and given a prescription for neck pain.

The record is devoid of credible evidence that either defendant acted with reckless disregard for the substantial risk posed by the plaintiff's serious medical needs. *See Thomas v. Nassau County Correctional Center,* 288 F.Supp.2d 333, 338 (E.D.N.Y.2003) (to establish a constitutional violation the facts must give rise to a reasonable inference that defendants *knew* of serious medical needs and intentionally disregarded them.). Based on the record here, summary judgment should be granted in favor of defendants Dickenson and Noone on plaintiff's denial of medical treatment claim.

*Conclusion*

For all the foregoing reasons, defendants' Motions for Summary Judgment (Docket # 67, 70) are granted. Having granted defendants' motion for summary judgment by determining that plaintiff has failed to adduce evidence of a constitutional violation, plaintiff's motions for "dismissal of defendant's (sic) motion" and "cross motion" for summary judgement (Docket # 75) are denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))


SO ORDERED.


W.D.N.Y.,2004.
Mowry v. Noone
Not Reported in F.Supp.2d, 2004 WL 2202645
(W.D.N.Y.)


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Jonathan HENRY, Plaintiff,
v.
James F. DINELLE, Corrections Officer; Russell E.
Duckett, Corrections Officer; Alfred J. Deluca,
Corrections Officer; Donald L. Broekema, Sergeant;
and Jean Norton, Nurse, Defendants.
No. 9:10–CV–0456 (GTS/DEP).

Nov. 29, 2011.
Sivin & Miller, LLP, Edward Sivin, Esq., of Counsel,
New York, NY, for Plaintiff.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Timothy P. Mulvey, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

*MEMORANDUM–DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

*1 Currently before the Court, in this prisoner civil
rights action filed by Jonathan Henry ("Plaintiff") against
the five above-captioned employees of the New York
State Department of Corrections and Community
Supervision ("Defendants"), is Defendants' motion for
partial summary judgment. (Dkt. No. 24.) For the reasons
set forth below, Defendants' motion is granted in part and
denied in part.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Claims**

Generally, liberally construed, Plaintiff's Complaint
alleges that, between approximately January 29, 2009, and
January 31, 2009, at Ulster Correctional Facility in
Napanoch, New York, Defendants violated Plaintiff's
following rights in the following manner: (1) Defendants

Nurse Jean Norton, Corrections Officer James F. Dinelle,
Corrections Officer Russell E. Duckett and Corrections
Officer Alfred J. DeLuca violated Plaintiff's rights under
the First Amendment by filing retaliatory false
misbehavior reports against him, and subsequently
providing false testimony against him at administrative
disciplinary hearings, which resulted in his spending time
in the Special Housing Unit ("SHU"); (2) Defendant
Dinelle violated Plaintiff's rights under the Eighth
Amendment by assaulting him on two occasions, and
Defendants DeLuca and Duckett violated Plaintiff's rights
under the Eighth Amendment by assaulting him once; (3)
Defendant Sergeant Donald L. Broekema violated
Plaintiff's rights under the Eighth Amendment by failing to
intervene to prevent one of these assaults from occurring;
(4) Defendant Norton violated Plaintiff's rights under the
Eighth Amendment by harassing him almost immediately
before he was subjected to the above-described assaults;
and (5) Defendants Norton, Dinelle, Duckett and DeLuca
violated Plaintiff's rights under the Fourteenth Amendment
by performing the aforementioned acts, which constituted
atypical and significant hardships in relation to the
ordinary incidents of prison life. (*See generally* Dkt. No.
1 [Plf.'s Compl.].) Familiarity with the factual allegations
supporting these claims in Plaintiff's Complaint is assumed
in this Decision and Order, which is intended primarily for
review by the parties. (*Id.*)

**B. Undisputed Material Facts**

At all times relevant to Plaintiff's Complaint, Plaintiff
was an inmate and Defendants were employees of the New
York Department of Corrections and Community
Supervision at Ulster Correctional Facility. On January 30,
2009, Defendant Dinelle took Plaintiff to the medical
ward, because Plaintiff was experiencing a foul odor and
oozing from a wound on his leg. After Defendant Norton
treated Plaintiff, she filed an inmate misbehavior report
against Plaintiff based on (1) Plaintiff's harassing behavior
toward Defendant Norton and Defendant Dinelle, and (2)
Plaintiff's disobedience of a direct order to be quiet. The
misbehavior report was signed by Defendant Dinelle as an
employee witness.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

At his deposition, Plaintiff testified, while leaving the infirmary, he was punched and kicked by Defendant Dinelle and two unknown prison officials. Plaintiff was then taken to the SHU, where he waited with Defendants Dinelle and Duckett, and up to three more individuals, for a sergeant to arrive. When Defendant Broekema (a sergeant) arrived at the SHU, Plaintiff was taken to a frisk room, where a frisk was conducted. During the frisk, Defendants Dinelle, Duckett and (Plaintiff suspected) DeLuca used force to bring Plaintiff to the ground. Plaintiff testified that, during the use of force, he was simultaneously punched in the nose by two officers while their supervisor watched.

**\*2** After the use of force, Plaintiff stated to Defendants Dinelle, Broekema and Duckette, "I will be contacting my attorney," or "I will be calling a lawyer." [FN1] Plaintiff never used the term "grievance" when addressing Defendants Dinelle, Broekema and Duckette (or Defendant Norton). [FN2] Subsequently, Defendant Duckett filed an inmate misbehavior report against Plaintiff based on his disobedience of frisk procedures and a direct order. Defendant DeLuca signed this report as a witness to the events.

> FN1. (*Compare* Dkt. No. 24, Attach. 9, at ¶ 17 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 27, Attach. 3, at ¶ 17 [Plf.'s Rule 7 .1 Response]; *see also* Dkt. No. 24, Attach. 4, at 100, 102–03 [attaching pages 216, 218 and 219 of Trans. of Plf.'s Depo.]; Dkt. No. 33, at 2–3 [attaching pages 228 and 229 of Trans. of Plf.'s Depo .].)

> FN2. (*Compare* Dkt. No. 24, Attach. 9, at ¶ 17 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 27, Attach. 3, at ¶ 17 [Plf.'s Rule 7 .1 Response]; *see also* Dkt. No. 24, Attach. 4, at 59–60, 100, 102–03 [attaching pages 175, 176, 216, 218 and 219 of Trans. of Plf.'s Depo.]; Dkt. No. 33, at 2–3 [attaching pages 228 and 229 of Trans. of Plf.'s Depo.].)

Familiarity with the remaining undisputed material facts of this action, as well as the disputed material facts, as set forth in the parties' Rule 7.1 Statement and Rule 7.1 Response, is assumed in this Decision and Order, which

(again) is intended primarily for review by the parties. (*Id.*)

**C. Defendants' Motion**

Generally, in support of their motion for partial summary judgment, Defendants argue as follows: (1) Plaintiff's claim that Defendants issued false misbehavior reports should be dismissed because Plaintiff has no constitutional right to be free of false misbehavior reports; (2) Plaintiff's First Amendment retaliation claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that he (a) engaged in protected activity, or (b) suffered adverse action as a result of engaging in protected activity; (3) Plaintiff's Fourteenth Amendment substantive due process claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendants deprived Plaintiff of his liberty rights; (4) Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that she (a) used force against Plaintiff, or (b) was in a position to prevent the use of force from occurring, yet failed to do so; (5) Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca should be dismissed because Plaintiff's identification of Defendant DeLuca is "very tentative"; (6) Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Broekema had a realistic opportunity to intervene to prevent or stop the assault, yet failed to do so; and (7) Defendants are protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances. (*See generally* Dkt. No. 24, Attach. 10 [Defs.' Memo. of Law].) [FN3]

> FN3. In their motion, Defendants do not challenge the evidentiary sufficiency of Plaintiff's Eighth Amendment excessive-force claim against Defendants Dinelle or Duckett. (*See generally* Dkt. No. 24, Attach. 10 [Defs.' Memo. of Law].)

In Plaintiff's response to Defendants' motion for partial summary judgment, he argues as follows: (1) his

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

retaliation claims should not be dismissed because there are triable issues of fact as to whether Defendants retaliated against him for stating that he would be contacting an attorney; (2) his failure-to-intervene claim against Defendant Broekema should not be dismissed because there are triable issues of fact as to whether Defendant Broekema failed to prevent excessive force from being used against him; (3) his excessive-force claim against Defendant DeLuca should not be dismissed because there are triable issues of fact as to whether Defendant DeLuca used excessive force against him; and (4) Defendants are not protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances. (*See generally* Dkt. No. 27, Attach. 5 [Plf.'s Response Memo. of Law].) [FN4]

> **FN4.** Plaintiff does not oppose Defendants' arguments that (1) Plaintiff's excessive-force claim against Defendant Norton should be dismissed, and (2) Plaintiff's substantive due process claim should be dismissed. (*See generally* Dkt. No. 27, Attach. 5 [Plf.'s Response Memo. of Law].)

**\*3** In their reply, Defendants essentially reiterate their previously advanced arguments. (*See generally* Dkt. No. 29, Attach. 1 [Defs .' Reply Memo. of Law].)

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's decision in *Pitts v. Onondaga Cnty. Sheriff's Dep't,* 04–CV–0828, 2009 WL 3165551, at \*2–3 (N.D.N.Y. Sept.29, 2009) (Suddaby, J.), which accurately recites that legal standard.

### B. Legal Standards Governing Plaintiff's Claims

### 1. First Amendment Retaliation Claim

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that, in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of his First Amendment rights. *See Gill,* 389 F.3d at 381–383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds, *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that (1) the speech or conduct at issue was "protected", (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights, and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based

on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

**\*4** In determining whether an inmate has established a prima facie case of a causal connection between his protected activity and a prison official's adverse action, a number of factors may be considered, including the following: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation. *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996); *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002). Even where the inmate has established such a prima facie case, the prison official may be entitled to judgment as a matter of law on the inmate's retaliation claim where the prison official has satisfied his burden of establishing that the adverse action would have been taken on proper grounds alone. *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994); *Jordan v. Garvin,* 01–CV–4393, 2004 WL 302361, at \*6 (S.D.N.Y. Feb.17, 2004).

**2. Eighth Amendment Claims of Excessive–Force and Failure–to–Intervene**

To establish a claim of excessive-force under the Eighth Amendment, a plaintiff must satisfy two components: "one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009). In consideration of the subjective element, a plaintiff must allege facts which, if true, would establish that the defendant's actions were wanton " 'in light of the particular circumstances surrounding the challenged conduct.' " *Id.* (quoting *Blyden v. Mancusi,* 186 F.3d 252, 262 [2d Cir.1999] ). The objective component asks whether the punishment was sufficiently harmful to establish a violation "in light of 'contemporary standards of decency.' " *Wright,* 554 F.3d at 268 (quoting *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Generally, officers have a duty to intervene and prevent such cruel and unusual punishment from occurring or continuing. *Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). "It is well-established that a law enforcement official has an affirmative duty to intervene

on behalf of an individual whose constitutional rights are being violated in his presence by other officers." *Cicio v. Lamora,* 08–CV–0431, 2010 WL 1063875, at \*8 (N.D.N.Y. Feb.24, 2010) (Peebles, M.J.). A corrections officer who does not participate in, but is present when an assault on an inmate occurs may still be liable for any resulting constitutional deprivation. *Id.* at \*8. To establish a claim of failure-to-intervene, the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene. *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008). Generally, officers cannot be held liable for failure to intervene in incidents that happen in a "matter of seconds." *Parker v. Fogg,* 85–CV–177, 1994 WL 49696 at \*8 (N.D.N.Y. Feb.17, 1994) (McCurn, J.).

**3. Fourteenth Amendment Substantive Due Process Claims**

**\*5** The Due Process Clause of the Fourteenth Amendment contains both a substantive component and a procedural component. *Zinernon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinernon,* 494 U.S. at 125 [internal quotations marks omitted]. The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law." Id.* at 125–126 [internal quotations marks and citations omitted; emphasis in original]. One of the differences between the two claims is that a substantive due process violation "is complete when the wrongful action is taken," while a procedural due process violation "is not complete unless and until the State fails to provide due process" (which may occur *after* the wrongful action in question). *Id.*

"Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) [internal quotations marks and citations omitted], *aff'g,* 91–CV–1196, Memorandum–Decision and

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

Order (N.D.N.Y. filed Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action).

"An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes 'an atypical and significant hardship on the ordinary incidents of prison life.' " *Whitaker v. Super,* 08–CV–0449, 2009 WL 5033939, at *5 (N.D.N.Y. Dec. 14, 2009) (Kahn, J. adopting Report–Recommendation by Lowe, M.J.) (quoting *Sandin v. Conner,* 515 U.S. 472, 484 [1995] ). Regarding the first prong of this test, "[i]t is undisputed ... that New York state law creates a liberty interest in not being confined to the SHU." *Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004). When evaluating whether an inmate's confinement in SHU violates his substantive due process rights, the issue, then, is whether his keeplock confinement imposed "an atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Id.* at 64.

"In the Second Circuit, determining whether a disciplinary confinement constituted an 'atypical and significant hardship' requires examining 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement.' " *Whitaker,* 2009 WL 5033939, at *5 (quoting *Palmer,* 364 F.3d at 64). "Where a prisoner has served less than 101 days in disciplinary segregation, the confinement constitutes an 'atypical and significant hardship' only if 'the conditions were more severe than the normal SHU conditions.' " *Id.* (quoting *Palmer,* 364 F.3d at 65).[FN5]

> FN5. Generally, " '[n]ormal' SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week." *Whitaker,* 2009 WL 5033939, at *5 n. 27 (citing *Ortiz v. McBride,* 380 F.3d 649, 655 [2d Cir.2004] ).

**4. Qualified Immunity Defenses**

*6 The qualified immunity defense is available to only those government officials performing discretionary functions, as opposed to ministerial functions. *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). As a result, a qualified immunity inquiry in a civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004), *accord, Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007).

In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992).[FN6] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169–70 (2d Cir.2007).[FN7] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

*v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).[FN5] As the Supreme Court has explained,

> FN6. *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v. City of Syracuse,* 26 F.3d 14, 17–18 (2d Cir.1994); *Calhoun v. New York State Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

> FN7. *See also Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' "); *Davis v. Scherer,* 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

> FN8. *See also Malsh v. Corr. Oficer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) [citing cases]; *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity

should be recognized.

*Malley,* 475 U.S. at 341.[FN9]

> FN9. *See also Hunter v. Bryant,* 502 U.S. 224, 299, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") [internal quotation marks omitted].

**III. ANALYSIS**

**A. Plaintiff's Retaliation Claim Under the First Amendment**

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that he (1) engaged in protected activity, or (2) suffered adverse action as a result of engaging in protected activity. More specifically, Defendants argue that the claim should be dismissed because (1) the statement of an inmate's intent to contact an attorney is not protected conduct, (2) Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Norton knew of Plaintiff's intention to contact an attorney, and (3) Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendants' actions were retaliatory. (Dkt. No. 24, Attach.10.) [FN10]

> FN10. Defendants also argue that Plaintiff's First Amendment claim should be dismissed to the extent that it is based solely on the fact that misbehavior reports against him were *false* (as opposed to being false *and retaliatory* ). The Court agrees that Plaintiff has no general constitutional right to be free from false misbehavior reports. *See Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997). As a result, to the extent that the Plaintiff's Complaint may be construed as asserting a claim based solely on the issuance of false behavior reports, that claim is dismissed.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

**\*7** After carefully considering the admissible record evidence adduced in this case, and carefully reviewing the relevant case law, the Court has trouble finding that an inmate's one-time making of an oral statement (immediately after the use of force against him) that he would be "contacting [his] attorney," or "calling a lawyer" at some unidentified point in the future constitutes engagement in activity that is protected by the First Amendment—especially where, as here, the inmate did not reference the prison grievance process in his statement.

Representation by a lawyer is certainly not necessary to file an inmate grievance in the New York State Department of Corrections and Community Supervision, nor does such representation necessarily result in the filing of a grievance. Rather, such representation is most typically associated with the filing of a civil rights action in federal court (as is clear from the motions for appointment of counsel typically filed in federal court actions). As a result, the statement in question does not reasonably imply that Plaintiff would be filing a grievance as much as it implies that he was going to consult an attorney as to whether or not to file a civil rights action in federal court.

Here, such a statement is problematic. This is because, generally, the filing of the prisoner civil rights action in federal court in New York State must be preceded by the prisoner's exhaustion of his available administrative remedies (or his acquisition of a valid excuse for failing to exhaust those remedies). Any filing without such prior exhaustion (or acquisition of a valid excuse), under the circumstances, would be so wholly without merit as to be frivolous. Of course, filing a court action that is frivolous is not constitutionally protected activity.<u>FN11</u>

<u>FN11.</u> *See Wade-Bey v. Fluery,* 07–CV–117, 2008 WL 2714450 at \*6 (W.D.Mich. July 8, 2010) ("Although it is well established that prisoners have a constitutional right of access to the courts ..., the filing of a frivolous lawsuit would not be protected activity.") [citation omitted].

Moreover, to the extent that Plaintiff's statement could be construed as reasonably implying that he was going to consult an attorney as to whether or not to file a grievance, the Court has trouble finding that such a vague statement is constitutionally protected.<u>FN12</u> As one district court has stated, "[h]oping to engage in constitutionally protected activity is not itself constitutionally protected activity."<u>FN13</u> The Court notes that a contrary rule would enable a prisoner who has committed conduct giving rise to a misbehavior report to create a genuine issue of material fact (and thus reach a jury) on a retaliation claim (alleging adverse action based on the issuance of that misbehavior report) simply by uttering the words, "I'm calling a lawyer," after he commits the conduct in question but before the misbehavior report is issued.

<u>FN12.</u> The Court notes that numerous cases exist for the point of law that even *expressly threatening* to file a *grievance* does not constitutes protected activity. *See, e.g., Bridges v. Gilbert,* 557 F.3d 541, 554–55 (7th Cir.2009) ("[I]t seems implausible that a *threat* to file a grievance would itself constitute a First Amendment-protected grievance.") [emphasis in original]; *Brown v. Darnold,* 09–CV–0240, 2011 WL 4336724, at \*4 (S.D.Ill. Sept.14, 2011) ("Plaintiff cannot establish that his threat to file a grievance against Defendant Darnold is a constitutionally protected activity."); *Koster v. Jelinek,* 10–CV–3003, 2011 WL 3349831, at \*3, n. 2 (C.D.Ill. Aug.3, 2011) ("The plaintiff does not seem to be asserting that he had a First Amendment right to threaten the facilitators with lawsuits and grievances, nor does the Court believe that he has such a right."); *Ingram v. SCI Camp Hill,* 08–CV–0023, 2010 WL 4973302, at \*15 (M.D.Pa. Dec.1, 2010) ("Stating an intention to file a grievance is not a constitutionally protected activity."), *aff'd,* No. 11–1025, 2011 WL 4907821 (3d Cir. Oct.17, 2011); *Lamon v. Junious,* 09–CV–0484, 2009 WL 3248173, at \*3 (E.D.Cal. Oct.8, 2009) ("A mere threat to file suit does not rise to the level of a protected activity...."); *Miller v. Blanchard,* 04–CV–0235, 2004 WL 1354368, at \*6 (W.D.Wis. June 14, 2004) ("Plaintiff alleges that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

defendants retaliated against him after he threatened to file a lawsuit against them. Inmates do not have a First Amendment right to make threats.").

FN13. *McKinnie v. Heisz,* 09–CV–0188, 2009 WL 1455489, at *11 (W.D.Wis. May 7, 2009) ("Hoping to engage in constitutionally protected activity is not itself constitutionally protected activity. At most, petitioner's actions could be construed as a 'threat' to assert his rights but that is not enough.").

In any event, even assuming, for the sake of argument, that Plaintiff's statement was constitutionally protected, the Court finds, based on the current record, that Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that his statement to Defendants Dinelle, Duckett, and Broekema that he would be contacting an attorney was a substantial or motivating factor for the issuance of the misbehavior report by Defendant Norton (which was signed by Defendant Dinelle as a witness), and the misbehavior report by Defendant Duckett (which was signed by Defendant DeLuca as a witness). The Court makes this finding for two alternate reasons.

**\*8** First, with regard to the misbehavior report issued by Defendant Norton, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that she was aware Plaintiff would be contacting an attorney. In addition, with regard to the report made by Defendant Duckett (which was signed by Defendant DeLuca as a witness), although there is record evidence that Defendant Duckett had knowledge of Plaintiff's statement that he would contact an attorney, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Duckett had reason to believe, at the time the misbehavior report was issued, Plaintiff would actually follow through with his one-time oral statement, made on the heals of a heated incident.

Second, even assuming that Defendant Duckett or Defendant Norton had reason to believe Plaintiff would contact an attorney, Plaintiff has failed to adduce

admissible record evidence from which a rational factfinder could conclude that Defendant Duckett or Defendant Norton would not have issued the misbehavior report anyway, based on Plaintiff's actions. Indeed, at Plaintiff's disciplinary hearings, evidence was adduced that he in fact committed most of the misconduct alleged in the misbehavior reports, which resulted in the hearing officer finding multiple violations and sentencing Plaintiff to SHU. [FN14] Furthermore, those convictions were never subsequently reversed on administrative appeal. [FN15] As a result, no admissible record evidence exists from which a rational factfinder could conclude that Plaintiff has established the third element of a retaliation claim—the existence of a causal connection between the protected speech and the adverse action.

FN14. *See Hynes v. Squillance,* 143 F.3d 653, 657 (2d Cir.1998) (holding that defendants met their burden of showing that they would have taken disciplinary action on valid basis alone where the evidence demonstrated that plaintiff had committed "the most serious, if not all, of the prohibited conduct"); *Jermosen v. Coughlin,* 86–CV–0208, 2002 WL 73804, at *2 (N.D.N.Y. Jan.11, 2002) (Munson, J.) (concluding, as a matter of law, that defendants showed by a preponderance of the evidence that they would have issued a misbehavior report against plaintiff even in the absence of his complaints against correctional department personnel, because they established that the misbehavior report resulted in a disciplinary conviction, "demonstrat[ing] that plaintiff in fact committed the prohibited conduct charged in the misbehavior report.").

FN15. For these reasons, the Court finds to be inapposite the case that Plaintiff cites for the proposition that the Court must accept as true his sworn denial that he committed any of the violations alleged in the misbehavior reports issued against him. *See Samuels v. Mockry,* 142 F.3d 134, 135–36 (2d Cir.1998) (addressing a situation in which a prisoner was placed in a prison's "Limited Privileges Program," upon a finding rendered by the prison's Program Committee, that he had refused to accept a

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

mandatory work assignment, *"without a hearing or a misbehavior report"* ) [emphasis added]. The Court would add only that, even if it were to accept Plaintiff's sworn denial as true, the Court would still find that he has failed to establish that Defendants Duckett and Norton would not have issued the misbehavior reports against him anyway, based on their subjective belief that he was acting in a disturbing, interfering, harassing and disobedient manner at the time in question (as evident from, *inter alia,* their misbehavior reports, the disciplinary hearing testimony of three of the Defendants, and admissions made by Plaintiff during his deposition regarding the "confusion" and "misunderstanding" that occurred during his examination by Defendant Norton, his persistent assertions about his prescribed frequency of visits, and his unsolicited comments about his proper course of treatment).

For each of these alternative reasons, Plaintiff's retaliation claim under the First Amendment is dismissed.

**B. Plaintiff's Claims Under the Eighth Amendment**

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's Eighth Amendment claims because (1) Plaintiff has failed to adduce any admissible evidence from which a rational factfinder could conclude that Defendant Norton used any force against Plaintiff, or was in a position to intervene to prevent the use of force against Plaintiff, yet failed to do so, (2) Plaintiff has failed to adduce any admissible evidence from which a rational factfinder could conclude that Defendant Broekema had a reasonable opportunity to intervene and prevent the alleged assault by Defendants Dinelle, DeLuca and Duckett, yet failed to do so, and (3) Plaintiff's identification of Defendant DeLuca is "very tentative."

As an initial matter, because Plaintiff did not oppose Defendants' argument that his excessive-force claim against Defendant Norton should be dismissed, Defendants' burden with regard to this claim "is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Xu–Shen Zhou v.*

*S.U.N.Y. Inst. of Tech.,* 08–CV–0444, 2011 WL 4344025, at \*11 (N.D.N.Y. Sept.14, 2011) (Suddaby, J.). After carefully considering the matter, the Court finds that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only that, based on its own independent review of the record, the Court can find no record evidence to support the claim that Defendant Norton used force against Plaintiff, or was in a position to intervene to prevent the use of force against Plaintiff, yet failed to do so. As a result, Plaintiff's Eighth Amendment claim against Defendant Norton is dismissed.

**\*9** Turning to Plaintiff's failure-to-intervene claim against Defendant Broekema, it is undisputed that it was Defendants Duckett, Dinelle and DeLuca who used force against Plaintiff. Plaintiff testified that, while Defendant Broekema was in the room at the time, Defendant Broekema was standing behind Defendant Dinelle on his "immediate right." In addition, Plaintiff testified that Defendant Duckett's threat of physical force against Plaintiff was conditioned on Plaintiff's continued failure to comply with (what Plaintiff perceived to be) conflicting instructions by Defendants Duckett and Dinelle during the frisk. (Dkt. No. 24, Attach. 4, at 97–99.) Furthermore, Plaintiff testified that it was only after he failed to put his hands in his pockets (rather soon after being warned by Defendant Duckett) that either Defendant Duckett or Defendant Dinelle punched him *one time* with a "closed fist" in the side of his nose, causing him to immediately fall to the ground. (*Id.* at 98–99.) Finally, Plaintiff testified that the kicks that he suffered soon after falling to the ground were limited in nature, having occurred only "a couple of times," and indeed having only *possibly* occurred. (*Id.* at 99.)

While the Court in no way condones the conduct alleged in this action, the Court is simply unable to find, based on the current record, that Plaintiff has adduced sufficient admissible record evidence to reach a jury on his Eighth Amendment claim against Defendant Broekema. Rather, based on the evidence presented, a rational factfinder could only conclude that the use of force was simply too uncertain for a reasonable person in Defendant Broekema's position to expect; and it was too brief in nature to give Defendant Broekema a realistic opportunity

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

to intervene in it, so as prevent the one punch and possibly few kicks that Plaintiff presumably experienced.[FN16]

> FN16. *See O'Neill v. Krzeminski,* 839 F.2d 9, 11–12 (2d Cir.1988) (noting that "three blows [that occurred] in such rapid succession ... [is] not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator"); *Blake v. Base,* 90–CV–0008, 1998 WL 642621, at *13 (N.D.N.Y. Sept.14, 1998) (McCurn, J.) (dismissing failure-to-intervene claim against police officer based on finding that the punch to the face and few body blows that plaintiff allegedly suffered "transpired so quickly ... that even if defendant ... should have intervened, he simply did not have enough time to prevent plaintiff from being struck"); *Parker v. Fogg,* 85–CV–0177, 1994 WL 49696, at *8 (N.D.N.Y. Feb.17, 1994) (McCurn, J.) (holding that an officer is not liable for failure-to-intervene if there "was no 'realistic opportunity' to prevent [an] attack [that ends] in a matter of seconds"); *see also Murray–Ruhl v. Passinault,* 246 F. App'x 338, 347 (6th Cir.2007) (holding that there was no reasonable opportunity for an officer to intervene when one officer stood by while another fired twelve shots in rapid succession); *Ontha v. Rutherford Cnty., Tennessee,* 222 F. App'x 498, 506 (6th Cir.2007) ("[C]ourts have been unwilling to impose a duty to intervene where ... an entire incident unfolds 'in a matter of seconds.' "); *Miller v. Smith,* 220 F.3d 491, 295 (7th Cir.2000) (noting that a prisoner may only recover for a correction's officer's failure to intervene when that officer "ignored a realistic opportunity to intervene").

Finally, based on the current record, the Court rejects Defendants' third argument (i.e., that Plaintiff's excessive-force claim against Defendant DeLuca should be dismissed because Plaintiff's identification of Defendant DeLuca is "very tentative"). Defendants argue that Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant DeLuca was present during the use of force

against Plaintiff (let alone that Defendant DeLuca used force against Plaintiff). This is because Plaintiff's basis for bringing his excessive-force claim against Defendant DeLuca is that he remembered being assaulted by three individuals, including Defendants Dinelle and Duckett, whose last names began with the letter "D." While this fact is undisputed, it is also undisputed that Defendant DeLuca was interviewed by the Inspector General's Office regarding his involvement in the incidents giving rise to Plaintiff's claims,[FN17] and that both Defendant Broekema's use-of-force report, and Defendant Broekema's Facility Memorandum, state that Defendant DeLuca participated in the use of force against Plaintiff.[FN18] Based on this evidence, a rational factfinder could conclude that Defendant DeLuca violated Plaintiff's Eighth Amendment rights. As a result, Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca survives Defendants' motion for summary judgment. The Court would add only that, although it does not construe Plaintiff's Complaint as alleging that Defendant DeLuca failed to intervene in the use of force against Plaintiff, assuming, (based on Plaintiff's motion papers) that Plaintiff has sufficiently alleged this claim, the claim is dismissed because the entirety of the record evidence as it pertains to Defendant DeLuca establishes that he used force against Plaintiff.

> FN17. (Dkt. No. 27, Attach. 2, at 19–20.)

> FN18. (Dkt. No. 27, Attach. 2, at 10, 14.)

**C. Plaintiff's Claim Under the Fourteenth Amendment**

**\*10** As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because Defendants did not deprive Plaintiff of his liberty rights. As stated above in note 2 of this Decision and Order, Plaintiff failed to address Defendants' argument that his substantive due process claim should be dismissed. As a result, as stated above in Part III.B. of this Decision and Order, Defendants' burden with regard to this claim "is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Xu–Shen Zhou,* 2011 WL 4344025, at *11.

After carefully considering the matter, the Court finds

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only that, based on its own independent review of the record, although the record evidence establishes that Plaintiff was confined in SHU for 150 days as a result of the misbehavior reports issued by Defendants Norton and Duckett, Plaintiff has failed to adduced admissible record evidence from which a rational factfinder could conclude that the conditions of his confinement during this 150–day period were more severe than normal SHU conditions.[FN19] As a result, Plaintiff's substantive due process claim is dismissed.

> FN19. *See Spence v. Senkowski,* 91–CV–0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr.17, 1998) (McCurn, J.) (finding that 180 days that plaintiff spent in SHU, where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217–19 (W.D.N.Y.1998) (180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353–56 (W.D.N.Y.1997) (161 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96–CV–2003, 1997 WL 137448, at *4–6 (S.D.N.Y.1997) (192 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116–17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94–CV–4094, 1996 WL 487951, at *4–5 (S.D.N.Y. Aug.27, 1996) (210 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103–04 (W.D.N.Y.1995) (270 days in SHU under numerous conditions of confinement that

were more restrictive than those in general population).

**D. Defendants' Defense of Qualified Immunity**

As stated above in Part I.C. of this Decision and Order, Defendants seek dismissal of Plaintiff's claims on the alternative ground that they are protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances.

**1. Retaliation**

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 [1982] ). Here, even assuming that Plaintiff's statement that he would contact an attorney regarding the use of force he experienced constitutes engagement in protected activity, and even also assuming that the only reason Defendant Norton and/or Duckett issued Plaintiff a misbehavior report was because he made this statement, these Defendants are, under the circumstances, entitled to qualified immunity. This is because the Court finds that the right to make this statement (without experiencing any resulting adverse action) was not a clearly established during the time in question (January 2009), based on a review of the relevant case law. *See, supra,* notes 12 and 13 of this Decision and Order.

As a result, Plaintiff's retaliation claim is dismissed on the alternate ground of qualified immunity.

**2. Excessive Force**

There is no doubt that the right to be free from the use of excessive force was "clearly established" at the time of the incidents giving rise to Plaintiff's claims. *See, e.g., Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). Moreover, with regard to whether it was objectively reasonable for Defendants to use the alleged amount of force that they used, the Second Circuit has made clear that, "[w]here the circumstances are in dispute, and contrasting accounts present factual issues as to the degree of force actually employed and its

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

reasonableness, a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity." *Mickle v. Morin,* 297 F.3d 114, 122 (2d Cir.2002) [internal quotation marks omitted].

**\*11** Here, after carefully reviewing the record, and construing it in the light most favorable to Plaintiff, the Court finds that, even if Defendants Dinelle, DeLuca and Duckett genuinely feared being assaulted by Plaintiff, and even if those three Defendants genuinely perceived Plaintiff's words and movements to constitute an attempt to resist a frisk, admissible record evidence exists from which a rational jury could conclude that those perceptions were not objectively reasonable under the circumstances. As the Second Circuit has observed, it is impossible to "determine whether [Defendants] reasonably believed that [their] force was not excessive when several material facts [are] still in dispute, [and therefore,] summary judgment on the basis of qualified immunity [is] precluded." *Thomas v. Roach,* 165 F.3d 137, 144 (2d Cir.1999).[FN20] For these reasons, the Court rejects Defendants' argument that Plaintiff's excessive-force claim should be dismissed on the ground of qualified immunity as it relates to Defendants Dinelle, DeLuca and Duckett.

> FN20. *See also* *Robison v. Via,* 821 F.2d 913, 924 (2d Cir.1987) ( "[T]he parties have provided conflicting accounts as to [who] initiated the use of force, how much force was used by each, and whether [the arrestee] was reaching toward [a weapon]. Resolution of credibility conflicts and the choice between these conflicting versions are matters for the jury and [should not be] decided by the district court on summary judgment.").

However, the Court reaches a different conclusion with regard to Plaintiff's failure-to-intervene claim against Defendant Broekema: the Court finds that, at the very least, officers of reasonable competence could disagree on the legality of Defendant Broekema's actions, based on the current record. As a result, Plaintiff's failure-to-intervene claim against Defendant Broekema is dismissed on this alternative ground.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for partial summary judgment (Dkt. No. 24) is **_GRANTED_** in part and **_DENIED_** in part in the following respects:

(1) Defendants' motion for summary judgment on Plaintiff's First Amendment claim is **_GRANTED;_**

(2) Defendants' motion for summary judgment on Plaintiff's Fourteenth Amendment substantive due process claim is **_GRANTED;_**

(3) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton is **_GRANTED;_**

(4) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema is **_GRANTED;_** and

(5) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca is **_DENIED;_** and it is further

**ORDERED** that the following claims are **_DISMISSED_** **with prejudice** from this action:

(1) Plaintiff's First Amendment claim;

(2) Plaintiff's Fourteenth Amendment substantive due process claim;

(3) Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton; and

(4) Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema; and it is further

**ORDERED** that Defendants Norton and Broekema are **_DISMISSED_** from this action; and it is further

**ORDERED** that, following this Decision and Order, the following claims remain pending in this action: Plaintiff's Eighth Amendment excessive-force claim against Defendants DeLuca, Dinnelle and Duckett; and it is further

**\*12 ORDERED** that counsel are directed to appear

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

on **JANUARY 4, 2012 at 2:00 p.m.** in chambers in Syracuse, N.Y. for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than **DECEMBER 16, 2011,** and the parties are directed to engage in meaningful settlement negotiations prior to the 1/4/12 conference.

N.D.N.Y.,2011.

Henry v. Dinelle
Slip Copy, 2011 WL 5975027 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



**MINA POURZANDVAKIL, Plaintiff, -against- HUBERT HUMPHRY, JUDISICIAL SYSTEAM OF THE STATE OF MINNESOTA AND OLMESTED COUNTY COURT SYSTEAM, AND STATE OF MINNESOTA, SAINT PETER STATE HOSPITAL, DOCTOR GAMMEL STEPHELTON, ET EL ERICKSON, NORTH WEST BANK AND TRUST, OLMESTED COUNTY SOCIAL SERVICE, J.C. PENNY INSURNCE, METMORE FINICIAL, TRAVELER INSURNCE, COMECIAL UNION INSURNCE, HIRMAN INSURNCE, AMRICAN STATE INSURNCE, FARMERS INSURNCE, C. O BROWN INSURNCE, MSI INSURNCE, STEVEN YOUNGQUIST, KENT CHIRSTAIN, MICHEAL BENSON, UNITED AIRLINE, KOWATE AIRLINE, FORDMOTOR CRIDITE, FIRST BANK ROCHESTER, GEORGE RESTWICH, BRITISH AIRWAYS, WESTERN UNION, PRUDENIAL INSURNCE, T.C.F. BANK, JUDGE SANDY KIETH, JUDGE NIERGARI, OLMESTEAD COUNTY JUDGERING, JUDGE MORES, JUDGE JACOBSON, JUDGE CHALLIEN, JUDGE COLLIN, JUDGE THOMASE, JUDGE BUTTLER, JUDGE MORKE, JUDGE MOWEER, SERA CLAYTON, SUSAN MUDHAUL, RAY SCHMITE, Defendants.** [1]

1 Names in the caption are spelled to reflect plaintiffs complaint.

**Civil Action No. 94-CV-1594**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK**

*1995 U.S. Dist. LEXIS 7136*

**May 22, 1995, Decided**
**May 23, 1995, FILED**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff filed a complaint accusing defendants with kidnapping plaintiff and her daughter, torturing plaintiff in the Mayo Clinic, and causing plaintiff and her daughter to suffer physically, financially, and emotionally. Certain defendants sought vacation of the defaults entered against them without proper service, some sought dismissal of the complaint, and some sought both vacation of the defaults and dismissal.

**OVERVIEW:** Plaintiff served defendants by certified mail. The court determined that such service was not authorized under federal law or under either New York or Minnesota law. Additionally, plaintiff's extraterritorial service of process was not effective under *Fed. R. Civ. P.*

*4(k)*. Defendants were not subject to federal interpleader jurisdiction, and they were not joined pursuant to *Fed. R. Civ. P. 14* or *Fed. R. Civ. P. 19*. No federal long-arm statute was argued as a basis for jurisdiction, and the alleged harm did not stem from acts in New York for jurisdiction under *N.Y. C.P.L.R. § 302(a)*. The complaint showed no basis for subject matter jurisdiction against defendants that were insurance companies with no apparent relationship to claims of rape, torture, harassment, and kidnapping, and the court found that no basis for supplemental jurisdiction under *28 U.S.C.S. § 1367(a)* existed. Venue was clearly improper under *28 U.S.C.S. § 1391(b)* because no defendant resided in the district and none of the conduct complained of occurred there. Plaintiff's claims of civil rights violations were insufficient because her complaint was a litany of general conclusions, not specific allegations of fact.

**OUTCOME:** The court vacated all defaults. The court dismissed plaintiff's complaint against all moving and non-moving defendants. The dismissal of the complaint against certain defendants premised on the court's lack of power either over the person of the defendant or the subject matter of the controversy was without prejudice, but dismissals against the remaining defendants were with prejudice. Requests for sanctions and attorney's fees were denied.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Service of Process > Methods > Residential Service*
*Civil Procedure > Pleading & Practice > Service of Process > Methods > Service Upon Agents*
*Governments > Federal Government > Employees & Officials*
[HN1] Under the Federal Rules of Civil Procedure, service on an individual may be made by (1) delivery to the named defendant; or (2) delivery to a person of suitable age and discretion at the defendant's dwelling house or usual place of abode; or (3) delivery to an agent authorized by law or by the defendant to receive service of process. *Fed. R. Civ. P. 4(e)(2)*. Service on an individual also can be accomplished through a method authorized by the state in which the district court sits or in which the individual is located. *Fed. R. Civ. P. 4(e)(1)*.

*Business & Corporate Law > Agency Relationships > Agents Distinguished > General Overview*
*Civil Procedure > Pleading & Practice > Service of Process > Methods > Mail*
*Civil Procedure > Pleading & Practice > Service of Process > Methods > Service Upon Corporations*
[HN2] Service on a corporation may be accomplished in a judicial district of the United States (1) pursuant to a method authorized by the law of the state in which the court sits or in which the corporation is located; or (2) by delivering a copy of the summons and complaint to an officer, managing or general agent, or to any other agent authorized by statute to receive service and, if the statute so requires, by also mailing a copy to the defendant. *Fed. R. Civ. P. 4(h)(1), 4(e)(1)*.

*Civil Procedure > Pleading & Practice > Service of Process > Methods > General Overview*
[HN3] Neither New York nor Minnesota law authorizes personal service on an individual or corporation by certified mail. *N.Y. C.P.L.R. §§ 308, 311* (Supp. 1995); *N.Y. Bus. Corp. Law § 306* (Supp. 1995); *Minn. Stat. § 543.08* (1995); Minn. R. 4.03 (1995).

*Civil Procedure > Pleading & Practice > Service of Process > Methods > Mail*
*Civil Procedure > Pleading & Practice > Service of Process > Time Limitations > General Overview*
*Governments > Local Governments > Claims By & Against*
[HN4] Service on states, municipal corporations, or other governmental organizations subject to suit can be effected by (1) delivering a copy of the summons and complaint to the state's chief executive officer; or (2) pursuant to the law of the state in which the defendant is located. *Fed. R. Civ. P. 4(j)(2)*. Minnesota law does not authorize service on a governmental entity by certified mail. Minn. R. 4.03(d), (e) (1995).

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
*Civil Procedure > Parties > Interpleaders > General Overview*
[HN5] A plaintiff's extraterritorial service of process in New York can be effective only under any of the following circumstances: (1) if defendants could be subjected to the jurisdiction of a court of general jurisdiction in New York state; (2) if the defendant is subject to federal interpleader jurisdiction; (3) if the defendant is joined pursuant to *Fed. R. Civ. P. 14* or *Fed. R. Civ. P. 19* and is served within a judicial district of the United States and not more than 100 miles from the place from which the summons issues; (4) if a federal statute provides for long-arm jurisdiction; or (5) if plaintiff's claims arise under federal law and the defendants could not be subject to jurisdiction in the courts of general jurisdiction in any state of the United States. *Fed. R. Civ. P. 4(k)*.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
[HN6] *N.Y. C.P.L.R. § 302(a)* provides that in order to obtain jurisdiction over a non-domiciliary, the plaintiff must show both certain minimal contacts between the defendant and the state such as transacting any business in the state and that the harm plaintiff suffered springs from the act or presence constituting the requisite contact.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General*

*Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Pendent Claims*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Same Case & Controversy*
[HN7] *28 U.S.C.S. § 1367(a)* requires a relationship between the state and federal claims for pendent jurisdiction so that they form part of the same case or controversy.

*Civil Procedure > Jurisdiction > Diversity Jurisdiction > Citizenship > General Overview*
*Civil Procedure > Venue > Multiparty Litigation*
[HN8] See *28 U.S.C.S. § 1391(a)*.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Federal Questions > General Overview*
*Civil Procedure > Venue > Multiparty Litigation*
[HN9] See *28 U.S.C.S. § 1391(1)*.

*Civil Procedure > Venue > Federal Venue Transfers > Improper Venue Transfers*
*Civil Procedure > Venue > Individual Defendants*
*Civil Procedure > Venue > Multiparty Litigation*
[HN10] Where venue is laid in the wrong district, the court shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought. *28 U.S.C.S. § 1406(a)*.

*Civil Procedure > Venue > Motions to Transfer > General Overview*
*Civil Procedure > Judicial Officers > Judges > Discretion*
*Governments > Legislation > Statutes of Limitations > General Overview*
[HN11] The purpose of the court's discretionary authority to transfer rather than dismiss in cases of improperly laid venue is to eliminate impediments to the timely disposition of cases and controversies on their merits.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Dismiss*
[HN12] Where a court has already dismissed against the moving parties on jurisdictional grounds, it has no power to address a *Fed. R. Civ. P. 12(b)(6)* issue.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*

*Civil Rights Law > General Overview*
[HN13] Complaints that rely on civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights instead of a litany of general conclusions that shock but have no meaning.

*Civil Procedure > Parties > Self-Representation > Pleading Standards*
[HN14] A pro se plaintiff's complaint must be construed liberally and should be dismissed only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview*
*Civil Procedure > Parties > Self-Representation > Pleading Standards*
[HN15] Even pro se complaints must show some minimum level of factual support for their claims.

*Civil Procedure > Parties > Self-Representation > General Overview*
*Civil Procedure > Counsel > Appointments*
*Civil Rights Law > Prisoner Rights > Prison Litigation Reform Act > Claim Dismissals*
[HN16] The United States Supreme Court explicitly has acknowledged a district court's power under *28 U.S.C.S. § 1915(d)* to dismiss as frivolous a complaint that lacks an arguable basis either in law or in fact. The Supreme Court has explicitly declined to rule, however, on whether a district court has the authority to dismiss sua sponte frivolous complaints filed by non-indigent plaintiffs. The law in the district of New York is that a district court may sua sponte dismiss a frivolous complaint even if the plaintiff has paid the filing fee.

**COUNSEL:** [*1] HUBERT H. HUMPHREY, III, Attorney General of the State of Minnesota, Attorney for Hubert H. Humphry, III, Judicial System of the State of Minnesota, St. Peter Regional Treatment Center, Gerald Gammell, MD, William Erickson, MD, Thomas Stapleton, MD, the Honorable James L. Mork, Chief Judge Anne Simonett, Judge Jack Davies, Judge Roger Klaphke, Judge Dennis Challeen, and Judge Lawrence Collins, St. Paul, MN, OF COUNSEL: JEROME L. GETZ, Assistant Attorney General.

CONDON & FORSYTH, P.C., Attorneys for British Airways, P.L.C. and Kuwait Airways Corp., New York, NY, OF COUNSEL: STEPHEN J. FEARON, ESQ., MICHAEL J. HOLLAND, ESQ.

DUNLAP & SEEGER, P.C., Attorneys for Olmsted County, Raymond Schmitz, Susan Mundahl, Norwest Bank Minnesota, N.A. (the Northwest Bank & Trust), C.O. Brown Agency, Inc., Rochester, MN, OF COUNSEL: GREGORY J. GRIFFITHS, ESQ.

ARTHUR, CHAPMAN, McDONOUGH, KETTERING & SMETAK, P.A., Attorneys for J.C. Penney Insurance Co. and Metropolitan Insurance Co., Minneapolis, MN, OF COUNSEL: EUGENE C. SHERMOEN, JR., ESQ.

SHAPIRO & KREISMAN, Attorneys for Metmor Financial, Inc., Rochester, NY, OF COUNSEL: JOHN A. DiCARO, ESQ.

COSTELLO, COONEY & FEARON, Attorneys [*2] for Travelers Insurance Companies; Hirman Insurance; Commercial Union Insurance Companies, Syracuse, NY, OF COUNSEL: PAUL G. FERRARA, ESQ., ROBERT J. SMITH, ESQ.

SMITH, SOVIK, KENDRICK & SUGNET, P.C., Attorneys for American States Insurance Co. and Prudential Insurance Co., Syracuse, NY, OF COUNSEL: THOMAS N. KAUFMANN, ESQ.

STEVEN C. YOUNGQUIST, ESQ., Pro Se, Rochester, MN.

THOMAS J. MARONEY, United States Attorney, Attorney for Michael Benson, Postmaster, Northern District of New York, Syracuse, NY, OF COUNSEL: WILLIAM F. LARKIN, Assistant United States Attorney.

GEORGE F. RESTOVICH & ASSOCIATES, Attorneys for George F. Restovich, Esq., Rochester, MN, OF COUNSEL: GEORGE F. RESTOVICH, ESQ.

CONBOY, McKAY, BACHMAN & KENDALL, L.L.P., Attorneys for Western Union, Watertown, NY, OF COUNSEL: GEORGE K. MYRUS, ESQ.

RICHARD MAKI, Pro Se, Rochester, MN.

**JUDGES:** ROSEMARY S. POOLER, UNITED STATES DISTRICT JUDGE

**OPINION BY:** ROSEMARY S. POOLER

**OPINION**

*MEMORANDUM-DECISION AND ORDER*

**INTRODUCTION**

In the four and one-half months since she filed this action, plaintiff Mina Pourzandvakil has filed three amended complaints and ten motions. She also has sought and received [*3] entry of default against ten defendants, none of whom she properly served. She twice has sought and been denied temporary restraining orders. She has included in her action defendants with no apparent connection to this forum, that were vindicated in actions she brought in other forums.

In response, several individual defendants and groups of defendants have filed a total of twelve motions, some seeking vacation of the defaults entered against them, some seeking dismissal and others seeking both. We grant defendants' motions insofar as they seek vacation of the clerk's entries of default and dismissal of the complaint. We vacate *sua sponte* the entries of default against the non-moving defendants. Finally, we dismiss the complaint in its entirety against all defendants.

**BACKGROUND**

Pourzandvakil commenced this action by filing a complaint in the Office of the Clerk on December 9, 1994 (Docket No. 1). The complaint named as defendants the Attorney General of the State of Minnesota, the State of Minnesota and Olmsted County, Minnesota judicial systems, various Minnesota judges and prosecutors, St. Peter State Hospital in Minnesota and various doctors who worked at St. Peter's. [*4] Without specifying the time or defendant involved, the complaint accused the defendants of kidnapping Pourzandvakil and her daughter, torturing Pourzandvakil in the Mayo Clinic since April 1985, and causing Pourzandvakil and her daughter to suffer physically, financially and emotionally. Pourzandvakil twice requested that we issue a temporary restraining order. We denied both requests. *See* Order entered December 14, 1994 (Docket No. 4) and Memorandum-Decision and Order entered December 22, 1994 (Docket No. 6).

On December 27, 1994, Pourzandvakil filed an amended complaint (the "first amended complaint") (Docket No. 7) that appears to differ from the original complaint by adding British Airways as a defendant without making any allegations against British Airways. The first amended complaint also differs by requesting additional damages for prior cases and adding descriptions of several previous cases. Annexed to the first amended complaint is another document labeled amended complaint (the "annexed amended complaint") (Docket No. 7) whose factual allegations differ substantially from both the original complaint and the first amended complaint. The annexed amended complaint also [*5] adds British Airways as a party but specifies only that Pourzandvakil has travelled on that airline and that British Airways, along with other airlines on which Pourzandvakil has travelled, is aware of all the crimes committed against her.

Pourzandvakil filed yet another amended complaint

on January 13, 1995 (the "second amended complaint") (Docket No. 11). The second amended complaint adds as defendants several banks, other financial institutions, insurance companies, insurance agents or brokers, attorneys and airlines as well as the Postmaster of Olmsted County and Western Union. The allegations against these defendants defy easy summarization and will be addressed only insofar as they are relevant to the various motions.

The Clerk of the Court has entered default against the following defendants: J.C. Penny Insurnce (*sic*) [2] ("J.C. Penney"), British Airways, Kowate (*sic*) Airline ("Kuwait"), MSi Insurnce (*sic*) ("MSI"), Judge Mork, Steven Youngquist ("Youngquist"), Prudncial Insurnce (*sic*) ("Prudential"), Ford Motor Credit ("Ford"), First Bank Rochester, and TCF Bank ("TCF"). Based on the submissions Pourzandvakil made in support of her requests for entry of default, [*6] it appears that she served these defendants by certified mail.

The court has received answers from the following defendants: Hubert H. Humphrey III, St. Peter Regional Treatment Center, and Drs. Gerald H. Gammell, William D. Erickson, and Thomas R. Stapleton (joint answer filed January 9, 1995); Olmsted County, Ray Schmitz ("Schmitz"), Susan Mundahl ("Mundahl"), C.O. Brown Agency, Inc. ("C.O. Brown") (answer to amended complaint filed January 23, 1995); George Restovich ("Restovich") (answer to complaint or amended complaint filed January 30, 1995); Norwest Corporation ("Norwest") (answer to amended complaint filed January 31, 1995, amended answer of Norwest Bank Minnesota, N.A. to amended complaint filed February 13, 1995); Travelers Insurance Company ("Travelers") (answer filed February 1, 1995); Michael Benson ("Benson") (answer filed February 6, 1995); Hirman Insurance ("Hirman") (answer filed February 6, 1995); Richard Maki ("Maki") (answer to complaint or amended complaint filed February 17, 1995); Western Union (answer filed February 21, 1995); Steven C. Youngquist ("Youngquist") (answer to complaint or amended complaint filed February 23, 1995); Kuwait (answer filed March [*7] 6, 1995); J.C. Penney (answer filed March 22, 1995); Susan E. Cooper [3] (answer to amended complaint filed March 24, 1995); and Chief Judge Anne Simonett, Judge Jack Davies, Judge Roger Klaphke, Judge Dennis Challeen and Judge Lawrence Collins (joint answer filed April 3, 1995).

> 2 Plaintiff's spelling is idiosyncratic, and we preserve the spelling in its original form only where absolutely necessary for accuracy of the record. Otherwise we substitute the word we believe plaintiff intended for the word she actually wrote, e.g., "tortured" for "tureared."

The court has also received a total of ten motions from Pourzandvakil since February 27, 1995. She moved

for a default judgment against defendants J.C. Penney, First Bank Rochester, Prudential, Ford, MSI, British Airways, and TCF. She moved for immediate trial and "venue in a different place" against several defendants and also requested action according to law and criminal charges. Finally, she made motions opposing defendants' motions.

> 3 Susan E. Cooper is not named as a defendant in the original complaint or any amended complaint filed with this court. From correspondence with Cooper's attorney, it appears that plaintiff sent Cooper a copy of a different version of the complaint. Because the original of this version was not filed with the court, no action against Cooper is pending in this court.

[*8] The court also has received a total of thirteen motions [4] from defendants. Several of the defendants moved for dismissal either under Rule 56 or *Rule 12 of the Federal Rules of Civil Procedure*. For instance, Commercial Union Insurance Companies ("Commercial") moved for dismissal of Pourzandvakil's complaint pursuant to *Fed. R. Civ. P. 12(b)* or, in the alternative, for a more definite statement. Commercial argued that Pourzandvakil's complaint against it is barred by *res judicata* and collateral estoppel and that this court does not have subject matter jurisdiction over the complaints against Commercial. American States Insurance Company ("ASI") moved for dismissal based on plaintiff's failure to state a claim upon which relief can be granted. ASI further moved for an order enjoining Pourzandvakil from further litigation against it. Maki moved for summary judgment based on lack of personal jurisdiction, improper venue, plaintiff's failure to state a claim upon which relief can be granted, and lack of subject matter jurisdiction. Hubert H. Humphrey, III, the Judicial System of the State of Minnesota, Judge James L. Mork, St. Peter Regional Treatment Center and Drs. Gammell, Erickson [*9] and Stapleton (collectively, the "state defendants") moved for summary judgment alleging lack of personal jurisdiction, improper venue, plaintiff's failure to state a claim on which relief can be granted, lack of subject matter jurisdiction, sovereign immunity, and, on behalf of Judge Mork and the judicial system, absolute judicial immunity. The state defendants also requested costs and attorney's fees. Travelers moved for summary judgment based on *res judicata* and/or collateral estoppel, frivolity, lack of subject matter jurisdiction, and improper venue. Travelers sought a transfer of venue to Minnesota in the alternative. Hirman moved for summary judgment based on frivolity, lack of subject matter jurisdiction, and improper venue. Hirman also sought transfer of venue in the alternative. Olmsted County, Schmitz, Mundahl, C.O. Brown and Norwest sought dismissal based on lack of personal jurisdiction, improper venue, and plaintiff's failure to state a claim upon which relief can be granted. With respect to

Schmitz and Mundahl, defendants sought dismissal based on absolute prosecutorial immunity, and with respect to C.O. Brown, defendants sought dismissal on *res judicata* grounds. [*10] Metmor Financial, Inc. ("Metmor") sought dismissal based on lack of personal jurisdiction, lack of subject matter jurisdiction, improper venue, and plaintiff's failure to state a claim upon which relief can be granted. Finally, Restovich moved for dismissal based on lack of personal jurisdiction. [5]

> 4   The court has also received three additional motions returnable May 22, 1995. The first -- from Judges Davies, Klaphake, Challeen, Collins and Chief Judge Simonett requests summary judgment dismissing the complaint based on lack of personal jurisdiction. The second by Western Union also requests summary judgment based, *inter alia,* on plaintiff's failure to state a claim on which relief can be granted. The third, by British Airways, also requests dismissal based, *inter alia,* on plaintiff's failure to state a claim on which relief can be granted. All three motions are mooted by this memorandum-decision and order which dismisses the complaint in its entirety against nonmoving defendants for failure to state a claim on which relief can be granted.
>
> 5   The court also received an affidavit and memorandum of law in support of summary judgment from J.C. Penney. However, the documents were not accompanied by a notice of motion.

[*11] Four defendants, British Airways, Kuwait, Prudential, and Youngquist, sought vacatur of the defaults entered against them. Prudential coupled its request with a request for an order enjoining plaintiff from filing or intervening in any litigation against it. Youngquist also requested dismissal of the complaint based on lack of personal jurisdiction and lack of subject matter jurisdiction.

## ANALYSIS

### The Defaults

We vacate the defaults entered in this matter because plaintiff improperly served defendants. Each application for entry of default shows service by certified mail, which is not permitted by relevant federal, New York or Minnesota rules. [HN1] Under the Federal Rules of Civil Procedure, service on an individual may be made by (1) delivery to the named defendant; or (2) delivery to a person of suitable age and discretion at the defendant's dwelling house or usual place of abode; or (3) delivery to an agent authorized by law or by the defendant to receive service of process. *Fed. R. Civ. P. 4(e)(2).* Service on an individual also can be accomplished through a method authorized by the state in which the district court sits or in which the individual is located. *Fed.* [*12] *R. Civ. P.*

*4(e)(1).* [HN2] Service on a corporation may be accomplished in a judicial district of the United States (1) pursuant to a method authorized by the law of the state in which the court sits or in which the corporation is located; or (2) by delivering a copy of the summons and complaint to an officer, managing or general agent, or to any other agent authorized by statute to receive service and, if the statute so requires, by also mailing a copy to the defendant. *Fed. R. Civ. P. 4(h)(1) and 4(e)(1).* [HN3] Neither New York nor Minnesota law authorizes personal service on an individual or corporation by certified mail. *See N.Y. Civ. Prac. L. & R. §§ 308, 311* (McKinney Supp. 1995); *N.Y. Bus. Corp. Law § 306* (McKinney Supp. 1995); *Minn. Stat. § 543.08* (1995); Minn. R. 4.03 (1995). Finally, [HN4] service on states, municipal corporations or other governmental organizations subject to suit can be effected by (1) delivering a copy of the summons and complaint to the state's chief executive officer; or (2) pursuant to the law of the state in which the defendant is located. *Fed. R. Civ. P. 4(j)(2).* Minnesota law does not authorize service on a governmental entity by certified mail. *See* Minn. [*13] R. 4.03(d) and (e) (1995).

We therefore grant the motions by British Airways, Prudential, Kuwait, and Youngquist to vacate the defaults entered against them based both on the defective service and also on the meritorious defenses discussed below. We vacate *sua sponte* the entries of default against MSI, Ford, First Bank Rochester and TCF, all of whom were served improperly and preserved the service issue by raising it or declining to waive it. Concomitantly, we deny Pourzandvakil's motion for a default judgment against J.C. Penney, First Bank Rochester, Prudential, Ford, MSI, British Airways and TCF. We vacate *sua sponte* the entry of default against J. C. Penney, which preserved the issue of service in its answer. By moving to dismiss or for summary judgment without raising the issue of service, Judge Mork may have waived the service issue. However Judge Mork objected to personal jurisdiction as inconsistent with due process and otherwise presented meritorious defenses. We therefore treat his motion for summary judgment as including a motion to vacate the entry of default and accordingly grant it.

## II. The Jurisdictional Arguments

In addition to raising various [*14] other grounds for dismissal, such as plaintiff's failure to state a claim on which relief can be granted and *res judicata,* most of the moving defendants urge (1) that this court lacks jurisdiction over either their persons or the subject matter of the controversy or (2) that this action is improperly venued. As we must, we examine jurisdiction and venue first.

### A. Personal Jurisdiction

Maki, the state defendants, Olmsted County,

Schmitz, Mundahl, C.O. Brown, Norwest, Metmor, Restovich and Younquist each allege that this court cannot exercise personal jurisdiction over them consistent with due process constraints. In support of their motions, these defendants present affidavits showing that they have had no significant contacts with the state of New York relevant to this lawsuit and that their contacts with Pourzandvakil all occurred in Minnesota. Nothing in plaintiff's voluminous submissions links any of these defendants with New York. [HN5] Plaintiff's extraterritorial service of process can be effective only under any of the following circumstances: (1) if defendants could be subjected to the jurisdiction of a court of general jurisdiction in New York State; (2) if the defendant [*15] is subject to federal interpleader jurisdiction; (3) if the defendant is joined pursuant to *Rule 14* or *Rule 19 of the Federal Rules of Civil Procedure* and is served within a judicial district of the United States and not more than 100 miles from the place from which the summons issues; (4) if a federal statute provides for long-arm jurisdiction; or (5) if plaintiff's claims arise under federal law and the defendants could not be subject to jurisdiction in the courts of general jurisdiction in any state of the United States. *Fed. R. Civ. P. 4(k)*. Defendants are not subject to federal interpleader jurisdiction and they were not joined pursuant to *Rule 14* or *Rule 19*. In addition, no federal long-arm statute is argued as a basis for jurisdiction, and the moving defendants all would be subject to jurisdiction in Minnesota. Therefore, we must look to New York's long-arm statute to determine whether plaintiff's extraterritorial service of process could be effective under the one ground remaining pursuant to *Rule 4(k). See N.Y. Civ. Prac. L. & R. § 302* (McKinney Supp. 1995). [HN6] This rule provides that in order to obtain jurisdiction over a non-domiciliary, the plaintiff must show both certain [*16] minimal contacts between the defendant and the state (such as transacting any business in the state) and that the harm plaintiff suffered springs from the act or presence constituting the requisite contact. *Id. § 302(a)*. The moving defendants have demonstrated that plaintiff does not claim harm stemming from acts or contacts within the purview of *Section 302(a)*. Therefore, we grant these defendants' motions to dismiss the complaint for lack of personal jurisdiction.

## B. Subject Matter Jurisdiction

Pourzandvakil's complaint does not contain the jurisdictional allegations required by *Fed. R. Civ. P. 8(a)(1)*. Several defendants move for dismissal based either on this pleading defect or on an affirmative claim that no subject matter jurisdiction exists. Commercial, Travelers and Hirman (collectively, the "moving insurance companies") moved for dismissal because plaintiff has not pled the complete diversity of citizenship required for subject matter jurisdiction. The

state defendants, relying on *District of Columbia Court of Appeals v. Feldman,* argue that we lack subject matter jurisdiction over any issue that was determined in a state court proceeding to which plaintiff [*17] was a party. *District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 482, 75 L. Ed. 2d 206, 103 S. Ct. 1303 (1983)*. These issues include plaintiff's hospitalization at St. Peter Regional Treatment Center. Finally, Metmor also moved for dismissal based on lack of subject matter jurisdiction because plaintiff has failed to plead a jurisdictional basis.

The moving insurance companies note correctly that insofar as the claims against them can be deciphered, plaintiff states that Traveler's and Commercial did not pay for damages to Pourzandvakil's property, harassed her and cancelled her policy. Pourzandvakil does not mention Hirman in her complaint, but Hirman's attorney states that Pourzandvakil informed him in a telephone conversation that her complaint against Hirman stemmed from actions it took as an agent of Travelers in denying Pourzandvakil's 1985 property damage claim.

The moving insurance companies argue that this court has no jurisdiction over the state insurance law claims absent complete diversity of citizenship between plaintiff and the defendants. *28 U.S.C. § 1332*. They point out that plaintiff lists a Syracuse, New York address for herself and that Kuwait's [*18] address as listed in the complaint is also in New York. Therefore, they argue, there is no complete diversity and this court lacks subject matter jurisdiction absent a basis for pendent jurisdiction under *28 U.S.C. § 1367(a). Section 1367(a)* [HN7] requires a relationship between the state and federal claims so that "they form part of the same case or controversy." *Id.* Because plaintiff's claims of denial of insurance coverage bear no apparent relationship to her other claims of rape, torture, harassment and kidnapping, we do not believe that an adequate basis for supplemental jurisdiction exists. *Id.* Plaintiff's complaint therefore shows no basis for subject matter jurisdiction against the moving insurance companies, and we dismiss as against them. [6]

> 6    We ordinarily would offer plaintiff an opportunity to amend her complaint because her submissions and Kuwait's answer indicate two bases on which plaintiff might be able to argue diversity of citizenship. First, although plaintiff lists her address in Syracuse, New York, she also has indicated on the civil cover sheet that she is an Iranian Citizen and we are not aware of her residence status. As a permanent resident, she would be deemed a citizen of the state in which she resides. *28 U.S.C. § 1332(a)*. However, if she lacks permanent resident status, her citizenship would be considered diverse from that of all the defendants. *Id. § 1332(a)(2)*. Second, Kuwait has submitted an answer in which it claims to be a foreign state within the meaning of *28 U.S.C. §*

*1603*. If Kuwait is correct, plaintiff may have an independent basis for jurisdiction over Kuwait. *See 28 U.S.C. § 1330*. If Pourzandvakil could show subject matter jurisdiction over Kuwait without resort to diversity of citizenship, then Kuwait's residence in New York may not be relevant to the issue of whether this court has diversity jurisdiction under *Section 1332*. *Cf. Hiram Walker & Sons, Inc. v. Kirk Line, 877 F.2d 1508, 1511-1512 (11th Cir. 1989), cert. denied, 131 L. Ed. 2d 219, 115 S. Ct. 1362 (1995)* (holding that the joinder of a non-diverse defendant sued under federal question jurisdiction did not destroy diversity as to the remaining defendant). Here, however, plaintiff's complaint is subject to so many other meritorious defenses -- including complete failure to state a cause of action -- that an amendment would be an exercise in futility. Additionally, plaintiff has not requested permission to amend, proffered an amended pleading, or indeed even supplied an affidavit stating her residency status or alleging a basis of jurisdiction over her claims against Kuwait other than diversity under *28 U.S.C. § 1332*.

[*19] We also agree with the state defendants that state court decisions may render certain of plaintiff's claims against them unreviewable either because of *res judicata* or lack of subject matter jurisdiction. However, because plaintiff's claims are so generally stated and so lacking in specifics, we are unable to discern at this juncture what parts of her complaint would be outside the jurisdiction of the court. In any case, we already have determined that the state defendants are clearly entitled to dismissal on personal jurisdiction grounds. As for Metmor, we believe that plaintiff may be attempting to state a civil rights claim by alleging a conspiracy to murder in connection with a judge although she fails to articulate an actionable claim. We note that we already have determined, in any case, that Metmor is entitled to dismissal on personal jurisdiction grounds.

### C. Venue

Metmor, Travelers, Maki, Hirman, Norwest, Olmsted County, C.O. Brown, Schmitz and Mundahl also allege that Pourzandvakil's action is not properly venued in this court. Although these defendants are entitled to dismissal on independent grounds, improper venue also would support dismissal as to these defendants. [*20] The general venue statute provides that a diversity action, except as otherwise provided by law, may be brought only in

[HN8] (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which the defendants are subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

*28 U.S.C. § 1391(a)*. Section 1391(b) provides that federal question actions, except as otherwise provided by law, may be brought only in

[HN9] (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

[*21] *Id. § 1391(b)*. The majority of the defendants in this action are residents of Minnesota and all of the events of which Pourzandvakil complains occurred in Minnesota. No defendant resides in the Northern District of New York, and none of the conduct plaintiff complains of, occurred in this district. Therefore, venue in the Northern District of New York is clearly improper. [HN10] Where venue is laid in the wrong district, the court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." *Id. § 1406(a)*. Because, as we will explain below, Pourzandvakil's complaint not only fails to state a claim upon which relief can be granted but is also frivolous, we do not deem it to be in the interest of justice to transfer this case to another district. [HN11] The purpose of the court's discretionary authority to transfer rather than dismiss in cases of improperly laid venue is "to eliminate impediments to the timely disposition of cases and controversies on their merits." *Minnette v. Time Warner, 997 F.2d 1023, 1027 (2d Cir. 1993)* (holding that it was an improper exercise of discretion to dismiss rather than transfer [*22] when the statute of limitations on a timely filed complaint ran between filing and dismissal). In this case, as discussed below, a review of the complaint and the plaintiff's submissions on these motions indicates that her claims are frivolous. We therefore dismiss as to the moving defendants both on venue grounds and on the other grounds already identified as applicable. We note also that plaintiff has made claims similar to those in this action against many of the same defendants in the United

States District Court for the District of Minnesota. *Pourzandvakil v. Price,* Civ No. 4-93-207 (D.Minn. 1993). This action was dismissed by Order to Show Cause entered April 12, 1993.

### III. Failure to State a Claim on Which Relief Can be Granted and Frivolity

Defendants ASI, Travelers, Hirman, Norwest, C.O. Brown, Olmsted County, Schmitz, Mundahl, Prudential, Metmor, and Youngquist as well as the state defendants have attacked the sufficiency of plaintiff's complaint. Travelers and Hirman urge that the complaint is frivolous while the remaining defendants argue only that the complaint fails to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6).* [7] [HN12] We already [*23] have dismissed against all the moving parties except ASI on jurisdictional grounds and therefore have the power to address the *Rule 12(b)(6)* issue only on ASI's motion. *See Bell v. Hood, 327 U.S. 678, 682-83, 90 L. Ed. 939, 66 S. Ct. 773 (1946)* (subject matter jurisdiction); *Arrowsmith v. United Press Int'l, 320 F.2d 219, 221 (2d Cir. 1963)* (personal jurisdiction). We grant ASI's motion and note in passing that were we empowered to reach the merits regarding the remaining moving defendants, we also would dismiss the complaint against them for failure to state a claim upon which relief can be granted. We also dismiss *sua sponte* as frivolous the complaint against all defendants who have not been granted dismissal previously on jurisdictional grounds.

> 7    J.C. Penney also submits an affidavit requesting dismissal on this basis and others, but has not filed or served a notice of motion.

Pourzandvakil has not specified a statutory or constitutional basis for her claims against ASI or any of the other [*24] defendants. She alleges that certain of the insurance company defendants denied her claims for damages without alleging that the denial was in any respect wrongful. She also alleges in general terms that the defendants harassed, tortured, kidnapped and raped her and perhaps were involved in a murder plot but does not supply (1) the dates on which these actions occurred, except to say that they began in 1984 and 1985; (2) the names of the specific defendants involved in any particular conduct; or (3) a description of any particular conduct constituting the harassment, torture or kidnapping. She suggests without further detail that ASI was involved in a plot to murder her by placing her in the Mayo Clinic. Although plaintiff does not allege specific constitutional provisions or statutes that defendants have violated, we assume -- largely because many of the defendants involved are state officials or state employees and she appears to complain of certain aspects of various trials -- that she wishes to complain of violations of her civil rights. [HN13] Complaints that rely on civil rights statutes are insufficient unless "they contain some specific allegations of fact indicating a deprivation [*25] of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Abrams, 810 F.2d 358, 363 (2d Cir. 1987).* [HN14] A *pro se* plaintiff's complaint must be construed liberally and should be dismissed only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Estelle v. Gamble, 429 U.S. 97, 106, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976)* (quotation omitted). Pourzandvakil has not satisfied even this minimal test; her complaint and submissions on this motion demonstrate that she cannot prove any set of facts in support of her claim which would entitle her to relief. Her complaint consists of a "litany of general conclusions" rather than "specific allegations of fact". *Barr, 810 F.2d at 363*.

Ordinarily we would allow plaintiff an opportunity to replead to state specific allegations against ASI, but three factors militate against this course of action. First, our December 22, 1994, Memorandum - Decision and Order denying plaintiff's request for a temporary restraining order indicated that she had not shown a likelihood of success on the merits of her claim because she had not [*26] pled any specific actionable facts. Despite the fact that plaintiff since has filed three amended complaints, she still fails to set forth specific actionable conduct. Second, the defendants' motions themselves have alerted plaintiff to the need to show specific actionable facts, and yet her voluminous submissions in opposition to the motions contain no specific actionable facts. Finally, plaintiff has asserted similar allegations against many of the same defendants sued in this action -- although not ASI -- as well as others in several different jurisdictions. *See Pourzandvakil v. Blackman,* [8] *Civ. No. 94-C944 (D.D.C. 1994), Pourzandvakil v. Doty* (E.D.N.Y. 1993), *Pourzandvakil v. Price,* Civ. No. 7 (D.Minn. 1993). Where the results are known to us these actions resulted in dismissals for failure to state a claim upon which relief can be granted. *Pourzandvakil v. Price,* Civ. No. 4-93-207, Order to Show Cause entered April 12, 1993; *Pourzandvakil v Blackman,* Civ. No. 94-C-94, Order entered April 28, 1994, *aff'd* Civ. No. 94-5139 (D.C. Cir. 1994) (per curiam). In the Minnesota case, dismissal took place after the district court offered plaintiff an opportunity to [*27] amend her pleading and plaintiff still was not able to offer specifics. [9] [HN15] Even *pro se* complaints must show "some minimum level of factual support for their claims." *Pourzandvakil v. Blackman,* Civ. No. 94-C-94, (quoting *White v. White, 886 F.2d 721, 724 (4th Cir. 1989)).* We therefore dismiss plaintiff's complaint against ASI for failure to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6)*.

> 8    Former Supreme Court Justice Harry A. Blackmun.
> 9    We note also that plaintiff has not requested leave to amend in this action.

We note that in *Pourzandvakil v. Blackman,* Judge John H. Pratt dismissed plaintiff's *in forma pauperis* complaint *sua sponte* under *28 U.S.C. § 1915(d)*, holding both that it failed to state a claim on which relief can be granted and that it was frivolous. We consider here whether we have the authority to dismiss *sua sponte* plaintiff's complaint, which was not filed *in forma pauperis,* as frivolous as against all non-moving defendants. [*28] [HN16] The Supreme Court explicitly has acknowledged a district court's power under *Section 1915(d)* to dismiss as frivolous a complaint which "lacks an arguable basis either in law or in fact." *Neitzke v. Williams, 490 U.S. 319, 325, 104 L. Ed. 2d 338, 109 S. Ct. 1827 (1989).* The Supreme Court explicitly declined to rule, however, on whether a district court has the authority to dismiss *sua sponte* frivolous complaints filed by non-indigent plaintiffs. *Id. at 329 n.8.* The law in this circuit is that a district court may *sua sponte* dismiss a frivolous complaint even if the plaintiff has paid the filing fee. *See Tyler v. Carter, 151 F.R.D. 537, 540 (S.D.N.Y. 1993), aff'd 41 F.3d 1500 (2d Cir. 1994); cf. Pillay v. I.N.S., 45 F.3d 14, 17 (2d Cir. 1995) (per curiam)* (dismissing *sua sponte* appeal for which appellant had paid normal filing fee). We believe that *sua sponte* dismissal is appropriate and necessary here because (1) plaintiff's claims lack an arguable basis in law and fact; (2) plaintiff has repeatedly attempted to replead her claims without being able to articulate actionable conduct; (3) some of plaintiff's claims have been tested in other courts [*29] and found to be without merit; and (4) the issue of frivolity has been presented by at least some of the moving defendants.

We therefore dismiss with prejudice plaintiff's complaint as frivolous as to all defendants -- regardless of whether they have moved for dismissal -- that have not been granted dismissal on jurisdictional grounds. We direct the clerk to return plaintiff's filing fee to her. *Tyler, 151 F.R.D. at 540.*

### IV. Requests for Sanctions, Costs, Attorney's Fees and Injunction Against Filing Further Actions

Because plaintiff is *pro se* and appears to have a belief in the legitimacy of her complaint, we do not believe that the purpose of Rule 11 would be served by awarding sanctions. *See Carlin v. Gold Hawk Joint Venture, 778 F. Supp. 686, 694-695 (S.D.N.Y. 1991).* Moreover, her litigiousness has not yet reached the point at which courts in this circuit have justified injunctive relief. *See id. at 694* (and collected cases). We therefore deny the requests of ASI and Prudential for injunctive relief. Our refusal to grant sanctions and injunctive relief however, is conditioned on this dismissal putting an end to plaintiff's attempts to sue these defendants [*30] on these claims in this forum. Any further attempts by plaintiff to revive these claims will result in our revisiting the issue of sanctions. *Id. at 695.*

### CONCLUSION

All defaults entered by the clerk are vacated. Plaintiff's complaint is dismissed in its entirety against all moving and non-moving defendants. The dismissal of the complaint against Maki, the state defendants, Olmsted County, Schmitz, Mundahl, C.O. Brown, Norwest, Metmor, Restovich, Youngquist, Commercial, Travelers and Hirman is without prejudice as it is premised on this court's lack of power either over the person of the defendant or the subject matter of the controversy. *See Voisin's Oyster House, Inc. v. Guidry, 799 F.2d 183, 188-9 (5th Cir. 1986)* (dismissal for lack of subject matter jurisdiction is not a dismissal on the merits); *John Birch Soc'y. v. National Broadcasting Co., 377 F.2d 194, 199 n.3 (2d Cir. 1967)* (dismissal for lack of subject matter jurisdiction implies no view of merits); *Orange Theatre Corp. v. Rayherstz Amusement Corp., 139 F.2d 871, 875 (3d Cir.) cert. denied, 322 U.S. 740, 88 L. Ed. 1573, 64 S. Ct. 1057 (1944)* (dismissal for lack of personal jurisdiction is not [*31] a dismissal on the merits). The dismissals against the remaining defendants are with prejudice. All requests for sanctions and attorney's fees are denied. The requests of defendants ASI and Prudential for an injunction with respect to future litigation is denied. However, plaintiff is cautioned that any litigation in this forum attempting to revive the claims addressed herein may subject her to sanctions. Plaintiff's motions are denied as moot.

IT IS SO ORDERED.

DATE: May 22, 1995

Syracuse, New York

ROSEMARY S. POOLER

UNITED STATES DISTRICT JUDGE