IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
_____

MARC LEWIS,

                              Plaintiff,        Civil Action No.
                                                9:12-CV-0031 (GLS/DEP)

        v.

KEVIN SHERIDAN, Lieutenant, Mt.
McGregor Correctional Facility,

                              Defendant.
_____

APPEARANCES:                                    OF COUNSEL:

FOR PLAINTIFF:

Marc Lewis, *Pro Se*
Orleans Correctional Facility
3531 Gaines Basin Road
Albion, NY 14411

FOR DEFENDANT:

HON. ERIC T. SCHNEIDERMAN          GREGORY J. RODRIGUEZ, ESQ.
New York State Attorney General    Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

*Pro se* plaintiff Marc Lewis, a New York State prison inmate, commenced this action in January 2012 against several corrections employees stationed at the prison facility in which he was confined at the relevant times, pursuant 42 U.S.C. § 1983, alleging the deprivation of his civil rights.  Although, with the exception of an excessive force cause of action against defendant Kevin Sheridan, the claims in plaintiff's original complaint were dismissed for failure to state a claim upon which relief may be granted, he was granted leave to replead his Eighth Amendment deliberate medical indifference cause of action against defendant Kevin Sheridan.  Plaintiff has now filed an amended complaint in which he asserts excessive force and deliberate medical indifference claims, in violation of the Eighth Amendment, arising from allegations that defendant Sheridan punched and thereafter neglected to seek medical attention on Lewis's behalf for twenty-five minutes.

In response to plaintiff's amended complaint, defendant Sheridan has again moved seeking dismissal of plaintiff's deliberate medical indifference cause of action.  For the reasons set forth below, I recommend that defendant's motion to dismiss be granted.

I.    BACKGROUND[1]

Plaintiff is a New York State inmate currently being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS").  *See generally* Compl. ([Dkt. No. 1](#)).[2]  Although he is now confined elsewhere, at the times relevant to this action plaintiff was an inmate at the Mt. McGregor Correctional Facility ("Mt. McGregor").  *Id.*

According to the allegations in plaintiff's amended complaint, on February 20, 2009, between 8:43 and 9:20 a.m., defendant Kevin Sheridan, a corrections lieutenant employed by the DOCCS and stationed at Mt. McGregor at the time, "punched the plaintiff from behind in his face, causing plaintiff to be knocked out of his chair and un-conscious."  Am.

---

[1]    In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's amended complaint, the contents of which have been accepted as true for purposes of the pending motion.  *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint."  (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546 (1964).  Portions of the background have also been derived from the exhibits attached to plaintiff's amended complaint, which may also properly be considered in connection with a dismissal motion.  *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991) ("[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."); *accord*, *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993).

[2]    This opinion contains hyperlinks to other documents or websites for the convenience of the parties and court staff.  The United States District Court for the Northern District of New York does not endorse, recommend, approve, or guarantee the services or products that any third party may provide.  Moreover, the court accepts no responsibility for the functionality of any hyperlink.  Accordingly, the fact that a hyperlink ceases to work or directs the user to an undesired document or website does not affect this opinion.

Compl. ([Dkt. No. 62](#)) at 5. Plaintiff alleges that, as a result, he suffered injuries to both the "right and left side of his face." *Id.*

Following the use of force, plaintiff maintains that defendant Sheridan did not notify proper medical personnel until at least twenty-five minutes later, despite the "[UNLIMITED] resources [available], such as telephones, walkie/talkies, stretchers, and additional staff on the scene, exactly when the incident occurred." Am. Compl. ([Dkt. No. 62](#)) at 5. Plaintiff alleges that defendant Sheridan declined to immediately notify medical personnel out of "malice," and that, as a result, plaintiff "was subject to additional pain and suffering, requiring a visit to the hospital for a head scan." *Id.*

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on January 9, 2012, with the filing of a complaint and motion for leave to proceed *in forma pauperis.* Dkt. Nos. 1, 2. Generally, plaintiff's original complaint named several defendants and asserted five causes of action. *See generally* Compl. ([Dkt. No. 1](#)). Following the filing of defendants' first a motion to dismiss, [Dkt. No. 30](#), I issued a report recommending that plaintiff's excessive force claim, asserted against defendant Sheridan, survive defendants' motion, and that plaintiff be permitted to file an amended complaint to cure the deficiencies

4

identified with respect to his deliberate medical indifference claim against that defendant, but that all remaining claims be dismissed without leave to replead. Dkt. No. 51 at 38-39. On March 28, 2013, Chief District Judge Gary L. Sharpe issued a memorandum-decision and order adopting that report. Dkt. No. 56. Two months later, plaintiff filed an amended complaint. Dkt. No. 62. That amended complaint, which is now the operative pleading in this matter, asserts excessive force and deliberate medical indifference claims against defendant Sheridan, in violation of the Eighth Amendment. *See generally* Am. Compl. (Dkt. No. 62).

In response to plaintiff's amended complaint, defendant Sheridan, the sole remaining defendant in this action, filed a motion to dismiss for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on June 6, 2013. Dkt. No. 63. In support of his motion, defendant argues that the medical records attached to plaintiff's amended complaint demonstrate that he did not suffer an injury that was sufficiently serious to give rise to an Eighth Amendment deliberate medical indifference cause of action. Dkt. No. 63-1 at 7-9. In response, plaintiff argues that his injury was sufficiently serious because, *inter alia*, defendant Sheridan's use of force rendered him unconscious. Dkt. No. 66 at ¶ 5.

The defendant's motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    Dismissal Motion Standard

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading using a standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny.  *Ashcroft v. Iqbal*, 556 U.S. at 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. 677-78 (quoting Fed. R. Civ. P. 8(a)(2)).  While modest in its requirements, that rule commands that a complaint contain more than mere legal conclusions.  *See id.* at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citing *Twombly*, 550 U.S. at 555-56); *see also Cooper v. Pate*, 378 U.S. 546, 546 (1964); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint does not apply to legal conclusions. *Iqbal*, 556 U.S. at 678.

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *see also Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570) (alterations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant, whose

complaint merits a generous construction by the court when determining whether it states a cognizable cause of action.  *Erickson*, 551 U.S. at 94 ("'[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)) (internal citation omitted)); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) ("[W]hen a plaintiff proceeds *pro se*, a court is obliged to construe his pleadings liberally." (internal quotation marks and alterations omitted)); *Kaminski v. Comm'r of Oneida Cnty. Dep't of Soc. Servs.*, 804 F. Supp. 2d 100, 104 (N.D.N.Y. 2011) (Hurd, J.) ("A pro se complaint must be read liberally.").

B.    Deliberate Medical Indifference[3]

Liberally construed, plaintiff's amended complaint alleges that defendant Sheridan was deliberately indifferent to plaintiff's serious medical needs when he failed to notify proper medical personnel about plaintiff's injuries, despite having "unlimited" resources to do so, after he punched plaintiff in the face.  Am. Compl. (Dkt. No. 62) at 5.  In support of his motion to dismiss, defendant argues that these allegations do not

---

[3]    Because defendant Sheridan only seeks dismissal of plaintiff's deliberate medical indifference claim, I have not analyzed the sufficiency of the excessive force claim also asserted against him.

plausibly suggest either that plaintiff suffered a serious medical injury, or that defendant acted with the requisite mental state in failing to provide plaintiff with medical care. Def.'s Memo. of Law (Dkt No. 63-1) at 7-11.

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society[,]' or which 'involve the unnecessary and wanton infliction of pain[.]'" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) and *Gregg v. Georgia*, 428 U.S. 153, 169-73 (1976) (internal citations omitted)). While the Eighth Amendment "'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)).

"These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle,* 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, . . . may actually produce physical torture or lingering death, [and] . . . [i]n less serious cases, . . . may result in pain and suffering no one suggests would serve any penological purpose." *Id.*

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment must satisfy

both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, 697 F. Supp. 2d 344, 356 (E.D.N.Y. 2010). To satisfy the objective requirement, the Second Circuit has said that

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care . . . . Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

*Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006)

The second inquiry of the objective test requires a court to look at the seriousness of the inmate's medical condition if the plaintiff alleges a complete failure to provide treatment. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280.

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin*, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quoting *Smith*, 316 F.3d at 185).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases . . ., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer,* 511 U.S. at 837); *see also Leach v. Dufrain,* 103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.)

(citing *Farmer*); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.).[4] "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40).

In this case, turning first to the objective element of a deliberate medical indifference claim, because the amended complaint alleges that defendant Sheridan waited twenty-five minutes to contact medical personnel after he punched plaintiff in the face with enough force to render him unconscious, Am. Compl. (Dkt. No. 62) at 5, I must focus on whether a twenty-five minute delay under the circumstances alleged is sufficiently serious. *Smith*, 316 F.3d at 185 ("When the basis for a prisoner's Eighth Amendment claim is a temporary delay . . . in the provision of otherwise adequate treatment, it is appropriate to focus on the challenged *delay* . . . in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms,' sufficiently serious,' to support an Eighth Amendment claim." (emphasis in original)). "A delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces 'a conscious disregard of a

---

[4]    Copies of all unreported decisions cited to in this report have been appended for the convenience of the *pro se* plaintiff.

substantial risk of serious harm.'"  *Thomas v. Nassau Cnty. Corr. Ctr.*, 288 F. Supp. 2d 333, 339 (E.D.N.Y. Oct. 28, 2003) (quoting *Chance*, 143 F.3d at 703); *accord*, *Johnson v. Enu*, No. 08-CV-0158, 2011 WL 3439179, at *10 (N.D.N.Y. July 13, 2011) (Homer, M.J.), *report and recommendation adopted by* 2011 WL 3439524 (N.D.N.Y. Aug. 5, 2011) (Scullin, J.).  "Even if a prisoner is able to establish delay, he must also show that his condition became worse or deteriorated as a result of the delay."  *Johnson*, 2011 WL 3439179, at *10 (citing *Thomas*, 288 F. Supp. 2d at 339)).

Plaintiff's amended complaint alleges that defendant Sheridan waited twenty-five minutes before contacting medical personnel after allegedly punching him, and that, as a result of this delay, "plaintiff was subjected to additional pain and suffering, requiring a visit to the hospital for a head scan."  Am. Compl. ([Dkt. No. 62](#)) at 5.  These vague allegations do not plausibly suggest that the delay in medical care significantly increased his risk of injury.  There are no allegations in the amended complaint that explain how the delay, rather than the punch itself, caused plaintiff to undergo a head scan, and there are no allegations that elaborate on the vague suggestion that he suffered "additional pain."  *See generally* Am. Compl. ([Dkt. No. 62](#)).  Moreover, there are no allegations that defendant Sheridan waited twenty-five minutes in an effort to punish

plaintiff, or "ignored a life threatening and fast-degenerating condition . . ., or delayed major surgery[.]" *Espinal v. Coughlin*, No. 98-CV-2579, 2002 WL 10450, at *3 (S.D.N.Y. Jan. 3, 2002) (quotation marks omitted) (citing *Demata v. N.Y.S. Corr. Dep't of Health Servs.*, 198 F.3d 233, at *2 (2d Cir. Sept. 17, 1999)). I note that the allegation indicating defendant Sheridan delayed medical treatment "with malice" is not sufficient to plausibly suggest that defendant Sheridan sought to punish plaintiff. Am. Compl. (Dkt. No. 62) at 5. Moreover, although plaintiff alleges that the application of force by defendant Sheridan rendered him unconscious, there are no allegations that his life was threatened, or the extent of the pain and injuries he suffered that would permit the court to infer a life threatening injury. *See generally id.* In fact, the medical records attached to the plaintiff's complaint indicate that, when he was seen at the Mt. McGregor infirmary on the same day of the incident, he presented "no acute medical problems," and that he refused ice for the slight swelling found on his face.[5] *Id.* at 9-10. Because there are no allegations plausibly suggesting

---

[5] Plaintiff has appended his medical records and the misbehavior reports issued to him as a result of the incident on February 20, 2009 to his amended complaint. Am. Compl. (Dkt. No. 62) at 8-32. The court may properly consider those extrinsic materials in connection with the pending motion to dismiss. *See Solomon v. Human Servs. Coalition of Tompkins Cnty. Inc.*, No. 11-CV-0226, 2012 WL 3996875, at *7 (N.D.N.Y. Sept. 11, 2012) (Suddaby, J.) ("Generally, when contemplating a dismissal pursuant to Fed. R. Civ. P. 12(b)(6) or Fed. R. Civ. P. 12(c), the following matters outside the four corners of the complaint may be considered without triggering the

that plaintiff suffered a serious injury requiring medical attention within twenty-five minutes, I conclude that plaintiff's amended complaint fails to satisfy the objective element of the medical deliberate indifference inquiry. *See Smith*, 316 F.3d at 186 (holding that, even if "an inmate suffers from an admittedly serious medical condition," a temporary delay in treatment may not be sufficiently serious if "the alleged lapses in treatment are minor and inconsequential"); *Cole v. N.Y.S. Dep't of Corr.* Servs., No. 10-CV-1098, 2012 WL 4491825, at *15 (N.D.N.Y. Aug. 31, 2012) (Dancks, M.J.), *report and recommendation adopted by* 2012 WL 4506010 (N.D.N.Y. Sept. 28, 2012) (Mordue, J.) (finding that a one-hour delay in treatment, where the allegations regarding the plaintiff's injuries included "two small abrasions and three small pink areas," were not sufficient to plausibly suggest a serious medical condition under the Eighth Amendment); *Cain v. Jackson*, No. 05-CV-3914, 2007 WL 2193997, at *7 (S.D.N.Y. July 27, 2007) ("[E]ven if [the plaintiff's] version of the facts is accepted, it would only indicate that her access to such treatment was delayed for a few hours, which is insufficient to implicate the Eighth Amendment.").

---

standard governing a motion for summary judgment: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are 'integral' to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case." (footnote omitted) (citing cases)).

*Compare Tlamka v. Serrell*, 244 F.3d 628, 630-31 (8th Cir. 2001) (finding,

on a motion for summary judgment, that the record evidence gave rise to a

cognizable Eighth Amendment deliberate medical indifference claim where

the plaintiff alleged that the defendants-corrections officers ordered

inmates to stop performing CPR on a the plaintiff who had a heart attack in

the yard, despite positive results brought about by their efforts, and the

inmate's condition deteriorated immediately and no further efforts were

made to resuscitate him until he was transported to a prison nurse, up to

ten minutes later).

Even assuming, however, that plaintiff's amended complaint satisfies

the objective inquiry, it does not meet the requirements of the subjective

element of the deliberate indifference test. The only allegation in the

amended complaint that could be said to even suggest that defendant

Sheridan acted with the requisite "deliberate indifference" is plaintiff's

contention that defendant Sheridan waited twenty-five minutes to contact

medical personnel "with malice." Am. Compl. (Dkt. No. 62) at 5. In

addition, in plaintiff's opposition to the pending motion to dismiss plaintiff

states, "[D]efendant Sheridan knew what he did and what he was doing,

but because he had no justification for what he did[,] he deliberately

became indifferent to the plaintiff[']s medical needs, and did everything

that he could to prevent the plaintiff from obtaining medical attention."

Plf.'s Resp. ([Dkt. No. 66](#)) at ¶ 20.  Neither of these allegations, however, is anything but conclusory.  It is not enough to satisfy the pleading requirements of a deliberate medical indifference claim to merely restate the elements of a claim; that is, however, precisely what plaintiff has done by parroting language such as "malice" and "deliberate indifference."  *See Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" (quotation marks and alterations omitted)); *accord*, *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129 (2d Cir. 2013).

Moreover, plaintiff's suggestion that defendant Sheridan was aware of a substantial risk to his serious medical condition simply because he was unconscious is not plausible.  Plf.'s Resp. ([Dkt. No. 66](#)) at ¶ 20. Again, plaintiff's amended complaint fails to allege how long he was unconscious, and it is only vaguely alleged that he suffered an "injur[y] . . . to both the right and left side of his face."  Am. Compl. ([Dkt. No. 62](#)) at 5. The medical records from the date of the incident, which are attached to plaintiff's amended complaint, show that plaintiff did not have an "acute medical problem," there was some swelling found on the right upper cheek

and lower eyelid and upper left cheek and no other injury or trauma found. Am. Compl. (Dkt. No. 62) at 9, 10, 12, 13.  Moreover, the medical records indicate that plaintiff refused ice for the swelling to his face.  *Id.* at 10. Without more, I cannot conclude that the amended complaint plausibly suggests that defendant Sheridan's delay in contacting medical personnel for twenty-five minutes was out of a deliberate indifference to plaintiff's serious medical needs.  *Compare Bozeman v. Orum*, 422 F.3d 1265, 1273 (11th Cir. 2005) ("We also conclude that the Officers, who knew Haggard was unconscious and not breathing and who then failed for fourteen minutes to check Haggard's condition, call for medical attention, administer CPR or do anything else to help, disregarded the risk facing Haggard in a way that exceeded gross negligence."); *Morgan v. Cnty. of Nassau*, 720 F. Supp. 2d 229, 239 (E.D.N.Y. 2010)  (finding the complaint alleged sufficient facts to give rise to an Eighth Amendment deliberate medical indifference claim where it was alleged that the defendant's "horse stepped on [the plaintiff], he lay unattended and unconscious on the ground, bleeding from the head . . . and [the defendant] deliberately ignored [the plaintiff's urgent medical need] for an unreasonable period of time").

Because I find that plaintiff's amended complaint fails to allege facts that satisfy either the objective or subjective elements of the Eighth Amendment medical indifference claim asserted against defendant Sheridan, I recommend that the claim be dismissed.

IV.    SUMMARY AND RECOMMENDATION

Plaintiff's amended complaint, like his original, fails to allege sufficient facts to give rise to a cognizable deliberate medical indifference claim against defendant Sheridan.  Specifically, the allegations do not plausibly suggest either that defendant Sheridan's twenty-five minute delay in seeking medical treatment was the result of a conscious disregard to a serious injury, or that he was actually aware of a substantial risk that serious harm would result.

Accordingly, it is hereby respectfully

RECOMMENDED that defendant's motion to dismiss (Dkt. No. 63) be GRANTED, and that only plaintiff's Eighth Amendment excessive force claim against defendant Kevin Sheridan remain in this action.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

_____
David E. Peebles
U.S. Magistrate Judge

Dated:      October 3, 2013
            Syracuse, New York



Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER FN1

> FN1. This matter was referred to the undersigned
> pursuant to 28 U.S.C. § 636(b) and
> N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments. FN2 In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

## I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

## II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

## III. Discussion

### A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

### 1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. Compare *Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and* *Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with* *Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See* *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,*524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at \*3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at \*3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989);* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Eric JOHNSON, also known as Debah J. Smith,
Plaintiff,
v.
Ayisha ENU, Physician, Hudson Correctional Facility;
Peter Bogarski; Reuteneaur, Jane Doe; McCoy, John
Doe; H.M. Miles; Joyce Duke; Wolff, John Doe;
Rother, Jane Doe; George, John Doe; Testo, John Doe;
Peter Behrle; M. Graziano; Michael Ambrosino; Philip
Heath; T. Mahar, Senior Correction Counselor, Greene
Correctional Facility; T. Gaines; Caulfield, John Doe;
John Doe # 1; John Doe # 2; Karen Meicht, Nurse,
Hudson Correctional Facility; Winnie, Lieutenant,
Hudson Correctional Facility; and Coffey, John Doe,
Defendants.[FN1]

> **FN1.** Ankesh Nigam and John Rodgers were also
> named as defendants in the amended complaint.
> Dkt. No. 64. On September 18, 2010, their
> motion for summary judgment was granted. Dkt.
> No. 115. Further, John Doe George was named
> as a defendant in the original complaint (Dkt.
> No. 1) but he was not named as a defendant in
> the amended complaint (Dkt. No. 64). The
> amended complaint also fails to allege that
> George engaged in any of the alleged
> unconstitutional conduct. Accordingly, the Clerk
> is directed to terminate him as a party to this
> action.

No. 08–CV–158 (FJS/DRH).

July 13, 2011.
Eric Johnson, c/o Debah J. Smith, Brooklyn, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Dean J. Higgins, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

**REPORT–RECOMMENDATION AND ORDER**[FN2]

> **FN2.** This matter was referred to the undersigned
> for report and recommendation pursuant to 28

U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

**\*1** Plaintiff *pro se* Eric Johnson ("Johnson"), formerly
an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), brings
this action pursuant to 42 U.S.C. §§ 1983 and 1985
alleging that defendants, twenty-one DOCS employees,
violated his constitutional rights. Am. Compl. (Dkt. No.
64). Presently pending is defendants' motion for summary
judgment pursuant to Fed.R.Civ.P. 56. Dkt. No. 119.
Johnson has not opposed this motion. For the following
reasons, it is recommended that defendants' motion be
granted in its entirety.

**I. Failure to Respond**

Johnson did not oppose defendants' motion.
"Summary judgment should not be entered by default
against a pro se plaintiff who has not been given any
notice that failure to respond will be deemed a default."
*Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996).
Defendants and the Court provided such notice here. Dkt.
Nos. 119–14, 120. Despite this notice, Johnson failed to
respond. "The fact that there has been no response to a
summary judgment motion does not ... mean that the
motion is to be granted automatically ." *Champion,* 76
F.3d at 436. Even in the absence of a response, a
defendant is entitled to summary judgment only if the
material facts demonstrate his or her entitlement to
judgment as a matter of law. *Id.;* Fed.R.Civ.P. 56(c).

Because Johnson has not responded to raise any
question of material fact, the facts-but not the legal
conclusions-set forth in defendants' Rule 7.1 Statement of
Material Facts (Dkt. No. 119–1) [hereinafter "Defs.' 7.1
Statement"] are accepted as true. *See, e.g., Onanuga v.
Pfizer, Inc.,* 369 F.Supp.2d 491, 493 n. 1 (S.D.N .Y.2005)
(citing *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 72
(2d Cir.2001); *Lopez v. Reynolds,* 998 F.Supp. 252, 256
(W.D .N.Y.1997);* see also* N.D.N.Y.L.R. 7.1(a)(3) *("The
Court shall deem admitted any facts set forth in the
Statement of Material Facts that the opposing party does
not specifically controvert."* ) (emphasis in original).

Finally, as to those facts not contained in defendants'
7.1 statement, the Court will assume for purposes of this

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

motion that plaintiff's version of those facts is true, as plaintiff is entitled to the benefit of all inferences at this stage. *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998). To be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit (or verified complaint) must, among other things, be based on "personal knowledge." Fed.R.Civ.P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). While the amended complaint is not notarized as was the original complaint (Dkt. No. 1), the amended complaint contains a statement above Johnson's signature stating, "I declare under penalty that the foregoing is true and correct." Am. Compl. at 31; Compl. at 21. Both verifications suffice to require that these documents be considered in opposition to the pending motion as long as the other requirements of Rule 56(c)(4) are satisfied, including personal knowledge, admissibility, and competency. *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

## II. Background

**\*2** In February 2005, while housed at Ulster Correctional Facility, Johnson was diagnosed with Hepatitis B. Defs.' 7.1. Statement ¶ 18. He was transferred to Hudson Correctional Facility ("Hudson") on March 15, 2006. *Id.* ¶ 19. Dr. Ayisha Enu, a defendant herein, reviewed Johnson's medical records upon his arrival at Hudson. *Id.* ¶ 22. On March 22, Hudson medical staff performed additional blood tests. *Id.* ¶ 24. Five days later, on March 27, Johnson informed Dr. Enu of his hepatitis diagnosis. *Id.* ¶ 23.

Dr. Enu received the results from Johnson's blood tests on September 1. *Id.* ¶ 25. The tests revealed that Johnson was HbeAg negative and anti-HBe positive, indicating that he had a variant of Hepatitis B and likely had it "for a very long time.". *Id.* ¶¶ 26–27. Dr. Enu then ordered liver function tests and counseled Johnson on the disease and treatment options. *Id.* ¶ 28. Johnson's liver function and Hepatitis B viral load tests were drawn on August 30. *Id.* ¶ 29. Those tests revealed elevated liver enzyme levels as compared to tests conducted earlier in

the year. *Id.* ¶ 30. Dr. Enu and Johnson discussed the results on September 5. *Id.* ¶ 31. Johnson stated that he did not believe the results because his liver function tests were always normal. *Id.* Dr. Enu then ordered a repeat of the liver function and Hepatitis B viral load tests. *Id.* ¶ 32.

On September 11, 2006, the results from the Hepatitis viral load drawn on August 30, 2006, "revealed a very high [viral load] count." Defs.' 7.1 Statement ¶ 33. Four days later, on September 15, Dr. Enu made arrangements for Johnson to see Dr. Rodgers, a gastroenterology specialist at Albany Medical Center Hospital, to discuss Hepatitis treatment. *Id.* ¶ 34. Samples for liver function and Hepatitis B tests were drawn again on September 20, 2006. *Id.* ¶ 35. Those tests, once again, revealed elevated enzyme levels. *Id.* Dr. Enu saw Johnson again on October 26. *Id.* ¶ 36. Dr. Enu ordered Hepsera for Johnson, and they discussed the blood and liver function testing regiment that Johnson would undergo once he started treatment. *Id.*

After starting treatment on October 26, Johnson researched Hepsera and learned of the complications that could develop if he were to ever stop taking the drug. Am. Compl. at 9; *see also* Defs.' Ex. B (Dkt. No. 119–4) at 263. Johnson returned to medical staff on November 3, 2006, because he had questions about the medication. Defs.' 7.1 Statement ¶ 37. Dr. Smith, who was covering for Dr. Enu, explained to Johnson the need for follow up and compliance because Hepatitis B is a chronic disease and that his liver function tests showed abnormal enzyme levels. *Id.* Johnson returned to the medical department on November 16 because he was concerned about Hepsera's side effects. Am. Compl. at 9; *see also* Defs.' Ex. B at 258. Nurse Peter Bogarski, a defendant herein, allegedly ignored Johnson's questions and asked that he be removed from the examination room. *Id.*

**\*3** Johnson requested permission from his instructor to file a grievance after returning to his work assignment. Am. Compl. at 9. He went to the library to file a grievance directly with Grievance Officer T. Testo, a defendant herein, but Testo was not present. *Id.* at 9–10. Johnson took a grievance form and attempted to return to his assignment but he was stopped by Correction Officer Rother, also a defendant herein. *Id.* at 10. Rother

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

conducted a pat and frisk of Johnson and told him that he could not file a grievance in there and to return to his assignment. *Id.* Correction Sergeant John Doe Wolfe,[FN3] another defendant herein, escorted Johnson back to his assignment. *Id.* Wolfe then questioned Instructor Deer about Johnson's "movement." *Id.* Deer stated that he assumed that Johnson was returning to the medical unit. *Id.* Johnson received a misbehavior report. *Id.*

> **FN3.** Defendant Wolfe's name is incorrectly spelled in the amended complaint. *See* Dkt. No. 64. The correct spelling is Wolfe. *See* Defs.' Answer to Am. Compl. (Dkt. No. 79) ¶ 2.

A CT scan was performed on Johnson at Albany Medical Center Hospital on November 25, 2006. Defs.' 7.1 Statement ¶ 38. On November 28, Dr. Enu learned that the scan revealed a mass on the tail of Johnson's pancreas. *Id.* ¶ 39. Johnson had an MRI on December 18. *Id.* ¶ 40. Consistent with the results of the earlier CT scan, the MRI also showed a mass on the tail of Johnson's pancreas. *Id.* ¶ 44. The differential diagnosis of the MRI "include[d] islet cell tumor, metatastic disease, or carcinoid." *Id.* ¶ 45; *see also* Defs.' Ex. B at 150.

Nurse Karen Meicht, a defendant herein, examined Johnson on December 13, 2006, after Johnson complained of stomach problems. Am. Compl. at 11; *see also* Defs.' Ex. B at 256. Johnson asked when he would see Dr. Rodgers again. Am. Compl. at 11. Meicht told Johnson that he would have to wait until the test results were ready for review. *Id.; see also* Defs.' Ex. B at 256. Johnson then received some stomach fiber and left the medical department. Am. Compl. at 11.

Dr. Enu referred Johnson to Dr. Nigam, a surgeon at Albany Medical College, for a consultation. Defs.' 7.1 Statement ¶ 46. Dr. Nigam's first examined Johnson on January 5, 2007, and Johnson agreed to remove the mass on the pancreas surgically. Nigam Aff. (Dkt. No. 94–2) ¶¶ 9–10. Four days later, Johnson claims to have written a letter to Bogarski, "requesting further clarity on the proposed surgery." Am. Compl. at 9. On January 30, 2007, the day of the scheduled surgery, Johnson expressed his reluctance to proceed with the surgery and wanted more information on other options, including waiting or a

biopsy. Nigam Aff. ¶ 11. Dr. Nigam warned Johnson that there was a "small risk" that the mass could develop into cancer by waiting. *Id.* Johnson decided not to have the surgery, and on April 5, 2007, Dr. Nigam wrote an order for a biopsy of the pancreas with Dr. Sood. *Id.* ¶ 12; Defs.' 7.1 Statement ¶ 49.

Johnson met with defendants Enu, Bogarski, Meicht and Nurse Jane Doe Reuteneaur [FN4] on February 2, 2007, to discuss follow-up surgical treatment. Am. Compl. at 14; *see also* Defs.' Ex. B at 88. Johnson claims that Enu acted as if the surgery were an elective procedure and focused on the mass on the chest instead of the mass on the pancreas. Am. Compl. at 14. Reuteneaur allegedly told Johnson that there was nothing that medical staff could do because Johnson refused the surgery. *Id.* Following this meeting, Hudson Deputy Superintendent for Security H.M. Miles, a defendant herein, allegedly removed Johnson from the outside community work crew, "implying" that Johnson had caused a disturbance. Am. Compl. at 14.

> **FN4.** Both the original complaint and the amended complaint name "Jane Doe Reuteneaur" as a defendant. Johnson believes that this defendant is female. *See* Am. Compl. at 5, 18. Terry Reuteneaur accepted service of the original complaint. *See* Dkt. No. 49. In support of the present motion, Terry Reuteneaur submitted an affidavit stating that he is male and that the allegations made against Jane Doe Reuteneaur do not refer to him. Reuteneaur Decl. (Dkt. No. 119–12) ¶¶ 4–5. Even if the pleadings were served on the incorrect person, no further identification or service upon Jane Doe Reuteneaur is necessary because doing so would be futile as Johnson has failed to state a claim against Jane Doe Reuteneaur. *See* discussion *infra* Point III(D)(4).

**\*4** On March 1, 2007, Johnson was brought to the medical building after complaining of a "spinning headache." Defs.' 7.1 Statement ¶ 61; Am. Compl. at 15. Dr. Enu recommended that Johnson be evaluated at Columbia Memorial Hospital because the Hudson emergency medical staff leaves at 10:00PM, and Johnson's

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

"new symptom" might require emergency medical staff. Defs.' 7.1 Statement ¶¶ 62–64. Johnson refused to go to the private hospital. *Id.* ¶ 66. Johnson was then sent to Coxsackie Correctional Facility's Regional Medical Unit ("Coxsackie RMU") for observation. *Id.* ¶ 68. Before returning to Hudson on the next day, Coxsackie RMU medical staff allegedly told Johnson that there was no reason for the transfer. Am. Compl. at 16.

Upon Johnson's return to Hudson on March 2, Meicht issued Johnson a misbehavior report, accusing Johnson of lying, providing false information, and failing to report an illness. Am. Compl. at 16; *see also* Defs.' Ex. D (Dkt. No. 119–6) at 4. Correction Lieutenant Winnie, a defendant herein, found Johnson guilty. Defs.' Ex. D at 1. Johnson received thirty-days in keeplock, and he had recreation, package, commissary, and phone privileges suspended for fifteen days. *Id.*

Johnson learned on March 15, 2007, that Dr. Enu requested a change in Johnson's medical level so that he could be transferred. *Id.* at 17. Johnson claims that the real reason for the transfer was because he was "argumentative and problematic." *Id.* Johnson also wrote to Bogarski on March 15 to request a "reevaluation of the canceled pancreatic surgery." Am. Compl. at 17. Johnson did not receive a response. *Id.*

Johnson was transferred to Greene Correctional Facility ("Greene") on March 21, 2007. Defs.' 7.1 Statement ¶ 52. Upon arriving at Greene, Johnson wrote to Greene Superintendent Peter Behrle, a defendant herein, requesting information on the transfer. Am. Compl. at 18. Greene Deputy Superintendent for Security M. Graziona, also a defendant herein, responded on April 2, 2007, and told Johnson that he was transferred for unspecified medical reasons and that he would return to Hudson once his medical needs were met. *Id.* Also on April 2, Johnson spoke with Physician John Doe Caulfield, another defendant herein, about the reason for the transfer and biopsy. *Id.* Johnson claims that Caulfield "made it appear as if [Johnson] were requesting the needle biopsy as an elective procedure," and that it took Caulfield two months to order the biopsy despite the "urgency of [the] condition." *Id.*

Graziano allegedly wrote to Johnson on June 17, 2007, to inform Johnson that his medical condition was changed, permitting him to transfer out of Greene. Am. Compl. at 19. Three days later, Johnson claims to have received a letter from Correction Counselor T. Gaines, a defendant herein, stating that Johnson's transfer was awaiting approval from the central office in Albany. *Id.*

**\*5** On June 6, 2007, while at Greene and under the care of Dr. Sood, Johnson underwent an upper endoscopy ultrasound in an attempt to biopsy the pancreatic mass. Defs.' 7.1 Statement ¶¶ 50–51. The pancreatic mass, however, could not be visualized. *Id.* ¶ 51. On September 7, 2007, under the care of Dr. Doreen Smith at Greene, Johnson had a CT scan. *Id.* ¶ 53. This scan showed a stable pancreatic tail mass that had been stable for at least ten months. *Id.* ¶ 53. Johnson also received a letter on September 7 from Behrle, stating that the transfer back to Hudson was now permissible. Am. Compl. at 19. But two weeks later, on September 21, Johnson received a letter from Gaines, stating that the central office denied the transfer as Greene was the proper facility because of Johnson's medical condition. *Id.* at 20. Greene Deputy Superintendent Michael Ambrosino, also a defendant herein, allegedly sent Johnson a letter on September 24 to inform him that his "medical level" was changed due to a hold placed on Johnson by the parole board on March 15, 2007. *Id.*

While at Greene, Johnson filed two grievances on September 22, 2007. Am. Compl. at 23. One grievance was about the failure to honor his request to speak with Caulfield. *Id.* The other was related to the circumstances of Johnson's transfer to Greene in March 2007. *Id.* Johnson was allegedly told that transfers were not grievable and that the grievance would not be filed. *Id.* Johnson alleges that it was Defendants John Doe # 1 [FN5] and John Doe # 2 who refused to file these grievances. *Id.* On October 3, 2007, Senior Correction Counselor Tim Mahar, another defendant herein, wrote to Johnson to inform him that an "unscheduled transfer [has] been submitted." Am. Compl. at 20. Johnson received a letter on October 16 from Greene Deputy Superintendent for Programs Philip Heath, also a defendant herein, stating that Johnson was "to remain at Greene." *Id.*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

FN5. Rule 4(m) of the Federal Rules of Civil Procedure requires that service of process be effectuated within 120 days of the date of the filing of the complaint. See also N.D.N.Y.L.R. 4.1(b) (service of process must be made within sixty days of the filing of the complaint). Because these defendants have not been identified by Johnson or served with process, it is recommended that the complaint be dismissed without prejudice as to John Doe # 1 and John Doe # 2. No further identification or service upon John Doe # 1 or John Doe # 2 are necessary because doing so would be futile as Johnson has failed to state a claim against these defendants. See discussion infra Point III(F).

Johnson returned to Hudson on February 2, 2008. Defs.' 7.1 Statement ¶ 56. Dr. Enu continued to work with Johnson in conjunction with Dr. Nigam and Dr. Rodgers.[FN6] Id. ¶ 52. Dr. Enu saw Johnson on March 28 and April 9, 2008, to discuss the elevated tumor markers. Id. ¶ 57. A CT of the liver was scheduled to be performed on May 12, 2008, because of an elevated tumor marker located next to the Hepatic Vein. Id. ¶ 58. Johnson, however, refused the procedure until he had an opportunity to discuss it with his family. Id.

FN6. A detailed discussion of Dr. Nigam's and Dr. Rodgers's involvement in Johnson's medical treatment can be found in the report and recommendation that recommended their dismissal. See Dkt. No. 114.

On April 28, 2008, Johnson was transferred to Coxsackie RMU for a medical trip. Defs.' 7.1 Statement ¶ 5; Am. Compl. at 22. Medical Transport Officer John Doe Coffey, a defendant herein, secured Johnson into a transport vehicle with handcuffs, chains, and leg irons. Defs.' 7.1 Statement ¶ 5. Johnson alleges that he was fondled in the "groin area" by Coffey during this process. Am. Compl. at 22. Johnson claims that this was the third such incident. Id. Johnson and Correction Sergeant Wolfe discussed this incident several days later, and Wolfe said that he would conduct an investigation. Id. Johnson was scheduled for a medical trip on May 12, 2008. Id. He requested that Coffey not be the transport officer for that

trip. Id. On May 12, however, Coffey was the transport officer, but Wolfe supervised the process. Id. Johnson complained that the shackles around his ankles were too tight but Wolfe said that Johnson had enough room. Id.

*6 Dr. Enu had another appointment to discuss the liver biopsy with Johnson on July 30, 2008. Id. at ¶ 59. Johnson refused the procedure. Id. at 55. This appointment was the last time that Dr. Enu examined Johnson. Id. ¶ 54. Johnson was transferred to Greene on August 15, 2008. Id. ¶ 60.

**III. Discussion**

**A. Legal Standard**

A motion for summary judgment may be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits that support the motion. Id.; see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. Matsushita Elec. Indus. Co. v.. Zenith Radio Corp., 475 U.S. 574, 585–86. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. Id. at 586. It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223–24 (2d Cir.1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-moving party special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

[t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude,"; that a *pro se* litigant's submissions must be construed liberally,"; and that such submission must be read to raise the strongest arguments that they "suggest[.]" At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the *pro se* litigant's allegations, or arguments that the submissions themselves do not "suggest,"; that we should not "excuse frivolous or vexatious filings by *pro se* litigants," and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law."

*Id.* (internal citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.") (citations omitted).

**B. Eleventh Amendment Immunity**

**\*7** The Eleventh Amendment prohibits suits against a state in federal court unless the state consents or waives its immunity. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101 (1984). A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997). The State has not consented to suit or waived its immunity here. § 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Daisernia v. New York,* 582 F.Supp. 792, 796 (S.D.N.Y.1984). Thus, a suit that seeks monetary damages from an official in his or her official capacity is barred even though asserted against the individual. *Kentucky v. Graham,* 473 U.S. 159, 169 (1985).

Johnson has named defendants in their official capacities as DOCS employees. *See* Am. Compl. at 2–6. Although defendants have not moved to dismiss on Eleventh Amendment grounds, it is recommended that the Court *sua sponte* dismiss any claims against defendants for money damages in their official capacities. *See* 28 U.S.C. § 1915(e)(2)(B)(iii).

**C. Personal Involvement**

Personal involvement is an essential prerequisite for § 1983 liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). A section 1983 defendant, however, cannot be liable "merely because he held a supervisory position of authority." *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Supervisory personnel may be considered "personally involved" only if the defendant: (1) directly participated in the alleged constitutional violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that a violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).[FN7]

> [FN7]. The Supreme Court's decision in *Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009), casts doubt in the continued viability of some of the categories set forth in *Colon. See Sash v. United States,* 674 F.Supp.2d 531 (S.D.N.Y.2009). Here, the Court will assume *arguendo* that all of the *Colon* categories apply.

**1. McCoy, Duke, and Testo**

Besides naming McCoy, Duke, and Testo in the amended complaint, Johnson has made no allegations that those defendants engaged in the alleged unconstitutional conduct. Accordingly, those defendants should be granted summary judgment.

**2. Behrle, Graziano, Ambrosino, Heath, Mahar, and Gaines**

Behrle, Graziano, Ambrosino, Heath, Mahar, and Gaines either received letters from Johnson or responded to Johnson when he inquired as to why he was transferred to Greene from Hudson. *Id.* at 18–20. Without more, Johnson has not alleged the personal involvement of these defendants in any alleged unconstitutional conduct. Nor does Johnson allege that he notified these defendants of the alleged unconstitutional conduct. He merely inquired into reasons for the transfer. *See id.*

Further, even if Johnson alleged unconstitutional conduct in these letters, the "mere receipt of letters from

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

an inmate by a [supervisory official] regarding [unconstitutional conduct] is insufficient to constitute personal liability." *Gonzales v. Wright,* No. 9:06–CV–1424 (JMH), 2010 U.S. Dist. LEXIS 15953, at *28, 2010 WL 681323, at *10 (N.D.N.Y. Feb. 22, 2010) (citations omitted); *see also Booker v. Doe,* No. 9:06–CV–73 (GLS), 2008 U.S. Dist. LEXIS 76413, at *22, 2008 WL 4527601, at *7 (N.D.N.Y. Sept. 30, 2008) ("It is now well-settled that the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement.").

**\*8** Accordingly, these defendants should be granted summary judgment.

### D. Pendent State Law Claims

To the extent that Johnson's claims may be construed as pendent state law claims alleging lack of informed consent prior to treatment, such claims must fail. Federal courts have supplemental jurisdiction over pendent state law claims pursuant to 28 U.S.C. § 1367. It is recommended, herein, however, that defendants be granted summary judgment on Johnson's federal claims against them on which rests federal jurisdiction over the pendent state law claims. Johnson asserts no other basis for the Court's jurisdiction over these claims and, therefore, the Court should decline to exercise supplemental jurisdiction over Johnson's state law claims if the recommendations are accepted. *See* 28 U.S.C. § 1367(c)(3). Such causes of action should be dismissed without prejudice.

Moreover, even if the state law claims are addressed, they still fail. In order to state an actionable claim for failure to provide informed consent:

plaintiff must prove (1) that the person providing the professional treatment failed to disclose alternatives thereto and to inform the patient of reasonably foreseeable risks associated with the treatment, and the alternatives, that a reasonable medical practitioner would have disclosed in the same circumstances, (2) that a reasonably prudent patient in the same position would not have undergone the treatment if he or she had been fully informed, and (3) that the lack of informed consent is a proximate cause of the injury.

*Foote v. Rajadhyax,* 702 N.Y.S.2d 153, 153 (N.Y.2000) (citations omitted). In this case, there is nothing in the record to show that the medical treatment that any of the defendants provided were the proximate cause of Johnson's injuries. In fact, there is nothing to show that Johnson was injured at all.

### E. Deliberate Medical Indifference

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This prohibition extends to the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d158, 162–63 (2d Cir.2003) (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

**\*9** Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. As such, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

In this case, defendants do not appear to challenge the fact that Hepatitis B and its potential complications or the resulting malignancies in Johnson's pancreas were serious medical needs. Rather, defendants contend that they were not deliberately indifferent.

### 1. Dr. Enu

Johnson contends that Dr. Enu was not receptive enough to a biopsy when the liver tumor was first discovered in 2006, refused to follow the advice of specialists who recommend a biopsy, and failed to refer Johnson to an oncologist. Am. Compl. at 25–26.

First, mere disagreements on treatment between a prison inmate and his doctor do not rise to the level of a constitutional violation. *Sonds,* 151 F.Supp.2d at 312. Likewise, even if other doctors, as Johnson argues, disagreed with Dr. Enu's prescribed treatment, Dr. Enu is entitled to his own medical judgment and the mere fact that he disagreed with other medical professionals is insufficient to show deliberate indifference even if Dr. Enu's judgment was misguided or negligent. *See Ortiz v. Makram,* No. 96 Civ. 3285, 2000 WL 1876667, at *10 (S.D.N.Y. Dec. 21, 2000).

Also, Johnson's refusal of the prescribed treatment further negates allegations of deliberate indifference. *See Gillard v. Rovelli,* No. 9:09–CV–0860 (NAM/GHL), 2010 WL 4905240, at *10 (N.D.N.Y. Sept. 29, 2010) (Lowe, M.J.) (citing *Rivera v. Goord,* 253 F.Supp.2d 735, 756

(S.D.N.Y.2003)). On May 14, 2008, Johnson refused a CT of his liver to evaluate whether a mass had become cancerous or spread. Defs.' Ex. B at 36–38. He refused the CT scan once again on June 19, 2008. *Id.* at 32–34. Finally, on July 30, 2008, Johnson refused a liver biopsy. *Id.* at 29. While Johnson might have refused the prescribed treatment because he disagreed with them, prisoners are not afforded the medical treatment of their choice. *Chance,* 143 F.3d at 703.

Finally, a review of Johnson's medical records fails to reveal any indication or suggestion that Dr. Enu was deliberately indifferent to Johnson's serious medical needs. Upon Johnson's transfer to Hudson on March 15, 2006, Dr. Enu reviewed Johnson's medical records. Defs.' Ex. B at 273. Dr. Enu conducted a physical examination of Johnson and learned of his Hepatitis B diagnosis approximately a week and a half later on March 27. *Id.* at 272. Dr. Enu ordered blood and liver function tests to evaluate Johnson's condition and repeated the tests after Johnson refused to believe the results. Defs.' Ex. B at 269–70. Dr. Enu also referred Johnson to outside specialists or other medical personnel when Hudson's facilities would be unable to provide assistance. *Id.* at 164 (consultation notes of Dr. Nigam reference referral from Dr. Enu), 176–80 (transfer to Coxsackie RMU because Johnson needed emergency care), 268 (ambulatory health record noting referral to a gastroenterology specialist). There is no indication that Dr. Enu was deliberately indifferent to Johnson's medical needs during the eighteen-month period that Johnson was under Dr. Enu's care.

**\*10** Accordingly, defendants' motion as to Dr. Enu should be granted on this ground.

### 2. Dr. Caulfield

Johnson asserts a delay in medical treatment claim against Dr. Caulfield. Am. Compl. at 18. A "delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Thomas v. Nassau County Corr. Ctr,* 288 F.Supp.2d 333, 339 (E.D.N.Y.2003) (internal quotation marks omitted) (citing *Chance,* 143 F.3d at 703). "The Second Circuit has

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years." *Thomas, 288 F.Supp.2d at 339* (internal quotation marks omitted) (citing *Espinal v. Coughlin,* No. 98 Civ. 2579, *2002 U.S. Dist. LEXIS 20, 2002 WL 10450, at \*3 (S.D.N.Y. Jan. 3, 2002)*). Even if a prisoner is able to establish delay, he must also show that his condition became worse or deteriorated as a result of the delay. *Thomas, 288 F.Supp.2d at 339.*

The record is devoid of any facts demonstrating that Dr. Caulfield delayed the procedure as a form of punishment, ignored a life threatening and fast-degenerating condition, or delayed major surgery. Johnson accuses Dr. Caulfield of waiting two months before ordering a needle biopsy. Am. Compl. at 18. Johnson claims that Dr. Caulfield acted as if the procedure were elective, and he appeared to have no knowledge of Dr. Nigam's "order for a needle biopsy." *Id.* Johnson also believed that the procedure was required immediately because of the "urgency of [his] condition." *Id.* There is no indication, however, that the needle biopsy was an urgent procedure. Dr. Nigam merely stated that delaying pancreatectomy and spleenectomy in favor of a biopsy would mean a "small risk of cancer." Defs.' Ex. A (Dkt. No. 119–3) at 38. Moreover, Johnson has failed to proffer any evidence that his condition deteriorated or became worse as a result of the delay.

Accordingly, Dr. Caulfield should be granted summary judgment on to this ground.

### 3. Bogarski

Bogarski, a nurse administrator, is accused of ignoring Johnson's questions and concerns about Hepsera, and removing Johnson from the examination room for no reason on November 17, 2006. Am. Compl. at 9. An ambulatory health record signed by Bogarski and dated November 17, 2006, indicates that Johnson became "verbally upset" and "uncooperative" as an "inquisition into [Johnson's] health history [was] attempted." Defs.' Ex. B at 258. Johnson "was asked to leave the medical office," and security was notified. *Id.* 6.

Johnson also accuses Bogarski of ignoring two letters

where Johnson inquired about the need for pancreatic surgery and a reevaluation for the canceled pancreatic surgery. Am. Compl. at 9, 17. On January 9, 2007, four days after Johnson's surgical consultation with Dr. Nigam, Johnson sent a letter to Bogarski, "requesting further clarity on the proposed surgery." *Id.* at 9. Then on March 17, 2007, approximately a month and a half after the surgery was canceled, Johnson wrote to Bogarski to request a reevaluation of the canceled surgery. *Id.* at 17. It does not appear that Bogarski responded to either of these letters. *See id .*

**\*11** These allegations fail to establish deliberate indifference on the part of Bogarski. There is no indication that Johnson failed to receive medical care and treatment for his conditions after Bogarski asked him to leave the medical department on November 17, 2006, or after Bogarski allegedly ignored Johnson's letters. Johnson continued to receive medical evaluations and monitoring of his liver conditions by medical staff. *See generally* Defs.' Ex. B.

Accordingly, defendants should be granted summary judgment on this ground.

### 4. Reuteneaur

Reuteneaur, a nurse, was allegedly present at a February 2, 2007, medical appointment that Johnson had with Dr. Enu. Am. Compl. at 14; see also Defs.' Ex. B at 88 (ambulatory health record signed by Dr. Enu showing a medical consult on February 2, 2007). After Dr. Enu told Johnson that he would receive a biopsy when the need for one arose, Johnson asked what his treatment would be should his condition become serious. Am. Compl. at 14. Reuteneaur allegedly told Johnson that "there would be nothing [that medical staff] could do" because Johnson refused the surgery.

While Johnson may contend that this amounted to deliberate indifference, Johnson has proffered no facts to support this conclusory statement. Moreover, a review of the record further belies a deliberate indifference claim as Johnson continued to receive medical evaluations to monitor the progression of his disorders. *See generally* Defs.' Ex. B. Accordingly, summary judgment as to Reuteneaur should be granted.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

**5. Meicht**

Nurse Meicht examined Johnson on December 13, 2006, because Johnson was experiencing stomach discomfort. Am. Compl. at 11; Defs .' Ex. B at 256. Johnson received stomach fiber before leaving. Am. Compl. at 11. Meicht also made an appointment for Johnson to see Dr. Enu. Defs.' Ex. B at 256. Without more, there is nothing to show that Meicht acted with deliberate indifference to Johnson's medical needs. Accordingly, Meicht should be granted summary judgment on this ground.

**F. Misbehavior Report and Keeplock Confinement**

The amended complaint alleges that Meicht issued a false misbehavior report against Johnson on March 2, 2007. Am. Compl. at 16. Johnson possessed no constitutional right to be free "from falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," but he is still entitled "not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). Thus, a fair hearing would cure any due process violations resulting from false accusations. *Grillo v. Coughlin,* 31 F.3d 53, 56 (2d Cir.1994); *Livingston v. Kelly,* 561 F.Supp.2d 329, 331 (W.D.N.Y.2008) ("As the Second Circuit noted ..., an inmate's allegation that he has been found guilty of false disciplinary charges may support a constitutional claim if he also alleges that he was denied the minimal procedural due process protections ....").

**\*12** To prevail on a procedural due process claim under section 1983, a plaintiff must show that he possessed a protected property or liberty interest, and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). Also, due process generally requires that a state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003).

To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995). This standard requires a

prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life. *Id.* at 484; *Jenkins v. Haubert,* 179 F .3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate has been disciplined with confinement in keeplock [FN8] or a special housing unit [FN9] alone is insufficient to establish an atypical and significant deprivation.

FN8. "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6.

FN9. SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

Hearing Officer Winnie sentenced Johnson to thirty-days in keeplock confinement. Defs.' Ex. D at 1. Winnie also suspended Johnson's recreation, package, commissary, and phone privileges for fifteen days. *Id.* District courts have noted that "decisions in the Second Circuit are unanimous that keeplock ... of 30 days or less in New York prisons is not 'atypical or significant hardship' under *Sandin.*" *Auleta v. LaFrance,* 233 F.Supp.2d 396, 398 (N.D.N.Y.2010) (citing *Williams v. Keane,* No. Civ. 95–0379(AJP)(JGK), 1997 WL 527677, at \*6–8 (S.D.N.Y. Aug. 25, 1997) (Peck, M.J.) (citing cases)). Moreover, "the loss of phone, telepackage, and commissary privileges does not give rise to a protected liberty interest under New York law." *Smart v. Goord,* 441 F.Supp.2d 631, 640 (S.D.N.Y.2006) (citing *Husbands v. McClellan,* 990 F.Supp. 214, 217 (W.D.N.Y.1998), citing in turn *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996)). Thus, Johnson did not have a protected liberty interest.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

Even if Johnson had a protected liberty interest, he received a fair and impartial hearing. While inmates are not given "the full panoply of [due process] rights," they are still afforded procedural due process. *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Prisoners are "entitled to advance written notice ...; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citations omitted). Due process requires written notice twenty-four hours prior to the commencement of a formal disciplinary hearing in order "to give the charged party a chance to marshal the facts in his defense and to clarify what the charges are .... " *Wolff,* 418 U.S. at 564 (citations omitted). "The effect of the notice should be to compel the charging officer to be sufficiently specific as to the misconduct ... charged to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges ...." *Taylor v. Rodriguez,* 238 F.3d 188, 192–93 (2d Cir.2001) (citations omitted). Such notice guarantees a meaningful hearing whereupon a prisoner can properly defend himself against the pending charges. *Id.* at 193.

**\*13** Here, the misbehavior report was delivered on March 2, 2007, and the hearing was held on March 8, 2006, giving Johnson six days to prepare a defense. Defs.' Ex. D at 1. Johnson also had the opportunity to present a defense, and he declined to call any witnesses. *Id.* at 2–3. Accordingly, defendants should be granted summary judgment 0n this claim.

### G. Interference with Grievance Process

Johnson accuses Rother, John Doe # 1, and John Doe # 2 of interfering with grievances that he had filed. Am. Compl. at 10, 23. The First Amendment protects a prisoner's right to meaningful access to the courts and to petition the government for the redress of grievances. *See 370 Bill Johnson's Rest., Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161 (1983). However, inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a

cognizable § 1983 claim. *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, at \*3 (S.D.N.Y. Mar. 29, 2001). If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim. *See Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel,* 2001 WL 303713, at \*3; *see also Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003); *Mahotep v. DeLuca,* 3 F. Su pp.2d 385, 390 (W.D.N.Y.1998).

Accordingly, it is recommended that defendants be granted summary judgment on this ground.

### H. Sexual Harassment

Johnson claims that he was fondled in the "groin area" by Coffey on three separate occasions. Am. Compl. at 22. The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. It is well settled that the "unnecessary and wanton infliction of pain on a prisoner constitutes cruel and unusual punishment in violation of the Eighth Amendment." *Boddie,* 105 F.3d 857, 861 (2d Cir.1997) (citing *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)). In order to prove a violation of the Eighth Amendment, a plaintiff must satisfy both an objective and a subjective inquiry. *See Trammell v. Keane,* 338 F.3d 155, 161 (2d Cir.2003). A prison official violates the standards of the Eighth Amendment when (1) the alleged punishment is "objectively, sufficiently serious" and (2) he or she acted with a "sufficiently culpable state of mind." *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Because sexual abuse by a prison official with a culpable state of mind may constitute a violation of contemporary standards of decency and cause severe harm to the prisoner, such allegations may be cognizable under the Eighth Amendment. *Boddie,* 105 F.3d at 861 ("[S]evere or repetitive sexual abuse of an inmate ... can be 'objectively, sufficiently serious.' "); *see also Farmer,* 511 U.S. at 834–35 ("[The] rape of one prisoner ... serves no legitimate penological objective, any more than it squares with evolving standards of decency.") (internal quotation marks and citations omitted).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

**\*14** On the other hand, sexual harassment violates the Eighth Amendment only if the harm is "objectively, sufficiently serious." *Boddie,* 105 F.3d at 861. The Second Circuit has held that a small number of isolated incidents of alleged sexual abuse, including verbal harassment, may not suffice to meet the objective prong of the test or involve a harm of a federal constitutional level. *Id.* Further, a plaintiff must demonstrate that an incident or series of incidents were sufficiently egregious to be "objectively, sufficiently serious" to the point where such actions resulted in the denial of "the minimal civilized measure of life's necessities" and posed a substantial risk of serious harm. *Id.; Trammel,* 338 F.3d at 161. The Supreme Court has also held that a plaintiff must prove that a defendant used force "maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995 (1992).

Coffey is a corrections officer, and his responsibility includes serving as a "transport officer for prisoners being taken to various places away from Hudson." Coffey Decl. (Dkt. No. 119–11) ¶¶ 1, 5. While securing a prisoner for transport, departmental policy requires securing the prisoner in a particular way, including placing a chain around the prisoner's waist. *Id.* ¶ 9. Occasionally, an "extra length chain is positioned so that it comes in contact with the prisoner's groin and waist area." *Id.* ¶ 10. Coffey states that his hands never came in contact with Johnson's groin area on the day in question. *Id.* ¶ 15. A DOCS investigation concluded that Johnson's allegations against Coffey were without merit. *See* Defs.' Ex. E (Dkt. No. 119–7) at 11–21.

Even if Coffey's hands had come into contact with Johnson's groin area while securing Johnson for transport, Johnson's allegations are insufficient to articulate a claim of constitutional dimensions. In *Boddie,* the Second Circuit dismissed as inadequate a prisoner's claim that a female corrections officer made a possible pass at him, squeezed his hand, touches his penis called him a "sexy black devil," pressed her breasts against his chest, and pushed her vagina against his penis. *Boddie,* 105 F.3d at 859–61. The Second Circuit concluded that no single incident was "severe enough to be 'objectively, sufficiently serious,' [n]or were the incidents cumulatively egregious in the harm they inflicted" to "involve harm of

federal constitutional proportions as defined by the Supreme Court." *Id.* at 861; *see also Morales v. Mackalm,* 278 F.3d 126, 132 (2d. Cir.2002) (allegations that staff member asked plaintiff to have sex with her and to masturbate in front of her and other staff members "do not even rise to the level of those made by the plaintiff in *Boddie,* [and] do not state a claim for sexual harassment in violation of the Eighth Amendment to the United States Constitution."); *Excell v. Fischer,* 08–CV–945, 2009 WL 3111711, at *6–7 (N.D.N.Y. Sep. 24, 2009) (Hurd, J., adopting Report–Recommendation on de novo review) (claim that officer grabbed and squeezed plaintiff's penis during strip search for contraband relates a "quick, isolated incident of inappropriate touching" but not an Eighth Amendment violation); *Davis v. Castleberry,* 364 F.Supp.2d 319, 321 (W.D.N.Y.2005) (allegation that corrections officer grabbed inmate's penis during pat frisk is insufficient to state constitutional claim); *Morrison v. Cortright,* 397 F.Supp.2d 424, 425 (W.D.N.Y.2005) (allegations that a corrections officer touched plaintiff's buttocks, and that another "rubbed up against plaintiff['s] buttocks with [the officer's] private part" during a strip search describe an isolated incident unaccompanied by physical injury, and therefore are not sufficiently serious to establish a constitutional claim); *Montero v. Crusie,* 153 F.Supp.2d 368, 373, 375 (S.D.N.Y.2001) (allegation that corrections officer squeezed inmate's genitalia during pat-frisks on several occasions does not show sufficiently serious deprivation to establish Eighth Amendment violation, particularly when inmate did not allege that he was physically injured by such conduct).

**\*15** Accordingly, Coffey should be granted summary judgment as on this claim.

### I. Excessive Force

On May 12, 2008, while securing Johnson for transport, Coffey allegedly placed the leg irons "extremely tight." [FN10] The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. *Hudson v. McMillian,* 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

> FN10. Although Johnson characterized this incident as a form of harassment (Dep. Tr. at 23), it is more appropriately analyzed as an excessive force claim.

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." *Hudson,* 503 U.S. at 9 (internal citations omitted); *Blyden,* 186 F.3d at 262. However, "the malicious use of force to cause harm constitute[s][an] Eighth Amendment violation *per se"* regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing, 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344

F.3d 282, 291 (2d Cir.2003) (internal quotation marks and citations omitted).

In this case, Johnson fails both prongs of the Eighth Amendment analysis. The alleged exertion of force resulted in no medically determinable injury to Johnson as a medical examination following the incident revealed "no bruises, no open areas, [and] no swelling" around Johnson's ankles. Defs.' Ex. B at 39–41. Moreover, an investigation concluded that Johnson was not shackled too tightly at all. Defs.' Ex. E (Dkt. No. 119–7) at 29. Johnson has proffered no evidence to raise an issue of material fact as to whether excessive force was used in this instance.

**\*16** Accordingly, defendants should be granted summary judgment on this claim.

### J. Verbal Harassment

Johnson claims that he was verbally harassed. Am. Compl. at 29. Verbal harassment alone, however, is not actionable under § 1983. See *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("The claim that a prison guard called [plaintiff] names ... did not allege any appreciable injury and was properly dismissed."); *Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) ("[V]erbal harassment or profanity alone unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem do not constitute the violation of any federally protected right and therefore is not actionable under ... § 1983 ."). Accordingly, defendants' should be granted summary judgment as to this claim.

### K. Retaliation

Johnson alleges defendants' engaged in unconstitutional conduct in retaliation for Johnson's filing of grievances. Am. Compl. at 29–30. To state an actionable claim for retaliation, a plaintiff must first allege that his conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996); *see also Lipton v. County of Orange,* 315 F.Supp.2d 434, 447–48 (S.D.N.Y.2004) (applying First Amendment retaliation factors to a pretrial detainee complaint). "Adverse action" is action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights. *See Mt.*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

*Healthy Cit. Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 214–15 (N.D.N.Y.2008). Conclusory allegations alone are insufficient. *Id.* at 214 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (explaining that "claim[s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.")).

The filing of grievances is a constitutionally protected activity. *See Davis v. Goord,* 320 F.3d 346, 352–53 (2d Cir.2003). Johnson, however, has failed to allege facts sufficient to support a retaliation claim. Johnson has only stated in conclusory terms that defendants were retaliating against him for filing grievances. Johnson offers no evidence to support his allegations, either through documentation or witness testimony. Thus, he has failed to allege specific facts from which one could conclude that defendants' actions were motivated by Johnson's constitutionally protected activities.

## L. Conspiracy

Johnson alleges that defendants conspired together to deprive him of his constitutional rights. Am. Compl. at 30. "Section 1985 prohibits conspiracies to interfere with civil rights." *Davila v.. Secure Pharmacy Plus,* 329 F.Supp.2d 311, 316 (D.Conn.2004). To state a claim for relief under § 1985(3), a plaintiff must show:

**\*17** (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

*United Bd. of Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 828–29 (1983); *see also Iqbal v. Hasty,* 490 F.3d 143, 176 (2d Cir.2007). "In addition, the conspiracy must be motivated by some class-based animus." *Hasty,* 490 F.3d at 176 (citations omitted).

Here, Johnson does not assert any facts giving rise to a conspiracy. First, Johnson vaguely asserts conclusory statements relating to an alleged conspiracy among defendants. This is insufficient. *See generally Thomas v. Roach,* 165 F.3d 137, 147 (2d Cir.1999) (granting summary judgment for a § 1985(3) claim where the "assertions were conclusory and vague, and did not establish the existence of an agreement among defendants to deprive [plaintiff] of his constitutional rights."). Second, there has been proffered no evidence relating to agreements, or even communications, between the defendants, the purpose of their alleged conspiracy, or an intent by defendants to deprive Johnson of his civil rights. Lastly, there is no evidence that any alleged conspiracy was motivated by racial- or class-based animus.

Accordingly, defendants' motion as to this claim should be granted.

## M. Qualified Immunity

Defendants also argue that they are entitled to qualified immunity. Defs.' Mem. of Law (Dkt. No. 119–13) at 12. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002), aff'd, 80 F. App'x 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citing *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, as discussed *supra,* accepting all of Helmer's allegations as true, he has not shown that defendants violated his constitutional rights.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)

(Cite as: 2011 WL 3439179 (N.D.N.Y.))

**\*18** Accordingly, it is recommended in the alternative that defendants' motion on this ground be granted.

### IV. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 119) be **GRANTED** in its entirety and that judgment be entered in favor of all defendants on all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.D.N.Y.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).*

N.D.N.Y.,2011.

Johnson v. Enu
Not Reported in F.Supp.2d, 2011 WL 3439179 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3439524 (N.D.N.Y.)

(Cite as: 2011 WL 3439524 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Eric JOHNSON, also known as Debah J. Smith,
Plaintiff,
v.
Ayshia ENU, Physician, Hudson Correctional Facility;
Peter Bogarski; Reuteneaur, Jane Doe; McCoy, John
Doe; H.M. Miles; Joyce Duke; Wolff, John Doe;
Rother, Jane Doe; George, John Doe; Testo, John Doe;
Peter Behrle; M. Graziano; Michael Ambrosino; Philip
Heath; T. Mahar, Senior Correction Counselor, Greene
Correctional Facility; T. Gaines; Caulfield, John Doe;
John Doe 1; John Doe 2; Karen Meicht, Nurse, Hudson
Correctional Facility; Winnie, Lieutenant, Hudson
Correctional Facility; and Coffey, John Doe,
Defendants.
No. 9:08–CV–158 (FJS/DRH).

Aug. 5, 2011.
Eric Johnson also known as Debah J. Smith, Brooklyn,
NY, pro se.

Office of the New York, State Attorney General, Dean J.
Higgins, AAG, of Counsel, Albany, NY, for Defendants.

**ORDER**

SCULLIN, Senior District Judge.

*1 Plaintiff commenced this action pursuant to 42
U.S.C. § 1983, 1985, alleging that Defendants violated his
constitutional rights. *See* Dkt. No. 64, Amended
Complaint. On November 12, 2010, Defendants filed a
motion for summary judgment. *See* Dkt. No. 119. Plaintiff
did not file any papers in opposition to that motion. In a
Report–Recommendation and Order dated July 13, 2011,
Magistrate Judge Homer recommended that the Court
grant Defendants' motion for summary judgment in its
entirety and enter judgment in favor of Defendants on all
claims. *See* Dkt. No. 121 at 35. Plaintiff did not file any

objections to these recommendations.

When a party does not object to a magistrate judge's
report-recommendation, the court reviews that
report-recommendation for clear error or manifest
injustice. *See Linares v. Mahunik,* No. 9:05–CV–625,
2009 WL 3165660, *10 (N.D.N.Y. July 16, 2009)
(citation and footnote omitted). After conducting this
review, "the Court may 'accept, reject, or modify, in
whole or in part, the ... recommendations made by the
magistrate judge.' " *Id.* (quoting 28 U.S.C. §
636(b)(1)(C)).

The Court has reviewed Magistrate Judge Homer's
July 13, 2011 Report–Recommendation and Order for
clear error and manifest injustice; and, finding none, the
Court hereby

**ORDERS** that Magistrate Judge Homer's July 13,
2011 Report–Recommendation and Order is **ACCEPTED
in its entirety** for the reasons stated therein; and the Court
further

**ORDERS** that Defendants' motion for summary
judgment is **GRANTED in its entirety;** and the Court
further

**ORDERS** that Plaintiff's federal claims are
**DISMISSED with prejudice;** and the Court further

**ORDERS** that Plaintiff's state-law claims are
**DISMISSED without prejudice** pursuant to 28 U.S.C. §
1367; and the Court further

**ORDERS** that the Clerk of the Court shall enter
judgment in favor of Defendants and close this case; and
the Court further

**ORDERS** that the Clerk of the Court shall serve a
copy of this Order on the parties in accordance with the
Local Rules.

**IT IS SO ORDERED.**

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3439524 (N.D.N.Y.)

(Cite as: 2011 WL 3439524 (N.D.N.Y.))

N.D.N.Y.,2011.

Johnson v. Enu
Not Reported in F.Supp.2d, 2011 WL 3439524
(N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 10450 (S.D.N.Y.)

(Cite as: 2002 WL 10450 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Cesar A. ESPINAL Plaintiff,
v.
Thomas COUGHLIN III, et al. Defendants.
No. 98 CIV. 2579(RPP).

Jan. 3, 2002.

Cesar A. Espinal, Great Meadow Correctional Facility, Comstock, Plaintiff Pro Se.

Eliot Spitzer, Attorney General for the State of New York, By Rebecca Ann Durden, Esq., Assistant Attorney General, New York, Counsel for Defendants.

OPINION AND ORDER

PATTERSON, D.J.

*1 Defendants, Dr. Lester Silver and Physician's Assistant ("P.A.") Donna Zaken, move for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. For the reasons that follow, Defendants' motion is granted.

In January 1998, Plaintiff commenced this action, brought pursuant to 42 U.S.C. § 1983, alleging that numerous employees of the New York State Department of Correctional Services ("DOCS") had denied him adequate medical care in violation of his rights guaranteed by the Eighth and Fourteenth Amendments while he was imprisoned.

On June 11, 1999, the Court granted a motion to dismiss pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ.P.") 12(b)(6) against all defendants other than Dr. Lester Silver and P.A. Donna Zaken. On December 11, 2000, after the close of discovery, the remaining defendants filed this motion for summary judgment pursuant to Fed.R.Civ.P. 56. On January 16, 2000, Plaintiff wrote the Court that he was unable to oppose the motion because he was unable to obtain legal help in the

DOCS facility to which he had been transferred, that he is a layman in the law, an illiterate person who suffers from a mental disease and that he cannot conduct the case unaided. Plaintiff also objected to Defendants' entire motion for summary judgment "because plaintiff contends there is genuine issues of fact to be tried." On October 10, 2001, Plaintiff, having been transferred to a different DOCS facility, submitted an Opposition to Defendant's Motion for Summary Judgment. On November 2, 2001, Defendants submitted a Reply Memorandum in Support of their Motion for Summary Judgment.

Defendants' assert Plaintiff has failed to exhaust the claims brought in his complaint against Defendants Silver and P.A. Zaken except the claims against P.A. Zaken on February 2, 1995 and February 3, 1995. (Mem. of Law in Supp. of Defs.' Mot. for Summ. J. at 6.) Plaintiff does not deny that he has failed to exhaust claims against Defendants Silver and P.A. Zaken, and requests that only his unexhausted claims should be dismissed. (Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 6.) The Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997(e), provides that "No action shall be brought with respect to prison conditions under section 1983 of this title ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Therefore, all claims against Silver and P.A. Zaken are hereby dismissed except for those claims against P.A. Zaken relating to the denial of medical care on February 2, 1995 and February 3, 1995 because those claims are admitted to have been exhausted administratively.

*I. Facts*

It is undisputed that prior to incarceration Plaintiff suffered a gun shot wound to his right knee on November 5, 1990 which necessitated surgery which he underwent to have the bullet removed. (Pl.'s Rule 56.1 Statement, ¶¶ 2-3.) After Plaintiff was incarcerated in DOCS facilities, he reinjured his right leg on: October 28, 1992; July 9, 1994 (baseball injury); August 10, 1994 (soccer injury); August 16, 1994; October 5, 1994 (walking); December

Not Reported in F.Supp.2d, 2002 WL 10450 (S.D.N.Y.)

(Cite as: 2002 WL 10450 (S.D.N.Y.))

10, 1994 (slip and fall); February 2, 1995 (fall down stairs). (Pl.'s 56.1 Statement, ¶¶ 10-48.) Plaintiff visited orthopedists on July 19, 1994 and September 16, 1994, but the rupture of the anterior cruciate ligament ("ACL") was not diagnosed until March 8, 1995. (Id. at ¶¶ 25, 33, 59.) It was confirmed by a magnetic resonance imaging ("MRI") on May 11, 1995, and he underwent reconstructive knee surgery on August 25, 1995.

**\*2** With respect to the events of February 2, 1995 and February 3, 1995, Defendant P.A. Zaken has filed a Declaration relying on the notes she made on those days, stating that on February 2, 1995, Plaintiff complained to her of injuries to his lower back, head, and right side due to a fall down stairs at the facility and Plaintiff stated that he had slid down steps on right side of his body and head; that she determined that Plaintiff was alert and oriented, that there were no hematomas, no abrasions, and no ecchymosis, or black and blue marks; there was no pain or palpation of plaintiff's ribs and back; and her examination of the head was unremarkable; that she also determined that, as Plaintiff requested medical confinement for unclear reasons as there were no apparent injuries, there was a psychological component to Plaintiff's condition, and asked Plaintiff if he wanted to speak with someone in Psychiatric Services Unit, but Plaintiff declined. (Decl. in Supp. of Summ. J., ¶ 12.)

Plaintiff admits that he was examined by Defendant P.A. Zaken on February 2, 1995 and by her examination, she concluded he did not have any injuries. (Pl.'s Rule 56.1 Statement, ¶ 49.) He asserts however, that despite the fact she had previously treated Plaintiff's chronic condition of knee instability, pain, and swelling, and was well aware of his condition, she proclaimed that there was nothing wrong with Defendant and that he was mentally insane due to his continuous complaints to his knee stating, "Are you having problems with correction officers or other inmates? Would you like to see someone in the Psychiatric Satellite Unit? There is obviously some component here-as there does not appear to be any medical condition. Will notify security." (Id. at ¶ 50.) He also asserts that, due to Defendant P.A. Zaken notifying security and informing them that Plaintiff does not have an injury, he was moved from the flats to the third floor. (Id. at ¶ 51.)

On February 3, 1995, Plaintiff was again seen by P.A.

Zaken in the medical clinic. According to her Declaration, he complained of back stiffness and requested medical unemployment which she denied; she ordered an outside consultation for the orthopedist for Plaintiff's complaints of his right knee; ordered Flexeril for muscle spasms of Plaintiff's back and decided that an MRI might not be feasible due to the possibility of it causing a shift in the metal fragments in Plaintiff's knee. (Decl. in Supp. of Defs.' Mot. for Summ. J., ¶ 13.)

On February 3, 1995, according to Plaintiff, he strongly expressed to P.A. Zaken that she had misdiagnosed him the day before because his condition had gotten worse. (Pl.'s Rule 56. 1 Statement, ¶ 52.) He requested medical confinement, which she denied, and she prescribed some painkillers for him. (Id.; Ex. B, 564.) Plaintiff does not deny that P.A. Zaken referred him to an orthopedist.

On March 8, 1995, Plaintiff was examined by the orthopedist and the orthopedist recommended that he have an MRI exam. (Id.; Pl's Rule 56.1 Statement, ¶ 59.) On May 11, the MRI was performed and on July 11, 1995, the orthopedist confirmed the MRI showed a need for surgery and scheduled him for reconstructive knee surgery which was performed on August 25, 1995. (Id. at ¶¶ 63, 66.)

## II. Deliberate Indifference Standard

**\*3** In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove, "deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104 (1976). There is both an objective and subjective component to this test. To satisfy the objective prong, the alleged deprivation must be "sufficiently serious." Wilson v. Seiter, 501 U.S. 294, 298 (1991). There must be "a condition of urgency, one that may produce death, degeneration or extreme pain." Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir.1994) (citations omitted). The subjective prong requires that the defendant "must act with a sufficiently culpable state of mind." Id. An official acts with deliberate indifference when that official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 10450 (S.D.N.Y.)

(Cite as: 2002 WL 10450 (S.D.N.Y.))

also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994).

Plaintiff asserts that these facts constitute a triable set of facts against P.A. Zaken for deliberate indifference on February 2, 1995 and February 3, 1995:(1) Plaintiff had re-injured his right knee and was in extreme pain at the time he had been examined by Defendant P.A. Zaken; (2) subsequent review of Plaintiff's medical records show that he was suffering from an exacerbated injury to his right knee, but Defendant failed to diagnose the correct information, deliberately delaying Plaintiff's access to proper treatment; (3) she turned his injury into a mental health condition when she noted in his medical file, notified Security, and revoked his work limitation slip; and (4) released him from the clinic even though she knew he was in need of proper medical treatment. (Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 9.)

Plaintiff's assertions, taken at face value, do not rise to the level of deliberate indifference. His complaint of extreme pain and deliberate delay of access to proper treatment does not meet the standard under the Eighth Amendment. Complaints of pain are subjective criteria not objective criteria upon which a medical practitioner has to rely in decisions for treatment. Also, a delay in treatment does not necessarily invoke the Eighth Amendment. The Second Circuit has "reserved such a classification for cases in which, for example officials deliberately delayed care as a form of punishment; ignored a 'life-threatening and fast-degenerating' condition for three days, or delayed major surgery for over two years." *Demata v. New York State Corr. Dept. of Health Servs.,* 1999 WL 753142 at *2, 198 F.3d 233 (2d Cir. Sept. 17, 1999)* (citations omitted). Plaintiff's condition was neither "life threatening" nor "fast-degenerating." In *Sharp v. Jeanty,* 1993 WL 498095 at * 2 (S.D.N.Y. Nov. 30, 1993), the court found that Plaintiff's complaints of pain in his knee, that ultimately culminated in surgery, that were repeatedly ignored by defendant, even if true, would not by itself reach the Eighth Amendment standard. As in *Sharp,* Plaintiff does not proffer any information that demonstrates the necessary "hostile intent or deliberate indifference" on the part of P.A. Zaken. *Tomarkin v. Ward,* 534 F.Supp. 1224, 1231 (S.D.N.Y.1982). Nor is the conduct he has alleged "repugnant to the conscience of mankind." *Estelle v. Gamble,* 429 U.S. at 105.

**\*4** Plaintiff's assertion that subsequent review of his medical records show that he was suffering from an exacerbated injury to his knee, and that Defendant P.A. Zaken "failed to diagnose the correct information deliberately delaying Plaintiff's access to treatment" is at most an allegation of negligence or disagreement with a course of treatment which does not rise to the deliberate indifference standard. *Chance v. Armstrong,* 143 F.3d 698, 703 (1998). *Estelle v. Gamble,* 429 U.S. at 106-07 ("Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment ... A medical decision not to order an x-ray, or like measures, does not represent cruel and unusual punishment.").

Plaintiff's assertion that P.A. Zaken turned his medical condition into a mental health condition is also, at best a claim for a difference in course of treatment. Defendant P.A. Zaken made a determination on February 2, 1995, seeing no apparent injuries and hearing his requests for medical confinement, that there might be a psychological component to his injury. In line with her assessment, she offered for him to speak to someone in the Psychiatric Satellite Unit. Even if her assessment was incorrect, this would only amount to a difference in opinion of course of treatment or negligence.

Plaintiff's claim that P.A. Zaken released him even though she knew he was in need of medical assistance is simply not founded on any facts. It is uncontested that P.A. Zaken ordered a pain killer for Plaintiff's complaints concerning his back and ordered an outside consultation for the orthopedist for Plaintiff's complaints of his right knee.

Additionally, Plaintiff did not have a sufficiently serious medical condition for purposes of the Eighth Amendment. Dr. Crane, Defendants' independent medical expert, states that a rupture of the ACL is a common knee injury and is often a chronic condition with which people may function well without operative intervention. (Mem. of Law in Supp. of Defs' Mot. for Summ. J. at 4-5.) He also opined that the period of time between Plaintiff's complaints and his knee surgery is also not unreasonable.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 10450 (S.D.N.Y.)

(Cite as: 2002 WL 10450 (S.D.N.Y.))

Even using the date he first complained of a reinjury, on October 28, 1992, not the relevant dates of February 2, 1995 and February 3, 1995, and overlooking his sports injuries to his knee thereafter, it was less than three years until he had his knee surgery. In *Demata v. New York State Corr. Dept. of Health Servs.,* 1999 WL 753142, 198 F.3d 233 (2d Cir. Sept. 17, 1999), Demata's knee injury occurred on February 23, 1994; in September of 1994, the knee was examined by an orthopedist who prescribed physical therapy and a knee support, and an MRI was done; Demata still complained of pain and was given Tylenol and more physical therapy; then, in March 1997, three years after his injury, additional medical consultations and MRIs culminated in knee surgery. *Id.* The Second Circuit noted, "strengthening exercises are in fact a form of medical care [and] Demata's mere disagreement with this form of treatment does not establish deliberate indifference." *Id.* at 3. In *Culp v. Koenigsmann,* No. 99 Civ. 9557(AJP), 2000 WL 995495 (S.D.N.Y. July 19, 2000), the court found that Culp had not alleged sufficient facts to meet the standard of the Eighth Amendment. There was no evidence from which a reasonable juror could conclude that defendants acted with deliberate indifference to his well-being as Culp was seen frequently by prison medical staff and by outside consultants; he was given x-rays and an MRI, all of which were negative; and he was given medical treatment, even if conservative, of a cane, physical therapy and follow-up exams. *Id.* The court found the fact that there was a "delay" from injury to surgery of one year is at most a disagreement to the appropriate course of medical treatment. *Id.*

**\*5** Plaintiff argues that Defendant acted purposefully in her deliberate indifference to Plaintiff's safety as she was aware of his pain and failed to provide access to immediate and necessary medical treatment. Complaints of pain are subjective indicia of injury, not objective indicia. As discussed above, Plaintiff is arguing with Defendant's course of treatment.

On both February 2, 1995 and February 3, 1995, P.A. Zaken completed reasonable examinations of the Defendant. At most, Petitioner's claims amount to disagreement with a course of treatment or negligence. The claims do not rise to deliberate indifference to a serious medical need. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). No reasonable juror could conclude that P.A. Zaken was deliberately indifferent to Plaintiff's medical needs. Summary judgment is granted.

*III. Qualified Immunity*

Qualified immunity gives officials protection from personal liability for damages under § 1983. *Walker v. McClellan,* 126 F.3d 127, 129 (2d Cir.1997). Officials are entitled to such immunity as long as their "conduct does not violate clearly established statutory or constitutional right of which a reasonable person would have known." *Id.* (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). As described above, P.A. Zaken's actions on February 2, 1995 and February 3, 1995 did not violate "clearly established statutory or constitutional rights" of the Plaintiff under established precedent in this Circuit or in the Supreme Court.

For the above reasons, Defendant P.A. Zaken is entitled to qualified immunity. The Defendants' motion for Summary Judgment is granted and the case is dismissed.

IT IS SO ORDERED.

S.D.N.Y.,2002.

Espinal v. Coughlin
Not Reported in F.Supp.2d, 2002 WL 10450 (S.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4491825 (N.D.N.Y.)

(Cite as: 2012 WL 4491825 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Ronnie COLE, Plaintiff,
v.
NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES, et al., Defendants.
No. 9:10–CV–1098 (NAM/TWD).

Aug. 31, 2012.
Ronnie Cole, of Counsel, Rome, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Kevin P. Hickey, Esq., of Counsel, Albany, NY, for Defendants.

**REPORT AND RECOMMENDATION AND ORDER**

THERÈSE WILEY DANCKS, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, was initially referred to Magistrate Judge George H. Lowe for Report and Recommendation by the Honorable Norman A. Mordue, United States District Judge, pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c). Upon Magistrate Judge Lowe's retirement on February 9, 2012, the case was reassigned to me. In his Amended and Supplemental Complaint ("Amended Complaint"), Plaintiff Ronnie Cole ("Cole") has alleged that Defendant New York State Department of Correctional Services [FN1] ("DOCS") and thirty of its employees violated his constitutional rights by subjecting him to excessive force; showing deliberate indifference to his medical needs; falsifying misbehavior reports; retaliating against him for filing grievances; conspiring to assault him, cover up the assault, and make false misbehavior reports; confining him in segregation; denying him a fair review of his Special Housing Unit ("SHU") confinement reviews; denying his

requests for restoration of visiting privileges; and denying him due process in connection with a Tier III disciplinary hearing that took place in July of 2010. (Dkt. No. 16.) Plaintiff has also asserted New York state law claims for assault and battery and negligence. *Id.* at 1. Currently pending before the Court is Defendants' motion for partial dismissal of Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), or, in the alternative, for an order directing Plaintiff to file a more definite statement under Federal Rule of Civil Procedure 12(e). (Dkt. No. 62 at 1.)

> FN1. On April 1, 2011, after the commencement of this lawsuit, the New York State Department of Correctional Services and the Division of Parole merged into one comprehensive agency entitled the New York State Department of Corrections and Community Supervision. Because all of the events relevant to this case occurred prior to the merger, I will refer to the Defendant agency as "DOCS."

In his opposition to Defendants' motion, Plaintiff has consented to the dismissal of the action as against named Defendants DOCS, Brian Fischer, Jack McDaniel, Albert Prack, Jeffrey St. Louis, Edward Dauphin, R. Judway, M.J. Cappadonia, R.J. Miller, S. Purdy,[FN2] C. Cucharale, H. Smith, T. Meachum, J. Mecca, D. Ashe, Debora Kinderman, A. Papaleo, Judy Palmer, C. Vail, Ted Vauss, Mary Shrimp, and Renna Piecce. (Dkt. No. 65 at ¶ 8.) The nine remaining Defendants are Ann Rabideau ("Rabideau"), First Deputy Superintendent for Health/Acting Superintendent at Walsh Medical Unit/Mohawk Correctional Facility ("MCF"); Stephen McCarthy ("McCarthy"), Deputy Superintendent of Security at MCF; G. Lawrence ("Lawrence"), Corrections Sergeant at MCF; Toney Szajer ("Szajer"), Corrections Sergeant at MCF; A. Durante ("Durante"), Corrections Officer at MCF; J. Griffith ("Griffith"), Corrections Officer at MCF; L. Russin ("Russin"), Registered Nurse at MCF; G. Reese ("Reese"), Licensed Practical Nurse at MCF; and Elaine Paluck ("Paluck"), Health Care Assistant at MCF.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4491825 (N.D.N.Y.)

(Cite as: 2012 WL 4491825 (N.D.N.Y.))

FN2. S. Purdy was not included as a defendant in the caption of the Amended Complaint, as he had been in the original Complaint. However, he was identified as a defendant in the body of the Amended Complaint. (Dkt. No. 16 at ¶ 11.)

By Plaintiff's own assessment, the claims against the remaining Defendants are limited to: (1) use of excessive force; (2) retaliation; and (3) deliberate indifference to Cole's medical needs for injuries he sustained as a result of the use of excessive force against him.[FN3] *Id.* at ¶¶ 2. Plaintiff's use of excessive force claims against Defendants Durante, Szajer, Griffith, and Lawrence are not presently at issue because Defendants have excepted those claims from their motion to dismiss.[FN4] (Dkt. No. 62 at 1; Dkt. No. 68 at 1.) Therefore, the sufficiency of those claims is not addressed herein.

FN3. None of the claims in Plaintiff's Amended Complaint that arose out of, or are related to, the July 2, 2010 Tier III inmate misbehavior report and hearing held in connection with the report have been included in Cole's list of remaining claims and, with the exception of Rabideau and McCarthy, this action has been dismissed as against the Defendants allegedly involved in those claims. (Dkt. No. 65 ¶¶ 2, 9.) Furthermore, Plaintiff has not addressed the claims in his Memorandum of Law. *Id.* at 12–31. Plaintiff has likewise elected not to include any claims that might be found to have arisen out of Rabideau's alleged failure to review the denials of his SHU confinement reviews in a fair manner, and Rabideau and McCarthy's denial of his requests for restoration of his visiting privileges among the claims he intends to pursue. Nor has Cole argued against dismissal of those claims in his Memorandum of Law. *Id.* at ¶¶ 2 & 9; (Dkt. No. 16 at ¶¶ at107–110; Dkt. No. 16–2 at 27–35, 46–49; Dkt. No. 65 at 12–31). Given Plaintiff's clear showing of intent not to pursue claims arising out of the July 2, 2010 Tier III Inmate Misbehavior Report and the hearing on the Report, the review of the denials on his SHU confinement reviews, and the denial of his requests for restoration of visiting privileges, I

have not addressed the sufficiency of those claims in this Report–Recommendation and recommend that they be dismissed as abandoned by Plaintiff.

In his Memorandum of Law in opposition, Plaintiff has indicated his intent to pursue supervisory liability claims against Defendants Ann Rabideau and Stephen McCarthy. (Dkt. No. 65 at 3, 25–26.) In addition, Cole's Memorandum of Law appears to leave open the possibility that he intends to pursue his state law claims for negligence and assault and battery. *Id.* at 2–4. Because Plaintiff has made arguments in support of his claims for supervisory liability and negligence, assault and battery in his Memorandum of Law, I am assuming for purposes of this motion that he does not intend to abandon them even though they were not included in his list of remaining claims. Furthermore, inasmuch as Plaintiff's Amended Complaint includes allegations of conspiracy against some of the remaining Defendants that relate to claims he intends to pursue, Cole's allegations of conspiracy are addressed herein as well.

FN4. In their letter brief in reply to Plaintiff's opposition, Defendants also advised the Court that they were withdrawing their motion to dismiss on qualified immunity grounds without prejudice. (Dkt. No. 68 at 2.) Since Defendants did not pursue dismissal on qualified immunity grounds in their initial motion papers, there was nothing to withdraw. (Dkt. 62–1 at 1–26.)

**\*2** For the reasons that follow, I recommend that Defendants' motion for partial dismissal of the Plaintiff's Amended Complaint be **GRANTED** in part and **DENIED** in part, and order that Defendants' motion for a more definite statement be **DENIED**.

# I. BACKGROUND

## A. Defendants Durante, Szajer, Griffith and Lawrence

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4491825 (N.D.N.Y.)

(Cite as: 2012 WL 4491825 (N.D.N.Y.))

Plaintiff is a prison inmate housed in the Walsh Regional Medical Unit at MCF. (Dkt. 16 at ¶ 3.) The allegations in the Amended Complaint describe a contentious relationship between Cole and Defendants Szajer, Durante, Griffith and Lawrence, which Plaintiff claims contributed to his filing of a number of grievance complaints. (*See generally* Dkt. No. 16.) According to Plaintiff, that, in turn, resulted in a series of retaliatory actions by the four Defendants, including harassment, the filing of numerous false misbehavior reports against him, and four alleged instances of the use of excessive force. (Dkt. No. 16 at ¶¶ 70–78, 80–84, 87–98.)

**1. Defendant Durante**

Defendant Durante is a corrections officer at MCF whose duties include escorting medical staff in and out of inmates' rooms during medication and treatment. (Dkt. No. 16 at ¶ 20.) Plaintiff claims that on September 30, 2010, Durante told him that he could "kick [Cole's] ass" and nothing would happen because We hate Niggers you terrorist Muslims, and then spit in his face and hit him on the head with big brass keys while continuing to say "Nigger, Nigger, Nigger." *Id.* at ¶ 70–2.[FN5]

> [FN5.] Plaintiff's Amended Complaint contains an extra paragraph 70 (located between paragraphs 72 and 73 on page 19), which is referred to herein as Paragraph 70–2.

Durante filed an inmate misbehavior report the same day charging Cole with yelling at him: "You are a straight up bitch, a Nigger! Open your ass up, I'm gonna fuck you, open your ass, I'm gonna fuck you." (Dkt. No. 16–2 at 25–26.) Plaintiff was found guilty of both harassment and making threats and was given thirty days in keeplock. *Id.* at 26. Durante filed another misbehavior report against Plaintiff on October 1, 2010 charging him with threats and harassment. (Dkt. No. 16–2 at 22–24.) He claimed that Cole had called him a "Nigger" several times and yelled "While you're here someone is 4 foot up in your wife's ass, like I'll be up in yours." *Id.* at 22. Plaintiff was again found guilty and given thirty days of keeplock and thirty days loss of earphones and radio. *Id.* at 23.

According to Plaintiff, on October 3, 2010, during his prayer time while he was making a prayer wheel, Durante came up behind him, pulled the front wheels of his wheelchair off the floor, dropping him backwards, and then began kicking him in the "butt" as he called him "cripple Nigger Muslim." (Dkt. No. 16 at ¶ 74.) Cole filed grievance complaint # MHK–11844–10, dated October 4, 2010, complaining of the alleged assaults on September 30 and October 3, 2010. (Dkt. No. 16–3 at 33.) Plaintiff filed a second grievance complaint, # MHK–11845–10, the same day complaining that his request to file an injury report in connection with the alleged assault by Durante had been wrongfully denied.[FN6] (Dkt. No. 16–3 at 34.) The grievance complaints were denied because Durante denied spitting in Plaintiff's face, striking him with keys, kicking him, and flipping him out of his wheelchair. Moreover, the nurse involved reported that Cole had not advised her of any physical altercation with the officer and had not requested an injury report or allowed a medical exam, and that the photographs and medical injury reports did not support any injury to Plaintiff. *Id.* at 33–34.

> [FN6.] Plaintiff has not included copies of his two October 4, 2010 Grievance Complaints as exhibits to his Amended Complaint (Dkt. No. 16), his opposition papers (Dkt. No. 65), or in the Appendix to his Supplemental Affidavit of Truth. (Dkt. Nos. 18–1, and 18–2.) He has, however, submitted the denials from which it is apparent that both arose out of the incidents with Durante that had occurred on September 30, 2010 and October 3, 2010. (Dkt. No. 16–3 at 33–34.)

**\*3** Durante filed another misbehavior report for harassment against Plaintiff on October 5, 2010, the day after Cole had filed a grievance complaint against him. (Dkt. No. 16–2 at 19–21.) In the Report, Durante claimed that on October 4, 2010 Cole had said "get out Nigger" and thrown a water cup at him. *Id.* Cole was again found guilty and given a thirty day loss of radio. *Id.* at 20. Durante also filed a misbehavior report on Plaintiff the following day. (Dkt. No. 16–2 at 13–15.) It charged Cole with violent conduct, propelling food or water, interference, and wasting state property. *Id.* According to Durante, Plaintiff had slapped his food trays towards Defendants Szajer and Durante after Szajer had placed them on the table. *Id.* Cole was found guilty of all of the claimed violations and given a six day loss of packages,

Not Reported in F.Supp.2d, 2012 WL 4491825 (N.D.N.Y.)

(Cite as: 2012 WL 4491825 (N.D.N.Y.))

commissary, earphones/radio, and loss of good time. *Id.* at 14.

On October 13, 2010, Durante filed a misbehavior report against Plaintiff for failure to follow a direct order, attempted smuggling, and failure to comply with correspondence procedures. (Dkt. No. 16–2 at 16–18.) The misbehavior report was filed after another corrections officer had found a letter in a book he had picked up from Cole. Durante's charges against Plaintiff were dismissed. *Id* . at 17. The Affidavit of inmate Montell Emerson, included as an exhibit to Plaintiff's Amended Complaint, avers that on October 14, 2010, the day the misbehavior report was filed, Durante entered his living area and made the following statement to him:

> Your buddy Cole (who's living area is 52.A2.15–1) just said to me that he doesn't want any problems and seeking a truce; the only way I'll think about giving him a truce is first I have to speak with my boys, then he has to beg me, and after that he has to write upfront and says he lied about me attacking him ... I already have a couple assaults on file and I have to watch my ass with Dep. McCarthy.

(Dkt. No. 16–1 at 1–2.)

**2. Defendant Szajer**

Defendant Szajer is a corrections sergeant responsible for supervising corrections officers at MCF. (Dkt. No. 16 at ¶ 25.) Plaintiff had filed a grievance complaint against Szajer on September 27, 2010, three days prior to the September 30, 2010 incident involving Durante. (Dkt. No. 18–1 at 37–38; Dkt. No. 65 at 23.) The grievance complaint, which charged Szajer with making false claims against Cole with regard to his use of pre-stamped envelopes for mailing, also alleged a pattern of harassment and threats by Szajer. *Id.* Plaintiff claims that Szajer told him that the harassment and threats would continue as long as he kept making use of the Inmate Grievance Resolution Committee. (Dkt. No. 18–1 at 38.) Plaintiff's grievance complaint was denied on the grounds that Szajer had denied harassing him, and the Lieutenant and Corrections Officer whom Cole had identified as witnesses to the alleged harassment denied seeing Szajer harass him. (Dkt. No. 18–2 at 32.)

**\*4** In his Amended Complaint, Plaintiff has not specifically alleged that Szajer was either present during the assault by Durante on September 30, 2010 or that he participated in the assault. (Dkt. No. 16 at ¶ 70.) Cole has, however, alleged generally in his Amended Complaint that Szajer joined in on Durante's assaults on him from July 16, 2010 through October 31, 2010, *id.* at ¶ 103, and claims in his Supplemental Affidavit and Appendix that he was assaulted by both Szajer and Durante on September 30 and October 3, 2010. [FN7] (Dkt. No. 18 at ¶ 26.) Moreover, according to Cole, both Durante and Szajer continued to harass him and file false behavior reports after the alleged assaults. (Dkt. No. 16 at ¶¶ 73 and 78.) In addition, Cole has alleged that Szajer co-signed four of the misbehavior reports submitted by Durante in October of 2010. (Dkt. No. 16 at ¶ 105.)

> FN7. Plaintiff also claims that Szajer was present for the alleged assault by Durante on September 30, 2010 in his October 24, 2011 unverified surreply to Defendants' October 13, 2011 reply letter. (Dkt. No. 69 at 1.)

In a series of letters written to Defendants Rabideau and McCarthy, the Inspector General, Governor Patterson, and the Chair of the New York State Commission of Correction in early October of 2010, Plaintiff alleged a pattern of harassment, including the filing of false misbehavior reports, by Szajer. (Dkt. No. 16–3 at 3–7, 9–12, 17–19.) On October 1, 2010, Cole wrote to Rabideau asking for her assistance in the matter of staff harassment by Szajer and Durante, whom he claimed had filed false misbehavior reports against him in retaliation for his filing of grievance complaints. (Dkt. No. 61–3 at 3–4.) In an October 4, 2010 letter to Rabideau, Plaintiff accused Szajer of being the driving force behind Durante's misbehavior reports against him. (Dkt. No. 16–3 at 5.) Cole sent a similar letter to McCarthy the same day. (Dkt. No 16–3 at 7.) [FN8]

> FN8. In his October 4, 2010 letter to the Inspector General's Office, Plaintiff claimed that Szajer had come to him in a threatening manner, kicked his wheelchair, and said "we will *ucking put you in the hospital on many machines" and then lie and say that Cole had attacked him. (Dkt.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

>
Not Reported in F.Supp.2d, 2012 WL 4491825 (N.D.N.Y.)

(Cite as: 2012 WL 4491825 (N.D.N.Y.))

No. 16–3 at 9.) In his letter of the same date to Governor Patterson, Plaintiff maintained that Szajer came to him after Durante had spit at him and hit him with the keys and told him it would be like that when he filed a grievance complaint against Szajer and proceeded to punch him in the chest and tell him to fight back because that is what Szajer and Durante and other corrections officers wanted him to do so that they could take his life. (Dkt. No. 16–3 at 11.) Plaintiff said the same thing in an October 4, 2010 letter to the Chair of the New York State Commission of Correction. (Dkt. No. 16–3 at 15.)

**3. Defendant Griffith**

Defendant Griffith is a corrections officer at MCF whose duties include escorting the medical staff during medication rounds. (Dkt. No. 16 at ¶ 27.) According to Plaintiff, Griffith had a history of harassing him by calling him names like "dumb monkey" and "Nigger," saying "Nigger death to all Muslims," trashing his incoming mail and pictures, cutting up his kufies/head coverings, and turning off the water in his room so that he could not cleanse himself before the start of Islamic prayer. *Id.* at ¶ 78.

Plaintiff maintains that at 9:35 p.m. on October 29, 2010, Griffith entered his room as Defendant Reese was giving him his 9:45 p.m. medication and told him to "shut the *uck up Cole and take the *ucking medication before I straight drill you in the *ucking face." *Id.* at ¶ 82. After Cole responded that he had already taken his medication, Griffith allegedly told the medical staff in the room (Defendants Reese and Paluck), to step out for a minute and then proceeded to kick Cole's bedside table tray into his wheelchair, pinning him in the chair and causing his two cups of Ensure Plus to splash all over his personal belongings. *Id.* at ¶ 83. According to Plaintiff, Griffith then punched him with a closed fist on the right side of his face, grabbed him by the neck and head butted him, and then began choking him until he became dizzy. *Id.* Griffith then struck Cole on the left side of his chest with a closed fist with some kind of silver metal object. *Id.* at ¶ 84.[FN9]

FN9. Cole described the alleged assault by Griffith in an October 29, 2010 letter to Defendant McCarthy. (Dkt. No. 16–3 at 35–36.)

**\*5** Griffith filed a misbehavior report charging Cole with violent conduct, assault on staff, interference with employee, threats, and refusing a direct order. (Dkt. 16–3 at 39; Dkt. No. 18–1 at 8.) In his narrative of the October 29, 2010 incident, Griffith claimed that Plaintiff was harassing the medical staff, and when Griffith ordered him to stop, Cole became more abusive and threatening and said "fuck you motherfucker. I'll kick your ass." *Id.* Griffith wrote that Plaintiff then began removing his clothes as if to prepare for a fight at which point Griffith ordered the medical staff to leave the room. Griffith maintained in the Report that as he too prepared to leave the room, Cole stood up and launched himself at Griffith and grabbed the Defendant's biceps. Griffith claims to have defended himself by pushing Cole in the chest with both hands. Cole then fell over backwards. *Id.* Plaintiff was found not guilty on the charges of violent conduct, assault on staff, and refusing a direct order in Griffith's Misbehavior Report and guilty of interference with employee and making threats. (Dkt. No. 18–1 at 6.) He was given one month in keeplock and a one month loss of packages, commissary, and earphones.[FN10] *Id.*

FN10. It appears that the guilty findings may have been reversed by the Central Office Review Committee on December 8, 2010. (Dkt. No. 18–1 at 1.)

Plaintiff filed an inmate injury report in which he claimed that Griffith had punched him with a closed fist, choked him, and hit him in the side of the chest. (Dkt. No. 16–3 at 41–42.) The injuries sustained by Cole, as described by the nursing staff on both the use of force report and inmate injury report, are largely consistent with Plaintiff's description of the alleged assault, including: "(1) 1/2 inch abrasion above bridge of nose (2) 1 x 1/2 inch abrasion Rt. cheek (3) 3x4 inch pink area [left] chest (4) 1 x 1/2 inch pink area below Rt ear (5) 3/4 x 1/2 inch pink area below [left] ear." *Id.* at 42–44.

Plaintiff has also alleged that Griffith was part of a conspiracy to assault him, cover up the assault, and make false misbehavior reports. *Id.* at ¶ 95.

**4. Defendant Lawrence**

Not Reported in F.Supp.2d, 2012 WL 4491825 (N.D.N.Y.)

(Cite as: 2012 WL 4491825 (N.D.N.Y.))

Defendant Lawrence is a corrections sergeant at MCF, and his duties include supervising corrections officers working during his shift. (Dkt. No. 16 at ¶ 19.) On October 5, 2010, Lawrence filed a misbehavior report on Plaintiff for threats of violence arising out of an incident that had occurred that morning. (Dkt. No. 61–2 at 38.) According to Lawrence, Plaintiff told the Defendant that he was going to "kick it up a notch," and when Lawrence asked what he meant, Cole said "you better call Judway, I'm not scared of you Lawrence and you're going to get hurt. I'm going to beat your ass." *Id.* Plaintiff was found guilty and given one month without his radio. *Id.* at 39.

Lawrence appears to have been the subject of Plaintiff's grievance complaint # MHK 11849–10 filed on October 7, 2010.[FN11] The complaint charged Lawrence with threatening and harassing Cole with actions that included tampering with his food and filing a false misbehavior report. (Dkt. No. 16–3 at 33; Dkt. No. 18–1 at 27.)

> **FN11.** The Grievance Complaint itself is not among the papers filed by Plaintiff. However, it appears from the denial of the Grievance that Lawrence was the subject. (Dkt. No. 16–3 at 33.)

**\*6** According to Plaintiff, on October 31, 2010 at 1:30 p.m., Lawrence came into his room while he was sitting at his desk. (Dkt. No. 16 at ¶ 89.) Cole claims that Lawrence pulled at the front of his pants and pulled out his penis and made lewd comments to Cole including telling him "I \*uck many muslims Cole and am here to \*uck you as well." *Id.* Lawrence began to walk towards Cole and pushed over his bedside table causing two cups of Ensure Plus to fall from the table on the side where Lawrence was standing. *Id.* Plaintiff contends that Lawrence continued to push his wheelchair and slipped and fell on the Ensure, making the Defendant angry. *Id.* at ¶ 90.

Cole has alleged that Lawrence got up and yelled at Plaintiff that he was going to "fuck his ass up" and then with a closed fist punched Cole below his left eye and stabbed him in the left hand with a silver pen knife when Cole attempted to protect his face with his hands. *Id.* Plaintiff claims that another corrections officer who was present punched him in the hand, and Lawrence and the other officer kicked Plaintiff then grabbed him in the chest and slung his wheelchair over the bedside table leaving his legs pinned. Lawrence and the corrections officer allegedly continued to punch Cole and call him names including "nigger terrorist." *Id.* Lawrence then spit on Plaintiff's face and left him on the floor with his wheelchair tipped over and the table on his legs where he remained for an hour or more. *Id.* at ¶¶ at 91–92.

Following the incident, Lawrence filed both misbehavior and use of force reports. (Dkt. No. No. 16–2 at 43–45; Dkt. No. 18 at 49–51 .) In the reports, Lawrence wrote that while he was supervising Cole's medication, Cole became violent and repeatedly screamed at Lawrence to show himself to the Plaintiff. (Dkt. No. 16–2 at 43; Dkt No. 18 at 49.) As he entered the room to address the issue, he slipped and fell in a puddle of Ensure landing on his back left side. *Id.* Cole then pushed his tray table onto Lawrence striking the Defendant in the right shin. Lawrence scrambled to his feet and took control of the tray table and pushed it into Cole knocking him and his wheelchair over and onto the floor. *Id.* The misbehavior report charged Plaintiff with assault on staff and violent conduct. (Dkt. No. 16–2 at 43.) Cole was found guilty on both charges on November 8, 2010 and given 270 days in the SHU, 180 days without packages and commissary, and 12 months loss of good time. *Id.* at 44.

**B. Defendants Russin, Reese, and Paluck**

Defendants Russin, Reese, and Paluck are all part of the medical staff at MCF. (Dkt. No. 16 at ¶¶ 28–30.) Plaintiff's claims against them relate to Defendant Griffith's alleged assault on October 29, 2010.

Defendant Russin is employed as a Registered Nurse at MCF and is charged with supervising the medical staff on her post and listing inmates' complaints. *Id.* at ¶ 28. In his Amended Complaint, Plaintiff has alleged that after he was assaulted by Griffith, he pressed his call button and Russin answered. *Id.* at ¶ 85. He informed Russin of what had taken place and told her he wanted to see Mary Shrimp ("Shrimp"), also a Registered Nurse at MCF, *id.* at ¶ 24, Defendant Szajer, the area supervisor, and Ms. Shatz, R.N., the Nurse Administrator at MCF. *Id.* According to Plaintiff, Russin said nothing and turned off Cole's call bell. *Id .* Cole also claims in conclusory fashion that Russin was part of a conspiracy to assault him, cover

Not Reported in F.Supp.2d, 2012 WL 4491825 (N.D.N.Y.)

(Cite as: 2012 WL 4491825 (N.D.N.Y.))

up the assault, and make false misbehavior reports against him. *Id.* at ¶ 95.

**\*7** Defendant Reese is a Licensed Practical Nurse at MCF, whose duties included making rounds and handing out the evening medicine. *Id.* at ¶ 29. Plaintiff has alleged that she would always try to give him the wrong medicine, drop his pills on the floor and do anything else to cause him pain. *Id.* at ¶ 79. According to Plaintiff, Reese was giving him medication at 9:35 p.m. on October 29, 2010 when Griffith came in and told her to leave before Griffith began assaulting Cole. *Id.* at ¶ 83. Cole claims that Reese was yelling "kill the nigger" from the next room while Griffith was choking him, and that she was part of a conspiracy to assault him, cover up the assault, and file false misbehavior reports. *Id.* at ¶¶ 83, 95.

Defendant Paluck is a nursing assistant at MCF, and her duties include assisting the nursing staff with washing and cleaning inmates who are unable to do it for themselves. *Id.* at ¶ 30. In his Amended Complaint, Plaintiff has alleged that Paluck came in with Reese and Griffith to give him his medicine and was told to leave the room before Griffith assaulted Cole. *Id.* at 83. Plaintiff claims to have seen Griffith and Paluck talking after the alleged assault, with Paluck saying that they had to get their story straight. *Id.* at ¶¶ 84–5. He maintains that Paluck was a part of a conspiracy to assault him, cover up the assault, and make false misbehavior reports. *Id.* at ¶ 95.

**C. Defendant Rabideau**

Defendant Rabideau is Deputy Superintendent of Health at MCF and was the Acting Superintendent during the time period relevant to Plaintiff's Amended Complaint. (Dkt. No. 16 at ¶ 6.) Plaintiff claims that between September 6, 2010 and October 31, 2010 he sent many letters of complaint to Rabideau regarding Durante and Szajer's continued harassment and filing of false misbehavior reports against him, and she never responded. *Id.* at ¶ 73.

In a September 30, 2010 letter, Plaintiff complained to Rabideau of continuing harassment by Defendants Durante and Szajer and asked Rabideau to meet with Durante, Szajer, and Cole to find common ground to end

the staff harassment and retaliation. (Dkt. No. 16–3 at 1–2.) According to Plaintiff, Rabideau did not respond to his letter. (Dkt. No. 16 at ¶ 70–2.)

In his October 1, 2010 letter to Rabideau, Plaintiff complained that Durante and Szajer were continuing to harass him, threaten assault, and file false misbehavior reports. (Dkt. No. 16–3 at 3–4.) In the letter, Cole faulted Rabideau and Defendant McCarthy for allowing the filing of false reports and turning a blind eye to Durante and Szajer's misconduct and asked why Rabideau never responded to his letters. *Id.* Cole complained that as long as Rabideau allowed Durante and Szajer's lies to continue, he would never get a break from keeplock and would never get his visiting privileges restored. *Id.*

In his October 4, 2010 letter to Rabideau, Plaintiff told her that Durante had spit in his face and hit him on the head with his keys. *Id.* at 5–6. He also complained again of the harassment and filing of false misbehavior reports by Durante and Szajer and told Rabideau that her failure to answer his letters had given Durante and Szajer a green light to continue the harassment and false misbehavior reports. *Id.* Plaintiff closed by asking Rabideau to review the misbehavior reports fairly. *Id.*

**\*8** Rabideau responded to Plaintiff's October 4, 2010 letter on the same date with a short message saying that "I will personally be looking into your allegations of assault from CO Durante." [FN12] (Dkt. No. 16–3 at 26.) Plaintiff wrote to Rabideau upon receipt of her message informing her of the incident on October 3, 2010 where Durante had allegedly flipped Cole's wheelchair and kicked him. *Id.* at 20–21. Rabideau sent Plaintiff another message on October 8, 2010 advising him that "[w]e are looking into all of your requests to see what we can do." (Dkt. 16–3 at 27.)

> FN12. Rabideau's message of October 4, 2010 indicates that it is in response to Plaintiff's correspondence of October 4, 2010 and September 28, 2010. Plaintiff's Amended Complaint does not contain any allegations regarding a letter of September 28th nor has the letter been included with any of his submissions. However, in his Supplemental Affidavit and

Not Reported in F.Supp.2d, 2012 WL 4491825 (N.D.N.Y.)

(Cite as: 2012 WL 4491825 (N.D.N.Y.))

Appendix, Plaintiff has described the letter as addressing Durante and Szajer's continued threats of assault. (Dkt. No. 18 at ¶ 23.)

Plaintiff wrote to Rabideau again on October 11, 2010. (Dkt. No. 16–3 at 22–25.) In that letter, Cole expressed his continuing concern over her failure to respond to his many letters advising her of the threats and continued harassment by Defendants Durante and Szajer. *Id.* at 23.

**D. Defendant McCarthy**

As Deputy Superintendent of Security at MCF, McCarthy is in charge of the supervision and discipline of the correctional staff at the facility. [FN13] (Dkt. No. 16 at ¶ 7.) In addition to copying McCarthy on his October 1, 2010 and first October 4, 2010 letters to Rabideau, Plaintiff communicated directly with McCarthy concerning his difficulties with Durante, Szajer, Griffith, and Lawrence, among other staff members.

FN13. In the capacity of Acting Superintendent, McCarthy also denied Plaintiff's Grievance Complaints MHK 11844–10 and MHK 11845–10 against Durante and Szajer, and MHK 11849–10 against Lawrence on October 27, 2010. (Dkt. No. 16–3 at 32–34.)

In his October 4, 2010 letter to McCarthy concerning Durante and Szajer's continued harassment, Cole claimed that two misbehavior reports filed by Durante had been Szajer's doing. (Dkt. No. 16–3 at 7–8.) On October 22, 2010, McCarthy sent Cole a memorandum responding to his claim that Durante had assaulted him on September 30, 2010. (Dkt. No. 16–3 at 28.) McCarthy advised him that the incident had been investigated, and that although there was no way for him to know for sure what had occurred, he had found inconsistencies in Cole's statements about it. *Id.* McCarthy also wrote "I would appreciate (sic) you write to me exclusively when you have issue with security staff. I am in the best position to address these issue. It serves no purpose to write to Albany or the Superintendent without my having a chance to review the issue(s). We spoke briefly about this and I left with the sense that you understood where I was coming from." [FN14] *Id.*

FN14. McCarthy's request may have been in

response to Plaintiff's letters to the Inspector General's Office, former Governor Paterson, and the State Commission of Correction on the subject of Durante and Szajer's harassment, and Durante's alleged assaults. (Dkt. No. 16–3 at 9–12, 17–19.)

On October 29, 2010, Plaintiff wrote to McCarthy to inform him of his allegations that Griffith had assaulted him on that date. *Id.* at 13–14. Cole indicated in the letter that he was giving notice to McCarthy first because he was in the best position to address the issues. *Id.* at 14. On November 3, 2010, McCarthy notified the Inspector General's Office of the alleged assaults on Plaintiff of October 29 and 31, 2010 and forwarded Plaintiff's letters to that office. (Dkt. Nos. 16 at ¶ 102 and 16–3 at 30.)

McCarthy sent Plaintiff a memorandum on November 29, 2010 (in response to a November 26, 2010 letter from Cole) accusing him of improperly using the grievance system in an adversarial manner, directing him to cease doing so, and assuring him that "disciplinary action will continue until you cease this form of harassment." (Dkt. No. 18–2 at 34.) On December 7, 2010, McCarthy sent Plaintiff another memorandum, this one in response to a December 6, 2010 letter from Cole, in which he wrote that he had found no evidence to support Plaintiff's many allegations of malfeasance by the security and medical staff and suggested that Cole was the problem. He recommended that Plaintiff make an effort to get along with staff. (Dkt. No. 18–1 at 59.)

**II. PROCEDURAL HISTORY**

**\*9** Plaintiff filed his original Complaint in this action on September 14, 2010. [FN15] On November 16, 2010, Cole moved for leave to serve an amended and supplemental complaint adding new defendants and additional claims, including excessive force claims arising out of four alleged assaults by prison personnel. (Dkt. No. 11.) On March 23, 2011, Judge Mordue granted Plaintiff's motion to amend and designated Cole's proposed amended complaint adding fifteen new defendants and the new claims as the operative complaint in the action. (Dkt No. 11–1; Dkt. No. 15 at 4.) A week later, on March 30, 2011, Plaintiff moved to file a Verified Supplemental Affidavit

Not Reported in F.Supp.2d, 2012 WL 4491825 (N.D.N.Y.)

(Cite as: 2012 WL 4491825 (N.D.N.Y.))

of Truth and Appendix in Support of Affidavit of Truth ("Supplemental Affidavit and Appendix") in support of his claims. (Dkt. Nos. 18, 18–1, and 18–2.) The papers were accepted for filing by Magistrate Judge Lowe in an April 8, 2011 text order.

> FN15. Plaintiff's original Complaint named only sixteen defendants and focused largely on his claims regarding the manner in which the hearing and appeal on the Tier III misbehavior report that had been filed against him on July 2, 2010 had been handled, including allegations of forgery, conspiracy, and cover-up relating to an envelope that was relevant to the charges against him. (Dkt. No. 1.) As previously noted, Plaintiff is no longer pursuing those claims. *See* p. 4, n. 3, *supra.*

Defendants thereafter filed their Rule 12(b)(6) motion for partial dismissal of the Amended Complaint. (Dkt. No. 62.)

## III. ANALYSIS

### A. Legal Standard Governing Motions to Dismiss for Failure to State a Claim

A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6). The motion tests the formal legal sufficiency of the complaint by determining whether it conforms to Rule 8(a)(2) of the Federal Rules of Civil Procedure, which requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972). Satisfaction of the requirement that a plaintiff "show" that he or she is entitled to relief requires that the complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense .... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679

(internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836 (1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

**\*10** Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *see also Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly* ). Furthermore, "[i]n cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they are consistent with the allegations in the complaint." *See, e.g., Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y .2004) (considering factual allegations in plaintiff's opposition papers) (internal quotations and citations omitted), *vacated and amended in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). *See also Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) ("Even where a document is not incorporated by reference [in the complaint], the court may nevertheless consider it [on a Rule 12(b)(6) motion without converting the motion to one for summary judgment] where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint.") (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995)).FN16

> FN16. In addition to Plaintiff's Amended Complaint and exhibits, I have considered his Affirmation in opposition with exhibits (Dkt. No. 65) and his Supplemental Affidavit and Appendix on Defendants' motion to dismiss. (Dkt. Nos. 18, 18–1, and 18–2.) Plaintiff filed an

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4491825 (N.D.N.Y.)

(Cite as: 2012 WL 4491825 (N.D.N.Y.))

original Affidavit of Truth with Appendix as an exhibit to his original Complaint. (Dkt. No. 1–2; Dkt. No. 16 at.) The Supplemental Affidavit and Appendix, as previously noted, was not filed as an exhibit to Cole's Amended Complaint but rather a week after the District Court had issued an Order accepting the Amended Complaint as the operative pleading in the case. (Dkt. No. 15.) Plaintiff's Supplemental Affidavit and Appendix was served on counsel for the Defendants at the time it was filed. (Dkt. No. 18 at 33.)

Giving consideration to the Supplemental Affidavit and Appendix is particularly appropriate in this case where: (1) Plaintiff has actual notice of, and clearly relied upon, their contents in drafting his Amended Complaint and specifically asked the Court to review them (Dkt. No. 18 at ¶ 66) (see *Chambers, 282 F.3d at 153; Cortec Indus., Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 48 (2d Cir.1991), *cert. denied,* 503 U.S. 960 (1992)); and (2) Defendants have themselves requested that a document in the Appendix be considered in support of their motion without converting it to a motion for summary judgment. (Dkt. No. 62–1 at 11, n. 4.)

Where a *pro se* complaint fails to state a cause of action, the court *generally* "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted). An opportunity to amend is not required where the plaintiff has already amended the complaint.[FN17] *See Advanced Marine Tech., Inc. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once). In addition, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco,* 222 F.3d at 112 (citation omitted).

FN17. In his Amended Complaint, Plaintiff has added new party defendants and claims not

included in his original Complaint. (Dkt. Nos. 1 and 16.) Because the claims Plaintiff has elected to continue to pursue were for the most part first asserted in the Amended Complaint and are largely against newly named defendants, I have treated the Amended Complaint as Cole's initial pleading for purposes of considering whether leave to amend should be given.

**B. Plaintiff's Official Capacity Claims For Money Damages Against the Defendants**

Plaintiff has asserted official capacity claims for money damages under 42 U.S.C. ¶ 1983 against all of the remaining Defendants in his Amended Complaint. (Dkt. No. 16 at ¶¶ 6–7, 19–20, 25, 27–30 .) I recommend the *sua sponte* dismissal of those claims.[FN18] The Eleventh Amendment protects a state against suits brought in federal court. *Alabama v. Pugh,* 438 U.S. 781, 782 (1978). The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are effectively arms of the state ( *Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.,* 466 F.3d 232, 236 (2d Cir.2006)) and bars all money damages claims against state officials acting in their official capacities, including the Defendants herein. *Kentucky v. Graham,* 473 U.S. 159, 167–68 (1985); *see also Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002) (an inmate plaintiff's claims for damages against all individual Department of Correctional Services employees sued in their official capacities are considered claims against New York and, therefore, are barred by the state's Eleventh Amendment immunity).

FN18. Defendants did not seek dismissal of the official capacity claims for money damages asserted against them in their motion to dismiss. However, the District Court is empowered to dismiss the claims *sua sponte* pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(iii). *See Johnson v. Enu,* No. 08–CV–158, 2011 WL 3439179, at *7, 2011 U.S. Dist. LEXIS 86831, at *19 (N.D.N.Y. July 13, 2011). The *sua sponte* dismissal is limited to claims for money damages and does not include any claims for prospective injunctive relief Plaintiff may be asserting against any of the Defendants in their official capacities. *See Ex parte Young,* 209 U.S. 123, 155–156 (1908)

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4491825 (N.D.N.Y.)

(Cite as: 2012 WL 4491825 (N.D.N.Y.))

(allowing prospective injunctive relief in certain circumstances in official capacity suits brought under section 1983).

## C. Plaintiff's Retaliation Claims

**\*11** Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Pidlypchak,* 389 F.3d at 381–83. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506 (2002). As the Second Circuit has noted,

[t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkewicz,* 534 U.S. 506.

To state a retaliation claim under 42 U.S.C. § 1983, a plaintiff must allege facts plausibly suggesting that: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287

(1977); *Pidlypchak,* 389 F.3d at 380 (citing *Dawes,* 239 F.3d at 492).

Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). Those factors include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Id.* (citing *Colon,* 58 F.3d at 872–73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.* The Second Circuit has held that the passage of "only six months" is sufficient to support an inference of a causal connection. *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009) (citing *Gorman–Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 555 (2d Cir.2001)).

## 1. Defendants Durante and Szajer

**\*12** In Plaintiff's September 27, 2010 grievance complaint against Defendant Szajer, he charged Szajer with harassment and threatening to file false misbehavior reports against Cole as long as he continued to write complaints. (Dkt. No. 18–2 at 37–38.) On September 28, 2010, Plaintiff wrote to Defendant Rabideau complaining of Durante and Szajer's continuing threats of assault.[FN19] (Dkt. No. 18 at ¶ 23.) In a September 30, 2010 letter to Rabideau, Cole asked her to set up a meeting with Defendants McCarthy, Durante, and Szajer to find some common ground to end the "Staff Harassment Retaliation Repraesel Lies Threats Tag team set up." (Dkt. No. 16–3 at 2.) In his October 1, 2010 letter to Rabideau, Cole complained again about Durante and Szajer's threats of assault and filing of false misbehavior reports against him in retaliation for his grievance complaint. (Dkt. No. 16–3 at 3.)

>    FN19. Although it is not included among Plaintiff's submissions, Rabideau referenced the September 28, 2010 letter in her October 4, 2010 note to him. (Dkt. No. 16–3 at 26.)

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4491825 (N.D.N.Y.)

(Cite as: 2012 WL 4491825 (N.D.N.Y.))

According to Plaintiff's letter of October 4, 2010 to the Inspector Generals Office, on September 27, 2010, Szajer came into his room and told him that if he had to answer one more of Cole's grievance complaints he would kick it up a notch and harass him every day and write false misbehavior reports. In the same letter, Plaintiff wrote that Szajer had come to him in a threatening manner "telling me what he going to do, he kick my wheelchair as he stated Cole we will *ucking put you in the hospital on many machines and he Toney Szajer would just lie and say I attack him." (Dkt. No. 16–3 at 9.) In his letter of October 4, 2010 to Governor Patterson, Plaintiff wrote that Szajer came to him after Durante had spit in his face and hit him over the head with his keys, told him it would be like that when he filed a grievance complaint against him and proceeded to punch him in the chest and tell him to fight back because that is what he and Durante and other corrections officers wanted him to do so that they could take his life. (Dkt. No. 16–3 at 11.)

Durante allegedly assaulted Plaintiff on September 30, 2010, and on the same day filed a misbehavior report which resulted in Plaintiff being given 30 days in keeplock. (Dkt. No. 16 at ¶¶ 70–2; Dkt. No. 16–2 at 25–26.) Durante filed another misbehavior report on Cole on October 1, 2010, which resulted in an additional 30 days in keeplock. Plaintiff claims Durante assaulted him again on October 3, 2010. (Dkt. No. 16 at ¶ 74.) Plaintiff has asserted in his Supplemental Affidavit and Appendix that Szajer was present and was a participant in alleged assaults on September 30 and October 3, 2010. (Dkt. No. 18 at ¶ 26.)

Both the September 27, 2010 grievance complaint and Plaintiff's letters of complaint to Rabideau of September 28, September 30, and October 1, 2010 constitute constitutionally protected conduct.[FN20] *Davis v. Goord,* 320 F.3d 346, 352–53 (2d Cir.2003) (the right to file grievances is a constitutionally protected activity for retaliation purposes); *Decayette v. Goord,* No. 9:06–CV–783, 2009 WL 1606753, at *9, 2009 U.S. Dist. LEXIS 48127 (N.D.N.Y. June 8, 2009) (plaintiff's right to send a letter of complaint to a prison official was constitutionally protected activity).

FN20. Plaintiff also commenced this lawsuit, another constitutionally protected activity, prior to the alleged assaults. *See, e.g., Allah v. Malenski,* No. 04–CV–0912A(Sr), 2010 WL 2403098, at *9, 2010 U.S. Dist. LEXIS 57176, at *24 (S.D.N.Y. June 10, 2010) (prisoners have a constitutional right of access to the courts and may not be retaliated against by prison officials for exercising that right). Szajer was named as a defendant in Cole's original complaint.

**\*13** An assault by corrections officers is sufficient to "chill a person of ordinary firmness from continuing to engage in his First Amendment activity." *See Rivera v. Goord,* 119 F.Supp.2d 327, 339–40 (S.D.N.Y.2000). Likewise, the filing of a misbehavior report which results in an inmate being placed in keeplock for 30 days has been found sufficient to satisfy the second element of a retaliation claim. *See, e.g., Jeffrey v. Ahmed,* No. 9:09–CV–0327, 2011 WL 4390220, at *11, 2011 U.S. Dist. LEXIS 106607, at *33 (N.D.N.Y. Aug. 22, 2011).

I find that Plaintiff's allegations of a "tag team" approach of harassment, the filing of false misbehavior reports, threats, and assaults by Durante and Szajer make a sufficient factual showing that the two were acting in concert with respect to Plaintiff's retaliation claims. Moreover, the temporal proximity between Plaintiff's grievance complaint and letters of complaint and the alleged assaults and false misbehavior reports is sufficiently close to plausibly suggest a causal relationship. Therefore, I recommend that Defendants Durante and Szajer's motion to dismiss the Plaintiff's retaliation claims against them be denied.[FN21]

FN21. Durante also filed misbehavior reports against Plaintiff on each of the two days after Cole had filed his October 4, 2010 grievance complaint against him with respect to the alleged assaults. (Dkt. No 16–2 at 13–15 and 19–21; Dkt. No. 16–3 at 33.) Cole was found guilty in both cases, and the punishment for the first was 30 days loss of radio and for the second was 6 days loss of packages, commissary, earphones/radio, and good time. (Dkt. No. 16–2 at 14 and 20.) With the possible exception of the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4491825 (N.D.N.Y.)

(Cite as: 2012 WL 4491825 (N.D.N.Y.))

loss of good time, the punishments were likely not serious enough to deter a person of ordinary firmness from exercising his constitutional rights. *Gill,* 389 F.3d at 381; *see also Bartley v. Collins,* No. 95 Civ. 10161(RJH), 2006 WL 1289256, at *7, 2006 U.S. Dist. LEXIS 28285, at *21 (S.D.N.Y. May 10, 2006) (The filing of misbehavior reports that result in a "temporary loss of various privileges such as permission to visit the commissary do not constitute adverse action because they are *de minimis;* they do not constitute penalties that would deter a similarly situated prisoner of ordinary firmness from exercising his constitutional rights.").

**2. Defendant Griffith**

In his Memorandum of Law, Plaintiff contends that Griffith assaulted him on October 29, 2010 in retaliation for his filing of grievance complaints # MHK11844–10 and # MHK11845–10 on October 4, 2010. (Dkt. No. 65 at 23.) However, those grievances relate to the alleged assaults on Plaintiff by Defendant Durante (and possibly Szajer) on September 30 and October 3, 2010, and were not directed against Griffith. (Dkt. No. 16–3 at 33–34.) There are no facts alleged in the Plaintiff's Amended Complaint supporting a causal connection between Plaintiff's filing of those grievance complaints against Durante and the alleged assault by Griffith, or suggesting that the protected conduct was a "substantial or motivating factor" in Griffith's alleged assault on Plaintiff. *See Mt. Healthy,* 429 U.S. at 287. Nor has Plaintiff identified any other protected conduct to which Griffith's alleged assault can be causally connected. Given the absence of adequate factual support to state a plausible retaliation claim against Griffith, I recommend that the claim be dismissed, without prejudice to Plaintiff's right to replead.

**3. Defendant Lawrence**

Defendant Lawrence's alleged assault of Plaintiff on October 31, 2010 was preceded by Cole's October 7, 2010 grievance complaint against Lawrence claiming that the Defendant had threatened and harassed Plaintiff by tampering with his food and filing false misbehavior reports. (Dkt. No. 16–3 at 33.) Cole claims that the October 31, 2010 assault was in retaliation for the October 7, 2010 grievance complaint. (Dkt. No. 65 at 23.) Filing of

the grievance complaint was protected conduct, and the alleged assault constituted an "adverse action" against Plaintiff that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights. *See Rivera,* 119 F.Supp.2d at 339–340. Furthermore, the less than one month time period between the filing of the grievance and the alleged assault is sufficient to support an inference that Plaintiff's grievance complaint played a substantial part in the alleged assault. *See Espinal,* 558 F.3d at 129 (the passage of "only six months" is sufficient to support an inference of a causal connection). Therefore, I recommend that Lawrence's motion to dismiss Plaintiff's retaliation claim against him be denied.

**D. Plaintiff's Claim of Medical Indifference Against Defendant Russin**

**\*14** The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishment. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (citation omitted). In fulfilling this duty, prison officials must ensure, among other things, that inmates receive adequate medical care. *Id.* (citing *Hudson v. Palmer,* 468 U.S. 517, 526–27 (1984)).

There are two elements to a prisoner's claim that prison officials violated his or her Eighth Amendment right to receive medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4491825 (N.D.N.Y.)

(Cite as: 2012 WL 4491825 (N.D.N.Y.))

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). There is no bright-line test to measure the seriousness of a prisoner's medical condition. *Stevens v. Goord,* 535 F.Supp.2d 373, 383 (S.D.N.Y.2008). However, the Second Circuit has set forth factors to consider when determining whether an alleged medical condition is sufficiently serious, including but not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702. Inquiry into whether a plaintiff had a serious medical need "must be tailored to the specific circumstances of each case." *Smith,* 316 F.3d at 185.

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702–03. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *See Farmer,* 511 U.S. at 825; *Ross v. Giambruno,* 112 F.3d 505 (2d Cir.1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105–6.

**\*15** Plaintiff claims that when he pressed his call bell following the alleged assault by Griffith on October 29, 2010 at approximately 9:35 and asked to see Nurse Shrimp, Szajer, and the Nurse Administrator, Defendant Russin answered the call, said nothing, and turned off

Cole's call bell. (Dkt. No. 16 at ¶¶ 82, 85 and 95.) The use of force report, submitted as an exhibit to Plaintiff's Amended Complaint, shows that Russin examined Cole at 10:30 p.m. that evening, approximately one hour after he pressed his call bell. (Dkt. No. 16–3 at 43.) At that time she observed "(1)1/ inch abrasion above bridge of nose (2) 1 x 1/2 inch abrasion Rt. cheek (3) 3x4 inch pink area [left] chest (4) 1 x 1/2 inch pink area below Rt ear (5) 3/4 x 1/2 inch pink area below [left] ear." *Id.* The Report gives no indication that any treatment was administered to Cole by Russin. *Id.* Plaintiff's health provider progress notes reveal that at 12:50 a.m. on October 30, 2010, he asked C. Foosek to cleanse his abrasions. She cleansed the reddened/pink areas on his neck and cheeks with sterile water and cleansed and applied a bandage to a very small abrasion on Plaintiff's nose at his request. (Dkt. No. 65 at 5.)

Prison officials can deprive inmates of medical treatment by unnecessarily delaying adequate medical treatment. *Smith,* 316 F .3d at 185. Where, as in this case, a plaintiff's claim is one of a temporary delay in the provision of otherwise adequate treatment, "it is appropriate to focus on the challenged delay ... in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious to support an Eighth Amendment claim." *Id.*

Plaintiff, who sustained only two small abrasions and three small pink areas in the alleged assault by Griffith, has failed to allege the plausible existence of a sufficiently serious medical condition of constitutional proportions as required to state claim for deliberate medical indifference under the Eighth Amendment. *Caiozzo,* 581 F.3d at 72 (plaintiff must show that he or she had a serious medical condition); *see also Jordan v. Fischer,* 773 F.Supp.2d 255, 261–2 (N.D.N.Y.2011) (superficial red marks were not sufficiently serious to meet the objective test for medical indifference); *Tafari v. McCarthy,* 714 F.Supp.2d 317, 354 (N.D .N.Y.2010) (two bruises and a superficial laceration were not enough to satisfy the objective test for medical indifference); *Dallio v. Hebert,* 678 F.Supp.2d 35, 44 (N.D.N.Y.2009) (black eyes, bruising, lacerations, red spots, and kick marks did not constitute a serious medical need). Further, Cole has failed to allege that he was

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4491825 (N.D.N.Y.)

(Cite as: 2012 WL 4491825 (N.D.N.Y.))

harmed by the approximately one hour delay from the time of the alleged assault until his examination by Defendant Russin and the three hour delay in the receiving treatment for his minor injuries. *See, e.g., Martinez v. Lape,* No. 9:09–CV–0665 (TJM/RFT), 2011 WL 4527943, at *5, 2011 U.S. Dist. LEXIS 116106, at *15–16 (N.D.N.Y. Mar. 28, 2011) (dismissal for failure to state a claim proper where amended complaint contained insufficient factual support to show serious harm or serious risk of harm as a result of alleged delay in response time).

**\*16** Plaintiff's pleading deficiencies with regard to the objective element of a medical indifference claims warrant dismissal of his claim for deliberate indifference to his serious medical need by Defendant Russin.[FN22] I therefore recommend that Defendant Russin's motion to dismiss Plaintiff's Eighth Amendment medical indifference claim be granted. Given the documented lack of seriousness of Plaintiff's alleged injuries, and the absence of harm from the delay in treatment, I also recommend that Cole be denied the right to replead his deliberate indifference claim against Defendant Russin. *See Cuoco,* 222 F.3d at 112 (an opportunity to amend is not required where a better pleading will not cure the substantive deficiencies in the complaint).

> FN22. It is also doubtful that Plaintiff set forth sufficient factual matter to state a claim with regard to the subjective element of an Eighth Amendment claim for relief for deliberate indifference to serious medical needs, since he has not alleged facts which would allow me to infer more than the mere possibility that Russin "was aware of facts from which the inference could be drawn that [Cole] had a serious medical need," and that he "actually drew that inference." *Chance,* 143 F.3d at 702–03. However, since in order to state a plausible medical indifference claim Plaintiff must include sufficient factual matter as to both the objective and subjective elements of the claim, it is not necessary for me to make that determination.

**E. Plaintiff's Claim of Deliberate Indifference to his Safety and Failure to Intervene Against Defendants Reese and Paluck**

Plaintiff claims that Defendants Reese and Paluck's failure to intervene on his behalf when he was assaulted by Griffith constituted deliberate indifference to his safety. (Dkt. No. 65 at 20.) Both Reese and Paluck were in Cole's room with Griffith prior to the alleged assault on October 29, 2010. (Dkt. No. 16 at ¶ 83.) They left in a hurry when Griffith directed them to leave the room before the assault began. *Id.* However, according to Plaintiff, during the time Griffith was allegedly choking him, Reese was in the next room yelling "kill the nigger." *Id.*

"The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dept. of Corrs.,* 84 F.3d 614, 620 (2d Cir.1996), citing *Farmer,* 511 U.S. at 832. Law enforcement officials, including prison officials, can be held liable under § 1983 for failing to intervene in a situation where another official is violating an inmate's constitutional rights, including the use of excessive force, in their presence. *Curley v.. Vill. of Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *see also Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) (prison official's Eighth Amendment duty to take reasonable measures to guarantee the safety of inmates in their custody includes a duty to protect inmates from harm threatened by other officers). A state actor can be held liable for failure to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008), *aff'd.,* 461 Fed.Appx. 18 (2012). The duty to intervene has been found applicable to prison nurses. *See Decayette,* 2009 WL 1606753, at * *3, 8, U.S. Dist. LEXIS 48127 (summary judgment denied on Eighth Amendment failure to intervene claim against a prison nurse who was alleged to have observed plaintiff being beaten by corrections officers); *see also Durham v.. Nu'Man,* 97 F.3d 862, 868 (6th Cir.1996), *cert. denied,* 520 U .S. 1157 (1997) (summary judgment denied state hospital nurse who "stood idly by" and watched while plaintiff prisoner was beaten by corrections officers).

**\*17** I find that Plaintiff has alleged facts sufficient to state a plausible Eighth Amendment claim that Defendant

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4491825 (N.D.N.Y.)

(Cite as: 2012 WL 4491825 (N.D.N.Y.))

Reese failed to intervene. Cole has alleged facts supporting a claim that there was a substantial risk that he would suffer serious harm at Griffith's hand for purposes of this motion. (Dkt. No. 16 at ¶¶ 82–84.) Moreover, Plaintiff has alleged in his Amended Complaint that rather than intervene or seek assistance for Plaintiff, Reese stood in the next room while he was being choked by Griffith and yelled "kill the nigger." *Id.* at ¶ 83. That allegation suggests that the Defendant was aware that there was a substantial risk that Cole would suffer serious harm, and she actively encouraged Griffith to inflict serious harm instead of taking reasonable measures to abate it. Therefore, I recommend that Defendant Reese's motion to dismiss be denied.

Plaintiff's Amended Complaint contains no factual allegations with regard to Defendant Paluck's actions from the time Griffith directed her to leave Cole's room until she allegedly told Griffith that they had to get their story straight after the claimed assault was over. *Id.* at ¶¶ 84–85. Given the absence of adequate factual support to state a plausible Eighth Amendment claim against Paluck, including the absence of allegations as to her actions after she was ordered out of the room by Griffith and her knowledge concerning a risk of serious harm to Plaintiff, I recommend that Defendant Paluck's motion to dismiss Plaintiff's Eighth Amendment claim against her be granted. However, I recommend that Plaintiff be allowed to replead with regard to Paluck.

**F. Plaintiff's Pendent State Claims for Negligence and Assault and Battery**

Defendants argue that Plaintiff's state law claims for negligence and assault and battery, presumably directed at Defendants Szajer, Durante, Griffith, and Lawrence, should be dismissed pursuant to New York Correction Law § 24. (Dkt. No. 62–1 at 7.) Defendants are correct. Section 24 provides as follows:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

This statute precludes inmates from suing DOCS employees in their personal capacity in New York State courts. *See Arteaga v. State,* 532 N.Y.S.2d 57, 62 (1988). The bar also applies to pendent state law claims in federal court because "[i]n applying pendent jurisdiction, federal courts are bound to apply state substantive law to the state claim." *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996) (citations omitted). "If a state would not recognize a plaintiff's right to bring a state claim in state court, a federal court exercising pendent jurisdiction ... must follow the state's jurisdictional determination and not allow that claim to be appended to a federal law claim in federal court." *Id.* at 15.

**\*18** In 2009, the United States Supreme Court held that Correction Law § 24 is unconstitutional to the extent it precludes inmates from pursuing § 1983 claims. *Haywood v. Drown,* 556 U.S.729 (2009). However, the courts in this District have held that the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state law claims against DOCS employees and have continued to dismiss those claims under Correction Law § 24. *See O'Diah v. Fischer,* No. 08–CV–941 (TJM/DRH), 2012 WL 987726, at \*21, 2012 U.S. Dist. LEXIS 39232, at \*60 (N.D.N.Y. Feb. 28, 2012); *Joy v. New York,* No. 5:09–CV–841 (FJS/ATB), 2010 WL 3909694, at \*4–5, 2010 U.S. Dist. LEXIS 104641, at \*15–16 (N.D.N.Y. Sept. 30, 2010); *Gillard v. Rovelli,* No. 9:09–CV–0860 (NAM/GHL), 2010 WL 4905240, at \* 16, 2010 U.S. Dist. LEXIS 124737, at \*47–48 (N .D.N.Y. Sept. 29, 2010); *Crump v. Ekpe,* No. 9:07–CV–1331, 2010 WL 502762, at \*18, 2010 U.S. Dist. LEXIS 10799, at \*61 (N.D.N.Y. Feb. 8, 2010). For the reasons set forth in those decisions, I recommend that the Court dismiss Plaintiff's pendent state law claims in this case without leave to amend.

**G. Plaintiff's Conspiracy Claim Against Defendants Griffith, Szajer, Russin, Reese, and Paluck**

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4491825 (N.D.N.Y.)

(Cite as: 2012 WL 4491825 (N.D.N.Y.))

In order to support a claim for conspiracy under 42 U.S.C. § 1983, "a plaintiff must demonstrate (1) an agreement between two or more state actors or a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Hamilton v. Fisher,* No. 9:10–CV–1066 (MAD/RFT), 2012 WL 987374, at *12, 2012 U.S. Dist. LEXIS 39118, at *36 (N.D.N.Y. Feb. 29, 2012) (citing *Ciambriello v. County of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002)). "A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir.1993) (citations and internal quotation marks omitted).

Plaintiff has alleged in conclusory fashion that on October 29, 2010 at 9:35 p.m. (the time at which Griffith allegedly assaulted Cole), a group of Defendants, including Griffith, Szajer, Russin, Reese, and Paluck, got together and "conspired to assault the Plaintiff and cover it the assault up and make false behavior reports." (Dkt. No. 16 at ¶ 95.) However, Plaintiff's Amended Complaint fails to set forth the factual details necessary to sustain a conspiracy claim—the existence of an agreement and meeting of the minds, including details of time, place, and the alleged effect of the conspiracy. *See Clayton v. City of Poughkeepsie,* No. 06 Civ. 4881 SCR, 2007 WL 2154196, at *5, 2007 U.S. Dist. LEXIS 55082, at *15–16 (S.D.N.Y. June 21, 2007). It contains no factual allegations indicating that the alleged parties to the conspiracy got together prior to the alleged assault by Griffith to plan or agree upon the assault, a cover up plan, or the filing of a misbehavior report, or that they took any steps in furtherance of any such plan prior to the assault.

**\*19** The only non-conclusory factual allegation made in support of Plaintiff's conspiracy claim is that Defendant Paluck commented to Griffith following the claimed assault that they needed to get their stories straight. (Dkt. No. 16 at ¶¶ 84–85.) A claim that parties conspired to conceal the truth about an incident after the fact does not by itself set forth a plausible conspiracy claim. *Clayton,* 2007 WL 2154196, at *5, 2007 U.S. Dist. LEXIS 55082, at *15–16. I therefore recommend that Plaintiff's claim for conspiracy be dismissed with leave to replead in accordance with the requirements for stating a conspiracy claim set forth herein.

## H. Plaintiff's Supervisory Liability Claims Against Defendants Rabideau and McCarthy

In a § 1983 action against a defendant in his or her personal capacity, the plaintiff must establish that the defendant, acting under color of state law, caused the plaintiff to be deprived of a federal right. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978). The United States Supreme Court has made it clear that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*").

The Second Circuit has held that personal involvement by a supervisor under § 1983 may be found where the supervisor has: "(1) participated directly in the alleged constitutional violation, (2) failed to remedy a violation after learning of it through a report or appeal, (3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) was grossly negligent in managing subordinates who committed constitutional violations, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).[FN23]

> **FN23.** The Supreme Court's decision in *Ashcroft,* 556 U.S. 662 has arguably nullified some of the categories set forth in *Colon. See Sash v. United States,* 674 F.Supp.2d 531, 543–44 (S.D.N.Y .2009). However, the Second Circuit has yet to issue a decision addressing *Iqbal's* effect on the *Colon* categories, and I will assume for purposes of these motions that *Colon* remains good law.

"*[R]espondeat superior* liability does not lie against corrections officers in Section 1983 actions" ( *Bass v.*

Not Reported in F.Supp.2d, 2012 WL 4491825 (N.D.N.Y.)

(Cite as: 2012 WL 4491825 (N.D.N.Y.))

*Jackson,* 790 F.2d 260, 263 (2d Cir.1986)), and "[h]olding a position in a hierarchical chain of command, without more is insufficient to support a showing of personal involvement." *Groves v. Davis,* No. 9:11–CV–1317 (GTS/RFT), 2012 WL 651919, at *6, 2012 U.S. Dist. LEXIS 25367, at *23 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon,* 568 F.2d at 934); *see also Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate ... a prison superintendent in a § 1983 claim") (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)). Therefore, "a plaintiff must ... allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass,* 790 F.2d at 263.

**1. Defendant Rabideau**

**\*20** Plaintiff has alleged in his Amended Complaint that he sent a number of letters to Acting Superintendent Rabideau complaining that he was being harassed by Defendants Durante and Szajer, that they were filing false misbehavior reports against him and threatening to assault him, and that Durante actually did assault him on two occasions. (Dkt. No. 16–3 at 1–6, 23.) In his letters to Rabideau, Cole complained that by turning a blind eye to their alleged misconduct and failing to respond to his requests she had given Durante and Szajer a green light to continue that behavior. *Id.* at 3–6. In his Memorandum of Law, Plaintiff argues that he has stated a claim for supervisory liability against Rabideau because she would have had notice of staff misconduct complaints, grievances, and letters by virtue of the procedure for dealing with allegations of employee harassment of inmates set forth in the regulatory guidelines at N.Y.Comp.Codes.R. and Regs. tit. 7, § 701.8 (2010). [FN24] (Dkt. No. 65 at 25.)

FN24. N.Y.Comp.Codes.R.and Regs. tit. 7, § 701.8(b) requires that all documents submitted with grievances alleging harassment be forwarded to the superintendent by the close of business on the date of filing. Under § 701.8((d) and (f), if the superintendent determines that it is a true case of harassment, he or she must render a decision on the grievance within twenty-five days. If the superintendent determines that the grievance does not present a bona fide

harassment issue, it is returned to the IGRC for normal processing. § 701.8(c).

The mere receipt of a grievance appeal, or in this case, the grievance itself, "does not suffice to place a supervisor on notice that a constitutional violation has occurred." [FN25] *Mandell v. Goord,* No. 9:06–CV–01478 (GTS/DEP), 2009 WL 3123029, at *13, 2009 U.S. Dist. LEXIS 90043, at *35–36 (N.D.N.Y. Sept. 29, 2009). Further, simply affirming the denial of a grievance is insufficient to confer personal responsibility on a defendant under § 1983. *See Warren v. Goord,* 476 F.Supp.2d 407, 413 (S.D.N.Y.2007). Nor can supervisory liability be established by an official's failure to respond to grievance letters or requests for investigations from prisoners. [FN26] *See, e.g., Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) ("It is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.") (citation and internal quotation marks omitted); *Walker v. Pataro,* No. 99 Civ. 4607(GBD)(AJP), 2002 WL 664040, at *12, 2002 U.S. Dist. LEXIS 7067, at *43 (S.D.N.Y. Apr. 23, 2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to black-letter law that 1983 does not impose respondeat superior liability.").

FN25. Supervisors are permitted to delegate responsibility for handling grievances to subordinates and may properly rely on the subordinate's determination. *Burns v. Trombly,* 624 F.Supp.2d 185, 205 (N.D.N.Y.2008). In this case, Plaintiff's appeals from grievance complaints MHK 11844–10, MHK 11845–10, and MHK 11849–10 were decided by Defendant McCarthy as Acting Superintendent. (Dkt. No. 16–3 at 32–34.)

FN26. "It is well established ... that inmate grievances procedures are undertaken voluntarily by the states, that they are not constitutionally required, and accordingly that a failure to process, investigate, or respond to a prisoner's

Not Reported in F.Supp.2d, 2012 WL 4491825 (N.D.N.Y.)

(Cite as: 2012 WL 4491825 (N.D.N.Y.))

grievance does not in itself give rise to a constitutional claim." *Swift v. Tweddell,* 582 F.Supp.2d 437, 445–46 (W.D.N.Y.2008) (citing cases). *See also Groves,* 2012 WL 651919, at *6, 2012 U.S. Dist. LEXIS 25367, at *24 (inmates do not have a constitutional right to an investigation of any kind by the government) (citation omitted).

" 'On the other hand, where a supervisory official receives and acts on a prisoner's grievance (or substantively reviews and responds to some other form of inmate complaint), personal involvement will be found under the second *Colon* prong: the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong." *Walker,* 2002 WL 664040, at *13, 2002 U.S. Dist. LEXIS 7067, at *44 (citations and internal quotation marks omitted) (in denying Superintendent's motion for summary judgment the court noted that responses to grievances or other inmate complaints "which attempt to defend or explain alleged constitutional violations have been found sufficient to sustain a plaintiff's claim of personal involvement.");[FN27] *see also Johnson,* 234 F.Supp.2d at 363 ("personal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievances or otherwise reviews and responds to a prisoner's complaint."); *Ramos v. Artuz,* No. 00 Civ. 0149 LTS HBP, 2001 WL 840131, at *10, 2001 U.S. Dist. LEXIS 10327, at *24–28 (S.D.N.Y. July 25, 2001) (court found personal involvement where a supervisory official's involvement "went beyond merely the receipt of complaint letters" and letters contained detailed information that should have been acted upon).

FN27. In *Walker,* the Superintendent whose motion for summary judgment was denied had responded to the plaintiff's grievance by informing him that it "was unsubstantiated based upon information received during investigation" *Id.,* 2002 WL 664040, at * 13, 2002 U.S. Dist. LEXIS 7067, at * 46–47.

*21 The only response Plaintiff received to his many complaint letters to Rabideau concerning Durante and Szajer were the two one sentence notes of October 4 and 8, 2010 letting Cole know that she would "personally be

looking into [his] allegations of assault from CO Durante," and that "[w]e are looking into all of your requests to see what we can do." (Dkt. No. 16–3 at 26–27.) There are no allegations in Plaintiff's Amended Complaint suggesting that he heard anything further from Rabideau, that she ever followed through on looking into Cole's assault allegations or any of his other requests, or that she took any action with regard to Plaintiff's complaints or grievances.

Rabideau can not be held liable based solely on a failure to respond to Plaintiff's complaint letters and requests for investigations. *See Johnson,* 234 F.Supp.2d at 363. However, in this case, she did respond by telling Cole that she was going to get personally involved in looking into his assault claim against Griffith and that she would be looking into his other complaints as well. Liberally construing Plaintiff's Amended Complaint and its exhibits and interpreting them to raise the strongest arguments they suggest, Plaintiff has alleged a plausible claim that Rabideau became personally involved in Durant and Szajer's alleged excessive use of force and unconstitutional retaliatory conduct by failing to take steps to remedy the alleged wrongs after learning of them and informing Cole of her intent to become personally involved in investigating them.[FN28] *See Williams v. Smith,* 781 F.2d 319, 323 (2d. Cir1986) (supervisory official may be personally involved in a constitutional deprivation by failing to remedy a wrong after learning of it); *Muhammad v. Rabinowitz,* No. 11 Civ. 2428(HB), 2012 WL 1155098, at *5, 2012 U.S. Dist. LEXIS 49163, at *15–16 (S.D.N.Y. Apr. 6, 2012) (allegations that supervisory personnel were aware of the allegedly unconstitutional conduct and were "either grossly negligent in their supervision [of the personnel personally involved in the conduct], aware of violations and failed to remedy the wrong, deliberately indifferent or condoned the alleged unconstitutional conduct" were sufficient to state a claim under § 1983). Therefore, I recommend that Defendant Rabideau's motion to dismiss be denied.

FN28. It may ultimately turn out that Rabideau delegated responsibility for investigating Plaintiff's complaints about Durante and Szajer to Defendant McCarthy since he is the one who appears to have investigated the complaints and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4491825 (N.D.N.Y.)

(Cite as: 2012 WL 4491825 (N.D.N.Y.))

informed Cole that he had found no wrongdoing by the corrections staff. (Dkt. No. 16–3 at 28.) If she did, Rabideau could properly rely on McCarthy's determination. *Burns,* 624 F.Supp.2d at 205. However, at this point, Rabideau's memo assuring Plaintiff that she was going to personally look into his complaints is sufficient to state a claim.

**2. Defendant McCarthy**

I find that Plaintiff has also stated a claim against Defendant McCarthy under the second *Colon* prong. McCarthy was copied on Plaintiff's October 1, 2010 letter to Rabideau complaining of Durante and Szajer's alleged harassment, threats of assault, and false misbehavior reports. (Dkt. No. 16–3 at 3–4.) In his October 4, 2010 letter to McCarthy, Plaintiff complained about two false misbehavior reports that had been filed by Durante, which were alleged by Cole to be Szajer's doing. The misbehavior reports presumably are those filed by Durante on September 30 and October 1, 2010, each of which resulted in the imposition of a sentence of thirty days in keeplock. (Dkt. Nos. 16–2 at 22–26.)

**\*22** The submissions considered on this motion suggest that McCarthy was actively involved in investigating and acting upon Plaintiff's complaints concerning Durante and Szajer. On October 22, 2010 McCarthy informed Plaintiff that the alleged September 30, 2010 assault by Durante had been investigated, and that although there was no way to be certain what had actually happened, McCarthy had found inconsistencies in Plaintiff's statements. (Dkt. No. 16–3 at 28.)

In his October 22, 2010 memorandum, McCarthy asked Cole to write exclusively to him when he had issues with security staff, raising an inference that McCarthy not only intended to be personally involved in addressing Plaintiff's complaints that Durante and Szajer had violated his constitutional rights by using excessive force and filing false misbehavior reports, but that he wanted to maintain control over any investigation conducted of the claims.[FN29] *Id.* On November 29, 2010, a month after Griffith and Lawrence allegedly assaulted Plaintiff, McCarthy threatened Cole with disciplinary action if he continued using the grievance system in an adversarial manner. (Dkt.

No. 18–2 at 34.)

FN29. McCarthy's October 22, 2010 memorandum containing his conclusions with regard to the alleged assault by Durante and his request that Cole write only to him on staff issues predated the alleged assaults by Griffith and Lawrence by approximately a week, arguably raising an inference that the corrections staff at MCF, including Griffith and Lawrence, may have been led to believe that there would be no consequences for unconstitutional conduct towards Plaintiff.

McCarthy's December 7, 2010 memorandum to Plaintiff indicating that his investigation had uncovered no malfeasance by the security and medical staffs and concluding that Cole was the problem further reveals his personal involvement and, along with his other communications with Plaintiff, provide a plausible factual basis for denying his motion to dismiss. (Dkt. No. 18–1 at 59.) See *Bourgoin v. Weir,* No. 3:10cv391 (JBA), 2011 WL 4435695, at \*5, 2011 U.S. Dist. LEXIS 108778, at \*14 (D.Conn. Sept. 23, 2011) ("[a] supervisor's response to a prisoner's grievance or complaint that attempt[s] to defend or explain alleged constitutional violations is sufficient to establish the personal involvement of that supervisor.") (citation and internal quotation marks omitted); *Walker,* 2002 WL 664040, at \*13, 2002 U.S. Dist. LEXIS 7067, at \*47 (grievances or other inmate complaints "which attempt to defend or explain alleged constitutional violations have been found sufficient to sustain a plaintiff's claim of personal involvement".); *Johnson,* 234 F.Supp.2d at 363 (personal involvement where a supervisory official receives and acts on a prisoner's grievances or otherwise reviews and responds to a prisoner's complaint). I therefore recommend that Defendant McCarthy's motion to dismiss be denied.

**I. Defendants' Motion for a More Definite Statement**

Defendants have moved for a more definite statement pursuant Federal Rule of Civil Procedure 12(e) in the event the Court does not grant their motion for partial dismissal of the Plaintiff's Amended Complaint. Rule 12(e) permits the filing of a motion for a more definite statement "[i]f a pleading to which a responsive pleading

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4491825 (N.D.N.Y.)

(Cite as: 2012 WL 4491825 (N.D.N.Y.))

is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Requests for a more definite statement are generally disfavored and should not be granted unless "the complaint is so excessively vague and ambiguous as to be unintelligible and as to prejudice the defendant seriously in attempting to answer it." *Holmes v. Fischer,* 764 F.Supp.2d 523, 531 (W.D.N.Y.2011) (citation and internal quotations omitted). Plaintiff's Amended Complaint is neither so vague nor so ambiguous as to be unintelligible, and Defendants will not be prejudiced by having to answer whatever allegations remain after determination of their motion to dismiss. Moreover, to the extent Plaintiff's Amended Complaint may be deemed to be vague or ambiguous, Defendants have the benefit of the numerous exhibits to the Amended Complaint and the clarifying materials that Plaintiff submitted in his opposition to their motion to dismiss. (Dkt. Nos. 16–2, 16–3,65, and 69.) In light of the foregoing, Defendants' motion for a more definite statement is denied.

**\*23 WHEREFORE,** it is hereby

**RECOMMENDED** that Defendants' motion for partial dismissal of the Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ( Dkt. No. 62) be ***GRANTED IN PART AND DENIED IN PART.*** Specifically, I recommend the partial dismissal of Plaintiff's Amended Complaint as follows:

1. Dismissal by Plaintiff's consent as to the claims against Defendants DOCS, Brian Fischer, Jack McDaniel, Albert Prack, Jeffrey St. Louis, Edward Dauphin, R. Judway, M.J. Cappadonia, R.J. Miller, S. Purdy, C. Cucharale, H. Smith, T. Meachum, J. Mecca, D. Ashe, Debora Kinderman, A. Papaleo, Judy Palmer, C. Vail, Ted Vauss, Mary Shrimp, and Renna Piecce, without leave to amend;

2. Dismissal on abandonment grounds of all claims arising out of or related to the July 2, 2010 Tier III inmate misbehavior report against Plaintiff and the hearing held in connection with the report, without leave to amend;

3. Dismissal on abandonment grounds of all claims arising out of Defendant Rabideau's alleged failure to review the denials of Plaintiff's SHU confinement reviews

in a fair manner, and Rabideau and Defendant McCarthy's denial of his requests for restoration of his visiting privileges, without leave to amend;

4. The *sua sponte* dismissal on Eleventh Amendment grounds of all claims seeking money damages that have been asserted against the Defendants in their official capacities, without leave to amend;

5. Dismissal of Plaintiff's First Amendment retaliation claim against Defendant Griffith, with leave to amend;

6. Dismissal of Plaintiff's Eighth Amendment claim for deliberate indifference to his medical needs against Defendant Russin, without leave to amend;

7. Dismissal of Plaintiff's Eighth Amendment claim for deliberate indifference to his safety and failure to intervene against Defendant Paluck, with leave to amend;

8. Dismissal of Plaintiff's state law claims for assault and battery and negligence, without leave to amend; and

9. Dismissal of Plaintiff's § 1983 conspiracy claim against Defendants Griffith, Szajer, Russin, Reese, and Paluck, with leave to amend; and it is further

**RECOMMENDED** that Defendants' motion for partial dismissal be **DENIED** as to: Plaintiff's (1) First Amendment claim for retaliation against Defendants Durante, Szajer, and Lawrence; (2) Eighth Amendment claim against Defendant Reese for deliberate indifference to Plaintiff's safety and failure to intervene; and (3) claims against Defendants Rabideau and McCarthy for their alleged failure to remedy the alleged violation of Plaintiff's rights under the First and Eighth Amendments after learning of those violations through Plaintiff's letters of complaint; and it is further

**RECOMMENDED** that Defendants be directed to answer those allegations in the Plaintiff's Amended Complaint that relate to the claims on which dismissal is denied as well as Plaintiff's claims for excessive force that were excepted by Defendants from their motion to dismiss; and it is hereby

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4491825 (N.D.N.Y.)

(Cite as: 2012 WL 4491825 (N.D.N.Y.))

**\*24 ORDERED** that Defendants' request for a more definite statement pursuant to Federal Rule of Civil Procedure 12(e) is **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2012.

Cole v. New York State Dept. of Correctional Services
Not Reported in F.Supp.2d, 2012 WL 4491825 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4506010 (N.D.N.Y.)

(Cite as: 2012 WL 4506010 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Ronnie COLE, Plaintiff,
v.
NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES ("DOCS"); Brian
Fischer, DOCS Commissioner; Ann Rabideau, First
Deputy Superintendent for Health, Mohawk
Correctional Facility; Stephen McCarthy, Deputy
Superintendent of Security, Mohawk Correctional
Facility; Jack McDaniel, Deputy Superintendent of
Programs, Mohawk Correctional Facility; Albert Prack,
Acting Director, DOCS Special Housing/Inmate
Discipline; Jeffrey St. Louis, Captain, Mohawk
Correctional Facility; S. Purdy, Correction Officer,
Mohawk Correctional Facility; Judy Palmer, Inmate
Records Clerk, Mohawk Correctional Facility; Tony
Szajer, Sgt., Mohawk Correctional Facility; D. Ashe,
Inmate Grievance Coordinator, Mohawk Correctional
Facility; Deborah Kinderman, Supervising Correction
Counselor, Mohawk Correctional Facility; A. Papaleo,
Correction Counselor, Mohawk Correctional Facility;
Edward Dauphin, Captain, Mohawk Correctional
Facility; R. Judway, Lieutenant, Mohawk Correctional
Facility; M.J. Cappadonia, Lieutenant, Mohawk
Correctional Facility, Defendants.
No. 9:10–CV–1098 (NAM/TWD).

Sept. 28, 2012.
Ronnie Cole, Rome, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, Kevin P. Hickey, Esq., Assistant New York
State Attorney, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

Hon. NORMAN A. MORDUE, District Judge.
   **\*1** In this *pro se* inmate civil rights action under 42
U.S.C. § 1983, defendants move (Dkt. No. 62) for an
order dismissing all causes of action in the amended
complaint, except the excessive force claims, or for an
order directing plaintiff to file a more definite statement.

Upon referral pursuant to 28 U.S.C. § 636(b) (1)(B) and
Local Rule 72.3(c), United States Magistrate Judge
Thérèse Wiley Dancks has issued a
Report–Recommendation and Order (Dkt. No. 71)
recommending that defendants' motion be granted in part
and denied in part. Magistrate Judge Dancks ordered that
defendants' request for a more definite statement pursuant
to Federal Rule of Civil Procedure 12(e) be denied.
   Plaintiff objects (Dkt. No. 73) to only one aspect of
the Report–Recommendation and Order, *i.e.,* the
recommendation that this Court dismiss plaintiff's pendent
state-law personal-capacity claims against employees of
the Department of Corrections and Community Services
("DOCCS"). Pursuant to 28 U.S.C. § 636(b)(1) (C), this
Court reviews *de novo* those parts of a report and
recommendation to which a party specifically objects. The
Court has reviewed Magistrate Judge Dancks' analysis of
the legal issue involved as well as plaintiff's objection. The
Court agrees with Magistrate Judge Dancks' conclusion
that the Supreme Court's decision in *Haywood v. Drown,
556 U.S. 729 (2009)*, does not affect the question of
district courts' jurisdiction to hear pendent state law claims
against DOCCS employees, and that therefore such claims
are properly dismissed as barred by section 24 of New
York Correction Law. *See, e.g., O'Diah v. Fischer,* 2012
WL 987726, *21 (N.D.N.Y. Feb. 28, 2012); *Tafari v.
McCarthy,* 714 F.Supp.2d 317, 384 (N.D.N.Y.2010).
Therefore, upon *de novo* review of the issue to which
plaintiff objects, and review of the balance of the
Report–Recommendation and Order for plain error or
manifest injustice, the Court adopts the
Report–Recommendation and Order in its entirety.

   It is therefore

   ORDERED that the Report–Recommendation and
Order (Dkt. No. 71) is accepted; and it is further

   ORDERED that defendants' motion (Dkt. No. 62) for
partial dismissal for failure to state a claim is granted in
part and denied in part as follows:

   Partial dismissal is granted as follows:

   1. Dismissal is granted by Plaintiff's consent as to all
claims against Defendants DOCS, Brian Fischer, Jack

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4506010 (N.D.N.Y.)

(Cite as: 2012 WL 4506010 (N.D.N.Y.))

McDaniel, Albert Prack, Jeffrey St. Louis, Edward Dauphin, R. Judway, M.J. Cappadonia, R.J. Miller, S. Purdy, C. Cucharale, H. Smith, T. Meacham, J. Mecca, D. Ashe, Debora Kinderman, A. Papaleo, Judy Palmer, C. Vail, Ted Vauss, Mary Shrimp, and Renna Piecce, without leave to amend;

2. Dismissal is granted on abandonment grounds of all claims arising out of or related to the July 2, 2010 Tier III inmate misbehavior report against Plaintiff and the hearing held in connection with the report, without leave to amend;

3. Dismissal is granted on abandonment grounds of all claims arising out of Defendant Rabideau's alleged failure to review the denials of Plaintiff's SHU confinement reviews in a fair manner, and Rabideau and Defendant McCarthy's denial of his requests for restoration of his visiting privileges, without leave to amend;

**\*2** 4. Sua sponte dismissal is granted on Eleventh Amendment grounds of all claims seeking money damages that have been asserted against the Defendants in their official capacities, without leave to amend;

5. Dismissal is granted of plaintiff's First Amendment retaliation claim against defendant Griffith, with leave to amend;

6. Dismissal is granted of Plaintiff's Eighth Amendment claim for deliberate indifference to his medical needs against Defendant Russin, without leave to amend;

7. Dismissal is granted of Plaintiff's Eighth Amendment claim for deliberate indifference to his safety and failure to intervene against Defendant Paluck, with leave to amend;

8. Dismissal is granted of Plaintiff's state law claims for assault and battery and negligence, without leave to amend; and

9. Dismissal is granted of Plaintiff's § 1983 conspiracy claim against Defendants Griffith, Szajer, Russin, Reese, and Paluck, with leave to amend.

Partial dismissal is denied as follows:

1. Dismissal is denied of plaintiff's first amendment claim for retaliation against defendants Durante, Szajer, and Lawrence;

2. Dismissal is denied of plaintiff's Eighth Amendment claim against defendant Reese for deliberate indifference to plaintiff's safety and failure to intervene; and

3. Dismissal is denied of plaintiff's claims against defendants Rabideau and McCarthy for their alleged failure to remedy the alleged violation of plaintiff's rights under the First and Eighth Amendments after learning of those violations through plaintiff's letters of complaint;

and it is further

ORDERED that defendants are directed to answer those allegations in plaintiff's amended complaint that relate to the claims on which dismissal is denied as well as his claims for excessive force (against Durante, Szajer, Griffith, and Lawrence) that were excepted by defendants from their motion to dismiss; and it is further

ORDERED that the following defendants remain in the case: Durante, Szajer, Lawrence, Reese, Rabideau, McCarthy, and Griffith; and it is further

ORDERED that the Clerk of the Court is directed to serve copies of this Memorandum–Decision and Order in accordance with the Local Rules of the Northern District of New York.

IT IS SO ORDERED.

N.D.N.Y.,2012.

Cole v. New York State Dept. of Correctional Services
Not Reported in F.Supp.2d, 2012 WL 4506010 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4506010 (N.D.N.Y.)

(Cite as: 2012 WL 4506010 (N.D.N.Y.))

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2193997 (S.D.N.Y.)

(Cite as: 2007 WL 2193997 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Ngina N. CAIN, Plaintiff,
v.
C.O. L. JACKSON, Defendant.
No. 05 Civ. 3914(LAP)(MHD).

July 27, 2007.
*MEMORANDUM AND ORDER*

LORETTA A. PRESKA, U.S.D.J.

**\*1** *Pro Se* Plaintiff Ngina Cain ("Plaintiff"), formerly incarcerated at the Bedford Hills Correctional Facility ("BHCF") in Bedford Hills, N.Y., brings this lawsuit pursuant to 42 U.S.C. § 1983, alleging violations of the Eighth Amendment by Defendant Lashaun Jackson ("Defendant"), formerly a Corrections Officer in the New York State Department of Correctional Services ("NYSDOCS") at the BHCF. Defendant has moved for summary judgment on the grounds that: (1) Plaintiff's allegations as to Defendant's actions, even if taken as true, do not amount to a violation of the Eighth Amendment; (2) the Defendant is entitled to Qualified Immunity; and (3) Plaintiff's claims against Defendant in his official capacity are barred by the Eleventh Amendment. For the reasons discussed below, the motion is GRANTED.

*BACKGROUND*

**A.** *Procedural Background*

On April 18, 2005, Plaintiff commenced a *pro se* action against twelve prison defendants. On March 30, 2006, this Court dismissed the claims against all but CO. Jackson. These remaining claims arise out of events that allegedly took place in November and December of 2003.

**B.** *Factual Background*

In January 2003, while incarcerated at the BHCF, Plaintiff fell from her cell bunk and injured her knee. (Pltf. 56.1 Stmt. ¶ 1).FN1 In February 2003, Plaintiff again fell from her bunk and injured her back. (*Id.*). Jeffrey Norwood, M.D., who served as Plaintiff's primary care physician at BHCF, summarized Plaintiff's medical history (as it applies to this case) while incarcerated there:

FN1. "Pltf. 56.1 Stmt." refers to the "Statement" filed by Plaintiff on May 24, 2007. The Court construes "complaints filed by *pro se* litigants liberally and 'interpret[s] them to raise the strongest arguments that they suggest.' " *Pabon v. Wright,* 459 F.3d 241, 248 (2d Cir.2006) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Although the Plaintiff in this case filed a general "Statement" in response to the Defendant's 56.1 Statement ("Def. 56.1 Stmt."), the Court construes it as a 56.1 Statement.

[Her] medical history through June, 2005 indicated arthritis in her left knee and degenerative disc disease in her cervical spine but no herniation or disc bulge. Arthritis and degenerative disc disease are common conditions that are not life threatening, but which usually present themselves in older patients. These conditions have been treated with physical therapy, muscle relaxers, nerve inhibiters and pain control medication, but have apparently not been completely resolved.

(Declaration of Jeffrey Norwood, M.D. dated Nov. 10, 2006 ("Norwood Decl.") ¶ 14.) From March 2003 through June 2003, Plaintiff was placed on a medical restriction by the medical unit that included "no lifting heavy objects ... [n]o shoveling, or other heavy outdoor work or groundwork [and n]o active sports/activities." (*Id.* Exhibit A, Plaintiff's medical records, 8-9.) From June 2003 to June 2004, the medical restriction was expanded to include "[n]o pushing/pulling activities like raking, mopping, [or] sweeping." (*Id.* at 2-3, 5.) The record indicates that on two relevant occasions, December 1, 2003 and March 3, 2004, Plaintiff was assigned by the BHCF Program Committee to be a porter, whose duties included "mop[ping], [and] lift[ing] garbage & buckets of water." (*Id.* at 6, 10.) Both sides agree that, at the time of the events at issue, Plaintiff was assigned as a porter. (Pltf. 56.1 Stmt. ¶ 9; Declaration of Benjamin Lee, dated Nov. 13, 2006, Exhibit A, Deposition of Plaintiff taken Sept. 25, 2006 ("Lee Decl. Exh. A"), Tr. 31 ln. 17-23.)

**\*2** Initially, Plaintiff claims that on November 21, 2003, she asked Defendant at approximately 8:00 a.m. to call the medical unit on her behalf in order to arrange a

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2193997 (S.D.N.Y.)

(Cite as: 2007 WL 2193997 (S.D.N.Y.))

visit but that Defendant did not call the medical unit until approximately 10:30 or 11:00 a.m. (Lee Decl. Exh. A, Tr. 23-24; Declaration of Lashaun Jackson, dated Nov. 1, 2006 ("Jackson Decl.") ¶ 3.) The BHCF housing logs from that day, submitted by the Defendant, demonstrate t hat the medical unit was called on Plaintiff's behalf at 9:45 a.m. on November 21, 2003. (Jackson Decl. Exh. A.) While there is a discrepancy between the parties as to when exactly the medical unit was called, even if the Court accepts Plaintiff's lengthier time frame as true, the delay was not sufficient to implicate the Eighth Amendment.

Second, Plaintiff contends that on November 24, 2003, Defendant instructed her to clean a bathroom in the BHCF housing unit in violation of her medical restriction because the activity involved the use of a large scrub brush that also involved some pushing and pulling. (Lee Decl. Exh. A, Tr. 33-37.) Defendant disputes this action violated Plaintiff's medical restriction and caused her neck pain and muscle spasms. (*See* Lee Decl. ¶¶ 11, 12; Exh. A, Tr. 45; Jackson Decl. ¶ 4.) Again, even if the Court accepts Plaintiff's version of the facts, which is disputed, as explained below these facts do not rise to the level of an Eighth Amendment violation.

The third incident allegedly took place on November 25, 2003. (Jackson Decl. ¶ 11.) Plaintiff claims that in the morning Defendant again refused to call the medical unit on her behalf. (Jackson Decl. Exh. A ¶¶ 11-12; Lee Decl. Exh. A Tr. 50-63). The Defendant also allegedly ordered Plaintiff to pick up cleaning supplies as part of her programming as a porter. (Jackson Decl. Exh. A ¶¶ 11-12; Lee Decl. Exh. A, Tr. 50-63.) Plaintiff contends this was another violation of her medical restriction (*see supra* at 3.) This assertion is disputed by Defendant, but the disagreement as to the facts here are immaterial because, as discussed below, even if the Court accepts Plaintiff's allegations as true, the purported behavior does not amount to a violation of the Eighth Amendment. (Pltf. 56.1 Stmt at 7.) Plaintiff then apparently went to the medical unit without permission at approximately 8:05 a.m. (Jackson Decl. ¶ 12; Exhibit B, Inmate Disciplinary files ("Jackson Decl. Exh. B"), Tr. 4; Lee Decl. Exh. A, Tr. 52-57). While the precise timing of the events is unclear, both sides agree that after a brief wait at the medical unit's "bullpen," Plaintiff was escorted back to her

unit and given a "ticket" for having violated the BHCF rules, namely "being out of place" and "leaving an assigned area without authorization." (Jackson Decl. SI 12; Jackson Decl. Exh. B; Lee Decl. ¶ 16.) Plaintiff was found guilty of these violations in a later disciplinary hearing, the findings of which are not challenged here. (Jackson Decl. Exh. B.)

**\*3** That same day, Plaintiff allegedly again asked Defendant to call the medical unit at approximately 11:00 a.m. but that Defendant refused. Plaintiff contends that she was unable to visit the medical unit until approximately 3:00 p.m., a delay of approximately four hours. (Lee Decl. Exh. A Tr. 63-64.) Defendant disagrees that he did anything wrong and submitted a BHCF housing log that indicates Plaintiff went to receive her medication at 4:45 p.m. (Jackson Decl. Exh. A at 399.)

Finally, Plaintiff alleges that on or about December 1, 2003, Defendant delayed her access to her prescribed medication for several hours. (*Id.* at 78-80.) Defendant disputes this allegation. (Jackson Decl. ¶ 13.)

*Discussion*

A. *Legal Standard for Summary Judgment*

"Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (quoting Fed.R.Civ.P. 56(c)). "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986) (citing Fed.R.Civ.P. 56(e)). "Factual disputes that are irrelevant or unnecessary" cannot defeat a motion for summary judgment. *Id. at 248.*

"In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to the non-movant, in this case [Ms. Cain]." *See Lucente v. Int'l Bus. Machs. Corp,* 310 F.3d 243, 253 (2d Cir.2002) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). Only if

Not Reported in F.Supp.2d, 2007 WL 2193997 (S.D.N.Y.)

(Cite as: 2007 WL 2193997 (S.D.N.Y.))

it is apparent that no rational fact-finder "could find in favor of the nonmoving party because the evidence to support its case is so slight" should summary judgment be granted. *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994).

B. *Section 1983*

42 U.S.C. § 1983 provides a procedure for persons alleging a constitutional deprivation to bring a claim but itself creates no substantive rights. *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993). Accordingly, to state a claim under § 1983, a plaintiff must allege that a defendant acting under color of state law has deprived her of a right, privilege, or immunity guaranteed by the Constitution. *See* 42 U.S.C. § 1983. Here, there is no dispute that the Defendant was an employee of the New York State Department of Corrections acting under color of state law. The remaining question is whether Plaintiff can establish a violation of any of her constitutional rights.

C. *Plaintiff's Expert Medical Evidence*

Before addressing the merits of the alleged Eighth Amendment violation in this case, the admissibility of a medical report from Dr. Joseph Suarez submitted by Plaintiff as expert testimony must be addressed. Plaintiff contends that a one-page questionnaire submitted as part of her 56.1 Statement establishes that some of the allegations in her complaint amount to an Eighth Amendment violation. (Pltf. 56.1 Stmt. ¶¶ 7, 12.) However, for the reasons set forth by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592-93 (1993), the questionnaire submitted by Dr. Suarez is deemed inadmissible.

1. *Legal Standard for Expert Testimony*

**\*4** The principles governing admissibility of evidence do not change on a motion for summary judgment. *Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.1997). As the Supreme Court explained in *Daubert,* 509 U.S. at 592-93, Federal Rule of Evidence 702 requires the Court to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." [FN2] *Ruggiero v. Warner-Lambert Co.,* 424 F.3d 249, 253 (2d Cir.2005). In *Daubert,* the Supreme Court enumerated "a list of factors that, while not constituting a 'definitive checklist or test,'

a district court might consider ...: whether a theory or technique has been and could be tested, whether it had been subjected to peer review, what its error rate was, and whether scientific standards existed to govern the theory or technique's application or operation." *Nimely v. City of New York,* 414 F.3d 381, 397 (2d Cir.2005) (quoting *Daubert,* 509 U.S. at 593-94) (ellipses in original). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable expert testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 266 (2d Cir.2002).

FN2. Rule 702 of the Federal Rules of Evidence, which governs the admissibility of expert testimony, provides as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

2. *Application to Legal Standard for Expert Testimony*

In this case, the expert testimony submitted by Plaintiff consists of a questionnaire with six questions pertaining to various medical conditions requiring a "yes" or "no" answer from a doctor. Dr. Suarez, Plaintiff's proposed expert, did not even examine Plaintiff, and Plaintiff does not assert that he did. The questionnaire consists merely of general, conclusory questions [FN3] that do not profess to be based on any scientific technique or medical examination of the Plaintiff, thus not meeting the minimum standards Courts of Appeals here and elsewhere have generally required for expert testimony to be admissible. *See McCullock v. H.B. Fuller Co,* 61 F.3d 1038, 1043-44 (2d Cir.1995) (holding that an experienced medical doctor's testimony was admissible because it was

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2193997 (S.D.N.Y.)

(Cite as: 2007 WL 2193997 (S.D.N.Y.))

based on a range of factors, including his care and treatment of the Plaintiff, his review of her medical records, his training and experience, the use of a specific scientific analysis in coming to his conclusions, and his reference to various scientific and medical treatises); *see also Carroll v. Morgan,* 17 F.3d 787, 790 (5th Cir.1994) (holding that a doctor was qualified under *Daubert* to give an expert opinion on standard of medical care based on thirty years of experience and his review of the medical records); *Hopkins v. Dow Corning Corp.,* 33 F.3d 1116, 1125 (9th Cir.1994) (holding that the district court properly admitted expert testimony under *Daubert* that was based on, *inter alia,* the doctors' clinical experience and review of the medical records). Plaintiff's expert testimony is so conclusory in nature and lacking in reliability that it does not reach the minimum of any of the enumerated factors in *Daubert* and is ruled inadmissible.

FN3. Questions and answers submitted by Plaintiff and Dr. Suarez include:

Question: "1. Could cleaning a bathroom, which includes filling a large mop bucket filled with water, scrubbing, mopping, sweeping, bending, etc., create a risk of death, degeneration, or extreme pain in a person diagnosed with paraspinal and trapezial muscle spasms, neck sprain, and strain, degenerate disk disease of the cervical spine with numbness and tingling of limbs, and with a MRI that reveal a signal change in the posterior horn of the meniscus with moderate to severe patella cartilage erosion and irregularity? (bathroom is a large institutional bathroom)"

Answer: "Not Death just pain"

Question: "Could cleaning an institutional bathroom used by 70 people exacerbate the above-mention conditions stated in question number 1? (cleaning that would take 20 minutes)?"

Answer: "Yes"

Question: "Can degenerative disk disease

become life threatening?"

Answer: "No"

D. *Legal Standard for Eighth Amendment violation*

**\*5** It is obvious that by virtue of their imprisonment, inmates must rely on prison officials to treat their medical needs. *Estelle v. Gamble,* 429 U.S. 97, 103 (1976). The Supreme Court has "therefore conclude[d] that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' *Gregg v. Georgia,* 428 U.S. 153, 182-83, 96 (1976), proscribed by the Eighth Amendment." *Estelle,* 429 U.S. at 104. The Eighth Amendment can be implicated "by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with [the] treatment once prescribed." *Id.* at 104-05 (internal footnotes omitted).

"The Constitution does not[, however,] contemplate that prisoners receive unfettered access to medical care." *Alston v. Howard,* 925 F.Supp. 1034, 1040 (S.D.N.Y.1996). In order to prevail on an Eighth Amendment claim alleging a failure to provide sufficient medical attention, an inmate must prove "deliberate indifference to [her] serious medical needs." *Estelle,* 429 U.S. at 105-06. Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are "serious." *Hudson v. McMillian,* 503 U.S. 1, 9 (1992).

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway,* 37 F.3d at 66. First, the alleged deprivation must be, in objective terms, "sufficiently serious" to implicate the Eighth Amendment. *Hathaway,* 37 F.3d at 66 (quoting *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). Second, the inmate must establish that the defendant acted with a "sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66.

1. *Legal Standard for First Prong, "Serious Injury"*

The Court of Appeals has enumerated several factors that courts may consider in determining whether a

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2193997 (S.D.N.Y.)

(Cite as: 2007 WL 2193997 (S.D.N.Y.))

prisoner's medical condition is sufficiently serious to give rise to a potential Eighth Amendment violation. These include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Rodriguez v. Mercado,* No. 00 Civ. 8588, 2002 WL 1997885, at *7 (S.D.N.Y. Aug. 28, 2002) (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)); *see Evening v. Reilly,* No. 98 Civ. 6718, 2001 WL 1150318, at *9 (S.D.N.Y. Sept. 28, 2001)). "It is well established that more than minor discomfort or injury is required in order for a plaintiff to demonstrate a serious medical need." *Evening,* 2001 WL 1150318, at *9. The "standard contemplates 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Hathaway,* 37 F.3d at 66 (quoting *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting)). It is only those deprivations denying "the minimal civilized measures of life's necessities" that are sufficient to form the basis of an Eighth Amendment violation. *Wilson,* 501 U.S. at 298.

2. *Application to First Prong, "Serious Injury"*

**\*6** Applying this standard for proving an Eighth Amendment violation, Plaintiff has not demonstrated that any of the injuries she allegedly suffered were "sufficiently serious." Even if the Court were to resolve all the disputed facts in the *pro se* Plaintiff's favor, the facts do not rise to the level required for the Eighth Amendment to be implicated. Courts in this circuit have found no "serious medical need" in injuries complained of that were similar to-or more serious than-the injuries alleged by Plaintiff. *See Evans v. Bonner,* 196 F.Supp.2d 252, 256 (E.D.N.Y.2002) (holding that untimely provision of medication to an HIV-positive inmate did not cause sufficiently serious injury to give rise to an Eighth Amendment violation); *see also Mercado,* 2002 WL 1997885 at *2-3, 8 (migraines and back pain not "sufficiently serious" to implicate the Eighth Amendment); *Henderson v. Doe,* No. 98 Civ. 5011, 1999 WL 378333, at *2 (S.D.N.Y. June 10, 1999) (broken finger not a severe injury); *Veloz v. New York,* 35 F.Supp.2d 305, 312 (S.D.N.Y.1999) (pain from foot fracture, bone cyst, and degenerative arthritis not sufficiently serious); *Alston v. Howard,* 925 F.Supp. 1034, 1040 (S.D.N.Y.1996)

(chronic ankle arthritis not a serious medical condition); *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (holding that a bunion deformity did not constitute a serious medical condition).

This Court fully acknowledges the fact that Plaintiff has experienced pain as a result of her two falls while at the BHCF and does not seek to minimize that unfortunate fact. In the context of the Eighth Amendment, however, it is the particular risk of harm faced by the Plaintiff due to a challenged deprivation of care, rather than the severity of her underlying medical condition, considered in the abstract, that is relevant. *Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir.2003) (citing *Chance,* 143 F.3d at 702-03). The pain and discomfort that Plaintiff alleges as a result of the delay in her receiving medical care and prescription medications, as well as the alleged pain and discomfort she experienced as a result of scrubbing bathroom walls for approximately 20 minutes on November 23, 2003, while not minimized by this Court, is simply insufficient to implicate the Eighth Amendment. As even delays of up to eight hours in visiting an infirmary do not amount to an Eighth Amendment violation, *Linden v. Westchester County,* No. 93 Civ. 8373, 1995 WL 686742, at *3 (S.D.N.Y. Nov. 20, 1995), Plaintiff's allegations with regard to Defendant's alleged delay in granting Plaintiff access to medical care, even if true, are not serious enough to implicate the Eighth Amendment.

Furthermore, Plaintiff's primary care physician at BHCC, Dr. Norwood, stated under penalty of perjury that

> with a reasonable degree of medical certainty that any short term (twenty minute) activity involving cleaning the bathroom floor would not create a serious medical risk, and certainly would not create a risk of death, degeneration, or extreme pain. Rather, any such cleaning activity may have caused Ms. Cain slight short term discomfort until she was later able to take her medication, but would not have any long term effects and would not result in extreme pain.

**\*7** (Norwood Decl. ¶ 16.) Even viewing the facts of the case in the light most favorable to Plaintiff, she has failed to demonstrate that she suffered any pain or deprivation sufficiently serious to implicate the Eighth Amendment.

Not Reported in F.Supp.2d, 2007 WL 2193997 (S.D.N.Y.)

(Cite as: 2007 WL 2193997 (S.D.N.Y.))

3. *Legal Standard for Second Prong, "Deliberate Indifference"*

Even if Plaintiff had demonstrated injuries severe enough to rise to the level of a serious medical need, she has not demonstrated that Defendant knowingly and intentionally put her at risk or disregarded a substantial risk of serious harm to her. *See Farmer,* 511 U.S. 825, 835-37 (1979); *Hathaway,* 37 F.3d at 67. To satisfy the subjective element of the deliberate indifference standard, an inmate must demonstrate that the prison official's conduct was more than negligent, but she need not show that it was "undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. Rather, it must be established that the prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Hathaway,* 37 F.3d at 66 (quoting *Farmer,* 511 U.S. at 837).

4. *Application to Second Prong, "Deliberate Indifference"*

Applying this standard, Plaintiff has failed to establish that Defendant knew of and disregarded "an excessive risk to [the Plaintiff's] health or safety ...." *Hathaway,* 37 F.3d at 66 (quoting *Farmer,* 511 U.S. at 837). Plaintiff alleges that on four instances Defendant displayed "deliberate indifference" to her "serious medical needs." [FN4] Plaintiff has submitted no evidence or testimony, other than her own allegations, to support any of these claims. Even if true, however, Plaintiff's allegations of delays of several hours in her access to medical care (*see supra* at 2-5) do not amount to a constitutional violation. Plaintiff did receive medical treatment on each day in question; even if her version of the facts is accepted, it would only indicate that her access to such treatment was delayed for a few hours, which is insufficient to implicate the Eighth Amendment. (*See supra* at 10-11).

> FN4. Plaintiff does not actually apply the test described by the Court of Appeals in *Hathaway,* but as a *pro se* litigant, the Court assumes that

Plaintiff intends to do so.

As for Plaintiff's allegations that Defendant violated her medical restriction by ordering her to clean the bathroom, Plaintiff fails to establish that Defendant acted with "deliberate indifference" here as well. Plaintiff does not allege that Defendant assigned her to be a porter. Consequently, the Defendant did not display any deliberate indifference to her needs by simply asking her to do her previously assigned tasks. Once she stopped cleaning after twenty minutes because of her alleged pain, Plaintiff does not allege that Defendant forced her to continue working. Plaintiff asserts only that she was subsequently "written up" for refusing to complete her assigned task. (Lee Decl. Exh. A Tr. 43.) By not forcing Plaintiff to continue cleaning once she stopped, but instead following prison procedures and writing her a "ticket," Defendant did not display any "deliberate indifference" to any of Plaintiff's alleged "serious medical needs." Accordingly, Plaintiff fails to state an Eighth Amendment claim.

E. *Alleged Violation of consent decree in Todaro v. Coughlin*

**\*8** Plaintiff also alleges that Defendant violated a consent decree regarding inmate medical care at BHCF known as the *"Todaro v. Coughlin* consent decree." [FN5] Plaintiff claims that Defendant denied her request to receive medication or medical treatment on four days and that, on November 24, 2003, Defendant forced Plaintiff to clean a bathroom for twenty minutes. (*See supra* pp. 2-6).

> FN5. The consent decree seems to be referred to as *Todaro v. Coughlin* by both parties, but there is no citation available to a case by that name. *Todaro v. Ward,* 431 F.Supp. 1129 (S.D.N.Y.1977) is the original case from which the consent decree seems to have originated.

The consent decree provides, *inter alia,* that sick call screenings are conducted based on facility protocols and that doctor appointments must be made within 28 days of an inmate's request. *See Defendant's Reply Memorandum of Law in Further Support of His Motion for Summary Judgment,* Exhibit A, Summary of Right to Medical Care as Guaranteed by *Todaro v. Coughlin* ("Deft's Reply

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2193997 (S.D.N.Y.)

(Cite as: 2007 WL 2193997 (S.D.N.Y.))

Mem. Exh. A"), The consent decree specifically distinguishes between screenings and the administration of medication but does not impose a timetable for when medication must be given after it is requested.

Plaintiff's complaints are not, however, covered by the consent decree in *Todaro v. Coughlin.* Any delay of a few hours in seeing medical personnel or the administration of medication on three or four occasions would not implicate the *Todaro* consent decree.

## *CONCLUSION*

For the reasons set forth above, Defendant's motion for summary judgment (dkt. no. 36) is granted. The Clerk of the Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED.

S.D.N.Y.,2007.

Cain v. Jackson
Not Reported in F.Supp.2d, 2007 WL 2193997 (S.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3996875 (N.D.N.Y.)

(Cite as: 2012 WL 3996875 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Saraiya SOLOMON, Plaintiff,
v.
HUMAN SERVS. COALITION OF TOMPKINS
COUNTY INC.; City Fed'n of Women's Org. of Ithaca
New York Inc.; et al., Defendants.
No. 5:11–CV–226 (GTS/ATB).

Sept. 11, 2012.
Saraiya Solomon, Ithaca, NK, pro se.

Stokes Roberts & Wagner, Arch Y. Stokes, Esq., Paul E.
Wagner, Esq., of Counsel, Ithaca, NK, for the Human
Services Defendants.

Pinsky & Skandalis, George Skandalis, Esq., of Counsel,
Syracuse, NK, for the City Federation Defendants.

### MEMORANDUM–DECISION and ORDER

GLENN T. SUDDABY, District Judge.

*1 Currently before the Court, in this *pro se*
employment civil rights action filed by Saraiya Solomon
("Plaintiff") against two not-for-profit corporations and
twenty-one employees and/or board members thereof
("Defendants"), are the following three motions: (1) a
motion to dismiss for failure to state a claim upon which
relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6),
filed by the Human Services Coalition of Tompkins
County Inc., and nineteen of its employees and/or board
members ("the Human Services Defendants"); (2) a
motion to dismiss for failure to state a claim upon which
relief can be granted pursuant to Fed.R.Civ.P. 12(b) (6),
filed by the City Federation of Women's Organizations of
Ithaca New York Inc., and one of its employees ("the City
Federation Defendants"); and (3) a cross-motion for leave
to file a Third Amended Complaint pursuant to
Fed.R.Civ.P. 15(a)(2), filed by Plaintiff. (Dkt.Nos.18, 23,

40.) For the reasons set forth below, the Human Services
Defendants' motion is granted; the City Federation
Defendants' motion is granted; and Plaintiff's cross-motion
is denied.

# I. RELEVANT BACKGROUND

## A. Claims Surviving the Court's Decision and Order of
May 27, 20112

Plaintiff filed her Complaint on February 28, 2011.
(Dkt. No. 1.) Generally, in her Complaint, Plaintiff, a
Black female, alleges that, beginning in June 2009, she
was subject to discrimination as a participant in an
employment program known as the Senior Community
Service Employment Program ("SCSEP"), administered
by Experience Works, an organization funded by the
United States Department of Labor ("USDOL"). (*See
generally id.*) More specifically, Plaintiff alleges that,
while she was assigned by SCSEP to Defendant Human
Services Coalition for on-the-job training and transition
into the workforce, certain Defendants discriminated
against her because of her race and retaliated against her
when she complained about this discrimination to the
USDOL. (*Id.*)

The first incident of alleged discrimination occurred
when Plaintiff was informed by one of the Defendants that
the library, which was owned by Defendant City
Federation of Women's Organizations and not leased by
Defendant Human Services Coalition, was "off limits,"
after she was seen using that library to speak with a Black
client. (*Id.*) The second incident of alleged discrimination
occurred approximately five to seven months later, when
another Defendant gave her an unwarranted written
reprimand for failing to follow proper "notification
procedures" prior to missing work (specifically, by
notifying her manager by email, with only a few hour's
notice, that she would be missing work for three days due
to "an emergency" that coincided with her birthday). (*Id.*)
The first incident of retaliation occurred when, seven days
after she complained to the USDOL about "the unlawful
discriminatory actions of said Defendants," certain
Defendants delayed three days in responding to her

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

request for access to her personnel file. (*Id.*) The second incident of retaliation occurred when, thirteen days after she made the aforementioned complaint to the USDOL, she was informed by Experience Works that Defendant Human Services Coalition would no longer host her. (*Id.*)

**\*2** Based on these (and other) factual allegations, Plaintiff's Complaint originally asserted thirteen causes of action against Defendants. (*Id.* at ¶¶ 24–88.) [FN1] However, on May 27, 2011, the Court issued a Decision and Order adopting the Report–Recommendation of United States Magistrate Judge Andrew T. Baxter recommending that the Court dismiss with prejudice the claims asserted in certain of Plaintiff's causes of action to the extent that they are premised on a violation of 18 U.S.C. § 241 and/or 18 U.S.C. § 245, or are asserted on behalf of a third party. (Dkt.Nos.4, 6.)

> FN1. For a detailed recitation of Plaintiff's original thirteen causes of action and the factual allegations on which they are based, the Court refers the reader to the Complaint in its entirety, and to United States Magistrate Judge Andrew T. Baxter's Report–Recommendation of March 4, 2011. (Dkt.Nos.1, 4.)

As a result, surviving after the Court's Decision and Order of May 27, 2011, were, and are, the following thirteen claims: (1) a claim that certain Defendants deprived Plaintiff of her right of "Equal Access [to SCSEP]" based on her race in violation of 42 U.S .C. § 2000, N.Y. Human Rights Law, and New York State common law; (2) a claim that certain Defendants conspired "to Deprive [Plaintiff] of [Her] Civil Rights" based on her race in violation of N.Y. Human Rights Law, and New York State common law; (3) a claim that certain Defendants "Willful[ly] Interfe[d] [with] and Oppress[ed] [Plaintiff's Engagement in] a Protected Activity" based on her race in violation of 42 U.S.C. § 1981, N.Y. Human Rights Law, and New York State common law; (4) a claim that certain Defendants "Retaliat[ed] [Against Plaintiff]" based on her race in violation of 42 U.S.C. § 1981, N.Y. Human Rights Law, and New York State common law; (5) a claim that certain Defendants "Tortious[ly] Interfere [d] with [Plaintiff's] Contract[ual Rights]" based on her race in violation of 42 U.S.C. § 1981, N.Y. Human Rights

Law, and New York State common law; (6) a claim that certain Defendants "Adverse[ly][A]ffect[ed] [Plaintiff's] Training/Employment Status" based on her race in violation of 42 U.S.C. § 1981, N.Y. Human Rights Law, and New York State common law; (7) a claim that certain Defendants "[Discriminated Against Plaintiff Regarding the] Privileges Terms and Conditions of [Her] Employment" based on her race in violation of 42 U.S.C. § 1981, N.Y. Human Rights Law, and New York State common law; (8) a claim that certain Defendants "Impos[ed] of Race–Biased Training/Employment Standard [on Plaintiff]" based on her race in violation of 42 U.S.C. § 1981, N.Y. Human Rights Law, and New York State common law; (9) a claim that certain Defendants "Intentional[ly] Inflict[ed] Emotional Harm [on Plaintiff]" based on her race in violation of 42 U.S.C. § 1981, N.Y. Human Rights Law, and New York State common law; (10) a claim that certain Defendants "Negligent[ly] Inflict[ed] of Emotional Distress [on Plaintiff]" based on her race in violation of 42 U.S.C. § 1981, N.Y. Human Rights Law, and New York State common law; (11) a claim that certain Defendants "Intentional[ly] Interfere[d] with [Plaintiff's] Contractual Relations" based on her race in violation of 42 U.S.C. § 1981, N.Y. Human Rights Law, and New York State common law; (12) a claim that certain Defendants "Intentional [ly] Interfere[d] with [Plaintiff's] Prospective Economic Advantage" based on her race in violation of 42 U.S.C. § 1981, N.Y. Human Rights Law, and New York State common law; and (13) a claim that certain Defendants "[Violated the] Duty of Care [Owed to Plaintiff]" based on her race (*Id.* at ¶¶ 24–88).

## B. Briefing on Defendants' Motions to Dismiss

### 1. Briefing on Human Services Defendants' Motion to Dismiss

**\*3** Generally, in their motion to dismiss, the Human Services Defendants assert the following six arguments: (1) the Complaint fails to state a claim against the individual board members, because it fails to allege facts plausibly suggesting that the board members played any role in the actions alleged (and because the board members cannot be, through mere negligence, held liable for any alleged violation of New York State law, given that the Human Services Coalition is a not-for-profit

Not Reported in F.Supp.2d, 2012 WL 3996875 (N.D.N.Y.)

(Cite as: 2012 WL 3996875 (N.D.N.Y.))

corporation); (2) the Complaint fails to state a claim for discrimination under 42 U.S.C. § 1981, 42 U.S.C. § 2000, and N.Y. Human Rights Law, because it fails to allege facts plausibly suggesting several necessary elements of such a claim, including the requirements that Defendants treated her differently than White employees, and that they did so because of her race; (3) the Complaint fails to state a claim for retaliation, because it fails to allege facts plausibly suggesting that she was subjected to sufficiently serious adverse action, that any such adverse action was taken by any Defendant in this case, or that any such adverse action taken by a Defendant in this case was taken because of her protected speech (as opposed to being taken because of Plaintiff's failure to follow appropriate absence-notification procedures); (4) the Complaint fails to state a claim for tortious interference with contract, because it fails to allege facts plausibly suggesting a breach of a contract, any Defendant's intentional procurement of that breach, and/or any actionable damages resulting therefrom; (5) the Complaint fails to state a claim for intentional infliction of emotional distress, because it fails to allege facts plausibly suggesting extreme and outrageous conduct, severe emotional distress, and/or an intention to cause any such severe emotional distress; and (6) the Complaint fails to state a claim for negligent infliction of emotional distress, because it fails to allege facts plausibly suggesting extreme and outrageous conduct and/or any of the extremely narrow grounds for such emotional distress (e.g., any threat to her physical safety, any wrongful notification of a relative's death, or the wrongful handling of a family member's remains). (*See generally* Dkt. No. 18, Attach. 1.)

Generally, in her opposition memorandum of law (the body of which is 47 pages in length),[FN2] Plaintiff (1) attacks the integrity and veracity of defense counsel,[FN3] (2) invokes the special solicitude ordinarily afforded to inexperienced *pro se* litigants, (3) repeats numerous of the factual allegations contained in her Complaint, (4) asserts various arguments and new allegations regarding her claims of discrimination, retaliation, and infliction of emotional distress, and (5) submits some 71 pages of exhibits to the Court for its consideration on the Human Services Defendants' motion to dismiss for failure to state a claim. (*See generally* Dkt. No. 27, Attach. 2.)

FN2. Although Plaintiff's opposition memorandum of law blatantly violates the Court's 25–page limit on such memoranda (which Plaintiff had previously been advised through her receipt of a courtesy copy of the District's *Pro Se* Handbook and Local Rules of Practice), the Court will ignore that violation, out of an extension of special solicitude to her as a *pro se* civil rights litigant.

FN3. For example, in addition to accusing defense counsel of "tak [ing] undue advantage of the Plaintiff as a pro se litigant," Plaintiff accuses defense counsel of violating Fed.R.Civ.P. 11(b) by falsely certifying that his motion to dismiss was mailed to Plaintiff on July 21, 2011, when in fact the postmark on the enclosing envelop indicates that it was mailed on July 25, 2011. (Dkt. No. 27, Attach. 2, at 4.) Plaintiff is advised that, even assuming defense counsel's certification was in error (which is not at all clear from the record), July 21, 2011, was the deadline for the *filing* of the motion in question, not the deadline for the *service* of that motion. (Dkt. No. 13.) Furthermore, as the Court stated in its Text Order of August 5, 2011, a delay of merely four days in such service would not support sanctions against counsel, especially given the lack of resulting prejudice to Plaintiff.

**\*4** Generally, in their reply, the Human Services Defendants argue that Plaintiff's response (1) improperly attempts to assert new allegations in an effort to bolster her otherwise-deficient claims, (2) fails to adequately respond to their argument that (based on Plaintiff's own factual allegations) the board members were not personally involved in the violations alleged, (3) improperly attempts to bolster her discrimination claims through the submission of her own affidavit and the affidavit of the Black client whom she was speaking with in the library (which are, in any event, conclusory in nature), (4) fails to adequately respond to their intentional procurement argument or their actionable-damages argument regarding her retaliation claim, and (5) improperly relies on a "Participant Schedule" in support of her claim of intentional

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3996875 (N.D.N.Y.)

(Cite as: 2012 WL 3996875 (N.D.N.Y.))

interference with contractual relations. (Dkt. No. 30.)

On September 12, 2011, Plaintiff attempted to file a sur-reply to the Human Services Defendants' reply. (Dkt. No. 32.) Local Rule 7.1 of the Local Rules of Practice for this Court prohibits the filing of sur-replies. N.D.N.Y. L.R. 7.1(b)(1). Plaintiff had been informed of that fact before the time in question, through (1) her receipt of a courtesy copy of the District's Local Rules of Practice, and (2) the absence of a deadline for such sur-replies on the Court's briefing schedule (*see* Docket Entry dated July 21, 2011).[FN4] Despite this fact, Plaintiff did not request leave of the Court to file such a sur-reply. (*See generally* Docket Sheet .) Even if she had requested such leave, the Court would have denied that request, given (1) the lack of usefulness of her sur-reply, and (2) the fact that she was afforded more than adequate opportunity to brief the issues presented by the Human Services Defendants' motion, through the filing of her 47–page opposition memorandum of law. For each of these alternative reasons, *the Court strikes from the docket Plaintiff's unauthorized sur-reply.*

> [FN4.] Indeed, Plaintiff was also informed of that need in June and July of 2005 when her counsel at the time moved *four times* for leave to file a sur-reply in the case of *Solomon v. Hartford Hosp.,* 02–CV–1116 (D.Ct.).

**2. Briefing on City Federation Defendants' Motion to Dismiss**

Generally, in their motion to dismiss, the City Federation Defendants assert the following four arguments: (1) in an effort to avoid repetition, and in the interest of judicial economy, the arguments made in the memorandum of law of the Human Services Defendants should be permitted to be adopted and incorporated by reference in the City Federation Defendants' memorandum of law;[FN5] (2) only Plaintiff's first, second, third, ninth, tenth and thirteenth claims (as described above in Part I.A. of this Decision and Order) are asserted against the City Federation Defendants; (3) even if the Court were to construe Plaintiff's other claims as somehow being asserted against the City Federation Defendants, those claims fail as a matter of law; and (4) the Complaint does not allege numerous facts necessary to subject the City

Federation Defendants to liability under the circumstances, including facts plausibly suggesting that (a) either of the two City Federation Defendants was an employer of Plaintiff or had any professional or contractual relationship with her, (b) the City Federation was an employer under either the N.Y. Human Rights Law or 42 U.S.C. § 2000a, or an employment agency or training program (or related entities) under the N.Y. Human Rights Law, and (c) the library in question was a place of "public accommodation, resort or amusement" under the N.Y. Human Rights Law, or a place of "public accommodation" under 42 U.S.C. § 2000a. (Dkt. No. 23, Attach.1.)

> [FN5.] Ordinarily, the Court would deny this request, in part due to the fact that granting the request would effectively permit the requesting party to circumvent the Court's page limitation on memoranda of law. *See Topliff v. Wal–Mart Stores East LP,* 04–CV–0297, 2007 WL 911891, at *9 n. 65 (N.D.N.Y. Mar. 22, 2007) (Lowe, M.J.) ("A party may not articulate a legal argument simply by 'incorporating by reference' the argument presented in another document. Such a practice violates the Local Rule on page limitations."), *accord, Nissan Motor Acceptance Corp. v. Dealmaker Nissan, LLC,* 09–CV–0196, 2012 WL 2522651, at *2 (N.D.N.Y. June 27, 2012) (Suddaby, J.). However, here, the body of the City Federation Defendants' memorandum of law is only three pages in length. Furthermore, and more importantly, the Court has the duty to review the pleading sufficiency of Plaintiff's claims against the City Federation Defendants, regardless of whether the Court has come to learn of those deficiencies *sua sponte* or by motion. *See* 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

**\*5** Generally, in her opposition memorandum of law (the body of which is 28 pages in length),[FN6] Plaintiff (1) repeats numerous of the factual allegations contained in her Complaint, (2) asserts various arguments and new allegations regarding her claims of discrimination, conspiracy, retaliation, and infliction of emotional harm, (3) responds to the thirteen pleading deficiencies identified in the City Federation Defendants' above-described arguments by arguing that those

Not Reported in F.Supp.2d, 2012 WL 3996875 (N.D.N.Y.)

(Cite as: 2012 WL 3996875 (N.D.N.Y.))

deficiencies do not, or should not matter, because of (a) the other allegations in her Complaint and new allegations that she has asserted, (b) her reading of the relevant statutes (which she supports with a citation to only one case, which regards the role of temporal proximity in evaluating a causal connection), (c) definitions provided by "Merriam Webster's Online Dictionary," and (d) statements made by the Defendant City Federation's website, and (4) submits eight pages of exhibits to the Court for its consideration on the City Federation Defendants' motion to dismiss for failure to state a claim. (Dkt. No. 28, Attach.3.)

> FN6. Again, the Court will ignore Plaintiff's violation of the Court's 25–page limitation in opposition memoranda of law, out of an extension of special solicitude to her as a *pro se* civil rights litigant. *See, supra,* note 2 of this Decision and Order.

Generally, in their reply, the City Federation Defendants assert the following five arguments: (1) Plaintiff appears to agree that only her first, second, third, ninth, tenth and thirteenth claims (as described above in Part I.A. of this Decision and Order) are asserted against the City Federation Defendants; (2) based on Plaintiff's Complaint and opposition memorandum of law, it appears that each of these claims is based on the so-called "library incident"; (3) Plaintiff's subjective conclusion of racism (and the subject interpretation of her third-party declarant) is insufficient to plead a claim for racial discrimination; (4) according to Plaintiff's own factual allegations, the new "off limits" policy promulgated by one of the Human Services Defendants was directed not solely at Plaintiff but at all staff of Defendant Human Services Coalition; and (5) as previously argued in the City Federation Defendants' memorandum of law in chief, the Complaint does not allege numerous facts necessary to subject the City Federation Defendants to liability under the circumstances. (Dkt. No. 29.)

On September 12, 2011, Plaintiff attempted to file a sur-reply to the City Federation Defendants' reply. (Dkt. No. 31.) For the same reasons described above in Part I.B.1. of this Decision and Order, *the Court strikes from the docket Plaintiff's unauthorized sur-reply.*

## C. Briefing on Plaintiff's Cross–Motion for Leave to Amend

On September 22, 2011, Plaintiff filed a cross-motion for leave to file an Amended Complaint (Dkt. No. 34); and on October 17, 2011, Plaintiff filed a second cross-motion for leave to file a Second Amended Complaint (Dkt. No. 37). On October 20, 2011, the Court denied both of Plaintiff's two cross-motions for the following three reasons: (1) they failed to include a supporting affidavit; (2) the failed to identify the amendments in the proposed pleading, either through the submission of a red-lined version of the original pleading or other equivalent means; and (3) they failed to offer cause for failing to file her cross-motions to amend on or before September 12, 2011, when briefing closed on the parties' motions. (Dkt. No. 38.) After receiving further briefing from Plaintiff on the issue, the Court deemed the denial of her first two cross-motions to be without prejudice, out of special solicitude to her as a *pro se* civil rights litigant. (Text Order filed Nov. 8, 2011.)

*6 On December 2, 2011, Plaintiff filed a cross-motion for leave to file a Third Amended Complaint. (Dkt. No. 40.) Generally, liberally construed, Plaintiff's cross-motion describes the proposed amendments as follows: (1) they "clarify the Complaint and correct any mistakes that were originally made in [it]"; (2) they "add additional pertinent facts"; and/or (3) they "add violations to the Fourteenth Amendment Section 1 of the United States Constitution [sic]." (*Id.* at ¶¶ F.2., F.3., F.4.) In addition, liberally construed, Plaintiff's cross-motion argues that there has been no undue delay on her part in making the motion because, "[a]s a pro se litigant the Plaintiff was confused and unclear about the timing regarding amending the Complaint. The Plaintiff thought that she could amend the Complaint pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure at any time *before trial* with either opposing counsel [sic] or the Court's permission." (*Id.* at ¶ F.2. [emphasis in original].)

Generally, in opposition to Plaintiff's cross-motion, the City Federation Defendants argue that Plaintiff's cross-motion should be denied for the following five reasons: (1) failure to serve a proper notice of motion and provide a return date for the motion, requiring the Court to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3996875 (N.D.N.Y.)

(Cite as: 2012 WL 3996875 (N.D.N.Y.))

set a return date and briefing schedule; (2) failure to include a supporting affidavit; (3) failure to identify the amendments in the proposed Amended Complaint through either a red-lined version of the original Complaint or other equivalent means, making it virtually impossible to determine what has been retained in the original Complaint, and what has been changed; (4) failure to offer cause for failing to file her motion to amend on or before September 12, 2011, when briefing closed on the parties' motions; and (5) the futility of the proposed amendments, which neither correct the pleading defects identified in Plaintiff's existing claims against the City Federation Defendants nor state a new Fourteenth Amendment claim against them that is actionable. (Dkt. No. 41.)

Generally, in opposition to Plaintiff's cross-motion, the Human Services Defendants argue that Plaintiff's cross-motion should be denied for the same five reasons identified by the City Federation Defendants (without attempting to incorporate those arguments by reference). (Dkt. No. 42.)

On December 27, 2011, Plaintiff filed a reply in further support of her cross-motion. (Dkt. No. 43.) [FN7] Generally, in her reply, Plaintiff (1) again asserts an *ad hominem* attack against defense counsel, (2) again invokes the special solicitude ordinarily afforded to inexperienced *pro se* litigants (for example, arguing that she did not file her motion to amend before September 12, 2011, because of her confusion as a *pro se* litigant), (3) states that she "feels that [her proposed amendments to] the Third Amended Complaint [are] clear," and (4) argues that "there are no 'significant' changes" made to her original Complaint in her proposed Third Amendment Complaint (with the exception of two paragraphs therein). (*Id.*)

> FN7. Local Rule 7.1 of the Local Rules of Practice for this Court prohibits the filing of replies on non-dispositive motions (such as motions to amend) without prior leave of the Court. N.D.N.Y. L.R. 7 .1(b)(2). However, because Plaintiff failed to serve a proper notice of motion and provide a return date for the motion, the Court was required to set a return date and briefing schedule. While doing so, the Court accidently set a deadline for Plaintiff's

reply. (Text Notice filed Dec. 7, 2011.) Out of an extension of special solicitude to Plaintiff as a *pro se* civil rights litigant, the Court will consider Plaintiff's reply.

**\*7** The Court notes that, in her "reply," Plaintiff improperly addresses the merits of Defendants' initial motions, rendering that part of her proposed "reply" in actuality a sur-reply. [FN8] However, out of an extension of special solicitude to Plaintiff as a *pro se* civil rights litigant, the Court has disregarded that violation.

> FN8. *Cf. Carlwood Dev. Inc. v. U.S.,* 10–CV–1773, 2011 WL 69374, at \*1 (D.Nev. Jan. 10, 2011)* (denying petitioner's motion to strike government's improper "crossmotion"-which did not "address[ ] any matters even remotely indicative of a motion for summary judgment" but rather merely responded to the matters raised by the petitioners in their opening brief-because "rather than striking any portion of the ['cross-motion'] itself, the Court will merely construe [it] as only a response to the [petitioner's] opening brief, and not a cross-motion," and strike the government's unauthorized reply on its improper cross-motion as "nothing more than a disingenuous attempt to get the last word").

## II. GOVERNING LEGAL STANDARDS

### A. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

In his Report–Recommendation of March 4, 2011, Magistrate Judge Baxter correctly recited the legal standard governing a district court's *sua sponte* review of pleadings submitted by a plaintiff seeking to proceed *in forma pauperis,* pursuant to 28 U.S.C. § 1915(e) and Fed.R.Civ.P. 12(b)(6). (Dkt. No. 4, at 1–2.) As a result, this standard is incorporated by reference in this Decision and Order, which is intended primarily for the review of the parties. The Court would add only two brief points.

First, as the Court pointed out in its Decision and Order of May 27, 2011, the abovereferenced pleading standard applies even to *pro se* litigants. (Dkt. No. 6, at 6.)

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3996875 (N.D.N.Y.)

(Cite as: 2012 WL 3996875 (N.D.N.Y.))

While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 12 (and Fed.R.Civ.P. 8).[FN9] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 12 (and Fed.R.Civ.P. 8) are procedural rules that even *pro se* civil rights plaintiffs must follow.[FN10] Stated more simply, when a plaintiff is proceeding *pro se*, "all normal rules of pleading are not absolutely suspended." *Jackson v. Onondaga County,* 549 F. Supp .2d 204, 214, n. 28 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review) [citations omitted].

> FN9. *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 214 & n. 34 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases).

> FN10. *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

Second, under the circumstances, a few words are appropriate regarding what documents are considered when a dismissal for failure to state a claim is contemplated. Generally, when contemplating a dismissal pursuant to Fed.R.Civ.P. 12(b)(6) or Fed.R.Civ.P. 12(c), the following matters outside the four corners of the complaint may be considered without triggering the standard governing a motion for summary judgment: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case.[FN11] Moreover, in the Second Circuit, a *pro se* plaintiff's papers in response to a defendant's motion to dismiss for failure to state a claim may be considered as effectively amending the allegations of his complaint-to

the extent those papers are consistent with the allegations in the complaint.[FN12]

> FN11. *See* Fed.R.Civ.P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *L–7 Designs, Inc. v. Old Navy, LLC,* No. 10–573, 2011 WL 2135734, at *1 (2d Cir. June 1, 2011) (explaining that conversion from a motion to dismiss for failure to state a claim to a motion for summary judgment is not necessary under Fed.R.Civ.P. 12[d] if the "matters outside the pleadings" in consist of [1] documents attached to the complaint or answer, [2] documents incorporated by reference in the complaint (and provided by the parties), [3] documents that, although not incorporated by reference, are "integral" to the complaint, or [4] any matter of which the court can take judicial notice for the factual background of the case); *DiFolco v. MSNBC Cable L.L. C.,* 622 F.3d 104, 111 (2d Cir.2010) (explaining that a district court considering a dismissal pursuant to Fed. R. Civ. 12(b)(6) "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.... Where a document is not incorporated by reference, the court may neverless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document 'integral' to the complaint.... However, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document.") [internal quotation marks and citations omitted]; *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2009) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (internal quotation marks and citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3996875 (N.D.N.Y.)

(Cite as: 2012 WL 3996875 (N.D.N.Y.))

Cir.1995) (per curiam) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint," the court may nevertheless take the document into consideration in deciding [a] defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (internal quotation marks and citation omitted).

FN12. *See Drake v. Delta Air Lines, Inc.,* 147 F.3d 169, 170 n. 1 (2d Cir.1998) (per curiam) ("[W]e deem Drake's complaint to include the facts contained in his memorandum of law filed in response to Delta's 1996 motion to dismiss."); *Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) ( "In his affidavit submitted in opposition to defendants' motion to dismiss, Gill asserts that Mooney's actions amounted to deliberate and willful indifference. Liberally construed under *pro se* pleading standards, Gill's allegations against Mooney involve more than ordinary lack of due care for the prisoner's interests or safety, ... and therefore state a colorable claim under the Eighth and Fourteenth Amendments.") (internal quotation marks and citation omitted); *Donhauser v.Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.) (Sharpe, M.J.) ("[I]n cases where *a pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside of the complaint to the extent they "are consistent with the allegations in the complaint.") (collecting district court cases), *vacated on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004) (Hurd, J.).

## B. Legal Standards Governing Plaintiff's Claims and Defendants' Defenses

**\*8** Because Defendants have demonstrated, in their memoranda of law, an accurate understanding of the relevant points of law contained in the legal standards governing Plaintiff's claims and their own defenses in this action, the Court will not recite, in their entirety, those legal standards in this Decision and Order, which (again) is intended primarily for review by the parties. (*See*

*generally* Dkt. No. 18, Attach. 1; Dkt. No. 23, Attach. 1; Dkt. No. 29; Dkt. No. 30.)

## C. Legal Standard Governing Motion to Amend

Motions for leave to amend a complaint are governed by Fed.R.Civ.P. 15, which states that leave to amend should be freely given "when justice so requires." Fed.R.Civ.P. 15(a)(2); *Foman v. Davis,* 371 U.S. 178, 182 (1962); *Manson v. Stacescu,* 11 F.3d 1127, 1133 (2d Cir.1993). Nevertheless, leave to amend a complaint is not automatic; and a court may deny a motion for leave to amend where there is an apparent or declared reason not to grant leave to amend, "such as [1] undue delay, bad faith or dilatory motive on the part of the movant, [2] repeated failure to cure deficiencies by amendments previously allowed, [3] undue prejudice to the opposing party by virtue of the allowance of the amendment, [4] futility of amendment, etc." *Foman,* 371 U.S. at 182; *S.S. Silberblatt, Inc. v. E. Harlem Pilot Block–Bldg. 1 Hous.,* 608 F.2d 28, 42 (2d Cir.1979).

With regard to the first factor described above (i.e., undue delay, bad faith or dilatory motive on the part of the movant), the Court notes that, where a motion is so belated as to violate a scheduling order, an additional requirement of good cause is imposed on the movant. *See Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 340 (2d Cir.2000) ("[D]espite the lenient standard of Rule 15(a), a district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause."); Fed.R.Civ.P. 16(b)(4), (f)(C) ("A schedule may be modified only for good cause and with the judge's consent.... On motion or its own, the court may issue any just orders ... if a party or its attorney ... fails to obey a scheduling or other pretrial order.").

Finally, in this District, a motion for leave to amend a pleading must (1) attach an unsigned copy of the proposed amended pleading, and (2) set forth specifically the proposed amendments, and identify the amendments in the proposed pleading, either through the submission of a red-lined version of the original pleading or other equivalent means. N.D.N.Y. L.R. 7.1(a)(4).

## III. ANALYSIS

## A. Human Services Defendants' Motion to Dismiss

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3996875 (N.D.N.Y.)

(Cite as: 2012 WL 3996875 (N.D.N.Y.))

After carefully considering the matter, the Court finds that the Human Services Defendants' motion to dismiss should be granted for each of the numerous alternative reasons stated in their memoranda of law. (Dkt. No. 18, Attach. 1; Dkt. No. 30.) *See also, supra,* Part I.A. of this Decision and Order. The Court would add only the following six points.

**\*9** First, even when construed with the utmost of special liberality, Plaintiff's Complaint does not allege that the so-called "library incident" occurred because *she* was Black, but because *her client* was Black. As an initial matter, any claims that Plaintiff is attempting to assert on behalf of a third-party have already been dismissed. (Dkt.Nos.4, 6.) In any event, the Complaint contains no facts plausibly suggesting that the "library incident" actually occurred because Plaintiff's client was Black. Granted, the Complaint alleges that Plaintiff had never been stopped during the previous unspecified times she interviewed clients who were White.[FN13] However, the otherwise-detailed Complaint is conspicuously devoid of any factual allegation plausibly suggesting that Plaintiff had been *seen* by Defendants Swayze and Johnson (or any Defendant) interviewing White clients in the library.

> FN13. For the sake of brevity, the Court will set aside the fact that any such interviews could have occurred during the year or so of part-time work that Plaintiff had performed for Defendant Human Services Coalition before the incident. (*See* Dkt. No. 1, at ¶¶ 6, 22, 28, 29, 67.)

Second, even if the Complaint could somehow be liberally construed as alleging that the "library incident" occurred because *Plaintiff* was Black, there are no facts plausibly suggesting that fact. Granted, the Complaint alleges that the library had been "often used" for such meetings (Dkt. No. 1, at ¶ 30), and that all other employees of Defendant Human Services Coalition are White (*id.* at ¶ 63). However, the otherwise-detailed Complaint is conspicuously devoid of any factual allegation plausibly suggesting that the library had been used by any of the White employees; rather, the Complaint allege facts plausibly suggesting that it was Plaintiff *herself* who had previously used the library. (*See, e.g.,*

Dkt. No. 1, at ¶ 36.) In any event, and more important, the otherwise-detailed Complaint is conspicuously devoid of any factual allegation plausibly suggesting that the White employees were *seen* interviewing White clients in the library, and permitted to continue to do so, by Defendants Swayze and Johnson (or by any Defendant).

Third, if anything, the factual allegations of the Complaint plausibly suggest that Plaintiff was asked not to use the library by Defendant Swayze because Defendant Human Services Coalition neither owned nor lease that space. (Dkt. No. 1, at ¶¶ 11, 12, 20, 21, 30–32, 34.)

Fourth, despite Plaintiff's subjective perceptions, even when construed with the utmost of special liberality, Plaintiff's Complaint does not allege facts plausibly suggesting (1) that any Defendant in this action reprimanded Plaintiff because of her race,[FN14] (2) that any Defendant in this action delayed Plaintiff access to her personnel file due to either her race or her complaint to the USDOL,[FN15] (3) that any Defendant in this action caused Experience Works to change Plaintiff's host agency from Defendant Human Services Coalition to another agency due to either Plaintiff's race or her complaint to the USDOL, or (4) more important, that such a reprimand, delay or transfer harmed her sufficient to chill her speech.

> FN14. For example, Plaintiff's Complaint alleges that her manager had reacted negatively when a White intern had not called in (or even emailed her) prior to failing to show up for work (plausibly suggesting that the notification procedure applied to White employees as well). (Dkt. No. 1, at ¶¶ 62–64.) Moreover, Plaintiff's Complaint alleges facts plausibly suggesting that Plaintiff's manager reprimanded her in part because she (with reason) believed that Plaintiff had misrepresented why she was taking the time off. (*Id.* at ¶¶ 57–61.)

> FN15. For example, Plaintiff's Complaint alleges that the delay in access to her personnel file was caused not by any Defendant in this action but by Defendant Human Services Coalition's "attorneys." (Dkt. No. 1, at ¶¶ 42.b., 42.c., 42.d.)

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3996875 (N.D.N.Y.)

(Cite as: 2012 WL 3996875 (N.D.N.Y.))

**\*10** Fifth, while under certain circumstances documents outside the four corners of a complaint may be considered by a court when contemplating a dismissal for failure to state a claim (*see, supra,* Part II.A. of this Decision and Order), the Court finds that those circumstances are not present in this case, except with regard to the following documents: (1) Plaintiff's letter to Defendant Dillon dated February 7, 2011, which is referenced in Paragraph 42.f. of her Complaint and provided in her response; (2) Plaintiff's email to certain Defendants on January 27, 2011, which appears to be referenced in Paragraph 85 of her Complaint and is provided in her response; (3) the "Referral Call Specialist Handbook," which is referenced in Paragraph 66 of her Complaint and appears to be provided in her response; and (4) the "SCSEP Host Agency Agreement," which appears to be the "contract" referenced in her Complaint and is provided in her response. In any event, even if *all* the documents in question were considered, the documents would not correct the pleading defects in Plaintiff's claims.[FN16]

> [FN16.] For example, Plaintiff's response papers contain an email message that she sent to various Defendants on January 27, 2011, indicating that it was she herself who offered to give to Defendants the letter of complaint she submitted to the USDOL (contrary to her allegation that, on January 28, 2011, certain Defendants asked to see the letter of complaint she submitted to the USDOL, *see* Dkt. No. 1, at ¶ 42.b.). (Dkt. No. 27, Attach. 17, at 2.) Moreover, Plaintiff's response papers contain two email messages indicating that (1) Plaintiff herself did not receive a written reprimand after failing to follow the notification procedure in question on May 14, 2010, and (2) she failed to follow the notification procedure in question also on December 15, 2010 (plausibly suggesting that it was not race but repetitiveness that played a role in the decision to issue her a written reprimand when she failed to follow the notification procedure in January 2011). (Dkt. No. 27, Attach. 10, at 2–3.) Furthermore, Plaintiff's response papers contain a letter she promptly sent to Defendant Dillon following the incidents

of January and February 2011, threatening to sue if her numerous demands were not met (plausibly suggesting that the alleged adverse action she experienced did not in any way chill her speech). (Dkt. No. 27, Attach. 12, at 3–5.)

Sixth, and finally, while a *pro se* plaintiff's papers in response to a defendant's motion to dismiss for failure to state a claim may sometimes be considered as effectively amending the allegations of his complaint to the extent those papers are consistent with the allegations in the complaint (*see, supra,* Part II.A. of this Decision and Order), the Court finds that such consideration is not appropriate in this case (which involves an 88–paragraph Complaint, some 75 pages of response briefs and 71 pages of exhibits, and a cross-motion to leave to amend). In any event, even if the Court were to so consider those response papers, they are either (1) so conspicuously absent from Plaintiff's detailed Complaint as to be inconsistent with that Complaint or (2) insufficient to correct the pleading defects in Plaintiff's claims.[FN17]

> [FN17.] For example, Plaintiff's response papers do not describe the name of any White employee who did *not* receive a written reprimand after failing to follow the notification procedure in question on a specific date. (*See generally* Dkt. No. 27.)

For all of these reasons, the Court grants the Human Services Defendants' motion to dismiss.

**B. City Federation Defendants' Motion to Dismiss**

After carefully considering the matter, the Court finds that the City Federation Defendants' motion to dismiss should be granted for each of the numerous alternative reasons stated in their memoranda of law. (Dkt. No. 23, Attach. 1; Dkt. No. 29.) *See also, supra,* Part I.B. of this Decision and Order. The Court would add to this analysis the six points stated above in Part III.A. of this Decision and Order.

For all of these reasons, the Court grants the City Federation Defendants' motion to dismiss.

**C. Plaintiff's Cross–Motion for Leave to Amend**

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3996875 (N.D.N.Y.)

(Cite as: 2012 WL 3996875 (N.D.N.Y.))

After carefully considering the matter, the Court finds that Plaintiff's cross-motion to amend should be denied for each of the numerous alternative reasons stated Defendants' opposition memoranda of law. (Dkt.Nos.41, 42.) *See also, supra,* Part I.C. of this Decision and Order. The Court would add only the following two points.

**\*11** First, neither Plaintiff's initial motion papers nor her reply on that motion is supported by an affidavit, in violation of Local Rule 7.1(a)(2). Rather, the one-page "affidavit" submitted by Plaintiff with her initial motion papers is neither notarized nor sworn to pursuant to 28 U.S.C. § 1746. (Dkt. No. 40, at 6–7.) In any event, all the "affidavit" states is "I, Saraiya Solomon affirm that I am the Plaintiff in the above entitled action; and respectfully request this Court to grant the Plaintiff's Motion for Leave to Amend the Complaint; and that statements made in the Complaint are true to the best of the Plaintiff's knowledge." (*Id.*) The "affidavit" does not contain the factual and procedural background that is relevant to her motion (for example, an explanation of her failure to file the motion before December 2, 2011) as required by Local Rule 7.1(a)(2), nor does it specifically set forth each of the proposed amendments in an effort to comply with Local Rule 7.1(a)(4). Moreover, the "affidavit" provided by Plaintiff in her reply is substantively the same as the one she provided in her underlying cross-motion. (Dkt. No. 43, Attach. 1, at 1–2.) It too does not contain the factual and procedural background that is relevant to her motion as required by Local Rule 7.1(a)(2), nor does it specifically set forth each of the proposed amendments in an effort to comply with Local Rule 7.1(a)(4). (*Id.*) Plaintiff's failure to provide an affidavit with her reply is simply unforgivable, given that she had been advised of her need for an affidavit at least *six* times before filing her reply.[FN18]

> FN18. More specifically, the Court finds that Plaintiff received notice of the need for an affidavit, through the following: (1) her receipt of a courtesy copy of the District's Local Rules of Practice, on March 7, 2011 (Dkt. No. 5); (2) her receipt of a courtesy copy of the District's *Pro Se* Handbook, on March 7, 2011 (Dkt. No. 5); (3) her receipt of the Court's Decision and Order of October 20, 2011 (Dkt. No. 38); (4) her receipt of the Court's Text Order of November 8, 2011; (5) her receipt of the City Federation Defendants'

opposition memorandum of law dated December 13, 2011 (Dkt. No. 41); and (6) her receipt of the Human Services Defendants' opposition memorandum of law dated December 19, 2011 (Dkt. No. 42).

Similarly, neither Plaintiff's initial motion papers nor her reply on that motion identifies the amendments in her proposed Third Amended Complaint, either through the submission of a red-lined version of her original Complaint or other equivalent means, in violation of Local Rule 7.1(a)(4). Rather, the "red-lined" version of the original Complaint submitted by Plaintiff simply contains a continuous line through *every* word in the second through eighth-eighth paragraphs of that Complaint. (Dkt. No. 40, at 9–25.) Simply stated, that version does not identify the specific changes that Plaintiff is proposing. (*Id.*) Again, her failure to provide such a version of her original Complaint with her reply is simply unforgivable, given that she had advised of the need for that version at least *six* times in this action.[FN19] While the Court may be inclined to excuse certain procedural violations (*see, supra,* Part I of this Decision and Order), the Court need not, and does not, excuse these violations, which impermissibly shift onto the Court (and opposing counsel) the heavy burden of attempting to discern, at their own peril, the proposed amendments to a lengthy and complex complaint.

> FN19. Specifically, the Court finds that Plaintiff received notice of the need for such a version of her original Complaint, through the following: (1) her receipt of a courtesy copy of the District's Local Rules of Practice, on March 7, 2011 (Dkt. No. 5); (2) her receipt of the Court's Decision and Order of October 20, 2011 (Dkt. No. 38); (3) her receipt of the Human Services Defendants' brief in opposition to her first motion to amend, dated October 17, 2011; (4) her receipt of the Court's Text Order of November 8, 2011; (5) her receipt of the City Federation Defendants' opposition memorandum of law dated December 13, 2011 (Dkt. No. 41); and (6) her receipt of the Human Services Defendants' opposition memorandum of law dated December 19, 2011 (Dkt. No. 42).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3996875 (N.D.N.Y.)

(Cite as: 2012 WL 3996875 (N.D.N.Y.))

For these reasons, the Court can, and does, base its denial of Plaintiff's cross-motion on the ground that she has willfully failed to (1) provide an affidavit and (2) identify the amendments in the proposed Third Amended Complaint, either through the submission of a redlined version of her original Complaint or other equivalent means.

**\*12** Second, in any event, the following relevant factors weigh decidedly against granting Plaintiff's cross-motion under the circumstances: (1) Plaintiff has failed to sufficiently explain why she waited until December 2, 2011, to bring her cross-motion, which was due as early as August 29, 2011 (the deadline for her opposition to Defendants' initial motions to dismiss),[FN20] and at the very latest on September 12, 2011, when the Court closed the briefing on the parties' motions;[FN21] (2) Plaintiff already had a fair opportunity to correct the pleading deficiencies in question, through her submission of *three* proposed amended complaints; (3) Defendants would be unduly prejudiced as a result of (a) the fact that they have already spent the time and incurred the expense of filing two separate motions to dismiss, and (b) the fact that as many as two years have now elapsed since the events giving rise to Plaintiff's proposed amendments (possibly affecting the memories of the numerous parties in the case, the ability to locate witnesses, and/or the preservation of evidence);[FN22] and (4) Plaintiff's proposed amendments are futile in that they fail to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b) (6).

FN20. *See* N.D.N.Y. 7.1(c) ("If a party makes a cross-motion, it must join its cross motion brief with its opposition brief, and this combined brief may not exceed twenty-five (25) pages in length, exclusive of exhibits. A separate brief in opposition to the original motion is not permissible."); *see, e.g., Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir.2007)* (characterizing plaintiff's motion to amend, filed in response to motion to defendants' motion to dismiss under Fed.R.Civ.P. 12[b] [6] as a "cross-motion"); *Deluca v. AccessIT Group, Inc., 695 F.Supp.2d 54, 57 (S.D.N.Y.2010)*

(characterizing plaintiff's motion to amend, filed in response to motion to defendants' motion to dismiss under Fed.R.Civ.P. 12[b][6] as a "cross-motion"). The Court notes that Plaintiff's failure to combine her briefing on her crossmotion with her briefing in opposition to Defendants' motions, as required by Local Rule 7.1(c), has unnecessarily confused and multiplied the issues presented by the parties' motions. The Court notes also that Plaintiff had been informed of that requirement before the time in question, through her receipt of a courtesy copy of the District's *Pro* Se Handbook and Local Rules of Practice.

FN21. The Court notes that the explanation Plaintiff proffered on December 2, 2011 (i.e., that she "thought that she could amend the Complaint pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure at any time *before trial* with either opposing counsel [sic] or the Court's permission") does not make sense, because (1) it acknowledges that, in the absence of opposing counsel's consent, permission to amend would need to be obtained from the Court *by motion,* (2) the deadline for such motions was September 12, 2011, and (3) in any event, its simply strains credulity to believe that Plaintiff, who litigated at least three other federal civil rights actions before filing the current one, did not know that the timeliness of a motion to amend is one of the factors to be considered in deciding such a motion.

FN22. *Cf. Barber v. U.S.,* 11–CV–1100, 2012 WL 1681978, at \*1 (N.D.N.Y. May 14, 2012) (Suddaby, J.) ("[T]he prejudice posed to Defendant by Plaintiff's failure to prosecute is exacerbated somewhat by the age of the case (which arises from events allegedly occurring as far back as 2009) and the number of events giving rise to the case. Under the circumstances, a further delay may well affect the memories of the numerous parties (and presumably witnesses) in the case, the ability to locate witnesses, and the preservation of evidence (particularly

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3996875 (N.D.N.Y.)

(Cite as: 2012 WL 3996875 (N.D.N.Y.))

documentary evidence regarding the housing sale in question)."); *Geordiadis v. First Boston Corp.,* 167 F.R.D. 24, 25 (S.D.N.Y.1996) ("The passage of time always threatens difficulty as memories fade. Given the age of this case, that problem probably is severe already. The additional delay that plaintiff has caused here can only make matters worse.").

For these reasons, the Court can, and does, base its denial of Plaintiff's cross-motion on the alternative ground that the relevant factors-articulated in *Foman v. Davis,* 371 U.S. 178, 182 (1962)-weigh decidedly against granting that cross-motion.

**ACCORDINGLY,** it is

**ORDERED** that the Clerk of the Court shall *STRIKE* from the docket Plaintiff's unauthorized sur-reply (Dkt. No. 31) with regard to the City Federation Defendants' motion to dismiss; and it is further

**ORDERED** that the Clerk of the Court shall ***STRIKE*** from the docket Plaintiff's unauthorized sur-reply (Dkt. No. 32) with regard to the Human Services Defendants' motion to dismiss; and it is further

**ORDERED** that the Human Services Defendants' motion to dismiss (Dkt. No. 18) is ***GRANTED;*** and it is further

**ORDERED** that the City Federation Defendants' motion to dismiss (Dkt. No. 23) is ***GRANTED;*** and it is further

**ORDERED** that Plaintiff's cross-motion to amend (Dkt. No. 40) is ***DENIED.***

The Clerk of the Court is directed to issue a Judgment for Defendants and close this action.

*The Court hereby certifies, for purposes of 28 U.S.C. § 1915(a) (3), that any appeal taken from the Court's final judgment in this action would not be taken in good faith.*

N.D.N.Y.,2012.

Solomon v. Human Services Coalition of Tompkins County Inc.
Not Reported in F.Supp.2d, 2012 WL 3996875 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.